**REDACTED**

THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * * * * * * * *    *
                                           *
DENISE EVARTS,                             *
    Plaintiff,                             *
                                           *
V.                                         *  CIV. ACTION NO. 3:00CV1124(JCH)
                                           *
THE SOUTHERN NEW                           *
ENGLAND TELEPHONE                          *
COMPANY,                                   *
                                           *
    Defendant.                             *  JUNE 20, 2005
                                           *
* * * * * * * * * * * * * * * * * * * *    *
```

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff is a former employee of defendant Southern New England Telephone Company

("SNET") who resigned from her job as a technician with the company eight years ago, in May, 1997.

In her single-count Complaint, plaintiff alleges that she was discriminated against and/or subjected

to a hostile work environment because of her gender. Her claim is brought pursuant to Title VII of

the Civil Rights Act of 1964, as amended, and Connecticut General Statutes § 46a-60(a)(1), a section

of the state Fair Employment Practices Act ("FEPA").

Plaintiff's claims are based exclusively upon complaints that she has about the way her

supervisor, Matt Cordner, managed her work, including on one occasion giving her a verbal warning,

the lowest form of discipline at SNET. She does not claim that she was subjected to an adverse

employment action such as a termination, demotion, suspension, or failure to promote. As the facts

below make clear, plaintiff was not discriminated against because of her sex. Instead, she became

tired of her job, which she had been doing for eight years, unsuccessfully tried to get her second-level manager, Ed Dillman, to lay her off, even before Mr. Cordner became her supervisor, and then ultimately resigned and brought this claim against the company.

The Court should grant summary judgment in favor of SNET because there is no genuine issue of material fact to be tried. To the extent that plaintiff is claiming SNET took a job action against her because of her gender, the Court should grant summary judgment because plaintiff did not experience an adverse employment action, there is no evidence in the record of this case that plaintiff was discriminated against because of her gender, and plaintiff cannot rebut SNET's legitimate, non-discriminatory reasons for its actions.

To the extent plaintiff is claiming that she was subjected to an unlawfully hostile work environment due to gender, the Court should grant summary judgment because plaintiff's claims do not constitute "severe or pervasive" harassment, there is no evidence that plaintiff was harassed because of her gender, and because plaintiff unreasonably failed to take advantage of remedial procedures SNET had in place.

## II.    STATEMENT OF FACTS

### A.    Background

SNET is a regional provider of a wide range of telecommunications services to businesses and private residences in Connecticut. The company employs approximately 7,400 persons at various locations throughout the state. Plaintiff was employed as part of SNET's New Haven Payphone Services Installation and Repair group ("Payphone Services"), which installed and repaired pay telephones. Pl. Dep. Vol. I at 25-26. She worked out of the SNET garage in New Haven. Pl. Dep. Vol. II at 70. Plaintiff was initially hired in 1987 as a repair service clerk and was promoted to

2

service technician in 1989. Pl. Dep. Vol. I at 26. As a service technician, plaintiff installed, repaired, and maintained coin-operated telephones and associated network facilities. She received regular pay increases and remained in that position until she resigned in May 1997. At the time she resigned in 1997, she was earning ▮▮▮▮▮▮ plus overtime.

Because they are usually in the field, service technicians are expected to work with autonomy while abiding by company policies and standards even without constant oversight. Plaintiff, like other technicians, was at all times a member of the Connecticut Union of Telephone Workers (the "Union"), and the terms and conditions of her employment were governed by a collective bargaining agreement between SNET and the Union. Pl. Dep. Vol. II at 138.

1.    Plaintiff's Early Employment With SNET.

Plaintiff began working as a service technician in 1989. Prior to that, while employed by SNET, she obtained a Bachelor's degree from Teikyo Post University majoring in business management; her tuition was reimbursed by SNET. Pl. Dep. Vol. I at 19-20. The year before that, in 1988, plaintiff's then-supervisor, Wanda Lewis (female), noted in her personnel file that plaintiff had difficulty accepting supervision. Ms. Lewis wrote,



Exh. 11 (authenticated at Cordner Aff. ¶ 33). Ms. Lewis made this notation after ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ This was long before plaintiff worked with Matt Cordner and long before any of the events about which she complains in this case.

After she transferred to the service technician job, until 1989 plaintiff's supervisor was Crystal White. Pl. Dep. Vol. II at 80. Plaintiff has no complaints about Ms. White as a supervisor or about any events occurring during that time. In 1989, Pat Kinsella (male) took over for Ms. White. Pl. Dep. Vol. I at 57. Again, plaintiff has no complaints about Mr. Kinsella as a supervisor or about any events occurring during that time. Plaintiff has testified that she thought Mr. Kinsella was a good supervisor. Pl. Dep. Vol. I at 34.

