REDACTED

THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DENISE EVARTS,
   Plaintiff,

v.       CIV. ACTION NO. 3:00CV1124(JCH)

THE SOUTHERN NEW
ENGLAND TELEPHONE
COMPANY,

   Defendant.       JUNE 20, 2005

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## LOCAL RULE 56(a) STATEMENT
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1. SNET is a regional provider of a wide range of telecommunications services to businesses and private residences in Connecticut. The company employs approximately 7,400 persons at various locations throughout the state.

2. Plaintiff was employed as part of SNET's New Haven Payphone Services Installation and Repair group ("Payphone Services"), which installed and repaired pay telephones. Pl. Dep. Vol. I at 25-26. She worked out of the SNET garage in New Haven. Pl. Dep. Vol. II at 70.

3. Plaintiff was initially hired in 1987 as a repair service clerk and was promoted to service technician in 1989. Pl. Dep. Vol. I at 26. As a service technician, plaintiff installed, repaired, and maintained coin-operated telephones and associated network facilities.

4. Plaintiff received regular pay increases and remained in that position until she resigned in May 1997. At the time she resigned in 1997, she was earning ~~~~~~~ plus overtime.

5. Plaintiff, like other technicians, was at all times a member of the Connecticut Union of

Telephone Workers (the "Union"), and the terms and conditions of her employment were governed by a collective bargaining agreement between SNET and the Union. Pl. Dep. Vol. II at 138.

6. Prior to working as a service technician, while employed by SNET, plaintiff obtained a Bachelor's degree from Teikyo Post University majoring in business management; her tuition was reimbursed by SNET. Pl. Dep. Vol. I at 19-20.

7. The year before that, in 1988, plaintiff's then-supervisor, Wanda Lewis (female), noted in her personnel file that plaintiff had difficulty accepting supervision. Ms. Lewis wrote,

[redacted]

Exh. 11 (authenticated at Cordner Aff. ¶ 33).

8. Ms. Lewis made this notation after [redacted] This was long before plaintiff worked with Matt Cordner and long before any of the events about which she complains in this case.

9. After she transferred to the service technician job, until 1989 plaintiff's supervisor was Crystal White. Pl. Dep. Vol. II at 80. Plaintiff has no complaints about Ms. White as a supervisor or about any events occurring during that time.

10. In 1989, Pat Kinsella (male) took over for Ms. White. Pl. Dep. Vol. I at 57. Again, plaintiff has no complaints about Mr. Kinsella as a supervisor or about any events occurring during that time. Plaintiff has testified that she thought Mr. Kinsella was a good supervisor. Pl. Dep. Vol. I at 34.

11. Prior to 1996, plaintiff applied to transfer to several other positions at SNET, but several

2

times was unable to pass the qualifying tests. Exh. 7 (transfer requests indicating plaintiff repeatedly attempted to transfer out of her job as early as 1994); Pl. Dep. Vol. II at 28-29; Pl. Dep. Vol. I at 46-50.

12. Also, <u>before</u> Matt Cordner joined her group and became her supervisor in mid-1996, plaintiff told Ed Dillman, manager of the Payphone Services team, that she wanted to leave her position. Dillman Aff. ¶¶ 4, 6. She told him that she had tried to transfer to other positions in SNET but kept failing the tests. Plaintiff communicated her desire to leave her position and her frustration with not meeting the qualifications for other jobs well before Mr. Cordner became her supervisor. Dillman Aff. ¶¶ 4, 6.

13. In July 1996, Matt Cordner joined the Payphone Services team and replaced Mr. Kinsella as plaintiff's supervisor. Complaint at ¶ 8.

14. There has never been an SNET coin satellite office in North Madison. Pl. Dep. Vol. II at 73. Athough Mr. Kinsella was plaintiff's supervisor for several years after the idea was allegedly formulated by her prior supervisor, Mr. Kinsella never opened a satellite office there for her.

15. Plaintiff does not believe that, Mr. Kinsella discriminated against her in any way and believes he was a good supervisor. Pl. Dep. Vol. II at 81.

