# EXHIBIT 12

# PUBLIC COMMUNICATIONS SERVICES GUIDELINES

## OBJECTIVES

- TO SUPPORT THE SNET STANDARDS OF CONDUCT WITH SPECIFIC GUIDELINES AND EXAMPLES

- TO FULLY COMMUNICATE PERFORMANCE EXPECTATIONS SO EVERYONE HAS A MUTUAL UNDERSTANDING OF EXPECTATIONS

- FOR EVERY EMPLOYEE TO UNDERSTAND:
  - MANAGEMENT'S RESPONSIBILITY TO COACH AND PROVIDE FEEDBACK
  - EVERY EMPLOYEE'S RESPONSIBILITY TO ADHERE TO THE GUIDELINES

- PROVIDE CONSISTENCY IN "HOW WE WORK" AND THE SUPERVISORY ADMINISTRATION OF THE EXPECTATIONS AND GROUND RULES

# EXHIBIT 13

# FAILURE TO MEET EMPLOYER EXPECTATIONS

Various employer expectations, rules and policies, if violated, could lead to disciplinary action. The fact that an item is not listed does not mean it is excluded from the discipline process.

## PROGRESSIVE DISCIPLINE

Progressive Discipline is intended to be used as a way to change an employee's behavior or performance. Generally Progressive Discipline steps would be followed in the sequence outlined below, except for extremely serious actions or in cases of repeated offenses:

1. Verbal Warning
2. Formal Written Warning*
3. Suspension (Optional)
4. Wage Reduction
5. Final Warning
6. Dismissal

A violation of the following employer expectations, rules or policies could result in Disciplinary Action. The application of discipline would be based upon the specific circumstances involved and an individual's past work record in all areas.

1. Following established Safety Practices
2. Following Safe Vehicle Operations
3. Being present at work and on time (current 12 months)

Absence:
- 2 cases/discussion with employee
- 8 or more days/review quarterly
- 3 cases/minimum verbal warning (documented)
- 4 cases/formal absence control and written warning

Tardiness:
- 4 cases/discussion with employee
- 6 cases/minimum varbal warning (documented)

Remember: A combination of absence and tardiness can result in disciplinary action.

4. Providing proper vehicle security.
5. Projecting a professional image, e.g., maintaining appropriate personal hygiene and personal appearance.
6. Adhering to SNET's policy of maintaining a harassment/discrimination free work environment.
7. Meeting Customer service expectations.
8. Meeting quality standards; both administrative and technical.

# EXHIBIT 14

STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

**FORM 103**

## AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

DATE: _____    CASE NO: _9830248_

My name is _Denise Evarts_
and I reside at _59-2 Cedar Lake Rd Chester CT 06412_
The respondent is _Southern New England Telephone_
whose business address is _227 Church St New Haven 06510_

I was:

| | |
|---|---|
| ( ) terminated | ( ) not hired/not promoted |
| ( ) suspended | ( ) not rented a dwelling |
| ( ) placed on probation | ( ) harassed ( )sexually harassed |
| ( ) demoted | ( ) earning a different rate of pay |
| ( ) warned | (✓) constructively discharged |
| ( ) given a poor evaluation | ( ) retaliated against |
| ( ) denied a raise | ( ) not hired due to a BFOQ |
| ( ) less trained | ( ) not hired due to a disability |
| ( ) denied an office | ( ) delegated difficult assignments |
| ( ) denied service (s) | ( ) other _____ |

(✓) discriminated against in terms and conditions of employment
on _5/30/98_ and believe that my

| | |
|---|---|
| ( ) race | ( ) national origin |
| ( ) color | ( ) marital status |
| (✓) sex { }male ({)female | ( ) physical disability |
| ( ) previously opposed, | ( ) mental retardation |
| filed or assisted | ( ) mental disorder |
| ( ) ancestry | ( ) religious creed    ( ) creed |
| ( ) age DOB: | ( ) familial status |
| ( ) religion | ( ) sexual orientation |
| ( ) pregnancy | ( ) learning disability |
| ( ) alienage | ( ) lawful source of income |

was in part a factor in this action. I believe that the respondent violated the following Connecticut General Statutes and acts listed below and ( ) enforced through Section 46a-58(a) (if applicable)

