Dillman Aff.

COPY; ORIGINAL FILED WITH CHRO

## AFFIDAVIT OF EDWARD DILLMAN

I, Edward Dillman, being duly sworn, do hereby depose and say:

1. I am over the age of eighteen and believe in the obligations of an oath.

2. I have personal knowledge of the facts set forth in this affidavit, and they are true and accurate to the best of my knowledge and belief.

3. In 1996-97, the times mentioned in the Complaint, I held the position of Manager, SNET Payphone Services, Installation and Repair. I was the manager of SNET's five Payphone Services teams statewide, including the New Haven team. I was the supervisor of Matt Cordner during the time that Mr. Cordner supervised Denise Evarts. I continue to be employed by SNET today.

4. Before Matt Cordner became the supervisor of the New Haven Payphone Services Team, Denise Evarts told me that she wanted to leave her position as a services technician. At the time, she was not yet working for Matt Cordner. She also said that she had tried to transfer to other positions in SNET but kept failing the tests.

5. In November 1996, Matt Cordner came to me and asked me to authorize a leave of absence for Denise Evarts because of the illness of her sister. I approved his request. Ms. Evarts took a leave of absence from November 1996 through late January 1997.

6. In April, 1997, Denise Evarts came to me and told me once again that she did not want to work as a services technician for SNET any longer. She asked me to lay her off with a "pink slip," so that she could collect unemployment benefits. Because I was not

laying off services technicians and still had a position for Ms. Evarts, I decided that issuing a pink slip so that she could obtain unemployment benefits would be fraudulent. Therefore, I told her that I would not do that. About two weeks later, Ms. Evarts submitted her resignation from SNET but kept working until May 30, 1997.

7. Both Matt Cordner and I frequently reinforce and remind our employees about SNET's locked vehicle policy, a copy of which is attached as Exhibit 4. Prior to and during the time that Denise Evarts worked for Matt Cordner, I reminded services technicians, including Ms. Evarts, of the policy during group meetings.

8. Similarly, all services technicians in my Payphone Services Group are clearly told that they are allowed only up to 300 minutes of cellular time per month. They are supposed to use the cellular telephones for personal calls only when absolutely necessary. This is not only because of the expense involved, but also because employees are not supposed to be making personal calls on company time. Ms. Evarts exceeded the usage limitation in 6 of the 12 months of 1996. She had 366 minutes of cellular usage in January, 1997; 334 minutes in February, 1997; and 378 minutes in May, 1997.

9. In the spring of 1997, I reviewed several of Denise Evarts' timesheets. Among other problems, they reflected unaccounted for time and tasks coded with the wrong numbers. Some of the timesheets showed duplicate entries for the same telephone number. These are errors in basic documentation that should not

Case 3:00-cv-01124-WIG   Document 116-8   Filed 06/20/2005   Page 4 of 20

occur. Such basics of accurate timekeeping are known by all services technicians, particularly after seven years on the job like Ms. Evarts.

10. Although I had worked with Denise Evarts for 5 1/2 years before she worked under Matt Cordner, she <u>never</u> told me or suggested to me that she believed that Mr. Cordner was harassing her or treating her any differently from her co-workers. The only thing she complained about to me was the fact that she was not interested in the work of the services technicians and was frustrated because she could not pass the tests required for other positions.

11. Contrary to Ms. Evarts' allegation in Paragraph 2 of the Complaint, I never promised her a promotion.

12. In my interactions with Ms. Evarts, I did not treat her any differently because of her gender, nor do I have any reason to believe that Matt Cordner "harassed" her or treated her unfairly because she is a woman.

_____
Edward Dillman

STATE OF CONNECTICUT)
                    )  ss: ~~Cheshire~~ Wallingford, Connecticut
COUNTY OF NEW HAVEN )       January 15, 1998

Personally appeared, Edward Dillman, who swore to and subscribed the above affidavit before me, this 15th day of January, 1998.

_____
~~Notary Public~~/Commissioner of
the Superior Court

F:\ALEXANDE\MISC\Dillman.AFF

3.

