DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    Q    Are you aware that under the union

2    contract bargain members are only provided three

3    days of leave after a death of a sister?

4            MS. HOLMES:  Object as to form.

5    A    And actually -- I'm sorry, strike my

6    previous answer about two weeks.  I'm not positive

7    at the time and I'm not positive as to how much

8    time you can get from SNET or from the union.  I

9    don't know that off the top of my head.  All I know

10   is that at the funeral, Matt Cordner came up to me

11   and he did say, "Take as much time as you need."

12   My husband was standing there as well as other

13   people were standing there.  And then I did get a

14   phone call, it was a few days later, from him

15   asking him where I was and why I hadn't showed up

16   for work.  It wasn't long after Ed told me, "Take

17   as much time as you need," so --

18   Q    Excuse me, just go back.  A couple days

19   after the funeral --

20   A    I don't remember the exact time, but

21   yeah, I -- it wasn't long after the funeral that he

22   called me up and asked me why I hadn't shown up for

23   work.

24   Q    Is there anything about the granting of

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    your leave that you contend was discriminatory?

2        A    Other than a lot of the -- the

3    discrimination increased after I came back.  The

4    intensity, I guess, of it increased after I came

5    back, more frequent.

6        Q    But the actual granting of the leave,

7    that is not a discriminatory act in your mind by

8    SNET?

9            MS. HOLMES:  Object as to form.

10       Q    Let's strike that question.  The actual

11   granting of the leave, do you believe that was

12   discriminatory?

13       A    I'm not sure I understand how that --

14   your question, how that can be discriminatory.

15       Q    Okay.  I'm just asking you whether the

16   fact that SNET granted you leave, whether they --

17   the fact that they granted you leave or the fact

18   that you had to come back from leave at a certain

19   time, was anything like that discriminatory in your

20   mind?

21           MS. HOLMES:  Object as to form.

22       A    No.  Well, the only discriminatory act

23   would be for him to tell me take as much time as I

24   need and then call me up and put it on the record

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1   that I didn't show up for work.  So I think that

2   would be a discriminatory act by Matt Cordner.

3       Q    Were you excused for your absences?  Were

4   excused -- were approved through the time that you

5   came back to work, isn't that right?

6       A    Right, and I think -- yes.  Yes, I think

7   so.

8       Q    Let's go to C.  "In or about January,

9   1997, one of the male services technicians in

10  plaintiff's department received a new work

11  vehicle."  First of all, who is the male service

12  tech that received a new vehicle in January --

13      A    Rick --

14      Q    -- 1997?

15      A    -- Della Volpe.

16      Q    Do you know anything about the

17  circumstances in which he received a truck -- a new

18  truck?

19      A    All I know is my truck was older than

20  his.  I was next in line for a new truck and he

21  ended up getting the new truck.  I went to speak to

22  the mechanics about it and they did say it's very

23  common when a supervisor doesn't like one of the

24  employees, that they can change the paperwork to

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    the new vehicles.

2        Q    Besides that, is there anything else?

3        A    No.

4        Q    Let's go to the next -- D, "On or about

5    February 6th, 1997, Matt Cordner informed the

6    plaintiff that he intended to perform a ride along

7    exercise with her."  What is a ride along?

8        A    They just ride with you in the truck and

9    they follow you around to your jobs and watch you

10   do your work.

11       Q    What did Mr. Cordner tell you when he

12   said that he intended to perform a ride along?

13       A    That's what he told me.

14            MS. HOLMES:  Object as to form.

15       Q    Okay.  Did you complain at the time when

16   he told you this?

17            MS. HOLMES:  Object as to form.

18       A    I was --

19       Q    Did you say anything to him?

20       A    I said I wasn't happy because I -- it had

21   been two weeks after my -- maybe not even two weeks

22   after my sister had died.  I didn't think it was an

23   appropriate time to evaluate my work.

24       Q    And why was that?

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    Cordner that day in terms of how he treated you

2    that you felt was inappropriate?

