# Pl. Dep. Vol. II

THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

VOLUME II

- - - - - - - - - - - - X
DENISE EVARTS    :   COPY
    PLAINTIFF,   :
          :
          :
VS         : NO. 3:00CV1124(JCH)
          :
          :
          :
SOUTHERN NEW ENGLAND :
TELEPHONE COMPANY  :
    DEFENDANT.  :
- - - - - - - - - - - - X

        Deposition of Denise Evarts
taken in accordance with the Connecticut
Practice Book at the office of Tyler
Cooper & Alcorn, LLP, 205 Church Street,
New Haven, Connecticut, before Clifford
Edwards, a Professional Shorthand
Reporter and Notary Public, in and for
the State of Connecticut, on September
14, 2001, commencing at 1:12 p.m.

DEL VECCHIO REPORTING SERVICES
PROFESSIONAL SHORTHAND REPORTERS
FAX 203245-2760

117 RANDI DRIVE     100 PEARL ST., 14th FLOOR
MADISON, CT 06443    HARTFORD, CT 06103-4506
  (203) 245-9583      (800) 839-6867

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:
MICHELLE HOLMES, ESQ.
LAW OFFICES OF KAREN LEE TORRE
51 ELM STREET, SUITE 307
NEW HAVEN, CT 06510


ON BEHALF OF THE DEFENDANT:
LORI ALEXANDER, ESQ.
TYLER COOPER & ALCORN, LLP
205 CHURCH STREET
NEW HAVEN, CT 06509

1    Q    EAP program.  Tell me how you came to see

2    Sandra Rhodes?

3    A    It was a -- SNET has a newspaper called the

4    SNET Times and there was an article in there

5    saying that if you needed counseling -- saying if

6    you needed counseling, they would provide you with

7    counseling services.

8    Q    So you called the SNET EAP office?

9    A    Yes.

10    Q    This wasn't through your husband's medical

11    insurance?

12    A    No.

13    Q    And they referred you to Sandra Rose?

14    A    Yeah.

15    Q    And is Sandra Rose an employee of SNET?

16    A    No.

17    Q    Where did you see her?

18    A    In New Haven.

19    Q    Did you have choices over who to go to?

20    A    No.

21    Q    She was the recommended person at the time?

22    A    Yes.

23    Q    Okay.  could you turn to page 12 please?

24    Referring you to interrogatory number one which

25    starts on the prior page.  Okay.  That was a

1    question about efforts to find employment.  Okay.

2    And I'm going to read the response.  See documents

3    attached hereto bearing Bates Stamp No. 0191 --

4    0199.  "The plaintiff was employed by May 1998

5    through August 1998.  Plaintiff earned $135 on a

6    weekly basis."

7         As to that part of your answer, why did you

8    leave the employment of Dorothy Gerardi (phonetic)

9    as a baby-sitter?

10    A    She moved.

11    Q    Okay.  And how did you find that

12    baby-sitting job?

13    A    She was my neighbor.

14    Q    Have you done any baby-sitting or day care

15    since that time since August of 1998?

16    A    Other than my own children, no.

17    Q    Okay. Have you sought any baby-sitting or

18    day care positions since August of 1998?

19    A    No.

20    Q    Has anyone asked you to be their day care

21    provider or baby-sitter after that date?

22    A    No.

23    Q    Are you qualified to be a baby-sitter or day

24    care provider?

25              MS. HOLMES:  Objection as to form.

1   Q    Are you working now anywhere?

2   A    Outside of the home, no.

3   Q    When will you be finishing law school?

4   A    May of 2002.  That's approximate.  I might

5   have to take a few summer courses in order to

6   fulfill the graduation requirements.

7   Q    Okay.  And during the summer of 2001, which

8   is this summer, did you work at all?

9   A    No.

10   Q    Did you go to school?

11   A    No.

12   Q    And why didn't you work during the summer of

13   2001?

14   A    Because the babies were only a few months

15   old at that point.

16   Q    What was their date of birth?

17   A    March 13th.

18   Q    13th, 2001?

19   A    Yes.

20   Q    And then during the summer of 2000, you

21   worked at Capusta & Otsel?

22   A    Yes.

23   Q    Did you work full-time?

24   A    I -- some weeks, yes.  Some weeks, no.  It

25   was, he would just send me work and however long

1    it took me to accomplish that work is how many

2    hours I would put in that week, so it varied.

3    Some weeks I would work ten hours, some weeks I

4    would work 50 depending on how many searches he

5    had for me to do.

6       Q    Were you an employee or an independent

7    contractor?

