1    money in the truck? You would take the coin box

2    out and secure them inside the facility?

3    A    Can you point to where in the deposition

4    that I said that it was policy?

5    Q    I'm asking you a separate question. I'm not

6    asking you whether you said that or not. I'm just

7    referring that to you for your reference. But was

8    it your practice if there was money inside of the

9    truck at the end of the day to take the coin box

10   out and lock it up?

11   A    It was common practice, and they don't want

12   you working overtime. If it was 4:30, you would

13   unload your truck the next morning. If you came

14   in and you had time and it was before, if you came

15   in before 4:30, and you had time, then you would

16   unload. It was common practice for you to unload

17   your truck the night before. And the other men

18   did the same thing. Sometimes they unloaded their

19   truck, sometimes the next morning. That was

20   common practice, and we all practiced that the

21   same way there. And the managers saw all this.

22   They saw coin boxes being unloaded the next

23   morning often.

24   Q    Did you take --

25                    MS. HOLMES: Are you finished

1          answering your question?

2                    THE WITNESS: Yes.

3   BY MS. ALEXANDER:

4   Q    Did you distinguish between when you had

5   money in the coin boxes and when you didn't?

6                    MS. HOLMES:  Objection as to form.

7   A    Did I distinguish?  Did I know?

8   Q    Did you, did you take the receptacle out

9   when it had money in it?

10  A    No.

11                   MS. HOLMES:  Just so the transcript

12           is clear, we just have to let Attorney

13           Alexander finish her question before you

14           respond to the question, and then you

15           can answer it.

16                   MS. ALEXANDER:  Would you read it

17           back please?

18                   (The referred to question was then

19           read back by the court reporter.)

20                   MS. HOLMES: Object as to form.

21  BY MS. ALEXANDER:

22  Q    The distinction that I'm making is between

23  when there was money in the receptacle and when

24  there wasn't.  Did you make it a practice to take

25  the coin box out of the truck and put it inside

1   the facility if there was money in it, you

2   individually?

3   A    No.  Like I said, it was more of a time

4   factor.  If you had time before 4:30, you emptied

5   the truck of any equipment and you took out any

6   coin receptacles if you had time. If not, we did

7   it in the morning.

8   Q    So you did that based on whether you had

9   time?

10              MS. HOLMES:  Objection as to form.

11  BY MS. ALEXANDER:

12  Q    Before the ending time?

13  A    Correct.

14  Q    And you didn't make a distinction whether

15  you had money in the coin box or not?

16  A    Me and all my colleagues did not.

17  Q    When -- sometimes when you had money in your

18  truck, did you fail to lock your vehicle?

19              MS. HOLMES:  Object as to form.

20  A    If I had money in it I did make an attempt

21  to lock my vehicle.  I tried to, if there was

22  money, lock the back of it at least

23  BY MS. ALEXANDER:

24  Q    And how were you able to do that?  How do

25  you lock the back of the truck?

1    A    Well, before you would open the door and hit

2    the knob and shut the door.  But mine was broken,

3    I had no knob on mine.  So I would have to

4    physically put the key in to lock it.

5    Q    Use the key?

6    A    Yes.

7    Q    And you did that when there was money in the

8    truck?

9    A    Yes.

10   Q    Even after it was broken, so to speak?

11   A    I tried to remember, yes.

12   Q    And why was it that you tried to lock it

13   when there was money in it?

14   A    I guess to secure the money.

15   Q    Okay.  Did you ever tell anyone at SNET that

16   you were bored with your job as a service

17   technician?

18   A    I don't think so.

19          MS. ALEXANDER:  Could you mark this

20          please.

21          (THEREUPON, DEFENDANT'S EXHIBIT NO.

22          16, PAGES OF DAY TIMER, WAS MARKED

23          FOR IDENTIFICATION.)

24   BY MS. ALEXANDER:

25   Q    Showing you Defendant's 16, can you take a

1   Q    And in what ways?

2   A    In I was, I was questioned and written up

3   for things that the other men always did and they

4   weren't questioned or written up for.

5   Q    Can you be any more specific than that?

6   A    Do you want me to go through every single

7   allegation at that point?

8   Q    I want a list of all of the reasons why you

9   believe that Matt Cordner had a problem with you.

