1    A    About 15, 20 minutes.

2    Q    And how, and you were offered to satellite

3    out of the Guilford office, right?

4    A    Yes.

5    Q    And how many minutes is that from your home?

6    A    I've never actually timed it from my home to

7    Guilford.  Maybe 45 minutes.

8    Q    And your claim in this case relates to your

9    desire to satellite out of the North Madison

10    office, not the Madison office, right?

11    A    Correct.

12    Q    And you never asked to satellite out of the

13    Madison office, right?

14    A    Correct.  I had been promised a North

15    Madison office.

16    Q    Do you understand that satellite offices

17    were to be offered to employees in order of

18    seniority?

19    A    Yes.

20    Q    And by seniority meaning how long you'd been

21    with the company?

22    A    Correct.

23    Q    Did Robert Bach have more seniority than

24    you?

25    A    Yes.  But he lived in Prospect.

```
 1      Q    I'm only asking you whether he had more
 2   seniority than you.  Did Robert Bach have more
 3   seniority than you?
 4              MS. HOLMES:  Attorney Alexander,
 5          she is entitled to answer the question
 6          how she'd like to answer the question.
 7              MS. ALEXANDER:  I'd like her to
 8          answer the question that I asked.
 9   BY MS. ALEXANDER:
10      Q    Did Richard Dellavolpe have more seniority
11   than you?
12      A    There were several men that had more than
13   me, but they all told me that they did not want to
14   satellite out of Madison because it would have
15   taken longer than New Haven, and Robert Bach lived
16   in Prospect and so it wouldn't be --
17      Q    You mean, did Richard Dellavolpe have more
18   seniority than you?
19      A    I think so.
20      Q    Did David Trapraem (phonetic) have more
21   seniority than you?
22      A    I don't know.  He --
23      Q    Did Bill Farenbloom (phonetic) have more
24   seniority than you?
25      A    I don't know.
```

1    Q    Did Lou Marino?

2    A    No.

3    Q    Did Joseph Levy have more seniority than

4    you?

5    A    I don't know.  SNET has all the, all the

6    service dates of, and so they would be able to

7    tell you who has more.

8    Q    You don't know?

9    A    I don't know the exact dates of everyone's

10   beginning service date.  I do know that in some

11   cases it's true that they had more service than

12   me.  And when we had been discussing satellite

13   offices, they said it wouldn't be feasible for

14   them to drive all the way out there, so they

15   wouldn't get it.  So it was promised to me.

16   Q    Did Oswell Gardner (phonetic) have more?

17   A    I don't know.

18   Q    Do you know whether Dave Ianello had more

19   seniority than you?

20   A    I don't know. If he did I'm not aware of it.

21   But SNET has all those records and they can tell

22   you who has more seniority than me.

23   Q    Did Crystal White promise you that you could

24   move to the satellite office in North Madison?

25   A    Yes.

1    Q    And when did you work for her?

2    A    Right before Pat Kinsella came to the Hamden

3    office.

4    Q    Did Crystal White leave the company in 1993?

5    A    I don't think it was that early.

6    Q    Do you remember when you stopped working for

7    Crystal White?

8    A    When she was fired.

9    Q    Do you remember what year that was?

10   A    No.

11   Q    When did she make that promise to you?

12   A    I don't recall the exact date.

13   Q    Do you know the year?

14   A    Do you have the date as to when she was

15   fired?

16   Q    Do you have any reason to doubt that she

17   left the company in July of '93?

18   A    I don't think it was that early, but if

19   that's what you're telling me then it would

20   probably be sometime in '93 that we had

21   discussions about the satellite.  Whatever year it

22   was before she left.  The year before she left or

23   before she was fired that we had discussions about

24   the satellite.

25   Q    Okay.  And then Pat Kinsella became your

```
1    supervisor, right?

2    A    Yes.

3    Q    And you've said Pat Kinsella did not

4    discriminate against you in your opinion because

5    you were a woman, right?

6    A    No.

7    Q    And he was your supervisor in '93 to '96?

8    A    Yes.

9    Q    And Mr. Kinsella did not move you to the

10   North Madison, to any satellite office in North

11   Madison, right?

12   A    No.

13              MS. HOLMES:  Objection as to form.

14          Attorney Alexander, I can start quoting

15          from the transcript those same questions

16          that were covered.  And I have to

17          express my dismay with the fact that we

18          can't even have an agreement between the

19          parties on the record in front of a

20          judge that's going to be honored

21   BY MS. ALEXANDER:

22   Q    You can answer the question.

23   A    Just so I give the exact same answer, can I

24   refer to the --

25              MS. HOLMES:  I'm just going to
```

1    satellite, yes.

