Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1492139
(Cite as: Not Reported in F.Supp.2d)

Page 1

C

Not Reported in F.Supp.2d, 2002 WL 1492139
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Ebonny FELICIANO, Plaintiff,
v.
ALPHA SECTOR, INC. and KINGSMAN GROUP, Defendants.
No. 00 CIV. 9309(AGS).

July 12, 2002.

Terminated lobby attendant brought employment discrimination action under Title VII and various state and municipal laws against her alleged employers, a corporate security provider and personal protection service provider, alleging sexual harassment and retaliation. Defendants moved for summary judgment. The District Court, Schwartz, J., held that: (1) personal protection service provider was not liable to attendant as a joint employer; (2) attendant failed to establish that corporate security provider created a hostile work environment, as would support Title VII sexual harassment claim; and (3) attendant failed to show causative link between her harassment complaint and termination two months later, as would support retaliation claim.

Motion granted.

West Headnotes

[1] Civil Rights 78 ⇌ 1112
78k1112 Most Cited Cases
    (Formerly 78k143)
Personal protection provider did not exercise considerable control over terminated lobby attendant's employment, and thus it was not liable to attendant for employment discrimination as a joint employer, where it did not hire, train, or supervise attendant, who was paid by corporate security provider; personal protection provider had nothing to do with attendant's employment or discharge, other than fact that same principals were involved in both security providers.

[2] Civil Rights 78 ⇌ 1185
78k1185 Most Cited Cases
    (Formerly 78k167)
Co-worker's alleged unwelcomed romantic overtures toward former employee and "dirty looks" in retaliation for her having spurned his advances did not amount to harassment so pervasive or severe as to alter conditions of employee's employment and create an abusive work environment, as would support employee's Title VII sexual harassment claim against her former employer. Civil Rights Act of 1964, § 703(a), as amended, 42 U.S.C.A. § 2000e-2(a).

[3] Civil Rights 78 ⇌ 1528
78k1528 Most Cited Cases
    (Formerly 78k371)
Co-worker who allegedly harassed former employee was not her "supervisor" for purposes of employee's Title VII sexual harassment claim against her former employer, although employer admitted co-worker was employee's supervisor based on co-worker's "oversight responsibility," where co-worker lacked power to hire or fire employee, or alter her hours, benefits, or any other condition of employment. Civil Rights Act of 1964, § 703(a), as amended, 42 U.S.C.A. § 2000e-2(a).

[4] Civil Rights 78 ⇌ 1189
78k1189 Most Cited Cases
    (Formerly 78k167)

Civil Rights 78 ⇌ 1528
78k1528 Most Cited Cases
    (Formerly 78k371)
Former employee failed to show that her former employer was negligent in failing to take appropriate action with respect to co-worker's allegedly harassing conduct, and thus employer was not vicariously liable for co-worker's conduct, for purposes of employee's Title VII sexual harassment, where employer reassigned employee within days of her complaint, so that employee had no interaction with co-worker. Civil Rights Act of 1964, § 703(a), as amended, 42 U.S.C.A. § 2000e-2(a).

[5] Civil Rights 78 ⇌ 1252
78k1252 Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
Former employee failed to show causative link between her complaint of sexual harassment and her suspension and subsequent termination two months later, as would support her retaliation claim under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in F.Supp.2d                                                                                    Page 2
(Cite as: Not Reported in F.Supp.2d)

Title VII against her former employer. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

Plaintiff Ebonny Feliciano was employed as a security guard by Alpha Sector, Inc., and, according to her, by The Kings Men Group (s/h/a Kingsman Group). Feliciano began to work on June 1, 1999, and claims she was later sexually harassed by Anthony McKoy, who Feliciano states was her supervisor. According to Feliciano, she rejected McKoy's advances, and McKoy retaliated against Feliciano by, inter alia, "set[ting] her up to look bad." Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, at 2. Feliciano complained to a more senior supervisor who adjusted her schedule so she would not normally have to encounter McKoy. Thereafter, Feliciano was transferred to what she claims was an undesirable location and later suspended and fired. On the basis of the above, Feliciano filed this action for harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) as well as for violations of various New York state and municipal laws. Defendants have moved for summary judgment pursuant to Fed.R.Civ.P. 56. FN1 For the reasons set forth below, defendants' motion is granted.

FN1. Defendants' Notice of Motion states that defendants are moving pursuant to Fed.R.Civ.P. 12(b)(6) and 56. The instant motion is more properly for summary judgment and the Court shall refer to it as such.

II. Factual Background FN2

FN2. Unless otherwise stated, the facts discussed herein are undisputed and are drawn from the parties' submissions, including statements pursuant to Local Rule 56.1 (Statements of Material Fact on Motion for Summary Judgment). According to Local Rule 56.1(c), all material facts set forth in the moving party's statement of facts will be deemed admitted unless controverted by the opposing party.

