153 F.Supp.2d 378 Page 1
153 F.Supp.2d 378, 86 Fair Empl.Prac.Cas. (BNA) 497
**(Cite as: 153 F.Supp.2d 378)**

153 F.Supp.2d 378, 86 Fair Empl.Prac.Cas. (BNA) 497
Briefs and Other Related Documents

United States District Court, S.D. New York.
Julie O'DELL, Plaintiff,
v.
TRANS WORLD ENTERTAINMENT CORPORATION, Defendant.
No. 00 Civ. 5156(SAS).

June 28, 2001.

Female former employee sued employer alleging violations of Title VII and New York Human Rights Law (HRL). Employer moved for summary judgment. The District Court, Scheindlin, J., held that: (1) male store manager did not create hostile work environment involving sexual harassment when he told complaining employee that he loved her, asked for dates and sent her presents, and by allegedly undermining her authority; (2) employer was not vicariously liable for any harassment by male manager; (3) complaining employee was not constructively discharged; (4) complaining employee was not retaliated against for making sexual harassment allegations; and (5) complaining employee was not entitled to year-end bonus.

Judgment for employer.

West Headnotes

[1] Civil Rights 78 €= 1185
78k1185 Most Cited Cases
   (Formerly 78k167)
Male music store manager did not engage in sexual harassment, creating hostile work environment in violation of Title VII and New York Human Rights Law (HRL), when he told female store manager that he loved her, asked for dates, and gave her presents. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); N.Y.McKinney's Executive Law § 296 et seq.

[2] Civil Rights 78 €= 1185
78k1185 Most Cited Cases
   (Formerly 78k167)
Male music store manager, who claimed to be in love with female manager, did not create hostile work environment by undermining her authority, in violation of Title VII and New York Human Rights Law (HRL), when he allegedly withheld information, talked to subordinates about things to be done in her store, and made sexual comments impugning her authority. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); N.Y.McKinney's Executive Law § 296 et seq.

[3] Civil Rights 78 €= 1189
78k1189 Most Cited Cases
   (Formerly 78k167)
Before an employer can reasonably respond to sexual harassment, so as to avoid liability under Title VII and New York Human Rights Law (HRL), it must have adequate notice of the harassment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); N.Y.McKinney's Executive Law § 296 et seq.

[4] Civil Rights 78 €= 1189
78k1189 Most Cited Cases
   (Formerly 78k167)
Employer did not have notice that female employee who was music store manager was being sexually harassed by male manager, as required for employer to be liable for sexual harassment under Title VII and New York Human Rights Law (HRL); complaining employee did not inform supervisor of alleged acts of misconduct, and supervisor's independently acquired knowledge that managers had one or two dates was insufficient. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); N.Y.McKinney's Executive Law § 296 et seq.

[5] Civil Rights 78 €= 1189
78k1189 Most Cited Cases
   (Formerly 78k167)

Civil Rights 78 €= 1528
78k1528 Most Cited Cases
   (Formerly 78k371)
Employer operating music stores had established and implemented policy against sexual harassment, as required to avoid vicarious liability for employee harassment under Title VII; female employee complaining of sexual harassment by fellow store manager had been informed of zero tolerance policy and procedure for reporting incidents, and employer



153 F.Supp.2d 378
(Cite as: 153 F.Supp.2d 378)

Page 2

responded promptly with investigation, to extent possible in view of complainant's refusal to discuss matter. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

[6] Civil Rights 78 1189
78k1189 Most Cited Cases
   (Formerly 78k167)

Civil Rights 78 1528
78k1528 Most Cited Cases
   (Formerly 78k371)

Civil Rights 78 1736
78k1736 Most Cited Cases
   (Formerly 78k451)
Employer operating music stores established absence of vicarious liability, under Title VII and New York Human Rights Law (HRL), for alleged sexual harassment of female employee who managed store by male store employee who later became her supervisor, through showing that complaining employee made inadequate use of harassment procedures by waiting for almost one year after sexual advances were made to make complaint, and showing that fear of reprisal was unwarranted. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); N.Y.McKinney's Executive Law § 296 et seq.

[7] Civil Rights 78 1189
78k1189 Most Cited Cases
   (Formerly 78k167)

Civil Rights 78 1528
78k1528 Most Cited Cases
   (Formerly 78k371)

Civil Rights 78 1736
78k1736 Most Cited Cases
   (Formerly 78k451)
Female employee, who managed music store, did not provide employer with notice that she was being sexually harassed by male store manager, triggering employer's vicarious liability for sexual harassment under Title VII and New York Human Rights Law (HRL), when she advised management not to promote male manager, without giving harassment as reason. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); N.Y.McKinney's Executive Law § 296 et seq.

[8] Civil Rights 78 1123
78k1123 Most Cited Cases
   (Formerly 78k145)
Female manager of music store was not constructively discharged, in violation of Title VII and New York Human Rights Law (HRL), when she resigned days after making complaint that male manager sexually harassed her, on grounds that claim would not be taken seriously; necessary showing of intolerable working conditions was not made. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); N.Y.McKinney's Executive Law § 296 et seq.

[9] Civil Rights 78 1246
78k1246 Most Cited Cases
   (Formerly 255k30(6.10) Master and Servant)
Employer operating music stores did not retaliate against female employee, who was store manager, in violation of Title VII and New York Human Rights Law (HRL), after employee reported sexual harassment by male store manager, when employer initially refused to communicate with female employee's counsel, did not provide employee with job that did not involve reporting to male employee, and did not accept doctor's note as support for sick day. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1); N.Y.McKinney's Executive Law § 296 et seq.

[10] Labor and Employment 231H 175
231Hk175 Most Cited Cases
   (Formerly 255k72 Master and Servant)
Under New York law, an employee's entitlement to a bonus is governed by the terms of the employer's bonus plan.

[11] Labor and Employment 231H 175
231Hk175 Most Cited Cases
   (Formerly 255k72 Master and Servant)
Under New York law, employee who managed music store was not entitled to year-end bonus, pursuant to employer's bonus plan, when she was not on payroll at date bonus checks were issued.

*380 Anne C. Vladeck, Karen Cacace, Vladeck, Waldman, Elias & Engelhard, P.C., New York, New York, for Plaintiff.
E. Johan Lubbe, Jonathan M. Kozak, Jackson Lewis Schnitzler & Krupman, White Plains, New York, for Defendant.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




153 F.Supp.2d 378             Page 3
(Cite as: 153 F.Supp.2d 378)

*OPINION AND ORDER*

SCHEINDLIN, District Judge.
Julie O'Dell brings this action against her former employer Trans World Entertainment Corporation ("Trans World") alleging: (1) sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law ("HRL"), Exec. Law § 296 *et seq.*; (2) unlawful retaliation in violation of Title VII and the HRL; and (3) breach of contract. Defendant now moves for summary judgment on all of plaintiff's claims pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, defendant's motion is granted.

