UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DENISE EVARTS                          :
                                       :
        Plaintiff                      :
                                       :      Civil No.  3:00CV1124 (WIG)
V.                                     :
                                       :
THE SOUTHERN NEW                       :
ENGLAND TELEPHONE COMPANY,             :      SEPTEMBER 19, 2005
                                       :
        Defendant                      :

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.    **INTRODUCTION**

        Denise Evarts worked at SNET for ten years in a male-dominated division of SNET.

She serviced and maintained coin-operated pay phones.  Laden with belts of equipment, she climbed

telephone poles and did her job as well as the men in her crew.  Although she was the only woman

in the crew, she got along well with her co-workers and they respected her.  Evarts ten year period

of relative happiness at SNET changed in July of 1996 when one Matthew Cordner transferred to

New Haven and took over as the supervisor of Evarts's crew.  For the next eight months, driven by

gender-based animus and the backward view that "women did not belong in [Evarts's] job", and

should be "home" or "behind a desk", Cordner hounded and harassed Evarts and in the end got what

he wanted.  Driven to tears and an overwrought emotional state by Cordner, Evarts  gave notice of

her intent to resign on May 16, 1997 and left SNET on May 30, 1997.

By its motion, SNET asks this Court to declare that no reasonable jury can conclude that Evarts was subjected to discriminatory terms and conditions of employment and a hostile and abusive work environment on account of her gender nor that it was reasonable for her to have felt compelled to quit.

The extensive evidentiary record developed in this case shows that Evarts endured, on a persistent and unrelenting basis, excessive, indeed obsessive, oversight and criticism, discipline, harassment, intimidation and abuse by a new supervisor who clearly aimed to get the plaintiff to quit. Apart from the fact that Evarts was the only woman in her crew, and contrary to SNET's claim, there is direct evidence that the harassment was born of gender bias.

As expected, SNET, in contravention of well-established principles of summary adjudication, casts the disputed facts in a light most favorable to itself and prompts the court to do the same. SNET mischaracterizes and understates the severity of the harassment and not only frequently misleads by omission but by flatly false statements.

Not surprisingly, SNET omits all reference to the outcome of the CHRO proceedings which preceded this action. After investigation and fact-finding hearings, the CHRO found in plaintiff's favor. Exh. 1[1] For reasons discussed infra at pp. 10-11, infra, CHRO's determination is meaningful

---

[1]SNET also omits reference to the State of Connecticut Employment Security Appeals Division proceeding on Evarts' claim of entitlement to unemployment compensation on the ground that she

2

as a matter of law and logic. The investigator quite easily saw through SNET's defense and properly dismissed its "evidence" of assertedly equal treatment of males as a post-hoc contrivance. SNET now moves for judgment in this action based on the same arguments and evidence submitted to the CHRO. The CHRO was not misled by this evidence; nor should this court be so misled.

As is further shown herein, SNET's representation that there is no evidence of gender-based discriminatory comments by plaintiff's supervisor is flatly false and this, and other misstatements which so characterized SNET's defense throughout the administrative proceedings below, are catalogued herein and should be borne in mind throughout in determining whether SNET has met its burden to show the absence of triable issues. On a motion for summary judgment, the ultimate question for the court always is what a panel of rational jurors may infer and conclude from the totality of the evidence. Just as Mr. Gordon, reviewing the same evidence, concluded that unlawful gender discrimination occurred and that plaintiff was constructively discharged, so may equally rational jurors conclude.

## II.     SUMMARY OF THE EVIDENCE

The record evidence, as developed through the CHRO process and this case, is extensively set forth in plaintiff's Rule 9 (c) (2) Statement of Evidence and Material Facts in Dispute, appended hereto which contains a citation to the record in support of each statement. The record is submitted

---

quit due to reasonable cause attributable to the employer. The State found in Evarts' favor. Exh. 2.

3

to the court in three bound volumes of exhibits and transcripts of deposition testimony. (Discovery was extensive. SNET took six depositions and the plaintiff, four.) Since that detailed statement is 65 pages in length, plaintiff will not here restate the contents but incorporates it as though set forth herein and will summarize as follows. Mathew Cordner was himself a technician working in another area of the state when he was promoted to Supervisor and took over the management of Evarts's eight-member crew in New Haven. Evarts was the only woman in the crew. At the time of Cordner's arrival, Evarts had been at SNET for nine years, free of any disciplinary troubles. She never had a problem with any of her previous supervisors and had got on well with them. Evarts enjoyed a good relationship with her fellow crew members in New Haven and there were never any problems or disputes between them. Evarts did her job as well as the men.

