time sheets at the end of the day. Even Cordner himself questioned why SNET was using two separate methods of time-keeping. When asked why paper time records were required to be completed when in fact technicians' time accountings were instantly transmitted to SNET's data base by the Huskys, Cordner responded "that's a good question" and added that the practice had since been abandoned. Evarts further testified that, believing she was being subjected to gender-based harassment with respect to the monitoring and criticisms of her time, she entered Cordner's office and reviewed her co-workers' time records. As expected, they had the same discrepancies. And, of course, SNET has destroyed all of the evidence of this, or at least it claims to have destroyed it.

SNET downplays the significance of Cordner's conduct in respect to Evarts' time-keeping. But the seriousness with which Cordner characterized it is borne out by his obsessive entries into Evarts' personnel file. See Exhs. 13, 14, 15, 16,17, 18, 19. Indeed, SNET's position on this issue shifted with the tide of the evidence. In attempting to avoid a reasonable cause finding from the CHRO, SNET characterized Evarts' conduct with respect to her time-keeping as "tantamount to fraud". Exh. 1. When SNET engaged plaintiff's counsel in an expensive and months-long battle in respect to plaintiff's demand for disclosure of the DCWS records, SNET argued before this court that the records were "irrelevant" because what really mattered was that plaintiff's paper time sheets were "messy" and contained numerous "cross outs".[8] Without question, SNET's position before the CHRO, and Cordner's and Dillman's own notes, and the very subject of the intimidating meetings

[8]Based upon the circumstances and evidence set forth in Exhibits 1-9 of Volume III, the plaintiff would be entitled at trial to have the jury draw an adverse inference against SNET. Byrnie v. Town of Cromwell, 2001 U.S.App. Lexis 5145 (2nd Cir. 2001)

was was her alleged failure to ensure that her paper time records matched the DCWS data. In addition to Evarts' own account of her analysis of her co-workers' time records, David Ianiello confirmed that the crew's time sheets were usually completed at the end of the day and they never matched the DCWS data. In the end, both records reflected the technicians' approximate time per job and total hours. In any event, disputed issues regarding this matter must be resolved by jurors.

What is not disputed is that Evarts was the only one subjected to a ride-along evaluation in February of 1997, incredibly not long after she came back from her sister's burial. Again, while Cordner characterizes this as an effort to "help" Evarts, Evarts saw it differently. He was picky and critical and she in fact questioned why he was doing it so soon after her sister's death. It is uncontested that, although SNET claims to have a policy of monthly evaluations, to the extent it even did have such a policy, it hardly was followed as evidenced by Exhibits 6, 7 and 8. (Showing only one ride-along in Evarts crew in 1995, one in 1996 and, under Cordner's management, only one in 1997, which was Evarts. Consistent with Evarts' testimony that ride-alongs were customarily conducted of new employees, the 1995 and 1996 evaluations were done with relatively new employees Rick DellaVolpe and David Ianiello. Although Evarts had nine years of experience at the time, Cordner did not subject any males to a ride-along even though two of the crew members had far less experience and were junior to Evarts. On this point the CHRO correctly found SNET's proffered evidence that other males were subjected to riding exercises long after Evarts left SNET

was not only irrelevant but at most represented SNET's effort to even up appearances.[9] For the same reason, the CHRO found unpersuasive SNET's preferred evidence that Cordner questioned a male crew member about his time records, after Evarts left SNET. A jury likewise may easily conclude that Cordner was merely covering his tracks.[10]

Contrary to SNET's argument, conduct similar to that experienced by Evarts has been held actionable under Title VII. In Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81 (2d Cir. 1996), plaintiff's two supervisors began a campaign of harassment calculated to drive her from the job which included documenting alleged performance deficiencies "taking her to task" for alleged critical comments about management, subjecting her to "coaching sessions", calling her into closed door office meetings and berating her, denying her an opportunity to attend a course on communications skills, soliciting other employees for negative information and suffering a down grade of her performance appraisal. Id. at 85-86. Chertkova suffered a nervous breakdown and left work. Id. at 85-86. The Second Circuit reversed the district court's grant of summary judgment on her Title VII claims holding that the supervisors' severe criticism of Chertkova despite evidence of her strong performance, the persistent pattern of unfounded criticisms coupled with an implicit threat of termination created intolerable working conditions which impeded Chertkova's ability to perform.

