UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DENISE EVARTS                              :

      Plaintiff                            :

                         :   Civil No.  3:00CV1124 (WIG)

V.                                          :

THE SOUTHERN NEW
ENGLAND TELEPHONE COMPANY,     :     SEPTEMBER 19 , 2005

      Defendant                           :

## PLAINTIFF'S LOCAL RULE 56 (a) (2) STATEMENT OF EVIDENCE AND MATERIAL FACTS AS TO WHICH THERE ARE GENUINE ISSUES TO BE TRIED

1.  Denise Evarts worked for SNET for ten years.  She started work in 1987 as a Repair Service Clerk and two years later became a Service Technician and remained in that position until May of 1997 when she left SNET.  The plaintiff's primary duties as a Service Technician involved installing, repairing and maintaining pay phones throughout the State, particularly in New Haven County.  Exhibit A passim.

2.  Plaintiff enjoyed her job and working for SNET.  She earned an Associates Degree in Computer Programming and later earned a Bachelor's Degree from Teiko University.  She majored in business management as she hoped to move up into a management position with SNET.  Exh. A at pp 25-26.

3.  Plaintiff was the sole woman in her work crew.  She got along well and had no problems with the seven male co-workers in her crew.  Exh. B at pp. 331-334.

4.  Prior to the arrival of Matthew Cordner as a new Supervisor in July of 1996,

Law Offices of Karen Lee Torre • 51 Elm Street, Suite 307, New Haven, Connecticut 06510 • Tel: (203) 865-5541

plaintiff worked under two managers, Crystal White and Patrick Kinsella.  Plaintiff had no problems with or complaints about either of these supervisors.  Exh. A p. 32

5.  Evarts for nine years enjoyed her work free from disciplinary problems and had performed her job well such that SNET received compliments from a business customer Exhs. 3, 27.

6.  Evarts also had received an award and recognition from SNET for having achieved the "lowest minutes per trouble" among all SNET technicians throughout the state. "Minutes per trouble" is SNET's measure of productivity; the lower a technician's minutes per trouble, the more productive that employee had been.  Exh. 27 at ¶ 9.

7.  The variety of acts of harassment and intimidation plaintiff suffered under the management of Matthew Cordner all took place within the time frame of July of 1996 until mid-May 1997 when Evarts gave notice of her intent to quit.

8.  Plaintiff lived in Chester, Connecticut, and had been looking forward to the opportunity to proceed to work each day out of a satellite location to be set up in North Madison which was close to her home.  Other crew members in the past, all male, had been allowed to report out of satellite offices.  Being able to do so was a great convenience as one could report out on jobs at a location closest to one's home and then proceed to other jobs througout the day.  Exh. A at pp. 54-56.

9. Plaintiff's previous supervisor, Crystal White, not only believed a North Madison

2

satellite location was appropriate, she confirmed her decision to authorize the satellite location based on her determination that there was enough work to justify it. White confirmed this in a teleconference with plaintiff at the time of the CHRO proceedings. Id. at 38.

10. Crystal White had researched the business need for the satellite and had determined that it would be a good idea. Although assignment to a satellite is often based on seniority, no technician senior to Evarts wanted the North Madison location because its convenience is linked to one's residential address. Accordingly, White promised the plaintiff she could have it. Id. at 85.

11. Crystal White was fired by Edward Dillman, and while the of it are unknown, White did complain to plaintiff that she was the victim of sex discrimination by Edward Dillman. Exh. 27.

12. Upon Crystal White's departure, one Patrick Kinsellla became the plaintiff's manager. Kinsella picked up where White left off on the issue of the North Madison satellite location. He had been working on the issue and had promised the location to the plaintiff. He asked the plaintiff for her help on logistical matters in getting the site set up as he was busy and needed plaintiff to help work out the details. Id. at 58 and 83.

13. Based on plaintiff's knowledge of SNET's activity in the area, the North Madison satellite was justified. Technicians had to deal with telephone line trouble in Madison on

3

a frequent basis and had to travel to the Madison area constantly. Id. at 84.

