you . . . I'm going to get you for that". Cordner had to be calmed down by the two other managers in the meeting who took him out of the room, got him to compose himself and later brought him back into the meeting. Id. at pp. 15-16.

99. Cordner became so angry that he "put his finger across the table in [Ianiello's] face, there was spit coming out of his mouth and his eyes were all blood shot . . . he was yelling". Id. at p. 19.

100. Ianiello described both Matthew Cordner and Edward Dillman as "very vindictive people". With respect to Denise Evarts, Cordner was "constantly writing up Denise, scrutinizing her work more than anybody else." Ianiello continued that "one day Denise challenged [Cordner] on that, and then it was ever since that point on that it got progressively worse." Id. at p. 19.

101. Ianiello likewise believed that he too was a victim of the same targeted discrimination because he was a Union President at the time. When he challenged Edward Dillman on the discrimination, the harassment got worse. The managers were "coming out and inspecting [his] jobs twice a week." The two men would show up without notice and without saying anything to scrutinize his work out in the field. Id. at p. 21.

102. Ianiello confirms Evarts' account of how the crew customarily prepared their handwritten time sheets. It was common and expected that the handwritten time sheets of crew members were at odds with the DCWS computer-generated records. Id. at p. 23. The crew used the SNET-provided "Huskies", a portable computer used for mechanized time reporting. The crew, however, customarily filled out their paper time sheets at the end

22

of the work. In consequence, the time sheets would not match up with the Husky printouts. As a matter of practice, as long as the actual hours a crew member worked during the day matched in both records, there was no problem. Id. at pp. 23-24.

103. Ianiello explained the unique circumstances under which he and other crew members had to employ two different methods of time recording. He and Evarts' other crew members were the only ones in the outside field that had to use both methods. He never understood the purpose of the paper time sheets. Id. at 23-30.

104. Based on what he knew to be the custom of the crew, none of the crew members' handwritten time sheets would match the DCWS computer-generated time records because a match was impossible due to the actual workings of the job even if one were to fill out the sheets throughout the day. Notwithstanding this, Cordner would "nitpick" and criticize plaintiff's time records as having discrepancies between the paper record and the DCWS printouts. According to Ianiello, if one were to review the DCWS printouts reflecting the male crew members' activities during the period of time in question (July 1996 through May 1997) one would see the same discrepancies which Cordner criticized and warned the plaintiff for. Id. at pp. 25-30.

105. With respect to the recording of a lunch break, Ianiello usually recorded his lunch as having been taken between noon and 12:30 when he filled out his time sheet whether or not he took lunch or took it at another time. Other males did the same. Neither he nor any other males were disciplined or threatened with discipline or discharge as a result. Id. at pp. 31-32.

23

106. Ianiello was aware of whether and to what extent males were reprimanded or disciplined because he was their union representative and was the first one to hear about it. With respect to Cordner's actions against the plaintiff in connection with her time record keeping and her recording of lunch times, no males were subjected to counseling, "coaching," or discipline. Ianiello confirmed this by interviewing them after Evarts complained that she was being harassed by Cordner. Id. at pp. 25-32.

107. After interviewing Evarts' fellow crew members, Ianiello advised Matthew Cordner of his belief that Cordner was singling out Denise Evarts for discriminatory treatment. He told Cordner that he was "treading in dangerous water". Id. at p. 32.

108. As a result of Cordner's harassment of Evarts, Ianiello noticed a change in Evarts' mood and personality. He discussed the matter with Evarts who stated that she was getting to the point where she was considering leaving SNET for she believed it was only a matter of time before she Cordner would fire her. Cordner's harassment of Evarts was persistent, nearly every day, with Cordner repeatedly coming at Evarts and "throwing her time sheets back at her" on nearly a daily basis. Evarts was "very clearly upset and stressed out". Id. at pp. 33-34.

