tasks, when asked what he personally observed of Evart's productivity, Dillman answered that he "did not make that many personal observations of technicians." Id. at p. 121.

214.   In contradiction to his previous testimony that he was unaware of any performance problems in Evarts' nine-year history prior to Cordner's supervision, Dillman, later in his deposition, and after being asked about SNET's January 15, 1998 CHRO submission, claimed that Evarts was slow <u>throughout her years of employment</u>.  There are no documents or other evidence to corroborate this. <u>Id</u>. at p. 121.

215.   In its January 15, 1998 submission to the CHRO, SNET represented that "in March, 1997, Mr. Cordner <u>checked every vehicle under his supervision</u> and found that [Evarts] and two other [unidentified] male employees' vehicles were unlocked.   He informally counseled all three employees about the policy and warned that their carelessness was unacceptable."  When shown this submission, Dillman could not identify these male employees. <u>Id</u>. at p. 122.

216.   Dillman claims that documentary evidence was presented to the Commission in support of this allegation but could give no further information.  <u>Id</u>.

217.   Dillman admitted that apart from an oral statement by Matthew Cordner that he counseled "two male employees" at the same time as plaintiff, Dillman is unaware of any proof, other than Mr. Cordner's word which would back up such a claim. <u>Id</u>. at p. 123.

218.   In the same submission of January 15, 1998, SNET represented to the CHRO that Matthew Cordner also gave verbal warnings to two other male service technicians and one formal written warning to a male services technician for having an unlocked vehicle.

42

When presented with this submission, Dillman could not identify these male colleagues nor could he say whether such action, if taken by Cordner, was taken before or after Evarts gave notice of her intent to quit and raised a claim of gender discrimination. Id. at p. 124.

### CIRCUMSTANCES AND QUESTIONS OF SNET'S DISPOSAL OF MATERIAL EVIDENCE AND THE ISSUE OF SPOLIATION WHICH WOULD BE RELEVANT TO JURORS

219.   There is no dispute between the parties that the DCWS forms and the information contained therein were generated and maintained electronically. As part of its investigation, the CHRO demanded that SNET produce documents which might show discrepancies between the DCWS forms and the time sheets prepared by male technicians. SNET responded by making the following statement to the CHRO on December 28, 1998:

> "DCWS records are not <u>routinely retained</u> by SNET so respondent is unable to answer this question <u>as posed</u>."   Vol. III Exh. 1.   (Emphasis supplied.)

220.   In still another submission to the CHRO dated January 12, 1999 in respect to the same request by the Commission's investigator, once again SNET responded as follows:

> "As explained previously, DCWS records are not <u>generally retained</u> by the <u>Pay Phone Services Department</u>, so it is unable to answer this question <u>as posed</u>. Once again, Ms. Esposito's comment that she 'finds it unusual' that old DCWS records are not retained is not in any respect evidence and is inappropriate in this investigation." Vol. III, Exh. 2.   (Emphases supplied.)

221.   Notwithstanding the fact that the DCWS forms are computer-generated, and the handwritten time sheets obviously are not, SNET in fact retained all of the handwritten

43

time sheets prepared by the technicians during the relevant period of Cordner's supervision of the plaintiff. They were not disposed of. Vol. III, Exhs. 4-9.

222. During the course of discovery in connection with the instant action, on September 24, 2002, plaintiff served the following written discovery document request on SNET, calling for production of the following material:

> "Daily time reports, 'DCWS' reports/printouts for the male technicians who worked with Denise Evarts under the supervision of Matthew Cordner from July, 1996 through May, 1997." Vol. III, Exh. 3.

223. On October 24, 2002, defense counsel served the following objection to that request:

> "**Objection**: This request is overly broad and burdensome and not reasonably calculated to lead to the discovery of admissible evidence." Vol. III, Exh. 3.

