THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    \*

DENISE EVARTS,                              \*
                                            \*
   Plaintiff,                \*
                                            \*
v.                                          \*  CIV. ACTION NO. 3:00CV1124(WIG)
                                            \*
THE SOUTHERN NEW                            \*
ENGLAND TELEPHONE                           \*
COMPANY,                                    \*
                                            \*
   Defendant.                \*  SEPTEMBER 19, 2005

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    \*

## PLAINTIFF'S RESPONSES TO LOCAL RULE 56(a) STATEMENT
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.  SNET is a regional provider of a wide range of telecommunications services to businesses and private residences in Connecticut.  The company employs approximately 7,400 persons at various locations throughout the state.

**Admitted in part. At the time of the events complained of in this action, this was true.  Since that time SNET's employees have been subsumed by SBC in consequence of SBC's takeover of SNET.**

2.  Plaintiff was employed as part of SNET's New Haven Payphone Services Installation and Repair group ("Payphone Services"), which installed and repaired pay telephones.  Pl. Dep. Vol. I at 25-26.  She worked out of the SNET garage in New Haven.  Pl. Dep. Vol. II at 70.

**Admitted.**

3.  Plaintiff was initially hired in 1987 as a repair service clerk and was promoted to service technician in 1989.  Pl. Dep. Vol. I at 26.  As a service technician, plaintiff installed, repaired, and

maintained coin-operated telephones and associated network facilities.

**Admitted.**

4. Plaintiff received regular pay increases and remained in that position until she resigned in May 1997. At the time she resigned in 1997, she was earning $41,080.00 plus overtime.

**Admitted.**

5. Plaintiff, like other technicians, was at all times a member of the Connecticut Union of Telephone Workers (the "Union"), and the terms and conditions of her employment were governed by a collective bargaining agreement between SNET and the Union. Pl. Dep. Vol. II at 138.

**Admitted in part - certain terms and conditions of employment were governed by the collective bargaining agreement.**

6. Prior to working as a service technician, while employed by SNET, plaintiff obtained a Bachelor's degree from Teikyo Post University majoring in business management; her tuition was reimbursed by SNET. Pl. Dep. Vol. I at 19-20.

**Admitted.**

7. The year before that, in 1988, plaintiff's then-supervisor, Wanda Lewis (female), noted in her personnel file that plaintiff had difficulty accepting supervision. Ms. Lewis wrote,

> Denise is a very hard person to deal with. When you try to give her advice she is never wrong. She accuse[s] someone else before she will take the blame.

Exh. 11 (authenticated at Cordner Aff. ¶ 33).

**Cannot admit. Cordner is not competent to authenticate the document and defendant has not deposed Ms. Lewis nor submitted an affidavit from her. The plaintiff was unaware of the existence of the document until this litigation commenced. Exh, 27 ¶10.**

2

8. Ms. Lewis made this notation after plaintiff had resisted her attempts to coach her to improve her customer service skills. Plaintiff's response had been that Lewis was being "picky." This was long before plaintiff worked with Matt Cordner and long before any of the events about which she complains in this case.

**Denied. Defendant does not cite to any record evidence in support of this statement and it has not been properly authenticated.**

9. After she transferred to the service technician job, until 1989 plaintiff's supervisor was Crystal White. Pl. Dep. Vol. II at 80. Plaintiff has no complaints about Ms. White as a supervisor or about any events occurring during that time.

**Admitted.**

10. In 1989, Pat Kinsella (male) took over for Ms. White. Pl. Dep. Vol. I at 57. Again, plaintiff has no complaints about Mr. Kinsella as a supervisor or about any events occurring during that time. Plaintiff has testified that she thought Mr. Kinsella was a good supervisor. Pl. Dep. Vol. I at 34.

**Admitted.**

11. Prior to 1996, plaintiff applied to transfer to several other positions at SNET, but several times was unable to pass the qualifying tests. Exh. 7 (transfer requests indicating plaintiff repeatedly attempted to transfer out of her job as early as 1994); Pl. Dep. Vol. II at 28-29; Pl. Dep. Vol. I at 46-50. **Admitted.**

12. Also, <u>before</u> Matt Cordner joined her group and became her supervisor in mid-1996, plaintiff told Ed Dillman, manager of the Payphone Services team, that she wanted to leave her position. Dillman Aff. ¶¶ 4, 6. She told him that she had tried to transfer to other positions in SNET

but kept failing the tests. Plaintiff communicated her desire to leave her position and her frustration with not meeting the qualifications for other jobs well before Mr. Cordner became her supervisor. Dillman Aff. ¶¶ 4, 6.

