THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * * * * * * * *   *
DENISE EVARTS,                            *
                                          *
    Plaintiff,                            *
                                          *
v.                                        *   CIV. ACTION NO. 3:00CV1124(WIG)
                                          *
THE SOUTHERN NEW                          *
ENGLAND TELEPHONE                         *
COMPANY,                                  *
                                          *
    Defendant.                            *   NOVEMBER 28, 2005
                                          *
* * * * * * * * * * * * * * * * * * *     *
```

## DEFENDANT'S REPLY TO OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT

As in virtually every pleading in this case, plaintiff devotes more time and energy in her Opposition to ad hominen attacks on defense counsel than on making supported legal arguments or presenting evidence from the record to support her claims.[1] Again, this strategy of distraction should not successfully defeat summary judgment, as the Court must grant summary judgment for the defendant if, at the conclusion of a trial, on the same evidence as presented by the parties

---

[1] In her Opposition, plaintiff's counsel again attacks by stating to the Court that "SNET mischaracterizes and understates the severity of the harassment and not only frequently misleads by omission but by flatly false statements." Pl. Opp. at 2. Yet nowhere in plaintiff's Opposition does she identify a single instance where defense counsel has misstated anything in its motion. Early on in this case, similar repeated unfounded accusations led The Honorable Janet Hall to deny four consecutive Motions to Compel by the plaintiff, several with requests for sanctions. The behavior has continued through the present time, when plaintiff's counsel, while seeking multiple extensions of time to try to formulate an opposition to SNET's Motion for Summary Judgment, again attacked defense counsel for having filed a Motion for Summary Judgment in a letter of complaint Tyler Cooper's Managing Partner and a demand that the matter be reassigned to another lawyer. Exh. A (attached).

1

on summary judgment, it would grant a motion for judgment as a matter of law.  Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003).

**I.      The Record Cannot Support Plaintiff's Claim Of Disparate Treatment Based on a Tangible Employment Action.**

In the Second Circuit, a plaintiff may establish discrimination based on disparate treatment through a tangible employment action or through a hostile work environment.  See Galvez v. The New York Mortg. Co., No. 05 Civ. 2365 at *4 (S.D.N.Y. 2005) (copy attached); Feingold v. New York University, 366 F.3d 138 (2d Cir. 2004); Goldschmidt v. New York State Affordable Housing Corp. 380 F. Supp.2d 303, 310 (S.D.N.Y. 2005).  There is no question here that plaintiff voluntarily resigned her employment at SNET on May 16, 1997, giving two weeks' notice prior to her last day of work on May 30, 1997.  See Exh. 27 of Plaintiff's Exhibits ("Pl. Exhs.") at ¶ 22.  Piecing together different arguments in plaintiff's Opposition, she appears to claim she suffered three tangible employment actions:  an involuntary "transfer," a "disciplinary reprimand," and an alleged constructive discharge.  See Opp. at 23-28, 33-35.[2]

Where a plaintiff seeks to make out a case of employment discrimination by pointing to disparate treatment of one or more similarly situated employees outside of the protected class, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated; such an employee must be similarly situated in all material respects.  Drummond v. IPC Intern., Inc., F.Supp.2d, 2005 WL 3078504 (E.D.N.Y. 2005).

---

[2]      Although plaintiff co-mingles adverse employment actions with her hostile work environment claim, arguing that "discrete adverse actions are not necessary to establish an actionable hostile work environment claim," these are properly two separate concepts.  Pl. Opp. at 16.  Throughout this case, SNET has sought to clarify whether plaintiff was proceeding both on a hostile work environment claim or on a claim of disparate treatment through a legally cognizable tangible employment action, or both.

SNET strongly disagrees that plaintiff has produced admissible and probative evidence that she suffered disparate treatment in the form of a tangible adverse employment action.

### A.    "Disciplinary Reprimand"

Plaintiff first argues that "the disciplinary reprimand . . . is unquestionably an adverse action." Pl. Opp. at 33. She does not identify what she claims constituted a "disciplinary reprimand," much less how such a disciplinary reprimand would constitute an adverse employment action under the law of this Circuit. See Pl. Opp. at 33. SNET assumes plaintiff is referring to the sole discipline that plaintiff received in the year in which Matthew Cordner was her supervisor, the verbal warning for failing to lock her SNET truck with tools and cash in it while parked in the SNET garage. See Verbal Warning, Exh. 11 of Pl. Exhs.

However, the record reveals the following undisputed facts with respect to this verbal warning: During the relevant time, SNET had a policy requiring service technicians to keep their vehicles locked whenever the vehicles were unattended. Def. Exhs. 1, 6; Cordner Aff. ¶¶ 11, 12. During the time when plaintiff worked with Mr. Cordner, the policy stated, "[I]f unattended, [company] vehicle[s] should be secured by locking doors and windows." Exh. 1 of Pl. Exhs., Cordner Aff. ¶ 11. Similarly, the policy entitled "Safeguarding Procedures for Services Technicians and Public Services Assistants," which plaintiff signed in 1994, stated that the procedure included "[c]losing all windows, locking all doors and removing of ignition key when leaving vehicle unattended." Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment ("Def. Exh.") 6 (authenticated at Cordner Aff. ¶ 28). That policy also stated that violation of the procedure was "sufficient cause for disciplinary actions up to and including dismissal . . . ." Def. Exh. 6. Part of the reason for the policy was that coin boxes were "often"

3

left in the company vehicles overnight in the garage, to be unloaded the next morning. See Pl. Dep. Vol. II at 38-40.

