raise a material dispute that would entitle plaintiff to a trial. In fact, the only evidence of this

event is Mr. Ianiello's testimony in which he indicates Mr. DellaVolpe lost his tools out of his

truck at or about the time that Ianiello was suspended, and this was <u>after</u> plaintiff had resigned

and left SNET. <u>See</u> Ianiello Dep Day I at 73-79 (attached). Moreover, Ianiello believed that

DellaVolpe <u>was</u> in fact disciplined after Ianiello complained, and he does not know whether the

incident occurred inside the SNET garage, and he does not know whether DellaVolpe had

previously been warned about an unlocked vehicle at all. Ianiello Dep. Day I at 73, 77-79, 104

(attached). From this record, the Court cannot consider Cordner's sworn statement that he

treated male and female technicians the same with respect to locking their vehicles to be a

material disputed fact.

### C.    Time Sheets – April 1997

Plaintiff argues that,

> There was sufficient evidence for jurors to conclude that Cordner obsessively scrutinized
> plaintiff's time records and subjected her to relentless criticism and intimidating
> counseling meetings while similarly situated males were not.

Pl. Opp. at 20. Plaintiff offers no citation to any evidence in support of this statement. Thus, it

may not be considered in opposition to summary judgment.

> While Cordner claims to have reviewed one or more males time records, the claim is
> simply not credible and moreover, there is absolutely no evidence to corroborate this.

Pl. Opp. at 20. Again, plaintiff's unsupported statement here clearly is not <u>evidence</u> and cannot

that could call into question in any respect Mr. Cordner's sworn testimony that, notwithstanding

his counseling, plaintiff continued to submit timesheets with multiple cross-outs, lunch recorded

at the same time every day regardless of when she took it, inaccurate codes, and blank spaces,

and that he also counseled a male technician about time sheets. Cordner Aff. ¶¶ 16-18.

Moreover, counsel's unsupported assertion that Mr. Cordner's testimony is not "credible" and

26

that SNET presented no "corroborating evidence" in addition to Cordner's testimony that he reviewed male employees' time records does not satisfy plaintiff's burden in opposing summary judgment:  to present probative, admissible evidence on each point she claims is materially disputed.  In fact, male technician David Ianiello, plaintiff's witness in this case, testified that he knew Cordner reviewed his time sheets and he signed them.  Ianiello Dep. Day I at 59 (attached).  Again, SNET has produced admissible evidence and plaintiff has not produced anything to contradict it.  On the record before the Court, a fact-finder could not reasonably conclude that Cordner treated plaintiff differently from male technicians with respect to her time records.

The absence of plaintiff's proof is particularly compelling where, as here, plaintiff apparently surreptitiously entered Mr. Cordner's office and looked through and copied time records of other technicians before she left SNET.  See Pl. Opp. at ¶¶ 25-28.  If she has any evidence both (1) that Mr. Cordner only reviewed her records – which is not true – and (2) that Mr. Cordner observed the same problems with time records of male technicians to the same degree as plaintiff's but did not speak with them about it – which is also not true -- she was required to produce such evidence in her Opposition papers.  She has not done so.[9]

With respect to time sheets, plaintiff further argued that,

> Evarts testified that a match between the DCWS forms and the handwritten time records was not possible for a variety of reasons, including mechanical problems with the `Huskies,' the immediacy of the information transmitted by the Huskie (while retrieving and preparing time records necessarily creates its own time gap) as well as the fact that crew customarily prepared their time sheets at the end of the day.  Even Cordner himself questioned why SNET was using two separate methods of time-keeping.  When asked why paper time records were required to be completed when in fact technicians' time accountings were instantly transmitted to SNET's data base by the Huskys, Cordner responded `that's a good question' and added that the practice had since been abandoned."

---

[9]  In addition to these problems with plaintiff's claim based on her supervisor talking with her about time records, such discussions were not discipline and are too minor to support a claim of discrimination.

27

Pl. Opp. at 20-21.

This is more of an attack on the wisdom of the departmental policy than it is any sort of evidence of gender discrimination. Again, first, plaintiff cites nothing in the record as <u>evidence</u> in support of any of the above narrative. Second, even if she had, it does not matter whether Cordner knew the company's reason for keeping separate handwritten time records, or agreed with them – much less whether the company had a good reason at all for keeping separate time records. The issue is whether asking plaintiff to keep reasonably accurate and neat handwritten timesheets created an atmosphere "permeated with sexual intimidation and ridicule," and whether Mr. Cordner required this because of plaintiff's gender. Mr. Cordner has testified that he treated male and female employees the same with respect to timesheets. Cordner Aff. ¶ 18. Plaintiff has produced nothing other than conjecture and speculation to call that testimony into question. In addition, there is nothing in Mr. Cordner's counseling that would suggest that gender was a motivation for talking with plaintiff about her inaccurate timesheets. <u>See</u> Def. Exh. 3.