Prior to 1996, before Matt Cordner joined her work group, the truth is that plaintiff had become tired of her technician job and wanted a career change. During that time, she applied to transfer to several other positions at SNET, but several times was unable to pass the qualifying tests. Exh. 7 (transfer requests indicating plaintiff repeatedly attempted to transfer out of her job as early as 1994); Pl. Dep. Vol. II at 28-29; Pl. Dep. Vol. I at 46-50. Also, before Matt Cordner joined her group and became her supervisor in mid-1996, plaintiff told Ed Dillman, manager of the Payphone Services team, that she wanted to leave her position. Dillman Aff. ¶¶ 4, 6. She told him that she had tried to transfer to other positions in SNET but kept failing the tests. As attested to by Mr. Dillman, plaintiff communicated her desire to leave her position and her frustration with not meeting the qualifications for other jobs well before Mr. Cordner became her supervisor. Dillman Aff. ¶¶ 4, 6.

2.  **In 1996, Plaintiff Was Angry that SNET Did Not Create an Office in North Madison for Her.**

In July 1996, Matt Cordner joined the Payphone Services team and replaced Mr. Kinsella as plaintiff's supervisor. Complaint at ¶ 8. According to plaintiff, soon after Mr. Cordner became her supervisor, he informed her that he would not establish a special "satellite office" in North Madison that would have allowed a service technician to work out of North Madison rather than the New

4

Haven garage. Pl. Dep. Vol. II at 171.[1] According to plaintiff, Crystal White had first raised the idea of plaintiff working out of the Madison satellite office years earlier,[2] and "promised" her she could move there if no one with greater seniority wanted it, Pl. Dep. Vol. II at 79, 84-85; Pl. Dep. Vol. I at 55-56, and Mr. Kinsella had told plaintiff that he was "working on" what White had thought was a good idea. Pl. Dep. Vol. I at 58; Pl. Dep. Vol. II at 83-84. Plaintiff admits, however, that there has never been an SNET coin satellite office in North Madison as far as she knows. Pl. Dep. Vol. II at 73. She also admits that she does not know whether Mr. Kinsella ever actually had approval to open a satellite office in North Madison, Pl. Dep. Vol. I at 58-59, and that there were no details regarding when plaintiff would start, Pl. Dep. Vol. I at 59-60. Notably, although Mr. Kinsella was plaintiff's supervisor for several years after the idea was allegedly formulated by her prior supervisor, it is undisputed that Mr. Kinsella never opened a satellite office there for her; she was very clear at her deposition that, notwithstanding Mr. Kinsella's inaction, she does not believe he discriminated against her in any way and believes he was a good supervisor. Pl. Dep. Vol. II at 81.

Plaintiff alleges that soon after Mr. Cordner took over for Kinsella, Mr. Cordner told plaintiff that he had analyzed the situation based on business needs and had determined that there wasn't enough work in North Madison to justify creating a satellite office there. Pl. Dep. Vol. I. at 60-62. Mr. Cordner has attested that he analyzed the situation and determined that there was insufficient business in the immediate area to justify creating a satellite office for a service technician. Cordner

[1]     Plaintiff apparently wanted the company to create a satellite office in North Madison and wanted to be the service technician allowed to report there. Had plaintiff been allowed to work out of North Madison, she estimated that her commute would have been fifteen to twenty minutes instead of thirty minutes. Pl. Dep. Vol. II at 72-73, 76-77.

[2]  This had to be before 1989, as that is when Ms. White stopped being plaintiff's supervisor.

5

Dep. at 44-50. However, he did conclude that there was a sufficient volume of business to create a satellite office in Guilford. He offered such an arrangement to plaintiff, but she was not interested. Pl. Dep. Vol. II at 77; Pl. Dep. Vol. I at 66. Plaintiff admits she was given this opportunity by Mr. Cordner but declined it. Pl. Dep. Vol. I at 66.

Plaintiff spoke to her union representative, David Iannielo about the situation, but plaintiff never asked for a grievance to be filed or requested that the Union follow up on her behalf. Pl. Dep. Vol. I at 64.

Plaintiff acknowledges that even if SNET had created a satellite office in North Madison, it is not clear that plaintiff would have been assigned to it, because it would have been offered according to seniority as specified in the Union contract. She further admits that there were a number of co-workers with more seniority than she had. Pl. Dep. Vol. II at 77-79.

Plaintiff acknowledges that she was angry and upset with Mr. Cordner "from the minute he became [her] supervisor," largely because of the satellite office issue. Pl. Dep. Vol. II at 171-172.

3.    **Matt Cordner Discouraged Plaintiff From Resigning From SNET to Care For Her Ill Sister, and Urged her to Consider a Leave of Absence From Work Instead.**

During the same time period as the satellite office was being discussed, a few months after Mr. Cordner became supervisor of he Payphone Services group, plaintiff approached him and told him that she was going to resign because of an illness in her family. Cordner Aff. ¶ 7. She said she believed she could not continue working because her sister had learned she was seriously ill with cancer. Cordner Aff. ¶ 7. Mr. Cordner told plaintiff to go home for the day and be with her family. He also urged plaintiff to look into the possibility of taking a leave of absence rather than resigning. Cordner Aff. ¶ 7.