16. Shortly after Mr. Cordner took over for Kinsella, Mr. Cordner told plaintiff that he had analyzed the situation based on business needs and had determined that there wasn't enough work in North Madison to justify creating a satellite office there. Pl. Dep. Vol. I. at 60-62.

17. Mr. Cordner had analyzed the situation and determined that there was insufficient business in the immediate area to justify creating a satellite office for a service technician. Cordner Dep. at 44-50.

3

18. However, he did conclude that there was a sufficient volume of business to create a satellite office in Guilford. He offered such an arrangement to plaintiff, but she was not interested. Pl. Dep. Vol. II at 77; Pl. Dep. Vol. I at 66; Pl. Dep. Vol. I at 66.

19. Plaintiff spoke to her union representative, David Iannielo about the situation, but plaintiff never asked for a grievance to be filed or requested that the Union follow up on her behalf. Pl. Dep. Vol. I at 64.

20. Even if SNET had created a satellite office in North Madison, it is speculative to assume that plaintiff would have been assigned to it, because it would have been offered according to seniority as specified in the Union contract. Further, there were a number of co-workers with more seniority than she had. Pl. Dep. Vol. II at 77-79.

21. Plaintiff was angry and upset with Mr. Cordner "from the minute he became [her] supervisor," largely because of the satellite office issue. Pl. Dep. Vol. II at 171-172.

22. During the same time period as the satellite office was being discussed, a few months after Mr. Cordner became supervisor of he Payphone Services group, plaintiff approached him and told him that she was going to resign because of an illness in her family. Cordner Aff. ¶ 7. She said she believed she could not continue working because her sister had learned she was seriously ill with cancer. Cordner Aff. ¶ 7.

23. Mr. Cordner told plaintiff to go home for the day and be with her family. He also urged plaintiff to look into the possibility of taking a leave of absence rather than resigning. Cordner Aff. ¶ 7.

24. ███████████████████████████████████████████. Complaint ¶ 12a.

25. Although plaintiff was not entitled to a leave of absence under the state or federal Family Medical Leave Act,[1] Mr. Cordner supported her request and SNET allowed plaintiff to go on a leave of absence beginning in November 1996 and ending in late January 1997. Complaint ¶ 12a.

26. Plaintiff wished to work some days during this period and, rather than insist on a firm work schedule, Mr. Cordner allowed her to come to work whenever she wished simply by calling him and notifying him the day before that she would be in. Cordner Aff. ¶ 8.

27. Because employees are not paid for holidays unless they work the day before the holiday, he specifically arranged for her to be able to work the days before Christmas and New Year's so that plaintiff would receive holiday pay for the holidays. Cordner Aff. ¶ 8.

27. Plaintiff's sister passed away on January 12, 1997. Although SNET's normal bereavement policy permitted Ms. Evarts to take three days off with pay thereafter, Mr. Cordner arranged to allow her to be out an additional week. Cordner Aff. ¶ 9; Cordner Dep. at 56.

28. Ms. Evarts did not return to work on the day scheduled, January 20, 1997. She did not call the garage to let anyone know her status. When Mr. Cordner called her, she indicated she was not ready to return, and Mr. Cordner arranged for her to take an unscheduled paid vacation until she indicated she was ready to return, which she did on January 27, 1997. Cordner Aff. ¶ 10; Complaint ¶ 12b.

29. Plaintiff was excused for all of her absences related to her sister's illness and death and she makes no claim in this case that anyone at SNET treated her poorly or unfairly because of this leave of absence. Pl. Dep. Vol. I at 74-78.

---

[1] Plaintiff is under the erroneous belief that she was entitled to this leave under the Family Medical Leave Act. Pl. Dep. Vol. I at 74-78. That Act does not apply, however, to leaves of absence connected to the illness of a sibling.

5

30. Shortly after plaintiff returned to work, Mr. Cordner went on a "ride-along exercise" with her, which involves a supervisor of a field employee spending a day with a technician "riding along" with him/her and offering constructive feedback. Pl. Dep. Vol. I at 86.