( ✓) 46a-60(a)(1)          (✓)    Title VII of the Civil Rights Act
( ) 46a-60(a)(4)                   of 1964, as amended, 42 U.S.C 2000e
( ) 46a-60(a)(7)( )( )( )          and the Civil Rights Act of 1991
( ) 46a-60(a)(8)( )( )( )          {cite for 15 individuals employed}
( ) 46a-64c( )( )          ( )     Age Discrimination in Employment
( ) 46a-64a( )( )                  Act, of 1967, 29 U.S.C. 621-634
( ) 46a-81( )( )( )                {cite for over 20 individuals
( ) 46a-80                         employed}
( ✓) Americans With Disabilities Act, 42 U.S.C. 12101 et seq.
( ) Equal Pay Act of 1964, U.S.C. 206
( ) Section 504 of the Rehabilitation Act of 1973, as amended

other_____

Denise Evarts
57-2 Cedar Lake Rd
Chester Ct 06412
November 13th 1997.

1. There are approximately 9,000 employees at Southern New England Telephone Company, throughout the state of Connecticut.

2. I left SNET on May 30, due to harassment from my supervisor Matt Cordner. The harassment had become so unrelenting, unwarranted and abusive that I became very depressed, and my home life was adversely effected. For my own health reasons I no other alternative but to quit. I had tried to transfer out of the department, and I went to the Union with regards to the harassment, but neither avenue had offered an alternative. I worked for the company for 10 years and had very good relationships with my previous supervisors. I had been promised the next promotion from the 2nd line supervisor Ed Dillman, and I always volunteered for task groups and work teams. My repair time was almost always above average. I was the only female supervised by Matt Cordner.

3. Summer of 96 Matt Cordner became my supervisor. Approximately two months after his assignment to my department I discussed my transfer to a satellite office that my previous supervisor had been in the process of arranging. Matt Cordner intervened and reversed the prior approval, he believed that there was insufficient work to justify a satellite office, although the previous supervisor had already established that there was.

4. November of 96. I was out on a Family Medical Leave Act, because I was informed by my sister's doctor that she would not live much longer with her cancer.

5. January 12, 1997 my sister passed away. I came back to work 2 weeks after, the last week in January.

6. January Rick Delevollpe received a new company truck. I had been told by Ed Dillman the 2nd line supervisor that I would be getting a new truck. As of May, I still had not received a new one. I went to the mechanics in the motor-vehicle dept and asked them if I was on a list for a new truck. They said that a new truck had not come in for me, and that it was common practice for a supervisor to change the names on the paperwork if they didn't like a particular employee.

7. February 6, 1997 Matt Cordner came to me in the morning and informed me he would be riding with me to evaluate my work. I felt that one week after returning back to work from a devastating loss was inappropriate bad timing to choose to evaluate someone's work. In addition, I had 9 years experience on the job, and there were two new technicians with less that a year on the job. He had never ridden with any technician since he came to the department. As of May 1997, he still had not ridden with any of the other technicians.

8. February    Matt physically took my cellular phone out of my company vehicle because he claims I went over the 300-minute limit the department had set. There was never any notices sent to the employees as to what the limit was. I offered to pay for any amount over the limit, he said no.

9. February 17, 1997 Matt Cordner gave me a written warning for leaving my truck unlocked. I showed him a note from the mechanics saying that the lock was broken. He began to scream at me at the top of his lungs saying that he didn't care what kind of note I had from the mechanics and that he was still writing me up. He showed me a policy saying that the vehicles needed to be locked. The company vehicles are inside a locked garage, which is inside a locked fence. At the meeting in which I was given a warning Gerry Nutzzo the union steward was present. He asked Matt if anyone else had ever been written up for leaving their trucks unlocked, Matt said "no".