# Pl. Dep. Vol. I

ORIGINAL

VOLUME I

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * *
                       *
                       *
DENISE EVARTS          *
         Plaintiff     *
                       *Case No. 3:00CV1124(JCH)
    VS.                *
                       *June 13, 2001
THE SOUTHERN NEW ENGLAND *
TELEPHONE COMPANY      *
         Defendant     *
                       *
* * * * * * * * * * * *
```

DEPOSITION OF DENISE EVARTS

Appearances:

    FOR THE PLAINTIFF:

    LAW OFFICES OF KAREN LEE TORRE
    51 Elm Street
    Suite 307
    New Haven, CT 06510
    By:  Michelle Holmes, Attorney

    FOR THE DEFENDANT:

    SOUTHERN NEW ENGLAND TELEPHONE
    310 Orange Street
    8th Floor
    New Haven, CT 06510
    By:  Stephen M. Pincus, Esq.
        Carol Wilder, Attorney

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  of either day school or preschool or --
2      A    Yeah, he went to Chester Child Care.
3      Q    Okay.  Was there any time where he stayed
4  home with you during the first couple years of his
5  life?
6      A    No.  The first couple years I was -- for
7  the first year and a half I was working --
8      Q    Okay.
9      A    -- at SNET and then, yes, there was a
10 period where he stayed home with me when I was -- I
11 had a babysitting job --
12     Q    Um-hum.
13     A    -- after I left SNET and he stayed home
14 with me then.  And then I went back to work, I got
15 a part-time job and he went back into Chester Child
16 Care.
17     Q    And when do you recall the babysitting
18 job, what year that was?
19     A    '98.
20     Q    How long did you have that babysitting
21 job?
22     A    Approximately nine months.
23     Q    Okay.  And then after that -- those nine
24 months you -- was there a time where you weren't

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