3                MS. HOLMES:  Object as to form.

4        A    Well, I felt it was inappropriate in one

5    instance that there is some type of SNET policy

6    that says that you are not supposed to open other

7    pay phones than the one you're working on and he

8    was -- and when we were working on one set I

9    couldn't get one open, he said, "Well, let's go

10   open up another telephone set," which is against

11   SNET's policy.  And he says, "Well, I don't really

12   necessarily believe in that," and so I thought that

13   struck me as odd that then I would be later written

14   up for other policy issues.

15       Q    Were you disciplined in any way for

16   anything that occurred during the ride along that

17   day --

18                MS. HOLMES:  Object as to form.

19       Q    -- with Mr. Cordner?

20       A    Not that I recall.

21       Q    Did Mr. Cordner ride along with you after

22   that date?

23       A    No.  After I gave my notice I think he

24   decided to start -- he decided to ride along with

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    one of the other male technicians after I gave my

2    notice.

3        Q    Why do you feel that Mr. Cordner riding

4    along with you is discriminatory?

5        A    Because you're evaluating someone's work.

6    And especially after -- in my situation, first of

7    all, I had nine years' experience on the job.  They

8    were like -- I don't know how else to say it, other

9    than there was two other male technicians who had

10   less than a year and their job -- I would think

11   that he would have wanted to evaluate the male

12   technicians' job before he would want to a evaluate

13   a nine year, experienced female technician who had

14   just come back two weeks from burying her sister.

15   I would say that would be why.

16       Q    So is it -- the fact that he evaluated

17   you first, is that part of the basis that you

18   feel --

19       A    The fact that --

20       Q    Wait a minute.  Is that part of the basis

21   that you feel that he was discriminating against

22   you?

23            MS. HOLMES:  Object as to form.

24       A    Repeat that.

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    for that particular reason.

2        Q    The question is, do you know whether

3    there was a grievance filed, yes or no?

4        A    Do I know whether one was filed?  Yes, I

5    know that one was filed or not and the -- I guess

6    no, one was not filed.

7        Q    No, it was not filed?

8        A    Right.

9        Q    Okay.  Did you ever make a complaint with

10   Ed Dillman about the ride along exercise with Mr.

11   Cordner?

12       A    Not that I recall.

13       Q    Did you ever file a complaint with SNET's

14   EEO office prior to your resignation regarding this

15   ride along exercise?

16       A    Yes.

17       Q    What did you tell the EEO office about

18   this issue?

19       A    Exactly what's in this complaint.

20       Q    And when did this complaint -- when did

21   you make this complaint to the EEO office?

22       A    Shortly before I left.

23       Q    What did you say to the EEO office or who

24   did you speak to at the EEO office?

104

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  because she went over the alleged 300 minutes of

2  allotted monthly cellular phone time."

3       A    Um-hum.

4       Q    My question to you is, do you know

5  whether or not you actually went over the 300

6  minutes of allotted phone time?

7       A    Do I know?  No, I'm not sure.  It was

8  never shown, I was just told.

9       Q    Okay.  Did you know that there was a

10 300-minute limit for use of cellular phones?

11      A    There was no written policy as to how

12 many minutes we were allowed each month, no.

13           MR. PINCUS:  Could I have my

14 question read back, please.

15           (Whereupon, the last question was

16 read back by the court reporter.)

17      Q    Question was, was there any policy,

18 whether it was written or oral, regarding the use

19 of cellular phones?

20      A    We were never told specifically.  There

21 was rumors in the crew maybe how much, but we were

22 never ever told how much -- how many minutes we

23 were allowed a month, no.

24      Q    Was it your belief that there was an

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    unlimited amount of time that you could use your

2    phone?

3                    MS. HOLMES:  Object as to form.

4         A    Unlimited, no.

5         Q    Do you know what the purpose of the cell

6    phones that were provided to you -- what was the

7    purpose for you to have a cell phone?

8                    MS. HOLMES:  Object as to form.

9         Q    Strike the question.  What was the

10   purpose -- do you know whether there was a purpose

11   for you to have a cell phone?

12                   MS. HOLMES:  Object as to form.

13        A    For convenience purposes I'm assuming and

14   for computer use and it was the phone company.