8       A    An independent contractor.

9       Q    And you were a sole proprietorship?

10      A    Yes.

11      Q    That's what your tax return says doesn't it?

12                MS. HOLMES:  Objection as to form.

13      A    I thought I just said independent contractor

14   BY MS. ALEXANDER:

15      Q    Okay. So you were not ever an employee of

16   Capusta & Otsel correct?

17      A    No.

18      Q    And in the summer of 2000 you had finished

19   two years of law school?

20      A    Yes.

21      Q    Did you apply for any full-time employment

22   positions during that time for that period?

23                MS. HOLMES:  Objection as to form.

24   BY MS. ALEXANDER:

25      Q    Let me strike that.  I'll start again. For

1    the summer of 2000, did you apply for any

2    full-time employment positions, employment

3    positions as opposed to independent contracting?

4                   MS. HOLMES:  Objection as to form.

5    A    No.  I thought we had already discussed this

6    here.  Didn't you already ask me about 2000?

7    BY MS. ALEXANDER:

8    Q    I asked you whether -- Did you apply to be

9    an employee anywhere?

10                  MS. HOLMES:  Objection as to form.

11   A    No.

12   Q    And was Capusta & Otsel the only position

13   that you applied for in the summer of 2000?

14   A    Capusta & Otsel was a job I applied for in

15   the summer of 1999.

16   Q    And so you had that job for two summers?

17   A    Yes.

18   Q    Do you know how much you earned in the

19   summer of 2000 for Capusta & Otsel?

20   A    It was probably just a few thousand dollars.

21   Q    For just the summer you're referring to.

22   Yes?

23   A    Yes.

24   Q    And how about the summer of 1999?

25   A    Probably the same thing, just a few thousand

1    dollars.

2    Q    If you had applied for summer associate or

3    some other legal positions, would you have been

4    qualified for a position that paid more than a few

5    thousand dollars?

6                    MS. HOLMES:  Objection as to form.

7    A    I don't know if I can answer that.

8    BY MS. ALEXANDER:

9    Q    Did you have colleagues at law school who

10    did in fact work for law firms and other

11    businesses and make more money during 1999 summer

12    and 2000 summer?

13    A    Well, I know that most of my colleagues

14    worked full-time and go to school at night like I

15    do so they already have full-time positions.

16    Q    Did you apply for any summer associate

17    positions at any time while you were in law

18    school?

19                    MS. HOLMES:  Objection as to form.

20    A    Yeah

21    BY MS. ALEXANDER:

22    Q    Do you have a plan to work for Capusta &

23    Otsel when you graduate?

24    A    No.

25    Q    And have you applied for any positions yet

1  for your graduation in the year 2002?

2          MS. HOLMES:  Objection as to form.

3  BY MS. ALEXANDER:

4    Q    You can answer the question.

5    A    Yeah.  I haven't physically applied but I

6  have been making some contacts.

7    Q    What contacts?

8    A    I don't even have names.  I have friends of

9  friends that have firms.  And there's a local firm

10  that I was speaking with here, and she was going

11  to speak with her friend and give her my

12  qualifications and let her know I'd be interested

13  in working for the firm in Chester when I

14  graduate.

15    Q    Could you turn to page 14 please?  At the,

16  toward the top of that page.  In response to

17  interrogatory number 13 you state, "In 1997 the

18  plaintiff inherited $20,000 which she used for

19  living expenses as a result of the termination."

20          Did I read that right?

21    A    Yes.

22    Q    And that was the $20,000 from your sister's

23  estate?

24    A    Yes.

25    Q    When did you first learn that you would be

1    inheriting $20,000?

2                    MS. HOLMES:  Objection as to form.

3    A    In the beginning of 1997.  I can't recall

4    the exact date.

5    BY MS. ALEXANDER:

6    Q    Was it shortly after your sister passed

7    away?

8    A    Yes.  A few months or so.

9    Q    When did you actually receive that money?

10                    MS. HOLMES:  Objection as to form

11    BY MS. ALEXANDER:

12    Q    In 1997?

13    A    I would just say in the beginning of 1997

14    sometime.  I'd have to look at my bank account

15    records to get the exact date.

16    Q    When did you decide to go to law school?

17                    MS. HOLMES:  Objection as to form.

18    A    19 -- I would say 199 -- I guess I always

19    wanted to go to law school, and I guess I applied

20    in 1998.

21    Q    I didn't hear --

22    A    1998.

23    Q    Certainly you made the decision that you

24    were going to apply before you applied, right?

25    A    Yes.

1    Q    Approximately when did you make the decision

2    to apply to law school?

3    A    I guess in 1998.  I don't remember the exact

4    date.

5    Q    You can't be any more specific than that?

6              MS. HOLMES:  Objection as to form.

7    A    Probably the beginning of 1998 because I

8    took the LSAT.

9    BY MS. ALEXANDER:

10    Q    At the bottom of page 14 you state that you

11    are presently insured through your spouse?