10              MS. HOLMES:  And I'm going to

11          continue to pose this same objection

12          that you're breaching your agreement,

13          that this was covered extensively at the

14          first deposition.

15              MS. ALEXANDER:  I'm trying to get

16          to a different question.  This is really

17          a background question.

18  BY MS. ALEXANDER:

19  Q    I want you to please tell me the reasons why

20  you say Matt Cordner had a problem working with

21  women. You were treated differently in what

22  respect?

23              MS. HOLMES:  And I'm going to

24          continue to pose this same objection,

25          that this topic was covered repeatedly

1          and thoroughly at the first deposition

2          and this answer is subject to that

3          answer that was given to the same

4          question as at the first deposition

5    BY MS. ALEXANDER:

6    Q    You can answer the question.

7    A    Because I was written up for things that the

8    other men were guilty of themselves of doing and

9    weren't written up for.

10   Q    And what was that?

11   A    Leaving the trucks unlocked, having my time

12   sheets match my DCWS, having my cellular phone

13   taken away when we went over, if I went over 300

14   minutes.  And there were other men who had high

15   minutes per trouble and their phones weren't taken

16   away.  I was questioned regarding my minutes per

17   trouble and why it was so high, and other men had

18   higher minutes per trouble and they weren't

19   questioned.

20   Q    Have you finished your answer?

21   A    I could if I can go through and read this.

22   I have everything written down here if you want to

23   give me a minute.

24   Q    Let me ask you about those.  When you say,

25   others with higher minutes per trouble were not

1  questioned but you were, who in particular do you

2  know that had higher minutes per trouble than you

3  did but were not questioned when you worked for

4  Matt Cordner?

5  A    I can't recall exactly every single

6  technician, but they posted the minutes for

7  trouble for every single technician up in the

8  garage, and SNET has those records.  So SNET would

9  know and could tell you who it was that had

10  higher.  SNET would have records of who had higher

11  minutes per trouble than myself.

12  Q    Are you able to answer the question any more

13  specifically than that?

14  A    No.  It was too long ago.

15  Q    And you say that your cell phone was taken

16  away because it was over 300 minutes but other

17  technicians also had over 300 minutes.  Can you

18  name any technicians that had over 300 minutes of

19  cellular usage more than one month in a row during

20  the time that you worked for Matt Cordner?

21            MS. HOLMES:  Objection as to form.

22  A    SNET would have those records also.  They

23  have the records of every single technician and

24  how many minutes that they used on their cell

25  phones.

1    Q    Can you be any more specific in your answer

2    than that?

3    A    No.

4    Q    And do you dispute that your phone usage was

5    over 300 minutes for several months in a row?

6                MS. HOLMES:  Objection as to form.

7                Do you want to put a time frame on that?

8    BY MS. ALEXANDER:

9    Q    Just prior to the time it was taken away?

10   A    No.  It was probably high, but I had offered

11   to pay for those minutes that I went over.  And it

12   was right around the time my sister passed away,

13   probably right before she passed away.  And the

14   month after she passed away it was probably high.

15               MS. HOLMES:  Are you finished with

16               your answer.

17   A    Yes

18   BY MS. ALEXANDER:

19   Q    You said that you were spoken to about your

20   time sheets not matching the DCWS?

21   A    Yes.

22   Q    But other technicians were not?

23   A    Yes.

24   Q    When you were spoken to were other

25   technicians present?

1              MS. HOLMES:  Object as to form.

2    A    No, no

3    BY MS. ALEXANDER:

4    Q    And when other technicians were spoken to

5    about other matters by Matt Cordner, were you

6    present?

7              MS. HOLMES:  Objection as to form.

8    BY MS. ALEXANDER:

9    Q    During the time you worked for Matt Cordner?

10   A    Was I present? No.

11   Q    And so is it fair to say that you were not

12   present for every single conversation between Matt

13   Cordner and his subordinates during the time you

14   worked for him?

15   A    Yes.

16   Q    And so you don't know, do you, whether he

17   had conversations with other technicians about

18   their time sheets?

19   A    Yes, I do.

20   Q    Do you have personal knowledge of that?

21   A    Yes.

22   Q    Okay. Who, in particular, who, in

23   particular, have you asked?