2    Q    So you did not satellite out of North

3    Madison at any time while Pat Kinsella was your

4    supervisor during that approximate three year

5    period, right?

6    A    No.  He had been working on the satellite

7    office and he had promised it to me, and we had

8    discussions regarding the satellite office, and he

9    asked me for help in getting the logistics of

10   satelliting out of an office resolved, such as;

11   how I would order the equipment, things like that,

12   how I would sign off, sign off in a job, and how I

13   would get pay phone equipment out to the satellite

14   office.  But I had never physically gone out

15   there, no.

16   Q    And you're not claiming, are you, that Pat

17   Kinsella's failure to put you in North Madison in

18   the satellite during the three years that he

19   supervised you was because you were a woman?

20   A    No.

21              MS. HOLMES:  Objection as to form.

22   A    Because Pat was very busy and he never got,

23   he wanted to work out all the details before he

24   moved me.  And he was too busy to do that.  He

25   asked me for help in solving some of the logistics

1   in moving out there such as; receiving, how I
2   would get paperwork out, when I would attend
3   meetings, how I would get the equipment so --
4   BY MS. ALEXANDER:
5       Q    But you do claim, do you not, that in the
6   months that Matt Cordner supervised you he did
7   discriminate against you by not moving you to
8   North Madison at that time?
9       A    Yes.
10      Q    Do you know how many pay phones there are in
11  North Madison?
12      A    No.  But I know we had at least trouble
13  there daily so we always had to go to Madison
14  almost on a daily basis.
15      Q    Is it your testimony that Crystal White
16  practically promised you that you would be able to
17  satellite out of North Madison?
18      A    It's my testimony that Crystal White was
19  setting up a satellite office in that obviously
20  she would have to offer it to the senior employees
21  and that, but that many of those senior employees
22  wouldn't want it and so that it would go to me.
23      Q    So it is your testimony that she did not
24  actually promise you that you would satellite out
25  of North Madison?

1    A    I, she told me that it would have been mine

2    because no one else wanted it, yes.

3    Q    And that was the extent of what she said to

4    you?

5    A    Yes.

6    Q    To your knowledge, what is the purpose

7    behind creating a new satellite office?

8    A    To my knowledge, at the time the State of

9    Connecticut had asked corporations to try and

10   reduce the amount of commuting traffic to the

11   major cities and since SNET had offices in every

12   single town and city they wanted, the state had

13   asked SNET I thought to try and save some of the

14   traffic congestion going into the cities by having

15   operators work out of their homes, which they do

16   now have technicians satelliting out of the local

17   offices, which many do.  Many men satellite out of

18   the offices.

19   Q    Do you have any personal knowledge that that

20   was SNET's purpose in creating satellite offices?

21                MS. HOLMES:  Objection as to form.

22   A    Yes

23   BY MS. ALEXANDER:

24   Q    Personal knowledge of that?

25   A    I can't recall exactly who told me that but

1    either?

2    A    I don't know what has gone on since I left.

3    I don't know that.

4    Q    Do you have any reason to believe that any

5    male employee of the coin department has ever been

6    allowed to satellite out of North Madison?

7    A    Do I have reason to believe?  No.

8    Q    Let's talk about time sheets for a minute.

9    A    Uh-huh.

10    Q    Do you agree that it's important to record

11    your time accurately on your time sheet when

12    you're a service technician?

13    A    No.  I agree that it's impossible to do it

14    as accurately as Matt was requiring it to be done

15    because he was requiring it to be matched up to

16    the DCWS which is physically impossible.

17    Q    So is it your position that it is important

18    to report your time accurately or not important to

19    record your time accurately?

20    A    I would say it's important to record your

21    total amount of hours per day that you worked

22    accurately.