Plaintiff Ebonny Feliciano was hired to work as a security guard on June 1, 1999. Defendants allege she was hired by Alpha Sector, Inc. ("Alpha"); plaintiff claims she was hired by both Alpha and The Kings Men Group ("Kings"). See Statement of Defendants Pursuant to Local Civil Rule 56.1 ("Defendants' 56.1 Statement"), at ¶ 1; Counter 56.1 Statement of Material Facts ("Plaintiff's 56.1 Statement"), at ¶ 1. Alpha provides traditional corporate security, while Kings provides personal protection (i.e., bodyguard services). Robert Joseph is sole owner and chief executive of both Alpha and Kings, and his childhood friend, Patrick Dixon, is a senior security manager for Alpha, and according to Feliciano, for Kings as well. See Defendants' 56.1 Statement, at ¶ 3; Plaintiff's 56.1 Statement, at ¶ 3. Feliciano notes that both companies provide security services at 25 West 39th Street and 485 Fifth Avenue. See Plaintiff's 56.1 Statement, at ¶ 3.

Dixon met Feliciano when she worked near 25 West 39th Street, where Alpha provides security services. He interviewed her and subsequently recommended her to Joseph for employment. Joseph then interviewed and hired her. At the outset, Feliciano was assigned to work the 2:00 p.m. to 10:00 p.m. shift, and was posted at the lobby security desk at 25 West 39th Street. In her position, Feliciano was responsible for communicating regularly with Alpha's central station in the building, including reporting relevant security matters and following instructions from the central station when events warranted. This was accomplished through a combination of regular two-way radio and telephone contact. The lobby desk at which Feliciano worked is also under observation by a fixed-post security camera, which is monitored in the central station. Anthony McKoy, the alleged harasser in this case, was one of Alpha's central station operators. Feliciano claims that McKoy, in addition to Dixon and Joseph, were her supervisors, whereas defendants state that only Dixon and Joseph exercised supervisory authority. See Defendants' 56.1 Statement, at ¶ 5-6; Plaintiff's 56.1 Statement, at ¶ 5-6. However, defendants concede that central station operators like McKoy have "oversight responsibility over the activities of security guards on duty." Defendants' 56.1 Statement, at ¶ 7. Defendants nonetheless maintain that central station operators have no actual managerial authority and had no authority over any of the terms or conditions of other employees' employment or daily work. See

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




*id.* at ¶ 7.

Feliciano met McKoy once she started working as a security guard. She gave her telephone number to several coworkers, including McKoy. She also accepted a ride from him when she was bringing a heavy computer monitor home. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opposition Brief"), at 3. Shortly thereafter, however, Feliciano maintains that McKoy began to express an interest in dating her and asked her out. According to Feliciano, McKoy "often told [her] she was beautiful and that he wanted to date her." Complaint, at ¶ 8. On one occasion, McKoy allegedly tried to hug Feliciano in the office and told her he wanted to hold her. *See id.* at ¶ 8. At the end of June 1999, McKoy allegedly appeared at a restaurant in the Bronx, knowing that Feliciano would be there. *See* Opposition Brief, at 3. Feliciano claims she intended to leave the restaurant and return after McKoy had left. *See id.* at 3. Although she intended to walk home, "McKoy insisted on driving her." *Id.* at 3. She accepted McKoy's invitation and got a ride from him. When they reached Feliciano's home, McKoy allegedly kissed Feliciano on the mouth and told her that he wanted to date her. *See id.* at 3. Feliciano says she pulled away from him and ran inside, shaken by the incident. *See id.* at 3. Despite Feliciano having made clear that she was not romantically interested in McKoy, McKoy allegedly continued to make advances towards her, including calling her from time to time. *See id.* at 4. Feliciano claims that at one point McKoy invited her to his house and asked if she would "lie down next to him." *Id.* at 4.

In late July or early August, Feliciano and McKoy argued at Feliciano's lobby desk post. Feliciano claims that she argued with McKoy regarding a new "arbitrary rule in retaliation to [sic] her rejection of his sexual advances." Plaintiff's 56.1 Statement, at ¶ 8. Defendants claim that the argument began when Feliciano overheard McKoy speaking to another security guard by radio and mistakenly believed they were speaking about her. Defendants state that when Feliciano responded to McKoy, he told her that he had not been talking to her, and she took offense. *See* Defendants' 56.1 Statement, at ¶ 8.