I. LEGAL STANDARD

Rule 56 provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shade v. Housing Auth. of City of New Haven*, No. 00-6160, 2001 WL 436043, at *5 (2d Cir. Apr. 30, 2001) (quotation marks and citations omitted).

"In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable *381 inferences against the moving party." *Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir.2001). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir.1999); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (quotation marks, citations and alterations omitted).

II. BACKGROUND

In late 1997, Trans World, a corporation that operates music and video stores throughout the United States, hired O'Dell to be the manager of a record store opening in early 1998 in West Nyack, New York. *See* Defendant's Local Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue to be Tried ("Def.56.1") ¶¶ 2, 4; Complaint ¶ 7. Plaintiff's offer of employment referred to the Managers' Bonus Program ("Bonus Program"). *See* Def. 56.1 ¶¶ 5, 6. Pursuant to its terms, the Bonus Program, with which plaintiff was familiar, had two components. *See id.* ¶ 11. *First,* upon reaching a certain threshold of sales as dictated in a store's operating plan, a manager would earn a quarterly bonus. *See id. Second,* a manager who achieves operating profits in excess of the store's operating plan would be eligible to receive a year-end bonus consisting of a percentage of the incremental profits in excess of the store plan. *See id.; see also* Store Manager Bonus Program, Ex. N to 4/2/01 Affidavit of E. Johan Lubbe, counsel for defendant, in Support of Defendant's Motion for Summary Judgment ("Lubbe Aff.") at 3. However, pursuant to the terms of the Bonus Program, payment of the year-end bonus is contingent upon the employee's continued employment as of the date the award checks are issued. *See* Store Manager Bonus Program at 5.

In its first year of operation, the sales target in the operating plan for O'Dell's store was raised twice. *See* Def. 56.1 ¶ 15. Although plaintiff received a quarterly bonus of $2,000 for the first, second and third quarters of 1998, *see id.* ¶¶ 20, 21, she did not receive a year-end bonus. *See* 4/22/01 Affidavit of Julie O'Dell ("O'Dell Aff.") ¶ 15. O'Dell contends that she would have received a year-end bonus had her sales target not been raised. *See id.*

A. Trans World's Sexual Harassment Policy

Trans World has a written sexual harassment policy. *See* Def. 56.1 ¶ 41. The policy is set forth in the company's employee handbook, which plaintiff received on November 3, 1997. *See id* ¶ 40. The sexual harassment policy states in relevant part:
It is the policy of Trans World Entertainment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




153 F.Supp.2d 378
(Cite as: 153 F.Supp.2d 378)

Page 4

("TWE") and its subsidiaries to prohibit all forms of unwelcome sexual contact or sexual harassment towards Associates, either during or outside of business.
No Associate-male or female-may harass another Associate by making unwelcome sexual advancements or favors, or other verbal or physical conduct of a sexual nature, a condition of employment; ... or by creating an intimidating, *382 hostile or offensive work environment by engaging in such conduct....
Sexual Harassment will not be tolerated by TWE, and allegations will be investigated promptly and confidentially. Any associate who feels they [sic] were sexually harassed by a fellow Associate, Supervisor, or any person(s) involved within the working environment must take the responsibility to advise management. To do so you can contact your store Manager, District Manager, or Regional Manager. Also you may call your Human Resources Associate Relations Manager at (518) 452-1242, or the Loss Prevention Hotline at 1-800-888-6299.
Id. ¶ 42 (emphasis in original).

B. Plaintiff's Allegations of Sexual Harassment

For the first several months of her employment, O'Dell trained to be a manager by "shadowing" Scott Rosen, the Manager of Trans World's White Plains store. Def. 56.1 ¶¶ 47, 49; O'Dell Aff. ¶ 2. During this time, O'Dell and Rosen had several dates, but never engaged in sexual relations. See Def. 56.1 ¶¶ 56, 57, 59; O'Dell Aff. ¶ 3.

Starting on January 1, 1998, Rosen sent O'Dell several e-mails, and at least one letter, professing his love for her. See Def. 56.1 ¶¶ 60, 61; O'Dell Aff. ¶ 4. O'Dell, however, repeatedly informed him that she was not interested in a romantic relationship. See Def. 56.1 ¶ 63; Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl.56.1") ¶ 62. Nonetheless, Rosen continued to pursue O'Dell. For example, on May 1, 1998, Rosen sent O'Dell the following e-mail:
I want to be the person who is your shelter in the rain. I want to be your anchor. I want to be your touchstone. I want to be the person who makes it all better. I want to be the person you love. Me. I do....
I've heard your arguments. I've heard the reasons why it's not a good idea; why it won't work.

[Y]eah, yeah. It doesn't wash. It's like you are trying to convince yourself.
Look, maybe you're right. Maybe I'm barking up the wrong tree. I still love you. I can't control it. It's like a force of nature.
Julie [ ] I love you. Purely. Unconditionally. You are my warmth in winter, you are my shade in summer....
I talk to you, and I want so much more. I want to see you. I want to spend time with you. I want to be the person you hold dearest in your heart.
5/1/98 E-Mail, Ex. S to Lubbe Aff. In addition, in February 1998, Rosen gave plaintiff gift certificates for her birthday and for Valentine's Day. See Defendant's Objections to Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ¶ 30.

When the West Nyack store opened on March 9, 1998, O'Dell became its manager. See Def. 56.1 ¶ 52. Then, in August 1998, Rosen was promoted to the position of District Manager, a supervisory position over O'Dell. See id. ¶ 65; Pl. 56.1 ¶ 186. Even after his promotion, Rosen continued to profess his feelings for O'Dell. See Def. 56.1 ¶¶ 66, 67. According to O'Dell, Rosen would call her several times a day both at work and at home, would stop by her store at the end of the work day and suggest they go out, and routinely suggested that they schedule their days off to coincide so that they could tour New York City together. See O'Dell Aff. ¶¶ 6-7. Although Rosen did not expressly ask her for sexual relations, O'Dell alleges that it was implied in his repeated requests for a relationship as well as his sexual comments. See Def. 56.1 ¶¶ 72-74; Pl. 56.1 ¶ 74. Such sexual *383 comments included that: he "liked" certain clothes she wore; he thought her outfits were "sexy"; and he had a "thing" for "girls with glasses". FN1 Def. 56.1 ¶ 74.

FN1. At the time, O'Dell wore glasses. See 12/4/00 Deposition of Julie O'Dell ("12/4/00 O'Dell Dep.") at 150-51.