Although not to Evart's face, Cordner made repeated derogatory comments about Evarts and other woman employed at SNET in jobs Cordner evidently believed should be performed by men. Cordner, in conversations with Evarts co-worker David Ianiello, derisively referred to Evarts as an example of a "woman who doesn't belong in the job". Cordner thought women should be "home" or "behind a desk", but "not in the field." He directed like comments toward other SNET woman employed in traditionally male jobs.

Acting on his bias and resentment toward woman in this regard, Cordner, Evarts alleges, proceeded to make her working life miserable. In a relatively short period of six months or so (excluding a leave of absence Evarts took to care for a terminally ill sister) Cordner: 1) denied Evarts the opportunity

4

to satellite out of a North Madison location which was closer to her home and which had been deemed a good idea by two previous supervisors; 2) denied her a new work truck, although she was scheduled to receive one due to the aged and poor condition of her vehicle, while affording a new vehicle to a male co-worker whose vehicle was in better condition than Evarts'; 3) subjected Evarts to an unprecedented "ride-along" evaluation, (an exercise typically done with new hires) which involved Cordner accompanying Evarts throughout an entire work day and employing a clipboard to record her performance, during which he "nitpicked" and was critical, ignoring protests from Evarts that she was being subjected to the exercise despite her nine years of experience and the fact that she had recently returned from the burial of her young sister. During her period of employment under Cordner's management, Evarts was the only one he selected for this exercise despite the fact that among Evart's crew were two junior males with far less experience; 4) issued Evarts a disciplinary reprimand (recorded in her personnel file) for failing to lock her truck while male crew members who did the same were not disciplined, including one whose failure to lock his truck during the same period and while under Cordner's supervison, resulted in the theft of some $500 worth of SNET-owned tools; 5) intimidated Evarts when he stated that her  failure to lock her vehicle (although the vehicle was kept in a secured garage inside a gated facility) was "serious", and  conveyed a threat of "discharge" upon another violation; 6) engaged in a near violent tantrum and screamed at Evarts in an open office area when she provided him documentary proof from SNET's mechanics that the locking mechanism on her truck was broken and the failure to repair it was the fault of the mechanics

5

who admittedly misplaced the ordered parts; 6) confiscated Evarts' SNET-provided cell phone as punishment for alleged violation of a policy limiting use to 300 minutes per month while other males who exceeded the alleged limit  did not have theirs taken away, and despite the fact that there was no written policy on usage, no oral advisement by management of such policy and no prior warning to Evarts, resulting in inconvenience and more difficulty as she had to work without the ability to communicate; 7) peppered Evarts' file with persistent, unfounded criticism; 8) engaged in relentless and obsessive oversight of Evarts' work; 9) repeatedly accused Evarts of improprieties with respect to her time record-keeping practices; 10) subjected Evarts to stressful and intimidating "coaching" sessions and later a meeting with higher management and a union representative at which he interrogated Evarts about her time records and accused her of discrepancies while male technicians whose time records were kept in the same manner were not.

## III. STANDARD OF REVIEW

It is axiomatic that upon motions for summary judgment the Court must construe all facts and evidence , including any inferences which may be drawn from them, in a manner most favorable to the non-movant.  The Court may not resolve ambiguities, matters of credibility and disputed issues of motive. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996) (court must resolve any ambiguities and draw all inferences against the moving party);  Cargill, Inc. v.. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991)(court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of

6

the evidence could support judgment in the plaintiff's favor). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

## IV.  ARGUMENT

### A.   <u>SNET'S ARGUMENT THAT CERTAIN OF PLAINTIFF'S CLAIMS ARE TIME-BARRED IS MERITLESS.</u>

First, it must be noted that this is the first time SNET raises an issue of timeliness with respect to Evarts' claims under federal and state law. The parties went through a lengthy, indeed exhaustive, CHRO hearing process. At no time did SNET raise an issue of timeliness or jurisdiction. The parties have also, as the court is well aware, been through one of the most lengthy, time-consuming and expensive District Court proceedings, at least in the experience of plaintiff's counsel. The alleged acts of harassment and discrimination, along with the relevant dates and periods, were set out in detail in plaintiff's CHRO complaint affidavit. <u>See</u> Defendant's Exh. 14. The attorney who represented SNET in the CHRO process is the same attorney who represents it in the instant action and has had the CHRO complaint before her since its filing in November of 1997. The allegations of the District Court complaint track the CHRO complaint. <u>Query</u> why defense counsel did not move to dismiss the complaint or otherwise seek judgment on the pleadings.