---

[9] This is especially true since Evarts filed an internal EEO complaint with SNET prior to leaving SNET.

[10] Cordner's uncorroborated assertion that he checked other crew members' records is simply not credible. First, he does not name them, has no evidence to corroborate this and, if Evarts and Ianiello's testimony is credited, had he done so he would have seen the same discrepancies for which he hounded Evarts. Of course, once again SNET claims to be unable to "access" this evidence.

Especially since Chertkova's male colleagues were not similarly treated, the Court noted, a fact-finder might well find that her supervisors "actually sought to compel her to resign".

The Court further noted that Chertkova's supervisor "yelled at her" during the coaching sessions. Here, Evarts was subjected to an abusive temper tantrum by Cordner. All it took for Cordner to "scream at [Evarts] at the top of his lungs" was her pointing out to him that the disciplinary reprimand for failing to lock her vehicle was unfair because everyone else failed to lock their trucks and the locking mechanism on her truck was broken. Clearly, Cordner's abusive and intimidating conduct is an important factor when accessing the entire record to get a realistic view of Evarts' environment under Cordner's supervision.

Similarly, in Holtz v. Rockefeller & Co., Inc., 201 U.S. App. LEXIS 15480 (2d Cir. 2001) the Second Circuit reversed a grant of summary judgment on a hostile environment claim where the evidence showed plaintiff's supervisor's conduct caused her to "burst into tears" and become physically and emotionally distressed. In reinstating her claims, the court found there was a triable issue as to whether the supervisor's conduct "unreasonably interfered with Holtz's work performance", especially since Holtz testified that "it was almost impossible for her to do her work without getting upset" when the harassment occurred. Id. at *23. Clearly, Cordner "altered the conditions" of plaintiff's employment that she enjoyed for nine years before he took over. The incidents complained of were more than "episodic"; they were "sufficiently continuous and concerted in order to be deemed pervasive". Alfano, 294 F.3d at 374. As the Court of Appeals' holding in Chertkova shows, SNET is mistaken in its seeming argument that an actionable hostile or abusive

working environment need consist of numerous discrete "adverse actions".[11]

In Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003), the court similarly reversed a grant of summary judgment on a factual record similar to the one at bar. In Terry, plaintiff's supervisor told co-workers not to speak to plaintiff, referred to plaintiff as "nuts" and suffering from "emotional problems" and purposely discarded some of plaintiff's personal belongings in order to harass him. Noting evidence that such harassment made Terry's work environment "unusually and unnecessarily unpleasant on a nearly daily basis," the Court of Appeals reinstated the claim, notwithstanding the employer's argument that Terry, notwithstanding the harassment, ably performed the duties of his job. The court stated that whether harassment actually interferes with an employee's ability to work is "merely one factor to be considered." Finally, the court noted sufficient evidence, albeit not direct evidence, that Terry's supervisor treated white employees in a more favorable manner. Id. at 149-150. In contrast to these cases, where only circumstantial evidence of a discriminatory motive existed, in Evarts' case there is direct evidence of Cordner's motive.

Although the effect of the harassment on an employee's psychological well-being is one factor, neither it nor any other factor is determinative under the objective standard. Harris v. Forklife Systems, Inc., 510 U.S. at 23. "The victim's psychological well-being need not be damaged in order to find a hostile working environment; 'the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but

---

[11]To the contrary, no court has so held. Otherwise, Cordner could have made Evarts sit in a chair, held a bright light to her face and dripped water on her forehead for eight hours without violating any laws.

the most egregious of cases'". Fitzgerald v. Henderson at 358 quoting Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997). Notwithstanding this authority, there is evidence in this case that Evarts' mental well-being was severely affected by Cordner's treatment. Although it is true Evarts did suffer a tragic loss when her sister died, Evarts' husband, Frederick Evarts, clearly was of the opinion that his wife exhibited normal grieving in response to the tragedy but that Cordner's harassment tipped her over the edge. According to Mr. Evarts, his wife became more incapacitated as Cordner's harassment increased, especially during April-May of 1997. She could not sleep, her ability to enjoy intimacy with her husband was affected, she often wept. Sunday nights were the worst for her, as the thought of returning to work on Monday to face Cordner caused her extreme anxiety. The plaintiff's therapist, Sandra Rhodes, confirms that Evarts suffered from depression. A primary cause of it was her sister's death but a secondary cause was Cordner's harassment which, in Rhodes opinion, not only contributed to Evarts' depression but may indeed have exacerbated it because he was harassing Evarts while aware that she had just suffered such a tragedy. Evarts' knowledge that she worked for a supervisor who not only harassed her but stepped up his harassment right after such a tragic loss would exacerbate Evarts' emotional reaction to Cordner's harassment.