14.  There was increased activity for technicians in the Madison area, especially in the warmer months, with the presence of Hammonassett State Park. There are a lot of pay phones in the area. While there are more pay phones in New Haven, for example, the repair and maintenance on them is necessitated more often by vandalism, whereas in the shoreline area, because of the longer telephone line distances, there were more frequent instances of line troubles. Id. at 75-76.

15.  The distance from plaintiff's home to what would have been the North Madison satellite would be approximately 15 to 20 minutes while a much longer distance was required for travel to the New Haven office. The distance from plaintiff's home to a Guilford satellite, in contrast, was approximately 45 minutes and thus an assignment to work out of a Guilford satellite was not attractive. Id. at 65-66 and 77.

16.  When Matthew Cordner replaced Kinsella as plaintiff's manager, he refused to allow plaintiff to satellite from North Madison. Plaintiff complained to Cordner and to manager Edward Dillman to no avail. Id. at 61-63.

17.  There was tension early on between Evarts and Cordner over the issue of the satellite location. Cordner entered an extensive note in his personnel file on November 8, 1996 in which he felt the need to record a direct quote from Evarts regarding his decision not to allow the satellite and he further complained that Evarts had gone over his head to

4

Manager Edward Dillman and had tried "to get [Dillman] to override me". Exh. 4.

18.  On November 11, 1996, Cordner entered another note in Evarts' file indicating that she had a "bad attitude" and "does not talk to [him]".  He made another entry on November 12, 1996 repeating the same claim.  Exh. 4.

19.  From that point on, Cordner targeted Evarts  for discriminatory treatment, excessive and obsessive supervision, oversight and criticism with the aim of forcing her out of the job or orchestrating her discharge. Exhs. 11-19.

20.  On November 15, 1996, Cordner entered a lengthy and critical note in Evarts' personnel file by which he mischaracterized an incident in which plaintiff called in sick in order to disparage her. He closes his entry by noting that her "attitude since the Guilford CO-offer has been very negative". Exh. 5.

21.  Plaintiff had a sister Debra with whom she was very close.  Debra was also a SNET employee. Tragically, Debra Evarts was diagnosed with an aggressive and fatal form of ovarian cancer and at some point it became clear to the Evarts family that Debra was going to die.  Debra was 31 years old at the time.  Exhs. 9, 10.

22.  SNET had a family and medical leave policy at the time which entitled SNET employees to unpaid leave to care for a seriously ill family member.  In order to establish entitlement to such leave, extensive documentation is required, and in Evarts' case, she had to submit statements from Debra Evarts' oncologist which gave detailed information

5

about the gravity of Debra's illness. Denise Evarts submitted the application up the line to Human Resources and the leave was approved by the SNET Benefits Committee. Exh.. 9, 27.

23. While SNET implies that Matthew Cordner, in a magnanimous gesture, was responsible for granting Evarts a leave, this is untrue as the decision to grant such leave is made at a much higher level. Exh.. 9, 27.

24. Evarts was on family medical leave from late November, 1996 until January 24, 1997. She cared for her sister Debra until Debra died on January 12, 1997. Matthew Cordner appeared at the wake for Debra Evarts which took place on a Friday. He approached Denise Evarts as she stood with her husband and family greeting visitors. In front of them, Cordner extended his condolence and stated to Denise that she should come back to work whenever she was ready. A couple of days later, however, on the following Monday or Tuesday, Cordner called the Evarts home questioning why Evarts had not yet returned to work. Exhs. 27; C at p. 50.

25. Shortly after plaintiff's return from the death of her sister, and despite the fact that Evarts had worked in the job for 10 years and performed the job well with no problems, Cordner targeted plaintiff for what is called a "ride along" exercise and evaluation. The ride along involves accompanying a technician and riding along in the truck. The supervisor monitors the technician's activities throughout the entire work day while employing a

6

clipboard to make notes regarding the technician's performance.  Exh. A. at pp. 86-88; Exhs. 8, 27.

26.  Ride-along evaluations were customarily done for new employees.  Evarts complained to Cordner about it to no avail.  Id.

27.  Cordner "criticized and nitpicked" the plaintiff's performance of her various jobs throughout the entire day of the ride along.  Exh. 27.

28.  During the entire time that Evarts worked for Cordner, Cordner did not subject anyone else in the crew to a ride-along evaluation.  Exh. D at pp. 236, 238-41; Exh. 8.