109. Based on his personal observations of the interactions between Cordner and Evarts, Ianiello believed that Evarts was being targeted for termination by Cordner and Dillman, and that Evarts would be unable to do anything to prevent the discharge as Cordner was bent on firing her and would find one reason or the other to justify it. Id. at p. 34.

110. At no time did either Ianiello or any other male crew member get called into a meeting with Cordner and Dillman during which the two men laid out all of the crew members' time sheets and pointed out each and every discrepancy between the written records and the DCWS forms. Id. at pp. 35-36.

111. At no time while Ianiello worked with Evarts under Cordner's management, did Cordner subject Ianiello or another male crew member to a ride-along evaluation and supervision. Id. at p. 36.

112. It was only after Evarts gave notice of her intent to resign and raised a claim of sex discrimination that Cordner subjected Ianiello to a ride-along evaluation. Id. at pp. 36-37.

113. With respect to Evarts' complaint of gender discrimination to SNET's Department of Human Resources, Ianiello was never interviewed by anyone in SNET management regarding his knowledge of Cordner's treatment of Evarts. He does not recall any attempt by a Human Resources representative to contact him for an interview. Id. at p. 37.

114. Had a Human Resources representative at SNET requested an interview with him or asked him to provide information or documents on the issue whether Evarts was discriminated against, Ianiello would have cooperated fully. Id. at pp. 37-38.

115. Ianiello received no letters, e-mails or other communications from SNET Human Resources requesting information or eyewitness accounts of Evarts' treatment by Cordner. Id. at pp. 37-38.

25

116. Edward Dillman never approached Ianiello or told him that the Human Resources Department needed information from him, nor did any other SNET official outside of Human Resources approach him with questions regarding his knowledge of Cordner's treatment of the plaintiff. Id. at p. 38.

### FREDERICK EVARTS

117. Frederick Evarts is the plaintiff's husband and he too was deposed by SNET's counsel. Exh. C.

118. Mr. Evarts described his wife as happy working for SNET. Plaintiff declined to take advantage of a buy-out offer from SNET in 1996 because she wanted to stay with the company.

119. Mr. Evarts recalled his wife complaining about harassment from Matthew Cordner not long after Cordner took over as plaintiff's boss. Plaintiff's attitude toward work changed after Cordner took over. Previously, plaintiff was active at SNET and involved in company committees. After Cordner became her boss, Mr. Evarts noticed dramatic changes in his wife. She was crying a lot over the harassment by Cordner. She could not sleep at night. She seemed to have lost her drive. Her personal relationship with her husband suffered. Their marriage and intimate life suffered as plaintiff lost her sex drive. Mr. Evarts recalled that the couple had just bought a house and had a baby and though it ordinarily was supposed to be the happiest time in their lives, it wasn't. Exh. A at pp. 55, 75.

120. The plaintiff was often crying at home and had problems sleeping. On Sunday

26

evenings, plaintiff's emotional state would be at its worst as she knew she had to go back to work the next day and face the harassment by Cordner. Plaintiff dreaded Sunday evenings. Exh. A at pp. 70-71.

121. Mr. Evarts recalled plaintiff's loss of her sister Debby from ovarian cancer during the period plaintiff worked under Cordner. Cordner appeared at the wake. Mr. Evarts had the impression that Cordner was not there out of courtesy or personal concern for plaintiff but rather as a duty given that he was her boss and Evarts' deceased sister had also been a SNET employee. Although at the wake Cordner stated to plaintiff, "come back to work when you're ready", he said this on a Friday only to telephone the Evarts' home the immediately following Monday or Tuesday questioning why plaintiff had not yet returned to work. Exh. A at p. 50.

122. Evarts described his wife as a strong person who, while devastated by her sister's death, exhibited normal grieving in response to it. However, Evarts observed that his wife's depression and mental state were far beyond that which related to this loss and, based on his personal observations, he attributed his wife's disabling emotional state to her work situation at SNET. He believes that if plaintiff's work environment had been the same as that which existed prior to Cordner's arrival, her mental state would not have been so bad. Id. at pp. 75-76.