224. In the wake of this objection, extensive, time-consuming and expensive disputes erupted between counsel, as the text of the objection suggested SNET did in fact have the records, knew they were highly supportive of plaintiff's claims and thus sought to avoid disclosure. Otherwise there would be no need or purpose to object on such grounds as SNET could merely respond by stating, "The documents no longer exist."

225. The District Court became involved in this dispute and teleconferences ensued with the Court's law clerk and with the Court. On the issue of the production of the DCWS forms, SNET counsel submitted to the District Court a pleading and voluminous submission opposing disclosure of the requested data on the grounds asserted in the objection. Vol.

44

III, Exhs. 4-6.

226.   In its November 11, 2003 submission to the court, and in defense of its objection to producing the DCWS information, SNET argued, "although this case was pending before the [CHRO] for more than 2 years and plaintiff asked for many documents in that form, she never requested copies of time records for other technicians". Vol. III, Exh.5.

227. Attorneys do not have discovery rights in connection with the CHRO process and have no right to compel the production of documents at a hearing.  In consequence, parties and their counsel must rely on the CHRO hearing officer to use the Commission's authority to compel documents from an employer.  Consistent with this practice, the CHRO in fact <u>twice</u> demanded that SNET produce the DCWS information.  In response, SNET responded in parsed and carefully couched language. Vol. III, Exhs. 1-2.

228.   Although SNET produced the paper time sheets for the seven male technicians, plaintiff's counsel, who had paid a substantial fee to Tyler, Cooper & Alcorn for the copying of those time sheets, had protested vigorously that the production of the sheets, and payment for them, were a complete waste as they were unaccompanied by the DCWS forms and thus the very purpose of making the request had been undermined by the omission, that purpose being the ability of plaintiff to show the court and jurors that Cordner had in fact, as part of his campaign of harassment against the plaintiff, singled out her time records for scrutiny in an effort to find discrepancies and thereby to build his case against her. Vol. III Exhs. 4, 5, 8.

45

229. In the District Court, SNET further argued against disclosure of the DCWS information on the ground that Evarts was criticized for the <u>way she completed her handwritten time sheets</u> thus rendering the DCWS information "irrelevant." This is in contradiction to Cordner's and Dillman's own internal memoranda and notes entered in plaintiff's personnel file which show clearly that both men spent a great deal of time comparing Evarts' handwritten time sheets with the <u>DCWS</u> information for the purpose of finding discrepancies between the two. Exhs. 13-19.

230. Pointedly belying SNET's carefully couched statements to the CHRO regarding the existence of the DCWS information, SNET, in the same November 11, 2003 submission, argued in the alternative as follows:

> "[I]f plaintiff truly has a basis for believing that there was a particular technician who did not record his time accurately on his time sheets during a particular period, but was treated differently from plaintiff, <u>SNET would find out whether any electronic time records are available for that technician based on the limited request.</u>" Vol. III, Exh. 6 at p. 2.

231. SNET made this statement after knowing and hearing the evidence at the CHRO hearing and taking plaintiff's deposition during which it was obvious to SNET that Evarts had reviewed the records herself while still employed there, had made the comparisons and alleged that none of the male technicians' time matched in the two records.

232. In its November 11, 2003 submission to the court, SNET made another carefully parsed statement that the "<u>paper</u> DCWS reports", were no longer available,

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

meaning the actual printouts from the computer database that were sitting on Cordner's file cabinet were disposed of. SNET continued, however, to note that the "paper" reports were generated from electronic information stored in SNET's database. SNET made no additional representation regarding the continued existence of the database. Vol. III, Exh. 6, p. 1, fn.1.

234. After these submissions, the District Court conducted a telephonic conference with counsel and heard the respective arguments of the attorneys.

235. On November 26, 2003, the court forwarded to counsel a memorandum indicating the court's view that SNET's objection should be overruled and the DCWS material produced.