**Denied. Plaintiff did speak with Dillman about moving up into management. Exh. 27 ¶10.**

13. In July 1996, Matt Cordner joined the Payphone Services team and replaced Mr. Kinsella as plaintiff's supervisor. Complaint at ¶ 8.

**Admitted.**

14. There has never been an SNET coin satellite office in North Madison. Pl. Dep. Vol. II at 73. Athough Mr. Kinsella was plaintiff's supervisor for several years after the idea was allegedly formulated by her prior supervisor, Mr. Kinsella never opened a satellite office there for her.

**Admitted.**

15. Plaintiff does not believe that, Mr. Kinsella discriminated against her in any way and believes he was a good supervisor. Pl. Dep. Vol. II at 81.

Admitted.

16. Shortly after Mr. Cordner took over for Kinsella, Mr. Cordner told plaintiff that he had analyzed the situation based on business needs and had determined that there wasn't enough work in North Madison to justify creating a satellite office there. Pl. Dep. Vol. I. at 60-62.

Admitted.

17. Mr. Cordner had analyzed the situation and determined that there was insufficient business in the immediate area to justify creating a satellite office for a service technician. Cordner Dep. at 44-50.

Denied that this was Cordner's true reason. Exh. A pp. 38,54-56, 61-65,75-77.

4

18. However, he did conclude that there was a sufficient volume of business to create a satellite office in Guilford. He offered such an arrangement to plaintiff, but she was not interested. Pl. Dep. Vol. II at 77; Pl. Dep. Vol. I at 66; Pl. Dep. Vol. I at 66.

**Denied. See response to #17 above.**

19. Plaintiff spoke to her union representative, David Iannielo about the situation, but plaintiff never asked for a grievance to be filed or requested that the Union follow up on her behalf. Pl. Dep. Vol. I at 64.

Admitted but the statement incorrectly implies that the issue is subject to the grievance and arbitration provisions of the contract.

20. Even if SNET had created a satellite office in North Madison, it is speculative to assume that plaintiff would have been assigned to it, because it would have been offered according to seniority as specified in the Union contract. Further, there were a number of co-workers with more seniority than she had. Pl. Dep. Vol. II at 77-79.

Denied. It is based on seniority; moreover, no one else wanted it because of where they lived. See citations in response to #17 above.

21. Plaintiff was angry and upset with Mr. Cordner "from the minute he became [her] supervisor," largely because of the satellite office issue. Pl. Dep. Vol. II at 171-172.

Admitted the quoted text is in the transcript but it has been mischaracterized and taken out of context.

22. During the same time period as the satellite office was being discussed, a few months after Mr. Cordner became supervisor of he Payphone Services group, plaintiff approached him and told him that she was going to resign because of an illness in her family. Cordner Aff. ¶ 7. She said

she believed she could not continue working because her sister had learned she was seriously ill with cancer. Cordner Aff. ¶ 7.

**Denied.** Exh. 27 ¶4.

23. Mr. Cordner told plaintiff to go home for the day and be with her family. He also urged plaintiff to look into the possibility of taking a leave of absence rather than resigning. Cordner Aff. ¶ 7.

**Denied. Exh. 27 ¶4.**

24. In November 1996, plaintiff began a leave of absence to be with her sister. Complaint ¶ 12a.

**Admitted.**

25. Although plaintiff was not entitled to a leave of absence under the state or federal Family Medical Leave Act,[1] Mr. Cordner supported her request and SNET allowed plaintiff to go on a leave of absence beginning in November 1996 and ending in late January 1997. Complaint ¶ 12a.

**Denied. Plaintiff applied for leave by formal application pursuant to SNET's FML policy and had to attach a certification from her sister's oncologist attesting to the gravity of Debra Evarts' illness. The application met SNET's standards and as Evarts was entitled to it, the application was granted by SNET's Benefits Committee. Cordner had no authority in the matter and is now attempting to cast himself as plaintiff's benefactor. Exhs. 27 ¶4; 9, 10.**

26. Plaintiff wished to work some days during this period and, rather than insist on a firm work schedule, Mr. Cordner allowed her to come to work whenever she wished simply by calling

---

[1]    Plaintiff is under the erroneous belief that she was entitled to this leave under the Family Medical Leave Act. Pl. Dep. Vol. I at 74-78. That Act does not apply, however, to leaves of absence connected to the illness of a sibling.

him and notifying him the day before that she would be in. Cordner Aff. ¶ 8.