In early March 1997, in a routine check of all of his technicians' vehicles in the garage, Mr. Cordner discovered that three of his technicians' vehicles were unlocked and he counseled all three of them individually about the need to lock their vehicles. Cordner Aff. ¶ 12; Cordner Dep. at 77. Plaintiff was one of the employees, and the other two were men. Id. Subsequently, Mr. Cordner found plaintiff's company truck unlocked on two more occasions and counseled her each time. Cordner Aff. ¶ 13. Finally on March 17, 1997, Mr. Cordner found plaintiff's vehicle's rear cargo door unlocked, and after this fourth time gave plaintiff a documented verbal warning. Cordner Aff. ¶ 13. When Mr. Cordner checked the vehicles of the other two (male) technicians in a follow-up inspection, he found them locked. Cordner Aff. ¶ 14. At this time, plaintiff had left open access to company tools, supplies, and a coin box with cash in it. Def. Exh. 2; Cordner Aff. ¶ 13. Plaintiff does not dispute that she left her truck unlocked and that there were tools, supplies, and a coin box with cash in it in the unlocked rear cargo area. Pl. Dep. Vol. II at 67-68. Nor does she dispute that a documented verbal warning is the first and lowest step of discipline in the progressive discipline policy in the collective bargaining agreement and lasts for only six months. Def. Exh. 13; Pl. Dep. Vol. II at 65. Mr. Cordner took no further action with regard to this or any other incident involving plaintiff's truck. Plaintiff does not identify any male technician whose truck Cordner found unlocked but was not treated similarly. As a result, there is no comparator identified by plaintiff, a fact which is fatal to her claim of discrimination.

Plaintiff does not dispute that she regularly left her truck unlocked or that she left it unlocked on the day that led to her verbal warning. Pl. Dep. Vol. II at 66-68; Pl. Dep. Vol. I at 28-30. Plaintiff further acknowledges that on previous occasions, equipment had been stolen out

4

of her truck and that she was not disciplined on those occasions. Pl. Dep. Vol. I at 121-24, 132. Plaintiff admits she never told Matt Cordner there was a problem with the lock until after she received the verbal warning. Pl. Dep. Vol. II at 59-60. Plaintiff received the verbal warning only after Mr. Cordner had found her truck unlocked for the fourth time. Cordner Aff. ¶ 14. Moreover, plaintiff admits she was still able to lock her rear cargo door by "physically put[ting] the key in to lock it" even though she claims the knob was broken. Pl. Dep. Vol. II at 40-41.

In addition to the above undisputed facts, plaintiff does not and cannot claim that there were <u>any actual negative consequences</u> to her of having a handwritten piece of paper in her personnel file entitled Documented Verbal Warning. Under these circumstances, the Documented Verbal Warning, attached as Exh. 11 to Pl. Exhs., given to her with no consequences in the terms and conditions of her employment, cannot be a tangible employment action as a matter of law. Moreover, given the undisputed identical treatment of male and female technicians with respect to this event, plaintiff cannot establish disparate treatment based on sex with respect to the verbal warning. <u>See</u>, <u>e.g.</u>, Exh. 20 to Pl. Exhs. (Documented Verbal Warning issued to male co-worker David Ianiello on May 19, 1997).

### B.    Involuntary Transfer

Plaintiff's argument that "analogizing the denial of a satellite office to a refusal of a transfer, as SNET has done, is useful, for looking at it that way, there is case law aplenty establishing that a transfer or location assignment that is unwanted may be an actionable adverse action" is unavailing. <u>See</u> Pl. Opp. at 34. The response is simple and beyond dispute: <u>plaintiff was not transferred</u>. Instead, plaintiff claims that SNET should have opened a new satellite office for her in North Madison, because she wanted it to, and because her commute time would be reduced by 10-15 minutes in the event no other technician with more seniority than she had

were to bid for this office location. Pl. Opp. at 4-5, 34. It is entirely speculative whether she would have gotten a new assignment to North Madison, even if the company had agreed to open an office there, because, as a member of the bargaining unit, such positions were assigned based on preference in seniority order.

The case law plaintiff's seeks to rely upon addresses transfer to an unwanted location as potentially actionable under circumstances tending to support a claim of discriminatory motive, whereas described below, the plaintiff simply requested a transfer to a location that was inappropriate considering her position, and was offered a transfer to a nearby facility as a reasonable attempt to satisfy her request. The plaintiff cannot credibly analogize a line of cases regarding an unwanted transfer to SNET's decision not to grant her request that it open a new office so that she might qualify to transfer there voluntarily. It is readily apparent that the plaintiff could find no case law supporting her position in this matter and is attempting to re-cast the facts to fit under a completely different theory by tying her situation to case law simply by noting both cases dealt with transfers. This is insufficient to survive summary judgment.

With respect to the satellite office, SNET has provided the following facts, supported by evidence in the record, and plaintiff has not disputed any of it with any contradictory evidence:[3] Plaintiff admits that there was no coin office in North Madison and therefore no position for a coin technician to transfer to there; she also has no reason to believe that any male employee of

---

[3]    Notably, in her Complaint, plaintiff claimed that SNET should have transferred her to SNET's satellite office in <u>Madison</u>, not that it should have set up a <u>new</u> office in <u>North Madison</u> for her. <u>See</u> Complaint at ¶ 12(a). Plaintiff appears to have abandoned her original claim with respect to a Madison office and attempts instead to set out an entirely different claim with respect to opening a North Madison office. First, any claim concerning setting up a new office in North Madison should not be considered, because it was not pled in the Complaint. Second, the claim cannot show disparate treatment based on gender as a matter of law, inasmuch as even plaintiff's unsupported arguments here do not include any claim that a similarly situated male wanted an new office set up for him in North Madison and that his request was granted. In fact, since there was never a North Madison office, no such claim could be made.