**D.    <u>Cell Phone Suspension – Spring 1997</u>**

Plaintiff's attempts to distract from the factual record is nowhere more apparent than with respect to her claim that Mr. Cordner took away her cell phone to harass her because she is a woman. For thirty days during March-April, 1997, plaintiff's company cell phone was taken away for repeatedly violating the division's 300-minute/month limitation on usage. <u>See</u> Cordner Aff. ¶¶ 19-22. In its Memorandum, SNET set forth the legitimate business reason why plaintiff's company cell phone was taken away, specifically, that she persisted in exceeding the limitation on use of 300 minutes per month, even after multiple warnings. Def. Mem. at 9-10. It included a copy of the relevant cell phone records of plaintiff and her co-workers, and presented evidence

that Mr. Cordner also took away (twice) the cell phone of male co-worker, David Ianiello, once before plaintiff's cell phone was taken away in 1996 and again in July, 1997. Def. Mem. at 9; Cordner Aff. ¶ 23. There is no question that Mr. Ianiello also reported to Mr. Cordner during this period and that Mr. Cordner made the decision to remove Mr. Ianiello's cell phone, just as he had removed plaintiff's. SNET produced the phone records as evidence that Mr. Ianiello and plaintiff had far exceeded the cell phone usage of their co-workers. Def. Exh. 4, and testimony in support of these facts at Cordner Aff. ¶ 23. In light of such evidence, plaintiff's speculative statement that SNET suspended plaintiff's company cell phone for violating company policy "while other males who exceeded the alleged limit did not have their taken away" is wholly unsupported and insufficient to defeat summary judgment. See Pl. Opp. at 5-6. The records also support Mr. Cordner's sworn testimony that he also took away the cell phone of the male service technician, David Ianiello, had cell phone usage similar to plaintiff's. See Cordner Aff. ¶ 23; see also Ianiello Dep. Day I at 21-24 (attached) (Ianiello reported to Cordner and worked in plaintiff's group.) Moreover, plaintiff's cell phone was taken away for one month out of the year that she worked with Cordner; the main way technicians communicated with their offices and received and signed off from their assignments was by a hand-held computer known as a DCWS.

Having little to dispute, plaintiff appears to argue about a statement that she claims SNET made to the CHRO in 1998 (but did not make to this Court or in its summary judgment papers), specifically, that four male technicians had their phones taken away. In response to this argument that SNET did not make on summary judgment, plaintiff responds that "[t]hese technicians not only never worked for Matthew Cordner, but were in fact disciplined by another SNET supervisor." Pl. Opp. at 12. First, plaintiff offers only the statement of counsel and no evidence for such a statement. Second, what happened in the CHRO is beside the point. Third,

29

in its summary judgment papers, SNET did not even bring up these four additional male technicians and argued only that Mr. Cordner took away the cell phone of one male technician, David Ianiello, whom he supervised. Last, plaintiff's incessant accusations of "deception" are without any basis. Inasmuch as plaintiff has brought up the issue, and inasmuch as the claim is that the company discriminated against the plaintiff based on her gender, it is relevant to note that, as indicated in plaintiff's exhibits filed with her Opposition, the cell phone of male technicians Steven Boisvert, Mike Tobin, and Mark Richard were also taken away by the company for excessive cell phone usage in 1996-97 by other supervisors in the Payphone Services Department. Exh. 25 of Pl. Exhs. This statement is accurate and shows a consistent pattern of enforcement of the rules by the Payphone Services Department, regardless of gender.

### E.   New SNET Truck – January 1997

Plaintiff returned to work after her leave of absence on January 27, 1997. Cordner Aff. ¶ 10; Complaint ¶ 12b. She resigned less than four months later, on May 16, 1997. Def. Exh. 9. She claims in her Opposition that SNET "denied her a new work truck, although she was scheduled to receive one due to the aged and poor condition of her vehicle, while affording a new vehicle to a male co-worker whose vehicle was in better condition that Evarts'." Pl. Opp. at 5. Plaintiff complains that a male technician received a new truck in January 1997 (apparently while she was out on her leave of absence) and complains that "she too was in line for a new vehicle." Complaint at ¶ 12(c). This is all plaintiff says about the "work truck" and she cites nothing in the record to support the statement above. Mr. Cordner has testified that he had nothing to do with decisions concerning giving technicians new trucks, and that such decision were made exclusively by the SNET motor vehicle department based on factors such as mileage,

age, general condition, etc. Cordner Dep. at 56-58 (attached). He had "nothing to do with" selecting or approving new vehicles for any technicians at any time. Id.

**F.    Other**

1.    "The Court must instead look at Evarts' nine-year history and the totality of her experience under Cordner's management in a period of but six months against the backdrop of Cordner's more favorable treatment, including his inaction, with respect to Evarts' male crew members." Pl. Opp. at 20.

Evarts did not work with Cordner for six months. The record is undisputed that Cordner took over as supervisor of plaintiff's group in July, 1996 and remained her supervisor until plaintiff resigned effective May 30, 1997. Complaint at ¶¶ 8, 11; Def. Exh. 9. This is a period of eleven months. Moreover, as set forth elsewhere in this Reply, plaintiff has produced no evidence that any similarly situated male technicians were treated more favorably with respect to terms and conditions of their employment than the plaintiff.

**G.    The Incidents Alleged Cannot Constitute Severe and Pervasive Sex Discrimination.**

The above allegations, to the extent that they are supported by any evidence (and many are not supported by evidence, as noted above), clearly do not rise to the level of severe and pervasive conduct or an atmosphere "permeated with gender-based ridicule and intimidation" as required in this Circuit to withstand summary judgment on a hostile work environment claim.

In a case very similar to the present one, but involving much more compelling facts for the plaintiff, Ottman v. City of Independence, Mo., 341 F.3d 751, 755 (8th Cir. 2003), the plaintiff claimed that in her new department, her supervisor gave her inferior job assignments because of her gender, excluded her from weekly department meetings, treated females in the department differently from males, belittled her work, frequently conversed with female

31

employees in a superior and condescending tone which he did not use when talking with men,
did not stop a co-worker from making sexist remarks on a weekly, if not daily, basis, cut off her
conversations with a city employee, and spoke to plaintiff "as if she were a child." Ottman, 341
F.3d at 755, 759-760. In Ottman, the plaintiff also presented evidence that on two separate
occasions, her supervisor had made the comment in front of her, "It's just like a woman"
referring to two women other than plaintiff and frequently referred to women as "girls." Id. at
760. In addition, plaintiff presented testimony that the supervisor had declared "we need more
men" and sometimes told female workers to "be quiet, men are talking," id., all evidencing a
discriminatory animus toward women, in plaintiff's view.