6

In November 1996, plaintiff began a leave of absence to be with her sister. Complaint ¶ 12a. Although plaintiff was not entitled to a leave of absence under the state or federal Family Medical Leave Act,[3] Mr. Cordner supported her request and SNET allowed plaintiff to go on a leave of absence beginning in November 1996 and ending in late January 1997. Complaint ¶ 12a. Plaintiff wished to work some days during this period and, rather than insist on a firm work schedule, Mr. Cordner allowed her to come to work whenever she wished simply by calling him and notifying him the day before that she would be in. Cordner Aff. ¶ 8. Because employees are not paid for holidays unless they work the day before the holiday, he specifically arranged for her to be able to work the days before Christmas and New Year's so that plaintiff would receive holiday pay for the holidays. Cordner Aff. ¶ 8.

Tragically, plaintiff's sister passed away on January 12, 1997. Although SNET's normal bereavement policy permitted Ms. Evarts to take three days off with pay thereafter, Mr. Cordner arranged to allow her to be out an additional week. Cordner Aff. ¶ 9; Cordner Dep. at 56. Ms. Evarts did not return to work on the day scheduled, January 20, 1997. She did not call the garage to let anyone know her status. When Mr. Cordner called her, she indicated she was not ready to return, and Mr. Cordner arranged for her to take an unscheduled paid vacation until she indicated she was ready to return, which she did on January 27, 1997. Cordner Aff. ¶ 10; Complaint ¶ 12b. It is undisputed that plaintiff was excused for all of her absences related to her sister's illness and death and she makes no claim in this case that anyone at SNET treated her poorly or unfairly because of this leave of absence. Pl. Dep. Vol. I at 74-78.

---

[3]    Plaintiff is under the erroneous belief that she was entitled to this leave under the Family Medical Leave Act. Pl. Dep. Vol. I at 74-78. That Act does not apply, however, to leaves of absence connected to the illness of a sibling.

4.    **Plaintiff Returned to Work on January 27, 1997, and Mr. Corder Spent Time Reacquainting Her With Her Job.**

Shortly after plaintiff returned to work, Mr. Cordner went on a "ride-along exercise" with her, which involves a supervisor of a field employee spending a day with a technician "riding along" with him/her and offering constructive feedback. At her deposition, plaintiff described a ride-along exercise as follows: "they [supervisors] just ride with you in the truck and they follow you around to your jobs and watch you do your work." Pl. Dep. Vol. I at 86. Although plaintiff complains in this case about Mr. Cordner observing her performance in this way after she returned from her leave of absence, she acknowledges that she did not receive any kind of warning, discipline, or significant criticism that she can recall as a result of the ride-along exercise. Pl. Dep. Vol. I at 91; Pl. Dep. Vol. II at 122-23. Although she admits her work performance was not up to par at that time because of her recent absence, she acknowledges that she has no basis for believing that Mr. Cordner criticized her performance based on the ride-along. Pl. Dep. Vol. II at 122-23. She did not receive any warnings based on the exercise, and in response to questions about whether Mr. Cordner was unfair to her in any way during the exercise, she responded only that he was "picky" when he suggested taking a shorter route to one of her job sites. Pl. Dep. Vol. II at 122-123.

Plaintiff believes that she may have orally complained to her union representative, Dave Iannielo, about the ride-a-long but she did not file a grievance. Pl. Dep. Vol. I at 96-97. Plaintiff does not believe she complained to Ed Dillman. Pl. Dep. Vol. I at 97.

8

5.    **Like a Male Co-Worker, Plaintiff's Continued Excessive Cell Phone Usage Resulted in Her Company Cell Phone Being Taken Away for a Month.**

In 1996 and 1997, SNET had begun to provide its service technicians with cell phones for business-related use only when other telephones were not available.[4]  SNET's policy, which was communicated to plaintiff, is that employees should not use their cell phones for personal calls and that total usage should not exceed 300 minutes per month. Cordner Aff. ¶ 20; Cordner Dep. at 70-71. Plaintiff was aware "they didn't want you going over 300," even though she says she had not seen any written policy. Pl. Dep. Vol. II at 133.