31. Plaintiff did not receive any kind of warning, discipline, or significant criticism that she can recall as a result of the ride-along exercise. Pl. Dep. Vol. I at 91; Pl. Dep. Vol. II at 122-23.

32. Although plaintiff's work performance was not up to par at that time because of her recent absence, she has no basis for believing that Mr. Cordner criticized her performance based on the ride-along. Pl. Dep. Vol. II at 122-23.

33. She did not receive any warnings based on the exercise. Pl. Dep. Vol. II at 122-123.

34. Plaintiff believes that she may have orally complained to her union representative, Dave Iannielo, about the ride-a-long but she did not file a grievance. Pl. Dep. Vol. I at 96-97. Plaintiff did not complain to Ed Dillman. Pl. Dep. Vol. I at 97.

35. In 1996 and 1997, SNET had begun to provide its service technicians with cell phones for business-related use only when other telephones were not available.

36. SNET's policy, which was communicated to plaintiff, is that employees should not use their cell phones for personal calls and that total usage should not exceed 300 minutes per month. Cordner Aff. ¶ 20; Cordner Dep. at 70-71.

37. Plaintiff was aware "they didn't want you going over 300," even though she says she had not seen any written policy. Pl. Dep. Vol. II at 133.

38. It is undisputed that both before and after plaintiff took her leave of absence, plaintiff regularly violated SNET's policy by consistently exceeding the 300 minute limit.

39. Plaintiff had exceeded the 300 minute limit in six of the ten full months she worked in

6

1996. Dillman Aff. ¶ 8; Exh. 4 (authenticated at Cordner Aff. ¶ 22).

40. Although Mr. Cordner counseled plaintiff informally about this problem in 1996 and again in the beginning of 1997, plaintiff exceeded the 300 minute limit again in January and February of 1997, after she had returned to work full-time following her leave of absence. She had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exh. 4; Dillman Aff. ¶ 8.

41. Plaintiff's usage and the usage of a male technician who similarly had his cell phone removed (twice) during this period were more excessive than any of their nine co-workers. Exh. 4.

42. Mr. Cordner did not discipline plaintiff because of excessive cell phone usage. Instead, he talked to her and reminded her about the limitation. Cordner Aff. ¶ 22.

43. Finally, Mr. Cordner removed plaintiff's access to her cell phone for a month, because she continued to exceed the usage limitation. Mr. Cordner made the decision to remove plaintiff's company cell phone for the month of March 1997. Exh. 4.

44. Plaintiff does not dispute that she exceeded the 300 minute limitation or that she used her cell phone for personal reasons during this time, notwithstanding the company policy. Pl. Dep. Vol. I at 104-06, 109-10, 135-36; Pl. Dep. Vol. II at 54.

45. Plaintiff was not suspended or demoted, nor was she disciplined in any way concerning cell phone usage.

46. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

47. During the relevant time, SNET had a policy requiring service technicians to keep their

vehicles locked whenever the vehicles were unattended. Exhs. 1, 6; Cordner Aff. ¶¶ 11, 12.

48. During the time when plaintiff worked with Mr. Cordner, the policy stated, "[I]f unattended, [company] vehicle[s] should be secured by locking doors and windows." Exh. 1; Cordner Aff. ¶ 11.

49. Similarly, the policy entitled "Safeguarding Procedures for Services Technicians and Public Services Assistants," which plaintiff signed in 1994, stated that the procedure included "[c]losing all windows, locking all doors and removing of ignition key when leaving vehicle unattended." Exh. 6 (authenticated at Cordner Aff. ¶ 28). That policy also stated that violation of the procedure was "sufficient cause for disciplinary actions up to and including dismissal . . . ." Exh. 6.

50. The policies applied both when the vehicles were in the field and when they were parked in the garage. Cordner Aff. ¶ 11.