When Matt had ridden with me on February 6th my computer was not working properly on a particular phone that I was on. He said to open another pay phone and try to dial on that line. I let him know that security personal had come to our garage and informed us that it was against the employee code of conduct

to open up pay phones other that the ones, which we were working on. He said he didn't' necessarily believe in that policy and told me to open up the pay phone. I was upset that he could arbitrarily pick and choose which policies he wants to adhere to, when and with whom. None of the other guys in the work group had ever been written up for leaving their truck unlocked

10. April 9th he questions me regarding a particular job and why it had taken so long. I asked everyone else in my crew if they had ever been questioned with regard to length of time they had ever spent on a job, they all said no.

11. April I called the EAP office and set up an appointment with a counselor. I had begun to feel sick to at the thought of going to work and I would begin shaking. The counselor said that I was depressed

12. April 29th. Following the chain of command, I asked Matt Cordner to ask his supervisor Ed Dillman for a Transfer or for a pink slip

13. May 2nd I had a meeting with Ed Dillman and Matt Cordner. The union representative was also at the meeting. Ed Dillman said he couldn't justify giving a pink slip and that there were not any job openings. The company had just given thousands of pink slips to employees in November of 1996. Ed Dillman and Matt Cordner then proceeded to pull out computerized sheet of my days work (DCWS) and match them to my written time sheets. They then asked me to account minute by minute my jobs on Friday 4/25/97. I was asked to go over the day 3 times. The union representative asked if anyone else had ever been questioned in this manner. No one ever had. I let him know I would be as accurate as I could be with my time sheets

14. May 6 Matt questioned me again about my time sheets matching up with the DCWS. I had done several jobs that day and he question why one job had 15 minutes more on one and 15 minutes more on another. The total time on the time sheets was the same. I told him it was a mistake and that I was trying to be as accurate as possible with my time reporting. I asked him if he checked any of the other guy's time sheets with the DCWS. He said "no but he would just so I couldn't say that". At the time of my notice on May 16th , he still had not checked any one elses time sheets with the DCWS.

15. Dave Ianello my (co-worker and union representative) had a meeting in the morning with me and the other guys in the crew. He asked if Matt had checked anyone's time sheets with the DCWS and everyone said no. He said that it was harassment what Matt was doing. I asked Dave the union representative to tell Matt that he should stop harassing me. He never did.. He said to wait for him to harass me again and to collect more evidence.

16. May 8th Matt spoke with me again about my time sheet, this time to give me a compliment on a "job well done". I thought this was very nice but he was still checking my time sheets and no one else's.

17. May 16th Friday I decided that Matt's harassment wouldn't stop and I saw no other alternative but to quit. I gave him 2 weeks notice. One of my co-workers Rick Dellevolpe had said, "you know he is going to keep harassing you until you quit. I gave him my notice on Friday. On Monday he started to write my co-workers up for various things

18. May 19th, 1997 AM Matt writes Dave Ianello up for leaving his truck unlocked.
19   May 19th 1997. PM. Lou informs me that Matt has shown up at his first job.
20   May 20th, 1997 Matt questions Robert Bock about his time sheets.

21  May 20th Matt left an ace message asking for volunteers to work the holiday.  If he doesn't get a volunteer he will pick a name out of a hat.  Prior to me giving him my notice, whenever he needed someone to work overtime he would always threaten to force the lowest person on overtime when we were in our reporting room in the morning.  He would always do this when we were in our reporting room in the mornings, and he would always look over to me.  He did this often enough that it became harassing.  I was always the lowest on the overtime list, due to my obligations at home.  A very sick sister and a very young baby.  Prior to these obligations I had always been near the top of the overtime list and had volunteered whenever I could for overtime.

22.  May 30th Last Day of work.  Matt refused to give me my exit paperwork, which is SNET policy.  I received the paperwork in the mail 3 days later.  Matt Cordner had stated on the exit papers "I would not rehire Denise Evarts due to high absenteeism".  The high absenteeism occurred during the time of my sister's death.  Prior to this tragedy, my sick time had been minimal.  In addition , he started searching my truck and pulling out every piece of equipment.  To the best of my knowledge this has never been done when someone leaves.

IMPORTANT: YOU MUST OBTAIN A NOTARIZATION OF YOUR COMPLAINT
BEFORE YOU RETURN

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

_Denise Evarts_ being duly sworn, on oath, states that she/he is the Complainant herein; that she/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated at _Waterbury_ Connecticut this _17th_ day of _November_
19 _97_.