```
 1   working or did you go back to another part-time
 2   job?
 3        A    After that nine months I started school
 4   and I was in school from August of '98 until May of
 5   '99, and then I started a part-time job at Kapusta
 6   and Otzel and I had that from '99 to 2000.
 7        Q    When you were in school from '98 to '99
 8   was Kyle in any day care or was he home?  Were you
 9   going to school at night?
10        A    Yes, he was in day care for a couple
11   hours three days a week.
12        Q    Okay.  That's fine.  I'd just like to go
13   through some schooling of yours.  You went to high
14   school, right?
15        A    Yes.
16        Q    Where did you graduate?
17        A    Foran High in Milford.
18        Q    Foran High?
19        A    Um-hum.
20        Q    What year was that?
21        A    '82.
22        Q    I know you have gone to college.  Could
23   you just tell me about your college?
24        A    Okay.  Teikyo I went.
```

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  Q    That's in Waterbury?
2  A    Yes.
3  Q    What years did you attend Teikyo?
4  A    Probably about '84 to about '94.
5  Q    Was there any other school that you went
6  to, besides Teikyo? Did you get credits from any
7  other college?
8  A    Yes, Gateway. Now it's -- is it Gateway
9  now? It was South Central Community College then,
10 I think now it's Gateway. I did that from, I
11 think, '83 to '85.
12 Q    So did you start off at Gateway and then
13 go over to Teikyo?
14 A    Yes, yes.
15 Q    And did SNET pay for any of these
16 courses?
17 A    SNET paid for most of the courses at
18 Teikyo and -- actually, it -- I'm sorry, '84. I
19 might be off by a couple years.
20 Q    Sure. And what concentration did you
21 pursue or, if any, major?
22 A    Business management major --
23 Q    Okay.
24 A    -- at Teikyo and it was a computer

POST REPORTING SERVICE

HAMDEN, CONNECTICUT  (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1   programming at Gateway.
2       Q    And did you graduate from Teikyo?
3       A    Yes.
4       Q    And what was your degree, BA or BS?
5       A    BA -- BS, I'm sorry.
6       Q    Sorry.  What year was that?
7       A    '97.
8       Q    What year -- what month in '97?
9       A    May.
10      Q    Just curious, in the last couple of
11  years, how many courses, for example in 1996 and
12  1997, were you taking a semester?
13          MS. HOLMES:  Object as to form.
14      Q    You can answer.
15      A    Well, I have the records at home.  I can
16  get you the exact figure, but I don't know if I
17  could say exactly off the top of my head, but I'd
18  say, you know, at least a couple.
19      Q    Okay.  All right.  We're going to have --
20  if you have those records, we'll just make a
21  separate request.
22      A    SNET has them, too, probably because they
23  paid for them all.
24      Q    Okay.  It's my understanding you

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1   continued your studies after Teikyo?
2       A   Yes.
3       Q   All right.  What studies did you pursue?
4       A   In '98 I went to Quinnipiac Law School
5   and I'm still currently enrolled there.
6       Q   Okay.  When did you decide to go to law
7   school?
8       A   Sometime in '98.  I think I took the
9   LSATs in February of '98 and I think that's pretty
10  much the time I made the definite decision.
11      Q   Okay.  And are you going full-time or
12  part-time at Quinnipiac?
13      A   Part-time.
14      Q   And how many courses -- so you started in
15  about September of '98?
16      A   August actually.
17      Q   August, '98.  How many courses do you
18  take a semester?
19      A   Approximately four.  You could put three
20  to four actually.
21      Q   Okay.  And how much would you have to
22  take if you were a full-time student?
23      A   Five.
24      Q   And when do you go, days or evenings?

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

22

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    A    Evenings.
2    Q    Is there -- I know -- understand in the
3  first couple years they give you mostly mandatory
4  courses, but is there a particular course of study
5  that you plan to pursue or are pursuing at
6  Quinnipiac right now --
7         MS. HOLMES:  Object to the form.
8    Q    -- in terms of type of law you're
9  interested in?  If you don't understand the
10 question, I can rephrase it.  It's a little long
11 winded.  Is there certain courses you were
12 concentrating in --
13        MS. HOLMES:  Object as to form.
14   Q    Certain areas of law you have
15 concentrated in?
16   A    I haven't concentrated in any particular
17 field yet because this -- the last year is when I
18 will be -- the first three years were pretty much
19 mandatory courses, so I haven't chosen any
20 particular field of study, although discrimination
21 is certainly one I'm interested in.
22   Q    Okay.  Do you have any plans or what are
23 your plans to do with your law degree, if any?
24        MS. HOLMES:  Object as to form.

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  Q   Do you have plans to practice law after you graduate?

3  A   Yes.

4       MS. HOLMES: Object as to form.

5  Q   What were your plans?

6       MS. HOLMES: Object as to form.

7  Q   You can answer the question.

8       MS. HOLMES: She already said she had plans. I can object as to form. You can answer the question if you understand it.

11 A   Yes.

12      MS. HOLMES: Or if you know the answer, so --

14      THE WITNESS: Okay.

15      MS. HOLMES: So if I object as to form, don't look to me to, you know -- you can answer the question.

18 A   I'm supposed to be answering.

19      MS. HOLMES: I'm preserving the record. There is -- too speculative. There is no time limit, so --

22      MR. PINCUS: Well, I asked after she graduates law school what her plans, so --

24      MS. HOLMES: So I'm objecting as to

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  A    I worked at a drugstore, I think, as a
2  clerk for a couple years and then I worked at a
3  company called Colonia Incorporated.
4  Q    Excuse me.
5  A    A company called Colonia Incorporated.
6  Q    And what did you do for them?
7  A    Order processing. It was pretty much
8  from there I went to SNET.
9  Q    According to the records, SNET you
10 started off in 1987 as a repair service clerk?
11 A    Yes.
12 Q    Just for my information, what is --
13 A    611.
14 Q    611. And then later on you started
15 working in business services administration or