15        Q    Did you use your cell phone for business

16   purposes?

17        A    Yes.

18        Q    Did you also use it for personal?

19        A    Yes.

20        Q    Okay.  How much time did you use it on

21   average for personal business?

22                   MS. HOLMES:  Object as to form.

23        A    Yeah, I can't answer that without looking

24   at the bills.

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

106

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1      Q    When you had a cell phone was it -- if
2   you remember, did you use it mostly for personal
3   time or mostly for business?
4             MS. HOLMES:  Object as to form.
5      A    I would have to look at -- I don't know.
6   I'd have to look at the phone bills.  Probably
7   right at the time my sister was dying, maybe in
8   those couple of months I could honestly say
9   absolutely mostly personal.  Maybe -- but as far as
10  most of the other time, I would say mostly
11  business.
12     Q    How long was your phone taken away?
13            MS. HOLMES:  Object as to form.
14     A    SNET has those records.  I'm not sure.  I
15  don't remember actually.
16     Q    Was it one month?
17            MS. HOLMES:  Object as to form.
18     A    I don't remember.
19     Q    Okay.  In your complaint you allege,
20  "Upon information and belief, during the relevant
21  time period, defendant SNET did not have a policy
22  written or otherwise with regard to the use of
23  employee cellular phones."  Did any manager ever
24  tell you -- strike that question.  It says,

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1      A    I think there might have been one other
2   technician whose phone had been taken away, but I'm
3   not sure whether or not that was before or after he
4   took mine away.  I'm pretty sure he took Dave
5   Ianniello's away.  I'm also -- positive he took
6   Dave Ianniello, but I can't remember if that was
7   before or after he took mine away.
8      Q    Is there anyone else besides --
9      A    Mr. Ianniello, I believe.
10     Q    Who you believe whose phone was taken
11  away?
12     A    No.
13     Q    Besides Dave Ianniello, whose phone was
14  taken away?  Sorry.  And why was Mr. Ianniello's
15  phone taken away?
16          MS. HOLMES:  Object as to form.
17     A    I think he consistently used up quite a
18  bit of minutes.  Very high minutes.  I think he was
19  very high with his minutes five, 600 minutes on the
20  cell phone.
21     Q    When your phone was taken away, was that
22  a surprise -- excuse me, strike it.  Did Mr.
23  Cordner tell you why he was taking your phone away?
24     A    Yes.

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    Q    And what did he say to you?

2    A    I don't remember the exact words, but

3    just that I had -- he was taking the phone away

4    because I used up too many minutes per month on my

5    cellular phone.

6    Q    Did he tell you how many minutes -- did

7    he tell you about a 300-minute allotment?

8    A    I don't think so. I think he just said

9    it was high.

10    Q    And what was your response to him when he

11    told you that?

12    A    I told him I was upset, that I needed to

13    be in contact with my family, especially -- I think

14    he took it away in January, very shortly after my

15    sister had died and I depended upon that as the

16    only way for my family to get in touch with me and

17    that I really needed the phone.

18    Q    Were you able --

19    A    And then I also -- I'm sorry, I also

20    offered to pay for any minutes that he considered

21    were personal. I offered to pay for all my

22    personal phone calls. I just needed the

23    convenience of the phone. I had no problem paying

24    for them.

121

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    about unlocked doors."  That's correct, right?

2              MS. HOLMES:  Object as to form.

3       Q    Mr. Cordner had spoken to you three times

4    previously about unlocked doors?

5              MS. HOLMES:  Object as to form.

6       A    I don't recall him talking to me three

7    times about unlocked doors and being against SNET

8    corporate policy, no, I don't recall that.

9       Q    At the time that you were provided a copy

10   of this written warning by Mr. Cordner --

11      A    No.  This was just his notes.  No, I

12   don't think I was provided a copy of this.

13      Q    So is your testimony that Mr. Cordner did

14   not talk to you, at all, prior to giving you this

15   written warning?

16      A    It's my testimony that I don't recall him

17   talking to me about it, no.