12    A    Uh-huh.

13    Q    And your spouse's name is Frederick Evarts?

14    A    Yes.

15    Q    Where does he work?

16    A    IMS in Marlborough, Connecticut.

17    Q    When did he start there?

18    A    About two years ago.

19    Q    1999?

20    A    I think so.

21    Q    And he was, he ran his own business before

22    that?

23    A    No he worked at a company called Novametrix

24    before that for a couple of years.

25    Q    Is there a painting company that your

1   Q   Do they pay 80 percent?

2   A   Sometimes less.

3   Q   What is the insurance company?

4   A   HMC PPO.

5   Q   And do you receive any other benefits

6   through your husband's insurance?

7                   MS. HOLMES:  Objection as to form.

8   BY MS. ALEXANDER:

9   Q   Do you receive any benefits through your

10  husband's life insurance?

11  A   Life insurance $5,000, I think.

12  Q   Since you left SNET have you been disabled

13  from working at any time?

14                  MS. HOLMES:  Objection as to form.

15  A   No

16  BY MS. ALEXANDER:

17  Q   Is there any mental or physical reason why

18  you could not be working full-time now?

19  A   No.

20  Q   And why is it that you decided to go to law

21  school?

22  A   I wanted to be a lawyer.  I don't know how

23  -- I just wanted to, I wanted to, I wanted a

24  position where I could make more money, I guess.

25  Q   And when did you first have the idea that

1    you wanted a position that, that you wanted a

2    position that would make more money?

3                MS. HOLMES:  Objection as to form.

4    A    I guess it was my goal since I was in high

5    school to get jobs that tend to make more money as

6    you got older.

7    BY MS. ALEXANDER:

8    Q    Do you anticipate that as a lawyer you will

9    make more money than you did at SNET?

10   A    I hope so.

11   Q    Do you claim as an element of damages in

12   this case your law school tuition?

13   A    I think they would have paid for it, yes.

14   Q    What is your basis for your belief that SNET

15   would have paid for your law school?

16   A    Because I had a conversation with a woman at

17   the tuition reimbursement program, and I had asked

18   her if they paid for law school, and she said she

19   has had other employees that have had

20   reimbursement for law school.

21   Q    Do you know of anyone that has gone to law

22   school and SNET has paid for it?

23   A    No.

24   Q    And did anyone give you a definitive answer

25   on that question about whether they would have

1    to I guess December of 2000.

2    Q    Since you left SNET, have you applied for

3    any sort of technician jobs?

4    A    Yes.

5    Q    What technician job did you apply for?

6    A    It was in, it was in the early part of 1997,

7    and I don't recall the exact companies.  I did

8    apply to several companies as well as managerial

9    positions at some companies because I had received

10   my bachelor's degree by then.

11   Q    And when you say early 1997, can you be any

12   more specific than that?

13   A    Probably the summer.

14   Q    Summer of '97.  So in the middle of 1997?

15   A    Yes.

16   Q    Are you able to be any more specific than

17   what you've already stated for your applications

18   of technician jobs in 1997?

19   A    No it was too long ago.

20   Q    Is that the only time that you applied for a

21   technician job in the last four years?

22   A    Yes.

23   Q    Did you apply for any jobs outside of SNET

24   before you left SNET?

25   A    No.

24

1    Q    You hadn't applied anywhere else before you

2    left?

3    A    No.

4                    MS. HOLMES:  Objection as to form

5    BY MS. ALEXANDER:

6    Q    How much were you earning at the time you

7    left SNET?

8    A    It's approximately 40.

9    Q    Okay.  And have you applied --

10   A    With over time it's more.

11   Q    Since you left SNET, have you applied for

12   any jobs that would pay approximately the same

13   amount?

14   A    Yes.

15   Q    And were those the same technician jobs that

16   you were discussing a moment ago in the middle of

17   1997?

18   A    Yes.

19   Q    And again, are you able to name any of the

20   companies that you applied to?

21   A    No.

22   Q    How many applications did you submit?

23   A    It was approximately three or four.

24   Q    Did you have any interviews?

25   A    None.

1    Q    Did you follow up with telephone calls?

2    A    Yes.

3    Q    And you received a computer programming

4    degree from South Central Community College?

5    A    Yes, years ago.

6    Q    What year was that?

7    A    '84, I think.

8    Q    Okay and what is a computer programing

9    degree?  Is it an associate's degree?

10    A    Yes.

11    Q    So less than a bachelor's degree?

12    A    Yes.

13    Q    Did SNET pay for that?

14    A    No.

15    Q    And what kinds of jobs does that degree

16    qualify you to do?