24   A    I went around and asked all the guys if they

25   were being questioned about their time sheets,

```
 1     Q     When were you written up?

 2     A     It's in here.

 3     Q     It was in '97, right?

 4     A     Yes.

 5     Q     It was shortly before you left, right?

 6     A     I guess.  What's shortly? It was in '97 and

 7     I left in '97.  So whatever you define as short.

 8     Q     Okay.

 9                 MS. ALEXANDER:  Could you mark that

10              please?

11                    (THEREUPON, DEFENDANT'S EXHIBIT NO.

12                    17, TROUBLE REPORT, WAS MARKED FOR

13                    IDENTIFICATION.)

14     Q     Showing you Defendant's Exhibit 17, what is

15     that document?

16     A     My trouble report.

17     Q     Is that document, do you claim that document

18     supports your claims in this case?

19     A     Yes.

20     Q     In what way?

21     A     It shows that my lock was broken.

22     Q     And when was your lock first broken?

23                 MS. HOLMES:  I'm going to object to

24              this line of questioning. It was already

25              covered in the original deposition and
```

1           once again, Attorney Alexander is

2           insisting on going over topics already

3           covered when she agreed not to.

4     BY MS. ALEXANDER:

5     Q    When was your lock broken?

6     A    I don't recall the exact date.

7     Q    Is it fair to say, based on this note, that

8     it was broken since January of '97?

9     A    Based on this note?

10    Q    At the bottom it says, "Installed two new

11    lock cylinders that have been on order since

12    January."

13    A    Then, yes.

14    Q    And do you remember, sitting here today,

15    that your lock was broken for more than two

16    months?

17    A    It's possible, yes.

18    Q    During those two months before, before you

19    received a written warning about this issue, did

20    you tell Matt Cordner that your lock was broken?

21    A    I don't recall, no. I don't think so, no.

22              (THEREUPON, DEFENDANT'S EXHIBIT NO.

23              18, MEMO IN PERSONNEL FILE, WAS

24              MARKED FOR IDENTIFICATION.)

25    Q    Showing you Defendant's 18, that's a copy of

1   a memo in your personnel file?  Excuse me.

2   A    Yes.

3   Q    And referring to the middle of the document,

4   and do you have an understanding that this

5   document was written by Matt Cordner?

6   A    Yes.

7   Q    Okay. And do you remember having a

8   conversation with Mr. Cordner around April 30th of

9   '97, about these issues, production time,

10  concerning production and sick time?

11  A    I remember issues about production time.

12  Q    Do you have any reason to doubt that he also

13  discussed with you concerns about sick time?

14  A    I don't recall it.  I recall definitely

15  being spoken to about production time.

16  Q    Okay.  Do you dispute that your production

17  time had slowed down or gotten worse in 1997?

18  A    No.

19  Q    You don't dispute that?

20  A    No.  I had always been one of the -- I had

21  always been at the bottom.  I had always had the

22  lowest minutes for trouble under all my previous

23  supervisors, but at the time I felt I was really

24  being discriminated against.  Yes, I don't dispute

25  the fact that my production time probably got

1    worse and worse as I felt the discrimination

2    increased.

3    Q    And at about in the middle of the page, "she

4    states she no longer wants to work at SPS or

5    SNET." Do you see that?

6    A    Yes.

7    Q    Did you tell Matt Cordner that you no longer

8    wanted to work at SPS or SNET in April of '97?

9    A    Well, I don't know what SPS is. I probably

10   told him my emotional state was so bad that, yes.

11   I don't want to work at SNET anymore. I had been

12   happy working for the previous nine years. I had

13   enjoyed working for SNET but around this time,

14   once the harassment got so bad, yes. I wanted to

15   leave SNET.

16   Q    Okay. So you probably told him in April that

17   you no longer wanted to work at SNET?

18              MS. HOLMES:  Object as to form.

19   A    It's possible I did because I, I couldn't

20   take getting up in the morning anymore and going

21   to work at that point.

22              MS. HOLMES:  Excuse me.  At this

23              point, Attorney Alexander, I would

24              appreciate if you would let her finish

25              her answers.  Saying, "okay, okay,"

1    you would leave?

2    A    Yes.

3    Q    And did you want that pink slip to file for

4    unemployment compensation?