23    Q    Are you saying there were lots of other

24    spaces to fill in?  You had to fill in the time

25    you spent on each job, right?

```
1    Q    How about in the counseling that you

2    complained Mr. Cordner had with you concerning

3    your time sheets?  Is it your testimony that he

4    never told you that your time recorded on each job

5    needed to be accurate?

6    A    I'm sorry.  Yes, he did.  He would tell me,

7    no.  This is what he would tell, me he would tell

8    me that my time on my the time sheets did not

9    match my DCWS.  And it couldn't, it can't.

10   Q    Did you have instructions from Matt Cordner

11   that your handwritten time sheets were supposed to

12   be accurate with respect to the time you spent on

13   each job?

14   A    No.  All I remember is being spoken, I do

15   remember him talking to me, telling me that my

16   time sheets and the DCWS did not match up.  That's

17   all I remember him telling me.

18   Q    And you don't remember him ever telling you

19   or you having an understanding that the time spent

20   on each job also needed to be recorded accurately?

21   A    No.  Because it was common practice that you

22   just did it at the end of the day, and you just

23   gave an estimate as to how much time you spent on

24   it.  It just doesn't really matter.

25   Q    Were you paid by your time spent?
```

1    Q    I'm only asking you that's three plus weeks

2    after that occurred.

3         Is that right?

4    A    About three weeks, yes.  But I had -- it was

5    actually two weeks after I had come back from the

6    leave of her death.

7    Q    Did you receive any sort of warning as a

8    result of this ride-along exercise?

9    A    No.  Just an evaluation.

10    Q    Did Mr. Cordner mistreat you in any way

11    during the ride-along exercise?

12    A    No.

13    Q    Did he yell at you or unfairly criticize

14    your work during the ride-along exercise?

15    A    He was very picky, I remember.

16    Q    Do you remember any details?

17    A    No.

18    Q    Did he give you pointers?

19    A    I do recall some pointers.  As a matter of

20    fact, when he -- we went to leave the garage.  The

21    garage is in New Haven at Long Wharf Avenue.  And

22    I think my first job was in the shoreline area.

23    And I got on the highway by going on the Ferry

24    Street bridge.  And he gave me a hard time saying

25    I could save a couple of minutes by getting on the

1   exit on Wooster Street.

2   Q    And you thought that was unfair?

3   A    I thought it was a little unreasonable to

4   save that minute or two to criticize what exit you

5   got on to get to your first job.  Critical, real

6   critical.

7   Q    Did you feel that your performance was up to

8   par as of February 6 of 1997?

9   A    I would say I don't know.  All I can

10   probably -- not this time.  No.  Probably wasn't.

11   After a couple of weeks after watching your sister

12   go I can't imagine my work would be very good.

13   No.

14   Q    And did you ever see in your personnel file

15   any sort of formal documentation of poor

16   performance or were there any results of work

17   performance criticism based on this riding

18   exercise?

19   A    There is criticism of my performance in my

20   personnel file, but I don't know if it relates to

21   this particular riding exercise or not.

22   Q    Now, in your complaint you said that at

23   least two male service technicians in your unit

24   had less than one year on the job but were never

25   subjected to a ride-along exercise?

1    Q    Okay.  Unemployment.

2         Anything else?

3    A    No.

4    Q    So you had no earned income for 1997 at all.

5         Is that right?

6    A    No.  Other than the unemployment.  No.

7    Q    And what is your college degree?

8         A Bachelor of arts or Bachelor of science?

9    A    B.S.

10                   MS. ALEXANDER:  Can you mark this.

11                   (THEREUPON, DEFENDANT'S EXHIBIT NO.

12                   27, 1998 TAX RETURN, WAS MARKED FOR

13                   IDENTIFICATION.)

14   BY MS. ALEXANDER:

15   Q    Showing you Defendant's 27, is that a copy

16   of your 1998 tax return?

17   A    Yes.

18   Q    And did you and your husband together earn

19   $33,004?

20   A    Yes.

21   Q    How much income did you yourself earn in

22   your work efforts in 1998?

23   A    It was approximately $150 a week for

24   approximately nine months, so --

25   Q    Okay.

1    Q    Are you planning to take classes in

2    employment law?

3    A    Yes.

4    Q    You were asked last time whether you

5    believed there was an unlimited amount of time

6    that you could use your telephone and your answer

7    was no.  Unlimited.  No.  Page 105.

8         What was your understanding of unlimited to

9    be?

10   A    There was a rumor that it was around 300,

11   but it was never confirmed, so the rumor, my

12   suspicion was they didn't want you going over 300,

13   but there was never any -- there was never any

14   paperwork submitted as to an actual time.  We were

15   never told you can't go over 300 minutes

16   specifically.  There was just -- just a rumor.