In her brief, Feliciano states that she complained to Dixon about the alleged sexual harassment "on many occasions," including the lobby incident. Plaintiff's 56.1 Statement, at ¶ 11. *See also* Opposition Brief, at 4. However, at her deposition, Feliciano denied telling Dixon or Joseph about the purportedly harassing activities that took place outside of work:

Q. Did you, in fact, tell Mr. Dixon everything? You said you told him everything.
A. The reason why I was having problems with Mr. McKoy?
Q. Did you ever tell Mr. Dixon that Mr. McKoy had driven you home?
A. No.
Q. Did you ever tell Mr. Dixon you had-that Mr. McKoy had come to the restaurant that evening that you testified about?
A. No.
Q. Did you ever tell Mr. Dixon Mr. McKoy had called you while you were working and he was at home?
A. No.
Q. Did you ever tell him he had called you at home while he was at home?
A. No.
Q. Did you ever tell him that Mr. McKoy called you from the central station and made comments to you about your appearance?
A. No.
Q. Did you ever tell Mr. Dixon that "Mr. McKoy tried to hug me"?
A. All that for me at that moment was part of saying Mr. McKoy likes me and that's why I'm having problems with him. I didn't think I had to give details at that moment.
Q. All right. I'm asking whether or not you ever gave those details to Mr. Dixon.
A. I'm saying no.
Q. You never gave any of the details to Mr. Dixon?
A. No.
Q. Did you ever tell Mr. Dixon that Mr. McKoy tried to kiss you?
A. No.
Q. Did you ever tell Mr. McKoy-did you ever tell Mr. Dixon that Mr. McKoy had, in fact, kissed you?
A. No.
Q. Did you ever tell Mr. Dixon [that] Mr. McKoy had engaged in any kind of contact that you would characterize as sexually harassive?
A. I probably didn't say that, but that's what I wanted to mean.
Q. Would your answers to all of the questions I

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d  
(Cite as: Not Reported in F.Supp.2d)

Page 4

just asked about telling details to Mr. Dixon, would your answers be the same if I asked you whether or not you had told any of those things to Mr. Robert Joseph?  
A. That's right.  
Deposition of Ebonny Feliciano ("Feliciano Dep."), appended to Defendants' Notice of Motion as Exhibit ("Ex.") 9, at 313-15. Feliciano claims that Dixon did nothing to remedy the alleged sexual harassment. *See* Opposition Brief, at 4.

After Feliciano complained to Dixon, McKoy allegedly began to harass her in retaliation. *See id.* at 4. This harassment included "shoving things" in and out of Feliciano's desk and "looking at [her] real bad" and "giving [her] dirty looks while [she] was there [...]" Feliciano Dep., at 236-37. In her Opposition Brief, Feliciano also claims that McKoy "began to make arbitrary rules to make [her] look bad." Opposition Brief, at 4. However, Feliciano's deposition testimony is far from clear as to what the rule was and how McKoy allegedly changed it:  
Q. What rule was it that Mr. McCoy [sic] changed?  
A. It was something like a signature when people come in the building or it was something regarding between the doors and people coming in and signatures and I was in charge of that front position, that I was working the front desk.  
Q. What was the rule and then what did the rule become?  
A. I don't recall.  
Q. You don't recall what the rule was?  
Ms. Lancer: Objection. Asked and answered.  
Q. Is that correct?  
A. I would say, to be honestly speaking, I don't remember, because the rule that he-his rule didn't make sense to me, because I was working there for a couple of weeks or months there and I knew that the way that I was working that front desk was being worked correctly.  
Feliciano Dep., at 100. Similarly, Feliciano claims in her 56.1 Statement that "McKoy constantly yelled at her [...]." Plaintiff's 56.1 Statement, at ¶ 9. However, the deposition transcript page cited by Feliciano, page 156, contains no reference to McKoy yelling at Feliciano. Feliciano does note that McKoy allegedly yelled at her during the aforementioned spat about the "sign in" rules, but appears not to allege in the deposition that McKoy's yelling was "constant." Likewise, when Feliciano was asked at her deposition whether McKoy did anything to her that was hostile, she answered,

"[i]ndirectly, yes, but not directly to me." *Id.* at 237.

Feliciano concedes that during the period of employment leading up to the argument with McKoy, Feliciano and McKoy had been working shifts that overlapped for approximately two hours. *See* Plaintiff's 56.1 Statement, at ¶ 12. Within a week after she complained to him, Dixon changed Feliciano's shift (at her request) so she would not normally overlap with McKoy except on occasional weekends or holidays. *See* Feliciano Dep., at 181-82. Feliciano claims in her 56.1 Statement that McKoy interacted with her when their shifts overlapped on such weekends and holidays. For support, she cites deposition transcript pages 179-181. *See* Plaintiff's 56.1 Statement, at ¶ 13; Opposition Brief, at 4. In fact, the transcript reveals that Feliciano admits that no interaction occurred:  
Q. Did you have any interaction with [McKoy] during those occasions?  
A. No.  
Q. Holidays and weekends when you worked the same time?  
A. I would avoid him. No, I didn't have no interaction with him.  
Q. So your interaction with him essentially ceased at the time that your shift had changed, correct?  
A. There was some hostility still and it ceased because we weren't working together.  
Q. So as of the time that your shift was changed, your interactions with Mr. McCoy ended, correct?  
A. Yes.  
Q. And that was true from that point until the end of your employment, correct?  
A. That's right.  
Feliciano Dep., at 180-81.