Shortly before Christmas 1998, Rosen arrived at the West Nyack store humming a song. See id. ¶ 76. At plaintiff's request, Rosen played the CD of the song in her presence and that of a male employee. See id. ¶¶ 77, 80. The song, "Santa's Beard", alludes to an extra-marital affair. See id. ¶ 82. O'Dell regarded this song as "disgusting" and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



153 F.Supp.2d 378
(Cite as: **153 F.Supp.2d 378**)

Page 5

"inappropriate". Pl. 56.1 ¶ 83. Around this time, Rosen gave O'Dell a third gift: cooking supplies for Christmas. *See* 12/12/00 Deposition of Scott Rosen ("Rosen Dep.") at 89.

O'Dell contends that after she rejected Rosen, he created obstacles which interfered with her performance. Specifically, plaintiff alleges: that Rosen withheld necessary information from her, such as changes in pricing and scheduled meetings; that he shared information with O'Dell's subordinates rather than with her; and that he failed to provide her with certain equipment. *See* Def. 56.1 ¶ 89; Pl. 56.1 ¶ 87. Then, in late November 1998, Rosen performed a "holiday audit" of O'Dell's store and gave her a rating of 55%, which is considered "unsatisfactory". Def. 56.1 ¶¶ 99-101. Rosen spoke to the regional manager, Alan Lauritsen, about the audit score and was directed to conduct a second holiday audit. *See id.* ¶¶ 102-03. On the second store audit, O'Dell's store received a score of 90%, which is considered "good". *Id.* ¶ 105.

### C. Trans World's Knowledge of and Response to Rosen's Conduct

When she first learned that Rosen would be promoted to District Manager, O'Dell informed Nicholas Perruccio, the acting District Manager, that it would be a "grave mistake" to promote Rosen. Pl. 56.1 ¶ 185. She also told Joe O'Neill, the acting Regional Manager, that is was not "a good idea" for Rosen to become a District Manager. 12/4/00 O'Dell Dep. at 131. Trans World did not inquire further of O'Dell. *See* Pl. 56.1 ¶ 187.

Shortly after his promotion, Rosen told Lauritsen that he was "concerned with how O'Dell was accepting his position, his authority ..." in part "because of the fact that while they were both store managers they had one or two dates...." Pl. 56.1 ¶ 188. Then, toward the end of 1998, Rosen complained to Lauritsen about O'Dell, saying that she was "noncooperative", "brusk", and "emotional". *Id.* ¶ 190. Rosen also asked Lauritsen to remove O'Dell's store from his district. *See id.* Lauritsen never asked either O'Dell or Rosen to elaborate on their prior relationship or the apparent tension between them. *See id.* ¶¶ 189, 191.

On December 24, 1998, O'Dell spoke with Lauritsen during his visit to her store. *See* Def. 56.1 ¶¶ 116, 117. O'Dell recalls that he told her he was aware of the "situation" between her and Rosen and that he would "make some changes after the holiday season". *Id.* ¶ 119. O'Dell perceived Lauritsen's comments as threatening her with a negative employment action. *See* Pl. 56.1 ¶ 119.

On December 29, 1998, plaintiff called Paula Heller, a Trans World Human Resource officer in Albany. *See* Def. 56.1 ¶ 35. During their conversation, O'Dell complained of sexual harassment by Rosen. *See id.* ¶¶ 124, 125, 132. Plaintiff asked Heller to keep the conversation confidential *384 for twenty-four hours because she wanted time to consult with her family. *See id.* ¶¶ 128-30. Heller told O'Dell that she would keep her confidence. *See id.* ¶ 130. When O'Dell spoke to Heller the next day and learned that Heller had spoken to her supervisor, Debra Markowitz-Best, about the complaint, O'Dell felt betrayed. *See id.* ¶¶ 135-38. Heller asked to meet with O'Dell the following day, December 31, 1998, to investigate the alleged harassment. *See id.* ¶¶ 140, 145. O'Dell, however, was ill and suggested meeting the following week instead. *See id.* ¶ 147; Pl. 56.1 ¶ 147. Heller requested a doctor's note, which O'Dell provided. *See* Def. 56.1 ¶¶ 149-50. The doctor's note stated: "For medical reasons, patient needs ten days off work." *Id.* ¶ 150. Even though Trans World had no policy regarding the "particular form" of a doctor's note, O'Dell received a voice mail message from Markowitz-Best stating that the note was insufficient. Rosen Dep. at 124-25; Pl. 56.1 ¶ 149; 12/14/00 Deposition of Paula Ann Heller at 136. Nonetheless, plaintiff took ten days off. *See* Def. 56.1 ¶ 151.

During those ten days, plaintiff decided not to return to Trans World because she feared she would be stigmatized as a troublemaker and would face retaliation. *See id.* ¶¶ 152, 154. She also hired an attorney. *See* O'Dell Aff. ¶ 11. When Trans World contacted O'Dell in an attempt to interview her for its investigation, plaintiff directed Trans World to her attorney. *See* Def. 56.1 ¶ 157-58. However, throughout much of January, Trans World refused to communicate with O'Dell's attorney, Anne Vladeck, or even to identify Trans World's counsel. *See* Pl. 56.1 ¶¶ 154, 159. Then, on January 27, 2000, defendant's counsel

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



153 F.Supp.2d 378
(Cite as: **153 F.Supp.2d 378**)

Page 6

contacted Vladeck. See Pl. 56.1 ¶ 159. On four occasions, Trans World asked Vladeck to make plaintiff available to participate in Trans World's internal investigation. See Def. 56.1 ¶¶ 159-61. Each time, plaintiff, through her counsel, refused to participate in any investigation because she believed that Trans World was investigating her conduct, rather than her complaint, in an effort to construct a defense. See id. ¶¶ 160, 162; Pl. 56.1 ¶¶ 154, 156, 159. Following Trans World's investigation, Rosen was never reprimanded or counseled regarding his conduct toward O'Dell. See Pl. 56.1 ¶ 207.

After leaving Trans World, O'Dell contacted independent recruiters seeking new employment. See Def. 56.1 ¶ 163. In January 1999, she interviewed with Sony Music, but was not offered employment. See id. ¶ 167. Thereafter, one of the independent recruiters informed O'Dell that Trans World had given her a negative reference, but could not identify the Trans World employee's name. See id. ¶¶ 171, 172, 174.

On June 10, 1999, plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). See Complaint ¶ 2. The EEOC issued plaintiff a right-to-sue letter on April 27, 2000. See id. ¶ 3.