7

With that procedural note aside, SNET claims that only those incidents and conduct occurring on or after January 21, 1997 are actionable under Title VII, but thereafter by way of specifics cites only the denial to plaintiff of a satellite offices as time-barred under Title VII. See Def's Memo. of Law at p. 21. In any event, SNET's argument is readily disposed of by the Supreme Court's decision in AMTRAK v. Morgan, 536 U.S. 101, 122 S.Ct. 2061 (2002). The court's opinion in Morgan explains that, with respect to hostile work environment claims, "an employee need only file a charge within . . . 300 days of any act that is part of [a] hostile work environment." This is so as "incidents comprising a hostile work environment are part of unlawful employment practice . . . The employer may be liable for all acts that are part of this single claim." The court continued:

> It does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court.

526 U.S. at 117-118.

In Patterson v. County of Oneida, 375 F.3d 206 (2nd Cir. 2004), our own circuit likewise held that "[a] claim of hostile work environment is timely as long as one act contributing to the claim occurred within the statutory period." Id. at 220. See also Mix v. Del. & Hudson Ry. Co., 345 F.3d 82, 89 (2nd Cir. 2003) (only one predicate act related to a hostile work environment need fall within the filing period).

There are exceptions to this rule, but none apply to Evarts' case. For example, a series of

8

discrete events spread out over a long period of time will in most circumstances not be considered an unlawful employment practice. <u>Morgan</u> at 118. There must be some relationship between the acts. Pre-<u>Morgan</u> authority also addressed the issue of disconnected or "discontinuous" hostile work environment claims, where the evidence shows a significant gap between time-barred acts of discrimination <u>or</u> when the alleged discrimination involves different supervisors in different employer locations. <u>See</u>, <u>e.g.</u>, <u>Cruz v. Coach Stores, Inc.</u> 202 F.3d 560, 568, fn 4 (2nd Cir. 2000) (distance of four years between victims not enough); <u>Quinn v. Greentree Credit Corp.</u>, 159 F.3d 759, 766 (2nd Cir. 1998) (gaps of one or more years between incidents preclude a finding of a continuum of discrimination); <u>Crosland v. City of New York</u>, 140 F.Supp. 2d 300, 308 (S.D.N.Y. 2001) (no continuing violation where alleged acts of discrimination were taken by different supervisors in different locations). Here, all of the predicate conduct was committed by the same supervisor (Mathew Cordner) and it consisted of numerous incidents of harassment, discipline and deprivation which occurred with marked frequency in a short time frame of July 1996 to May 1997. Moreover, although Evarts worked at SNET ten years, all of her troubles arose when Cordner became the new supervisor of her crew and was in charge during that period.

In urging dismissal of one or more claims, SNET does not cite, much less discuss, the <u>Morgan</u> holding and other cases and instead relies on a pre-<u>Morgan</u> decision of the Seventh Circuit and a pre-<u>Morgan</u> decision of the Second Circuit. <u>See</u> Def's Memo. of Law at p. 22, n. 9. SNET argues that plaintiff's FEPA claim is barred in its entirety. SNET makes no such claim with respect to the Title VII cause except it argues that any claim related to the satellite office is time-barred under Title VII.

9

Although, in a footnote, SNET mentions the "continuing violation" exception, SNET, citing <u>Miller</u> <u>v. International Telephone & Telegraph Corp.</u>, 755 F.2d 20, 25 (2d Cir. 1985), argues that plaintiff cannot rely on this theory because it was not alleged in the administrative complaint. <u>See</u>, Def.'s Memo. of Law, p. 22, n.9. The allegation set forth in plaintiff's administrative complaint, however, suffice to establish jurisdiction. First, contrary to SNET's suggestion, Evarts need not have invoked, in express terms, a "continuing violation theory" in her complaint nor does <u>Miller</u> stand for that. Indeed, in <u>Fitzgerald v. Henderson</u>, 251 F.3d 345 (2d Cir. 2001) the Second Circuit reversed as the district court had held Fitzgerald to an overly exacting pleading standard with respect to her administrative complaint. The district court had ruled that Fitzgerald was not entitled to invoke the continuing violation theory because she had not alleged an "ongoing discriminatory practice or policy" in her administrative complaint. In reversing the district court, Judge Kearse noted the court's "doctrinal, factual, and procedural difficulties with [that] ruling". Noting that Fitzgerald's administrative complaint set forth a series of acts of harassment from April 1995 through September 1997, her "assertions of escalating harassment every day present an apt basis for application of the