**5. There Is A Sufficient Evidentiary Basis To Impute Liability to SNET**

The U.S. Supreme Court has held that an employer is presumed absolutely liable in cases where the harassment is perpetrated by the victim's supervisor, although the employer may assert and prove an affirmative defense to rebut that presumption. Burlington Industries v. Ellerth, 524 U.S. 742

(1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275; 141 L.Ed. 2d 662 (1998).[12]

There is no question in this case that Cordner was a "supervisor with immediate authority over [Evarts]" and Edward Dillman, as Cordner's superior in the chain of command, had "successively higher authority". Therefore SNET is absolutely liable for Cordner's harassment. Faragher, at 2292-93.

SNET appears to raise this affirmative defense in its moving papers and claims that notwithstanding the existence of a hostile or abusive working environment that SNET is entitled to judgment as a matter of law because Evarts failed to avail herself of SNET's internal complaint process. On this issue, it is SNET which bears the burden of proof, not Evarts, and SNET must plead and prove that 1) it exercised reasonable care to prevent and properly correct the harassment by Cordner, and 2) Evarts *unreasonably failed to avail herself of any "corrective" or "preventative" opportunities provided by SNET or to "avoid harm otherwise*".

Quin v. Green Tree Credit Corp. 159 F.3d 759, 767 (2d Cir. 1998). (Emphasis supplied.)

SNET's argument in this regard rests entirely on its claims that Evarts failed to resort to SNET's EEO manager for relief until she gave notice of her intent to resign. First, the circumstances surrounding Evarts' notice of resignation and her resort to SNET's EEO office must be considered

---

[12] In contrast, if the harasser is an equal - - a co-worker, the employer will only be liable if it his negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995); see also Faragher, 118 S.C. at 2289; 29 C.F.R. §1604.11(d)(1998) (employer liable for co-worker harassment if the employer's agents or supervisory employees knew or should have known of the conduct).

in deciding whether she "unreasonably" failed to avail herself of services from that office. First, at the point at which Evarts decided to resign, Cordner had stepped up his harassment and it was occurring on a near daily basis, in most cases involving his calling Evarts to task repeatedly over the time sheets. According to Frederick Evarts, his wife called him from her truck and she was "balling her eyes out." She asked her husband if there was any way they could survive financially if she quit. Given his wife's overwrought state, Mr. Evarts told his wife to flee SNET immediately and come home. Evarts, although she wanted to, declined, stating that she wanted to give SNET notice. She accordingly submitted a letter of resignation to Cordner and at the same time filed a complaint with SNET's EEO office.

Evarts was, by all accounts, "a wreck" on May 16, 1997 when she gave her letter of resignation. In her interview with SNET EEO manager Constance Rogers, Evarts stated that she "couldn't take it anymore" and would have to leave SNET. It was at this point that SNET had an opportunity to do something but as the following facts show, SNET's response to the EEO complaint was shockingly dismal.

**THE CONDUCT OF SNET'S EEO MANAGER CONSTANCE ROGERS**

All of the facts surrounding Rogers handling of Evarts'complaint are uncontested. In a nutshell, Rogers did nothing. First, Rogers had only been in the job several years, having held numerous (9) unrelated positions previously. Incredibly, she conceded SNET did not even have a policy instructing or advising human resources personnel on how to conduct a proper investigation into sexual harassment or sex discrimination. Rogers did not even record the date on which she took

the complaint from Evarts. She only interviewed Evarts once. She interviewed Matthew Cordner who not surprisingly told Rogers that he did not discriminate against Evarts. For example, Cordner stated that he subjected Evarts' male co-workers to ride-along evaluations and otherwise treated Evarts the same as the others. With this and no more, Rogers closed her file after declaring Evarts' complaint meritless. By her own admission, she did not interview a single male co-worker of Evarts. She did not request Cordner's personnel file nor did she bother to discover if there had been any previous complaints against him. She admitted she disposed of Evarts' complaint based solely on what Cordner told her and because "the facts were not in dispute". She never asked for any records. She did not contact Edward Dillman to determine what he knew or what relevant records he could offer.