29.  During the ride along, Cordner violated SNET policy by insisting that plaintiff open one pay phone while another one was still open.  When Evarts pointed out to Cordner that SNET policy prohibited her from having two phones open at once, Cordner responded that he didn't care as he did not approve of that policy.  Exh. A. at p. 91.

30.  At  the time that Cordner subjected Evarts to an unprecedented ride-along evaluation,  she had 10 years of experience in the job and there were two male crew members with less than 12 months experience on the job.  Neither man was subjected to a ride-along evaluation by Cordner.  Id. at pp. 92-93.

31.  In contrast to SNET's and Cordner's claim that ride-along exercises were "routine" and expected of supervisors, SNET's records recording riding exercises in 1995 show that only one member of Evarts' crew was subjected to a ride-along the entire year.

7

Exh. 6. Cordner was not a supervisor at the time.

32. SNET's records reflecting riding exercises for the year 1996 show that only one crew member (not Evarts) was subjected to a ride-along exercise in the entire year of 1996. Neither the exercise in 1995 nor the one in 1996 were done by Cordner but were instead conducted by a predecessor supervisor. Exh. 7.

33. After Evarts gave notice of her intent to resign and raised an issue of gender discrimination with SNET's EEO officer, Cordner, in July of 1997, subjected David Ianiello to a riding exercise, and later, several other males. Exh. 8.

34. Evarts' SNET-provided vehicle was aged and in bad condition. The condition of one's vehicle and seniority ordinarily determined who would get a new truck. Evarts was slated by SNET to get a new vehicle in 1997 but was denied one. Exh. 22. Male crew member Rick DellaVolpe instead received a new truck. Although his was old, it was in much better condition than Evarts'. Evarts spoke with the mechanics and asked why she, although scheduled to receive a new vehicle, did not get one. She was told it was common if the "boss doesn't like you, they change the paperwork to give the truck to someone else". Id. at pp. 78-80; see also Def.'s Exh. 14 at ¶6. Plaintiff had also previously been advised by Manager Edward Dillman that she would be getting a new truck.

35. Plaintiff complained to Cordner about this to no avail. Exh. A at p. 84.

36. In February 1997, not long after she was subjected to the ride-along evaluation,

8

Cordner took away Evarts' SNET-issued cell phone as punishment for alleged violation of a policy limiting use to no more than 300 minutes per month. There is no written policy stating this limit nor were crew members ever given anything in writing regarding such a policy. Nor was plaintiff orally advised about any such limit. Id. at p. 104; Def.'s Exh. 14 at ¶8; Exh. 27.

37.  Evarts was very upset over the taking of her cell phone shortly after the death of her sister. To the extent that Evarts exceeded any limit on the number of minutes during this period, it would have been a consequence of her need to be available to family members in connection with her sister. Id. at p. 110; Exh. 27.

38.  When Cordner advised he was taking away her cell phone, Evarts responded by offering to pay SNET for the minutes and implored Cordner not to take the phone because she needed the convenience of it. While technicians also had a beeper, they could get beeped but could not respond unless there was an available phone in the area. Id. at p. 110.

39.  The number of cell phone minutes per month used by male technicians was known to Evarts as the data was posted in the technicians' meeting room. Evarts saw that other male crew members had also exceeded the limit but were not punished for it by Cordner. Id. at pp. 111-113. That at least three other males, David Ianiello, Lou Marino and Rich DellaVolpe, exceeded the claimed limit is established by SNET's Exh. 4.

40.  On March 17, 1997, Cordner made a note in Evarts' file that he found the rear door of her truck unlocked and stated that Evarts had been warned "in the past" about it.

9

Exh. 12.

41. Cordner then summoned plaintiff to a meeting with a union representative on March 17, 1997. Exh. 12.

42. On March 17, 1997, Cordner disciplined the plaintiff for the offense of leaving her vehicle door unlocked while it was housed in SNET's garage overnight. Evarts was given a "documented verbal warning" to be kept in her personnel file for a minimum of six months. Exh. 11.