123. On the day plaintiff decided to flee the work-site, she called her husband from work. She was crying. Plaintiff asked her husband if there was any way she could leave SNET. She was speaking of the household finances. Plaintiff was earning most of the

27

household money and so she had been afraid in April to confront him with the question of leaving SNET. Mr. Evarts was not making much money and although plaintiff's leaving SNET would create a huge financial burden, he was in favor of it because his wife "was a wreck". Id. at p.

124. Given his wife's overwrought state, he told her to get in her car and leave SNET immediately but plaintiff wished to give SNET notice. Id. at p. 100.

125. Plaintiff did not wish to leave SNET but she could no longer tolerate Cordner's constant harassment. Id. at p. 101.

## MATTHEW CORDNER

126. Cordner admits that a documented verbal warning is a disciplinary action under SNET policy and it is reflected in one's personnel file. Exh. D at pp. 96-97.

127. Cordner, at his deposition, was less than forthcoming regarding what constitutes "discipline" and engaged plaintiff's counsel in a lengthy semantic discourse on the issue. Id at pp. 103-116.

128. With respect to his taking Evarts' cell phone away, Cordner admits that there was no written policy setting a monthly limit of 300 minutes nor any policy whatever of SNET calling for a cell phone to be taken away as punishment. Id at pp. 70-72.

129. Cordner's basis for believing there was a policy limiting cell phone usage to 300 minutes was based on his understanding while working as a technician on another crew as related to him by Edward Dillman. He has no documents to corroborate this claim. Id. at pp. 379-80.

28

130. Cordner claims that employees were orally advised of the limit at a "tail-gate type of session". Id.

131. He does not recall the number of times he claims to have spoken to plaintiff about cell phone usage being high nor does he know whether he took notes of male technicians' use or overuse of their cell phones. Id at p. 73.

132. Cordner admits that Evarts offered to pay SNET for any excess minutes to the extent it cost SNET anything. He further admits that he failed to record that fact in his personnel notes. Id at p. 381.

133 Cordner "doesn't recall" the cell phone usage of the male crew members or whether one or two of them exceeded the alleged 300 minute limit during the time Evarts worked there. Id at p. 386.

134. Cordner admits there is no documentary evidence nor does he have a clear recollection that he warned Evarts in advance about excess use of the cell phone or gave her fair warning before taking it away from her. Id at p. 387.

135. Cordner also admits that he possessed no information as to whether plaintiff may have made personal calls on her own lunch break or during travel. He further admits that he has no evidence that SNET was deprived of Evarts' labor during any of the cell phone calls. Id at 385.

136. With respect to the ride-along evaluation, Cordner claims that, per SNET policy, he was to conduct ride-alongs once a month. He admitted that he did not follow that policy but claimed his failure was due to "time constraints" and the fact that he was a "new"

29

supervisor. Id at p. 65.

137. When Cordner himself was a technician, not a single member of his crew was given a ride-along evaluation, including himself. Id at pp. 214-215.

138. Cordner claims he conducted a ride-along with Evarts because she had just come back from leave due to her sister's death and he wished to help her. He admits that he has no documentation to support this claim nor does he remember whether he ever told plaintiff that this was the reason for the ride-along. Id at p. 220.

139. With respect to SNET's representation to the CHRO that, in contradiction to plaintiff's claims, David Ianiello was also subjected to a ride-along, Cordner conceded that Ianiello had such an evalution in January, 1996 by another supervisor and it took place long before Cordner became the manager. Id at p. 224.

140. Cordner conceded that from July 1996 until plaintiff resigned, he did not subject a single male to a ride-long evaluation even though there were males who were junior to Evarts and much less experienced. Evarts was the only one he picked. Id at pp. 223-225; 233-234.