236. Throughout the pendency of this dispute SNET maintained its stated objection to producing this material on the grounds that it would be "burdensome" to do so and that the material was "otherwise not calculated to lead to the discovery of admissible evidence." At no time did SNET counsel advise plaintiff's counsel or the court that the electronic data sought did not even exist because it was allegedly "inaccessible." The production request pended for nearly a year during which there was a months'-long dispute, numerous communications between the attorneys, teleconferences with the court, its staff and voluminous submissions by the parties. Plaintiffs' counsel estimates that the cost to the parties in attorney fees related to the dispute approximate $10,000 collectively for both sides. Vol. III Exh. 8. (Letter of January 8, 2004 from plaintiff's counsel to SNET counsel.)

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

237.  Once ordered to produce the requested material, further disputes ensued necessitating another letter from plaintiff's counsel to SNET counsel complaining that well over a month had elapsed after the District Court ordered counsel to produce the DCWS forms yet they still had not been produced.  Plaintiff's counsel had to write to defense counsel twice to request compliance with the Court's instruction.  Vol. III, Exh. 8.

238.  On August 27, 2003, plaintiff's counsel wrote to SNET counsel again noting a failure to respond to previous letters in respect to the failure to produce the DCWS forms. Id.

239.  Finally, on December 26, 2003, SNET counsel served on plaintiff's counsel an answer to the long extant document request indicating that no such records exist.  Vol. III, Exh. 9.

240. Under date of December 30, 2003, in response to a complaint from plaintiff's counsel, SNET counsel mailed a copy of an unsworn statement from one Thomas E. Taft, SNET's "area manager for network engineering" dated December 22, 2003 wherein Taft claims that the DCWS report is but a "working tool" that supervisors are to "use as a summary of work for each technician in their group."  (Emphasis supplied.)  Further, Taft stated, the data is "one part of the information stored in the electronic dispatch system (WFADO) dating back to 1996-97."  Taft continued that the DCWS information "would have been purged during the October 1996 through 1997 time frame," that the "electronic copy of the information is not retrievable" and that "information prior to 2001 is not accessible. (sic)."  He did not elaborate on why this was the case.  Exh. 9.

48

241. At no time prior to interposing an objection to the request for production of the DCWS forms on the grounds of "burden" and "irrelevance" did SNET or SNET counsel advise the plaintiff that the electronic data had been "purged" or was otherwise "inaccessible."

242. Based on her own personal knowledge and experience regarding SNET's practices, Evarts believes that Mr. Taft's statement is not credible.    Exh. 27 at ¶ ¶ 27-30.

### SANDRA RHODES

243.    SNET defense counsel traveled to Orleans, Massachusetts to take the deposition of Sandra Rhodes, who was a psychotherapist associated with SNET's Employee Assistance Program (EAP). Exh. G.

244. Rhodes possesses a Master's degree in child development, a Master's degree in counseling and an M.S. W. from Smith College. She is a licensed social worker and was previously licensed in Connecticut until the year 2000 when she relocated. Id. at pp. 6-7.

245. Rhodes has particularized training in the area of employee assistance and was one of the therapists employed by SNET to provide EAP services for SNET employees. Id. at p. 9.

246. Rhodes provided counseling services to Denise Evarts. The first session was on April 3, 1997 and there were a total of five (5) counseling sessions. Id. at p. 13.

247. The counseling ended on May 15, 1997 as Evarts used the maximum number of visits under SNET's EAP benefit program. In addition, according to Rhodes, Evarts' problem at that point was partially resolved.

49

248. Evarts disclosed to Rhodes the fact that she had suffered the tragic loss of a young sister. She also disclosed problems she was having with her supervisor, Matthew Cordner. Id. at pp. 29-30.

249. Rhodes believed that Evarts presented with clinical signs of depression. Counseling directed to the symptoms of depression was a priority for Rhodes, especially given the limited five sessions available under the EAP program. Id. at p. 30.

250. In response to repeated questions and efforts by SNET counsel, Rhodes declined to attribute plaintiff's emotional state entirely to the loss of her sister, opining instead that a secondary cause of plaintiff's depression was the issue of her work environment. Id. at pp. 31-32.