Denied. Exh. 27 ¶ 5..

27. Because employees are not paid for holidays unless they work the day before the holiday,

he specifically arranged for her to be able to work the days before Christmas and New Year's so that

plaintiff would receive holiday pay for the holidays. Cordner Aff. ¶ 8.

Denied. Exh. 27 ¶ 5.


27.    Plaintiff's sister passed away on January 12, 1997.    Although SNET's normal

bereavement policy permitted Ms. Evarts to take three days off with pay thereafter, Mr. Cordner

arranged to allow her to be out an additional week. Cordner Aff. ¶ 9; Cordner Dep. at 56.

Denied as misleading. Exh. 27 ¶6.

28. Ms. Evarts did not return to work on the day scheduled, January 20, 1997. She did not

call the garage to let anyone know her status. When Mr. Cordner called her, she indicated she was

not ready to return, and Mr. Cordner arranged for her to take an unscheduled paid vacation until she

indicated she was ready to return, which she did on January 27, 1997. Cordner Aff. ¶ 10; Complaint

¶ 12b.

Denied as misleading. Exh. 27¶ 6.

29. Plaintiff was excused for all of her absences related to her sister's illness and death and

she makes no claim in this case that anyone at SNET treated her poorly or unfairly because of this

leave of absence. Pl. Dep. Vol. I at 74-78.

Denied that plaintiff was "excused".  Plaintiff made a formal application, which included the

required certificate from her sister's oncologist, to Human Resources for the family leave pursuant

7

to her right under SNET's leave policy. The application was granted by SNET's Benefits committee. Exhs. 9,10, 27.

30. Shortly after plaintiff returned to work, Mr. Cordner went on a "ride-along exercise" with her, which involves a supervisor of a field employee spending a day with a technician "riding along" with him/her and offering constructive feedback. Pl. Dep. Vol. I at 86.

Admitted in part. Denied that Cordner's purpose was to offer "constructive feedback". Exh. 27¶ 9.

31. Plaintiff did not receive any kind of warning, discipline, or significant criticism that she can recall as a result of the ride-along exercise. Pl. Dep. Vol. I at 91; Pl. Dep. Vol. II at 122-23.

Denied in part. Plaintiff received criticism throughout the exercise. Id.

32. Although plaintiff's work performance was not up to par at that time because of her recent absence, she has no basis for believing that Mr. Cordner criticized her performance based on the ride-along. Pl. Dep. Vol. II at 122-23.

Denied as a mischaracterization of the transcript.

33. She did not receive any warnings based on the exercise. Pl. Dep. Vol. II at 122-123.

Admitted.

34. Plaintiff believes that she may have orally complained to her union representative, Dave Iannielo, about the ride-a-long but she did not file a grievance. Pl. Dep. Vol. I at 96-97. Plaintiff did not complain to Ed Dillman. Pl. Dep. Vol. I at 97.

Admitted but to the extent the statement implies it is a grievable issue under the union contract, it is denied.

35. In 1996 and 1997, SNET had begun to provide its service technicians with cell phones for business-related use only when other telephones were not available.

Admitted.

36. SNET's policy, which was communicated to plaintiff, is that employees should not use their cell phones for personal calls and that total usage should not exceed 300 minutes per month. Cordner Aff. ¶ 20; Cordner Dep. at 70-71.

Denied. Exhs. 27, A, pp.104, Def's. Exh. 14 at para.8.

37. Plaintiff was aware "they didn't want you going over 300," even though she says she had not seen any written policy. Pl. Dep. Vol. II at 133.

Denied as misleading. Plaintiff's testimony, as revealed by the transcript shows that she heard crew talking of a "rumor" or a 300 word limit but that no oral directive was issued by management nor was there a policy communicated or even seen. Id.

38. It is undisputed that both before and after plaintiff took her leave of absence, plaintiff regularly violated SNET's policy by consistently exceeding the 300 minute limit.

Denied. Id.