the coin group has ever been allowed to satellite out of North Madison. Pl. Dep. Vol. II at 88. She admits that the only reason she believes Mr. Cordner's actions with respect to a satellite office were discriminatory is that she believed (but was not sure) each of her two prior supervisors had "approved" such an office, and because she had "discussed it" with them. Pl. Dep. Vol. I at 68. Admittedly neither of her prior supervisors set up such an office in the years they were her supervisor. There is no evidence of a tangible employment action by Cordner, much less a tangible employment action motivated by gender. Based on the clear record this case, any claim of disparate treatment based on failing to be transferred to a non-existent satellite office in North Madison fails as a matter of law.

Moreover, it is undisputed, and plaintiff has acknowledged, that her prior male supervisor, Pat Kinsella (who plaintiff does not believe discriminated against her), did not allow her to make such a move either for the more than six years that she asserts he was her supervisor before Matt Cordner. Pl. Dep. Vol. I at 31; Pl. Dep. Vol. II at 81. Mr. Cordner was plaintiff's supervisor only from July 1996 to May 1997, and plaintiff was out on a leave of absence for two months of that period. Plaintiff admits that Mr. Cordner gave plaintiff the alternative opportunity to work out of a Guilford satellite office in 1996, but she turned it down and continued to report to the New Haven garage. Pl. Dep. Vol. I at 66-67.

### C.    Constructive Discharge

#### 1.    A Constructive Discharge is Not a Tangible Employment Action in this Circuit.

The law is clear in the Second Circuit that a constructive discharge does not constitute a "tangible employment action" as that term is used in <u>Burlington Inds., Inc. v. Ellerth</u>, 524 U.S. 742 (1998), and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998). <u>Caridad v. Metro-North Commuter Railroad</u>, 191 F.3d 283 (2d Cir. 1999). This is because "a tangible employment

decision requires an official act of the enterprise, a company act . . . ." <u>Caridad v. Metro-North Commuter Railroad</u>, 191 F.3d 283, 294 (2d Cir. 1999). In addition, "unlike demotion, discharge, or similar economic sanctions, an employee's constructive discharge is not ratified or approved by the employer." <u>Caridad</u>, 191 F.3d at 294. For these reasons, a constructive discharge cannot be a tangible employment action in this Circuit as a matter of law.

### 2.    The Record Cannot Support a Claim of Constructive Discharge Under Connecticut Law.

In addition to the above, there is no genuine issue of material fact that would entitle the plaintiff to a trial on her claim of constructive discharge. Plaintiff seems to argue that summary judgment should not be granted as to a constructive discharge claim because "it was reasonable for her to have felt compelled to quit." Pl. Opp. at 2. But plaintiff's description does not properly reflect the standard for constructive discharge in this state.

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have <u>felt compelled to resign</u>." <u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 128 (2d Cir. 2003) (emphasis added) (quoting <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 73 (2d Cir. 2000)). To prevail on a claim of constructive discharge, a plaintiff must show "deliberate action on the part of the employer . . . . [S]omething beyond mere negligence or ineffectiveness is required." <u>Whidbee</u>, 223 F.3d at 73. The first issue is whether the conduct alleged rises to the level of a constructive discharge in the first instance, and the second is whether there was deliberate action on the part of the employer company that forced the plaintiff to resign. <u>Mack</u>, 326 F.3d at 128. Where the company "immediately began an investigation" following a complaint and took appropriate

action thereafter, there can be no constructive discharge. See id. In addition, the law is clear that a disagreement with management over the quality of an employee's performance will not suffice to establish a constructive discharge. See, e.g., Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993).

Although plaintiff discusses the law of constructive discharge, she avoids making in any part of her Opposition a plain and direct statement, supported by the record, of exactly what she claims constituted a constructive discharge. That is because, when stacked up against cases in which summary judgment has been granted on constructive discharge claims, plaintiff's evidence falls far short of enabling a reasonable factfinder to conclude that she was constructively discharged. See discussion of plaintiff's complaints at pp. 19-34, infra.

Plaintiff cites only two cases that she claims support her argument that she has set forth probative evidence that raises a genuine issue as to her constructive discharge claim. First, in the Second Circuit case of Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996), the Second Circuit found that there was enough evidence in the record to support an actual discharge, as the plaintiff had submitted evidence to the District Court that the employer had taken a number of adverse employment actions against her, including negative performance evaluations, putting her on pre-probation status, putting her on probation, and announcing to her that it intended to terminate her employment. Id. at 88. In addition, Chertkova's supervisor yelled at her in insulting terms and told her: "What do you hope for? Do you think you are going to outlive us? There is no chance! You are not going to be here!" and "mocked" her when she attempted to explain she was at the bottom of the pay range for her position. Id. at 89. Although plaintiff successfully completed probation, she was "told she would be fired immediately if, over the course of two years, she did not maintain satisfactory performance

levels, demonstrate satisfactory behavior, and improve her listening skills, which might be viewed as using her undoubted technical competence at work so long as she only listened and never spoke." Id. at 89. The facts in Chertkova were much more extreme and compelling than in the present case.