    While the District Court in Ottman denied summary judgment on the hostile work
environment claim, the Court of Appeals reversed, "conclud[ing] the district court erred in
finding a triable issue for the jury." Id. at 760. The Court noted that Ottman had failed to
establish the supervisor's alleged harassment was "so severe or pervasive as to alter a term,
condition or privilege of Ottman's employment." Id. at 760. In Ottman, the Eighth Circuit
concluded that the supervisor's remarks, "while certainly patronizing and unprofessional, cannot
be characterized as 'extreme' and did not constitute 'discriminatory intimidation, ridicule, and
insult that is sufficiently severe or pervasive to alter the conditions of [Ottman's] employment
and create an abusive working environment." See also Duncan v. General Motors Corp. 300
F.3d 928, 934 (8th Cir. 2002) (manager's posting of derogatory poster combined with boorish
behavior was not 'so severe and extreme that a reasonable person would find that the terms or
conditions of [ ] employment had been altered."); Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958,
967 (8th Cir. 1999) (nine incidents of unpleasant conduct and offensive comments, considered
"either individually or collectively," were not "severe or pervasive enough so as to alter a term,

condition, or privilege of [ ]employment."); <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78 (1998).

Within this District, in addition to the legal authority previously cited in SNET's Memorandum, <u>see</u> Mem. at 35-37, in <u>Braheney v. Town of Wallingford</u>, No. 300CV2468(CFD), 2004 WL 721834, at *4 (D. Conn. Mar. 30, 2004) (copy attached), the District Court for the District of Connecticut granted summary judgment for the employer on a hostile work environment claim with allegations much more severe and pervasive than in the present case. In <u>Braheney</u>, the plaintiff, who was a firefighter in a male-dominated profession, claimed she had been treated unfairly and scrutinized more than male employees in the following manners: (1) she had been issued a counseling memo for her involvement in a motor vehicle accident; (2) she had received counseling regarding her use of sick time; (3) she had received a verbal warning[10] for being absent without leave; (4) she was issued a written warning, which was reduced to a verbal warning, for her excessive use of sick time; (5) she was summoned to a counseling meeting regarding her absenteeism and pattern of sick leave; (6) she was charged with committing a dispatch error and received counseling; (7) she was suspended for four weeks and docked eleven and one-half hours for allegedly leaving work after receiving an order to stay; (8) she was suspended for two weeks for allegedly misrepresenting the truth in order to secure time off; (9) she was suspended again for four days as a result of purportedly committing a second dispatch error; and (10) she was suspended for six weeks for again allegedly misrepresenting the truth in order to secure time off. <u>Id</u>. at *1-2. The District Court described Braheney's claims as follows:

---

[10]   By contrast, in the present case, it is undisputed that plaintiff received <u>no</u> discipline of any sort at any time, other than a single verbal warning for failing to lock her SNET vehicle in the garage after repeated warnings. <u>See</u> Pl. Opp. at 1.

Braheney alleges that she was subjected to greater scrutiny than male firefighters in every aspect of her employment and that she was unfairly and disproportionately punished for using her sick time and other accrued leave time to which she was entitled. While Braheney admits that she was suspended four times for the reasons listed above, she maintains that if the same acts had been committed by male firefighters, they would not have been disciplined as harshly. In particular, she contends that she is aware of two male firefighters who each committed a dispatch error and were not disciplined in a similar fashion. Braheney also alleges that she was one of the few employees who did not use her sick time for a longer vacation, to work a second job, or to have the weekends off. In addition, she claims that there was a notice on a bulletin board in the Captain's office stating "If Cindy [Braheney] calls, make sure to check it, see if she has the time."

Id. at *4. The conduct alleged in Braheney is much more severe and pervasive than the conduct complained of by Ms. Evarts, who has presented no evidence of male employees being treated differently, and further admits that the only discipline she ever received was a single verbal warning which resulted in no consequences to her and would be in effect only for six months under the SNET labor agreement. Pl. Opp. at 1. Given the facts of the Braheney case, the Court concluded that, as to Brahaney's hostile work environment claim, "Braheney's representation that she has been treated differently from male firefighters is not sufficient to survive summary judgment," that the disciplinary actions taken against her were not severe or pervasive, and that the discipline with the other conduct did not establish that her "workplace was permeated with discriminatory intimidation, ridicule, or insult." Id. at *4.

Similarly, in Hanson v. Cytec Industries, No. 399CV86 (CFD), 2002 WL 519714 at *4 (D. Conn. Mar. 8, 2002) (copy attached), the District Court granted summary judgment to the employer on plaintiff's hostile work environment claim. In Hanson, the plaintiff claimed race and national origin discrimination. He alleged that (1) his supervisor used profanity with him and had also done so on a previous occasion with another man of Jamaican descent and African-American race; (2) his supervisor called him at home to see if he could work overtime, rather

34

than scheduling him in advance as was the practice for white employees, in this case depriving him of overtime opportunities; (3) his supervisor assigned him a sweeping duty which was not appropriate for an employee in plaintiff's job classification; (4) his supervisor assigned a white employee to work overtime as an "extruder operator," when normal practice was to schedule the employee who had worked a regular shift as extruder operator for that overtime (which would have been plaintiff); (5) Hanson's supervisor asked him to take an early lunch break, although it was not the supervisor's practice to schedule breaks for white employees; and (6) on the same day, Hanson's supervisor handed him an assignment while plaintiff was eating his lunch in the break room, although the normal practice was to leave assignments in the third-floor office. Id. at *2-3.