It is undisputed that both before and after plaintiff took her leave of absence, she regularly violated SNET's policy by consistently exceeding the 300 minute limit. In fact, plaintiff had exceeded the 300 minute limit in six of the ten full months she worked in 1996.[5]  Dillman Aff. ¶ 8; Exh. 4 (authenticated at Cordner Aff. ¶ 22). Although Mr. Cordner counseled plaintiff informally about this problem in 1996 and again in the beginning of 1997, plaintiff exceeded the 300 minute limit again in January and February of 1997, after she had returned to work full-time following her leave of absence. She had 366 minutes of cell phone usage in January, 1997; 334 minutes in February, 1997; and 378 minutes in May, 1997. Exh. 4; Dillman Aff. ¶ 8. Her usage and the usage of a male technician who similarly had his cell phone removed (twice) during this period were more excessive than any of their nine co-workers. Exh. 4.

---

[4]    During this period, the cost of cell phone usage was substantially higher than the use of landline telephones. Cordner Aff. ¶ 19.

[5]    Plaintiff only worked part of November and did not work at all in December because of the leave of absence she took in connection with her sister's illness.

Mr. Cordner did not discipline plaintiff because of excessive cell phone usage. Instead, he talked to her and reminded her about the limitation, although the limitation had already been discussed multiple times in group meetings. Cordner Aff. ¶ 22. Finally, Mr. Cordner removed plaintiff's access to her cell phone for a month, because she continued to exceed the usage limitation.[6] Accordingly, Mr. Cordner made the decision to remove plaintiff's company cell phone for the month of March 1997. Plaintiff does not dispute that she exceeded the 300 minute limitation or that she used her cell phone for personal reasons during this time, notwithstanding the company policy. Pl. Dep. Vol. I at 104-06, 109-10, 135-36; Pl. Dep. Vol. II at 54. Plaintiff was not suspended or demoted, nor was she disciplined in any way concerning cell phone usage. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

### 6.    Plaintiff Persisted in Leaving Her Company SNET Vehicle Unlocked and Received a Verbal Warning.

During the relevant time, SNET had a policy requiring service technicians to keep their vehicles locked whenever the vehicles were unattended. Exhs. 1, 6; Cordner Aff. ¶¶ 11, 12. During the time when plaintiff worked with Mr. Cordner, the policy stated, "[I]f unattended, [company] vehicle[s] should be secured by locking doors and windows." Exh. 1; Cordner Aff. ¶ 11. Similarly, the policy entitled "Safeguarding Procedures for Services Technicians and Public Services Assistants," which plaintiff signed in 1994, stated that the procedure included "[c]losing all windows, locking all doors and removing of ignition key when leaving vehicle unattended." Exh. 6

---

[6]    Notably, when the cell phone was returned to her, she continued to exceed the limitation, showing 378 minutes of usage in the following month. Again, plaintiff simply refused to abide by departmental policy with respect to this issue.

10

(authenticated at Cordner Aff. ¶ 28). That policy also stated that violation of the procedure was "sufficient cause for disciplinary actions up to and including dismissal . . . ." Exh. 6. The policies applied both when the vehicles were in the field and when they were parked in the garage. Cordner Aff. ¶ 11. Locking the vehicles was particularly important when coins from the payphones were in the vehicles, which was often the case. Under the policy, violations will result in progressive discipline, beginning with a verbal warning for the first occurrence and leading up to possible termination for repeated offenses. See Exhs. 1, 13. According to the plaintiff, coin boxes were "often" left in the company vehicles overnight in the garage, to be unloaded the next morning. Pl. Dep. Vol. Ii at 38-40.

Mr. Cordner frequently reinforced and reminded all his service technicians, including the plaintiff, of the locked vehicle policy. Cordner Aff. ¶ 12. He instructed them on this point in group meetings. Cordner Aff. ¶ 12. Ed Dillman, Mr. Cordner's manager who also attended some of the group meetings, has attested that both prior to and during the time that plaintiff worked for Matt Cordner, he also reminded service technicians, including Ms. Evarts, of the policy concerning locking company vehicles at all times when unattended. Dillman Aff. ¶ 7.

In March 1997, in a routine check of all of his technicians' vehicles in the garage, Mr. Cordner discovered that three employees' vehicles were unlocked and he counseled all three of them individually about the need to lock their vehicles. Cordner Aff. ¶ 12; Cordner Dep. at 77. Plaintiff was one of the employees, and the other two were men. Subsequently, Mr. Cordner found plaintiff's company truck unlocked on two more occasions and counseled her each time. Cordner Aff. ¶ 13. Finally on March 17, 1997, Mr. Cordner found plaintiff's vehicle's rear cargo door unlocked, and after this fourth time gave plaintiff a documented verbal warning. Cordner Aff. ¶ 13. At this time, plaintiff

11

had left open access to company tools, supplies, and a coin box with cash in it. Exh. 2; Cordner Aff. ¶ 13. Plaintiff does not dispute that she left her truck unlocked and that there were tools, supplies, and a coin box with cash in it in the unlocked rear cargo area. Pl. Dep. Vol. II at 67-68. A documented verbal warning is the first and lowest step of discipline in the progressive discipline policy in the collective bargaining agreement and lasts for only six months. Exh. 13; Pl. Dep. Vol. II at 65. Under the policy, Mr. Cordner could have given plaintiff a verbal warning after the first offense. Exh. 1. Mr. Cordner took no further action with regard to this or any other incident involving plaintiff's truck.