51. Under the locked vehicle policy, violations would result in progressive discipline, beginning with a verbal warning for the first occurrence and leading up to possible termination for repeated offenses. See Exhs. 1, 13.

52. Mr. Cordner frequently reinforced and reminded all his service technicians, including the plaintiff, of the locked vehicle policy. Cordner Aff. ¶ 12. He instructed them on this point in group meetings. Cordner Aff. ¶ 12. Ed Dillman, Mr. Cordner's manager who also attended some of the group meetings, also reminded service technicians, including Ms. Evarts, of the policy concerning locking company vehicles at all times when unattended. Dillman Aff. ¶ 7.

53. In March 1997, in a routine check of all of his technicians' vehicles in the garage, Mr. Cordner discovered that three employees' vehicles were unlocked and he counseled <u>all three of them</u>

individually about the need to lock their vehicles. Cordner Aff. ¶ 12; Cordner Dep. at 77. Plaintiff was one of the employees, and the other two were men.

54. Subsequently, Mr. Cordner found plaintiff's company truck unlocked on two more occasions and counseled her each time. Cordner Aff. ¶ 13. Finally on March 17, 1997, Mr. Cordner found plaintiff's vehicle's rear cargo door unlocked, and after this fourth time gave plaintiff a documented verbal warning. Cordner Aff. ¶ 13. At this time, plaintiff had left open access to company tools, supplies, and a coin box with cash in it. Exh. 2; Cordner Aff. ¶ 13.

55. A documented verbal warning is the first and lowest step of discipline in the progressive discipline policy in the collective bargaining agreement and lasts for only six months. Exh. 13; Pl. Dep. Vol. II at 65.

56. Under the locked vehicle policy, Mr. Cordner could have given plaintiff a verbal warning after the first offense. Exh. 1. Mr. Cordner took no further action with regard to this or any other incident involving plaintiff's truck.

57. Plaintiff does not dispute that she regularly left her truck unlocked or that she left it unlocked on the day that led to her verbal warning. Pl. Dep. Vol. II at 66-68; Pl. Dep. Vol. I at 28-30.

58. On previous occasions, equipment had been stolen out of her truck and that she was not disciplined on those occasions. Pl. Dep. Vol. I at 121-24, 132.

59. After receiving the verbal warning, plaintiff told Cordner that her rear cargo lock was broken, but she never informed Mr. Cordner that the lock was broken until then. Exh.1 (documented verbal warning); Pl. Dep. Vol. II at 60; Cordner Aff. ¶ 14.

60. Plaintiff received the verbal warning only after Mr. Cordner had found her truck unlocked

9

for the fourth time. Cordner Aff. ¶ 14.

61. During this time, plaintiff was still able to lock her rear cargo door by "physically put[ting] the key in to lock it" even after the knob was broken. Pl. Dep. Vol. II at 40-41.

62. In response to the verbal warning, plaintiff did not indicate she would do better but instead accused Mr. Cordner, supervisor, of being on a "power trip." Cordner Aff. ¶ 14.

63. Plaintiff's productivity, that is, the number of jobs she completed in a work day, declined during 1997. Her production time had slowed down and gotten "worse and worse" but attributes her poor performance to "being discriminated against." Pl. Dep. Vol. II at 61-62.

64. Mr. Cordner never disciplined her or gave her a critical performance evaluation because of her drop in productivity, but he did meet with plaintiff on or about April 9, 1997 to discuss it. Pl. Dep. Vol. I at 134-35.

65. Mr. Cordner did not discipline plaintiff about productivity, and plaintiff admits that her productivity had been "down in recent months." Pl. Dep. Vol. II at 61-62.

66. Mr. Cordner told plaintiff that it was important that her time sheets be accurate for each job that she worked on and that it was important that her time match the computerized records. Pl. Dep. Vol. II at 91.

67. It is undisputed that plaintiff's handwritten records often did not coincide with the computerized records. Plaintiff has admitted that rather than keeping contemporaneous records of her performance, she was in the practice of waiting until the end of the day to try to reconstruct her time. Pl. Dep. Vol. I. at 92.