X _Denise Evarts_
(Complainant's Signature)

Subscribed and sworn to before me this _17th_ day of _November_, 19 _97_

_[signature]_
Notary Public/Commissioner of
the Superior Court

My commission expires: _9/30/95_

PAGE.010        TO 7869869        79837-13NS MOAT  E4:71 76, 1 J30

Cordner Aff.

THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| * | * |
| DENISE EVARTS, | * |
|    Plaintiff, | * |
| | * |
| v. | *  CIV. ACTION NO. 3:00CV1124(JCH) |
| | * |
| THE SOUTHERN NEW | * |
| ENGLAND TELEPHONE | * |
| COMPANY, | * |
| | * |
|    Defendant. | *  JUNE 20, 2005 |
| | * |
| * * * * * * * * * * * * * * * * * * | * |
| * | |

## AFFIDAVIT OF MATTHEW CORDNER

I, Matthew Cordner, being duly sworn, hereby depose and say:

1.   I am over the age of eighteen and understand the obligations of an oath.

2.   I have personal knowledge of the facts set forth in this Affidavit.

3.   I am a management employee of the Southern New England TelephoneCompany

("SNET") and have worked for SNET for 18 years. I was Denise Evarts' supervisor at SNET

from July, 1996 to the time of her voluntary resignation on May 16, 1997 and subsequent

separation from employment.

4.   Over the course of the year that I supervised her, I did have occasion to counsel

Ms. Evarts about her productivity, about the need to lock her company vehicle at all times

when unattended, about filling out her time sheets accurately, and about excessive cell phone usage. I was expected to adhere to company policies with respect to these and other issues and to counsel employee who did not act in accordance with such policies. I did not treat Ms. Evarts any differently from my other service technicians and did not discriminate against her because of her gender.

5.      Neither I nor the company terminated the plaintiff's employment, suspended her, demoted her, or decreased her pay or benefits in any respect, or imposed any adverse employment action on her.

6.      In July, 1996, I was promoted into Ms. Evart's work group as a supervisor in the Payphone Services Department and became Ms. Evarts' supervisor.

7.      A few months after I started with the group, Ms. Evarts came to me and told me her sister was seriously ill with cancer and she would have to resign from her job because she did not believe she could keep working. I told her to go home for the day with pay and be with her family, while I explored the company leave of absence criteria. After I did so, I urged her to look into the possibility of taking a leave of absence instead of resigning, which she did.

8.      Ms. Evarts took a leave of absence from November 21, 1996 through January 26, 2006. Although there was no requirement for me to do so, during the leave, I allowed Ms Evarts to work full or half days whenever she wanted to during her leave of absence; all she had to do was telephone me the day before to let me know if she wanted to come in and I

would schedule her for work. I did not require a predetermined schedule. I arranged for Ms. Evarts to work the days before Christmas and New Year's Day so that she would receive holiday pay for the holidays.

9.      Ms. Evarts' approved leave was from November 21, 1996 through January 10, 1997. She informed us that her sister passed away on January 12, 1997. Although SNET's normal bereavement policy permitted Ms. Evarts to take 3 days off with pay thereafter, I arranged for her to have 3 days off plus 2 additional days with pay, to allow her to be with her family for a week without worrying about a pay loss.

10.      Ms. Evarts did not return to work on the day scheduled, January 20, 1997. She did not call the garage to let us know her status. When I called her at home, she indicated she was not ready to return. I arranged for her to take an unscheduled paid vacation for a week until she was ready to return to work. She returned on January 27, 1997.

11.      Attached hereto as Exhibit 1 is a true and accurate copy of SNET's policy, applicable during the time I supervised Ms. Evarts, concerning the locking of company vehicles. The policy stated, "[I]f unattended, [company] vehicle[s] should be secured by locking doors and windows." This policy applied whether the vehicles were out in the field or in the SNET garage. The intent of the rule is to safeguard company property from theft.

12.      I frequently reinforced and reminded all of service technicians, including Ms. Evarts, of the locked vehicle policy. I instructed them on this point in group meetings. In March, 1997, I checked every vehicle under my supervision in the garage and found that Ms.