16 administrator?
17 A    That's pretty much 611 for business --
18 for businesses where 611 is for residential.
19 Businesses, I think it was a different phone number
20 you actually had to dial than 611, but --
21 Q    Then you became a service technician?
22 A    Yes.
23 Q    Do you know approximately when you became
24 a service technician?

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    A    In the summer of '89.

2    Q    You had to apply to transfer into that
3 position?

4    A    Yes.

5    Q    And why did that -- why did you transfer
6 into that position?  Why did you seek transfer into
7 that position?

8    A    I had a friend who had heard that there
9 was an opening and she applied for it, decided she
10 didn't want to, she told me about the job, it
11 sounded interesting to me, so I applied.

12    Q    Did you enjoy your job when you started?

13    A    Yes.

14    Q    What -- just briefly what did the job
15 entail?

16    A    I was a -- I repaired and installed pay
17 phones.

18    Q    Okay.  What kind of tools did you use
19 when you were working?

20    A    Quite a lot actually.  I don't know if
21 you want a list of them all or --

22    Q    Just in general.

23        MS. HOLMES:  Can we go off the
24 record for a minute?

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  receptacles.

2    Q    What happened to the coin receptacles at
3  the end of the day when you came back?

4    A    You put them in a -- you brought them
5  into the office and they had a locked box inside
6  the gate.

7    Q    Okay. There was money, of course, in
8  those boxes?

9    A    Sometimes. Most of the time. Sometimes
10 they're empty because if you are doing change out
11 or something, sometimes they're empty.

12    Q    It was the practice and policy to take
13 the boxes out of the truck and have them secured
14 inside the facility, is that right?

15    A    Unless they were empty or something. Or
16 you could do it in the morning, too, if you had
17 time.

18    Q    But if there was money in them you had to
19 secure them at night?

20    A    Well, yes, you were supposed to put them
21 in the box at night --

22    Q    Okay.

23    A    -- or in the morning sometimes. Practice
24 was to go clean out our trucks in the morning if we

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  came into the garage and it was late, it was, like,
2  4:30 and they wanted us to go home on time that
3  day. We would clean out our trucks in the morning,
4  put the coin receptacles into the locked area then
5  in the morning, too.
6      Q    So you are saying sometimes you or others
7  kept the coin boxes in the trucks overnight?
8      A    Yes.
9      Q    Okay. And who would -- it was my
10 understanding that the policy was to keep them
11 secured every day at the end of the day.
12           MS. HOLMES:  Is that a question?
13           MR. PINCUS:  I haven't answered the
14 second part of the question.
15           MS. HOLMES:  Right.  That's not even
16 a question.
17     Q    It's my understanding that the policy is
18 you're supposed to keep them locked up.  My
19 question to you is, what made you believe that
20 there was a practice to keep them sometimes in the
21 truck overnight?
22           MS. HOLMES:  Object as to form.
23     Q    You can answer it.
24     A    Because that's just -- I guess that was

POST REPORTING SERVICE
HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  just the general practice of what we all did.
2  There was -- I guess sometimes you put them in at
3  night, sometimes you put them in the morning.
4      Q    Were your managers aware that sometimes
5  you kept them in the truck overnight, coin boxes?
6      A    Yes.
7      Q    And which managers were aware of this
8  practice?
9      A    I would -- the ones that are your direct
10 supervisors because they'd see you unloading them
11 in the morning sometimes.
12     Q    Could you please tell me the names of the
13 supervisor you had?
14     A    Crystal White.
15     Q    Okay.
16     A    Pat Kinsella, and Matt Cordner,
17 C-O-R-D-N-E-R.
18     Q    So just be clear, it's your testimony
19 that these three individuals knew that you and
20 others kept coin boxes overnight?
21     A    They would see me and other technicians
22 unloading the coin boxes out of our garages in the
23 morning, yes.
24     Q    Besides White, Kinsella and Cordner, were

POST REPORTING SERVICE
HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  you supervised by anyone else during the time you
2  were a service technician?
3       A    No.
4       Q    Let's go through -- Pat Kinsella, how
5  long was he your supervisor?
6       A    I'd have to -- can I see a copy of my
7  service record so I can look at the dates?
8       Q    What I would like to do is if you don't
9  know, you don't know, but if you can give me an
10 approximate time --
11      A    It's approximate -- approximately six
12 years.
13      Q    And from what years to what years?
14           MS. HOLMES:  Object as to form.  She
15 just testified that she wasn't exactly sure when,
16 so she just gave you an approximation.
17           MR. PINCUS:  Right now I'm asking
18 which years she's approximately thinking she worked
19 with Mr. Kinsella.
20      A    Approximately '89 to '96.  There was
21 actually a period in there where Crystal White was
22 my supervisor because I think -- I think for a
23 two-year period within that time frame that Crystal
24 White was my supervisor.

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1   question.
2           MS. HOLMES:  Very good.
3           MR. PINCUS:  I will now ask her
4   another question.
5           MS. HOLMES:  Wait until there is a
6   question on the table before you answer it.
7           THE WITNESS:  Okay.
8           MS. HOLMES:  Right now there is no
9   question pending.
10
11  BY MR. PINCUS:
12      Q    Is there any information that you have or
13  that you learned about why she may or may have not
14  been terminated?
15      A    No.  All I know is that she felt that she
16  was discriminated against by Ed Dillman and she was
17  filing a discrimination suit after she was fired.
18  That's the only -- and she was -- yes, I do recall
19  now.  She was fired one day when at -- the second
20  liner came down to the garage and she was late for
21  work and they fired her that day.
22      Q    Do you know what reason she believes she
23  may have been discriminated against?
24          MS. HOLMES:  Object as to form.

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102