18      Q    Now, you had previously lost a Husky

19   terminal while you were working under Mr. Dillman's

20   group, is that right?

21              MS. HOLMES:  Objection as to form.

22      A    It was in an -- it was stolen from the

23   office -- stolen from the office when I was on

24   vacation.

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    Q    First of all, just so we can get it
2    clear, what is a Husky terminal?
3    A    It's a computer terminal so you can
4    receive and sign off jobs.
5    Q    Okay.  And you said that while you were
6    on vacation your terminal was there, when you came
7    back from vacation it was not?
8    A    Right.  It was stolen from the office.
9             MS. HOLMES:  I'm going to object as
10   to form in terms of -- I'd like the time frame of
11   when this alleged incident happened.
12   Q    Do you recall when this happened?
13   A    Yes, I recall that it -- no, I recall it
14   happening.  I don't recall the exact date.  We can
15   certainly go through the records and find out which
16   day I was on vacation and that's when it happened.
17   Q    This was before you worked for Mr.
18   Cordner, is that right?
19             MS. HOLMES:  You know, when it
20   happened.
21             THE WITNESS:  Yes, yes.
22             MS. HOLMES:  I'm asking you to put a
23   time frame on this question.
24             MR. PINCUS:  I'm asking her if she

POST REPORTING SERVICE
HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    recalls.
2                    MS. HOLMES:  If you are going to ask
3    a question regarding an incident that occurred, you
4    should put time frame on it.
5                    MR. PINCUS:  I did put a time frame.
6    I said before Mr. Cordner.
7                    MS. HOLMES:  You don't know the
8    year?
9                    MR. PINCUS:  I'm not the one
10   answering questions.
11                   MS. HOLMES:  Then I'm going to
12   object to the form of the question.
13
14   BY MR. PINCUS:
15       Q    You weren't disciplined, at all, as to
16   this missing Husky terminal?
17                   MS. HOLMES:  Object as to form.
18       A    No.  It was stolen when I was on vacation
19   from the office.
20       Q    They didn't blame you?
21       A    For being stolen, no.
22       Q    Right.  There was also something about a
23   Dewault drill being missing while you were employed
24   at SNET.

124

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1             MS. HOLMES:  Object as to form.
2        Q    Did you lose a Dewault drill while you
3    were employed?
4        A    It's Dewault.
5             MS. HOLMES:  Object as to form.
6        Q    Dewault drill?
7        A    Yes.
8        Q    What is a Dewault drill, first of all?
9        A    It's a cordless drill.
10       Q    What happened with the Dewault drill?
11            MS. HOLMES:  Object as to form.
12       A    I just went to go use it one day and I
13   couldn't find it.  Pretty much that was it.  It was
14   taken from my -- it must have been stolen from my
15   truck.
16       Q    Okay.  And were you ever disciplined for
17   the missing Dewault drill?
18       A    Not that I recall, no.
19       Q    Was your truck locked when your Dewault
20   drill was stolen from your truck?
21       A    I don't know when it was stolen.  I just
22   went to go use it when I opened my truck one day
23   and it was missing.
24       Q    Okay.  Was it locked, your door -- your

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

132

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1      Q   Besides receiving the documented verbal

2   warning which is Exhibit No. 12, did you receive

3   any other form of discipline for having your truck

4   unlocked?

5      A   No.

6      Q   Okay.  You weren't demoted?

7      A   No.

8      Q   Didn't lose any pay?

9      A   No.

10      Q   Not suspended or reassigned?

11         MS. HOLMES:  Object as to form.

12      A   No.

13      Q   Besides this documented verbal warning,

14   did you ever receive any other form of discipline

15   for having your truck unlocked at any time?

16      A   No.

17      Q   Why do you think -- why do you feel that

18   -- strike the question.  Why do you feel that the

19   fact that you received a documented verbal warning

20   was due to gender discrimination?

21      A   Because it was common practice for all

22   the male technicians to leave their trucks

23   unlocked.  Some might have locked the trucks, but

24   the majority of the male technicians left the

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1          MS. HOLMES:  Object as to form.