17    A    Probably data entry jobs.

18    Q    Anything else, computer programming jobs?

19    A    Probably not with an associate's.

20    Q    No?

21           MS. HOLMES:  Objection as to form.

22    A    Probably need a bachelor's to do

23    programming.

24    BY MS. ALEXANDER:

25    Q    Since the time you left SNET, have you

1    A    I -- those are the jobs that I'm trained and

2    skilled at

3    BY MS. ALEXANDER:

4    Q    Are you qualified to be a computer

5    programmer?

6              MS. HOLMES:  Object as to form.

7    A    No

8    BY MS. ALEXANDER:

9    Q    What kinds over technical jobs are you

10   qualified to do?

11             MS. HOLMES:  Object as to form.

12   A    Pay phone installer, I guess would be the

13   only one.

14   BY MS. ALEXANDER:

15   Q    No other technical jobs?

16             MS. HOLMES:  Object as to form.

17   A    I guess that would be it.

18   BY MS. ALEXANDER:

19   Q    Now, in 1994 did you request, put in a

20   transfer request, for a position called service

21   consultant?

22   A    Yes.

23   Q    What does a service consultant do?

24   A    Sells pay phones.

25   Q    Sells what?

1    A    Pay phones.

2    Q    So it's a sales/marketing position?

3    A    Uh-huh.

4    Q    You have to say "yes" or "no." Just so that

5    he can write it down.

6    A    Yes.

7    Q    So you're qualified for a marketing

8    position?

9    A    No.

10    Q    That was a marketing position, right?

11    A    No.

12    Q    You're not qualified for it because you

13    didn't pass a test?

14    A    Correct.

15    Q    But outside of SNET, in terms of your other

16    qualifications, are you qualified in general to do

17    marketing and sales?

18              MS. HOLMES:  Object as to form.

19    A    No

20    BY MS. ALEXANDER:

21    Q    No.  Why not?

22              MS. HOLMES:  Object as to form.

23    A    I've never done them.  SNET would have

24    provided training for those sales positions.

25    BY MS. ALEXANDER:

1    Q    Would you be qualified to do entry-level

2   sales positions?

3                    MS. HOLMES:  Object as to form.

4    A    No.  I don't think I'm good at it,

5   obviously, I couldn't pass the test.

6   BY MS. ALEXANDER:

7    Q    Okay.  So during the entire time that you've

8   been going to law school, you've been going at

9   night?

10    A    Correct.

11    Q    Never during the day?

12    A    No.

13    Q    Okay.

14    A    I might have taken one class at 3:00, which

15   might be considered a day class, but all my

16   classes are at night.  I'm registered as a night

17   student.

18    Q    And before your twins were born in March of

19   this year, what did you do during the days after

20   you left SNET once you started law school and

21   before your twins were born?  What were you doing

22   during the day?

23    A    The baby-sitting job and Capusta & Otsel.

24    Q    Okay.  And how many hours a week was the

25   baby-sitting job?

1    A    Forty.

2    Q    Was there ever a time that you weren't

3    working while you had been in law school?

4                MS. HOLMES:    Object as to form.

5    A    Yeah.

6    BY MS. ALEXANDER:

7    Q    When was that?

8    A    From August '98 to May of '99.

9    Q    You didn't work at all?

10    A    Right.

11    Q    Why didn't you work at all during that

12    period?

13    A    I think I had tried to because I was going

14    to law school and I was taking care of Kyle and I

15    had lost the baby-sitting job, so.

16    Q    Okay.  Between August of '98 and May of '99,

17    did you apply for any jobs?

18    A    No.

19    Q    Was your decision to go to law school

20    voluntary?

21    A    Yes.

22    Q    No one forced you to go?

23    A    No.

24    Q    And you didn't go to law school because you

25    couldn't find a job anywhere?

1              MS HOLMES:  Object as to form.

2     A    I think that was one of the reasons I did go

3     to law school because I wasn't finding a job.  I

4     had applied for several jobs in the technical

5     field.  I wasn't getting them.  It was only three

6     jobs, and I wanted a career, I guess, to make more

7     money.  And so I decided to enter a field which I

8     hoped to increase my salary on and that would be

9     law school.

10    BY MS. ALEXANDER:

11    Q    Okay.  now let's switch gears a little bit

12    and talk about some of the claims in your case.

13    What individual or individuals do you claim

14    discriminated against you because you're a woman?

15    A    Matt Cordner.

16    Q    Okay.  And you don't claim that Pat Kinsella

17    discriminated against you?

18    A    No.

19    Q    Pat is a man, right?

20    A    Correct.  Although he did make comments that

21    were inappropriate, but --

22    Q    Well, is that a claim in this case that Pat

23    Kinsella discriminated against you?

24    A    No.

25    Q    And do you believe that Connie Rogers, the