5    A    Yes.    Until I could find another job, yes.

6    Q    And what did -- did Matt Cordner tell you

7    whether he would give you a pink slip or not?

8    A    No.

9    Q    I only have one of these so I'm going to ask

10    you to look on with your counsel, please.

11              MS. HOLMES:    I ask that you just

12              make a copy for me at the break, please.

13              (THEREUPON, DEFENDANT'S EXHIBIT NO.

14              19, DOCUMENTED VERBAL WARNING, WAS

15              MARKED FOR IDENTIFICATION.)

16    BY MS. ALEXANDER:

17    Q    Defendant's Exhibit 19, which says,

18    "documented verbal warning" at the top.    Do you

19    see that?

20    A    Yes.

21    Q    Okay. Did you receive this document on or

22    about March 17, 1997?

23    A    Well, I didn't sign this.    So I, I'm not

24    sure I ever received this document.

25    Q    Did you receive a verbal warning on or about

1    March 17, 1997?

2      A    Yes.

3      Q    And was the verbal warning consistent with

4    what's written here?  Why don't you take a minute

5    to read it?

6      A    No.  Because I don't recall being warned

7    three times.

8      Q    But my question was the morning that you

9    gave, that Matt Cordner gave you the verbal

10   warning on March 17, 1997, did he say to you in

11   substance what's written down here?

12     A    I don't think he specifically told me he

13   warned me three times in the past.  I don't recall

14   that and being given a verbal warning.

15     Q    Is it consistent, the rest of it consistent

16   with what Mr. Cordner told you on that date?

17     A    I can't say I specifically recall being

18   shown our responsibilities, it's possible, but I

19   don't specifically recall at this point.  The only

20   thing I can recall was being given a documented

21   verbal warning.

22     Q    Do you recall anything else that's written

23   on here?

24     A    No.

25     Q    Are you disputing that this is accurate or

1    just that you can't recall?

2    A    It's just that I can't recall.

3    Q    Had you in fact been warned three times

4    prior to March of 1997, that doors had to be

5    locked, vehicle doors had to be locked?

6    A    I don't recall being warned three times, no.

7    Q    Did you understand that it was against SNET

8    corporate policy prior to March 1997, to leave the

9    vehicle doors unlocked?

10   A    I understand it's probably against policy

11   but general practice was for everyone to leave the

12   premises and just leave their truck unlocked.  It

13   was inside a locked garage, it was gaited, and it

14   had a guard, and if you would walk through you

15   would be on one side of the garage.  And I walked

16   on one end of the garage and I would walk through

17   and all the other trucks and general policy was

18   for people to just to leave the trucks open.

19   Q    General practice?

20   A    General practice.  Sometimes there was

21   probably people, there might have been a few

22   individuals who were neurotic about it and did

23   lock it, but for the most part, they left their

24   doors unlocked.

25   Q    Can you name any technicians who routinely

1    left their trucks unlocked in the garage during

2    the time you worked for Matt Cordner?

3        A    I would say most of them.  I would say

4    Joseph Levy, he probably locked his truck.

5        Q    I'm asking the other question though.

6        A    But I would say the other technicians, they

7    definitely left their trucks unlocked.

8        Q    Who?

9        A    All the others.

10       Q    Are you able to name any technicians who

11   routinely left their trucks unlocked during this

12   period?

13       A    All the technicians that I worked with.  So

14   it would have been Dave Ianello, Lou Marino,

15   Robert Bach (phonetic), Richard Dellavolpe.  I

16   think that's it.

17       Q    Do you -- and those are all people that you

18   claim routinely left their trucks unlocked?