17   Q    Are you finished?

18   A    Yes.

19   Q    Were you at group meetings in which the 300

20   limit was discussed?

21   A    Not that I recall.  No.

22   Q    Is that something you would recall?

23   A    Yes.

24   Q    Did Matt Cordner ever tell you that there

25   was a 300-minute limit?

1    us -- we would have been forced to work.

2    Q    And that made business sense.

3    Right?

4    A    I guess.  Yeah.

5    Q    And is it true that under the Collective

6    Bargaining Agreement, employees can, in fact, be

7    forced to work overtime based on business needs of

8    the company?

9    A    I don't know.  I don't know.  I am not

10    familiar with the entire Collective Bargaining

11    Agreement actually.

12    Q    The terms and conditions of your job were

13    covered by a Collective Bargaining Agreement, were

14    they not?

15    A    Correct.

16    Q    Do you remember how many times Pat Kinsella

17    forced you to work overtime?

18    A    Not often.  He was very good.  If you wanted

19    to get out of overtime, he would do everything

20    possible to get you out of overtime.

21    Q    Are you able to estimate the number of

22    times?

23    A    I can't recall being forced to work at all

24    under Pat.

25    Q    And in the twenty times that you claim you

1   run more efficiently.  And so I volunteered for

2   these meetings.

3     Q    So it is your testimony that in December of

4   1996, you still had a positive attitude towards

5   your work?

6     A    I was trying to.  Yes.

7     Q    I'm not sure that that answered my question.

8   Did you have a positive attitude towards your work

9   in December of '96?

10              MS. HOLMES:  Objection as to form.

11    A    I think I was trying to because I think he

12  was my supervisor then.  I wasn't happy with him

13  from the minute he became my supervisor, so this

14  shows that I was attempting to be a productive

15  effective employee.  Yes.

16  BY MS. ALEXANDER:

17    Q    What did Mr. Cordner do the minute he became

18  your supervisor to make you not happy with him?

19    A    He reversed the decision.

20    Q    For the satellite office?

21    A    Yes.

22    Q    And that's what made you not happy with him

23  from the minute he started?

24    A    That he really -- that - yes.  That he --

25  that he either didn't like me, he might not have

1    liked me for some time, and the only -- and after

2    the harassment, all I could assume was that it was

3    because I was a woman.

4    Q    Were you very angry about not working in the

5    North Madison satellite?

6    A    I was upset because, like I said, I have

7    been counting on it. So, yes, I was upset. So,

8    yes, I was upset that I didn't get the satellite.

9    Q    And it's your testimony that you've been

10   counting on it for years?

11   A    Several years.

12   Q    Since Crystal White had been your

13   supervisor?

14   A    Yes.

15   Q    And she left in '93?

16   A    Yes. But then Pat took over and he was

17   trying to initiate the satellite for a couple of

18   years, too.

19                    MS. ALEXANDER:  Would you mark

20            that, please.

21                    (THEREUPON, DEFENDANT'S EXHIBIT NO.

22            38, TASK FORCE DOCUMENTATION, WAS

23            MARKED FOR IDENTIFICATION.)

24

25   BY MS. ALEXANDER:

1    A    Yes.

2    Q    Have you sent your updated resume to anyone

3    since the summer of 1997?

4    A    Yes.

5    Q    Who?

6    A    Capusta & Otsel, C-a-p-u-s-t-a, O-t-s-e-l.

7    Q    Anyone else?  Have you sent your resume to

8    any other entity since the summer of 1997?

9    A    No.

10   Q    Have you regularly checked the newspaper for

11   job ads since the summer of 1997?

12   A    Regularly, no.  Periodically.

13   Q    Is it fair to say that you've removed

14   yourself from the job market in terms of

15   comparable to that that you had at SNET?

16   A    Yes, because I'm qualified for different

17   positions now.

18   Q    And what is the position that you hope to

19   have after you graduate from law school?

20   A    I'd like to be an associate in a firm.

21            MS. ALEXANDER:  Would you mark

22         this, please.

23            (THEREUPON, DEFENDANT'S EXHIBIT NO.

24         40, TIME SHEETS OF RICK DELLAVOLPE,

25         WAS MARKED FOR IDENTIFICATION.)

C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _3rd_ day of _October_ , 2001.

Clifford Edwards

Notary Public

My commission expires:  9/30/06