Defendants allege that in late August, Feliciano failed to appear for her shift and failed to call in advance to notify Alpha of her absence. *See* Defendants' 56.1 Statement, at ¶ 14. According to defendants, company policy requires advance notice of four hours for "no-shows" and failure to give such notice is grounds for dismissal. *See id.* at ¶ 14. Feliciano responds by stating that she did call in but waited until after McKoy's shift was over in order to avoid speaking with him. *See* Plaintiff's 56.1 Statement, at ¶ 14. However, in her deposition, Feliciano states that she did not call in because she did not want to speak to McKoy and makes no mention of calling in once McKoy's shift had ended.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in F.Supp.2d  
(Cite as: Not Reported in F.Supp.2d)

Page 5

*See* Feliciano Dep., at 206-07.

On September 27, 1999, Feliciano was transferred from 25 West 39th Street to 485 Fifth Avenue and was assigned to a foot post monitoring the vicinity of the loading dock and freight elevator. This transfer did not change Feliciano's position, title, status, compensation, or hours. *See* Defendants' 56.1 Statement, at ¶¶ 16-17; Plaintiff's 56.1 Statement, at ¶¶ 16-17. Feliciano states that the new post involved patrolling a small corner, near garbage, and that she found the new assignment demeaning. *See* Plaintiff's 56.1 Statement, at ¶¶ 16-17. Defendants contend that the transfer was required because the client in question, Tommy Hilfiger, was engaged in a construction project and needed additional security coverage. *See* Defendants' 56.1 Statement, at ¶ 16. Defendants claim that lobby posts are generally entry-level positions and that after gaining familiarity with the lobby post, guards are assigned to a foot or walking post. *See id.* at ¶ 17. Defendants state that the transfer was lateral and that the new assignment required a greater exercise of discretion. *See id.* at ¶ 17.

Defendants allege that on October 5, 1999, Feliciano was "no call/no show" for the second time. *See* Defendants' 56.1 Statement, at ¶ 18. Feliciano denies this occurred. *See* Plaintiff's 56.1 Statement, at ¶ 18. On October 6, when Feliciano arrived for work, she was told by Dixon that she was suspended, and not to come to work until further notice. Feliciano was fired shortly thereafter. Defendants claim that after being suspended but before being fired, Feliciano made an unauthorized attempt to contact Andy Hilfiger, a senior executive of Alpha's client (and brother of designer Tommy Hilfiger). *See* Defendants' 56.1 Statement, at ¶ 19. Feliciano states that her attempt to contact Hilfiger occurred after she was fired. *See* Plaintiff's 56.1 Statement, at ¶ 19. Feliciano claims she was not "no call/no show" and was suspended and fired solely on the basis of her complaint against McKoy several months earlier:

   Q. So it's your testimony that you were suspended one day out of the blue while you were working in the second building months after whatever issue you had with Mr. McCoy [sic], but that was the only reason; is that correct?  
   A. Yes.  
Feliciano Dep., at 203.

In light of the foregoing allegations, Feliciano has filed the instant action against Alpha and Kings pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*) and various New York state and municipal law claims. She seeks fifteen million dollars in compensatory and punitive damages, attorney's fees, and the option to be reinstated to her former position. Alpha and Kings move for summary judgment pursuant to Fed.R.Civ.P. 56.

### III. Legal Standard

Summary judgment is appropriate where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden lies with the moving party to demonstrate the absence of any genuine issue of material fact and all inferences and ambiguities are to be resolved in favor of the nonmoving party. *See, e.g., Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999) ; *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223-24 (2d Cir.1994). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo,* 22 F.3d at 1224.

The question of whether summary judgment is appropriate in the context of discrimination cases is a particularly delicate subject. The Second Circuit has acknowledged that there is seldom a "smoking gun" in a discrimination action, and that employment discrimination is often carried out through "discreet manipulations" and is often "hidden under a veil of self-declared innocence." *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991). "A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Id.* at 533. As a consequence, the Second Circuit has "emphasized that the trial court must be especially cautious in deciding whether to grant this drastic provisional remedy [i.e., summary judgment] in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi,* 191 F.3d at 135.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d        Page 6
(Cite as: Not Reported in F.Supp.2d)

At the same time, a showing of merely metaphysical doubt by the nonmoving party is insufficient to overcome a motion for summary judgment. *See, e.g., Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.1994). Similarly, "to defeat a motion for summary judgment[,] a plaintiff cannot rely on 'conjecture or surmise.' " *Id.* at 723. Notwithstanding the Second Circuit's cautious approach to granting summary judgment in discrimination cases, the "salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials-apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). Indeed, "[t]he summary judgment rule would be rendered sterile [...] if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Id.* at 998. Just two months ago, the Second Circuit held that in order to survive a motion for summary judgment in a discrimination case, a plaintiff "must come forward with at least some credible evidence that the actions of the [defendants] were motivated by [...] animus or ill-will." *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 234 (2d Cir.2002).