### C. The Instant Complaint

Plaintiff filed this Complaint on July 13, 2000. The Complaint asserts five claims arising under both federal and state law. In claims I and II, plaintiff alleges that as a result of Rosen's sexual harassment defendant discriminated against her in violation of Title VII and the HRL, respectively. See Complaint ¶¶ 25-31. Claims III and IV are also brought under Title VII and the HRL, respectively. In those claims, plaintiff asserts that Trans World retaliated against her for her opposition to defendant's unlawful employment practices-specifically, her complaint to Human Resources of Rosen's alleged sexual harassment. See id. ¶¶ 32-38. Plaintiff *385 asserts that "defendant's retaliatory conduct included but was not limited to causing plaintiff's constructive discharge." Id. ¶¶ 33, 37. Finally, plaintiff contends in claim V that Trans World breached its contract with plaintiff by failing to pay her a year-end bonus. See id. ¶¶ 39-42.

### III. DISCUSSION

#### A. Hostile Work Environment

Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). The phrase "terms, conditions, or privileges of employment" is broad enough to render actionable an employer's requirement that an employee work in a discriminatorily hostile or abusive environment. See *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001).

In order to prevail on a hostile work environment claim, a plaintiff must establish two elements: (1) a hostile work environment; and (2) a specific basis for imputing the conduct that created the hostile environment to the employer. See *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir.1998); *Gallagher v. Delaney*, 139 F.3d 338, 347-48 (2d Cir.1998). To establish the first element, the plaintiff must show that her workplace was objectively hostile-that it was " 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In addition, the plaintiff must demonstrate that she subjectively perceived the conduct as hostile or abusive. See *Gregory*, 243 F.3d at 691-92. FN2

FN2. Plaintiff's hostile work environment claim under the HRL is analyzed under the same legal standards as those applicable to Title VII claims. See *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998); *Ponticelli v. Zurich Am. Ins. Group*, 16 F.Supp.2d 414, 427-28 (S.D.N.Y.1998).

Defendant contends that summary judgment is appropriate on O'Dell's claim of sexual harassment discrimination for two reasons: (1) Rosen's conduct was not sufficiently severe or pervasive as to render O'Dell's work environment objectively hostile; and (2) there is no basis for holding Trans World

 

153 F.Supp.2d 378  Page 7
(Cite as: 153 F.Supp.2d 378)

vicariously liable for Rosen's alleged discriminatory acts. See Defendant's Memorandum of Law in Reply to Plaintiff's Opposition to Defendant's Motion For Summary Judgment at 3, 5.

### 1. Objectively Hostile Work Environment

[1] The Supreme Court has emphasized that the standard for judging whether a work environment is objectively hostile must be sufficiently demanding so as to prevent Title VII from becoming a "general civility code". *Oncale,* 523 U.S. at 80, 118 S.Ct. 998. Indeed, Title VII does not prohibit all sexual or flirtatious behavior in the workplace:

> [Title VII] does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment.... We [the Supreme Court] have always regarded that requirement as crucial, and as sufficient *386 to ensure that courts and juries do not mistake ordinary socializing in the workplace-such as male-on-male horseplay or intersexual flirtation-for discriminatory "conditions of employment."

*Id.* at 81, 118 S.Ct. 998 (citations omitted). Therefore, courts must distinguish between "merely offensive or boorish conduct" and conduct that is sufficiently severe or pervasive as to alter the conditions of employment. FN3 *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 571 (2d Cir.2000) (holding that supervisor's conduct-such as repeatedly stating that women should be barefoot and pregnant, standing very close to women employees when talking to them, looking women employees up and down, and backing the plaintiff against a wall while talking to her-"brings this case over the line separating merely offensive or boorish conduct from actionable sexual harassment.").

FN3. While this determination may involve difficult line-drawing that is sometimes best left for a jury, *see Gallagher,* 139 F.3d at 347-48, summary judgment is appropriate "when reasonable minds could not differ on the issue" of whether a work environment is hostile. *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir.1999); *see also Distasio,* 157 F.3d at 62 ("Summary judgment applies no less to Title VII cases than to commercial cases or other areas of litigation, and plaintiff must still offer concrete evidence from which a reasonable juror could return a verdict in [her] favor.").

In determining whether a workplace is objectively hostile, a court should examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. A court must evaluate the "quantity, frequency, and severity" of the incidents "considered cumulatively in order to obtain a realistic view of the work environment." *Schwapp v. Town of Avon,* 118 F.3d 106, 111 (2d Cir.1997) (quotation marks and citations omitted). "[I]solated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Quinn,* 159 F.3d at 768 (quotation marks and citation omitted).

Plaintiff has failed to adduce sufficient evidence of a hostile work environment. Plaintiff has presented evidence that while Rosen was both a co-employee and her supervisor, he repeatedly asked her out. Rosen made comments about her appearance, sent her e-mails professing his love for her, called her at work and at home, invited her to tour New York City with him, gave her three gifts, and played her a song that she found offensive. *See supra* Part II.B. This conduct, however pervasive, was not sufficiently severe as to alter the conditions of her employment, particularly in light of the fact that Rosen was not O'Dell's supervisor throughout the period of time during which he pursued her, and that plaintiff has not alleged any "inappropriate touching" or "a pattern of verbal abuse". *Grossman v. The Gap, Inc.,* No. 96 Civ. 7063, 1998 WL 142143, at *6 (S.D.N.Y. Mar. 25, 1998) (granting employer summary judgment on plaintiff's hostile work environment claim where supervisor repeatedly called plaintiff at home and asked her out on dates, followed her around the store, asked her to model a bathing suit, and made one rude, sexually suggestive comment); *cf. Quinn,* 159 F.3d at 768 (holding that plaintiff's work conditions were not altered where supervisor told plaintiff that she had been voted the "sleekest ass" in the office and he

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

153 F.Supp.2d 378
(Cite as: 153 F.Supp.2d 378)

Page 8

deliberately touched her breasts with some papers he was holding); *Gonzalez v. Kahan*, No. 88 Civ. 922, 1996 WL 705320, at \*387 \*3-\*4 (E.D.N.Y. Nov. 25, 1996) (granting summary judgment because one obscene phone call, a bear hug, several requests for dates and a marriage proposal were insufficient to establish a claim for hostile environment).

Indeed, with the exception of the "Santa's Beard" song played by Rosen, plaintiff has not alleged that Rosen engaged in any vulgar conduct or made any sexually inappropriate comments. *Cf. Franklin v. Consolidated Edison Co. of New York, Inc.*, 98 Civ. 2286, 1999 WL 796170, at \*7 (S.D.N.Y. Sept. 30, 1999) (holding that hostile work environment was created by supervisor who made sexual comments about employee's body, asked her out on dates, told sexual jokes in her presence, gave her gifts, and engaged in physically threatening behavior). Nor were any of the three gifts that Rosen gave plaintiff- only one of which, a Christmas gift, was given while Rosen was her supervisor-in any way sexual or offensive.