10

continuing violation theory. Id. at 364.[2] Accordingly defendant's argument is without merit.[3]

**B.    More Than Ample Evidence Suffices To Establish Triable Issues Whether Evarts Suffered Discrimination In The Terms And Conditions of Her Employment And A Hostile And Abusive Work Environment On Account of Her Gender.**

**1.    Plaintiff Has Established A Prima Facie Case As Evidenced By The Findings Of Fact And Determination Of Reasonable Cause In Her Favor By The CHRO.**

SNET omits mention of the outcome of the CHRO process for obvious reasons.    Edward Dillman, Matthew Cordner and plaintiff all appeared at the hearings and testified.  Since SNET omits all reference to this process, it obviously does not contend with the agency's claim that it conducted

---

[2]Indeed, Fitzgerald's allegations, which Judge Kearse found to be sufficient to sustain an actionable hostile work environment claim, are remarkably similar to those in the instant case.  Fitzgerald's supervisor had "unjustifiably berated her about her hours and productivity", forced her to work unscheduled overtime, "criticized her" and "treated her more harshly than male employees.  She was constantly criticized for the length of time it took for her to deliver mail, yelled at her for parking improperly and reprimanded her for leaving her work area. Id. at 363-64.  SNET obviously does not rely on Fitzgerald but the holding effectively disposes of all of SNET's claims, both on timeliness and the sufficiency of the evidence to sustain an actionable hostile work environment.

[3]To suggest otherwise would place Evarts, and all other discriminatees, in a Catch-22 for the law is quite clear that single, isolated acts will not suffice to establish a hostile or abusive working environment under Title VII.  Therefore, to suggest that a victim of discrimination must run to the EEOC with a claim on each and every occasion on which a discrete act of discrimination takes place would result in employers' demands for dismissal of each and every complaint on those grounds.  It is only when multiple incidents of sufficient character accumulate that Title VII's prohibition against discriminatory "terms and conditions of employment" are implicated.  In such cases, for employers to use filing deadlines to evade liability would turn Title VII on its head.  Clearly, the Supreme Court recognized this in Morgan, an important and wide-reaching Title VII holding which ought to have been in SNET's brief.

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

a thorough investigation, reviewed all documentary and testimonial evidence offered by the parties, and, at the fact-finding hearing, afforded the parties full and fair opportunity to present their cases. A review of the investigator's findings of fact and reasonable cause determination reveals no meaningful difference between SNET's claims then and SNET's claims now. Against overwhelming evidence that Cordner singled Evarts out for discriminatory treatment and harassment, SNET resorted to what can only be characterized as deception. One example is illustrative. SNET offered its "Exhibit D" to the investigator, an exhibit that was created by SNET for admission at the hearings. It purports to identify four male technicians subject to the same penalty as Evarts for excess cell phone use. These technicians not only never worked for Matthew Cordner, but were in fact disciplined by another SNET supervisor. Because the claims against SNET stemmed entirely from Matthew Cordner's treatment of the plaintiff, this exhibit was utterly useless and irrelevant but that was left for Evarts and the investigator to figure out. This propensity to mislead by omission manifests throughout SNET's summary judgment submission. A core principle of summary adjudication is that all matters related to the credibility of a party or witness must be left to the fact-finder. Matthew Cordner and Edward Dillman both testified at the hearing; SNET's case was presented through them as it is now.    The investigator did not find them or their alleged documentary evidence credible.

Although such a finding is not dispositive before this court or a jury, the Second Circuit has held that a finding of probable or reasonable cause by the CHRO is admissible to help establish the prima facie case. See Philbrook v. Ansonia Bd. Of Educ., 757 F. 2d 476, 481 (2nd Cir. 1985) ("[W]e

12

agree that a finding of probable cause by an administrative agency, such as the EEOC, though not

determinative, is admissible to help establish this prima facie case.") <u>See also</u> <u>Smith v. Universal</u>

<u>Services, Inc.</u>, 454 F2d 154, 157-158 (5th Cir. 1972); <u>EEOC v. Patrick Henry Educ. Assoc.</u> 741 F.