Although Rogers claims to have attempted to telephone David Ianiello, Ianiello has no such recollection of any attempted contact. Moreover, Ianiello testified, had Rogers interviewed him or requested documents or other information on how Evarts was treated in comparison to males, he would have cooperated fully. Evarts was still working for SNET when Rogers advised her by telephone that her complaint was deemed meritless.

What is disturbing about Rogers' handling of the matter is that she knew that Evarts had worked for SNET for ten years and was stating an intent to resign due to gender-based harassment. Had Rogers bothered to take the complaint seriously, she would have seen that Evarts had a ten-year history of service to SNET free of controversy or discipline.

Rogers' failure to interview any of Evarts' male co-workers appears all the more shocking in

light of Rogers' admission that, once installed in the EEO manager's job, she was sent for training and attended seminars at which employment lawyers advised that an important part of any such investigation is an interview with similarly situated employees outside the plaintiff's protected class.

SNET was not a Mom-and-Pop operation but a huge company with over 9000 employees. That its EEO manager would conduct an investigation of a complaint of gender discrimination, especially a complaint coming from one who stated the harassment was so bad that she felt compelled to give notice, is no less than shocking. Of course, Rogers' handling of the complaint is entirely consistent with what Evarts had heard about the effectiveness of SNET's EEO office from other women employees at SNET and from her own supervisor, Crystal White. Notwithstanding this reputation, Evarts still gave SNET's EEO office a shot at doing something. Of particular relevance is Evarts' emphatic statement that she did not wish to SNET. SNET employment was a family affair of sorts. Evarts' step-mother worked there for twenty-seven years. Evarts' two sisters worked for SNET. Evarts attained her bachelor's degree at night while working full-time for SNET.[13] Evarts states that had SNET's EEO office conducted a prompt and meaningful investigation and afforded her some options or relief, Evarts would gladly have stayed. SNET could have removed or transferred Cordner. SNET also could have arranged for Evarts to be transferred to another

---

[13]Evarts contests SNET's mischaracterization of her testimony regarding her desire to go to law school. While SNET implies that Evarts quit SNET to further her goal of becoming a lawyer, Evarts states that she did not decide to go to law school until 1998. Even then, Evarts would have attended law school at night just as did when earning her bachelor's degree. Indeed, even after Evarts left her employ, she in fact obtained her J.D. degree in the evening division at Quinnipiac Law School. Exh.

department, a resolution Evarts would have accepted. Instead, SNET's EEO office did what the women at SNET expected it to do, which was circle the wagons around their fellow managers and insulate their employer from liability.

It is SNET's burden in this case to prove as a matter of fact and law that Evarts unreasonably failed to avail herself and on this evidentiary record, a jury might well conclude that this was not the case.

**6. Apart from SNET's Affirmative Defense, the Record Evidence Supports a Finding of Liability of SNET for the Conduct of Matthew Cordner**

With respect to harassment by a co-worker that is, one who conduct may not as a matter of law be imputed to the employer, the employer need not have actual knowledge of the harassment; an employer is considered to have notice of [it] if the employer – or any of its agents or supervisory employees, knew or should have known of the conduct. DiStasio v.Perkin-Elmer Corp., 157 F.3d 55, 63 (2nd Cir. 1998). (citations omitted)(emphasis supplied) As the Second Circuit explained:

> An official's knowledge will be imputed to an employer when: (A) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company; or (B) the official is charged with a duty to act on the knowledge and stop the harassment; or (C) the official is charged with a duty to inform the company of the harassment.

DiStasio, 157 F.3d at 63 (citation omitted) (emphasis supplied). According to Evarts, in the May 2, 1997 meeting, at which she was interrogated relentlessly about her time records, present were Cordner's manager Edward Dillman and Evarts' union representative, Debbie Guarnieri. In that meeting, both Evarts and Guarnieri challenged Cordner on whether he was treating the males in the

crew in a like manner. Cordner was specifically asked by both women whether he had scrutinized and examined the males' time records. Cordner answered, "No." Clearly, Edward Dillman, who held a high management position, was on notice right then and there of an issue of gender-based discrimination. SNET's policy on "Sexual And Other Unlawful Harassment" includes the following provision:

> **Responsibility of Supervisors**
>
> Supervisors have a responsibility to foster an environment free of sexual or other unlawful types of harassment. Supervisors who observe sexual or other unlawful harassment should tell the harasser to stop. In addition, supervisors who become aware of possible sexual or other unlawful harassment must promptly the EEO Manager at (203) 771-4712.