43. At the time in question, the locking mechanism on the rear door of Evarts' vehicle was broken, a fact reported to SNET mechanics who were supposed to fix it, made a record of it, but failed to repair the vehicle. Evarts' truck was in fact stored inside a locked garage which itself is inside of a facility secured by a locked fence. No material or tools were stolen from the truck. Def.'s Exh. 14; Exh. A at pp. 115-118.

44. At the disciplinary meeting at which Evarts was issued the warning, SNET Union Steward Gerry Nuzzo was present. The Union representative asked Cordner if anyone else had ever been written up for leaving their trucks unlocked and Cordner stated "no". Def.'s Exh. 14 at ¶9; Exh. A at pp. 129-133.

45. Edward Dillman was present at the disciplinary meeting at which the issue of discriminatory discipline with respect to the locked vehicle policy was brought up. Exh. A at p. 133.

46. Evarts had personal knowledge of the habits and practices of her male crew members with respect to the locking of vehicles. No one complied with the policy. Evarts

10

personally observed fellow crew members returning their vehicles, leaving them unlocked inside the garage and returning the next morning to open them without the necessity of unlocking them. Exh. A at pp. 116-118.

47.  With respect to the disciplinary action of March 17, 1997, plaintiff presented Cordner with documentary proof from SNET mechanics showing that the lock on her vehicle was broken and the mechanics failed to fix it because they lost the ordered parts. Cordner did not rescind the discipline but instead became angry that plaintiff had presented such evidence. He lost his temper and began to scream in the plaintiff's face at "the top of his lungs". While screaming at her, Cordner stated that he didn't care what kind of a note she had from the mechanics and that the discipline would stand. Def's Exh. 14; Exh. 27.

48.  The evidence Evarts showed Cordner was a SNET "Motor Vehicle Trouble Report" form prepared by SNET mechanics indicating that the back door on Evarts vehicle did not lock properly, that parts had been on order for it since January, there was a mixup as mechanics misplaced the parts, and it was their mistake. Exh. A at p. 118; Exh. 21.

49.  During the period Evarts worked for Cordner, male crew member Rick DellaVolpe failed to secure his vehicle (appartently off-site) and as a result some $500 worth of SNET-owned tools were stolen. DellaVolpe reported the incident to Cordner and explained that the loss was a result of his failure to secure his truck. Cordner did nothing to DellaVolpe by way of discipline nor did SNET create a record of it. Exh. B at pp. 10-12, 14-15; 19.

50.  Evarts does not recall Cordner having "orally" warned her three times previously

11

in respect to locking her vehicle. Exh. A. at p. 21.

51. Cordner's own diary notes contain conflicting statements on this point. In one note, he claims that he warned her orally twice before and in another he claims he warned her three times before imposing more serious discipline. Exhs. 12; D at p. 285.

52. Although no other male crew member was disciplined for failing to lock his vehicle and DellaVolpe was not disciplined for the above incident, once Evarts gave notice to quit and raised a claim of gender discrimination, Cordner proceeded to reprimand a male crew member for the purpose of evening up appearances. Exh. A at p. 133; Exh. 1.

53. On March 18, 1997, Cordner wrote another lengthy note in Evarts' file wherein he recounted Evarts' presenting him with proof from SNET mechanics that the lock was broken. Cordner stated the following:

> "She [Evarts] feels me telling her about the seriousness of the situation (<u>could lead to dismissal</u>) was a threat from me -- (it was a reminder of how serious this is).

Exh. 8 (emphasis supplied).

54. It appears that although he formally disciplined Evarts on March 17, 1997, by his notes, he talked about the "seriousness of the situation" which, he told Evarts, "could lead to dismissal," on March 18, 1997. Exh. 12.

55. On April 9, 1997, Cordner summoned plaintiff to his office for oral counseling. Cordner alleged that plaintiff had too many "minutes for trouble" in March, 1997. According to plaintiff, for a decade her performance in this area was fine. She had previously been given an award by SNET for having the best record in the entire state. Exh. 27. To the

12

extent she was less productive in March, 1997, it was because she had recently returned from leave in connection with her sister's death. Id. at pp. 134-136.

56. Productivity data respecting crew members' "minutes per trouble" were actually posted in the office. Other male crew members who had comparable "minutes per trouble" as the plaintiff were not called into Cordner's office for criticism or counseling. Id. at pp. 137-138.