141. Cordner did not conduct a ride-along with Lou Marino, who was junior to and less experienced that Evarts even though Marino had performance problems – he took too long to finish jobs. Cordner stated that he doesn't know why he never conducted a ride-along with Marino, but he suggested that he might have been too busy with other things. In contrast, there was no evidence that Evarts took too long to complete jobs, nor were there any complaints about her. Id. at pp. 389-390, 396.

30

142. Cordner concedes that he conducted a ride-along of a male crew member only after Evarts filed her internal EEO complaint. Id at pp. 238-241.

143. Cordner concedes that Evarts complained that he treated her differently from the males before Evarts went to EEO with such a complaint. Id at p. 236.

144. With respect to plaintiff's locked vehicle, Cordner admits that plaintiff's truck was kept in a locked facility but would not say whether the facility was secured on the particular day in question. Id at p. 252.

145. Cordner claims a failure of recollection as to whether, as Evarts claims, he yelled at her in a loud voice. Id at p. 244.

146. With respect to plaintiff's leave-taking to care for her sister, Cordner admits that federal FMLA leave and state law leave provisions are backed by SNET with its own leave policy. Id at pp. 257-58.

147. He admitted calling Evarts at her home shortly after Debra Evarts' funeral to ask why Evarts was not at work but justified this by saying Evarts' family leave ended with "the burial." Id at p 258.

148. With respect to the incident in which Cordner faulted plaintiff for going home sick one day without finding and telling him in advance, he admitted there was no written policy requiring Evarts to find him. He further admits he was "probably out in the field" at the time. Id at pp. 276-277.

149. With respect to Cordner's internal memo accusing plaintiff of having a negative attitude, Cordner testified at his deposition that Evarts started to "treat [him] <u>and other</u>

31

people poorly. . . ." (Emphasis supplied) When asked who the "other people" were, he retracted the statement and admitted that he knew of no others who were treated poorly by Evarts. When asked why he made the statement if it were not true, Cordner answered, "I just don't know." Id at p. 277.

150. When asked to describe what Evarts did to treat him "poorly," Cordner stated that on several days Evarts did not say "Good morning" to him. He concedes, however, that this was at a time when Evarts believed he was trying to harass her out of her job. Id at p. 278.

151. Cordner was asked about a discrepancy in his twin memos of March 17 and March 18, 1997 in which he states first that Evarts was warned twice before about unlocked doors and later she was warned three times. He claimed that the reference to two previous warnings was "a mistake." Id. at p. 285.

152. Although Cordner claims that he checked everyone's time sheets and not just Evarts', he could not name a single male technician whose time sheets he had reviewed. Nor could he give any further details about his purported investigations. Id at pp. 286-287.

153. When asked if he analyzed the time sheets of the male crew members he claimed to have examined and compared their sheets with the corresponding DCWS data with respect to each male technician, he could not "recall." Id. at 374, 378.

154. He admits that during one of his "sessions" with Evarts, during which he was analyzing and criticizing her time sheets, Evarts stated that it was making her "sick" to come to work. Id. at pp. 294-296.

155. He admits that he did not ask Evarts why she hated her job or was sick at the thought of coming to work nor does he know why his file entry is silent as to the reasons why Evarts made that statement to him. Id at pp. 297-298.

156. Cordner conceded that technicians contemporaneously record their movements throughout the day by transmittal through the Husky into the DCWS data base. When asked why, if the Husky remote computer already generated a record of the technicians' time, an additional paper time sheet was necessary, Cordner answered, "That's a good question" and added that the practice has since been abandoned. Id at pp. 306-307.

157. Cordner admits that technicians reported mechanical difficulties with use of the Huskies, the computers were down many times and eventually SNET went over to a new time system. Id at 376-377.

158. Cordner also admits that male technicians' time sheets, if compared to the DCWS data, may not in fact match up for the period of July 1996 to May 1997. Id at 377.