251. When asked by SNET counsel if it were true that Evarts' depression was "primarily attributable to the illness and death of [plaintiff's] sister," Rhodes responded by opining that it was "probably both," that is, the death of the sister and the stressors at work. She furthered that the death of plaintiff's sister was "most imperative because it was so recent" but that the "second issue, [of Cordner's management] which sort of had been a constant for a couple of months, was the work environment." Id. at p. 32.

252. Rhodes recalls plaintiff finding it difficult to work with Cordner and stating that Cordner was "much more on her case than often the men that were in the department because she was one of the few women in her department." Id. at p. 33.

253. Rhodes remembers Evarts talking about her difficulties with Cordner but did not give any details under the "work history" section of the counseling records, probably

50

because "there wasn't enough room." Id. at p. 49.

254.  Rhodes' therapy notes are what she described as a "very short-hand version of what transpires in the session ...". Id. at p. 54.

255.  Rhodes recorded Evarts as suffering from sleep disturbances and other difficulties sleeping, early morning awakenings, appetite disturbances, decreased concentration, tearfulness, loss of pleasure and increased irritability. Id. at p. 49.

256.  Rhodes noted that Evarts took family medical leave from November, 1996 to January 24, 1997 to care for her terminally ill sister who died on January 12, 1997 after an eighteen-month battle with ovarian cancer.  Evarts was with her sister when she died.  Id. at p. 53.

257.  Later in the therapy, on April 27, 1997, Rhodes noted that Evarts appeared to be doing somewhat better, was not crying as much and had some improvements in sleeping.  Evarts had also gone to bereavement group counseling.  Id. at pp. 59-60.

258.  At the May 1, 1997 counseling session, Evarts was improved although there were lingering issues with depression.  She did report, however, increased frustration and dissatisfaction at work and wanted a transfer or a pink slip.  Rhodes noted "lots of agitation comes from work stress." Id. at p. 66.

259.  Rhodes stated her impression was that the issue was not that Evarts did not enjoy her work because she did enjoy the job and enjoyed meeting people.  Evarts also felt that she was good at what she did at SNET and that the dissatisfaction with the job environment stemmed from her relationship with her boss.

51

260.  Rhodes closed her file with the last visit on May 15, 1997 in which Evarts appeared more relaxed, cheerful and more focused.  She told Rhodes she was considering resigning from SNET and taking her chances in the job market.  Id. at p. 71.

261.  In respect to Rhodes' counseling notes of May 17, 1997, which indicate that things were looking a little better or "rosier," Rhodes agreed that if Evarts had made a decision to remove herself from a harassing work environment, such a decision would make her feel more in control of her life and further, it would not surprise her as a therapist if Evarts' decision to remove herself from that stressor would net an improvement  in her emotional state.  Id. at pp. 101-02.

262.  With respect to Cordner's knowledge that plaintiff had lost a young sister with whom she was very close, Rhodes opined that harassment by a supervisor whom Evarts knew was aware of this loss would exacerbate the stress suffered by Evarts..  Id. at pp. 103-04.

## CONSTANCE ROGERS

263.  Constance Rogers was employed by SNET and retired in February, 1999.  The last position and title she held was "manager EEO."  Exh. F at p. 11.

264.  She held nine (9) different positions during her twenty-eight (28) years at SNET.  In the last several years of her career, she held the position of EEO manager.  Id. at p. 13

265.  Rogers has no formal degrees or educational credits in the field of personnel or human resources.  When she was selected for the job in 1995, her training consisted of

52

an immediate enrollment in a training program that involved travel to California for a week. She subsequently went to other training programs and workshops associated with equal employment opportunity. Id. at pp. 16-17.

266. At the time she was appointed EEO manager, she did not possess any college or graduate degrees in business administration or industrial relations. Nor had she attained any certificates of advanced training in the area of personnel administration, employment law or EEO compliance. Id. at p. 18.