39. Plaintiff had exceeded the 300 minute limit in six of the ten full months she worked in 1996. Dillman Aff. ¶ 8; Exh. 4 (authenticated at Cordner Aff. ¶ 22).

Denied. Id.

40. Although Mr. Cordner counseled plaintiff informally about this problem in 1996 and again in the beginning of 1997, plaintiff exceeded the 300 minute limit again in January and February of 1997, after she had returned to work full-time following her leave of absence. She had 366 minutes of cell phone usage in January, 1997; 334 minutes in February, 1997; and 378 minutes

9

in May, 1997. Exh. 4; Dillman Aff. ¶ 8.

Denied that plaintiff was "counseled informally". Admitted that her cell phone usage was as stated for the months indicated.

    41.  Plaintiff's usage and the usage of a male technician who similarly had his cell phone removed (twice) during this period were more excessive than any of their nine co-workers. Exh. 4

Admitted in part. The reference to "this period" is vague. Admitted that the only other person to suffer the loss of his cell phone was David Ianiello although two other males exceeded the alleged limit without penalty. Exh. 4. Admitted that plaintiff's usage was greater than co-workers but in the January-February bills would be reflected time spent on the cell phone dealing with Hospice and family members concerning the plaintiff's sister. All other calls were business related. Exh. 27¶ 15.

    42.  Mr. Cordner did not discipline plaintiff because of excessive cell phone usage. Instead, he talked to her and reminded her about the limitation. Cordner Aff. ¶ 22.

Denied. Exh. 27.

    43.  Finally, Mr. Cordner removed plaintiff's access to her cell phone for a month, because she continued to exceed the usage limitation. Mr. Cordner made the decision to remove plaintiff's company cell phone for the month of March 1997. Exh. 4.

Admitted that the cell phone was taken away. Denied that the real reason was alleged overuse.

    44.  Plaintiff does not dispute that she exceeded the 300 minute limitation or that she used her cell phone for personal reasons during this time, notwithstanding the company policy. Pl. Dep. Vol. I at 104-06, 109-10, 135-36; Pl. Dep. Vol. II at 54.

Denied that company policy forbid use of the cell phone for personal reasons or that there was an established limit on business use. Exh. 27 ¶14.

45. Plaintiff was not suspended or demoted, nor was she disciplined in any way concerning cell phone usage.

Denied inasmuch as the removal of her cell phone privileges is a punishment. Admitted that plaintiff did not receive a form of discipline as outlined in SNET's disciplinary policy.

46. In September, 1996, Mr. Cordner also removed the cell phone of a male technician, David Ianiello, for exceeding the 300-minute limitation. He also took Mr. Ianiello's cell phone away a second time in July, 1997 for the same reason.

Admitted that the cell phone was taken, the second time after plaintiff left SNET. Denied that Cordner's real reason was excess use as Ianiello, who advocated for Evarts and told Cordner that he was discriminating against her, also believes that he had been targeted by Cordner for discipline based on his union advocacy. Exh. B *passim*.

47. During the relevant time, SNET had a policy requiring service technicians to keep their vehicles locked whenever the vehicles were unattended. Exhs. 1, 6; Cordner Aff. ¶¶ 11, 12.

Admitted.

48. During the time when plaintiff worked with Mr. Cordner, the policy stated, "[I]f unattended, [company] vehicle[s] should be secured by locking doors and windows." Exh. 1; Cordner Aff. ¶ 11.

Admitted.

49. Similarly, the policy entitled "Safeguarding Procedures for Services Technicians and Public Services Assistants," which plaintiff signed in 1994, stated that the procedure included "[c]losing all windows, locking all doors and removing of ignition key when leaving vehicle unattended." Exh. 6 (authenticated at Cordner Aff. ¶ 28). That policy also stated that violation of

11

the procedure was "sufficient cause for disciplinary actions up to and including dismissal . . . ." Exh.
6.

Admitted.

50. The policies applied both when the vehicles were in the field and when they were parked in the garage. Cordner Aff. ¶ 11.

Denied in part. SNET did not apply the policies to Evarts' crew when their vehicles were in SNET's garage. Exh.. A at pp. 116-118; 129-133; Exh. B at pp. 10-12,14-15,19.

51. Under the locked vehicle policy, violations would result in progressive discipline, beginning with a verbal warning for the first occurrence and leading up to possible termination for repeated offenses. See Exhs. 1, 13.

Denied in part. The policy actually says discipline "could" result, not "would" result. Def.'s Exh. 13.