In the second case relied upon by plaintiff, Holtz v. Rockefeller & Co., Inc., 258 F.3d 62 (2d Cir. 2001), the plaintiff alleged that her supervisor physically touched and grabbed her daily and made sexually inappropriate statements to her. Id. at 70. In addition, the plaintiff claimed that she was reprimanded for complaining about being harassed by her supervisor. Id. The Court concluded that the alleged conduct was both objectively and subjectively offensive such that a jury could conclude that a reasonable person would find it hostile or abusive and the victim did in fact perceive it to be so. Id. at 76. Unlike the allegations in the present case, the conduct alleged in Holtz was unquestionably more severe and pervasive. The facts of Holtz in no way resemble plaintiff's allegations -- much less her proof -- and thus the court's conclusions have no bearing on the instant case.

Finally, in Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003), the plaintiff set forth evidence demonstrating that despite his seventeen years of experience in his job and excellent credentials, he was passed up for two promotions to vacancies that were filled by less senior and less qualified individuals who were either younger and/or of a different race. Id. at 138-40. The plaintiff also established strong evidence that he suffered retaliation based on his complaint of discrimination. Id. at 141. Thus, the Court's conclusion that the plaintiff had established a prima facie case and that summary judgment was not proper was based on ample evidence of both age-based and racial discrimination. As with the previous two cases, the plaintiff in Terry set forth demonstrable evidence of both discrimination and retaliation. The plaintiff in the present case

has not established that she suffered from harassment of any kind, let alone harassment as severe and pervasive as that demonstrated in <u>Terry</u>, <u>Holtz</u>, and <u>Chertkova</u>. Thus, contrary to plaintiff's assertions, those cases are not analogous to the instant case and they have no bearing on the outcome of the present motion.

## II.    The Fact That Certain of Plaintiff's Claims are Time-Barred Was Properly Raised.

Plaintiff complains that SNET never raised "an issue of timeliness with respect to Evarts' claims under federal and state law." Pl. Opp. at 7. That statement is incorrect. In SNET's Answer and Affirmative Defenses dated September 18, 2000, SNET clearly raised as its Fourth Affirmative Defense that "[p]laintiff's claims are barred, in whole or in part, by the applicable statute(s) of limitations." Plaintiff offers no legal authority for an assertion that SNET was required to do anything else to raise and preserve this statute of limitations defense. Moreover, to the extent plaintiff claims SNET was obligated to argue to the Connecticut Commission on Human Rights and Opportunities ("CHRO") at the agency level that certain of the events should be stricken from the administrative charge based on untimeliness, it is common knowledge that the CHRO will not dismiss specific allegations in a piecemeal fashion but takes the position that it only has authority to dismiss a charge in its entirety or retain it in its entirety. Thus, a claim by SNET to the CHRO that certain of the events alleged were time-barred would have been futile before the CHRO. It raised this affirmative defense promptly in the present action.

### A.    Plaintiff's Claim Regarding Failure to Open a New Office is Time-Barred.

Plaintiff's claim that she was denied the ability to "transfer to SNET's `satellite office' in Madison, Connecticut," Complaint at ¶ 12(a), is time-barred under both Title VII and the FEPA. Under Title VII, a plaintiff is required to file a charge of discrimination within 300 days of the date on which the alleged act occurred. 42 U.S.C. § 2000e-5(e)(1); <u>see also</u> <u>National Railroad</u>

11

Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002).  Similarly, under the FEPA, a plaintiff must file a charge of discrimination within 180 days of the time the alleged conduct occurred. Conn. Gen. Stat. § 46a-82 (e).  In the present case, it is undisputed that plaintiff dually filed her charges of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on November 17, 1997.  See Def. Exh. 14 (CHRO Complaint); Exh. B (attached) (EEO Complaint).  Accordingly, plaintiff can only recover on her Title VII claim for conduct occurring **on or after January 21, 1997** (300 days prior to November 17, 1997).  Plaintiff can only recover on her FEPA claim for conduct occurring **on or after May 21, 1997**[4] (180 days prior to November 17, 1997).

According to plaintiff's complaint filed with the CHRO, plaintiff was informed in mid-to-late 1996 that SNET had decided not to open a satellite office in North Madison.  Complaint at ¶12(a).  This event is alleged to have occurred long before both January 21, 1997 and May 2, 1997.  Thus, the claim regarding SNET's failure to open a new satellite office is substantively time-barred and cannot be considered on summary judgment.

**B.    The Satellite Office Claim Cannot be Saved by a Continuing Violation Theory.**

Recognizing the staleness of such a claim, the plaintiff now attempts to save it by relying on the "continuing violation" exception allowed in certain cases.  She claims that SNET's failure to open a satellite office was part of a continuing pattern of discrimination based on her sex.

**1.    The Plaintiff Did Not Plead a Continuing Violation Theory.**

The Second Circuit has made clear that

When employees are hired or refused employment pursuant to a continuous

---

[4]  With respect to this date, SNET's Memorandum contained a typographical error, leaving out the "1" in the date of May 21, 1997.  SNET apologizes for any confusion this may have caused. See Def. Mem. at 21.

> practice and policy of discrimination, the commencement of the statute of
> limitations period may be delayed until the last discriminatory act in furtherance
> of it, provided such a continuing violation is clearly asserted both in the EEOC
> filing and in the complaint.

Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 25 (2d Cir. 1985) (internal citations omitted) (emphasis added).    A plaintiff may rely on a continuing-violation theory to avoid having his claim time-barred "provided such a continuing violation is `clearly' asserted both in the EEOC filing and in the complaint." Miller v. Int'l Tel. and Tel. Corp., 755 F.2d 20, 25 (2d Cir.), cert. denied, 474 U.S. 851 (1985); Cavallaro v. Corning, Inc., 93 F.Supp.2d 334, 339 (W.D.N.Y. 2000) (emphasis added); see also Scott v. Federal Reserve Bank of New York, 704 F. Supp. 441, 450 (S.D.N.Y. 1989 (failure to plead continuing violation exception in plaintiff's EEOC charge and his court complaint was a "fatal procedural flaw" because "in this Circuit the continuing violation exception must be asserted clearly both in the EEOC charge and in the complaint.")    Where a plaintiff does not specifically allege a continuing violation in his administrative charge and in his complaint, the District Court may not consider claims that extend beyond the 300-day limitation. Cavallaro, 93 F.Supp.2d at 339. Because plaintiff did not allege a continuing violation theory in her EEOC charge, CHRO charge, or her Complaint in this case, she may not argue such a theory in opposition to summary judgment. See Def. Exh. 10; Def. Exh. 14; Exh. B (attached); and District Court Complaint.

### 2.    A Claim of Continuing Violation Would Fail on the Record of This Case.

Second, plaintiff's claim for a continuing violation is entirely misplaced.  Even if the plaintiff had satisfied the procedural requisite by alleging a continuing violation in her EEOC Charge and her Complaint in this action -- neither of which she has done -- the continuing violation theory would not apply to the substantive allegations plaintiff tries to make.

13

"[T]he continuing violation doctrine is disfavored in [the Second] Circuit and will be applied only upon a showing of compelling circumstances." <u>Lloyd v. WABC-TV</u>, 879 F. Supp. 394, 399 (S.D.N.Y. 1995); <u>Buckvar v. City of New York</u>, No. 98 CIV. 3106, 2000 WL 274195 (S.D.N.Y. Mar. 13, 2000) (copy attached). "The theory of continuing violation must be guardedly employed . . . because within it are seeds of destruction of statutes of limitations in Title VII cases." <u>Kilpatrick v. Riley</u>, 98 F. Supp.2d 9, 15 (D.D.C. 2000).

The Second Circuit has repeatedly held that the continuing violation doctrine applies only to incidents that are shown to result from a common policy of discrimination. "Multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." <u>Rutkowski v. Sears Roebuck Corp.</u>, No. 99-9219, 2000 WL 354223 at *3 (2d Cir. April 6, 2000) (copy attached) (quoting <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 765 (2d Cir. 1998); <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708 (2d Cir. 1996); <u>Arnold v. United Int'l Video Stores, Inc.</u>, 1994 U.S. Dist. LEXIS 20770 (D. Conn. 1994)). "The continuing violation exception applies where there is evidence of specific discriminatory practices, such as the repeated use of discriminatory seniority lists or employment tests." <u>Lightfoot v. Union Carbide Corp.</u>, 110 F.3d 898, 907 (2d Cir. 1997). It does not apply to a series of discriminatory acts that are not part of an established policy or practice.

Involuntary terminations, discriminatory evaluations, demotions, and failures to promote or hire are generally discrete actions that "cannot be lumped together" under the umbrella of a continuing violation theory. <u>See Lightfoot</u>, 110 F.3d at 907 ("Completed acts such as a termination through discharge or resignation, a job transfer, or discontinuance of a particular job assignment are not acts of a 'continuing nature'" and do not support a continuing violation

theory); <u>McKinney v. Eastman Kodak Co.</u>, 975 F. Supp. 462, 468 (W.D.N.Y. 1997) (plaintiff's claim that her important job duties were reassigned to other employees, that she was forced to correct errors by others, and that the co-worker who made the errors was praised despite her complaints "show[ed] nothing more than discrete instances of alleged discrimination, and [fell] far short of the kind of policy or practice that must be shown to establish a continuing violation"); <u>Wingfield v. United Techs. Corp.</u>, 678 F.Supp 973, 979 (D. Conn. 1988) (no continuing violation where plaintiff had been downgraded, demoted, and deprived of a promotion on four separate occasions).

It is not enough for a plaintiff opposing summary judgment to assert the existence of a continuing violation through a discriminatory policy; supporting evidence must be produced. <u>Lightfoot</u>, 110 F.3d at 907. As the Second Circuit held in <u>Lightfoot</u>, a plaintiff's own statement that the denial of a pay-grade increase, his several demotions, and his subsequent termination were "part of an ongoing policy of 'victimizing' older employees" was not probative evidence and could not raise a triable issue on his continuing violation claim. <u>Lightfoot</u>, 110 F.3d at 907.

Similarly, it is not enough for a plaintiff to claim that several alleged discriminatory incidents were related because they "culminated" in his termination or constructive termination. <u>See Ortiz v. Prudential Ins. Co.</u>, 94 F. Supp.2d 225, 233 (D. Conn. 2000) (no continuing violation where plaintiff alleged a number of discriminatory practices over several years by various managers that he claimed culminated in his termination).

Here, plaintiff claims that in the summer of 1996, her supervisor, Matt Cordner, did not authorize the opening of a new satellite office for her. Def. Exh. 10 (CHRO Complaint) at ¶ 3. The next event of which she complains allegedly occurred six months later; she alleges that in January, 1997, a male co-worker received a new truck when she had been "promised" one.

15

Given the separateness of these alleged events and the passage of time between them, they cannot be lumped together (and thus the satellite office claim saved) by the continuing violation theory. Moreover, learning that SNET would not open a satellite office in North Madison is not the sort of event that could support a continuing violation that would include plaintiff's later allegations. Discrete and isolated events such as these should each have put plaintiff on notice of any alleged discrimination claim she now tries to make and should have been brought in timely EEOC and CHRO charges at the appropriate time. See Wingfield, 678 F.Supp. at 979-81.