The Court in Hanson held that, even if a trier of fact could find that these incidents were racially motivated,[11] they were "simply insufficient as a matter of law to constitute a hostile work environment under Title VII." Id. at *4. Compare Williams v. County of Westchester, 171 F.3d 98, 101-02 (2d Cir. 1999) (holding that plaintiff's evidence that a file containing racist material, including a memorandum entitled "Affirmative Action in Heaven" was found near his office, that plaintiff was consistently given menial tasks and was treated as nothing more than a "driver" for the District Attorney, and that the plaintiff was told by some of his fellow criminal investigators to "go wash and gas the boss's car" did not establish a hostile work environment for purposes of Title VII claim), with Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 68, 70-72 (2d Cir. 2000) (finding a hostile work environment where plaintiffs were subjected to a "stream of racially offensive comments over the span of two to three months," including a statement that a supervisor "should go out and buy a truck and drag someone by the truck who is black"), and

---

[11] The Court made no such finding in the case.

Schwapp v. Town of Avon, 118 F.3d 106, 110-12 (2d Cir. 1997) (holding that question of material fact existed as to hostile work environment claim where plaintiff was subjected to at least ten clear "racially-hostile incidents" and two incidents reflecting racial bigotry during his 20 months of employment by the defendants).

Similarly, the Court in Brown v. Town of Greenwich, Civ. A. 3:02CV316 (CFD), 2004 WL 2106593, at *2 (D. Conn. Sept. 15, 2004) (copy attached), concluded that plaintiff's hostile work environment discrimination claim based on race failed as a matter of law, because the plaintiff had failed to present evidence of a hostile work environment sufficient to withstand summary judgment. It reached this conclusion because "[t]he incidents Brown alleges were not sufficiently severe or pervasive to alter the conditions of her employment." Brown, 2004 WL 2106593, at *2. In support of her claims, plaintiff presented evidence that (1) in April 1998, she was denied training in desktop publishing software necessary to produce the Human Resources Department newsletter, while such training was provided to a white female colleague; (2) plaintiff's November 1998 performance evaluation included the comments that she appeared "reluctant at times to `think out of the box'"; (3) the Deputy Director of Human resources told another member of the department that plaintiff had a "minority chip on her shoulders"; and (4) plaintiff was wrongfully accused by the Director of Human Resources of improperly maintaining petty cash receipts. Such evidence did not rise to the level of severe and pervasive conduct as a matter of law. See also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view."). The work environment must be both subjectively and objectively hostile. Harris, 510 U.S. at 21-22; see also Oncale v. Sundowner Offshore Servs., Inc. 523 U.S. 75, 81 (1998) (emphasizing that "the objective

36

severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position.").

### H.     Plaintiff has Failed to Show a Nexus Between Her Gender and Any Adverse Treatment by SNET

"Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of [in this case sex]." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 523-24 (1993).

Plaintiff must demonstrate that she was singled out for such punishment *because she is a woman*.

> [A] plaintiff must first establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) *the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class*.

Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) (emphasis added).  As stated in Dawson, it is well established that a key element of a prima facie case for discrimination is that the action taken by the employer be *related* to the plaintiff's membership in a protected class. Here plaintiff has offered no evidence to indicate that any adverse action taken with respect to her was related to her gender.  To the contrary, the evidence indicates that a similarly situated male employee was treated the same.

Moreover, it is still the case that mere disbelief of an employer's proffered reason is insufficient to support a finding of intentional discrimination." Noble v. Brinker Internat'l, Inc., 391 F.3d 715, 721-22 (6th Cir. 2004) (emphasis added).  Even if the employer's given reason

37

seems unpersuasive, that "does not necessarily establish that the plaintiff's proffered reason for race [discrimination] is correct." Hicks, 509 U.S. at 524.[12]

Although decided on appeal of a motion for judgment as a matter of law, the recent case of Noble v. Brinken Internat'l., Inc., 391 F.3d 715 (6th Cir. 2005) is particularly instructive in considering the present motion for summary judgment.[13]   In considering plaintiff's discrimination claim, the Noble Court found that Noble had "introduced evidence to support the first three elements of his prima facie case; that is, (1) he was a member of a protected class; (2) he suffered an adverse employment action; and (3) he was qualified for the position from which he was discharged." Noble, 391 F.3d at 728. It then noted that "[a] plaintiff may make out the fourth element of a prima facie case by showing that he was either replaced by someone outside the protected class or treated differently than similarly situated, non protected employees." Id. Evarts does not argue that she was replaced by someone outside the protected class, but instead argues that she was treated differently from similarly situated male technicians at SNET.

Absent proof that employees outside the protected class were similarly situated but were not treated similarly, plaintiff presented no evidence that could have permitted a reasonable jury to conclude that SNET intentionally discriminated against the plaintiff because of her gender.

---

[12]   As the Court in Noble stated, "The Reeves Court . . . required that a plaintiff present *both* evidence supporting a *prima facie* case *and* evidence sufficient to support the fact finder's disbelief of the defendant's proffered reason." Noble, 391 F.3d at 726 (quoting Reeves, 530 U.S. at 148).

[13]   Under the Federal Rules of Civil Procedure, the standard in for a motion for judgment as a matter of law, and for a motion for summary judgment are the same, namely, when on the evidence presented, there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue. Rule 50, Fed. R. Civ. P.

To be "similarly situated," the plaintiff must show that specific individuals, referred to as "comparables," are "similarly situated in all respects." <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original).