Plaintiff does not dispute that she regularly left her truck unlocked or that she left it unlocked on the day that led to her verbal warning. Pl. Dep. Vol. II at 66-68; Pl. Dep. Vol. I at 28-30. Plaintiff further acknowledges that on previous occasions, equipment had been stolen out of her truck and that she was not disciplined on those occasions. Pl. Dep. Vol. I at 121-24, 132. By way of explanation/excuse, plaintiff claims that her rear cargo lock was broken, but she admits that she never informed Mr. Cordner that the lock was broken until after she received a verbal warning after the fourth occurrence. Exh. 1 (documented verbal warning); Pl. Dep. Vol. II at 60; Cordner Aff. ¶ 14. She had allowed this situation (unsecured vehicle) to persist without notifying her supervisor. She admits she never told Matt Cordner there was a problem with the lock until after she received the verbal warning. Pl. Dep. Vol. II at 59-60. Plaintiff received the verbal warning only after Mr. Cordner had found her truck unlocked for the fourth time. Cordner Aff. ¶ 14. Moreover, plaintiff admits she was still able to lock her rear cargo door by "physically put[ting] the key in to lock it" even after the knob was broken. Pl. Dep. Vol. II at 40-41. In response to the verbal warning, plaintiff did not indicate she would do better but instead accused Mr. Cordner, supervisor, of being on a

12

"power trip."  Cordner Aff. ¶ 14.

### 7.    During 1997, Plaintiff's Productivity and Attitude Toward Her Supervisors Deteriorated.

Plaintiff was clearly affected by the loss of her sister.  She also had a two-year-old child at home, who she dropped off at her mother's house every morning and picked up after work in the evening.

Plaintiff's productivity, that is, the number of jobs she completed in a work day, declined during 1997.  Plaintiff admits that her production time had slowed down and gotten "worse and worse" but attributes her poor performance to "being discriminated against."  Pl. Dep. Vol. II at 61-62.  While Mr. Cordner never disciplined her or gave her a critical performance evaluation because of her drop in productivity, he did meet with plaintiff on or about April 9, 1997 to discuss it.  Pl. Dep. Vol. I at 134-35.  It is undisputed that Mr. Cordner did not discipline plaintiff and plaintiff admits that her productivity had been "down in recent months."  Pl. Dep. Vol. II at 61-62.

Plaintiff also refused to record the time spent on her jobs neatly and accurately, as Mr. Cordner requested of all his service technicians.  Service technicians were required to keep their time in two ways.  First, they were expected to maintain a written record of the time they spend on each job.  To keep this record, they carried paper forms in their vehicles, which they completed manually during the day.  Second, SNET technicians kept a computerized record on a "DCWS" handheld computer.  These records were expected to be accurate and to coincide with each other, at least roughly.  Plaintiff admits that Mr. Cordner told her that it was important that the time sheets be accurate for each job that she worked on and that it was important that her time match the computerized records.  Pl. Dep. Vol. II at 91.

13

It is undisputed that plaintiff's handwritten records often did not coincide with the computerized records. Plaintiff has admitted that rather than keeping contemporaneous records of her performance, she was in the practice of waiting until the end of the day to try to reconstruct her time. Plaintiff says that she tried to change her practice, but it was a habit that was hard to break. Pl. Dep. Vol. I. at 92.

On April 30, 1997, several months after she had returned to work, Mr. Cordner sat down with plaintiff and discussed the problems   he had noted with her time sheets. Cordner Aff. ¶ 16. He did not discipline her in any way with respect to time sheets, and simply wanted her to be more accurate. On or about May 2, 1997, Mr. Cordner and his supervisor, Mr. Dillman, again met with plaintiff to counsel her about her time records. Complaint ¶ 12g. She indicated she understood clearly how the time sheets should be completed. Cordner Aff. ¶ 17. Despite these reminders, Ms. Evarts continued to submit time sheets with multiple cross-outs and changes that differed significantly from the DCWS computer-generated records, sometimes reflecting not only different times worked but also different sequences of jobs performed. Others reflected unaccounted for time and tasks coded with the wrong numbers. Cordner Aff. ¶ 17. She almost always recorded that she took lunch from 12:00 to 12:30, no matter what time she actually took it. Neither Mr. Cordner nor Mr. Dillman took any further action with regard to these matters.

There is no dispute that Mr. Cordner also counseled a male technician in the group about time inaccurately recorded in August, 1996. Cordner Aff. ¶ 18. That employee improved his time reporting after Mr. Cordner spoke with him about it. Cordner Aff. ¶ 18. Plaintiff was counseled more often than others simply because her performance was worse than others with respect to time recording. Ms. Evarts made no discernable effort to correct these mistakes despite requests from her

14

supervisor, Cordner. See Cordner Aff. ¶ 18.