68. On April 30, 1997, several months after she had returned to work, Mr. Cordner sat down with plaintiff and discussed the problems she had noted with her time sheets. Cordner Aff. ¶ 16. He

10

did not discipline her in any way with respect to time sheets, and simply wanted her to be more accurate.

69. On or about May 2, 1997, Mr. Cordner and his supervisor, Mr. Dillman, again met with plaintiff to counsel her about her time records. Complaint ¶ 12g. She indicated she understood clearly how the time sheets should be completed. Cordner Aff. ¶ 17.

70. After these meeting, Ms. Evarts continued to submit time sheets with multiple cross-outs and changes that differed significantly from the DCWS computer-generated records, sometimes reflecting not only different times worked but also different sequences of jobs performed. Others reflected unaccounted for time and tasks coded with the wrong numbers. Cordner Aff. ¶ 17.

71. Plaintiff almost always recorded that she took lunch from 12:00 to 12:30, no matter what time she actually took it. Neither Mr. Cordner nor Mr. Dillman took any further action with regard to these matters.

72. Mr. Cordner also counseled a male technician in the group about time inaccurately recorded in August, 1996. Cordner Aff. ¶ 18. That employee improved his time reporting after Mr. Cordner spoke with him about it. Cordner Aff. ¶ 18.

73. In April, 1997, plaintiff told the manager of her group, Ed Dillman, that she did not want to work for SNET any longer and asked him for a "pink slip" indicating she was laid off, so that she could collect unemployment benefits apparently knowing she would not qualify for such benefits if she resigned. Dillman Aff. ¶ 6. She did not indicate that she felt harassed or discriminated against by Mr. Cordner or anyone else at SNET.

74. Mr. Dillman declined to issue her a pink slip that stated she had been laid off, since she had not been laid off and he felt to do so would be fraudulent. Dillman Aff. ¶ 6.

11

75. A little more than two weeks after their discussion, on May 16, 1997, plaintiff submitted her resignation. Dillman Aff. ¶ 6. She kept working until May 30, 1997. Dillman Aff. ¶ 6. Her resignation letter stated,



76. During the relevant time, SNET had an anti-discrimination and anti-harassment policy that contained complaint procedures. Exh. 10. Plaintiff did not advantage of these procedures until after she had submitted her letter of resignation from SNET. Pl. Dep.

77. After plaintiff submitted her resignation, she made a complaint of discrimination to SNET's internal EEO office for the first time.

78. SNET's internal EEO office investigated the complaint and concluded that plaintiff's claims of discrimination were unsupported.

79. After May 16, 1997, Mr. Cordner did not discipline plaintiff or counsel her about performance problems.

80. The only "disciplinary action" Ms. Evarts had while she worked under my supervision was a single verbal warning, documented in writing, for leaving her vehicle unlocked. A documented verbal warning is the mildest form of discipline under the Labor Agreement. Ms. Evarts' verbal warning had no adverse consequences to her such as a pay reduction, inability to transfer, etc.

81. In September, 1996,

Cordner Aff. ¶ 23.

82. Mr. Cordner spot-checked the time sheets of other technicians reporting to him. He also counseled a male services technician about time inaccurately recorded on his time sheets in August, 1996. That employee improved his time reporting after their discussion. Cordner Aff. ¶ 18.

Dated at New Haven, Connecticut this 20th day of June, 2005.

THE DEFENDANT,
SOUTHERN NEW ENGLAND TELEPHONE, INC.

By _____
Lori B. Alexander
Federal Bar No. CT08970
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut 06509
Tel. (203) 784-8200
Fax No. (203) 789-2133
E-Mail: alexander@tylercooper.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent via first-class mail, postage prepaid to all counsel and *pro se* parties of record on this 20th day of June, 2005, as follows: Karen Lee Torre, Esquire, Law Offices of Karen Lee Torre, 51 Elm Street, Suite 307, New Haven, Connecticut 06510.

_____
Lori B. Alexander
Federal Bar No. CT08970