Evarts' vehicle and the vehicles of 2 male service technicians were all unlocked. I informally counseled all 3 employees about the need to lock the vehicles, even in the garage, and to abide by company policy. I warned all 3 that their carelessness was unacceptable. Although the Labor Agreement authorized me to give her a verbal warning (discipline) at this point, I chose instead to counsel her on this issue. Counseling or "coaching" as it is sometimes referred to at SNET, is not discipline.

13.    After these discussions, I found Ms. Evarts' vehicle unlocked on 2 more occasions. At that point, I issued a documented verbal warning for failing to lock her vehicle for the fourth time. Ms. Evarts' failure to secure her vehicle on the third time left open access to company tools, supplies, and a coin box with cash in it from a pay telephone. Attached as Exhibit 1 is a true and accurate of the documented verbal warning given to Ms. Evarts on March 17, 1997. This warning document was kept in the normal course of SNET's business, it was in the normal course of SNET's business to keep such documents, and the document was created at or near the time the events reflected in it occurred.

14.    It was only after Ms. Evarts received a verbal warning that she told me for the first time her rear lock was broken and had been for a long time. I did not remove the verbal warning based on the lock being broken, because Ms. Evarts had never told me about the problem and had instead apparently left her vehicle unsecured for several months, despite our many discussions about the need to lock her vehicle. Instead of acknowledging that she would adhere to the vehicle locking policy in the future, Ms. Evarts accused me of being "on a

power trip." The vehicles of the other 2 technicians were locked when I checked them during the follow-up inspection.

15.    Between 1996 and 1998, I also gave verbal warnings to 2 other (male) services technicians, and one Formal Written Warning (a more severe step in progressive discipline) to a male technician for an unlocked company vehicle. I did not treat Ms. Evarts differently from male technicians with respect to locking her vehicle.

16.    Ms. Evarts also failed to fill out her time sheets accurately, despite being counseled several times about the need to fill them out accurately and neatly. On April 30, 1997 and May 2, 1997, several months after Ms. Evarts returned from her leave of absence, I sat down with her and discussed the problems I'd noted with her timesheets. I never disciplined her about her timesheets but simply talked with her about them. Attached hereto as Exhibit 3 is a true and accurate copy of my record of those meetings. The documents, written by me, were created in the normal course of SNET's business, it was in the normal course of SNET's business to keep such documents, and the documents were created at or near the time the events reflected in them occurred.

17.    In the May 2, 1997 meeting, Ms. Evarts made it clear she fully understood how to complete time sheets properly. On May 5, 1997, as part of my regular staff meetings, I reminded my entire crew about the importance of keeping accurate time sheets and reviewed instructions about how they should be completed. Despite these reminders, Ms. Evarts continued to submit time sheets with multiple cross-outs and changes that differed significantly

from the DCWS computer-generated records, sometimes reflecting not only different times but also different sequences of jobs performed. Some reflected unaccounted for time and tasks coded with the wrong numbers.

18.    I spot-checked the time sheets of other technicians reporting to me. I also counseled a male services technician about time inaccurately recorded on his time sheets in August, 1996. That employee improved his time reporting after our discussion. Ms. Evarts did not.

19.    During the period that I supervised Ms. Evarts, the service technicians had cellular telephones in their company vehicles, which they were supposed to use for business purposes only and when other telephones were not available. This limited use was due to the high cost of cell phone usage at that time and the desire to maximize work time.

20.    All of the technicians, including Ms. Evarts, were instructed not to exceed 300 minutes of cellular usage per month. In 1997, I had several group discussions with my technicians about the cellular telephone policy, and Ms. Evarts attended those sessions.

21.    Despite those discussions, Ms. Evarts exceeded the 300-minute limitation in 3 of the first 5 months of 1997. I did not give her a verbal or written warning about this excessive usage. Instead I counseled her about the situation. Her response was to continue to exceed the usage limitations, and I then removed her company cell phone for one month.