2      A     No.

3      Q     Did you ever speak to Mr. Dillman after

4   this meeting about a verbal warning?

5      A     No.

6      Q     Did you file an EEO complaint with the

7   internal SNET office prior to the time you gave

8   your resignation regarding this documented verbal

9   warning?

10     A     I'm pretty sure this is one of the things

11  I did speak to her about, yes.

12     Q     But that time you had already given your

13  resignation, is that correct?

14         MS. HOLMES:  Object as to form.

15     A     I'm sorry, what was the -- by when?

16     Q     The only time that you complained to the

17  EEO office about this instance was after you had

18  given in your resignation?

19     A     I'm not sure of the time frame.

20     Q     Let's go through F, please.

21     A     Um-hum.

22     Q     "On or about April 9th, 1997, the

23  plaintiff was given a verbal warning by Matt

24  Cordner claiming that her production/performance

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

135

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    time had dropped off."  You used the word "verbal

2    warning" here, could you explain what you mean by

3    that term?

4         A    I guess just a conversation.

5         Q    What was that conversation?

6         A    Verbal conversation.  He probably just

7    took me into his office and complained about my

8    performance.

9         Q    You used the word "probably."  Do you

10   have a recollection of this conversation?

11        A    Yes.

12        Q    What is that recollection?

13                  MS. HOLMES:  Object as to form.

14        A    All I -- I recall him complaining that --

15   bringing me into his office and just complaining

16   that my minutes per trouble were too high.

17        Q    And this was on or about April 9th.  Do

18   you have any notes of this incident?

19        A    I think so.  It's possible.

20        Q    What did you say to Mr. Cordner?

21        A    I don't recall.

22        Q    Did you believe your minutes per trouble

23   were high?

24                  MS. HOLMES:  Object as to form.

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1          A    If -- I believe my minutes per trouble
2    were probably high around the time my sister was
3    dying, yes.  For the other nine years they had not
4    been, no.
5          Q    I'm really focusing on the time of April
6    9th, 1997.  In March of 1997 do you believe your
7    minutes per trouble were high?
8                   MS. HOLMES:  Object as to form.
9          A    I don't recall my minutes per trouble
10   every single month.  All I recall is I will
11   probably admit that after my -- probably before and
12   after my sister died my minutes per trouble were
13   probably high, but any time before that my minutes
14   were low.
15         Q    My question is, before March, 1997
16   whether your minutes --
17         A    Do I know?  No, other than what he was
18   telling me.
19         Q    Did you protest to Mr. Cordner when he
20   told you that your minutes per trouble were high?
21         A    I don't recall.  I don't think so.
22         Q    You used the word "warning."  Up to --
23   excuse me.  He told you -- strike that question.
24   He told you that your minutes per trouble were

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1    to me as an option.

2        Q    Paragraph 12 of the complaint you

3    allege, "The plaintiff was subjected to a myriad of

4    adverse employment actions based upon her gender

5    which created a hostile working environment."

6    That's what you allege in your complaint, right?

7        A    Yes.

8        Q    Okay.  At no time were you demoted, is

9    that correct?

10       A    No.

11       Q    And your pay was never decreased?

12       A    No.

13       Q    And your title was never changed?

14       A    As a result of this?  No.

15       Q    You never had any benefits taken away

16    from you?

17       A    No.

18       Q    You weren't terminated?

19       A    No.

20       Q    You weren't involuntarily transferred to

21    another position?

22       A    Repeat the question.

23       Q    You weren't transferred to another

24    position against your will?

213

## CERTIFICATE

STATE OF CONNECTICUT)

            ) ss.

COUNTY OF NEW HAVEN )

            I, Cheryl Mantiglia, LSR No. 00015 and a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that the foregoing record is a correct and verbatim transcript of the proceeding hereinbefore set forth.

            I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this proceeding is taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, or financially interested in the action.

            In witness whereof I have hereunto set my hand and affixed my notarial seal this 18th day of June, 2001.

                                     _____

                             Notary Public

My commission expires: April 30, 2006

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102