19       A    You could see the windows were rolled down.

20   The front of their cabs were open.

21       Q    So the answer to my question would be?

22       A    Yes.  Would be yes.

23       Q    Do you dispute that on March 7, 1997, you

24   did leave your vehicle unlocked?  Do you dispute

25   that?

```
 1    A    No.

 2    Q    And do you dispute that there were tools,

 3    supplies, and a coin box with cash in it inside

 4    the truck?

 5    A    No.

 6    Q    And you understood that you were being given

 7    a six-month warning?

 8    A    Yes.

 9              MS. ALEXANDER:  Would you mark this

10              please?

11              (THEREUPON, DEFENDANT'S EXHIBIT NO.

12              20, LETTER WRITTEN BY MATT CORDNER,

13              WAS MARKED FOR IDENTIFICATION.)

14    Q    Showing you Defendant's 20, is this also a

15    letter that you understand to have been written by

16    Matt Cordner?

17    A    Yes.

18    Q    That was in your personnel file?

19    A    Yes.

20    Q    I'm going to ask you to take a minute to

21    read it and tell me if there's anything that Mr.

22    Cordner wrote in this memo that was not true?

23    A    Have you read this?  Because I'm not sure

24    what this means, "when asked why she didn't call

25    the maintenance center," and then there's a big
```

1    said that?

2    A    Yes.  But I dispute this fact that this says

3    "this time does not show on the DCWS." And it

4    can't show on the DCWS, is my complaint.

5    Q    Okay.  Anything else that's inaccurate in

6    this memo?

7    A    No.

8    Q    And Debbie G. Is who?

9    A    Union Steward.

10    Q    Debbie Ganare (phonetic)?

11    A    Yes.

12    Q    Now, the garage that you worked at was in

13    New Haven, is that right?

14    A    Yes.

15    Q    And when you first applied for the service

16    technician job at SNET, were you living in

17    Meriden?

18    A    Yes.

19    Q    You lived in a condominium?

20    A    Yes.

21    Q    What was the, what is the address of that

22    condominium?

23    A    20 Gravel Street, in Meriden.

24    Q    Is that right near the high school?

25    A    Yes.

1   make that commute of an hour and a half?

2   A    No.  There was other people actually in my

3   town that worked in Norwalk with me.

4   Q    And did you ask for a transfer to New Haven?

5   A    Yes.  After several years, about three years

6   commuting.  Yes.

7   Q    When did you first become a service

8   technician?

9   A    '89.

10  Q    Eventually you moved to, eventually you

11  moved your job to New Haven, or you were working

12  out of New Haven?

13  A    Hamden was next.

14  Q    Hamden.  And how far was your commute from

15  Chester to Hamden?

16          MS. HOLMES:  Objection as to form.

17  A    It was about a half hour.

18  Q    And then you started working out of New

19  Haven after that?

20  A    Yes.

21  Q    Do you remember when you started working out

22  of the New Haven garage?

23  A    No.

24  Q    You don't remember what year?

25  A    They have this all on my records.  If I had

1    my personnel file here in front of me I could tell

2    you.

3        Q    And how long was your commute from Cedar

4    Lake Road in Chester to the New Haven garage?  How

5    many minutes?

6        A    About an hour.

7        Q    You still live there?

8        A    Yes.

9        Q    And one of your claims in this case is that

10   you should have been allowed to work out of North

11   Madison, right?

12       A    Yes.

13       Q    And is that office the one at the junction

14   of Route 79 and 81?

15       A    Yes.

16       Q    Has there ever been an SNET coin satellite

17   office in North Madison, to the best of your

18   knowledge?

19       A    No.  It was something new that they were

20   initiating.

21       Q    Is it about seven miles from the North

22   Madison office to the Guilford office of SNET?

23                   MS. HOLMES:  Wait. I believe I'm

24            going to object to this line of

25            questioning in that this topic also was

76

1   A   I think I understand what you're asking.  I

2   would say we had -- you mean how many times each

3   phone had had trouble reports on it?  No.  I

4   should say we had just as many trips out there.

5   We had many line troubles out there.

6       There was a lot of woods, very long

7   distances so pay phones didn't work out there.

8   The longer the line, the more trouble you have on

9   a pay phone, but in New Haven are probably

10  vandalized more.  So I would say it's probably

11  even as far as --

12              MS. HOLMES:  Denise, were you

13          finished with your answer?  I'm just

14          wishing that, I know we're trying to

15          rush along but it's seems like you're

16          not being able to finish your answer.

17  BY MS. ALEXANDER:

18  Q   Did you have an opportunity to answer your

19  question?

20  A   Yes.  That one I did.

21              MS. HOLMES:  Fine.

22  BY MS. ALEXANDER:

23  Q   How many minutes from your home, in terms of

24  a commute, is the North Madison office that you

25  wanted to satellite out of?