IV. Legal Analysis

A. The Kings Men Group Is Not a Proper Defendant

Feliciano has named both Alpha and Kings as defendants in this action. Defendants do not dispute that Feliciano worked for Alpha and that Alpha is a proper defendant. However, defendants argue that Kings has been improperly named as a defendant in this action. While conceding that Robert Joseph is the sole owner and chief executive of both companies, defendants submit that while Alpha provides corporate security, Kings provides personal protection (i.e., bodyguard services) and that the two companies are otherwise separate. Defendants also state that the two companies are legally separate entities, and that Feliciano was only employed by Alpha. *See* Defendants' 56.1 Statement, at ¶¶ 1-3.

[1] Feliciano contends that she was jointly employed by both Alpha and Kings. She alleges that both Alpha and Kings provided security services at 25 West 39th Street and 485 Fifth Avenue, and that Dixon is the Security Manager for Kings as well as Alpha. *See* Plaintiff's 56.1 Statement, at ¶ 3. She concedes that she was on the payroll of Alpha and not of Kings. She cites *EEOC v. Sage Realty Corp.*, 507 F.Supp. 599, 611 (S.D.N.Y.1981) for the proposition that an entity may be considered a joint employer, notwithstanding the fact that an employee is not listed on its payroll, if it "exercised considerable control over the terms and conditions of her employment." The Court does not doubt that if Kings exercised "considerable control" over Feliciano's employment, it could be considered jointly liable in this action. However, Feliciano fails to provide any evidence that Kings had anything to do with her employment or her discharge, other than the fact that the same principals are involved in both companies, and that the two companies may share an address.

The facts in the *Sage* case that Feliciano cites are totally different than the ones here. Indeed, the sentences directly following the language quoted by Feliciano set forth the factual basis upon which the Court held that defendant Sage jointly employed the plaintiff in that case: "Sage hired, trained and supervised [plaintiff], and ultimately ordered her discharge. Sage controlled the uniform policy challenged here." *Sage*, 507 F.Supp. at 611. In contrast, Feliciano presents no evidence (nor even suggests) that she was hired, trained, or supervised by Kings, or that Kings was responsible for her discharge. The mere fact that there are principals common to both companies, without more, does not mean the companies are interchangeable or that they jointly employed Feliciano. On this basis, defendants' motion to dismiss the instant action against Kings is granted.

B. Summary Judgment is Warranted for Feliciano's Federal Harassment Claim

Feliciano's first federal cause of action is for sexual harassment in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII"). The statute provides, in relevant part, that:
It shall be an unlawful employment practice for an employer-
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...
42 U.S.C. § 2000e-2(a). In order to prevail on a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



claim that sexual harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements:

First, the plaintiff must show that the workplace is permeated with "discriminatory intimidation, ridicule, and insult...that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment."
[...]
Second, the plaintiff must show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer."

*Howley v. Town of Stratford,* 217 F.3d 141, 153-54 (2d Cir.2000). Because Feliciano has failed to establish either of the two required elements of a Title VII harassment claim, her claim must be dismissed.

1. Feliciano Fails to Demonstrate Pervasive Workplace Discrimination

While any form of sexual harassment may be considered undesirable, Title VII's scope is limited to "pervasive" or "severe" harassment that alters the conditions of employment and creates an abusive work environment. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ; *Howley,* 217 F.3d at 153. In light of this requirement, "a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was 'extraordinarily severe." ' *Howley,* 217 F.3d at 153 (quoting *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000)). *See Ferris v. Delta Air Lines, Inc.,* 277 F.3d 128, 136 (2d Cir.2001) (holding that a single incident of rape can satisfy the first prong of employer liability under a hostile work environment theory). Accordingly, a plaintiff must either demonstrate a single extraordinarily severe incident, or a series of incidents that were sufficiently "continuous and concerted to have altered the conditions of her working environment." *Cruz,* 202 F.3d at 570. Feliciano does neither.

As a preliminary matter, it is noteworthy that most of Feliciano's allegations of harassment by McKoy happened outside of work. With the exception of the "rule-changing" incident, the majority of the other allegations made by Feliciano occurred outside of the workplace environment. FN3 Thus, the incidents including the alleged kiss, the alleged telephone calls to Feliciano's home, and the "surprise" meeting at the restaurant all occurred outside of the workplace. While this fact alone does not necessarily insulate potentially harassing activities, "[a]s a general proposition, employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees." *P. v. Delta Air Lines Inc.,* 102 F.Supp. 132, 138 (E.D.N.Y.2000) (Weinstein, J.), *vacated on other grounds by Ferry v. Delta Air Lines, Inc.,* 277 F.3d 128 (2d Cir.2001).

FN3. As noted *supra,* while Feliciano claims in her Opposition Brief that McKoy "constantly yelled at her" and "gave her dirty looks," Feliciano's deposition testimony does not support such sweeping allegations.