[2] Finally, although evidence that an employer has undermined an employee's authority may, in appropriate circumstances, contribute to a hostile work environment, *see Howley v. Town of Stratford*, 217 F.3d 141, 154-55 (2d Cir.2000), the evidence proffered by plaintiff adds little to her hostile work environment claim. In *Howley*, the court ruled that the plaintiff, a female firefighter, was subjected to a hostile work environment where her subordinate had publicly yelled out a series of obscene insults at the plaintiff. *See id.* at 154. The subordinate also attempted to diminish plaintiff's authority by refusing to accept orders and spreading untrue rumors about her, such as that she had gained her office only by performing sexual favors. *See id.* The plaintiff proffered evidence that a number of her subordinates had called expressing skepticism as to her competence. *See id.* at 155. Although the Court of Appeals stated that "a subordinate's refusal to follow ... orders would not alone suffice to support a hostile-work environment claim," *id.* at 155, it nonetheless reversed the district court's grant of summary judgment. The court reasoned that "the fomenting of gender-based skepticism as to the competence of a commanding officer may easily have the effect, among others, of diminishing the respect accorded the officer by subordinates and thereby impairing her ability to lead in the life-threatening circumstances often faced by firefighters." *Id.* at 154.

Here, by contrast, plaintiff primarily complains that Rosen withheld certain information from her and talked directly to her subordinates about things that needed to be done at the store. *See supra* Part II.B. Plaintiff has not alleged that Rosen spread untrue rumors about her or made sexual comments that impugned her credibility or authority. Indeed, plaintiff's allegations are not supported by any evidence that her authority or credibility had been tarnished. Therefore, Rosen's actions, even examined in concert with his other conduct, were not sufficiently abusive as to render plaintiff's work environment hostile.

In sum, while Rosen's dogged pursuit may have been irritating, possibly even exasperating, his conduct fell far short of altering the conditions of O'Dell's employment. Accordingly, plaintiff's hostile work environment claims are dismissed.

2. Trans World's Vicarious Liability

A plaintiff pursuing a hostile work environment claim must also establish a basis on which to hold an employer liable for the conduct of its employees. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). If the plaintiff establishes a claim of *quid pro* \*388 *quo* discrimination-that is, when a plaintiff proves that a "tangible employment action" resulted from a refusal to submit to a supervisor's sexual demands-the employer will be held vicariously liable. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 760-61, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). However, in the absence of a tangible employment action, an employer's vicarious liability is subject to a two-part affirmative defense. The employer can escape liability for the sexual harassing conduct of a supervisory employee by demonstrating that: (1) it took reasonable steps both to prevent sexual harassment and to remedy the sexually harassing conduct promptly once it was brought to the employer's attention; and (2) the harassed employee unreasonably failed to avail herself of any corrective or preventive opportunities made available by the employer. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ; *Ellerth*, 524 U.S. at 765, 118 S.Ct.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

153 F.Supp.2d 378
(Cite as: 153 F.Supp.2d 378)

Page 9

2257.

As plaintiff admits, the actions taken by Rosen against O'Dell when she rejected his advances-such as the withholding of certain information and giving her a negative performance review-do not satisfy the high standard required to prove a tangible employment action. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.Mem.") at 15 n. 20; *see also Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257 (defining a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Accordingly, if Trans World can satisfy both prongs of the *Faragher /Ellerth* affirmative defense, summary judgment on plaintiff's sexual harassment claims will be granted. FN4

FN4. The *Faragher /Ellerth* defense is not available when it is a co-employee, rather than a supervisor, who engages in sexual harassment. *See Richardson*, 180 F.3d at 440. All parties agree that this case should be analyzed under the framework established in *Faragher* and *Ellerth* because Rosen's alleged sexual harassment continued while he was plaintiff's supervisor.

a. The First Prong of the *Faragher /Ellerth* Defense

In determining whether an employer has met the first prong of its affirmative defense, the existence of an anti-harassment policy with complaint procedures is an important, although not dispositive, consideration. *See Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir.1999), *cert. denied*, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000) ; *Franklin*, 1999 WL 796170, at *8. The employee may then rebut the employer's proof by showing that the sexual harassment policy is not effective, which can be demonstrated, for example, by evidence that the employer did not disseminate its policy to its employees. *See, e.g., Faragher*, 524 U.S. at 808, 118 S.Ct. 2275 (holding that an employer that has not disseminated its policy to its employees could not have exercised reasonable care to prevent harassment); *Meng v. Ipanema Shoe Corp.*, 73 F.Supp.2d 392, 402 (S.D.N.Y.1999) (denying summary judgment on *Faragher /Ellerth* defense because material question of fact existed as to whether sexual harassment policy was distributed to employees in a timely fashion); *Mills v. George R. Funaro & Co.*, No. 99 Civ. 4816, 2001 WL 50893, at *11 (S.D.N.Y. Jan. 19, 2001) (denying summary judgment because "a genuine issue of fact exist[ed] as to whether [the employer's] policy had force.").

*389 Throughout plaintiff's tenure, Trans World had a sexual harassment policy which plaintiff received and reviewed when she was hired. *See* Def. 56.1 ¶ 40. That policy informed plaintiff that sexual harassment would not be tolerated and that it was her responsibility to advise management of potential sexual harassment. *See generally* Trans World's Associate Handbook, Ex. P to Lubbe Aff., at 6-7. Furthermore, the policy provided three harassment reporting mechanisms: notifying a supervisor, calling the appropriate Human Resources representative, or contacting the Loss Prevention Hotline. Assuming it was effective, such a policy satisfies the first prong of the defense. *See DeWitt v. Lieberman*, 48 F.Supp.2d 280, 291 (S.D.N.Y.1999) ("[It] is undisputed that [the employer] had an effective antiharassment policy in place at the time of the alleged incidents. Thus, the first element of the affirmative defense is met."); *see also Donovan v. Big v. Supermarkets, Inc.*, No. 98 Civ. 2842, 1999 WL 615100, at *6 (S.D.N.Y. Aug. 12, 1999) (finding that a reasonable avenue of complaint existed based on the defendant's sexual harassment policy), *aff'd*, 2000 WL 426154, 210 F.3d 354 (2nd Cir.2000) ; *Barua v. Credit Lyonnais-U.S. Branches*, No. 97 Civ. 7991, 1998 WL 915892, at *4 (S.D.N.Y. Dec. 30, 1998) (granting summary judgment to employer on *Faragher /Ellerth* defense where plaintiff made no showing that employer's anti-discrimination policy was ineffective).