Supp. 670 (N.D. Ohio 1990) (same). If anything, as a matter of logic, the investigator's findings of

fact and determination of reasonable cause should have some bearing on the ultimate issue of whether

a rational jury could draw certain inferences and conclusions based upon the same evidence. Without

a doubt, CHRO investigators, by virtue of their very job responsibilities and familiarity with

applicable legal standards, are uniquely suited to sift through the chafe and the wheat. Again, while

the CHRO outcome is not dispositive, it does have some meaning.

### 2. There Is Direct Evidence Of Gender Bias On The Part Of Matthew Cordner.

In what is perhaps the most glaring omission in SNET's moving papers is the failure to

mention the testimony of David Ianiello. Because he was identified and thus known to defense

counsel as a witness to Cordner's discriminatory animus towards women, he was deposed extensively

by defense counsel.[4] Remarkably, SNET states there is "no evidence in the record of this case" and

---

[4] Indeed, the CHRO found reasonable cause that SNET violated Title VII in its treatment of Evarts despite the fact that neither Evarts' counsel nor the Commission were aware of Ianiello as a witness at that stage. Thus, the Commission did not hear from him. During the course of discovery, in an exercise of caution, plaintiff's counsel gave notice to SNET counsel of her intent to interview Ianiello as a potential witness along with other male co-workers of the plaintiff. Plaintiff's counsel did this to avoid being accused, albeit unfairly, of a violation of the Rules of Professional Conduct in the event SNET counsel claimed one or more of the potential witnesses were her clients or otherwise came within the scope of Rule 4.2. Ianiello was not a manager and clearly did not fall with the parameters of Rule 4.2. Nonetheless, SNET counsel refused to agree to allow an interview of David Ianiello. Once again, expensive and time-consuming motion procedures ensued. Upon motion of

13

that "plaintiff has failed to identify any evidence" that Cordner's conduct was gender-based. Def.'s Memo. at p. 34. SNET also states, "It is undisputed that Cordner never made a discriminatory remark of any sort to the plaintiff." Id. at p. 28. (Emphasis supplied) The extensive testimony of Ianiello was omitted entirely from SNET's moving papers.

In conversations with Ianiello, Cordner repeatedly denigrated women at SNET and Evarts in particular. In reference to Evarts, in fact in the context of a discussion about Denise Evarts, Cordner stated, "Women don't belong in her [Evarts'] job." Cordner also made sneering and derogatory remarks about other women, even though, according to Ianiello, these women worked in other departments and Cordner had no personal knowledge or other basis on which to deem them useless or incompetent. When Cordner would spot a woman in another crew which performed predominantly "male" work, he would sneer, point at her and say, "There goes *another* one who doesn't belong here." Cordner thought women belonged "behind a desk" or "at home". He was "very clear" about his feeling towards women in this area of work. Exh. B.

For SNET to omit this evidence from its moving papers is one thing, but to go further and make the representation that there is "no evidence in the record" of a gender-based character to Cordner's conduct is to stretch the duty of candor to its limit.

In claiming that Evarts can prove no set of facts to show that her gender was a motivating factor in her treatment, SNET not only omits Ianiello from its misleading picture and ignores the

---

plaintiff's counsel, granted by Judge Hall, the interview proceeded and Ianiello was discovered to be an eye-witness to Cordner's discriminatory comments about Evarts and women at SNET.

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

evidence that male employees were not subject to the same treatment, but relies on cases which bear

no resemblance to the case at bar. For example, SNET cites to <u>Kerns v. Capitol Graphics, Inc.</u>, 178

F.3d 1011 (8th Cir. 1999). A review of <u>Kerns</u>, however, reveals that a plaintiff's supervisor-antagonist

was "a difficult person with whom to work, regardless of [employees'] gender". Indeed, the Court

noted that "[b]oth male and female employees testified that he accused them of incompetence, uncut

their authority and threatened to fire some of them; one of these male employees testified that he

ultimately quit because of Castiglioni". <u>Id</u>. at 1014. Moreover, the Court noted the complete absence

of direct evidence that the supervisor treated Kerns poorly because she was a woman and that Kearns

failed to challenge the supervisor's ill treatment of her as pretextual. Lastly, the Court noted that once

Kerns quit, her duties were then given to two other women. Finally, in respect to Kerns's

constructive discharge claim, the Court noted the absence of evidence that Kerns's supervisor took

action against her because she is female or that his behavior toward her or other women contributed

to her decision to leave the company. <u>Id</u>. at 1016 -1018.