Def's Exh. 10. (emphasis supplied)

Clearly, under the express terms of this policy which SNET now invokes in its effort at judgment, Dillman was required to notify the EEO Manager the moment he stepped out of that meeting. According to Evarts, however, Dillman and Cordner were friends. Dillman also joined in on the scouring and analysis of Evarts' time records. In addition, Dillman previously had appeared as ineffectual in reacting to unlawful harassment on the job. Evarts recalls that years earlier, when she worked in SNET's Norwalk location, she had a great relationship with management but endured offensive and crude behavior from male co-workers. One of them made repeated and lewd comments about plaintiff's breasts. One of them, unknown, left a dead rose on the windshield of her car accompanied by a note which read, "I wanna suck your pussy – I'm jerking off . . ." Evarts presented the note to Dillman who read it. Dillman did nothing. Patrick Kinsella, Evarts' supervisor, was on

vacation but upon his return, he at least arranged for Evarts to meet with a woman from SNET's Human Resources department. She told Evarts essentially that dirty comments are a fact of life in a male-dominated occupation and did not see any illegalities. She advised Evarts to tell the men to stop. Frustrated at the situation, Evarts' husband traveled and appeared at the work site to confront the offending co-workers. Evarts resolved the matter herself when she transferred to New Haven. On this evidentiary record, there is clearly a triable issue as to whether Evarts unreasonably failed to take advantage of SNET's EEO office, a matter relevant only to SNET's strict liability for Cordner's conduct. Equally, however, there is a triable issue as to whether SNET is liable under the factors set forth in DiStasio since SNET was on notice of the harassment by reason of Dillman's knowledge and acquiescence in it.

### C. EVARTS SUFFERED ADVERSE ACTIONS

SNET's claim that Evarts suffered no adverse action is not supported by the caselaw. First, the disciplinary reprimand issued to plaintiff is unquestionably an adverse action. In addition to the classic examples of adverse action which include discharge, refusal to hire, demotion and reduction in pay, the Second Circuit has held that a reprimand can also constitute an adverse action. See Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999). Other than these classic examples, if the total circumstances of one's working environment change so to become reasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace, an adverse action can be established. Coogan v. Smyers, 134 F.3d 479, 483-84 (2d Cir. 1998); Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2001). With respect to the reprimand, it is itself an adverse action. Moreover, with

the issuance of the reprimand as the basis, Cordner threatened Evarts with possible discharge upon a repeat offense.

Analogizing the denial of a satellite office to a refusal of a transfer, as SNET has done, is useful, for looking at it that way, there is case law aplenty establishing that a transfer or location assignment that is unwanted may be an actionable adverse action. See, e.g., Rodriguez v. Board of Education, 620 F.2d 362 (2d Cir. 1980)(Transfer was adverse action even though it did not diminish teacher's salary and benefits nor add any increased workload); Jacobs v. Martin Sweets Co., 550 F.2d 364, 367-68 n.9 (6th Cir. 1977)(Transfer was adverse action despite no salary reduction or change in work hours since it was considered a step down in prestige); Goodwin v. Circuit Court, 729 F.2D 541 (8th Cir. 1984)(Transfer is an adverse action despite no reduction in pay or benefits), *aff'd on second ground*, 741 F.2d 1087 (8th Cir. 1984) *cert. denied*, 469 U.S. 1216, 105 S.Ct. 1194 (1985); St. John Employment Development Dept., 642 F.2d 273 (9th Cir. 1981)(Transfer to another job of the same pay and status in retaliation for filing of EEOC complaint is adverse action); Ferguson v. E.I. DuPont de Nemours & Co., 560 F.Supp. 1172 (D.Del. 1983)(Although temporary transfer of secretary to a pool was not adverse action, Court noted that a permanent transfer despite no change in salary or benefits would be an adverse action); Trout v. Hidalgo, 517 F.Supp. 873 (D.D.C. 1981),(Retaliatory transfer to department in which plaintiff had no background despite no reduction in salary or benefits is adverse action), *aff'd in part and rev'd in part sub nom.* Trout v. Lehman, 226 U.S.App. D.C. 257, 702 F.2d 1094 (D.C.Cir. 1983), *vacated on other grounds*, 465 U.S. 1056, 104 S.Ct. 1404 (1984); Burkey v. Marshall County Board of Education, 513 F.Supp. 1084 (N.D.W.Va. 1981)(Retliatory