57. On April 25, 1997, Cordner, together with Dillman, spent a great deal of time analyzing Evarts' time records and made extensive notes on where and to what extent discrepancies could be found in her timekeeping. Exh. 13.

58. On April 29, 1997, once again a detailed review and analysis of Evarts' time records were done with notes detailing alleged discrepancies. Exh. 14.

59. On April 30, 1997, Cordner again writes a lengthy, single-spaced handwritten memorandum to Evarts' file in which he criticizes her production, sick time and alleged discrepancies between her time sheets and the DCWS data. This time, Cordner noted Evarts' response was that she no longer wished to work at SNET, that she would prefer a "pink slip" so she could leave, that she now "hates" her job and it "makes her sick to come to work." Evarts was further quoted as saying she has tried to transfer into other departments but was unable to because she could not pass required tests. Cordner notes that he explained to Evarts that her decision to leave SNET is "up to her" and indicates that he will continue to speak to her about her time sheets. Exh. 15.

60. Exh. 15 contains no notes by Cordner of his response to being told by the only

13

female crew member he had that she hated coming to work and it was making her sick. The only memorialized note that he made was his comment that her decision to leave SNET was up to her.

61. After she was disciplined for leaving her truck unlocked, Evarts asked her co-workers if any had been spoken to or disciplined for leaving a truck unlocked. Id. at p. 58. None were although Evarts witnessed them leaving their trucks not only unlocked but with the windows open. Id. at p. 67.

62. Because SNET management tried to avoid overtime where possible, crew members would not unload their trucks when they returned to the garage in the evening but would leave equipment and coin boxes in them overnight. Evarts saw managers witnessing coin boxes being unloaded the next morning by crew members, indicating that they had been left in their trucks overnight. Id. at p. 38.

63. Evarts witnessed her seven male co-workers opening up their unlocked trucks in the morning the majority of the time. Id. at 106-107.

64. Notwithstanding this practice, the trucks were kept overnight inside of a locked garage which itself was in a gated, guarded premises. Id. at p. 66.

65. With respect to time sheets, the male crew members along with Evarts prepared their handwritten sheets at the end of the day, often while sitting together. Id. at p. 92.

66. When Evarts confronted Cordner with her belief that she was being singled out for discriminatory treatment regarding the scrutiny and actions taken against her in respect to her time-keeping practices, Cordner became sarcastic. Evarts asked him if the "guys"

14

were being checked as well. Cordner answered, "No" but furthered that he would go ahead and do so in the future so she can't say or prove that he was after her. Id. at pp. 145-146.

67. When Cordner began to harass the plaintiff about her time-keeping practices, Evarts interviewed her male co-workers and asked them if Cordner ever questioned them about their time-keeping or disciplined them for discrepancies. All said, "No."

68. Exhausted by Cordner's almost daily harassment, Evarts spoke with union representative David Ianiello who told her that Cordner would keep on harassing her until she quit. Id. at p. 154.

69. On May 2, 1997, Evarts was again summoned to a meeting with Cordner at which were present Cordner's boss, Edward Dillman, and the plaintiff's union representative Debbie Guarnieri. Cordner and Dillman proceeded to splay out DCWS reports and compare them to plaintiff's written time sheets, showing discrepancies between them. They asked her to account minute-by-minute for the jobs she performed throughout the day on Friday, April 25, 1997. She was asked to go over the day three times. Evarts and Guarnieri raised the issue of discriminatory treatment and demanded to know if Cordner had analyzed the male crew members' time records as well. Cordner answered "No." Id. at 145-146; Def's Exh. 14 at ¶13.

70. On May 2, 1997, Cordner devoted time to writing an extensive memo to Evarts' file regarding this meeting. He does not quote any comments made by Evarts or Guarnieri and instead writes a self-serving account of the meeting in which he interrogated her about her time and activities on two previous work days. Exh. 17.

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

71. Within several days, Cordner again writes negative entries into Evarts' personnel file on May 5, 1997, and again on May 6, 1997. Cordner again was analyzing Evarts' time sheets and noting criticisms in the file. On May 6, 1997, Cordner records the fact that he analyzed Evarts' time records again and records his summoning Evarts to another meeting where he "started to explain to her the mistakes made." Evarts demanded a union representative. Cordner proceeds to write more self-serving comments and ends the memo by stating that "Denise also told me I'd better be checking everyone else's time sheets – told that's not the issue here!" Exh. 18.