159. Notwithstanding his claims to have addressed problems of time record-keeping with the male crew members, Cordner could not point to a single document or personnel file note which reveals that he recorded such counselings or criticisms in the manner he did with respect to Evarts. Id at pp. 315-316. He and Dillman analyzed Evarts' records together. Id. at p. 408.

160. Cordner claims a failure of memory regarding certain details of the meetings with Dillman, Evarts and the union representative. He does not remember, for example, union representative Guarnieri challenging him on the propriety of his conduct toward

33

Evarts. He does claim to remember, however, that Guarnieri told plaintiff to "Sit still and be quiet" as plaintiff was agitated at the meeting. Cordner doesn't recall any other statements by Ms. Guarnieri. Id at pp. 321-322.

161. The formal meeting with plaintiff on May 2, 1997 that involved Cordner's boss, Edward Dillman, and union representative Guarnieri took place only two days after plaintiff told Cordner that she now hated the job and coming to work was making her sick to her stomach. At this meeting, Cordner rehashed the same issue of discrepancies with Evarts' time sheets and the DCWS data.

162. Cordner claims he brought Guarnieri into the meeting to "help" Evarts. Although he denies Guarnieri challenged him on his discriminatory treatment, he failed to record any of Guarnieri's remarks in his memo. Id at pp. 326-327.

163. Cordner concedes that his personnel file entries respecting Evarts included his recording a threat of discharge to her. Id at p. 329.

164. Cordner admits that there is no evidence that Evarts ever performed her work in an unsatisfactory way. He admits that none of Evarts co-workers ever had any problem with her or her work. He admits that there were no customer complaints about Evarts. He admits that there were no complaints from members of the public about Evarts. He further conceded that she was well-liked by her co-workers. Id at pp. 331-334, 396.

165. Cordner admits that, even taking into account the time record discrepancies, there was no evidence that Evarts did not put in a full day's work, that she took too long to complete jobs or did a poor quality job. Id. at pp. 423-424.

34

166. Although Cordner denies having had a temper tantrum and screaming in plaintiff's face after she presented evidence that the locking mechanism on the rear cargo door of her truck was broken, he admits that he did nothing in the wake of such evidence to remove the written reprimand from Evarts' file. Id at p. 338.

167. With respect to Evarts' allegation regarding the satellite office, Cordner admits that his personnel file entry for November 8, 1996, does not accurately record everything he and plaintiff said to each other regarding the issue. Id at 364.

168. Cordner admits that Evarts was not provided a new vehicle as scheduled. See Exh. 22. While he admits Evarts complained of this, he made no record of it. Id. at 398-99.

169. In SNET's "Work Reference Report," created on Evarts' last day at work, Cordner stated that Evarts would not be recommended for rehire because of frequent absenteeism. Exh. 28.

170. Per the Union contract, Evarts was entitled to ten sick days per year. Exh. D at p. 432.

171. Cordner admits that for the one-year reporting period reflected in the report, Evarts had called in sick eight times for a total of 12 sick days. Thus, Evarts had exceeded sick leave by only two days. Id. at pp. 432-434.

172. Cordner could not state the record of sick time use by male crew for the same period. Id.

### EDWARD DILLMAN

173. Edward Dillman was Matthew Cordner's superior and the statewide manager

35

of SNET's pay phone services. He was involved in hiring Matthew Cordner as supervisor of plaintiff's crew and had interviewed him for the job. Exh. E at p. 10.

174. Dillman could cite no performance problems with Evarts prior to her working under the management of Matthew Cordner. Id. at p. 17.

175. Edward Dillman was present during the CHRO hearings which preceded this civil action and along with Matthew Cordner testified before the Commission regarding plaintiff's allegations as set forth in her CHRO complaint. Dillman was represented at the hearing by Attorney Lori Alexander. Id. at pp. 19-21.