267. With respect to Evarts' complaint of gender discrimination filed with her office, Rogers did not meet with Evarts in person. She spoke to Evarts only by telephone. She spoke to Evarts by telephone a second time but only for the purpose of telling Evarts that she had conducted an investigation into Evarts' complaint. Prior to disposing of Evarts' complaint, she did not speak to Evarts beyond the first initial teleconference. Id. at p. 25.

268. Rogers' documentation of Evarts' complaint was written on notes that do not contain a date. When asked whether it had been her habit to take complaints of sex discrimination and not note the date on which it came in, Rogers stated that she did not know why she did not date the document. Id. at pp. 26-27.

269. Rogers did not ask to see Evarts in person nor did she ask any other SNET EEO representative to interview Evarts. Id. at p. 27.

270. Rogers did, however, interview Matthew Cordner in person. No one else was present at this meeting. Rogers recorded a summary of what Cordner stated during the interview. Id. at pp. 27-28.

271. In defense of the claim of gender discrimination, Cordner told Rogers that he had subjected David Ianiello to the same disciplinary actions as Evarts. Id. at p. 29.

272. Rogers' notes of Cordner's remarks do not indicate that Cordner informed Rogers that any disciplinary action against Ianiello was taken after Evarts had resigned and raised an issue of gender discrimination. Id. at p. 29.

273. Rogers never interviewed in person or spoke by telephone with Dave Ianiello. No EEO representative at SNET ever spoke with Ianiello. Rogers claims to have attempted to telephone Mr. Ianiello without success. Id. at 28, 30-31.

274. When she could not reach Ianiello, Rogers stated that she "didn't do anything" because, in her opinion, she "couldn't force an employee to talk to us." Id. at p. 31.

275. Rogers acknowledged that SNET was a private employer and, when asked why SNET would not demand an interview with a subordinate employee who was identified as a witness to discrimination, Rogers responded that she was unaware of any SNET policy on the matter. Id. at pp. 31-32.

276. Rogers stated that SNET had no written policy setting forth how an investigation of a complaint of sex discrimination should be conducted. Id. at p. 33.

277. Apart from failing to interview Mr. Ianiello, Rogers also failed to interview a single male co-worker of Evarts. Id. at p. 33.

278. To Rogers' knowledge, no other EEO or other SNET official interviewed or spoke to Evarts' male co-workers with respect to Cordner's treatment of Evarts. Id. at pp. 33-35.

54

279.  Rogers was not even sure whether all of Evarts co-workers were male.  Id. at p. 35.

280.  Rogers did not request Evarts' personnel file or otherwise look at her seniority or work history with SNET.  Id. at p. 35.

281.  Rogers concluded her investigation without looking at Evarts' performance history during the years she worked at SNET and she concluded her investigation solely on the basis of what Cordner told her.  Id. at p. 35.

282.  Rogers stated that it was SNET practice that an employee's direct supervisor has control of the employee's personnel file.  Id. at pp. 37-41.

283.  Rogers was unclear about the extent of Mr. Cordner's authority to suspend or fire a subordinate without first gaining approval from someone in her office or from a superior officer.  She stated that her office would not be involved in what a local supervisor was doing.  Id. at p. 46.

284.  Rogers further stated she was unaware of any established policy which required Cordner to submit a decision to suspend or fire Evarts to a manager of higher authority.  Id. at pp. 46-47.

285.  Before disposing of Evarts' complaint, Rogers did not undertake to find out whether anyone else had ever complained about Cordner, nor did she speak to any personnel officials regarding Cordner's performance history.  Id. at pp. 58-59.

286.  Rogers did not request nor did she review Cordner's personnel file.  Id. at p. 59.

LAW OFFICES OF KAREN LEE TORRE • 51 ELM STREET, SUITE 307, NEW HAVEN, CONNECTICUT 06510 • TEL: (203) 865-5541

287. Rogers claims there was no need for her to do anything further because "what [she] found out as a result of [her] investigation was that the facts were not in dispute." Id. at p. 59.