52. Mr. Cordner frequently reinforced and reminded all his service technicians, including the plaintiff, of the locked vehicle policy. Cordner Aff. ¶ 12. He instructed them on this point in group meetings. Cordner Aff. ¶ 12. Ed Dillman, Mr. Cordner's manager who also attended some of the group meetings, also reminded service technicians, including Ms. Evarts, of the policy concerning locking company vehicles at all times when unattended. Dillman Aff. ¶ 7.

Denied. Exh. 27 ¶ 13

53. In March 1997, in a routine check of all of his technicians' vehicles in the garage, Mr. Cordner discovered that three employees' vehicles were unlocked and he counseled all three of them individually about the need to lock their vehicles. Cordner Aff. ¶ 12; Cordner Dep. at 77. Plaintiff was one of the employees, and the other two were men.

Denied. This uncorroborated statement is not credible given the entire evidentiary record. Telling is Cordner's failure in his affidavit to name these individuals or to point to personnel entries, such as those he continuously wrote regarding the plaintiff. Cordner likewise did not identify these men at the CHRO hearing although one would presume that he could easily do so. That Cordner did "routine checks" of all his technicians vehicles is also denied. Exh. A at pp. 21, 58, 60, 116-118; Exh. B at p. 10-12,14-15,19.

54. Subsequently, Mr. Cordner found plaintiff's company truck unlocked on two more occasions and counseled her each time. Cordner Aff. ¶ 13. Finally on March 17, 1997, Mr. Cordner found plaintiff's vehicle's rear cargo door unlocked, and after this fourth time gave plaintiff a documented verbal warning. Cordner Aff. ¶ 13. At this time, plaintiff had left open access to company tools, supplies, and a coin box with cash in it. Exh. 2; Cordner Aff. ¶ 13.

Denied that plaintiff had been counseled. See citations in #53 above.

55. A documented verbal warning is the first and lowest step of discipline in the progressive discipline policy in the collective bargaining agreement and lasts for only six months. Exh. 13; Pl. Dep. Vol. II at 65.

Admitted.

56. Under the locked vehicle policy, Mr. Cordner could have given plaintiff a verbal warning after the first offense. Exh. 1. Mr. Cordner took no further action with regard to this or any other incident involving plaintiff's truck.

Denied that there were previous "offenses" which Cordner spoke to plaintiff about. Denied that Cordner even considered it an offense given that he did nothing to any of the male crew members for leaving their trucks unlocked. Nor did he discipline Rick Della Volpe who left is truck unlocked

13

off-site (when you should really lock it for security reasons) with the result that $500 in SNET-owned tools were stolen. Exh. B. See also citations in response to #53 above.

57.  Plaintiff does not dispute that she regularly left her truck unlocked or that she left it unlocked on the day that led to her verbal warning. Pl. Dep. Vol. II at 66-68; Pl. Dep. Vol. I at 28-30.

Admitted.

58.  On previous occasions, equipment had been stolen out of her truck and that she was not disciplined on those occasions. Pl. Dep. Vol. I at 121-24, 132.

Denied. Counsel has misstated the testimony. Plaintiff had something stolen from her at SNET, not from her truck. Another tool was misplaced. The statement is also deceiving because it implies Cordner was the supervisor and thus gave plaintiff a break. Cordner was not even there at the time.

59.  After receiving the verbal warning, plaintiff told Cordner that her rear cargo lock was broken, but she never informed Mr. Cordner that the lock was broken until then. Exh.1 (documented verbal warning); Pl. Dep. Vol. II at 60; Cordner Aff. ¶ 14.

Admitted.

60.  Plaintiff received the verbal warning only after Mr. Cordner had found her truck unlocked for the fourth time. Cordner Aff. ¶ 14.

Denied. See response above.

61.  During this time, plaintiff was still able to lock her rear cargo door by "physically put[ting] the key in to lock it" even after the knob was broken. Pl. Dep. Vol. II at 40-41.

Admitted.

62.  In response to the verbal warning, plaintiff did not indicate she would do better but

14

instead accused Mr. Cordner, supervisor, of being on a "power trip." Cordner Aff. ¶ 14.
Denied that plaintiff should indicate that she should do better than every one of her male co-workers who engaged in the same practice without penalty.