While plaintiff attempts to rely on Amtrak v. Morgan, 536 U.S. 101 (2002), to support her continuing violation claim, she has failed to refer to the portion of Morgan in which the Court expressly stated that the denial of a transfer – such as the denial of a transfer to a satellite office in Madison -- is a *discrete act*, and thus *cannot* be saved from being otherwise time-barred by a claim of a continuing violation. A plaintiff "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." Id. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." Id. at 113. Morgan weighs heavily against a continuing violation theory as applicable to this case. There is no question that SNET's decision not to open a satellite office in North Madison --  thus not permitting plaintiff to apply for a transfer there -- was a discrete act and thus cannot fit within the narrow definition of a continuing violation.

## III.    The Record Cannot Support a Claim of Discriminatory Harassment Based on Gender.

Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Harris v. Forklift, Sys., Inc., 510 U.S. 17, 21 (1993)).

Plaintiff makes clear in her Opposition that her discrimination claim is based primarily on a claim of hostile work environment. "To establish a cause of action for hostile work environment sexual harassment, [a plaintiff] must prove (1) she 'belongs to a protected group,' (2) she was sexually harassed; (3) the conduct was based on [the plaintiff's] gender, (4) the conduct was unwelcome, and (5) 'the harassment affected a term, condition, or privilege' of [plaintiff's] employment." Ottman v. City of Independence, Mo., 341 F.3d 751, 759 (8th Cir. 2003). "Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Howard v. Burns Bros., Inc., 510 U.S. 17, 21 (1993)). Relevant factors for determining whether conduct rises to the level of abusiveness include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

The Supreme Court has "made it clear" that "conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998) (explaining only "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive" is actionable under Title VII).

Plaintiff's Opposition makes it abundantly clear that her hostile work environment claim fails on summary judgment for three reasons: (1) plaintiff's proof does not rise to the level of "severe or pervasive harassment," (2) there is no evidence that plaintiff was harassed because of

17

her gender, and (3) plaintiff unreasonably failed to take advantage of remedial procedures SNET had in place.

"As a general matter, isolated remarks or <u>occasional episodes of harassment</u> will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or <u>with regularity that can reasonably be termed pervasive.</u>" <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998) (emphasis added, citations and internal quotation marks omitted).

In opposing a motion for summary judgment, there is no question that it was plaintiff's burden to present <u>probative and admissible evidence</u> to establish each element of her claims. <u>Celotex Corp. v Cattrett</u>, 477 U.S. 317, 322-23 (1986). In opposing a motion for summary judgment, a plaintiff may not rely on conclusory statements of a party or counsel, or mere contentions that the evidence in support of summary judgment is not credible. <u>See Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993). SNET has searched through plaintiff's Opposition to identify all purported "facts" which plaintiff's counsel claims supports plaintiff's hostile work environment claim. Here, there is a marked contrast between the <u>evidence</u> in this case and plaintiff's counsel's purported descriptions of the evidence in the case.

## A.    <u>Ride-Along Exercise – February 1997</u>

Plaintiff raises a ride-along exercise on which her supervisor accompanied her on February 6, 1997. Exh. 8 of Pl. Exhs. As to the ride-along exercise, the evidence in the record is as follows: Shortly after plaintiff returned to work, Mr. Cordner went on a "ride-along exercise" with her, which is when a supervisor of a field employee spends a day or part of a day with a technician "riding along" with him/her and offering constructive feedback. At her deposition, plaintiff described a ride-along exercise as follows: "they [supervisors] just ride with

you in the truck and they follow you around to your jobs and watch you do your work." Pl. Dep. Vol. I at 86.[5]   Although plaintiff complains in this case about Mr. Cordner observing her performance in this way after she returned from her leave of absence, she acknowledges that she did not receive any kind of warning, discipline, or significant criticism that she can recall as a result of the ride-along exercise.[6]   Pl. Dep. Vol. I at 91; Pl. Dep. Vol. II at 122-23.   Although she admits her work performance was not up to par at that time because of her recent absence, she acknowledges that she has no basis for believing that Mr. Cordner criticized her performance based on the ride-along.   Pl. Dep. Vol. II at 122-23.   She did not receive any warnings based on the exercise, and in response to questions about whether Mr. Cordner was unfair to her in any way during the exercise, she responded only that she thought he was "picky" when he suggested taking a shorter route to one of her job sites.   Pl. Dep. Vol. II at 122-123.

There is absolutely <u>no evidence</u> in this case that would refute the above facts or the legitimate business reason why Mr. Cordner decided to ride along with plaintiff after she had returned to work on February 6, 1997.   In fact, plaintiff's own exhibits indicate that male technicians Stephen Boisvert, David Starling, Joshua Brown, Andrew Jackson, and David Ianiello[7] had riding exercises with their supervisors.   Exhs. 7 and 8 of Pl. Exhs.   The only other

---

[5]   Unless otherwise noted, citations to deposition testimony refer to transcript pages attached to Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment filed on June 20, 2005.

[6]   To the extent that plaintiff's self-serving affidavit filed in opposition to summary judgment contradicts her sworn testimony at her deposition, such affidavit statements are inadmissible on a motion for summary judgment and may not be considered.   Notably, in her affidavit to the CHRO in 1997, she complains only about feeling it was "inappropriate bad timing" for Cordner to ride along with her but did not complain about being criticized or any sort of bad conduct during the exercise.   See Def. Exh. 14 ¶ 7.