Plaintiff has failed in her Opposition to come forward with any evidence at all that <u>SNET took any action with respect to plaintiff because she is a woman</u> or that any particular male technician similarly situated in all relevant respects, was treated more favorably after Mr. Cordner learned of the same conduct. In fact, the evidence in the record is to the contrary: SNET bent over backward to help plaintiff succeed in her job. <u>See</u> SNET Mem. at 1-17. With no evidence that SNET discriminated against her, plaintiff's attempt to claim the protection of Title VII because she voluntarily chose to leave her job is inexcusable. Without establishing a nexus between her female gender and either a tangible adverse job action or a hostile work environment, plaintiff's case cannot proceed.

## IV.    One Remark That Was Unknown to Plaintiff is Insufficient to Demonstrate Intentional Discrimination.

Plaintiff's sole attempt to tie SNET's actions to alleged discrimination against plaintiff because of her gender is the testimony of former SNET employee David Ianiello, a technician who himself has claimed Matt Cordner harassed <u>him</u> at work. In fact, Ianiello complains that Cordner "disciplined [him] a lot." Ianiello Dep. Day I at 23 (attached). The remark Mr. Ianiello attributed to Cordner was a negative remark about women in the workplace other than plaintiff. Ianiello Dep. at 4-7. The sum total of Mr. Ianiello's testimony on this subject was that Mr. Cordner "has made that statement to me on more than one occasion that he doesn't believe women belong in the field." Ianiello Dep. Day I at 39 (attached).

Plaintiff's focus on this testimony is misplaced. First, it is undisputed that plaintiff was never aware of the purported remark while she was an employee and only recently became aware

of Ianiello's account when her counsel interviewed Ianiello as part of this case. Pl. Opp. at 13 n. 4. Comments of which the plaintiff was unaware during employment cannot be part of a claim for hostile work environment or disparate treatment. Even "[m]ean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not `harassment' of the plaintiff (severe, pervasive, or other). Thus, for alleged incidents [of racism] to be relevant to showing the severity or pervasiveness of the plaintiff's hostile work environment claim, the plaintiff must know of them." Mason v. S. Ill. Univ. at Carbondale, 233 F.3d 1036, 1046 (7th Cir. 2000); see also Burnett v. Tyco Corp. 203 F.3d 980, 981 (6th Cir. 2000); see also Buttron v. Sheehan, No. 00CV4451, 2003 WL 21801222 at *4 (N.D.Ill. 2003) (copy attached) ("Plaintiffs must have known of these [inappropriate] statements and this [inappropriate] conduct during the time they experienced the purported harassment for the evidence to be probative of a hostile work environment"); cf. Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997) (fact that plaintiff learned second-hand during his employment of racially derogatory comment could impact his work environment).

While Ianiello did testify that Cordner suggested that in general women should not "work in the field," such a remark constitutes an "offhand remark," which is clearly insufficient to establish that Cordner discriminated against the plaintiff. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). It is well established that, "[i]solated, minor acts or occasional episodes do not warrant relief." Brennan v. Metropolitan Opera Assoc., 192 F.3d 310, 318 (2d Cir. 1999). Thus, although Cordner was plaintiff's supervisor, the isolated statement that Ianiello testified to hearing does not create the necessary nexus between plaintiff's gender and any action alleged to have been taken by SNET with respect to the plaintiff.

40

Moreover, plaintiff's counsel's description of Cordner's mindset is wholly unsupported by the record. She states,

> In conversations with Ianiello, Cordner repeatedly denigrated women at SNET and Evarts in Particular. In reference to Evarts, in fact in the context of a discussion about Denise Evarts, Cordner stated, "Women don't belong in her [Evarts'] job." Cordner also made sneering and derogatory remarks about other women, even though, according to Ianiello, these women worked in other departments and Cordner had no personal knowledge or other basis on which to deem them useless or incompetent. When Cordner would spot a woman in another crew which performed predominantly "male" work, he would sneer, point at her and say, "There goes *another* one who doesn't belong here." Cordner thought women belonged "behind a desk" or "at home." He was "very clear" about his feelings towards women in his area of work.[14]

Plaintiff cites no evidence in the record to support this narrative, other than "Exh. B." Exhibit B comprises 38 pages of one part of David Ianiello's deposition. Plaintiff has avoided quoting the actual record evidence with specific citations to precise parts of the record.

## V.   Plaintiff Offers no Evidence to Support a Factfinder's Disbelief of SNET's Reasons for Its Actions.

The law is clear on a Title VII claim that "[t]he jury may not reject an employer's explanation . . . unless there is a sufficient basis in the evidence for doing so." Gray v. Toshiba Am. Consumer Prods., Inc., 263 F.3d 595, 598 (6th Cir. 2001). To do so, there must be facts in evidence that the employer's reason "had no basis in fact." Noble v. Brinker Internat'l, Inc., 391 F.3d 715 (6th Cir. 2004) (finding there was sufficient evidence to support a finding of pretext, but not sufficient evidence to support an ultimate finding of intentional discrimination). With respect to each event mentioned by plaintiff, SNET has set forth its legitimate business reasons for its actions. It did not create a new satellite office in North Madison because, after analyzing the relevant data, Mr. Cordner made the business decision that there was not enough business in

---

[14]   While SNET and Mr. Cordner both strongly deny Ianiello's account, that dispute cannot be resolved on summary judgment and is not material to the pending motion.