### 8.    Plaintiff Voluntarily Resigned From SNET and Went Back to School.

In April, 1997, plaintiff told the manager of her group, Ed Dillman, that she did not want to work for SNET any longer and asked him for a "pink slip" indicating she was laid off, so that she could collect unemployment benefits apparently knowing she would not qualify for such benefits if she resigned. Dillman Aff. ¶ 6. She did not indicate that she felt harassed or discriminated against by Mr. Cordner or anyone else at SNET. Mr. Dillman declined to issue her a pink slip that stated she had been laid off, since she had not been laid off and he felt to do so would be fraudulent. Dillman Aff. ¶ 6.

A little more than two weeks after their discussion, on May 16, 1997, plaintiff submitted her resignation. Dillman Aff. ¶ 6. She kept working until May 30, 1997. Dillman Aff. ¶ 6. Her resignation letter stated,



Exh. 9. The letter states nothing about unfair treatment by Mr. Cordner, much less unlawful harassment or discrimination. Plaintiff's last day of work was May 30, 1997. Complaint ¶ 11.

Following her resignation, plaintiff made no real effort to find substantially similar work. Plaintiff testified that she filled out three or four applications, but she couldn't recall the name of any of the companies that she applied to. Plaintiff did not receive any job offers. Pl. Dep. Vol. II at 23-25.

In late 1997 or early 1998, plaintiff began working full-time as a baby-sitter for a neighbor, stopping only when her neighbor moved away in August 1998. Pl. Dep. Vol. I at 17-18; Pl. Dep. Vol. II at 7-8. During this time, plaintiff worked forty hours per week and earned $150 per week. Pl. Dep. Vol. II at 30-31, 128. She was able to care for her son at the same time.

In early 1998, plaintiff decided to go to law school, which was something she testified she had always wanted to do. Pl. Dep. Vol. I at 20-21; Pl. Dep. Vol. II at 15-16. Plaintiff enrolled in Quinnipiac Law School in the fall of 1998 as a part-time evening student. Pl. Dep. Vol. I at 21-22. Plaintiff testified that she wanted to go to law school so that she could make more money and she clearly anticipates that she will make more money as a lawyer than she made at SNET.[7] Pl. Dep. Vol. II at 19-20, 32. Plaintiff was enrolled in law school from 1998 through the time of her deposition in 2001, taking three to four courses each semester. Pl. Dep. Vol. I at 21-22. She was to graduate in May of 2002. Pl. Dep. Vol. II at 10.

The only job plaintiff has held since she enrolled in law school was as a title searcher for Capusta & Otsel from May 1999 until December 2000. Pl. Dep. Vol. I at 17-18; Pl. Dep. Vol. II at 10-11. Plaintiff did not apply for any positions with law firms for the summer of 2000, Pl. Dep. Vol. II at 11-12, and plaintiff did not work at all during the summer of 2001 because she was taking care of her new-born twins, Pl. Dep. Vol. II at 10-11. Plaintiff testified that since she resigned from SNET, she had not sent her resume out to anyone other than Capusta & Otsel. She acknowledged that she had removed herself from the job market for jobs that were comparable to the positions she held at SNET. Pl. Dep. Vol. II at 174.

---

[7]     In fact, plaintiff has most certainly already surpassed her income, having completed law school and working as a lawyer. (Plaintiff has not updated her responses to SNET's discovery requests to indicate her currently employment and salary.)

Plaintiff testified that she planned to practice law after she graduated. Pl. Dep. Vol. I at 23. However, as of the time of plaintiff's last deposition, she had made no formal efforts to obtain employment after graduating from law school. Pl. Dep. Vol. II at 13-14.

There are no facts in this case to support plaintiff's discrimination claim. Despite significant performance problems, the only disciplinary action she received was a single verbal warning for leaving her vehicle unlocked, the mildest step in SNET's progressive discipline process. She received this verbal warning after engaging in the same unacceptable conduct for at least the fourth time.

## III.   PROCEDURAL HISTORY

Plaintiff filed an Affidavit of Illegal Discriminatory Practice with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on November 17, 1997. Exh. 14. In her complaint, plaintiff alleged that she was discriminated against because of her gender based on Mr. Cordner's supervision and "discipline" of her.