22.    Attached hereto as Exhibit 4 are copies of business records of SNET reflecting the cell phone usage of Ms. Evarts and her co-workers in 1996 and 1997. These documents

were created in the normal course of SNET's business, it was in the normal course of SNET's

business to keep such documents, and the documents were created at or near the time the

events reflected in them occurred.

23.    In September, 1996, I also removed the cell phone of a male technician, ████████

████████ for exceeding the 300-minute limitation. ████████████████████████████████

████████████████████████████████████  Ms. Evarts was treated the same as male

employees with respect to cell phone usage.

24.    When I was Ms. Evarts' supervisor, I learned that she wanted the department to set up

a special satellite office for her in North Madison so that her commute time would we slightly

reduced. I did an analysis of the volume of work and the number of pay telephones in the area and

concluded  that there was not sufficient business in the North Madison area to justify opening a

special office there. However, I determined that Guilford was a more populated area and offered to

allow her to satellite out of an office in Guilford. She declined the offer.

25.    While I was Ms. Evarts' supervisor, she displayed a real reluctance to listen to

direction, a resistance to my supervision, and a disregard of company policies.

24.    While I was her supervisor, Ms. Evarts told me that she was not interested in

the services technician work, and her real goal was to go to law school and be a lawyer.

25.    Ms. Evarts was a bargaining unit employee subject to the terms and conditions

of the collective bargaining agreement between SNET and the Communications Workers of

America.

26.    The only "disciplinary action" Ms. Evarts had while she worked under my supervision was a single verbal warning, documented in writing, for leaving her vehicle unlocked. A documented verbal warning is the mildest form of discipline under the Labor Agreement. Ms. Evarts' verbal warning had no adverse consequences to her such as a pay reduction, inability to transfer, etc.

27.    Attached hereto as Exhibit 5 is a true and accurate copy of the relevant portions of the Labor Agreement between SNET and the Communications Workers of America.

28.    Attached hereto as Exhibit 6 is a true and accurate copy of a document entitled "Safeguarding Procedures for Services Technicians and Public Services Assistants" signed by Ms. Evarts and kept in her personnel file.

29.    Attached as Exhibit 7 are true and accurate copies of Transfer Requests made by Ms. Evarts in 1994 and early 1996, before I joined her work group or became her supervisor. These documents are business records of SNET and are kept in Ms. Evarts' personnel file.

30.    Attached as Exhibit 8 are true and accurate copies of a document entitled "Public Services Riding Exercise" completed by me and reflecting the ride-along exercise completed by me with Ms. Evarts on February 6, 1997. This document was kept in the normal course of SNET's business, it was in the normal course of SNET's business to keep such documents, and the document was created at or near the time the events reflected in it occurred. This was not an evaluation but an opportunity for feedback. Ms. Evarts was not criticized at all for her work performance during the ride along exercise.

31.    Attached as Exhibit 9 is a true and accurate copy of Ms. Evarts' resignation letter received by me on May 16, 1997.  Ms. Evarts gave two weeks' notice and continued working through May 30, 1997.  I did not discipline her or counsel her about performance problems after May 16, 2997.

32.    Attached hereto as Exhibit 10 are true and accurate copy of SNET's policies against discrimination in effect while Ms. Evarts worked under my supervision in the Payphone Services group in 1996-1997.

33.    Attached hereto as Exhibit 11 are copies of documents from Ms. Evarts' personnel file.  These documents are business records of SNET, they were kept in the normal course of SNET's business, and it was in the normal course of SNET's business to keep such documents.

34.    Attached as Exhibit 12 is a true and accurate copy of an excerpt from SNET's PCS Guidelines for supervisors stressing the importance of "management's responsibility to coach and provide feedback to employees."  I was expected to, and did, follow this guideline during the time Ms. Evarts worked in my group and today.

37.    Attached hereto as Exhibit 13 is a true and accurate copy of SNET's progressive discipline policy in effect in 1996-97 while Ms. Evarts worked in my group.

MATTHEW CORDNER

STATE OF CONNECTICUT  )
COUNTY OF NEW HAVEN  )        ss:  Meriden, Connecticut

Personally appeared, Matthew Cordner, who swore to and subscribed the above affidavit before me, this 17th day of June, 2005.

Notary Public/Commissioner of the Superior Court