[2] Regardless, the level of the alleged harassment that took place, both inside and outside of the work environment, does not rise to the requisite level of pervasiveness or severity. In order to facilitate the Court's analysis, McKoy's alleged actions can be divided into two types: first, his alleged unwelcomed romantic overtures towards Feliciano; and second, his alleged harassment in retaliation for Feliciano having spurned his advances. With regard to the romantic overtures, nothing Feliciano alleges constitutes a violation of Title VII. According to Feliciano, McKoy complimented her, said he wanted to date her, attempted to hug her, stated on one occasion that he wanted to "lay with" Feliciano, and, after having given her a ride home, kissed her. FN4 While McKoy may well have breached the bounds of politesse and while Feliciano may not have appreciated McKoy's interest in her, his activities, as alleged by Feliciano, do not constitute actionable offenses under Title VII, as the Supreme Court recently noted:

FN4. Feliciano states that McKoy's kiss (which she admits lasted less than a second) was an "unwelcome sexual assault that constituted sexual harassment." Opposition Brief, at 11. For support for the proposition that a single incident of sexual assault can constitute sexual harassment, Feliciano cites *Tomka v. Seiler. Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995). The facts of that case involved a woman who was gang-raped after a business dinner by three colleagues in the back of a rental car. *See id.* at 1301-02. Feliciano's attempt to equate a single kiss

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d     Page 8
(Cite as: Not Reported in F.Supp.2d)

she received from a co-worker with a brutal gang rape is, to say the least, hyperbolic.

The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. [...] We have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace-such as male-on-male horseplay or intersexual flirtation-for discriminatory "conditions of employment."*Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Stepping out of one's home into the working world means, to some extent, subjecting oneself to the slings and arrows of daily life. Title VII does not codify Emily Post's rules of etiquette. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (holding that Title VII is not a "general civility code"). What it does is provide a remedy to employees who are subjected to harassment so severe or pervasive as to create an abusive working environment. McKoy's alleged come-ons did not rise to that level.

Turning to McKoy's alleged retaliatory actions, Feliciano again fails to allege harassment sufficient to make out a cognizable claim under Title VII. As noted *supra,* although Feliciano claims in her Opposition Brief that McKoy "constantly yelled at her," the pages of her deposition to which she refers do not support this. *See* Opposition Brief, at 4. Beyond one argument in the lobby about proper sign-in procedures, Feliciano alleges that McKoy gave her dirty looks and laughed at her on one or more occasions. *See* Opposition Brief, at 4. Assuming Feliciano's allegations are correct, McKoy is guilty of nastiness or immaturity, not a violation of Title VII:
> As a general matter, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive."

*Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998) (citation omitted). As this Court noted, "[u]nless the alleged harassment is severe ( *e.g.* sexual assault), it will not be actionable unless it occurs regularly [...]." *Ruiz v. New York City Fire Dep't,* No. 00 Civ. 4371, 2001 WL 767009, at *4 (S.D.N.Y. July 9, 2001). In the course of three hundred sixty-three pages of deposition testimony, Feliciano fails to recount any incident or series of incidents severe enough to warrant the protection of Title VII. For this reason, her claim must be dismissed.

2. Feliciano Fails to Demonstrate Harassment by a Supervisor

Feliciano's claim for harassment fails not only because she fails to demonstrate pervasive or severe harassment, but also because she fails to demonstrate harassment imputable to Alpha. *See Howley v. Town of Stratford,* 217 F.3d 141, 154 (2d Cir.2000) (under Title VII, a plaintiff must demonstrate that a "specific basis exists for imputing the conduct that created the hostile employment to the employer") (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)). An employer is presumed liable in cases where the harassment is perpetrated by the victim's supervisor, though employers may interpose an affirmative defense to rebut that presumption. *See Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). However, if the alleged harasser is the victim's co-worker, the employer will only be liable if it is negligent-if it either "provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 441 (2d Cir.1999) (quoting *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995)). Feliciano's claim for harassment must be denied because (1) she fails to demonstrate that McKoy was her superior, and (2) she fails to demonstrate that Alpha failed to take remedial measures after it was alerted of McKoy's allegedly harassing behavior.

a. McKoy Was Not Feliciano's Supervisor

[3] Feliciano alleges that McKoy was her supervisor at Alpha. Her evidence consists not only of her deposition testimony, but also of McKoy's statement to the EEOC ("[Feliciano] was not a coworker. I am the supervisor and she was an officer under my supervision at the time"). Statement of Anthony W. McKoy, appended to Declaration of Eric M. Nelson ("Nelson Decl.") as Exhibit ("Ex.") 1. Moreover, in their response to

Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

plaintiff's interrogatory question, "Identify the person(s) who supervised Plaintiff and the company that employs this person(s)", defendants' listed "Anthony McKoy, Alpha." Defendants' Responses and Objections to Plaintiff's First Set of Interrogatories and First Request for Production of Documents, at 2, appended to Declaration of Dina Lancer ("Lancer Decl.") as Ex. 1.

These admissions notwithstanding, there is a difference between a "supervisor" in the colloquial sense and a "supervisor" under the rubric of Title VII. Under Supreme Court precedent, an employer (i.e., Alpha) is subject to vicarious liability for a supervisor's actions in creating a hostile work environment. *See, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ; *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The assignment of vicarious liability to the employer for the actions of a supervisor is predicated on the assumption that a supervisor has some power over the employee's condition of employment:

> [O]ne co-worker (absent some elaborate scheme) cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.