Plaintiff argues that there is a genuine issue of material fact as to whether Trans World had an effective anti-harassment policy because it failed to take reasonable steps to remedy O'Dell's complaint of sexual harassment. Specifically, plaintiff complains that: (1) Lauritsen did not take any action to determine if it was appropriate for Rosen to supervise O'Dell; and (2) Trans World's investigation was ineffective. *See* Pl. Mem. at 16-18.

[3] [4] Before an employer can reasonably respond

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



to sexual harassment, it must have adequate notice of the harassment. *See Fierro v. Saks Fifth Ave.,* 13 F.Supp.2d 481, 492 (S.D.N.Y.1998). Lauritsen had no such notice. Not only did O'Dell never inform Lauritsen of Rosen's misconduct, but his knowledge that plaintiff and Rosen had "one or two dates" does not constitute constructive notice. *See Murray v. New York Univ. Coll. of Dentistry,* 57 F.3d 243, 250 (2d Cir.1995) (holding that dental student's complaint to supervising doctor that clinic patient was "staring at [her] and trying to get her attention," was insufficient to put university on notice of sexual harassment).

[5] Furthermore, no reasonable jury could conclude that Trans World's sexual harassment policy was ineffective. Heller sought to meet with O'Dell promptly after O'Dell complained of sexual harassment. *See* Def. 56.1 ¶¶ 140, 145. Indeed, on several occasions, Trans World asked O'Dell's attorney to permit plaintiff to participate in its investigation. *See id.* ¶¶ 159, 161. Plaintiff repeatedly refused Trans World's requests. *See id.* ¶¶ 160, 162. This was patently unreasonable. *See Woodward v. Ameritech Mobile Communications, Inc.,* No. IP 98-0744-C H/G, 2000 WL 680415, at *15 (S.D.Ind. Mar. 20, 2000) (granting employer summary judgment on its affirmative defense where plaintiff, on the advice of counsel, refused to participate in employer's investigation of sexual harassment). Neither Heller's breach of confidentiality nor Trans World's initial refusal to communicate with O'Dell's attorney justifies plaintiff's refusal to cooperate with Trans World's investigation. FN5 *See Leopold *390 v. Baccarat, Inc.,* 239 F.3d 243, 245 (2d Cir.2001) (stating that sexual harassment policy that does not guarantee confidentiality is nonetheless sufficiently effective to satisfy the first element of the *Faragher /Ellerth* defense); *cf. United States v. New York City Transit Auth.,* 97 F.3d 672, 677 (2d Cir.1996) ("An employer has latitude in deciding how to handle and respond to discrimination claims, notwithstanding the fact that different strategies and approaches in different cases and classes of cases will result in differences in treatment."). Having refused to cooperate with Trans World's investigation, thereby undermining its legitimacy, plaintiff cannot now claim that defendant's investigation and sexual harassment procedures were ineffective. Accordingly, Trans World has satisfied the first prong of the *Faragher /Ellerth* defense.

FN5. The fact that Heller informed her supervisor, Markowitz-Best, of O'Dell's complaint although she promised to keep it confidential for twenty-four hours does not suggest that Trans World's sexual harassment policy was ineffective. Indeed, an employer has an obligation to investigate a claim of sexual harassment even when the employee decides not to proceed with her complaint. *See Malik v. Carrier Corp.,* 202 F.3d 97, 106 (2d Cir.2000) ("Nor is the company's duty to investigate subordinated to the victim's desire to let the matter drop. Prudent employers will compel harassing employees to cease all such conduct and will not, even at a victim's request, tolerate inappropriate conduct that may, if not halted immediately, create a hostile environment.").

b. The Second Prong of the *Faragher /Ellerth* Defense

[6] The second prong of the *Faragher /Ellerth* defense requires the employer to show that the employee unreasonably failed to take advantage of its sexual harassment complaint procedures. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257. Evidence of "*any* unreasonable failure [by the employee] to use *any* complaint procedure provided by the employer ... will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* (emphasis added). The policy rationale underlying such a rule is sound. "Employees must be required to accept responsibility for alerting their employers to the possibility of harassment." *Fierro,* 13 F.Supp.2d at 492. Otherwise, Title VII's remedial and deterrent purposes would not be served. *See Faragher,* 524 U.S. at 805-06, 118 S.Ct. 2275 ("Although Title VII seeks to make persons whole for injuries suffered on account of unlawful employment discrimination, its primary objective, like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm.") (quotation marks and citations omitted).

In analyzing whether an employee acted unreasonably in failing to avail herself of an employer's internal complaint procedures, the Second Circuit has employed a burden-shifting analysis. The employer has the initial burden of demonstrating that an employee has failed to avail herself of the complaint procedures. *See Leopold,* 239 F.3d at 246. The burden of production then

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




153 F.Supp.2d 378
(Cite as: 153 F.Supp.2d 378)

Page 11

shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures. *See id.* An employee's "credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint" satisfies the employee's burden of production. *Caridad,* 191 F.3d at 295. "A credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints." *Leopold,* 239 F.3d at 246. The employer, however, may rely upon the absence or inadequacy of such a *391 justification in carrying its ultimate burden of persuasion. *See id.*

[7] Trans World has satisfied its initial burden of demonstrating that O'Dell unreasonably failed to take advantage of Trans World's remedial procedures. O'Dell first complained of Rosen's sexual harassment on December 29, 1998, nearly one year after Rosen first began pursuing O'Dell and approximately four months after Rosen became O'Dell's supervisor. FN6 *See* Def. 56.1 ¶ 132. Such a lengthy delay alone demonstrates that O'Dell unreasonably failed to take advantage of Trans World's preventive and corrective opportunities. *See, e.g., Dayes v. Pace Univ.,* No. 98 Civ. 3675, 2000 WL 307382, at *6 (S.D.N.Y. Mar. 24, 2000) (granting employer summary judgment on its *Faragher /Ellerth* defense where plaintiff delayed one year before reporting supervisor's harassment), *aff'd,* No. 00-7641, 2001 WL 99831, at *3 (2nd Cir. Feb. 5, 2001) ; *Barua,* 1998 WL 915892, at *5 (same). Furthermore, after having complained of sexual harassment, plaintiff refused to participate in Trans World's investigation. As already noted, her refusal to participate in the investigation, although upon the advice of counsel, was unreasonable. *See supra* Part III.A.2.a.

FN6. Contrary to her suggestion, plaintiff's statements to Perruccio and O'Neill urging Trans World not to promote Rosen did not adequately notify Trans World of Rosen's sexual harassment. *See Murray,* 57 F.3d at 250. O'Dell's comments did not inform Trans World of Rosen's conduct or the fact that she felt that she was being sexually harassed. An employer is not clairvoyant and cannot be expected to divine that a general complaint about an employee is a masked grievance of sexual harassment.