 <u>Scusa v. Nestle U.S.A. Co., Inc.</u>, 181 F.3d 958 (8th Cir. 1999) is even more foreign to the

instant case. First, <u>Scusa</u> involved alleged co-worker harassment, not discriminatory treatment by

supervisors. Second, in what should have been a glaring distinction for defense counsel, the Court

noted that by Scusa's own admissions, "none of the incidents [she] identified [in support of a hostile

environment] was, in fact, based on her sex". Indeed, Scuza "testified that she believed [one

worker's] attitude and his comments <u>had nothing to do with the fact that she is a woman</u>". Similarly,

none of the other incidents involving another co-worker "was based on [Scusa's] sex. Scusa admitted

the individual behaved similarly toward both male and female employees. Id. at 965. Thus, Scusa is likewise of no import. As there is not only ample but compelling circumstantial evidence that Evart's gender drove the disparate treatment and harassment (as she was the only woman in the crew working in a male-dominated job and evidence suffices to prove that men engaged in the same conduct for which Evarts was harassed and disciplined) but direct evidence that Cordner harbored and voiced resentment and bias toward woman working in such jobs, SNET has hardly met it burden to show the absence of a triable issue as to whether Evarts' gender was a motivating factor in Cordner's conduct.

**3. SNET Fails To Establish As A Matter of Law That No Triable Issue Exists On The Issue Whether Evarts Was Subjected To A Hostile Or Abusive Working Environment On The Basis Of Gender.**

To the extent SNET posits that it is entitled to judgment because Evarts did not suffer an adverse employment action, it is wrong on two counts. First, Evarts did suffer adverse employment actions as set *infra* at Argument C. Second, discrete adverse actions are not necessary to establish an actionable hostile work environment claim. "If a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of lack of an adverse employment decision is inappropriate". Cite Fitzgerald v. Henderson, 251 F.3d 345, 360 (2d Cir. 2001) citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d at 71 (where reasonable jurors may disagree as to whether the incidents of harassment "would negatively alter the

16

working conditions of a reasonable employee", "the potential for***disagreement renders summary judgment inappropriate". (Quoting <u>Richardson v. New York State Dept. Of Correctional Service</u>, 180 F.3d at 439).

It is well-established that an actionable hostile environment must be both subjectively and objectively offensive. That is, Evarts must show: 1) a reasonable person would find it hostile or abusive, and; 2) that she did, in fact, perceive it to be so. <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21-22 (1993). As to the second element, without question, Evarts perceived the environment to be hostile and abusive. She made that clear to Ianiello, to Guarnieri, to Cordner himself, to SNET's EEO manager and finally, to her therapist, Sandra Rhodes. As to the first element, ample evidence exists to permit jurors to agree that a reasonable person would have found the environment hostile or abusive. First, the above categorized instances should be looked at against the backdrop of Cordner's having called the plaintiff at her home within days of her sister's burial and, under an implicit threat of "discharge", demanded to know why plaintiff had not yet returned to work. Cordner justifies this based on his understanding that family leave ends with the "burial".[5] Moreover, there was an element of physical intimidation in Cordner's conduct in connection with his issuance to Evarts of a disciplinary reprimand for alleged failure to lock her vehicle. According to Evarts, when she confronted Cordner with documentary proof from SNET mechanics that the locking mechanism

---

[5] Cordner's affidavit included in SNET's moving papers of course casts an entirely different account of this and is at odds with Evarts' testimony. As with all other contested facts, however, the decision as to which version is "more likely true than not" rests with the jurors.

Law Offices of Karen Lee Torre • 51 Elm Street, Suite 307, New Haven, Connecticut 06510 • Tel: (203) 865-5541