transfer of teacher from one school to another was adverse action; Collins v. State of Illinois, 830 F.2d 692 (7th Cir. 1987)(Transfer of library consultant to new department where plaintiff's duties were not as challenging and where she no longer had her own office was an adverse action). And while such acts as taking away Evarts' cell phone would not, by themselves, constitute adverse actions, they can be deemed to have "contributed to an atmosphere of adverse employment action." Wanamaker v. Columbian Rope Co, 108 F.3d 462 (2d Cir. 1997) citing Collins v. State of Illinois, 830 F, 2d 692, 704 (2d Cir.1987)(noting that in Collins the court held that denial of an office and telephone and other like acts can on the whole constitute and adverse employment action.)

## D. THERE IS AMPLE EVIDENCE UPON WHICH JURORS MAY FIND THAT EVARTS WAS CONSTRUCTIVELY DISCHARGED

Without question, the evidentiary records suffices to permit a jury to find that Evarts was constructively discharged. An employee is constructively discharged when her employer, rather thann discharging her directly, intentional creates a work atmosphere so intolerable that she is forced to quit involuntarily. Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996). The Second Circuit has explained that "working conditions are intolerable when, viewed as a whole, they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id. 92 F.3d at 89 (quotations omitted). In addition, to state a prima facie case of constructive discharge, Evarts must establish that the discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class". Id. At 91. Proof of such a causal connection "can be established directly through evidence of retaliatory animus

directed against a plaintiff' or through unfavorable treatment as compared to similarly situated male employees. Terry v. Ashcroft, 336 F.3d 128, 152 (2d Cir. 2003)(citations omitted).

In Terry, the Second Circuit, in a case very much akin to the one at bar, found sufficient evidence to allow a jury to conclude that a reasonable person in Terry's position would have felt compelled to terminate his employment as jurors could conclude that he experienced a hostile work environment "which involved pervasive, unabated harassment by his supervisors". One of Terry's co-workers corroborated the claim by testifying that, based on her observations, plaintiff's supervisor was trying to make "[his] life so miserable he would quit". Id. Like Evarts, the plaintiff in Terry did "not allege that just a single event caused him to be constructively discharged, but rather that such a discharge resulted from the cumulative, unabated harassment that he experienced." Id. At 152-53. Accordingly, the Second Circuit found summary judgment inappropriate and on the same basis and for the same reasons judgment in favor of SNET is not possible on this evidentiary record.

SNET points to a variety of claimed or contested facts in urging judgment in its favor, among them evidence that Evarts had previously sought transfers, that she may not have been happy in the job or that she really wished to become a lawyer. SNET of course is free to advance those arguments at trial but they provide no basis for judgment in SNET's favor as a matter of law. Moreover, there is ample evidence, in the testimony of Frederick Evarts and that of Sandra Rhodes, which corroborates Evarts' claim that her decision to tender her resignation on May 16, 1997 was necessary for her mental and physical health. SNET no doubt will argue that the tragic death of Evarts' sister was responsible for her emotional state and not any alleged harassment by Cordner. But SNET must

make this and other arguments to jurors, not the court. All SNET has accomplished by its moving papers is set the stage for competing inferences. But the choice among competing inferences is the province of the fact-finders. The role of the court on summary judgment is "not to try issues of fact, but only to determine whether there are issues of fact to be tried". Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).

**CONCLUSION**

For all of the foregoing reasons, SNET's motion must be denied.

THE PLAINTIFF, DENISE EVARTS

BY: ______________________
KAREN LEE TORRE
Federal Bar No. ct01707
Law Offices of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, CT 06510
(203) 865-5541

Her Attorney

CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, First Class, postage paid, on September 19, 2005, to:

Lori B. Alexander, Esq.

Tyler, Cooper & Alcorn, LLP
205 Church Street
New Haven, CT 06509

Karen Lee Torre