72. Within days again, Cordner is writing negative entries in Evarts personnel file, this time noting that he talked to the crew about time sheets, that there were wrong entries and that he went over them with the crew. He does not mention the names of any male crew members. He does record in a separate note that Evarts' time sheet was incorrect. Exh. 19. The claim that he counseled the crew was fabricated and designed in        to Evarts' complaint of discrimination.

73. On May 6, 1997, Cordner reprimanded the plaintiff for an alleged mismatch on her time sheets. Cordner had compared Evarts' time sheets with the DCWS data transmitted to SNET's data base by the Husky. Although the total time expended was the same on both time sheets, Cordner hounded Evarts on the alleged mismatch between the two records. The reason for the mismatch was the same for everyone. The Huskies often didn't work correctly and the time sheets were done at the end of the day with crew members estimated their time period. Id. at pp. 145-146; Def's Exh. 14 at ¶14.

16

**The following statements are based on the September 14, 2001 deposition of the plaintiff by SNET counsel. Note: The court reporter failed to maintain pagination.**

74. Evarts asked Dillman for a pink slip because she believed she could not stay in the position any more for mental health reasons due to Cordner's harassment. SNET at this time was laying off numerous employees. A lay-off would allow to go out and search for another job without suffering a total loss of income. She could not afford to quit. At this point, she was waking up sick and nauseous at the thought of going to work every morning and had to get out. Id at pp. 146-147; Exh. 27.

75. After Evarts was interrogated by Cordner into May 1997 on almost a daily basis regarding her time records, she visited his office in his absence and located all of her male co-workers' time records and DCWS data. Evarts spent about an hour analyzing the records and comparing the time sheets of the males with the corresponding DCWS data sheets. The very same discrepancies were found in their records. Id at 151-153, 160. 163.

76. For the sake of her mental health, Evarts gave notice of her intent to resign. Id. at pp. 159-160.

77. Evarts spoke to union representative Guarnieri before resigning, indicating she could not withstand Cordner's harassment any more. While attempting to talk with Guarnieri about it, she "couldn't stop crying". Id at p. 171, 191.

78. Evarts stated that when she came back from her family leave, other than being devastated at watching her sister die, she had been relatively healthy, but with Cordner's harassment she became increasingly anxious about going to work every day. She could

17

not sleep. She lived in fear of what she was going to be reprimanded for next.    Her relationship with her husband was suffering as a result. Id at pp. 177-188.

79. Employing SNET's EAP program, she saw therapist Sandra Rhodes for the allotted five visits allowed by SNET. Id at p. 189.

80. Plaintiff gave a full two-weeks notice of her intent to resign and decided to work through May 30, 1997. Prior to that she contacted Constance Rogers, SNET's EEO manager. Id at 33.

81. Evarts told Rogers the details about Cordner's harassment and discrimination. She told Rogers that she "couldn't take it any more" and felt compelled to quit. Id at 33-34.

82. Evarts did not tell Rogers that she was leaving SNET in order to spend more time with her son. SNET has misrepresented or mischaracterized her remark. What Evarts actually said was that the only good thing about being harassed out of her job was that in consequence she could spend more time with her son. Id. at p. 37.

83. Evarts stayed on for two weeks after giving notice of her intent to leave during which she spoke with her male co-workers who complained that Cordner, in consequence of plaintiff's notice and EEO complaint, was attempting to cover his tracks, that is, in order to defeat Evarts' claim, he was targeting male co-workers for criticism and discipline so he could even up appearances. The crew members were mad about it. Id. at 110-111.

84. Evarts was aware of other women who complained of having gone to SNET's EEO office and had been dissatisfied. There was dissatisfaction with that office as nothing would ever get done at EEO and that therefore it would be futile to complain because

18

management protects management.  In the culture of SNET, according to other women, Rogers was management and her job was to quash any claims brought to her which might lead to liability for SNET.  Id at 140; Exh. 27 at ¶ 21.