176. Mr. Dillman does not recall ever being advised of the outcome of the CHRO proceedings. Id. at p. 22.

177. Mr. Dillman could not identify any male co-worker of the plaintiff who was subjected to a ride-along evaluation by Matthew Cordner prior to the date plaintiff gave notice of her intent to leave SNET. Id. at p. 24.

178. Mr. Dillman could not recall any male co-worker of the plaintiff who received a written warning from Matthew Cordner at any time prior to the date plaintiff gave notice of her intent to leave SNET. Id. at p. 25.

179. Mr. Dillman could not identify any male co-worker of the plaintiff who received an oral disciplinary warning by Matthew Cordner at any time prior to the date plaintiff gave notice of her intent to leave SNET. Id. at p. 25.

180. Dillman participated in the review and analysis of plaintiff's time sheets and participated in one of the face-to-face meetings that Cordner had with plaintiff regarding

36

alleged discrepancies in her time records. A union representative (Debbie Guarnieri) was also present at this meeting. Id. at p. 26.

181. He reviewed and analyzed plaintiff's time-keeping records because Matthew Cordner made him aware of alleged issues regarding the records. Id. at pp. 30-31.

182. Dillman neither retrieved nor reviewed the time records of any of plaintiff's male co-workers. Id. at pp. 31, 89-90.

183. Dillman is unaware of any other SNET supervisor or manager who accused Evarts of deficiencies in her work performance. Matthew Cordner was the only one. Id. at p. 32.

184. According to Dillman, Cordner himself was allowed to satellite out of an office closer to his home when he was a technician. Id. at p. 37.

185. Dillman did not find it odd or curious that Matthew Cordner was reporting problems with Evarts' performance in light of the fact that Evarts had a ten-year history of problem-free performance at SNET. Id. at p. 46.

186. At no time did Dillman interview any of Evarts' co-workers in an effort to determine whether Cordner was treating Evarts fairly. Id. at p. 46.

187. With respect to the decision to discipline a technician for violating an alleged policy limiting cell phone usage, Dillman left the decision with respect to enforcement of it to Matthew Cordner. Id. at pp. 47-48.

188. Dillman became aware that Cordner had taken Evarts' cell phone from her as a penalty for alleged excess use but did not thereafter undertake any efforts to scrutinize

37

the telephone use records of Evarts' male colleagues to ensure that she was not being singled out. Id. at p. 49.

189. With respect to plaintiff's leave-taking for the purpose of caring for her terminally ill sister, Dillman did not participate directly in any discussions between Cordner and Evarts on the issue nor did he speak to Evarts directly. To the extent that Matthew Cordner takes credit for affording the plaintiff leave, Dillman bases his understanding in this regard solely on statements made by Matthew Cordner. Id. at pp. 49-50.

190. Dillman could not give any particulars regarding SNET's policy on employees' entitlement to unpaid leaves of absence for family or medical reasons. Id. at pp. 54-55.

191. With respect to the alleged investigation of Evarts' internal EEO complaint conducted by SNET EEO manager Constance Rogers, Dillman was neither interviewed nor contacted by Rogers as part of the investigation. Id. at p. 59.

192. Dillman was never asked by any SNET official, including Constance Rogers, to retrieve or produce any documents regarding Cordner's treatment of plaintiff's male co-workers nor was he asked to interview any member of the crew or arrange for one or more of them to be interviewed by Ms. Rogers. Id. at pp. 59-60.

193. Mr. Dillman does not recall whether he became aware that Evarts had filed an EEO complaint prior to the date Constance Rogers disposed of it as meritless. Id.

194. With respect to the Commission's finding, in respect to cell phone usage, that SNET admitted that other male crew members exceeded the alleged limit without penalty, Dillman could provide no information nor point to any documents which rebut the

38

Commission's finding. Id. at pp. 70-78.

195. Dillman stated his disagreement with the Commission's findings, however, by making a distinction between male crew members' use of their cell phones for <u>personal</u> calls as opposed to their exceeding a 300-minute monthly limit. Id. at pp. 72-73.