288.  She concedes that her only basis for concluding that Evarts was treated the same as male crew members was Mr. Cordner's own statements to her. Id. at p. 60.

289.  In the "resolution" section of the tracking form, Rogers stated the outcome as follows:

> "Denise alleged that she was being discriminated against because she was a woman and it was a major factor in her decision to leave the company.  This allegation could not be corroborated." Id. at p. 61.

290. When asked why the section of the form which calls for the investigator to detail his/her findings was blank, Rogers stated, "because the facts weren't disputed, there wasn't a need to elaborate in the findings area." Id. at p. 63.

291.  With respect to Evarts' claim that she was subjected to a discriminatory ride-along evaluation, Rogers accepted as undisputed and true Cordner's claim that the ride-along was "a standard practice." Id. at p. 64.

292. When asked why she would accept Cordner's statement as true, Rogers stated that "supervisors and technicians ride with technicians on a regular basis."  She claims to know this because of her own knowledge of supervisors and subordinates. Id. at p. 64.

293.  Rogers later stated that she was "not sure" whether one of the things Evarts was complaining about was that she was singled out for ride-alongs while her male

56

colleagues were not. Id. at p. 65.

294. When asked how she could conclude that Evarts was subjected to ride-alongs on an equal basis with male co-workers in light of the fact that she did not interview a single one of them, Rogers merely answered once again that she "didn't talk to any male subordinates." Id. at p. 65.

295. With respect to Cordner's comments in defense of Evarts' various allegations, including those related to the discipline imposed on her for failing to lock her truck, Rogers admits that she never went back and spoke to Evarts again for the purpose of determining whether Cordner's statements to Rogers were true. Id. at p. 68.

296. Cordner had denied singling Evarts out for monitoring and discipline regarding her time sheets and told Rogers that he treated the male technicians in the same manner. Id. at p. 69.

297. When asked what, if anything, she did to determine whether Cordner's statement was true, Rogers answered "I didn't speak to anybody else." Id.

298. Although Rogers claimed she was interested in determining whether Cordner discriminated against Evarts because she was a woman, Rogers admits that she took no steps to determine whether Cordner had ever been the subject of a previous complaint, nor did she review his personnel file. Id. at pp. 75, 85.

299. Rogers states that she communicated her conclusions based on her disposition of the complaint to Evarts by telephone but she is not sure whether it was right before Evarts left SNET or immediately after. Id. at p. 76.

300. Rogers cannot recall whether she reported to any superiors the fact or details of her disposition of Evarts' EEO complaint nor does she believe doing so was required by SNET policy. Id. at pp. 79-80.

301. To Rogers' knowledge, there was no one individual superior to her in SNET's chain of command who would insist on being advised of a complaint of unlawful discrimination or the results of any investigation into such a complaint. Id. at pp. 84-85.

302.   With respect to training she received during her several years as EEO manager, including attendance at seminars run by attorneys, Rogers stated that she retained all her training materials and they were kept in a training file at SNET. She did not dispose of them, nor did she remove those files from SNET. They were kept in a locked file. Id. at p. 91.

303. In response to a plaintiff's discovery request calling for the production of these training materials, SNET did not turn over such materials and claimed they do not exist.

304. In respect to employment-related seminars which she did attend, Rogers conceded she was advised at the seminars that it was particularly important when investigating a claim of discriminatory treatment to interview a complainant's co-workers to determine how they were treated as compared to the complainant. Id. at p. 93.

305. Based on what an unidentified individual told her, Rogers believes that Evarts' CHRO complaint was dismissed for lack of merit. Id. at 98.

### CHRO PROCEEDINGS AND OUTCOME IN PLAINTIFF'S FAVOR

306. In compliance with the administrative prerequisites to suit under Title VII, the

58

plaintiff filed a complaint with the State of Connecticut's Commission on Human Rights and Opportunities ("CHRO" or "Commission"). In her complaint summary, plaintiff set forth factual allegations which are identical to those set forth in the instant District Court complaint. See Defendant's Exh. 14.