63. Plaintiff's productivity, that is, the number of jobs she completed in a work day, declined during 1997. Her production time had slowed down and gotten "worse and worse" but attributes her poor performance to "being discriminated against." Pl. Dep. Vol. II at 61-62.
Denied in part. Again, counsel has misstated the testimony. A review of the transcript indicates that plaintiff acknowledged that for a period of time after her sister's death, she was not herself. What she stated further was that as Cordner's harassment intensified, her production got worse and worse.

64. Mr. Cordner never disciplined her or gave her a critical performance evaluation because of her drop in productivity, but he did meet with plaintiff on or about April 9, 1997 to discuss it. Pl. Dep. Vol. I at 134-35.
Denied that the meeting did not constitute a "critical performance evaluation."

65. Mr. Cordner did not discipline plaintiff about productivity, and plaintiff admits that her productivity had been "down in recent months." Pl. Dep. Vol. II at 61-62.
Admitted in part. There is no evidence that SNET's policy includes discipline for productivity. Cordner excessively monitored Evarts's work and looked to find reasons to counsel her, coach her and discipline her. Cordner also knew that Evarts had suffered a tragedy and Evarts freely admits that for a period after the funeral, she was not herself. Plaintiff also made it clear that her productivity suffered as a result of feeling sick and stressed out over Cordner's harassment. Exh. A *passim.*

66. Mr. Cordner told plaintiff that it was important that her time sheets be accurate for each

15

job that she worked on and that it was important that her time match the computerized records. Pl. Dep. Vol. II at 91.

Admitted that Cordner made these statements during the time he was using plaintiff's time records as an excuse to harass her.

67. It is undisputed that plaintiff's handwritten records often did not coincide with the computerized records. Plaintiff has admitted that rather than keeping contemporaneous records of her performance, she was in the practice of waiting until the end of the day to try to reconstruct her time. Pl. Dep. Vol. I. at 92.

Admitted that plaintiff testified she completed her time records in this manner along with the rest of the crew.

68. On April 30, 1997, several months after she had returned to work, Mr. Cordner sat down with plaintiff and discussed the problems she had noted with her time sheets. Cordner Aff. ¶ 16. He did not discipline her in any way with respect to time sheets, and simply wanted her to be more accurate.

Denied. The entire record is the source for this denial.

69. On or about May 2, 1997, Mr. Cordner and his supervisor, Mr. Dillman, again met with plaintiff to counsel her about her time records. Complaint ¶ 12g. She indicated she understood clearly how the time sheets should be completed. Cordner Aff. ¶ 17.

Admitted that plaintiff was subjected to the meeting with two managers. Denied that Evarts made any statements indicating that she understood how the time sheets should be completed. Evarts and her union representative challenged Cordner on his discriminatory treatment in respect to time records. Exh. A pp. 145-146; Def.'s Exh. 14 ¶13.

70. After these meeting, Ms. Evarts continued to submit time sheets with multiple cross-outs and changes that differed significantly from the DCWS computer-generated records, sometimes reflecting not only different times worked but also different sequences of jobs performed. Others reflected unaccounted for time and tasks coded with the wrong numbers. Cordner Aff. ¶ 17. Unable to admit or deny, even in part. SNET has not pointed to an exhibit to show this or to show the unspecified frequency stated. Admitted that, as in the case of plaintiff's co-workers, the time would often not match between the two records. Morever, other technicians' sheets were also poorly written. Exh. 24. (Sample of time sheet of Rick DellaVolpe.

71. Plaintiff almost always recorded that she took lunch from 12:00 to 12:30, no matter what time she actually took it. Neither Mr. Cordner nor Mr. Dillman took any further action with regard to these matters. Admitted that plaintiff recorded her lunch in that manner along with other crew member. Denied that Cordner and Dillman took no futher action. Cordner, with Dillman's knowledge, continued to harass Evarts about her time sheets and pepper her file with negative entries while paying no mind to the record-keeping practices of the males.

72. Mr. Cordner also counseled a male technician in the group about time inaccurately recorded in August, 1996. Cordner Aff. ¶ 18. That employee improved his time reporting after Mr. Cordner spoke with him about it. Cordner Aff. ¶ 18. Denied as incredible. Cordner had not and never has identified this person and suspiciously refers to him as a "male technician" and not by his name.