[7]   Although all five were technicians in the Payphone Services Group, David Ianiello was the only one who reported to Matt Cordner.   Mr. Ianiello had been a technician since 1995, and thus

19

technician to be deposed, David Ianiello, testified that Cordner's predecessor, Pat Kinsella, did a ride along exercise with him in January 1996. Ianiello Dep. Vol. I at 30-31, 35 (attached). He did not consider the ride-along exercise to be punitive or harassing, but described a ride-along as an opportunity for the supervisor to show him how to deal with certain problems with the phone repairs. Ianiello Dep. Day I at 31-32, 71 (to have a ride-along exercise with a technician including the plaintiff, would not have been discriminatory.) (attached). Mr. Ianiello also recalls Mr. Cordner doing a ride-along exercise with him in 1997. Ianiello Dep. Day I at 33 (attached). There is absolutely no evidence that Mr. Cordner rode along with plaintiff because of her gender, and plaintiff offers none. Last, a supervisor riding with a subordinate is not an adverse employment action, and simply riding along with an employee, when no disciplinary action or other result occurs, cannot be the basis for a claim of sex discrimination.

Plaintiff's counsel also argues in her Opposition,

> Again, while Cordner characterizes this [ride along exercise] as an effort to `help' Evarts, Evarts saw it differently. He was picky and critical and she in fact questioned why he was doing it so soon after her sister's death. It is uncontested that, although SNET claims to have a policy of monthly evaluations, to the extent it even did have such a policy, it hardly was followed as evidence by Exhibits 6, 7, and 8. (Showing only one ride-along in Evarts crew in 1995, one in 1996 and, under Cordner's management, only one in 1997, which was Evarts.

Pl. Opp. at 22. Again, there is no citation to the record for any of these statements. Mr. Cordner testified that "a ride-along is used to coach or help any and all technicians." Cordner Dep. (attached) at 62. He took the time to ride along with her after her leave of absence "to hopefully get her back on track and help her out in any way that we can alter the situation [with her sister]

---

he had been in the position for two years. Ianielo Dep. Day I at 14-15 (attached). As indicated in plaintiff's Exhibits, in 1997, Mr. Cordner also did riding exercises with the following male technicians who reported to him: David Ianiello, Lou Marino, Robert Bock, Rick DellaVolpe, David Kapral, and Robert Reiss. See Exh. 8 of Pl. Exhs.

that she was just put through." Cordner Dep. (attached) at 69-70. He thought it would help her get re-acquainted with the job. Id.

In fact, Cordner's testimony is consistent with plaintiff's purported belief that riding exercises were generally used with employees who were new or at least not so familiar with the job, see Pl. Opp. at 22. This is consistent with Cordner's attempts to help plaintiff re-familiarize herself after being away from work for three months during her leave of absence. Plaintiff has produced nothing to call that legitimate business reason into question, much less to establish that going on a riding exercise was an adverse action of any sort. This purported event simply cannot support a claim of hostile work environment gender-based harassment.

### B.    Locked Vehicle – March 1997

During the eleven months that Mr. Cordner was plaintiff's supervisor, plaintiff claims that he yelled at her once in the SNET garage, when he gave her a verbal warning about failing to lock her vehicle. Even if this had occurred as plaintiff alleges, she does not claim – because she does not know – whether Mr. Cordner yelled at any male technician during the same period. See Ianiello Dep Day I at 26-27 (attached) (technicians were together in garage only for about a half hour in the morning before going into the field). In fact, the record indicates that co-worker David Ianiello in fact brought a claim against SNET based on Mr. Cordner's alleged treatment of him during the same period including alleged "harassment" and "intimidation." The alleged incident of "yelling"[8] at plaintiff purportedly occurred after plaintiff told him for the first time that, notwithstanding that he'd spoken with her about the same issue four times before, the lock

---

[8]   Notably, the sole technician whose deposition was taken, co-worker David Ianielo, testified that he never heard any shouting between Cordner or plaintiff, or verbal fights of any sort. Ianielo Dep. Day I at 26-27 (attached).

21

on her rear cargo door was broken and she had never told him about it. Pl. Opp. at 24. In an attempt to exaggerate the record, plaintiff's counsel states in her Opposition,

> [t]here was an element of physical intimidation in Cordner's conduct in connection with his issuance to Evarts of a disciplinary reprimand for alleged failure to lock her vehicle. According to Evarts, when she confronted Cordner with documentary proof from SNET mechanics that the locking mechanism on the rear cargo door of her truck was broken and that the delay in repair waw [sic] due to the misplacement of ordered parts by mechanics, Cordner engaged in a near-violent temper tantrum and `screamed at the top of his lungs' in Evarts' face . . . Exh. 27 at ¶ 11; see also Def.'s Exh. 14 ¶ 9.

Of the two citations offered in support of this narrative, Exhibit 27 is plaintiff's self-serving affidavit in which she states some of the same allegations as set forth above. Defendant's Exhibit 14 is plaintiff's statement in the form of her complaint to the CHRO in 1997; it says nothing about physical intimidation or a "near-violent temper tantrum."

With respect to the locked vehicle incident, the underlined record actually establishes the facts set forth above. See pp. 3-5 supra. Plaintiff offers no argument, much less admissible evidence, to dispute any of those facts.

Plaintiff also argues that,

> Evarts also testified that male crew members left their trucks unlocked all the time and, in her presence, SNET managers saw this.