41

that area to justify opening an office there. <u>See</u> SNET Mem. at 5-6 and testimony cited therein. Mr. Cordner gave plaintiff a verbal warning for failing to lock her SNET vehicle in the garage, because it was company policy to do so and because plaintiff had been warned about this several times previously. Mr. Cordner suspended plaintiff's cell phone for one month, for exceeding the limitation on cell phone usage repeatedly for several months prior to having it taken away; he also took away a male technician's cell phone for the same reason. Mr. Cordner spoke to plaintiff about her time sheets, because she was not recording her lunch hours when she actually took them, she was recording her jobs in a different order form the order in which she did them, they contained numerous cross-outs and items that were difficult to read, and her times did not come close to being consistent with the times in the handheld computer. Plaintiff has not produced admissible evidence to refute any of these reasons.

## VI.    Plaintiff's Heavy Reliance on a Preliminary and Unreliable Finding of an Administrative Agency Highlights the Weakness of Her Evidence.

Plaintiff claims in her Opposition that she has established a prima facie case of unlawful discrimination based on a preliminary finding by an administrative agency, the Connecticut Commission on Human Rights and Opportunities ("CHRO") as her evidence. She argues that, "Plaintiff has established a prima facie case as evidenced by the findings of fact and determination of reasonable cause in her favor by the CHRO." Pl. Opp. at 11. She then represents that,

> Not surprisingly, -SNET omits all reference to the outcome of the CHRO proceedings which preceded this action. After investigation and fact-finding hearings, the CHRO found in plaintiff's favor.

Pl. Opp. at 2. This description is entirely inaccurate. First, as plaintiff's counsel well knows, there was no hearing. In fact, the plaintiff asked for an obtained a release of jurisdiction from the Commission before any administrative hearing could be held. Exh. C (attached). Under the

42

Connecticut General Statutes governing this procedure, a finding of "reasonable cause" (see Exh.
1 of Pl. Exhs. at p. 8), is made after a mandatory mediation session, an expedited or extended
fact-finding conference, or an investigation. Conn. Gen. Stat. § 46a-83(c). "Reasonable cause"
is defined in the statutes as "a bona fide belief that the material issues of fact are such that a
person of ordinary caution, prudence and judgment could believe the facts alleged in the
complaint." Conn. Gen. Stat. § 46a-83(c) (emphasis added). This is a far cry from "finding in
plaintiff's favor" after a "hearing," much less is it "evidence" that would be admissible before this
Court on summary judgment. The next step in the administrative process would have been an
administrative hearing, but the plaintiff opted to move the case out of the CHRO and it never
reached the hearing stage. Exh. C (attached). For plaintiff to represent to the Court that there
was a "hearing" and a finding "in plaintiff's favor" is inexcusable.

The Second Circuit has explained the law governing admissibility of CHRO findings in
some detail. Paolitto v. John Brown E.&C., Inc., 151 F.3d 60, 64-66 (2d Cir. 1998). CHRO
findings are public records and as such fall under the "public records" exception to the hearsay
rule. Under this exception, "factual findings resulting from an investigation made pursuant to
authority granted by law" are not hearsay, "unless the sources of information or other
circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C). The Second Circuit
has followed the rule of the majority of circuits in holding that state agency determinations may
be admitted into evidence only in the discretion of the district court. Id. at 65. The Second
Circuit noted both (1) the existence of the "lack of trustworthiness" rule permitting a judge to
exclude an agency finding, and (2) the district court's discretion to exclude such findings even if
they are not hearsay if the danger of prejudice outweighs the findings' probative value. In
Paolitto, the Second Circuit upheld the District Court's decision not to admit a CHRO finding

43

dismissing a charge. The District Court gave two reasons for excluding the CHRO finding: the evidence that the plaintiff introduced at trial undercut many of CHRO's factual findings, and the defendant had a full opportunity to present to the jury all the evidence it had submitted to CHRO. The Second Circuit held that these were legitimate reasons to exclude the CHRO findings. Id.

In two fairly recent cases, federal judges in Connecticut have categorically refused to admit into evidence CHRO reasonable cause findings. In the most recent, The Honorable Ellen Burns granted defendants' motion to strike a CHRO Reasonable Cause Investigation Report, which included a reasonable-cause finding in favor of the plaintiff. Barlow v. Connecticut, 319 F.Supp.2d 250, 258 (D.Conn. 2004). She characterized the report as "a preliminary investigation into whether discrimination or retaliatory conduct against plaintiff could have occurred." Id. Judge Burns relied on both the "lack of trustworthiness" rule in Fed. R. Evid. 803(8)(C) and the probative-value rule in Fed. R. Evid. 403. Judge Burns held that "[t]he party seeking to strike public records has the burden to establish lack of trustworthiness." Id. She cited the advisory committee report to Fed. R. Evid. 803 for the principle that in assessing trustworthiness, the court considers (1) the timeliness of the investigation, (2) the special skill or experience of the official, (3) whether a hearing was held and the level at which it was conducted, and (4) any motive of the investigator inconsistent with accuracy. The court may also consider other factors, such as the finality of the report. The court, she said, has the discretion to determine whether the document has sufficient indicia of reliability to justify its admission.

Judge Burns found that the CHRO report in Barlow was "unreliable." Id. The investigator's conclusions were based largely on hearsay and statements from the plaintiff. The investigator disregarded the defendants' testimony and other evidence that favored the defendants. Also, because the court had before it all the evidence that the investigator

44

considered in making her reasonable-cause determination, there was little probative value in the investigator's conclusions. Judge Burns therefore struck the reasonable cause finding from the record.

Judge Hall similarly granted the defendants' motion to strike a CHRO reasonable cause finding made "in summary disposition" after a reasonable cause determination she correctly described as a "preliminary investigation." Keene v. Hartford Hosp., 208 F.Supp.2d 238, 242-43 (D.Conn. 2002). She laid out the same standards for evaluating a lack-of-trustworthiness claim under Fed. R. Evid. 803(8)(C) that were cited in Barlow. Her discussion of her decision not to admit the finding was brief: "In this case, the CHRO document is a preliminary investigation into whether discrimination could have occurred. See Pl. App., Exh. 8, at 29. The findings and determination were subject to final review and hearing by a CHRO Hearing Officer. Id. Exercising its discretion, the court strikes the CHRO reasonable cause determination." Id. at 243 (emphasis in original).