On June 16, 2000, plaintiff filed the present Complaint in this action. Plaintiff's Complaint consists of one count, which appears to be a claim that she was discriminated against or harassed because of her gender in violation of Title VII of the Civil Rights Act of 1964 and the FEPA. See Complaint ¶ 12 (Plaintiff was "subjected to a myriad of adverse employment actions based upon her gender which created a hostile working environment."). In support of her claim, plaintiff makes the following factual allegations: (i) Mr. Cordner did not approve her request that she be allowed to work out of a satellite location in North Madison, (ii) plaintiff did not get a new truck in January 1997, (iii) Mr. Cordner once observed her performance by riding along with her in her truck, (iv) Mr. Cordner took her company-issued cell phone away for a month after she exceeded the company's policy on cell-phone use, (v) Mr. Cordner once issued plaintiff a verbal warning for leaving her vehicle

17

unlocked, (vi) Mr. Cordner counseled plaintiff about her production and performance, (vii) Mr. Cordner once counseled her about her recordkeeping. Complaint ¶¶ 12a through 12g.

## IV.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pl.'s Dep. at 56(c).  Courts should not "strain to find the existence of a genuine issue where none exists." Kirk v. Home Indem. Co., 431 F.2d 554, 559-60 (7th Cir. 1970).

The Second Circuit has repeatedly stressed the availability and virtue of summary judgment. In Knight v. U.S. Fire Ins. Co., 804 F.2d 9 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987), then Chief Judge Feinberg made it clear that the Second Circuit looks with favor upon summary judgment motions and expressed regret over any misperception that it does not.  Id. at 12.  This District has recognized that disfavor of summary judgment has been "jettisoned" and views the procedure as an "effective and correct method of avoiding protracted trials."  Nichols Planning & Zoning Comm'n of Stratford, 667 F.Supp. 72, 74 (D. Conn. 1987).

Even more recently, the Second Circuit has stated that, "Summary judgment applies no less to Title VII cases than to commercial cases or other areas of litigation, and plaintiff must still offer 'concrete evidence from which a reasonable juror could return a verdict in her favor.'"  Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998).  "[S]ummary judgment under Rule 56 is still fully appropriate, indeed mandated, when the evidence is insufficient to support the non-moving party's case."  Id. at 61; see also Cleese v. Hewlett Packard Co., 911 F. Supp. 1312, 1320 (D. Or. 1995) ("It is often appropriate to resolve the issue [of whether a hostile environment exists] on

18

summary judgment if it is clear from the facts that the offensive behavior alleged is legally insufficient
to rise to the level of sexual harassment.").

    In fact, as one Circuit Court has put it,

> [G]iven the ease of pleading cases of discrimination, plaintiffs seeking to avoid
> summary judgment should be strictly held to the requirements of Rule 56(e); the
> plaintiff must present specific non-conclusory facts that would support a jury verdict
> against the particular defendant on discriminatory intent.

Ratliff v. DeKalb County, Ga., 62 F.3d 338, 341 (11th Cir. 1995) (emphasis added).

    In moving for summary judgment, the moving party may prevail "by 'showing' -- that is,
pointing out to the district court -- that there is an absence of evidence to support the [nonmovant's]
case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Summary judgment should be granted
unless the non-moving party comes forward with admissible and significantly probative evidence
showing there is a genuine issue for trial. Celotex, 477 U.S. at 322-23; Anderson, 477 U.S. at 249-
56.

## V.    LEGAL ARGUMENT

### A.    Plaintiff's Discrimination Claim Must Fail on the Record of This Case.

    In the single count of plaintiff's Complaint, plaintiff claims that she was "subjected to a myriad
of adverse employment actions based upon her gender which created a hostile working environment."
Complaint ¶ 12. The person she claims discriminated against her because of her gender was her
supervisor, Matt Cordner. Pl. Dep. Vol. II at 32. Although it is not clear whether plaintiff's claim
is for disparate treatment (i.e., different treatment through an adverse employment action) on the basis
of gender or a hostile work environment on the basis of gender, the Court should grant summary
judgment regardless, because plaintiff cannot recover under either theory.

19

According to the plaintiff's testimony, Mr. Cordner treated her differently in the following ways:

> A: Because I was written up for things that the other men were guilty of themselves of doing and weren't written up for.
> Q: And what was that?
> A: Leaving the trucks unlocked, having my time sheets match my DCWS, having my cellular phone taken away when we went over, if I went over 300 minutes. And there were other men who had high minutes per trouble and their phones weren't taken away. I was questioned regarding my minutes per trouble and why it was so high, and other men had higher minutes per trouble and they weren't questioned.

Pl. Dep. Vol. II at 51-52. In other words, plaintiff claims she was discriminated against because (1) she was given a verbal warning for leaving her truck unlocked, (2) her cell phone was taken away for exceeding the 300-minute limitation, (3) she was counseled about having her time sheets "match by DCWS," and (4) she was "questioned" about her minutes per trouble, i.e., her productivity. Per plaintiff's own testimony, these are the alleged incidents that she claims comprised unlawful employment discrimination based on gender.