*Burlington,* 524 U.S. at 762. While McKoy may have had "oversight responsibility," his position was not endowed with the typical (and, for Title VII purposes, relevant) trappings of authority-the power to hire and fire or set schedules and vacations. *See* Defendants' 56.1 Statement, at ¶ 7. Any harassment by McKoy, while unpleasant, would not have had the coercive effect of harassment by one who directly controlled Feliciano's conditions of employment. As the Supreme Court recently noted:

> When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor, whose "*power to supervise-[which may be] to hire and fire, and to set work schedules and pay rates*-does not disappear...when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion."

*Faragher,* 524 U.S. at 803 (emphasis added). While Feliciano states that McKoy was her supervisor during the two hours their shifts initially overlapped, she admits that McKoy never changed her shift, her pay, her work schedule, or any other aspect of the terms and conditions of her work at Alpha. *See* Feliciano Dep., at 173-74. Nowhere does Feliciano allege that McKoy had the power to hire or fire her, or alter her hours, benefits, or any other condition of employment. FN5 Because McKoy had none of the relevant supervisory powers implicit in the Title VII definition of "supervisor," McKoy was not Feliciano's supervisor for purposes of Title VII.

FN5. At most, she alleges that McKoy "influenced" Joseph to fire her. Feliciano Dep., at 203. Feliciano provides no evidence for this claim other than her supposition. Leaving aside Feliciano's unsupported assertion that Joseph fired Feliciano solely because of an argument she had with McKoy two months earlier, the bald claim that McKoy "influenced" Joseph, without more, does not implicate any supervisory authority McKoy may or may not have had.

b. Alpha is Not Vicariously Liable for McKoy's Alleged Actions

[4] Because McKoy was not Feliciano's supervisor for Title VII purposes, Feliciano can only hold Alpha liable for his alleged actions if Alpha was negligent because it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. *See Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 441 (2d Cir.1999). As noted in the Factual Background section *supra,* Feliciano admits that she never told Dixon about any of the alleged sexual harassment. FN6 Feliciano does not support her allegation that Dixon or Joseph knew of the alleged sexual harassment. Moreover, shortly after she complained to Dixon about the argument in the lobby, he reassigned her shift (at her request) so that the two-hour overlap with McKoy was eliminated. *See* Feliciano Dep., at 178-81. After the reassignment, Feliciano admits she had virtually no interaction with McKoy. *See* Feliciano Dep., at 180-81. In other words, Feliciano's own deposition shows she complained to Dixon-though apparently not about any alleged sexual harassment-and Dixon promptly reassigned Feliciano within days. On these undisputed facts, Alpha is not liable for McKoy's alleged harassment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw   Westlaw

FN6. Q. Did you ever tell Mr. Dixon that Mr. McKoy had engaged in any kind of contact that you would characterize as sexually harassive?
A. I probably didn't say that, but that's what I wanted to mean.
Feliciano Dep., at 314-15.

### C. Summary Judgment is Warranted as to Feliciano's Federal Retaliation Claim

Feliciano's second federal claim (listed as her fourth cause of action in the Complaint) is for retaliatory discharge. The statute reads in relevant part:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees [...] because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
42 U.S.C. § 2000e-3(a). The above language applies not only to formal discrimination complaints but also to "informal protests of discriminatory employment practices, including making complaints to management [...]." *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

In order to prevail on a claim of retaliation, a plaintiff must prove: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse employment action." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir.2000). It is not at all clear that Feliciano has met the first requisite element of a retaliation claim. FN7 Assuming, *arguendo*, that she has, it is not disputed that Feliciano has met the second element. The third element has also been met, but only insofar as Feliciano was eventually suspended and fired. FN8 However, Feliciano fails to present any evidence showing a causative link between her complaint to Dixon and her suspension and subsequent termination.

FN7. The Court notes, however, that it is not entirely clear that the language of the statute covers Feliciano's activities. Although she claims otherwise in her Opposition Brief, the deposition transcript reveals that Feliciano did not tell Dixon about McKoy's sexual harassment. See Feliciano Dep., at 313-15. As such, her complaints about McKoy were primarily about his allegedly mean-spirited treatment of her, without regard to his alleged advances.

FN8. Feliciano's transfer does not constitute adverse employment action. She concedes that there was no reduction in pay, hours, benefits, or vacation days. Feliciano provides no evidence that her new foot patrol posting was created to punish her, and defendants provide a reason for the assignment-their client was engaged in construction and needed additional security coverage. *See* Declaration of Patrick Dixon, at ¶ 14, appended to Defendants' Notice of Motion. On this basis, there is no genuine of question of material fact that Feliciano's transfer was not an adverse employment action, notwithstanding the fact that Feliciano was disappointed by her new posting.