The burden of production now shifts to O'Dell to come forward with evidence that her failure to avail herself of Trans World's remedial procedures was caused by a credible fear that her complaint would not be taken seriously or that she would suffer an adverse employment action. O'Dell offers two explanations. *First,* plaintiff argues that after Lauritsen was informed of the "situation" between her and Rosen, he stated that he would "make some changes after the holiday season", and that this statement threatened her with an adverse employment action. Pl. 56.1 ¶ 119. *Second,* plaintiff contends that she did not believe that a sexual harassment complaint would be taken seriously by Trans World because she heard Trans World's Chief Executive Officer ("CEO") curse while in O'Dell's store, which she believed was prohibited by the sexual harassment policy. *See* Pl. Mem. at 20. Neither of plaintiff's proffered justifications are adequate.

Lauritsen's statement was allegedly made on December 24, 1998, five days before O'Dell finally complained of Rosen's conduct. Based on its timing alone, this statement cannot excuse plaintiff's lengthy delay in reporting Rosen's misconduct to Human Resources. Moreover, no reasonable jury could find that Lauritsen's comment threatened plaintiff with retaliation. As already noted, Lauritsen did not know of Rosen's sexual harassment, even if he knew of a "situation" concerning the poor professional relationship between O'Dell and Rosen. *See supra* Part III.A.2.a. O'Dell's subjective interpretation of Lauritsen's statement as a threat of retaliation is therefore untenable. As this Court has previously stated:

[E]very employee who feels harassed by a supervisor will at some level fear the inevitable unpleasantness which will result from complaining to the employer. Confrontation is by its very nature unpleasant. However, to allow an employee to circumvent the reasonable complaint requirements of *Faragher* and *392 [*Ellerth* ] by making conclusory allegations of feared repercussions[ ] would effectively eviscerate an affirmative defense which the Supreme Court clearly went to great effort to craft in order to stem the tide of unwarranted lawsuits.

*Fierro,* 13 F.Supp.2d at 492. *See also Leopold,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




153 F.Supp.2d 378
(Cite as: 153 F.Supp.2d 378)

Page 12

239 F.3d at 246 (assertion that plaintiff failed to avail herself of internal complaint procedures because she feared "she would be fired for speaking up" was "conclusory" and thus failed "as a matter of law to constitute sufficient evidence to establish that her fear was credible") (quotation marks omitted).

Plaintiff's second asserted justification fares no better. Plaintiff has not alleged that the CEO sexually harassed her or in any way condoned sexual harassment by others. *Cf. Meng*, 73 F.Supp.2d at 402 (denying summary judgment on *Faragher / Ellerth* defense where sexual harassers were high-ranking officers of corporation who threatened to fire plaintiff if she reported their harassment). Nor has she adduced any evidence that the employer has ignored or resisted discrimination or sexual harassment complaints by other employees. *Cf. Finn-Verburg v. New York State Dep't of Labor*, 122 F.Supp.2d 329, 334 (N.D.N.Y.2000) (denying summary judgment on employer's affirmative defense because plaintiff presented evidence that other women complained of sexual harassment to no avail and that those women were retaliated against for filing complaints). Plaintiff's allegation that the CEO uttered an expletive which may have offended her sensibilities in no way suggests that the company's sexual harassment procedures were ineffective.

In short, defendant has demonstrated that O'Dell's lengthy delay in availing herself of the company's internal complaint procedures and refusal to participate in Trans World's internal investigation satisfy the second prong of the *Faragher /Ellerth* defense. Accordingly, summary judgment on plaintiff's hostile work environment claims is granted. FN7

FN7. The New York Court of Appeals has not yet decided whether the *Faragher /Ellerth* defense is applicable to claims of sexual harassment. *See Vitale v. Rosina Food Products Inc.*, No. 783, 2001 WL 633635, at *3 (4th Dep't June 8, 2001) (refusing to decide whether *Faragher /Ellerth* defense applies to claims under the HRL). Courts within this Circuit, therefore, have been left with little guidance. *See Ponticelli*, 16 F.Supp.2d at 432-33 (refusing to apply *Faragher / Ellerth* defense to HRL claims); *Hecht v. GAF Corp.*, No. 95 Civ. 10379, 1999 WL 249711, at *2 (S.D.N.Y. Apr. 28, 1999) (applying *Faragher /Burlington* standard of employer liability to HRL claim). Some courts have continued to apply the pre-*Faragher /Ellerth* standard, that under the HRL an employer is not liable for an employee's discriminatory acts unless the employer became a party to it "by encouraging, condoning, or approving it." *DeWitt*, 48 F.Supp.2d at 293 (citation omitted). Because plaintiff has offered no proof whatsoever that Trans World encouraged, condoned or approved of Rosen's conduct, plaintiff's hostile work environment claim under the HRL must be dismissed applying either the *Faragher /Ellerth* standard or its state law predecessor.

B. Retaliation

Section 704 of Title VII prohibits an employer from "discriminat[ing] against any of its employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge ... or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she was engaged in a protected activity known to the defendant; (2) the defendant was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection *393 between the protected activity and the adverse employment action. FN8 *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000).

FN8. The same standards apply to plaintiff's retaliation claim under the HRL. *See Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir.1997).

For purposes of this motion, Trans World has conceded the first two prongs. Defendant primarily contests the third prong-that O'Dell suffered an adverse employment action following her complaint of sexual harassment to Heller.

1. Constructive Discharge

[8] Plaintiff contends that she was constructively discharged in retaliation for her complaint of sexual harassment. In support of her claim of constructive discharge, plaintiff argues that she believed that Trans World would not take her sexual harassment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



complaint seriously. This fear was based on the following acts: (1) Heller did not keep plaintiff's complaint of sexual harassment confidential for twenty-four hours, as she had promised; (2) Trans World initially refused to communicate with O'Dell's counsel; and (3) O'Dell was told that her doctor's note was insufficient, leading her to believe that "Trans World was attempting to create an issue about her medical condition". Pl. Mem. at 22-23.