on the rear cargo door of her truck was broken and that the delay in repair waw due to the misplacement of ordered parts by mechanics, Cordner engaged in a near-violent temper tantrum and "screamed at the top of his lungs" in Evarts' face. Cordner's explosion did not take place in private but in an open area of SNET's administrative offices. The disturbance prompted two SNET employees to come over and ask Evarts if "everything was all right". Exh.27 at ¶11; see also Def.'s Exh. 14, ¶9. Cordner refused to rescind the discipline notwithstanding the mechanic's note. Evarts also testified that male crew members left their trucks unlocked all the time and, in her presence, SNET managers saw this. Of greater import is the evidence that crew member Rick DellaVolpe failed to secure his vehicle (apparently while on the road) and in consequence some $500.00 worth of SNET-owned tools were stolen. DellaVolpe reported the incident to Cordner and admitted that tools were stolen in consequence of his failure to secure his vehicle. According to Ianiello, who witnessed this exchange, the incident occurred during the period Evarts worked for Cordner. DellaVolpe was not disciplined in any manner by Cordner. In contrast, Cordner disciplined Evarts for leaving her vehicle unlocked at a time when the vehicle was housed in a locked garage which itself was contained within a secure, fenced facility. Of course, no equipment was lost.[6] Although Evarts catalogues numerous incidents all occurring within a relatively tight short time frame, "[t]here

---

[6] On this point, it is worth noting still another of SNET's misstatements of the evidence. SNET claims that prior to being disciplined, Evarts twice had SNET property stolen from her vehicle in consequence of failing to secure it. SNET also implies that Cordner was the supervisor at the time. Def.'s Memo at p.121. This is false. A review of the transcript citation SNET offers for this shows that, long before Cordner became her supervisor, a piece of equipment was stolen out of SNET's offices. On another occasion Evarts simply could not locate a tool and it was apparently lost. Again, this is one of many examples of SNET's twisting of evidence.

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, or a number of incidents below which a plaintiff fails as a matter of law to state a claim. Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000).[7]  Similarly, the fact that Cordner did not make comments or engage in conduct of a sexual or erotic character is of no matter. See, Grey v. Norwalk Bd. of Educ., 30 F.Supp.2d 314, 327 (D.Conn. 2004)("the alleged harassment need not be explicitly sexual [or age-based] though a basis must exist for inferring that the conduct occurred because of [one's] membership in the protected class").  What matters is whether the "total circumstances of [Evarts] working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace". Phillips . Bowan, 278 F.3d 103 (2d Cir. 2002) while SNET of course downplays the significance or severity of all of these incidents, even were the court to find one or more of them "minor", the court must view them against the backdrop of the totality of the circumstances. Howley, supra at p.13 (faulting District Court for failing to consider the totality of the circumstances).

"Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a long period of time may be actionable if they attain the critical mass of unreasonable inferiority." Phillips v. Bowan, 878 F.3d at 103.

---

[7]Indeed in Howley, a case handled by the undersigned counsel, the Second Circuit reversed Judge Covello's grant of summary judgment to the employer even though Howley presented a single instance of abuse by a co-worker.  The Court of Appeals, however, found the incident sufficiently egregious under the circumstances to sustain a hostile environment claim attributable to the employer. Id. At 141. See also Ferris v. Delta Airlines, Inc., 277 F.3d 128, 136 (2d Cir. 2001)(single egregious instance of abusive behavior can constitute hostile working environment).

19

While the Courts of Appeal have repeatedly cautioned against this, SNET nevertheless invites this court to look at the evidence in a vacuum and in its brief isolates each incident as if it were not part of a whole. The Court must instead look at Evarts' nine-year history and the totality of her experience under Cordner's management in a period of but six months against the backdrop of Cordner's more favorable treatment, including his inaction, with respect to Evarts' male crew members. "Especially in the context of a claim of discrimination the Court should not view the record in piecemeal fashion." Fitzgerald v. Henderson, 251 F.3d 345, 360 (2d Cir. 2001); see also Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d at 69. (Vacating grant of summary judgment because the District Court improperly analyzed the incidents of harassment without looking at the totality of the circumstances); Stern v. Trustees of Columbia Univ., 131 F.3d 305, 314 (2d Cir. 1997)(jury "will be entitled to view the evidence as a whole in assessing whether there was impermissible discrimination").

There was sufficient evidence for jurors to conclude that Cordner obsessively scrutinized plaintiff's time records and subjected her to relentless criticism and intimidating counseling meetings while similarly situated males were not. While Cordner claims to have reviewed one or more males time records, the claim is simply not credible and moreover, there is absolutely no evidence to corroborate this. Evarts testified that a match between the DCWS forms and the handwritten time records was not possible for a variety of reasons, including mechanical problems with the "Huskies", the immediacy of the information transmitted by the Huskie (while retrieving and preparing time records necessarily creates its own time gap) as well as the fact that crew customarily prepared their

20