### WITNESS DAVID IANIELLO

85.  David Ianiello was one of plaintiff's male crew members.  He was also a Union steward and later President.  He was junior to the plaintiff in terms of seniority as a technician.  In his opinion, Evarts did a "fine job" as a technician and during the time he worked with her, he never witnessed an occasion where she failed or was otherwise unable to perform the duties of the job just as well as any man on the crew.  Exh. B at pp. 8-9.

86.  Ianiello recalled his first experience with Evarts when he was new to the job and he had to perform an installation together with Evarts.  The job involved a pedestal phone and they were to run a loop from the pole to the mast on the phone which required taking a ladder off the truck, erecting it and, with belt equipment on, climbing the telephone pole. As he wanted to be "a gentleman", Ianiello offered to do the task but Evarts declined, saying that Ianiello was new and she was there to do the work and teach him.  Ianiello watched Evarts put up the ladder and climb the pole.  Ianiello was impressed.  Evarts "was teaching [him] the job and . . . did a fine, fine job".  Exh. B. at p. 9.

87.  During the time that Ianiello and Evarts worked together under Matthew Cordner's management, Cordner repeatedly made narrow-minded and discriminatory comments about Denise Evarts and women at SNET in general.  In conversations with

19

Ianiello, Cordner, in the context of discussions about Denise Evarts, stated repeatedly that "women don't belong in the field" and "women don't belong here." Id. at pp. 5-6. Although Evarts was the only woman in Cordner's crew, Ianiello heard Cordner make derisive and insulting remarks about other women employed at SNET. He testified as follows:

> "On a couple of occasions we were discussing Denise, and on other occasions other women that work in the garage, that work in other departments, and like he would see them and say 'there's <u>another</u> one, you know, they should be home', or, I mean, you know, comments like that." Id. at pp. 5-6.

88. Cordner did not supervise any of these other women employees. There were not very many women in the area, approximately six at most, with some working in the cable department and some in splicing. Id. at p. 6.

89. When Cordner would spot one of these women, he would point at her and make a statement such as, "there's <u>another</u> one that doesn't belong in the field." Id.

90. When Cordner made such remarks, he indicated no familiarity at all with the work performance of any of these women. Id.

91. Ianiello testified further as follows:

> "Matt made it very clear, I mean to me, that he was of the opinion that women did not belong working out in the field, that was a man's job and they should be in an office behind a desk. I mean, it was very clear to me, very clear, he said it on more than one occasion." Id. at p. 8.

92. Ianiello has personal knowledge of an incident in which crew member Rick DellaVolpe failed to secure his SNET work tools which resulted in the theft of all of his tools. This occurred during the time Evarts was a member of the crew. Id. at p. 10.

20

93. DellaVolpe reported the theft to Matthew Cordner. When Cordner asked DellaVolpe what happened, DellaVolpe responded that he failed to lock his truck and somebody stole all of his tools. This exchange was witnessed by Ianiello. Id. at pp. 12-19.

94. The SNET-owned tools had a monetary value of approximately $500.00. Id.

95. After Evarts gave notice of her intent to resign her employment and raised a claim of gender harassment, Cordner disciplined Ianiello for failing to lock his truck. Although nothing was stolen from Ianiello's vehicle, and there were no consequences to SNET from his failure to lock the truck, Ianiello was suspended for five days. Cordner took these actions against Ianiello as part of his effort to defeat any claim made by Evarts. Exh. 1.

96. During a meeting with management regarding the grievance filed over the discipline, Ianiello brought up prior incident involving DellaVolpe and argued that he had not been disciplined by Cordner in any way. Edward Dillman, Cordner's manager, was present at this meeting. Id. at pp. 14-15.

97. During the grievance meeting, Ianiello also addressed other evidence of Cordner's discriminatory disciplinary practices. He related incidents involving Cordner and one Louis Marino, plaintiff's former crew member, in which both men violated a variety of established safety rules involving the use of safety cones, hard hats, safety glasses, etc. while a failure to abide by the same rules would subject Ianiello to discipline. Id. at p. 15.

98. When Cordner's discriminatory practices were brought up in this meeting, Cordner lost his temper, rose to his feet and threatened Ianiello, stating, "I'm going to get

21