196. Dillman stated that he recognized that technicians at times would need to make personal calls so there was not a "total prohibition against personal calls." Rather, he stated, the "objective was to stay within the 300 minutes per month of usage ... " Id. at p. 73.

197. In its submissions to CHRO, however, SNET asserted that its interest and the purpose of the 300 minute policy was to limit technicians' use of the cell phone for personal calls since making personal calls on work time would necessarily interfere with their productivity. Id. at pp. 73-79.

198. At no time prior to plaintiff's notice to SNET of her intent to resign did Dillman analyze the cellular telephone records of any of Evarts' male co-workers. Id. at p. 77.

199. Nor did Dillman analyze the cellular records in advance of his appearance and participation as a witness in CHRO hearings for purposes of providing documentary proof to the Commission. Id. at 78-79

200. With respect to the Commission's conclusion that one or more of plaintiff's male co-workers were disciplined only after plaintiff gave notice of her intent to resign and filed an internal gender discrimination complaint and that such actions by SNET appear to have been taken for the purpose of evening up appearances, Dillman stated his

39

disagreement with the Commission. Despite repeated invitations from plaintiff's counsel, however, he could not point to any specific facts or other information which would support his contention that the Commission erred in that finding. Id. at pp. 84-90.

201. In respect to the May 7, 1992 meeting he attended with the plaintiff, Cordner, and Debbie Guarnieri, Dillman claims a failure of recollection on the issue whether Ms. Guarnieri complained that plaintiff was being singled out for discriminatory treatment by Mr. Cordner. Id. at pp. 92-93.

202. Dillman concedes that Cordner did not conduct a ride-along evaluation of any of plaintiff's male co-workers prior to plaintiff's resignation from SNET. Id. at 110.

203. During the CHRO hearings, SNET counsel submitted to the Commission SNET's "Exhibit D", a document prepared for offer at the hearing, which purports to set forth information on cell phone usage by male employees whom SNET claimed also suffered the loss of their cell phones as a penalty for excessive use. Id. at p.111; Exh 25.

204. SNET's Exhibit D contained a representation to the Commission that three male SNET employees, Mike Tobin, Steven Boisvert and Mark Richard, all had their cell phones taken away in the period "1996-97". Exh. 25.

205. Mr. Dillman admitted that Mike Tobin did not work for Matthew Cordner. Id. at p. 111.

205. Mr. Dillman admitted that Steven Boisvert did not work for Matthew Cordner. Id. at p.112.

206. Mr. Dillman admitted that Mark Richard did not work for Matthew Cordner. Id.

40

207. Dillman conceded that Exhibit D was a graph of sorts that SNET used in order to persuade the CHRO on this particular point. Id.

208. Dillman admitted that other than David Ianiello, no other male crew member of the plaintiff had his cell phone taken away as punishment for alleged excess personal use or violation of the alleged 300 minute monthly limit. Id. at p. 113.

209. SNET's Exhibit D submitted to the Commission omitted information regarding cell phone usage by Evarts' male co-workers. Id. at pp. 113-114.

210. At his deposition, Dillman was asked about the following representation that SNET made to the CHRO in its written submission of January 15, 1998 authored by SNET counsel. In reference to Denise Evarts, SNET claimed:

> "She was also often slow in completing the jobs assigned to her but was never disciplined in any way for her failure to work as quickly as her co-workers."

With respect to this statement, Dillman did not know if it was "[his] statement or not, but, yes, [he] can say that." Id. at p. 119..

211. Dillman stated he had personal knowledge that plaintiff was slow in completing the jobs assigned to her as he and Cordner tracked technicians' performance based on the time they expended to complete jobs. Id. at pp. 119-120.

212. When asked about documents and other evidence showing that such tracking and analysis was done regarding Evarts, Dillman claimed he was unaware if such documents exist any longer. Id. at p. 120.

213. With respect to SNET's representation that plaintiff was slow in performing

41