307.   The Commission investigated plaintiff's complaint and held fact-finding hearings. Present and represented by counsel (Attorney Lori B. Alexander) were Matthew Cordner, plaintiff's supervisor, and Edward Dillman, manager of SNET's Service Delivery Department and Cordner's superior.   The hearing officer, Attorney Richard Gordon, conducted the investigation and the fact-finding hearings. Cordner, Dillman and the plaintiff all testified.  Exh. 1.

308.   After investigation and hearing, and upon review of all pleadings, arguments and evidence submitted by SNET counsel, the hearing officer issued a Finding of Reasonable Cause along with the agency's findings of fact. Exh. 1.

309.   The issue as framed by the Commission was as follows:

"Was [Denise Evarts] constructively discharged by [SNET] on the basis of her sex, female, on May 30, 1997 where respondent continually treated complainant differently from other male employees in violation of 46a-60(a)(1), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. section 2000e and the Civil Rights Act of 1991?" Exh. 1.

310.  In accordance with the Commission's rules and regulations, the complaint and case file were reviewed for the purpose of determining the Commission's jurisdiction. After review, the Commission determined that it had jurisdiction to receive, investigate and issue a determination upon the merits of the complaint.   The Commission saw no issues

59

respecting timeliness of filing of the complaint with respect to the 180-day deadline for the filing of complaints with the CHRO or the 300-day deadline for the filing of complaints with the EEOC.  Exh. 1 at p. 2.

311.  SNET at no time asserted a claim that plaintiff's allegations were untimely filed.

312.  The Commission's investigator and hearing officer conducted a thorough and complete investigation into the facts of the complaint.  Exh.1 at p. 2.

313.  The Commission, acting through its investigator Richard Gordon, framed the question as whether the facts adduced at the hearing were "sufficient to support a finding that there exists reasonable cause to believe that a discriminatory practice has occurred or is occurring within the meaning of the Act."  Exh. 1 at p. 3.

314.  The Commission, acting through its hearing officer and investigator, proceeded to determine the merits of plaintiff's complaint using the following definition of "reasonable cause": "A bona fide belief that the material issues of fact are such that a person of ordinary caution, prudence and judgment could believe the facts alleged in the complaint."  Exh. 1 at p. 3.

315.  The Commission acknowledged that its reasonable cause standard in this case required the following:

    1)    that the investigation be thorough and complete;

    2)    that the investigator consider all reliable and probative proof, irrespective of whom it supports;

    3)    that the investigator make findings with respect to all material issues of fact, including disputed facts;

60

4)    that the investigator resolve issues of credibility and draw appropriate inferences; and

5)    that the investigator ultimately decide whether the facts are such that a person of ordinary caution, prudence and judgment could believe the facts alleged in the complaint. Exh. 1 at p. 3.

316. Employing these standards the Commission issued a series of findings of fact based on the testimony of the parties, the documentary evidence and the hearing officer's determination of the credibility of Evarts, Cordner and Dillman. Exh. 1 at p. 1.

317. The Commission found that Matthew Cordner subjected plaintiff to varying instances of discriminatory treatment including: a) rescinding the opportunity for plaintiff to satellite out of an office closer to her home; b) subjecting her to "ride-along" supervision and evaluation; c) taking away her cell phone as punishment for alleged violation of usage limitations; d) disciplining her for allegedly leaving her truck unlocked; e) subjecting her to unreasonable and constant scrutiny, criticism and reprimand in respect to her time record-keeping; f) denying her a new truck. With respect to his conduct toward and actions taken against Evarts, similarly situated male co-workers under Cordner's supervision were not subject to the same treatment. Exh. 1.

318. The Commission found that a reasonable person in Evarts' situation would quit because she found the working conditions intolerable. Exh. 1 at pp. 4-5.