73. In April, 1997, plaintiff told the manager of her group, Ed Dillman, that she did not want to work for SNET any longer and asked him for a "pink slip" indicating she was laid off, so that she

17

could collect unemployment benefits apparently knowing she would not qualify for such benefits if she resigned. Dillman Aff. ¶ 6. She did not indicate that she felt harassed or discriminated against by Mr. Cordner or anyone else at SNET.

Admitted although denied that there is some meaning to the fact that she did not state she was feeling harassed since she had already made that fact known. Moreover, Evarts, based on her experience with Dillman, did not trust him to do anything about Cordner as they were friends and Dillman had been ineffective in the past in making sure that SNET was a safe and fair working environment for woman. Exh. 27 ¶¶ 18-19.

74. Mr. Dillman declined to issue her a pink slip that stated she had been laid off, since she had not been laid off and he felt to do so would be fraudulent. Dillman Aff. ¶ 6.

Admitted that plaintiff, aware that SNET was laying off many employees at the time, inquired about whether she could be one of them so she could remove herself from the abusive environment and not suffer financially while she looked for a new job. Exh. 27 ¶16.

75. A little more than two weeks after their discussion, on May 16, 1997, plaintiff submitted her resignation. Dillman Aff. ¶ 6. She kept working until May 30, 1997. Dillman Aff. ¶ 6. Her resignation letter stated,

> I feel that it is no longer in my best interest to remain employed at SNET in this current position. I have tried to transfer to other positions, but I have not been successful. Please accept my resignation and my last day of employment being two weeks from the date of this letter.

Admitted.

76. During the relevant time, SNET had an anti-discrimination and anti-harassment policy that contained complaint procedures. Exh. 10. Plaintiff did not advantage of these procedures until

18

after she had submitted her letter of resignation from SNET. Pl. Dep.

Admitted that plaintiff did so at the time she submitted her notice but before she left SNET's employ.

77. After plaintiff submitted her resignation, she made a complaint of discrimination to SNET's internal EEO office for the first time.

See response to #76 above.

78. SNET's internal EEO office investigated the complaint and concluded that plaintiff's claims of discrimination were unsupported.

Denied that SNET investigated the complaint. Admitted that SNET's EEO office advised the plaintiff that her complaint was deemed unfounded. Exh. F.

79. After May 16, 1997, Mr. Cordner did not discipline plaintiff or counsel her about performance problems.

Admitted that after Cordner knew plaintiff was leaving, he neither disciplined her nor counseled her about performance problems.

80. The only "disciplinary action" Ms. Evarts had while she worked under my supervision was a single verbal warning, documented in writing, for leaving her vehicle unlocked. A documented verbal warning is the mildest form of discipline under the Labor Agreement. Ms. Evarts'verbal warning had no adverse consequences to her such as a pay reduction, inability to transfer, etc.

Admitted in part. Denied that there are no adverse consequences to having a disciplinary action noted on one's personnel file. To the contrary, as Cordner threatened, the next step might be discharge.

19

81. In September, 1996, I also removed the cell phone of a male technician, David Ianiello, for exceeding the 300-minute limitation. I took Mr. Ianiello's cell phone away a second time in July, 1997 for the same reasons. Ms. Evarts was treated the same as male employees with respect to cell phone usage.    Cordner Aff. ¶ 23.

This is a repeat. Moreover, as to the last sentence, Defendant's Exh. 4 shows other males exceeding the alleged limit without penalty.

82. Mr. Cordner spot-checked the time sheets of other technicians reporting to him.  He also counseled a male services technician about time inaccurately recorded on his time sheets in August, 1996.  That employee improved his time reporting after their discussion.  Cordner Aff. ¶ 18.  This is a repeat of # 72.

Dated at New Haven, Connecticut this 20th day of June, 2005.

THE DEFENDANT,
SOUTHERN NEW ENGLAND TELEPHONE, INC.

By_____
    Lori B. Alexander
    Federal Bar No. CT08970
    Tyler Cooper & Alcorn, LLP
    205 Church Street
    New Haven, Connecticut  06509
    Tel. (203) 784-8200
    Fax No. (203) 789-2133
    E-Mail: alexander@tylercooper.com

THE PLAINTIFF, DENISE EVARTS

BY: _____

KAREN LEE TORRE
Federal Bar No. ct01707
Law Offices of Karen Lee Torre
51 Elm Street, Suite 307
New Haven, CT 06510
Tel. (203) 865-5541
Fax No. (203) 865-4844