Pl. Opp. at 18. Plaintiff offers no citation to the record for this. This unsupported statement of counsel is clearly insufficient to defeat summary judgment. Notably, plaintiff carefully avoids attesting that she has personal knowledge that Mr. Cordner noticed male technicians' trucks unlocked but did nothing about it. Nor does she offer any evidence from any male technician that would support such a factual finding. Since plaintiff is claiming disparate treatment by Cordner, for this assertion to have any relevance she would have to produce evidence that Cordner knew about similarly situated male technicians failing to lock their vehicles at least four

times but failed to discipline them.  Mr. Cordner has attested to the opposite:  that he treated plaintiff the same as male technicians with respect to locking company vehicles.  Cordner Aff. ¶ 15; see also Ianiello Dep. Day I at 75-76 (attached) (recalling Cordner checking all technicians' trucks, not just plaintiff's, for security in March 1997).  It is undisputed that plaintiff and two male technicians were all warned about the same conduct at the same time, Cordner Aff. ¶ 12; Ianiello Dep. Day I at 77 (attached) and it is also undisputed that a male technician also received a Documented Verbal Warning for the same offense not long after plaintiff did.  See Exh. 20 of Pl. Exhs. (Documented Verbal Warning issued by Mr. Cordner to male technician David Ianiello).  In fact, later Mr. Ianiello was suspended by Cordner for the same repeated offense, clearly a much harsher level of discipline.  Ianiello Dep. Day I at 73 (attached).  In fact, Mr. Ianiello felt picked on and harassed by Cordner for this and other discipline given to him.  See Ianiello Dep. Day I at 80-82 (attached).  On the record before the Court, the plaintiff cannot support a gender discrimination claim based on her verbal warning for failing to lock her company vehicle after several warnings.

In addition to the fact that male technicians in Cordner's group were similarly disciplined, the record reveals two other undisputed facts that are absolutely fatal to a claim of different treatment/harassment because of gender based on the unlocked vehicle:  (1) plaintiff had been asked by Cordner multiple times to lock her vehicle, and she was clearly aware of his request when she continued to leave her truck unlocked in the garage; and (2) the documented verbal warning was the mildest form of discipline at SNET and resulted in no changes in the terms or conditions of plaintiff's employment.  See Ianiello Dep. Day I at 20 (attached) (verbal warning was first step in progressive discipline).  In fact, plaintiff signed a document reflecting the procedures for safeguarding company vehicles, including "locking all doors . . . when leaving the

vehicle unattended." Def. Exh. 6. While plaintiff may believe that there should not have been a rule requiring trucks to be locked in the garage, her disagreement with the company's requirements or her supervisor's enforcement of the requirements, is not probative of the pending motion for summary judgment. She clearly believes she should not have been required to lock her vehicle, since she persisted in leaving the truck unlocked even after being told to do so several times. Her disagreement with her supervisor's insistence on following the rules, to both female and male employees, is not a basis for denying summary judgment.

Plaintiff has provided no evidence demonstrating that Matt Cordner singled her out because of her gender to give her a verbal warning about leaving her truck unlocked on multiple occasions, which was in clear violation of SNET policy. It is a well established tenet of the Federal Rules of Civil Procedure that,

> [w]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e); see also Jones v. Denver Post Corp., 203 F.3d 748, 756 (10th Cir. 2000) (holding that, "generic and conclusory testimony" about other employees making similar errors and escaping discipline, with no testimony as to specific instances, is insufficient to demonstrate disparate treatment).

Plaintiff has provided nothing more than general, unsupported claims that other employees violated the policy regarding the locking of trucks. In her deposition, plaintiff merely made general statements that she could "guarantee" that other technicians left their trucks unlocked and that it was "just common practice" to leave trucks unlocked. Pl. Dep. Vol. I at 117 (attached). When asked to identify specific people who left their trucks unlocked in violation of

24

the policy, plaintiff said only that "almost everyone" did, and "for the most part they all left their doors unlocked and their windows down." Pl. Dep. Vol. I at 118 (attached). Plaintiff was unable to identify even *one* specific employee whose door was found unlocked by Cordner but who escaped counseling or verbal warning by Cordner. Thus, plaintiff's testimony is "wholly devoid of any specific instances of disparate treatment," and, accordingly, it does not suffice as a meritorious response to SNET's motion for summary judgment. Id.

Moreover, plaintiff's effort to identify an excuse for her outright refusal to follow her supervisor's multiple prior requests to lock her vehicle is to no avail: she admits that even though one of the locks on her truck was allegedly broken, she could nonetheless lock her vehicle using her key but simply declined to do so. Pl. Dep. Vol. II at 40-41.

With respect to the unlocked vehicle, plaintiff further argues that,

> Of greater import is the evidence that crew member Rick DellaVolpe failed to secure his vehicle (apparently while on the road) and in consequence some $500.00 worth of SNET-owned tools were stolen. DellaVolpe reported the incident to Cordner and admitted that tools were stolen in consequence of his failure to secure his vehicle. . . . DellaVolpe was not disciplined in any manner by Cordner.

Pl. Opp. at 18.

Once again, there is no citation to evidence for these propositions, much less admissible evidence on personal knowledge. This speculative argument cannot be considered on summary judgment. Even if it were considered substantively, plaintiff offers no evidence of (1) when this event allegedly occurred, (2) whether Mr. DellaVolpe had previously been warned at least three times about the same conduct, (3) whether Mr. DellaVolpe left his truck unlocked in the garage overnight, or (4) any circumstances whatsoever surrounding this alleged incident. Absent proof that Mr. DellaVolpe was "similarly situated" to plaintiff with respect to leaving his truck unlocked in the garage after three prior warnings, this conclusory statement of counsel cannot