Barlow also cited a decision by Judge Goettel concluding that an EEOC reasonable-cause determination should be given no weight. Equal Employment Opportunity Comm'n v. Regency Architectural Metals Corp., 896 F.Supp. 260, 263 (D.Conn. 1995). Judge Goettel held that the EEOC's determinations should be given no weight because they "consist largely of brief factual assertions which were the subject of testimony at the trial, and legal reasoning, which is the province of the court." Id. Further, he said, there was no foundation from the plaintiffs as to how the information in the determinations was compiled. See also

The above decisions collectively establish that a trial court will find that a CHRO reasonable cause finding is inadmissible if it considers the finding unreliable and/or if the court

45

has before it all of the evidence that supported the CHRO finding. Here, the preliminary findings of the CHRO were unreliable.

First, the fact-finding conference was conducted on November 6, 1998. Exh. D (attached). The reasonable cause finding was issued by a "law clerk," Richard Gordon, more than a year later, on December 29, 1999. Exh. E (attached). Although Mr. Gordon indicated in the finding that he had reviewed a "fact finding tape," no such tape was made of the conference. The investigator's findings are also unreliable in that they contradict the undisputed facts; for example, the investigator found that, as to the truck locking incident, "complainant showed [Mr. Cordner] proof from respondent's mechanic shop evidencing that the door was faulty and could not be locked." Exh. 1 of Pl. Exhs. at 5. However, plaintiff's undisputed testimony is that the door could be locked with her key. Pl. Dep. Vol. II at 40-41 (in SNET's Appendix of Exhibits).

Finally, Gordon's preliminary determination is unreliable because of his own problems with the CHRO. In fact, his tenure as an law clerk/investigator for the CHRO was so problematic and unsuccessful that he himself sued the CHRO for discrimination, retaliation, violation of his Due Process rights, and violation of his First Amendment Rights. Exh. F (attached). According to the Court record, beginning in August 1996, Mr. Gordon had been a part-time law clerk for the CHRO while he attended law school at Touro Law School in New Jersey from which he graduated while this case was pending, in May 1999. Exh. G at ¶ 10 (attached). Gordon accused the CHRO of conspiring against him so that he would not get a permanent position with the CHRO, and he accused the CHRO of treating white employees more favorably. Exh. G (attached). After he left employment, the CHRO found that he had many "aged" cases that were "not being handled expeditiously." Exh. G at ¶ 57 (attached). In its pleadings, the CHRO represented that just prior to his departure Gordon had requested Family

46

Medical Leave "to allegedly take care of his ill mother knowing that he already accepted a [new] position in New Jersey" for the same period. Exh. G at ¶¶ 66, 75 (attached). It stated that Gordon had notarized his own signature and held himself out as an attorney admitted to practice law in Connecticut, when in fact he was not admitted to practice law in Connecticut. Exh. G at ¶ 83 (attached).

In addition, after Gordon's departure from the CHRO, the Regional Director reported "that a review of the files assigned to Richard Gordon <u>showed numerous errors, disorganized material, un-filed records, incomplete work or no work product at all</u>." Exh. G at ¶ 87 (attached) (emphasis added). In fact, the CHRO noted that there was such "a discrepancy between Richard Gordon's time sheets and the computerized entry access card printout showing the detailed activity of CHRO employees" that it demanded repayment from him of wages paid to him because of his <u>inaccurate time reporting</u>. Exh. G at ¶¶ 95-96 (attached). On July 9, 2002, Mr. Gordon entered into a Stipulation of Facts and Disposition with the Statewide Grievance Committee in which he admitted he had committed the unauthorized practice of law in Connecticut. Exh. G at ¶ 98 (attached). Finally, the CHRO has represented that "[h]ad Newton [the Chief of Field Operations for the CHRO] been fully aware prior to Gordon's departure that he had represented himself as Commissioner of the Superior Court, that <u>his work files were incomplete or deficient</u>, that he had used state resources or that <u>his payroll sheets were inaccurate</u>, Newton would have initiated disciplinary action, up to and including termination." Exh. at ¶ 100 (attached). A CHRO law clerk whose work produce contains "numerous errors," and who is far behind on his files, disorganized, and records his own time inaccurately, and who takes a year to make the finding based on a conference for which there is no tape recording,

clearly could create a reliable finding in this case.  The CHRO reasonable cause finding is unreliable and inadmissible.

**VII.    There is No Supportable Basis for Imputing Liability to SNET on Plaintiff's Hostile Work Environment Claim.**

As set forth above, a plaintiff may only recover on a hostile work environment claim if she proves not only that she experienced a hostile work environment within the meaning of the relevant statutes, but also that "a specific basis exists for imputing the conduct that created the hostile environment to the employer."  Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 436 (2d Cir. 1999) (internal citations omitted).  SNET argued in its Memorandum that there is no such basis for imputing liability, since SNET exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities.  See Def. Mem. at 41-43

Whether the person allegedly creating a hostile work environment is a co-worker or the plaintiff's "supervisor" determines the analysis with respect to imputing liability to an employer.  Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  SNET has not argued that Cordner was a co-worker.  He was plaintiff's supervisor.