## 1.    Many of Plaintiff's Allegations are Time-Barred.

As an initial matter, plaintiff cannot recover under Title VII for any conduct that occurred or is alleged to have occurred more than 300 days before plaintiff filed her charge of discrimination with the CHRO, or under the FEPA for conduct that occurred more than 180 days before the filing of the charge. This is because under Title VII, a plaintiff is required to file her charge of discrimination within 300 days of the date on which the act complained of occurred. 42 U.S.C. § 2000e-5(e)(1); Quinn v. Greentree Credit Corp., 159 F.3d 759 (2d Cir. 1998). Similarly, under the FEPA, a plaintiff must file her charge of discrimination within 180 days of the time the conduct complained of occurred. Conn. Gen. Stat. § 46a-82(e). In this case, it is undisputed that plaintiff dually filed her

charge of discrimination with the Connecticut Commission on Human Rights and Opportunities

("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on November 17, 1997.

See Exh. 14. Consequently, plaintiff can only recover on her Title VII claim for conduct occurring

on or after January 21, 1997 (300 days prior to November 17, 1997). She can only recover on her

FEPA claim for conduct occurring on or after May 2, 1997 (180 days prior to November 17, 1997).

a.      Plaintiff's FEPA Claim is Barred in Its Entirety.

There is no dispute that plaintiff submitted her resignation on May 16, 1997. Exh. 9; Cordner

Aff. ¶ 34. Mr. Cordner did not discipline her or even counsel her about any performance issues after

May 16, 1997. Cordner Aff. ¶ 31. Thus, none of the conduct about which plaintiff complains could

have occurred on or after May 20, 1997.[8]  Her FEPA claim is thus time-barred in its entirety.

b.      Any Claim Related to a Satellite Office is Time-Barred
        Under Both Title VII and the FEPA.

Plaintiff did not allege, when describing the bases for her claims, that they included any

complaint that SNET would not open a satellite office in North Madison for her. Thus, such a claim,

if made by the plaintiff in opposition to summary judgment, should not be considered by the Court.

Even if the Court were to consider a claim related to plaintiff's desire to have SNET open a

new satellite office for her in North Madison, such a claim would be time-barred under both Title VII

and the FEPA. According to plaintiff's complaint filed with the CHRO, Mr. Cordner told plaintiff

in mid to late 1996 that she would not be able to work out of a satellite office in North Madison

_____

    [8]      It is undisputed that plaintiff's verbal warning for leaving her truck unlocked was
given on March 17, 1997, Exh. 2, Pl. Dep. Vol. II at 64-65; her cell phone was removed during a
month spanning March-April, 1997, Exh. 4; she was counseled about her inaccurate time sheets in
April 1997 and on May 2, 2997, Exh. 3; and Mr. Cordner spoke to her about her minutes per
trouble (productivity) also on May 2, 1997, Exh. 3. She was not counseled about these items
after May 16, 1997. Cordner Aff. ¶ 34.

21

because he could not justify opening a satellite there. See Exh. 14, CHRO Charge ¶ 3. Because this event is alleged to have occurred well before January 21, 1997, and May 2, 1997, plaintiff cannot recover for it and it cannot form a part of her complaint of discrimination. See Quinn, 159 F.3d at 765; see also Koelsch v. Beltone Electronics. Corp., 46 F.3d 705, 708 (7th Cir. 1995) (in determining whether employee had stated claim of sexual harassment, Court would not consider any incident that occurred or was alleged to have occurred more than 300 days before she filed her charge of discrimination).[9]

## 2. Plaintiff Cannot Establish a Prima Facie Case of Gender Discrimination.

In analyzing a claim under Title VII[10] that an employer has discriminated against an employee on the basis of her gender, courts rely on the familiar three-stage, burden-shifting analysis first set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that familiar paradigm, the initial burden is on plaintiff to establish a prima facie case of discrimination. The burden of production, but not proof, then shifts to the employer to merely articulate a legitimate,

---

[9]     Nor can plaintiff rely on the "continuing violation" exception. First, she did not make such an allegation in her charge. Miller v. International Telephone and Telegraph Corp., 755 F.2d 20, 25 (2d Cir. 1985) (plaintiff cannot rely on continuing violation theory because it was not alleged in the charge he filed with the EEOC). Second, there is not a sufficient nexus between what is alleged to have occurred outside the relevant period to what is alleged to have occurred within that period to sustain a continuing violation claim with respect to not being given a special office in North Madison.

[10]     To the extent that the Court could find that plaintiff's FEPA claim is not time-barred – a conclusion that SNET would strongly disagree with -- the same burden-shifting analysis applies to claims brought under the FEPA. State v. Commission on Human Rights and Opportunities, 211 Conn. 464, 470 (1989); Levy v. Commission on Human Rights and Opportunities, 35 Conn. App. 474, 480 (1994). As such, summary judgment should also be granted for SNET on the FEPA claim on the same grounds as those that apply to the Title VII claim.

22