[5] The timeline of events is significant. Feliciano joined Alpha on June 1, 1999. *See* Defendants' 56.1 Statement, at ¶ 1. She complained to Dixon in early August; he promptly assigned Feliciano to a new shift at her request. Feliciano began working her new shift on August 9, 1999. *See id.* at ¶ 12; Plaintiff's 56.1 Statement, at ¶ 12. No further harassment by McKoy is alleged to have occurred after that time. *See* Opposition Brief, at 4-5; Feliciano Dep., at 180-81. Feliciano was suspended on October 5, 1999, and terminated shortly thereafter. Thus, according to Feliciano, she was fired approximately two months after the last incident of harassment occurred, and two months after her complaint to Dixon. While this time lag is not dispositive of the issue, Feliciano puts forth no evidence whatsoever as to a causal link between her complaint to Dixon in early August and her termination in early October:
Q. So it's your testimony that you were suspended one day out of the blue while you were working in the second building months after whatever issue you had with Mr. McCoy [sic], but that was the only reason; is that correct?
A. Yes.
Feliciano Dep., at 203. As a matter of law, "[t]he mere fact that the incidents of which [a plaintiff] complains occurred after...grievances were filed does not create an issue of fact as to causality." *O'Dell v. Trans World Entm't Corp.*, 153 F.Supp.2d 378, 396 (S.D.N.Y.2001) (quoting *Ali v. Mount Sinai Hosp.*, No. 92 Civ. 6129, 1996

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




Not Reported in F.Supp.2d                                                                                           Page 11
(Cite as: Not Reported in F.Supp.2d)

WL 325585, at *9 (S.D.N.Y. June 12, 1996)). FN9

FN9. Feliciano also alleges that Dixon told her the reason for her suspension and termination was "because of McCoy [sic]." Feliciano Dep., at 202. Specifically, Dixon allegedly told Feliciano that Joseph had said that "if [Feliciano] can't get along with my co-workers then one of us had to leave and that would be me, because I was the last one to come in the company." Id. at 202. Assuming this to be true, Feliciano's testimony negates her argument that she was fired because she complained about sexual harassment. As noted above, Feliciano admits she never told Dixon about the sexual harassment; merely about McKoy's infrequent teasing and the argument in the lobby.

At the same time, defendants provide sworn testimony alleging that Feliciano was "no call/no show" on two occasions prior to her suspension (i.e., failing to either report for duty or call four hours in advance to inform management). See Declaration of Patrick Dixon, at ¶¶ 12, 16; Declaration of Robert Joseph, at ¶¶ 19-20, both appended to Defendants' Notice of Motion. Moreover, although Feliciano initially claims she was never "no call/no show," see Feliciano Dep., at 196, she later admits that in fact she was:

Q. Now, with that in mind, did it ever happen that you were no call/now show while you worked at the first building and that when you were asked why you hadn't called you said it was because you didn't want to speak to Mr. McCoy [sic]?
A. I remember saying that, yes.

Feliciano Dep., at 206. She makes the same admission on the next page of the deposition:

Q. Did you ever say to Mr. Dixon that the reason you hadn't called when you couldn't show up for your shift was because you didn't want to speak Mr. McCoy?
A. Yes, I did say that to him.

Feliciano Dep., at 207. Feliciano fails to provide any evidence that her suspension and firing were related to her complaint two months earlier, and her own deposition testimony confirms that defendants had valid, non-prohibited reasons to terminate her employment. FN10 On this basis, her federal claim for retaliation must be dismissed.

FN10. Of course, as an at-will employee, Feliciano could be fired for any reason or no reason, as long as the reason for her termination was not prohibited by law.

D. Feliciano's State Law Claims Should be Dismissed

Feliciano's remaining claims (her second, third, fifth, and sixth causes of action) arise under New York state and municipal law. FN11 While the Court recognizes that it may exercise supplemental jurisdiction over these remaining state law claims pursuant to 28 U.S.C. § 1367, a district court may decline to exercise such jurisdiction when "the district court has dismissed all claims over which it had original jurisdiction [...]." 28 U.S.C. § 1367(c)(3). Accordingly, the Court declines to exercise supplemental jurisdiction and plaintiff's remaining state and municipal law claims are dismissed without prejudice.

FN11. Feliciano's second cause of action is for sexual harassment under N.Y. Exec. Law § 296 et seq.; her third cause of action is for sexual harassment under N.Y.C.Code § 8-101 et seq.; her fifth cause of action is for retaliation under N.Y. Exec. Law § 296 et seq.; and her sixth cause of action is for retaliation under N.Y.C.Code § 8-101 et seq.

V. Conclusion

For the reasons set forth above, defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 is GRANTED. Accordingly, the federal claims are dismissed with prejudice; the state and municipal law claims are dismissed without prejudice. The Clerk of the Court is directed to close the file in this action.

SO ORDERED.

S.D.N.Y.,2002.
Feliciano v. Alpha Sector, Inc.
Not Reported in F.Supp.2d, 2002 WL 1492139

Briefs and Other Related Documents (Back to top)

. 1:00CV09309 (Docket) (Dec. 07, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