In order to maintain a claim for constructive discharge, plaintiff must show that Trans World deliberately made her working conditions so intolerable that she was forced into an involuntary resignation. *See Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1155 (2d Cir.1993). Plaintiff must demonstrate that Trans World created working conditions that were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir.1993). The most common constructive discharge cases involve scenarios where the employee is threatened with firing unless she resigns. *See Dean v. Westchester County Dist. Attorney's Office*, 119 F.Supp.2d 424, 430-31 (S.D.N.Y.2000) ; *Doria v. Cramer Rosenthal McGlynn, Inc.*, 942 F.Supp. 937, 947 (S.D.N.Y.1996). The Second Circuit has stated that the mere dissatisfaction with work assignments, unfair criticism, or working conditions that can be categorized as unpleasant, do not constitute a constructive discharge. *See Spence*, 995 F.2d at 1156; *Stetson*, 995 F.2d at 360. It is also insufficient that the employee disagreed with the business judgment of the employer. *See Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983). The employee's subjective perceptions are not determinative. *See Nobler v. Beth Israel Med. Ctr.*, 702 F.Supp. 1023, 1030 (S.D.N.Y.1988).

Plaintiff's constructive discharge claim fails for three reasons. *First*, failing to take a sexual harassment complaint seriously does not constitute a constructive discharge. Courts finding instances of constructive discharge have required more serious conduct than that alleged by plaintiff. *See, e.g., Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996) (finding female employee had been constructively discharged because her boss repeatedly "yelled at her in insulting terms" in front of others, "mocked her", "treated [her] arbitrarily and severely criticized [her] despite her strong performance", and "engaged in a pattern of baseless criticisms"); *cf. Mesenbourg v. Dun & Bradstreet Software Servs., Inc.*, No. 97 Civ. 02291, 2001 WL 256153, at *4 (D.Conn. Mar. 8, 2001) (rejecting contention*394 that employment conditions became intolerable where employee was required to travel more, was deprived of his managerial responsibilities, and no longer had profit and loss responsibility); *Mercury Air Group, Inc. v. Perez*, No. 00 Civ. 2975, 2001 WL 88228, at *3-*4 (S.D.N.Y. Jan. 31, 2001) (rejecting constructive discharge claim because usurping corporate president's decision-making authority did not constitute sufficiently intolerable working conditions). Trans World did not threaten O'Dell with discharge, suggest that she resign, demote her, change her job responsibilities, or reduce her pay or benefits. *See Stetson*, 995 F.2d at 361 ("[T]hough [plaintiff] was dissatisfied with his assignments, with the criticisms of his work, and apparently with his compensation, the record falls far short of reflecting working conditions so difficult or unpleasant" as to constitute a constructive discharge); *cf. Dean*, 119 F.Supp.2d at 431 ("A demotion with a reduction in pay and loss of employee benefits, when accompanied by evidence of malicious intent, can establish constructive discharge.").

*Second*, even assuming that a failed investigation of an employee's sexual harassment complaint constitutes intolerable conditions of employment, at the time that O'Dell decided to resign, her belief that her complaint would not be taken seriously was mere conjecture and speculation. O'Dell decided not to return to Trans World less than ten days after she complained of Rosen's conduct. *See supra* Part II.C. By that date, Trans World had barely begun its investigation. Such a "speculative claim ... hardly rises to the level of 'intolerable' working conditions envisioned by the Second Circuit's standard for constructive discharge." *Raskin v. Wyatt Co.*, No. 94 Civ. 2314, 1996 WL 175087, at *6 (S.D.N.Y. Apr. 15, 1996) (granting employer summary judgment on plaintiff's constructive discharge claim where employee merely feared the "potential" that his compensation and/or job responsibilities would be reduced). Indeed, the fact that plaintiff never returned to work after complaining of Rosen's conduct militates against a finding that her resignation was prompted by allegedly intolerable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



153 F.Supp.2d 378  Page 14
(Cite as: 153 F.Supp.2d 378)

work conditions. *See Katz v. Beth Israel Med. Ctr.,* No. 95 Civ. 7183, 2001 WL 11064, at *12 (S.D.N.Y. Jan. 4, 2001) ("The fact that a plaintiff had been out on leave for a time prior to her resignation makes it less likely that the resignation was prompted by an atmosphere so intolerable that a reasonable person would have felt compelled to resign.").

*Third,* even assuming that the conditions of plaintiff's work were intolerable and that these conditions prompted her resignation, plaintiff has failed to adduce any evidence that Trans World *deliberately* made her work intolerable in order to force her to resign. While the Second Circuit has declined to state whether deliberateness on the part of the employer requires specific intent to force the employee to resign, it has stated that deliberate conduct requires more than mere negligence or ineffectiveness. *See Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 74 (2d Cir.2000). As ineffective as Trans World's handling of O'Dell's complaint may have been, it does not show that Trans World deliberately acted in such a manner to force O'Dell's resignation. *See id.* (affirming grant of summary judgment on constructive discharge claim because employer's failure to properly sanction co-worker who made racist comments and employer's suggestion that the plaintiffs may have to leave if co-worker's behavior did not stop did not "rise to the level of deliberate action required by our precedent"). Accordingly, plaintiff's claim of retaliation based on constructive discharge is dismissed.

*395 2. Plaintiff's Other Allegations of Retaliation

[9] In addition to her contention that she was constructively discharged, plaintiff provides a litany of "adverse" employment actions allegedly taken by Trans World. Specifically, plaintiff lists five such adverse employment actions in her memorandum of law: (1) Trans World's refusal to communicate with plaintiff's counsel during its initial investigation; (2) the investigator's "biased view that O'Dell was not cooperating with the investigation"; (3) Trans World's failure to offer O'Dell a job not reporting to Rosen; (4) the fact that Trans World never suggested that O'Dell is welcome to return to work; and (5) Trans World's rejection of her doctor's note. FN9 Pl. Mem. at 23.

FN9. Plaintiff does not argue that the alleged negative reference constitutes an adverse employment action. Nor would such an allegation prevent summary judgment. Although a negative reference can constitute an adverse employment action, *see Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997), plaintiff's allegation is inadmissable hearsay, which cannot defeat summary judgment. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999) ("Where, however, there is no admissible evidence that the statements of the former employer caused or contributed to the rejection by the prospective employer, the plaintiff has failed to present a prima facie case. [of retaliation].").

It is well settled that to constitute an "adverse employment action", a plaintiff must demonstrate that the employment action was a "materially adverse change in the terms and conditions of [her] employment." *Richardson,* 180 F.3d at 446 (quoting *Torres,* 116 F.3d at 640 (citations omitted)). Although the contours of what comprises a materially adverse change in the terms and conditions of employment may be imprecise, the Court of Appeals has set forth the following relevant factors:

[t]o be "materially adverse" a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (quotation marks and citations omitted); *see also Fridia v. Henderson,* No. 99 Civ. 10749, 2000 WL 1772779, at *6 (S.D.N.Y. Nov. 30, 2000) ("[A] materially adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity."). Not every unpleasant matter, such as insubstantial changes in an employee's working conditions, constitutes an adverse employment action. *See Wanamaker,* 108 F.3d at 466. "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw  Westlaw