319. The Commission found a causal connection between what it described as "intolerable working conditions" and Evarts' decision to resign. Exh. 1 at p. 5.

320. The Commission also found that the intolerable working conditions imposed

61

by SNET were motivated by unlawful gender bias on the part of plaintiff's manager. Exh. 1 at pp. 5-6.

321. The Commission further found that SNET's explanations for its treatment of the plaintiff were offered by individuals with personal knowledge: Mr. Edward Dillman, manager of the service delivery department and Matthew Cordner, plaintiff's supervisor.

322. The Commission further found that SNET's various explanations for its treatment of Evarts were either not factually true or not worthy of credence. Exh. 1 at p. 7.

323. To the extent that SNET offered evidence that one or more males were reprimanded or subject to adverse actions , the Commission found that SNET, acting through Cordner, did so only for the sake of appearances and after Evarts gave notice of her intent to quit and raised a complaint of gender discrimination. Exh. 1 at pp. 4-6.

324. Before the Commission, SNET claimed that Evarts' conduct with respect to her time-keeping records was "tantamount to fraud." Exh. 1 at p. 6.

325. Though SNET characterized plaintiff's alleged time record discrepancies in such serious terms, the Commission found that SNET did not enforce its policy against Evarts' male co-workers and that Cordner in particular questioned a male crew member (one Robert Bock) about his time sheets on May 20, 1997, after Evarts gave notice of her intent to quit and expressed her belief that Cordner was discriminating against her on the basis of her gender. Exh. 1 at p. 6.

326. With respect to Evarts' request, in April, 1997, for the issuance by SNET of a "pink slip," the Commission rejected SNET's argument that this evidence showed plaintiff

62

simply did not wish to work for SNET for reasons unrelated to sex discrimination. The Commission instead found that Evarts' request for a pink slip preceded, and was linked to, Cordner's continued harassing conduct. Exh. 1 at p. 6.

327. The Commission's ultimate conclusion was that all evidence contained in the investigative file, considered in its entirety, amply supported a finding that illegal discrimination occurred. Exh. 1 at p. 7.

328. The Commission issued its final findings of fact and determination of reasonable cause after providing the parties with a draft summary of the agency's preliminary findings and affording the parties fifteen days' notice and an opportunity to contest the findings or otherwise forward additional comments for the Commission's review and consideration. SNET contested the draft summary and submitted various arguments urging the Commission to reverse it's preliminary findings. The Commission received and reviewed the parties' comments, accorded them due consideration as required by law, and decided nonetheless that the draft findings of fact and determination of reasonable cause were warranted by the evidence. The Commission accordingly issued its final findings consistent with its proposed draft. Exh. 1 at p. 2.

329. In contrast to SNET's CHRO submission, in which it accused Evarts of conduct tantamount to "fraud" in connection with her time-keeping practices at SNET, in resisting turning over the time records of male technicians during discovery in this action, SNET argued that Evarts had merely been "spoken to" about her "messy" time sheets and that it had no disciplinary character to it. Vol. III, Exh. 5 at p 3.

63

## OUTCOME OF STATE OF CONNECTICUT EMPLOYMENT SECURITY
## APPEALS DIVISION PROCEEDING

330.  Evarts applied for unemployment compensation benefits.  After hearing Evarts relate the facts regarding her work experience and environment while supervised by Cordner, the appeals referee determined Evarts was eligible for unemployment compensation as she had quit her employment for good cause attributable to her employer. Exh. 2.

64

Respectfully submitted:

THE PLAINTIFF, DENISE EVARTS

BY:

KAREN LEE TORRE
Federal Bar No. ct01707
Law Offices of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, CT 06510
(203) 865-5541

Her Attorney

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, First Class, postage paid, on September 19, 2005, to:

Lori B. Alexander, Esq.
Tyler, Cooper & Alcorn
205 Church Street
New Haven, CT 06509

Karen Lee Torre

65