If behavior illegal under Title VII culminates in a supervisor's tangible employment action, the employer will be vicariously liable for it.  Mack v. Otis Elevator Co., 326 F.3d 116, 124 (2d Cir. 2003).  However, in cases in which "supervisor harassment . . . does not culminate in a tangible employment action," . . . the employer may also be held vicariously liable for the supervisor's harassing behavior, but such liability is not established simply by establishing that the misbehaving employee is the victim's supervisor. . . ."  Mack v. Otis Elevator Co., 326 F.3d

48

116, 124 (2d Cir. 2003) (citing <u>Faragher</u>, 524 U.S. at 804). In these cases, a defendant employer may raise an affirmative defense which consists of the following elements:   "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998).

"One way for an employer to demonstrate that they exercised reasonable care is to show that they had anti-harassment policy in place:

> An employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct.  Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense.

<u>Mack v. Otis Elevator Co.</u>, 326 F.3d 116, 128 (2d Cir. 2003) (quoting <u>Caridad v. Metro-North Commuter R.R.</u>, 191 F.3d 283, 295 (2d Cir. 1999)), <u>cert</u>. <u>denied</u>, 529 U.S. 1107 (2000).  SNET had a policy against harassment, with a clear complaint procedure, and plaintiff acknowledges she knew about it.  Ianiello Dep. Day I at 67 (attached) (SNET had a clear policy against harassment based on sex that was part of the collective bargaining agreement); Def. Exh. 5 at 8; Def. Exh. 10. In fact, she acknowledges that she used the complaint procedure but only after she admittedly had resigned from the company.  Exh. 27 to Pl. Exhs. at ¶ 22.  Moreover, plaintiff admits she had complained about harassment to SNET management years prior when she worked for a different supervisor, so there can be no dispute that she was aware of the procedure. Exh. 27 to Pl. Exhs. at ¶¶ 18-19.

Recognizing that she did not complain in a timely fashion, plaintiff's argument seems to be that she did not "unreasonably" fail to take advantage of SNET's corrective measures available. Apparently, according to plaintiff's Opposition, she believed she was being harassed and discriminated against because of her gender starting with the company not opening up a new office for her in Madison allegedly in September, 1996. See Complaint at ¶ 12(a). Yet, by her own admission, plaintiff did not complain to SNET's internal EEO group until after she had submitted her resignation from employment on May 16, 1997 and during the two-week notice period prior to actually stopping work.[15] Exh. 27 of Pl. Exhs. at ¶ 22.

Plaintiff submitted her resignation on May 16, 1997, giving two weeks' notice. Exh. 27 of Pl. Exhs. 27 at ¶ 22. Plaintiff's lengthy attack on the conduct of SNET's EEO manager, again with no citation to any evidence, does nothing to refute SNET's affirmative defense. For plaintiff's counsel to assert, again without any basis in the record, that "Rogers did nothing," is unsupported and inaccurate. See Pl. Opp. at 28-30. The Court should not consider counsel's narrative. The record indicates that Ms. Rogers interviewed both the plaintiff and Mr. Cordner and concluded that his actions toward her were based on legitimate business reasons, including company policy. Exh. H (Rogers Aff.; original filed with CHRO in 1998).

Moreover, whether or not plaintiff agrees with the scope of the investigation that Ms. Rogers conducted, the fact remains that plaintiff did not complain to the EEO office until after she had resigned from her employment. Recognizing that this single fact requires a finding in SNET's favor on the affirmative defense, plaintiff attempts to back-peddle by now averring that, if only SNET had carried out a proper investigation, she would have rescinded her resignation

---

[15] Plaintiff's counsel's argument is completely unsupported by any citation to evidence that "at the point at which Evarts decided to resign, Cordner had stepped up his harassment . . . ." Pl. Opp. at 28.

and returned to work. See Pl. Exh. 27 at ¶ 24. A plaintiff's self-serving claim that she would have come back to work after resigning is simply not sufficient to overcome the affirmative defense when both of its elements are established: that SNET had an anti-harassment policy in place, and that plaintiff unreasonably failed to take advantage of it prior to resigning. See Labor Agreement anti-harassment policy, Def. Exh. 5 at p. 8; see also Def. Exh. 10, SNET Anti-Harassment Policy.

Plaintiff's response is that she had "heard" from "other women" at SNET that SNET's EEO complaint procedure was ineffective. Such speculation and hearsay is inadmissible and cannot be an adequate basis for a jury to conclude that plaintiff's decision not to complain until after she resigned was "reasonable." Moreover, the fact that Evarts did in fact complain on her way out the door belies any such argument that she did not complain because she thought the act would be futile. She did in fact complain, but such complaint was simply too late as she had already resigned. She did so without giving SNET an opportunity to investigate and determine whether remedial action would be appropriate.

## IX.    Conclusion

For all of the aforementioned reasons and those set forth in SNET's previously filed Memorandum, there is no genuine issue of material fact in this case that would entitle the plaintiff to a trial.

Dated at New Haven, Connecticut this 28th day of November, 2005.

THE DEFENDANT,
SOUTHERN NEW ENGLAND TELEPHONE
COMPANY

By _____

     Lori B. Alexander
     Federal Bar No. CT 08970
     TYLER COOPER & ALCORN, LLP
     205 Church Street
     P. O. Box 1936
     New Haven, Connecticut 06509-1910
     Tel. (203) 784-8200
     Fax (203) 789-2133
     E-Mail: alexander@tylercooper.com

52

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed by first-class mail, postage prepaid to all counsel and *pro se* parties of record on this 28th day of November, 2005, as follows: Karen Torre, Esquire, Law Offices of Karen Lee Torre, 51 Elm Street, Suite 307, New Haven, Connecticut 06510.

*Lori B. Alexander*

Lori B. Alexander
Federal Bar No. CT08970