# IANIELLO DEP. DAY 1

**Page 1**

```
                    SEALED CONFIDENTIAL

              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT

    ------------------------------------X
    DENISE EVARTS

    VS                          3:00CV1124(JCH)

    THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY
    ------------------------------------X

         Deposition of David Iannielo taken in
    accordance with the Connecticut Practice Book at the
    law offices of Tyler Cooper & Alcorn, 205 Church
    Street, New Haven, Connecticut, Before Holly M.
    Murphy, a Licensed Shorthand Reporter and Notary
    Public, in and for the State of Connecticut at 1:00 PM
    on September 10, 2003.

              Holly Murphy, License No. 177
              DEL VECCHIO REPORTING SERVICES
              PROFESSIONAL SHORTHAND REPORTERS
    117 RANDI DRIVE          100 PEARL ST., 14TH FLOOR
    MADISON, CT  06443       HARTFORD, CT  06103-4506
    203 245-9583                  800 839-6867
                FAX 203 245-2760
```

**Page 2**

```
    APPEARANCES:
    ON BEHALF OF THE PLAINTIFF:
    KAREN TORRE, ESQ.
    LAW OFFICES OF KAREN LEE TORRE
    51 ELM STREET
    SUITE 307
    NEW HAVEN, CT  06510

    ON BEHALF OF THE DEFENDANT:
    LORI B. ALEXANDER, ESQ.
    TYLER COOPER & ALCORN
    205 CHURCH STREET
    NEW HAVEN, CT  06509-1910

    ALSO PRESENT:
    DENISE EVARTS
    MATT CORDNER
```

**Page 3**

```
                       STIPULATIONS

         IT IS HEREBY STIPULATED AND AGREED by and
    between counsel representing the parties that each
    party reserves the right to make specific objections
    at the trial of the case to each and every question
    asked of and the answers given thereto by the
    deponent, reserving the right to move to strike out
    where applicable, except as to such objections as are
    direct to the form of the question.
         IT IS FURTHER STIPULATED AND AGREED by and
    between counsel representing the respective parties
    that proof of the official authority of the
    Commissioner of Deeds before whom this deposition is
    taken is waived.
         IT IS FURTHER STIPULATED AND AGREED by and
    between counsel representing the respective parties
    that the reading and signing of the deposition by the
    deponent is
         IT IS FURTHER STIPULATED AND AGREED by and
    between counsel representing parties that all defects,
    if any, as to the notice of the taking of the
    deposition are waived.
         Filing of the Notice of Deposition with the
    original transcript is waived.
```

**Page 4**

```
              SEALED  CONFIDENTIAL TRANSCRIPT

                    D A V I D   I A N N I E L O
    Address 43 Basset Road, North Haven, Connecticut,
    having been duly sworn, was deposed and testified as
    follows:

         MS. ALEXANDER:  For the record, you have
    indicated, Mr. Iannielo, that you would like to read
    and sign the transcript of this deposition?
              THE WITNESS:  Yes.

                    DIRECT EXAMINATION
    BY MS. ALEXANDER:
13:20:22  Q.   Mr. Iannielo, my name is Lori Alexander.  I
13:20:24  represent Southern New England Telephone Company in an
13:20:26  action that has been brought by Denise Evarts.
13:20:29       Are you familiar with the fact that there is
13:20:31  litigation by Denise Evarts?
13:20:33  A.   Yes.
13:20:33  Q.   You came her in response to a subpoena?
13:20:36  A.   Yes.
13:20:36       (Whereupon, Defendant's Exhibit No. 1 was
13:21:21  marked for identification.)
13:21:21  Q.   Mr. Iannielo, is that a copy of the
```

## 13

```
13:31:55  1    Q.   During that whole period of time?  From '90
13:31:55  2  to '93?
13:31:59  3    A.   Yes, roughly.
13:32:01  4    Q.   Two or three years?
13:32:02  5    A.   Yeah.
13:32:02  6    Q.   When you became local president, were you
13:32:05  7  elected --
13:32:05  8    A.   It's an elected position.
13:32:10  9    Q.   You've got to let me finish.  Were you
13:32:10 10  elected by the members of the bargaining unit?
13:32:12 11    A.   I was elected by the members of that local
13:32:15 12  which I represented.
13:32:17 13    Q.   That would include the technicians who
13:32:18 14  worked out of the New Haven garage?
13:32:20 15    A.   Yes.
13:32:20 16    Q.   Did that include the group that worked with
13:32:25 17  Denise Evarts?
13:32:26 18    A.   Yes.
13:32:27 19    Q.   Do you remember how long you were the local
13:32:28 20  president?
13:32:40 21    A.   I'd say like maybe six years.
13:32:43 22    Q.   So a long time?
13:32:44 23    A.   Yes.
13:32:45 24    Q.   Were you elected each year?
13:32:48 25    A.   Yes.
```

## 14

```
13:32:49  1    Q.   Do you recall whether you had more or less
13:32:51  2  seniority in the company than Denise Evarts?
13:32:55  3    A.   I'm not sure of that.
13:32:56  4    Q.   You're not sure.  Have you ever been a
13:32:59  5  supervisor?
13:32:59  6    A.   No.
13:33:00  7    Q.   So at SNET you worked as what?  What were
13:33:03  8  the positions that you held?
13:33:07  9    A.   I started off as operator services,
13:33:07 10  directory assistance.  Then I went to central office
13:33:13 11  attendant, then a public service technician.  That was
13:33:20 12  the pay phone division.
13:33:22 13    Q.   What was that?
13:33:23 14    A.   The pay phone division, public service
13:33:26 15  technician.
13:33:28 16    Q.   Public service technicians are the people
13:33:30 17  who install and repair coin telephones?
13:33:34 18    A.   Yes.
13:33:35 19    Q.   Like pay phones?
13:33:36 20    A.   Yes.
13:33:37 21    Q.   Was it while you held that position that
13:33:39 22  you worked with Denise Evarts?
13:33:41 23    A.   Yes.
13:33:41 24    Q.   During what period of time did you hold
13:33:43 25  that position?
```

## 15

```
13:33:44  1    A.   I believe from '95 until I left in October.
13:33:53  2    Q.   From 1995 to October 2001?
13:33:55  3    A.   Yes.
13:33:57  4    Q.   You never were a supervisor of other
13:33:59  5  employees; right?
13:34:00  6    A.   No.
13:34:01  7    Q.   Did you ever report directly to Ed Dillman?
13:34:06  8    A.   No.  He was a second line manager.
13:34:09  9    Q.   Meaning there was someone in between?
13:34:10 10    A.   Yes.
13:34:11 11    Q.   Do you recall who you reported to while you
13:34:13 12  were a public service technician?  I'm going to just
13:34:16 13  say technician.
13:34:17 14    A.   No.  It was Pat Kinsella when I first got
13:34:23 15  there.  Then Matt Cordner.  Then Brad Fenty was the
13:34:25 16  last supervisor I had.
13:34:27 17    Q.   Did you ever report to Crystal White?
13:34:30 18    A.   No.  That was before my time.
13:34:39 19    Q.   What did public service technicians do on a
13:34:39 20  day-to-day basis?
13:34:40 21    A.   We installed, repaired, removed pay phones
13:34:46 22  or maintained them.  Sometimes you've got to go out
13:34:49 23  and clean them.  That's about it.
13:34:50 24    Q.   So you were out in the field?
13:34:52 25    A.   Yes.
```

## 16

```
13:34:52  1    Q.   Was this the first field job that you had
13:34:55  2  at SNET?
13:34:56  3    A.   Yes.
13:34:56  4    Q.   When you go out to repair the phones, do
13:35:01  5  you drive a truck?
13:35:01  6    A.   A van.
13:35:03  7    Q.   A SNET vehicle?
13:35:04  8    A.   Yes.
13:35:05  9    Q.   Did anyone drive with you or were you on
13:35:07 10  your own when you did that?
13:35:09 11    A.   When I first started, you go out with an
13:35:12 12  experienced technician.  I think it was a week maybe
13:35:15 13  or two weeks I road.
13:35:17 14         Then you go out.  I went out with Pat
13:35:24 15  Kinsella.  One day I road with him and he was
13:35:26 16  comfortable that I knew the job then you pretty much
13:35:30 17  went on your own.
13:35:30 18    Q.   So you didn't work in teams initially?
13:35:35 19    A.   It depends.  Sometimes you did work in a
13:35:35 20  team if you had a big install.
13:35:39 21    Q.   But most of your jobs you were doing on
13:35:41 22  your own?
13:35:42 23    A.   For the most part you were on your own.
13:35:46 24    Q.   Did you do something called changing out
13:35:49 25  sets?  Do you know what that term means?  To change
```

## 17

```
13:35:55  1  out a set?  I know you're going back away.
13:35:59  2      A.    There was all different circumstances on
13:36:03  3  why you would change out a set.
13:36:03  4      Q.    What does that term mean?
13:36:06  5      A.    Change out a set?
13:36:06  6      Q.    Yes.
13:36:06  7      A.    To me?
13:36:06  8      Q.    Yes.
13:36:06  9      A.    To me, to replace a set in the field.  I
13:36:09 10  replace a set.
13:36:10 11      Q.    So take out an old coin telephone and put
13:36:14 12  in a different one?
13:36:14 13      A.    Right.
13:36:15 14      Q.    About how long did it take to change out a
13:36:19 15  set?
13:36:21 16      A.    Every job was different.  You can't really,
13:36:24 17  you know, depending on what needed to be done.  It's
13:36:27 18  hard for me to answer that question in that limited
13:36:31 19  context.  Every job is different.
13:36:33 20      Q.    Are you able to give a range of times that
13:36:36 21  it would take to change out a set?
13:36:39 22      A.    If you just had to change the actual set,
13:36:42 23  remove one set and put one in an existing enclosure,
13:36:46 24  maybe an hour, an hour and a half depending on how
13:36:48 25  long it took to drive to the job.  Say an hour and a
```

## 18

```
13:36:52  1  half, an hour.
13:36:53  2      Q.    If it was more complicated than that, how
13:36:56  3  long would it be?
13:36:58  4      A.    I mean, it's really hard for me to answer
13:37:02  5  that question because you never know what the job
13:37:03  6  entailed.  You know what I mean?  You can go on the
13:37:07  7  job that lasts for hours.
13:37:09  8      Q.    For hours?
13:37:10  9      A.    Yeah.  Depending on what you find there.
13:37:13 10      Q.    What does that mean to do a conversion?
13:37:17 11      A.    They used to have all old electronic sets.
13:37:20 12  They were changing them out to a digital chassis set.
13:37:25 13  So you have to go out and actually refurbish the set,
13:37:30 14  change the inside, put a new upper housing on it.
13:37:34 15      Q.    Is that called a conversion?
13:37:37 16      A.    That's a conversion.
13:37:37 17      Q.    How long did it take to do a conversion?
13:37:41 18      A.    I mean again, it's hard to say.  Everybody
13:37:45 19  is different.  Me, maybe an hour.  I would average
13:37:47 20  like seven, eight in an eight hour day.
13:37:52 21      Q.    What did you average on changing out sets?
13:37:56 22      A.    Like I said, maybe seven to eight a day.
13:38:00 23      Q.    Same estimate?
13:38:00 24      A.    Yes.
13:38:00 25      Q.    Well, those are two different things;
```

## 19

```
13:38:02  1  aren't they?
13:38:02  2      A.    Changing out a set?
13:38:02  3      Q.    Right?
13:38:05  4      A.    I'm sorry.  I mean, I really couldn't
13:38:07  5  answer that exactly.
13:38:11  6      Q.    That one is harder to estimate?
13:38:11  7      A.    Yes.
13:38:16  8      Q.    Do you recall how long you worked with Pat
13:38:16  9  Kinsella?
13:38:20 10      A.    The length of time, I don't know.  Maybe a
13:38:24 11  year.  I can't really recollect how long.
13:38:27 12      Q.    How did you get along with him?
13:38:29 13      A.    Fine.
13:38:30 14      Q.    How would you characterize him as a
13:38:32 15  supervisor?
13:38:33 16      A.    Pat Kinsella?
13:38:34 17      Q.    Yes.
13:38:36 18      A.    He was a supervisor, I mean.
13:38:41 19      Q.    Are you able to recall whether he was a
13:38:45 20  good supervisor, a poor supervisor, got along well
13:38:49 21  with people or didn't?
13:38:51 22      A.    I mean, I got along well with him.  That's
13:38:54 23  about all I can say.  I mean, I got along well with
13:38:59 24  him.
13:39:00 25      Q.    As a union steward, you were clearly
```

## 20

```
13:39:03  1  involved in disciplinary issues; right?
13:39:06  2      A.    Yes.
13:39:10  3      Q.    You're familiar with the fact that SNET has
13:39:10  4  a discipline policy, a progressive discipline policy?
13:39:16  5      A.    Right.
13:39:16  6      Q.    What does that mean?
13:39:18  7      A.    There's a process by which they discipline.
13:39:22  8  First it will be a verbal warning, then a written
13:39:25  9  warning, then the final warning, then possibly
13:39:28 10  termination.
13:39:29 11      Q.    There could be a suspension in there?
13:39:32 12      A.    Yes.  A suspension.
13:39:32 13            (Whereupon, Defendant's Exhibit No. 2 was
13:40:17 14  marked for identification.)
13:40:17 15  BY MS. ALEXANDER:
13:40:18 16      Q.    Showing you Defendant's Exhibit 2, if you
13:40:20 17  look under progressive discipline it says, I think the
13:40:24 18  terms you just testified to.  Verbal warning, formal
13:40:24 19  written warning, suspension, wage reduction, final
13:40:24 20  warning, dismissal; right?
13:40:33 21      A.    Right.
13:40:33 22      Q.    Is this a copy of the progressive
13:40:35 23  discipline policy for SNET?
13:40:37 24            MS. TORRE:  Objection to form.
13:40:39 25            MS. ALEXANDER:  You can answer the
```

## Page 21

```
13:40:40  1  question. Do you want to read it?
13:40:42  2     A.   I've read it. I don't know if this is what
13:40:45  3  they're actually using now.
13:40:47  4     Q.   I mean during the time that you were there?
13:40:48  5     A.   I can't recall if this is the actual
13:40:52  6  document that's in the contract.
13:40:56  7     Q.   I'm not saying that it's part of the
13:40:59  8  contract because it's not.
13:41:01  9     A.   Right.
13:41:01 10     Q.   Is this the progressive discipline steps
13:41:04 11  that SNET had while you were there?
13:41:06 12     A.   Yes. To the best of my knowledge that's
13:41:08 13  what it was.
13:41:09 14     Q.   What is coaching? Are you familiar with
13:41:19 15  that term? I'm not talking about soccer coaching.
13:41:19 16  I'm talking about coaching at SNET?
13:41:21 17     A.   No, I'm not familiar.
13:41:24 18     Q.   You have not heard that term?
13:41:25 19     A.   Yeah, but I can't elaborate on it, like
13:41:27 20  what management is coaching or something in that
13:41:31 21  regard.
13:41:36 22     Q.   Do you recall how long you worked with Matt
13:41:41 23  Cordner?
13:41:41 24     A.   I'm not sure the exact. I can't be exact
13:41:48 25  to the length of the years. A couple of years.
```

## Page 22

```
13:41:51  1     Q.   If I were to tell you that he became a
13:41:52  2  supervisor in June of 1996. You were there until
13:42:01  3  October of 2001?
13:42:02  4     A.   Three years maybe.
13:42:03  5     Q.   But he wasn't your supervisor when you
13:42:07  6  left; was he?
13:42:07  7     A.   No.
13:42:08  8     Q.   But you worked with him for more than a
13:42:08  9  year; is that fair to say?
13:42:10 10     A.   I would guess.
13:42:16 11     Q.   When you worked for Matt Cordner, did you
13:42:18 12  think he treated you fairly?
13:42:23 13     A.   Yes.
13:42:25 14     Q.   Did he treat you with respect?
13:42:29 15     A.   Yes.
13:42:31 16     Q.   Are you able to characterize him as a
13:42:33 17  supervisor?
13:42:37 18     A.   I mean, like I would say with Pat. He's a
13:42:41 19  supervisor. You know, he's a supervisor.
13:42:45 20     Q.   Is it fair to say that he was by the book?
13:42:49 21  Do you know what the expression means? To follow the
13:42:52 22  rules by the book.
13:43:04 23     A.   No. As far as what his job entailed? As
13:43:11 24  far as, I mean, I don't know what a management book
13:43:13 25  is. So I would have to say no.
```

## Page 23

```
13:43:15  1     Q.   How were his interactions with you? You
13:43:17  2  worked with him on a day-to-day basis; right?
13:43:19  3     A.   Yeah. For the most part we had good
13:43:24  4  interactions until -- I can't say the exact date.
13:43:33  5  Maybe like towards the end before I left, I was being
13:43:38  6  disciplined a lot I would say.
13:43:42  7     Q.   Was that while Mr. Cordner was still your
13:43:44  8  supervisor?
13:43:45  9     A.   Yes.
13:43:49 10     Q.   I think the question that led you to say
13:43:51 11  that was how did you get along with him? Are you
13:43:54 12  saying that your relationship changed at that point in
13:43:58 13  some way?
13:43:58 14     A.   I mean, this is a working relationship. So
13:44:01 15  let's keep it in that context. I mean, no. It had
13:44:06 16  not changed. He was the supervisor. I was the
13:44:10 17  worker. So in that respect, no. It didn't change.
13:44:12 18     Q.   When you did encounter discipline or
13:44:16 19  feedback on your performance, did you try to do better
13:44:19 20  after that?
13:44:20 21     A.   Yes.
13:44:23 22     Q.   You worked as a peer with Denise Evarts;
13:44:28 23  right?
13:44:28 24     A.   Yes.
13:44:29 25     Q.   Who is sitting right there?
```

## Page 24

```
13:44:30  1     A.   Yes.
13:44:30  2     Q.   Do you recall how long you worked with her?
13:44:33  3     A.   Since I was in Hamden when I started in '95
13:44:39  4  up until she left which was sometime in '96, '97.
13:44:43  5     Q.   So you worked with her for about two years?
13:44:46  6     A.   Three, yeah.
13:44:49  7     Q.   Did you ever work on jobs directly with
13:44:50  8  Denise Evarts?
13:44:51  9     A.   The only one I remember we worked on a job
13:44:54 10  in Orange. That's the only one I can remember.
13:44:57 11     Q.   Is there anything that stands out in your
13:44:59 12  mind about that job?
13:45:00 13     A.   Well, I mean, yeah. I was new. I remember
13:45:05 14  there was a pole. We had to get access from the pole
13:45:11 15  and I just, you know, I volunteered to go up the pole.
13:45:15 16  She said, "No, no. I'll get it." She put the ladder
13:45:18 17  up. I was new on the job. I said, "Wow." She went
13:45:22 18  up and she did her job.
13:45:29 19     Q.   Were you surprised about that?
13:45:31 20     A.   No. I wasn't surprised. I mean, you know,
13:45:33 21  like I'm trying to be a gentleman. Let me. I'll go up
13:45:36 22  on the ladder if you want.
13:45:36 23          She said, "No, no. It's my job. You're here
13:45:40 24  as the helper." She did her job.
13:45:41 25     Q.   Is it fair to say you never noticed any
```

## Page 25

```
1   problems with her work performance?
2   A.   No.
3   Q.   Were you friends outside of work at all?
4   A.   No.
5   Q.   Your families didn't get together or
6   anything like that?
7   A.   No.
8   Q.   How about since you left the company?
9   A.   No.
10  Q.   Have you gotten together at all?
11  A.   No.
12  Q.   What were your interactions with Miss
13  Evarts at work?  You worked on one job together in two
14  years?
15  A.   That I remember.  There could have been
16  more.  That's the one I remember.
17  Q.   What do you recall?
18  A.   We just go to work, get our jobs in the
19  morning pretty much then went our own way.
20  Q.   As technicians you start out in that break
21  room or whatever that room is to get your assignments
22  then you all go your separate ways?
23  A.   Pretty much.
24  Q.   About how much of the day would you be in
25  the same place as Miss Evarts during the time you
```

## Page 26

```
1   worked together?
2   A.   On a normal working day, if we didn't work
3   together, maybe for a half hour in the morning.
4   Q.   What happened during that half hour?
5   A.   You come in.  You wait.  At that time the
6   boss would hand out a job.  There were bulk jobs.
7   There would be bulk jobs in the morning.
8        You just wait for him to hand out the jobs
9   and if there were any issues to go over, he went over
10  them in the morning with the crew and then you went
11  out.
12  Q.   You would be out in about a half hour
13  unless something unusual happened?
14  A.   Yes.
15  Q.   What time did you report to work?
16  A.   At eight.
17  Q.   When you say the boss hands out the jobs,
18  that would be either Pat Kinsella or Matt Cordner?
19  A.   Yes.
20  Q.   Did you ever witness any fights?  I mean
21  verbal fights, not physical fights, between Miss
22  Evarts and Mr. Cord?
23  A.   Not that I recollect.
24  Q.   Did you ever witness any shouting or
25  screaming between the two of them?
```

## Page 27

```
1   A.   No.
2   Q.   Did Mr. Cordner ever yell at you?
3   A.   No.  He never yelled at me, no.
4   Q.   Did you ever witness him yelling at Miss
5   Evarts?
6   A.   No, no.
7   Q.   Did Miss Evarts tell you at some point that
8   she wanted to resign from the company?
9   A.   I don't know if it was put in that exact
10  context, but I know she was having a lot of problems
11  there and to a point where I don't know if she said
12  exactly like that or she said that she's going to wind
13  up having to leave here.
14  Q.   Before Mr. Cordner became supervisor of the
15  group, do you recall Miss Evarts telling you that she
16  wanted to resign?
17  A.   No.
18  Q.   Before Mr. Cordner became the supervisor,
19  do you recall her telling you that she wanted to
20  transfer to another job?
21  A.   No.
22  Q.   Did she tell you that she had been trying
23  to transfer for a long time because she no longer
24  wanted to be a technician?
25  A.   No.  If she did, I don't recall it now.
```

## Page 28

```
1   Q.   Were you familiar with the fact that Miss
2   Evarts had a family and a child during the time that
3   you worked together?
4   A.   Yes.
5   Q.   Did she ever express to you frustration
6   getting her child to day care or dealing with mother
7   type issues?
8   A.   No.
9   Q.   That's not the kind of thing you talked
10  about?
11  A.   No.
12  Q.   Do you remember a time when Miss Evarts
13  took a leave of absence related to her sister's
14  illness?
15  A.   Yes, that I remember.
16  Q.   Did you know Miss Evarts' sister?
17  A.   No.
18  Q.   What do you recall about the leave of
19  absence?
20  A.   Just that she was gone for whatever period
21  of time because of her sister had passed away.
22  Q.   Do you recall her taking time off ever
23  before that?
24  A.   That I don't recall.
25  Q.   Do you recall her coming into work
```

## 29

```
13:50:01  1    periodically during some period of time? In other
13:50:06  2    words, coming in once a week or?
13:50:10  3       A.    No.
13:50:10  4       Q.    You don't recall that?
13:50:12  5       A.    No.
13:50:14  6       Q.    What's a right along exercise or a riding
13:50:16  7    exercise depending on?
13:50:19  8       A.    That's when your supervisor comes out with
13:50:23  9    you on your jobs.
13:50:28 10       Q.    So the supervisor sits in your truck with
13:50:31 11    you and goes while you repair the phone?
13:50:35 12       A.    Yes.
13:50:35 13       Q.    What does the supervisor do? What's the
13:50:37 14    purpose of that?
13:50:38 15       A.    He has like a checklist of proper procedure
13:50:42 16    that you're supposed to do. You know, make sure that
13:50:47 17    you're doing everything you're supposed to be doing.
13:50:50 18    Like an evaluation more or less, slash coaching,
13:50:54 19    training.
13:50:54 20       Q.    So is it a setting in which the supervisor
13:51:00 21    gives you feedback on your work?
13:51:02 22       A.    It's both. Like I said, it could be like
13:51:09 23    where they're assessing whether you're doing your
13:51:11 24    complete job with a checklist that they go through to
13:51:14 25    make sure you're doing everything you're supposed to
```

## 30

```
13:51:17  1    do. Then, yes. They give you feedback.
13:51:20  2       Q.    Is it something that leads to discipline?
13:51:22  3    Is it discipline?
13:51:27  4       A.    I don't recall. I don't recall. I don't
13:51:31  5    think it is, but I'm not accurate in that. I don't
13:51:35  6    know for sure.
13:51:36  7       Q.    It's not one of the steps in progressive
13:51:38  8    discipline?
13:51:39  9       A.    No.
13:51:40 10       Q.    That would be silly, a ride along exercise?
13:51:43 11       A.    Right, right.
13:51:44 12       Q.    Did you have ride along exercises with your
13:51:47 13    supervisors at all during the time that you were at
13:51:51 14    SNET?
13:51:56 15       A.    Not during the time frame that Denise
13:51:59 16    Evarts was working there, no.
13:52:01 17       Q.    But I asked you a little different
13:52:04 18    question. I asked you whether you had any ride along
13:52:07 19    exercises with your supervisor while you were a
13:52:09 20    technician at SNET?
13:52:11 21       A.    Yes.
13:52:11 22             (Whereupon, Defendant's Exhibit No. 3 was
13:53:01 23    marked for identification.)
13:53:01 24    BY MS. ALEXANDER:
13:53:01 25       Q.    Do you recall Pat Kinsella doing a riding
```

## 31

```
13:53:04  1    exercise with you in 1995?
13:53:11  2       A.    I remember the original one.
13:53:15  3       Q.    I'm sorry. Strike that. 1996. Early
13:53:15  4    1996.
13:53:18  5       A.    Yeah. I believe I do recall that.
13:53:19  6       Q.    Can you tell me what was that like?
13:53:22  7    Describe for me what occurred?
13:53:26  8       A.    I mean, it was so long ago. I really don't
13:53:26  9    remember but.
13:53:26 10       Q.    You're right. It's seven years.
13:53:28 11       A.    But it was just, there was something like
13:53:35 12    one part of the job when I was, I think it had to do
13:53:44 13    with like there's a relay in the pay phones.
13:53:46 14             It was something I think to do with relay
13:53:49 15    timing or something he wanted to show me. You know,
13:53:53 16    it was something that I know I was having a problem
13:53:55 17    with doing.
13:53:56 18             Like I ran into a couple of problems on a pay
13:53:59 19    phone and I didn't diagnose the problem. I think he
13:54:03 20    came out that day because there was a couple of pay
13:54:06 21    phones that had that problem to show me.
13:54:08 22       Q.    So to show you how to do it?
13:54:10 23       A.    Right.
13:54:10 24       Q.    Were you able to do it after that to the
13:54:13 25    best of your knowledge?
```

## 32

```
13:54:14  1       A.    I don't recall exactly. I mean, he never
13:54:17  2    road with me after that I don't think so.
13:54:21  3       Q.    So it must have been okay?
13:54:22  4       A.    Right.
13:54:23  5       Q.    Did you consider the riding exercise with
13:54:26  6    Pat Kinsella to have been punitive in any way?
13:54:32  7       A.    I mean, no. No, because he explained to me
13:54:38  8    why he was coming out with me that day.
13:54:41  9       Q.    Did you think he was harassing you because
13:54:43 10    he did a riding exercise with you?
13:54:47 11       A.    No.
13:54:48 12       Q.    Did you interpret that as a way for him to
13:54:51 13    help you and improve your work performance?
13:54:54 14       A.    I mean, no. I was nervous. I was nervous
13:54:58 15    that he was coming with me. I didn't think of it
13:55:00 16    either way.
13:55:03 17             He explained to me. Yes. Because he said to
13:55:07 18    me that I would have a problem with those two pay
13:55:08 19    phones. There's a couple of jobs you signed off and
13:55:10 20    you didn't diagnose it.
13:55:12 21             So yeah. I mean, I did view it that way
13:55:14 22    because he told me that's why he was coming out with
13:55:19 23    me.
13:55:19 24       Q.    When you say that way, you mean as an
13:55:19 25    opportunity to show you --
```

## 33

```
13:55:21  1    A.    Right.
13:55:21  2    Q.    -- how to improve your performance?
13:55:29  3    A.    Right. Because he made that clear to me.
13:55:29  4    Q.    Do you recall doing a riding exercise with
13:55:32  5  Matt Cordner?
13:55:35  6    A.    Yeah. He came out with me I think once.
13:55:38  7  I'm not sure.
13:55:38  8    Q.    Do you recall if that was in July of 1997?
13:55:48  9    A.    I don't recall the date, no. I really
13:55:48 10  don't. It might have been more than one. I think
13:55:51 11  there was one like later on in 2000 or something.
13:55:54 12    Q.    I'm going to show you a document and I'm
13:55:59 13  not going to ask you to identify it. But if you could
13:56:02 14  look through it and see if it refreshes your
13:56:03 15  recollection about whether Matt Cordner did a riding
13:56:08 16  exercise with you in July of 1997?
13:56:30 17    A.    Yes. 7/29, yes.
13:56:31 18    Q.    Do you remember that was in the summer that
13:56:33 19  that occurred?
13:56:37 20    A.    Yeah. I believe so. I think it was in the
13:56:38 21  summer. I mean, I think there was more than one so
13:56:43 22  it's hard to, you know, remember exactly when and
13:56:49 23  where.
13:56:51 24    Q.    Did you consider the riding exercise that
13:56:54 25  Matt Cordner did with you to be somehow punitive? Did
```

## 34

```
13:57:01  1  you think he was punishing you by going out on a
13:57:07  2  riding exercise with you?
13:57:29  3    A.    I'm trying to think of the proper way. I
13:57:32  4  didn't think it was punishment. Punishment, no. I
13:57:44  5  have to say no. I didn't perceive it as punishment.
13:57:44  6         (Whereupon, Defendant's Exhibit No. 4 was
13:58:28  7  marked for identification.)
13:58:28  8  BY MS. ALEXANDER:
13:58:28  9    Q.    I'm showing you what I marked as
13:58:30 10  Defendant's 4. It says at the top: Public service's
13:58:35 11  riding exercise, date 1/29/96. I tried to see if
13:58:42 12  there's a signature on this, but I don't see that
13:58:44 13  there is.
13:58:45 14         Is this a document that you got while you
13:58:48 15  were working for Pat Kinsella?
13:58:50 16    A.    No.
13:58:50 17    Q.    So you don't see the riding exercise forms
13:58:54 18  that the supervisor makes out while they're riding
13:58:57 19  with you?
13:59:00 20    A.    No.
13:59:00 21    Q.    So you have not seen this before today?
13:59:03 22    A.    No.
13:59:03 23    Q.    Does it refresh your recollection as you
13:59:05 24  through look it and take a minute to look through it,
13:59:08 25  that Pat Kinsella did a riding exercise with you on
```

## 35

```
13:59:11  1  January 29, 1996? Take your time.
13:59:15  2    A.    Yes. Because right here it says:
13:59:19  3  Dismantle validator for instructional purposes.
13:59:21  4    Q.    Is that what you were referring to before?
13:59:23  5    A.    Right.
13:59:24  6    Q.    Does this document refresh your
13:59:25  7  recollection that it was January 29, 1996 that Pat
13:59:29  8  Kinsella did a riding exercise with you?
13:59:39  9    A.    I mean, yeah. Yes. I would say yes.
13:59:39 10         (Whereupon, Defendant's Exhibit No. 5 was
14:00:16 11  marked for identification.)
14:00:16 12  BY MS. ALEXANDER:
14:00:30 13    Q.    Showing you what has been marked as
14:00:32 14  Defendant's Exhibit 5 and for the record the word
14:00:37 15  "male" on the top was written on the document in
14:00:39 16  connection with the CHRO proceeding.
14:00:42 17         But other than that, take a minute to look at
14:00:45 18  this and I'm going to ask you whether this is the form
14:00:49 19  that was completed by Matt Cordner in connection with
14:00:53 20  your July 1997 riding exercise?
14:02:01 21    A.    This doesn't, like, jar my memory. I
14:02:05 22  remember that exclusively.
14:02:07 23    Q.    Let me ask you this. Is this document
14:02:08 24  critical of your performance now that you have read
14:02:13 25  through it?
```

## 36

```
14:02:13  1    A.    I mean, yeah. But that's the point of it.
14:02:16  2  They critique your performance.
14:02:19  3    Q.    What comments here are critical since you
14:02:22  4  understand the terminology?
14:02:22  5         MS. EVARTS: They all --
14:03:10  6         MS. ALEXANDER: No, you can't testify.
14:03:11  7  Excuse me.
14:03:20  8    A.    I mean they all explain what I did on the
14:03:23  9  set. I didn't make any mistakes on that one. See, if
14:03:27 10  you look at this one?
14:03:28 11    Q.    You're looking at Defendant's, the '96 ride
14:03:28 12  along?
14:03:33 13    A.    Where it said: Literally a 15 minute trip.
14:03:36 14  We had to go back to the garage because I didn't have
14:03:39 15  a hand set, a phone set cord on the truck.
14:03:42 16    Q.    That's critical?
14:03:43 17    A.    Yeah. I mean, you've got to take a 15
14:03:46 18  minute trip, a return trip.
14:03:50 19    Q.    That's Pat Kinsella's 1996 ride along
14:03:50 20  exercise?
14:03:54 21    A.    Right.
14:03:54 22    Q.    Looking at the 1997 one, are you able to
14:03:56 23  identify anything that's critical of your performance
14:04:02 24  in Mr. Cordner's ride along exercise?
14:04:07 25    A.    No. That he found any faults, no.
```

## Page 37

```
14:04:13  1      Q.  Let me ask you a different question.  Are
14:04:16  2  you finished?
14:04:18  3      A.  Yes.
14:04:22  4      Q.  Did you ever tell Miss Evarts that you
14:04:27  5  thought Mr. Cordner was trying to make life as
14:04:34  6  difficult as possible for her?
14:04:34  7      A.  Did I ever tell?  Repeat that.
14:04:35  8      Q.  Did you ever tell Miss Evarts that you
14:04:39  9  thought Matt Cordner was trying to make life as
14:04:44 10  difficult as possible for Miss Evarts?
14:04:47 11      A.  I might have.  I can't remember saying that
14:04:50 12  distinctly, but I might have said that.
14:04:55 13      Q.  But you don't recall saying it or it didn't
14:04:58 14  happen?
14:04:58 15      A.  I don't recall saying that to her, but I
14:05:03 16  mean, thinking back on all that happened I very well
14:05:06 17  might have said that to her because that was my
14:05:10 18  impression.
14:05:10 19      Q.  Tell me the basis for that impression?
14:05:13 20  What did you actually observe that led you to have the
14:05:18 21  impression that Mr. Cordner was trying to make life
14:05:21 22  difficult for Miss Evarts?
14:05:30 23      A.  It was like a process of like discipline.
14:05:34 24  He would constantly challenge her, call her into the
14:05:40 25  office about the time report sheet that it didn't
```

## Page 38

```
14:05:44  1  match up with the DWS forms.
14:05:46  2          I mean, most of the guys in the crew, we all
14:05:51  3  fill them out at the end of the day.  We estimated the
14:05:53  4  times.  None of our time sheets matched up.
14:05:57  5          But he would constantly call her in every day
14:06:00  6  and threaten discipline for her not doing accurate
14:06:09  7  time recording.  But none of us did, you know.
14:06:11  8      Q.  Is there anything else that led you to
14:06:16  9  believe that Mr. Cordner was trying to make life as
14:06:18 10  difficult as he possibly could for Miss Evarts?
14:06:26 11      A.  Can we take a ten minute break?
14:06:28 12      Q.  After you answer the question you can.  You
14:06:31 13  have to answer the question.
14:06:31 14      A.  You said if I wanted a break you'd give me
14:06:31 15  a break.
14:06:36 16      Q.  You can unless it's an emergency.
14:06:36 17      A.  You didn't say that.
14:06:36 18      Q.  I need you to answer the question from your
14:06:38 19  testimony, not from anyone else's.
14:06:44 20      A.  She was constantly being scrutinized for
14:06:47 21  every like little thing that she did on the job.  I
14:06:50 22  mean, it was quite evident and it wasn't only evident
14:06:54 23  to me.
14:06:56 24          I mean, on one occasion I even brought it up
14:06:59 25  to Matt because I was a union official.  It's like
```

## Page 39

```
14:07:03  1  you're treading in dangerous waters because you're
14:07:06  2  disciplining her for other things that other people do
14:07:09  3  and you're not disciplining them.
14:07:13  4          I mean, on more than one occasion.  I mean,
14:07:19  5  Matt was of the belief like a lot of management people
14:07:22  6  are at SNET that women do not belong out in the field.
14:07:26  7  He has made that statement to me on more than one
14:07:28  8  occasion that he doesn't believe women belong in the
14:07:32  9  field.
14:07:34 10          Now can I have my break?  I answered the
14:07:36 11  question.
14:07:37 12      Q.  Sure.  Are you finished with your answer?
14:07:39 13      A.  Yeah, pretty much.
14:07:40 14      Q.  How long do you need?
14:07:41 15      A.  I don't know.  Ten minutes, five minutes.
14:07:44 16  Between five and ten.  Are you going to hold me to
14:07:47 17  that?
14:07:48 18      Q.  You can have a break.  I am going to ask
14:07:50 19  you about conversations so I would ask you not to do
14:07:54 20  that.
14:07:54 21          (Whereupon there was a brief 20 minute
14:21:46 22  recess in the proceedings.)
14:21:46 23  BY MS. ALEXANDER:
14:21:48 24      Q.  Mr. Iannielo, during your testimony were
14:21:51 25  you shown anything on that pad by Attorney Torre?
```

## Page 40

```
14:21:57  1      A.  During my testimony?
14:22:00  2      Q.  During your testimony.
14:22:00  3      A.  By Attorney Torre?
14:22:02  4      Q.  Yes.
14:22:02  5      A.  No.
14:22:03  6      Q.  How about by Miss Evarts?
14:22:05  7      A.  Yes.
14:22:06  8          MS. ALEXANDER:  I'd like to mark that,
14:22:08  9  whatever it was that you showed him during his
14:22:10 10  testimony.  For the record, I would ask that Miss
14:22:24 11  Evarts who is here as a witness not be passing notes
14:22:27 12  which you know better than to do to the witness during
14:22:27 13  his testimony.
14:22:27 14          (Whereupon, Defendant's Exhibit No. 6 was
14:22:58 15  marked for identification.)
14:22:58 16  BY MS. ALEXANDER:
14:22:58 17      Q.  Defendant's Exhibit 6, is that the note
14:23:00 18  what was shown to you by Miss Evarts during your
14:23:04 19  testimony?
14:23:04 20      A.  Yes.
14:23:04 21      Q.  Did either of these ladies speak with you
14:23:06 22  during the break?
14:23:08 23      A.  Yes.  Attorney Torre.
14:23:09 24      Q.  What did she say?
14:23:10 25      A.  She wanted clarification on the question
```

**57**

```
14:45:07  1    Q.    But you filled it in none the less; right?
14:45:07  2    A.    Right.
14:45:10  3    Q.    Because you were supposed to do that?
14:45:12  4    A.    Yes.
14:45:12  5    Q.    Field exception code.  What does that mean?
14:45:17  6    A.    Pertains like to the work I guess you're
14:45:20  7  doing.  Like 180 is like maintenance of the set.  I
14:45:24  8  think 1 is like the actual work.  I believe 188 is
14:45:24  9  like the set and 988 is you work on the pedestal or
14:45:34 10  enclosure.
14:45:34 11    Q.    So that's the piece of equipment you're
14:45:36 12  actually working on?
14:45:39 13    A.    I believe, yeah.
14:45:39 14    Q.    Hours are the number of hours you worked on
14:45:41 15  that job?
14:45:42 16    A.    Yes.
14:45:42 17    Q.    Does that include travel time?
14:45:45 18    A.    Yes.
14:45:46 19    Q.    So for example here you worked an hour and
14:45:49 20  a half on the first job?
14:45:50 21    A.    Yes.
14:45:53 22    Q.    Then three-quarters of an hour on the
14:45:54 23  second one?
14:45:55 24    A.    Yes.
14:45:55 25    Q.    Your testimony is that you filled those out
```

**58**

```
14:45:57  1  at the end of the day with all this information?
14:46:00  2    A.    Right.
14:46:00  3    Q.    Did you look back at the forms?
14:46:03  4    A.    No.  Because you're signing it off in the
14:46:05  5  computer.  Really, no.  I would just like try and keep
14:46:09  6  track in my head.
14:46:10  7    Q.    How did you remember the telephone numbers?
14:46:13  8    A.    Oh, that I would have a list of the
14:46:15  9  numbers.
14:46:16 10    Q.    So you look back on the paperwork for that
14:46:20 11  information?
14:46:20 12    A.    Right.
14:46:20 13    Q.    Then you sometimes filled in partial day
14:46:22 14  responsibility code?  What does that refer to?
14:46:38 15    A.    These were I think when we did the
14:46:41 16  conversions if I remember correctly.  Remember when we
14:46:47 17  talked about conversions when you're converting the
14:46:52 18  dumb sets to smart sets.  I think that was the code, I
14:46:55 19  think, a special function code for that.
14:46:58 20    Q.    You tried to fill that in when you were
14:47:01 21  supposed to do that?
14:47:01 22    A.    Yes.
14:47:02 23    Q.    The same with function codes, those are
14:47:04 24  similar depending on what kind of job you were doing?
14:47:11 25    A.    Right.
```

**59**

```
14:47:12  1    Q.    Did you have an understanding that Matt
14:47:14  2  Cordner looked at those time sheets after you filled
14:47:18  3  them in?
14:47:20  4    A.    Yes.
14:47:21  5    Q.    Because he signed them; right?
14:47:22  6    A.    Right.
14:47:24  7    Q.    Let's go back to your statement that Mr.
14:47:33  8  Cordner constantly, I think was the word you used,
14:47:36  9  asked to speak with Miss Evarts about her time sheets.
14:47:39 10         Is that what you said?
14:47:41 11    A.    I don't know if I said constantly.
14:47:43 12    Q.    What did you say?
14:47:44 13    A.    Continually.
14:47:45 14    Q.    How many times did you see him do that?
14:47:49 15    A.    I can't recall.  I know it was a lot of
14:47:52 16  times.
14:47:52 17    Q.    Can you give me a estimate?
14:47:56 18    A.    I don't know.
14:47:56 19    Q.    Are we talking about a dozen times or a
14:47:58 20  hundred times?
14:48:00 21    A.    Maybe dozens.  Not hundreds.
14:48:03 22    Q.    Did he talk to her about the issues
14:48:05 23  concerning her time sheets in front of the other
14:48:08 24  technicians or did he go and talk with her privately?
14:48:11 25    A.    Usually I think, yeah.  I don't remember
```

**60**

```
14:48:13  1  him bringing it out in front of the whole group of
14:48:18  2  people.
14:48:18  3    Q.    That's the right thing to do; right?
14:48:18  4    A.    Yes.
14:48:19  5    Q.    You didn't hear the conversation between
14:48:21  6  the two of them; right?
14:48:26  7    A.    No.
14:48:27  8    Q.    You would not have been invited to that as
14:48:29  9  president of the local or anything like that?
14:48:32 10    A.    No.
14:48:35 11    Q.    If she had been disciplined concerning time
14:48:37 12  sheets, she would have had the right to have union
14:48:41 13  representation; right?
14:48:42 14    A.    Yes.
14:48:47 15    Q.    When Mr. Cordner asked to speak with her
14:48:51 16  about the time sheets, was he rude?
14:49:03 17    A.    I wouldn't say he was rude, but more like
14:49:03 18  agitated.
14:49:07 19    Q.    Do you know what time period you observed
14:49:11 20  him asking to speak with her about her time sheets?
14:49:14 21    A.    I can't place the actual date on it, no.
14:49:17 22  It was like maybe two or three months like leading up
14:49:24 23  to the time she left.
14:49:25 24    Q.    When he would ask to speak to her, did she
14:49:28 25  then make comments to you or anyone else?  Like here
```

## Page 65

1  A.  I would have to say yes. I don't remember her exact words. I think it was that day that I just referred to, when they had -- like it got vocal.

    She came to me. She was very upset. How she said it, like you've got to do something about this, you know. I can't remember exactly. But I think she did and put it in some way to me that I ought to interject.

9  Q.  Is her statement true that he never did. He said to wait for him to harass me again?

11 A.  I don't remember saying that. I can't recall either way whether I said it. I might have said it. I don't know. I'm not going to refute it. I can't say I actually said it.

15 Q.  You don't know?
16 A.  I don't know.
17 Q.  But your testimony a little while ago was that you went to Matt?
19 A.  I did talk to him. I don't know if it was because of that, but I remember talking to him about it.
22 Q.  So the statement --
23 A.  We're talking about a long time ago.
24 Q.  I know. I'm trying to get clear what the facts are from your perspective. Is it true or is it

## Page 66

not true that you never did talk to Matt about harassment of Miss Evarts as Miss Evarts' claims?

3  A.  I said that. I did broach the subject with Matt about that.

5  Q.  So if she said --
6  A.  I might not have told her. I mean, I might not have said, "Yeah, I sat down to talk to him."

8  Q.  So if Miss Evarts said he never did, meaning you, he said to wait for him to harass me again and collect more evidence." That's not what you said?

12 A.  I told you. I can't remember whether I said that or not.

14 Q.  Is that something that you would say as a union representative?

16 A.  I mean like, I don't know when she was referring to. You know? I mean, if it was something that was just occurring, I would probably say, "Yeah. I want you to document more."

    I mean, if it was like one or two times I might have said that. I don't know like when she was referring to in that process of what was going on. I mean.

24 Q.  Is it fair to say that discrimination of any sort is a violation of the collective bargaining

## Page 67

agreement?

2  A.  Yeah. I mean, yeah.
3  Q.  There is a provision in the collective bargaining --
5  A.  I'm not sure of the exact wording. I'm not really sure. If have you it, enlighten me.
7  Q.  I'm trying to avoid too many documents.
    (Whereupon, Defendant's Exhibit No. 8 was marked for identification.)
BY MS. ALEXANDER:
11 Q.  Could you look at Bates stamp page number 1448. There's a section there that says: Non-discrimination clause. In a desire to restate the respective policy, neither the company nor the union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, age or national origin; right?
18 A.  Right.
19 Q.  So does this refresh your recollection that it is in fact a violation of the collection bargaining agreement to discriminate against someone because of their sex?
23 A.  Yes.
24 Q.  Is it in fact true that you did not have Miss Evarts file a grievance alleging discrimination?

## Page 68

1  A.  I don't know. I don't know. I can't say that because I referred to her to Debby Guarneri but I don't remember exactly what that was for.

    But I did get her in touch with a steward. I knew it was Debby Guarneri. I apprised her of the situation that was going on.

7  Q.  What did you tell her?
8  A.  Debby?
9  Q.  Yes.
10 A.  That we may have a case of harassment going on and that she needed to speak with Denise. Like I stated earlier, in my capacity as president I didn't handle grievances.

14 Q.  Right. But you referred people?
15 A.  Right.
16 Q.  Do you know when you referred her to Debby Guarneri?
18 A.  I don't remember.
19 Q.  The other thing you said, one of the other things you said in response to my question about where you got your general impression?
22 A.  Right.
23 Q.  That Miss Evarts was constantly being scrutinized for every little thing. When you made this comment or this statement, were you referring to

## 69

1 the time sheet situation we already talked about?
2  A. No I mean, no. It was like all little
3 things, like leaving your van unlocked, riding
4 exercises.
5  Q. So your testimony is that Miss Evarts was
6 being scrutinized for every little thing because she
7 had riding exercises?
8  A. I mean, I remember -- like it's so long
9 ago.
10  Q. Can you answer that question and then you
11 can say what you want to say?
12  A. Can you ask me the question again?
13  Q. Is it your testimony that Miss Evarts was
14 constantly being scrutinized in your view for every
15 little thing because among other things, she had a
16 riding exercise?
17  A. If I remember correctly, it was more than
18 one. I can't remember every incident, but I know
19 thinking back on it, it seemed like every day it was
20 something.
21      To ask me to pinpoint certain things, I can't
22 exactly say, well it was for this or that or the other
23 thing.
24  Q. You've given your general impression. What
25 I need to do now is find out specifically what are the

## 70

1 facts that created that general impression.
2      If you don't remember them, you don't
3 remember them. But I need to do know to the extent
4 that you're going to testify at trial about something,
5 I need to know that now.
6  A. Right.
7  Q. Have you been asked to be a witness for
8 Miss Evarts at trial?
9  A. I don't know. Have I? I guess. That's
10 why I'm here; isn't it?
11  Q. Do you understand they have disclosed you
12 as a witness at trial?
13  A. Yeah. Yes. I mean, yes.
14  Q. So let me go back to my original question.
15 The fact that Mr. Cordner did a riding exercise with
16 Miss Evarts?
17  A. I'm under the impression it was more than
18 one.
19  Q. Let's look back at the exhibit. If I were
20 to tell you that Mr. Cordner only did one riding
21 exercise with Miss Evarts --
22  A. I would find that hard to believe. Maybe
23 one documented one.
24  Q. If I were to tell you that there was only
25 one, would you consider that to be discriminatory?

## 71

1  A. In itself, no.
2  Q. Do you have any reason to believe that
3 anything happened on the riding exercise that was
4 unfair to Miss Evarts?
5  A. I don't know what happened on the riding
6 exercise.
7  Q. Defendant's 3, if you look at that. Mr.
8 Cordner became the supervisor in June of 1996?
9  A. Yes.
10  Q. According to that document how many riding
11 exercises did she have?
12  A. One.
13  Q. Therefore, I'm going to ask you about each
14 of the things you specified. Do you have any reason
15 to believe that it was discriminatory for Mr. Cordner
16 to have a riding exercise with one of his technicians?
17      MS. TORRE: Objection to the form.
18  A. In the limited context in which you phrased
19 that question, to have a riding exercise with one of
20 his technicians, no. I don't.
21  Q. But if he had had five with her, you would
22 think that was discriminatory perhaps? Or not?
23  A. Yes, yes, I would.
24  Q. You say it was constantly something and the
25 other thing you've mentioned was leaving the van

## 72

1 unlocked?
2  A. Right.
3  Q. Do you have an understanding that Miss
4 Evarts was counseled or coached about leaving her van
5 unlocked?
6  A. No. I was not aware of that.
7  Q. What do you know about leaving the van
8 unlocked? What lead you to say that?
9  A. I know that she was called in, I mean, on
10 several occasions about that.
11  Q. About leaving her van unlocked?
12  A. Right.
13  Q. How did you know that?
14  A. I don't know. Like you're working together
15 in an office and I mean, you know. I don't know if
16 she came up or talked about it among the crew.
17  Q. So either she told you about it or one of
18 the other technicians told you?
19  A. Right.
20  Q. Matt Cordner didn't tell you?
21  A. No.
22  Q. He wouldn't do that?
23  A. No, no.
24  Q. Do you know whether she received discipline
25 concerning leaving her van?

**73**

1  MS. TORRE: Objection to the form.
2  A. Repeat the question.
3  Q. Did you know whether she was disciplined
4  for leaving her van unlocked?
5  MS. TORRE: Objection to the form.
6  A. I don't know.
7  Q. You in fact were disciplined for leaving
8  your van unlocked; right?
9  A. Uh-huh.
10 Q. Yes?
11 A. Yes. I was suspended, I believe.
12 Q. What part of the van did you leave unlocked
13 that led to that?
14 A. It had to be the rear because you're
15 supposed to leave the cab unlocked.
16 Q. You're supposed to leave the driver's side
17 of the cab unlocked; right?
18 A. Yes.
19 Q. In case of fire?
20 A. Yes. All your valuable items are supposed
21 to be secured in the back of the van.
22 Q. When you say valuable items, do you mean
23 tools and coin receptacles, that sort of thing?
24 A. Yes.
25 Q. Sometimes did you leave coin receptacles in

**74**

1  the back of your truck rather than putting them in the
2  locker?
3  A. I would imagine, probably, yes.
4  Q. Overnight?
5  A. Collected coin boxes with money in them.
6  Q. Right. You did that sometimes?
7  A. Yes.
8  Q. Other technicians did that?
9  A. I would imagine. I mean, I don't know for
10 sure.
11 Q. You're a male; right? You're a male?
12 A. I hope so.
13 Q. Mr. Cordner also spoke with Mrs. Evarts
14 about the same issue; right?
15 A. Yes. Mine wasn't addressed until after
16 Denise was already gone. Never during the time that
17 Denise Evarts worked there was I ever confronted about
18 leaving my van unlocked that I remember.
19 Q. In March of 1997, Mr. Cordner checked all
20 the vehicles?
21 A. Did he? Well, maybe. I said to the best
22 of my recollection.
23 Q. Well, let me see if I can refresh your
24 recollection.
25 A. All right.

**75**

1  Q. If March of 1997 which is several months
2  before Miss Evarts left, do you recall she left in May
3  of 1997?
4  A. Yeah. I mean, not the actual day, but.
5  Q. Do you recall that Mr. Cordner actually
6  checked all the technicians' trucks?
7  A. Yes.
8  Q. Do you recall that as a result of checking
9  all those trucks, he found three technicians with the
10 back door unlocked or some door unlocked. Do you
11 recall that?
12 A. I'm taking your word for it.
13 Q. Do you recall that?
14 A. I don't know. I know he did it. Some
15 mornings he would come in and the first thing he would
16 do is check all the doors on the vans.
17 Q. He wasn't just checking Miss Evarts' door.
18 He was checking everybody's?
19 A. Yes. I guess from what you're telling me.
20 Well, yes, he did. No you're right. Yes, he did. He
21 came in in the morning and checked them.
22 Q. Take your time. I don't want you to feel
23 rushed because I want you to make sure you're
24 distinguishing between what you know yourself and what
25 I'm saying to you?

**76**

1  A. Right.
2  Q. So the record is clear, you know that Mr.
3  Cordner was checking all the technicians' trucks;
4  right?
5  MS. TORRE: Objection to the form.
6  MS. ALEXANDER: You can answer.
7  THE WITNESS: Repeat the question.
8  MS. ALEXANDER: Do you want to answer that?
9  (Whereupon there was a momentary pause in
10 the proceedings.)
11 MS. ALEXANDER: Can you read that back?
12 (Whereupon the court reporter read back the
13 previous question.)
14 A. Yes.
15 BY MS. ALEXANDER:
16 Q. Was that a change from your prior
17 supervisor? Did Pat Kinsella do that?
18 A. I don't think he did, no.
19 Q. Do you recall after Mr. Cordner checked all
20 the technicians' trucks, he found that more than one
21 technician had left them unlocked?
22 A. Right.
23 Q. Do you recall that you were one of those
24 technicians?
25 A. I mean, I won't contest that statement from

**77**

```
15:09:59  1  you.  Let's put it that way.
15:10:01  2      Q.   Is that something you did fairly often?
15:10:04  3      A.   Yes.
15:10:07  4      Q.   At least initially?
15:10:07  5      A.   Yes.
15:10:07  6      Q.   Do you recall that Mr. Cordner coached or
15:10:10  7  counseled or spoke to you and the others about his
15:10:16  8  expectations that you had to lock the trucks?
15:10:19  9      A.   I know he spoke to me about it.
15:10:24 10      Q.   It was later that you received formal
15:10:27 11  discipline about that; right?
15:10:29 12      A.   Yes.  Much later.
15:10:32 13      Q.   At the time that you received formal
15:10:34 14  discipline you had already been spoken to about that
15:10:40 15  issue how many times?
15:10:41 16      A.   I don't recall.
15:10:42 17      Q.   Can you give me an estimate?
15:10:44 18      A.   Three, four times probably.
15:10:46 19      Q.   So you didn't think it was unfair did you
15:10:49 20  for Mr. Cordner to institute discipline when it was an
15:10:56 21  issue that he had spoken with you about before?
15:10:59 22      A.   I thought it was very unfair because we had
15:11:04 23  another technician in our crew.  His name was Rick
15:11:08 24  Dellavolpe.  I don't know whether or not they were in
15:11:09 25  the back, but he had left all his tools unsecured in
```

**78**

```
15:11:17  1  the cab of his truck and subsequently they were all
15:11:17  2  stolen.
15:11:19  3           He reported it to Matt.  It came up at my
15:11:22  4  grievance hearing for my suspension.  Matt never even
15:11:26  5  gave him a verbal warning or any kind of discipline.
15:11:30  6  He lost $300 worth of tools.
15:11:32  7           So I thought it was unfair because he checks
15:11:38  8  the vans in the morning, but I know.  I mean, I know
15:11:41  9  that I wasn't the only one that left them open.  I was
15:11:46 10  suspended.  I know someone who lost $300 worth of
15:11:47 11  equipment, you know.
15:11:48 12      Q.   So you thought that Mr. Dellavolpe was
15:11:57 13  being treated preferentially?
15:11:57 14      A.   I think it's more that he was less
15:11:58 15  intimidated by me than he was by Mr. Dellavolpe.  Plus
15:12:04 16  I was a union officer.  So I think that played a part
15:12:05 17  in it as well.
15:12:09 18      Q.   Do you know whether it was the first time
15:12:11 19  that Mr. Dellavolpe had been found to leave his truck
15:12:17 20  unlocked?
15:12:17 21      A.   I don't know.  But I do know that I never
15:12:20 22  lost the tools or had the tools stolen from the
15:12:23 23  vehicle.
15:12:28 24      Q.   He didn't lose any money.  He lost $300
15:12:27 25  worth of stuff is what you said?
```

**79**

```
15:12:28  1      A.   Right.
15:12:29  2      Q.   It was stolen in the garage?
15:12:30  3      A.   I'm not sure.  I just know he had to get
15:12:32  4  all his tools replaced.
15:12:34  5      Q.   But you don't know, do you, whether he had
15:12:38  6  been counseled two or three times before that?
15:12:43  7      A.   I don't know.
15:12:44  8      Q.   So you thought that Mr. Cordner was
15:12:47  9  actually unfair to you by disciplining you about not
15:12:53 10  leaving your truck unlocked?
15:13:00 11      A.   I thought it was unfair being suspended for
15:13:03 12  five days, losing five days pay when there was another
15:13:07 13  technician who actually lost $300 worth of equipment
15:13:10 14  and didn't receive any disciplinary action whatsoever,
15:13:14 15  be it verbal warning or whatever.  Yes.  I thought
15:13:17 16  that was very unfair.
15:13:19 17      Q.   Did you think it was unfair when Mr.
15:13:24 18  Cordner spoke to you about the need to lock your truck
15:13:27 19  before he suspended you?
15:13:29 20      A.   No, no.  I mean, no.
15:13:30 21      Q.   What do you think would have been fair
15:13:34 22  under the circumstances instead of the suspension?
15:13:39 23      A.   I can't answer that.  I don't know what
15:13:41 24  would have been fair.  I don't know.  I don't know.
15:13:43 25      Q.   Well, you're not a supervisor?
```

**80**

```
15:13:46  1      A.   Right.
15:13:46  2      Q.   So you feel like you can't make that
15:13:48  3  decision.  But if you look at the steps of progressive
15:13:51  4  discipline, is there a step of discipline that you
15:13:53  5  would not have felt was unfair under those
15:14:00  6  circumstances?
15:14:04  7           MS. TORRE:  Objection to the form.
15:14:04  8           MS. ALEXANDER:  You can answer.
15:14:04  9      A.   I mean, I don't know.  No.  I'm not
15:14:08 10  prepared to make any kind of determination of what
15:14:11 11  would have been fair and what would not have been
15:14:16 12  fair.
15:14:16 13      Q.   Fair enough.  Did you grieve that
15:14:17 14  suspension?
15:14:18 15      A.   Yes, I did.
15:14:19 16      Q.   How did that come out?
15:14:24 17      A.   Well, here we go with this one.  We were in
15:14:30 18  the grievance hearing.  It was myself with Chris Smith
15:14:32 19  who was the business agent there.
15:14:35 20           I don't remember if there was a steward there
15:14:36 21  or not.  There might have been.  It was Matt Cordner,
15:14:41 22  Ed Dillman and Dave Roberts I believe was there who
15:14:43 23  was labor relations.  I think Eric Rask might have
15:14:48 24  been there, too.  He was the executive coordinator
15:14:51 25  from the union.
```

81

1 And they thought that the suspension was
2 excessive. I believe it was five days. I don't know
3 if they wanted to get it completely thrown out or
4 reduced to like two or three days.
5 Part of the contention there was that it was
6 harassment of a union official. It was brought up
7 about Rick Dellavolpe, how he had $300 worth of tools
8 stolen. I never lost any tools or had any stolen.
9 And it was brought up that he didn't ever
10 receive any discipline about it, verbal warning or
11 anything.
12 I remember Ed Dillman asked that of Matt
13 Cordner and Matt said, "No, I didn't, no." Dillman
14 said when he comes in the garage tonight, you're going
15 to give him a verbal warning.
16 The steward said, "No, you can't do that.
17 Because you're suspending him now and you let him go,
18 you can't take a guy in after four weeks or however
19 long it was, a month and now discipline him because
20 you're suspending Dave and he's grieving it."
21 Then Ed Dillman brought up a list of other
22 violations that I had. One was like working, where I
23 was working on pay phones one day and the pay phone
24 was roadside. I was under the impression the only
25 time that you're supposed to wear a hard hat is when

82

1 you're working aloft.
2 I never read the actual SNET safety book
3 which is that thick. Matt pulled up on the job and
4 said, "Dave, I have to write you up because you're
5 working on a pay phone that's roadside and you don't
6 have a hard hat on."
7 It was maybe five feet from the street,
8 whatever. There was times I got written up for not
9 having safety glasses on, not having cones out.
10 So Ed Dillman was going through the list of
11 things. I said to Ed, "I understand your concern
12 about safety practices."
13 I said, "You know, don't you think that it
14 would be right that like your management people should
15 exhibit these safety practices more than anyone else?
16 I mean lead by example."
17 He said, "Yes, Dave. You're right. That's
18 true." Like a week prior to that hearing we had a new
19 supervisor. His name was Lou Marino.
20 I came up on him. Matt was showing him how
21 he does inspections. He was training for the
22 supervisor job. They were working in Cromwell, a
23 Mobile station on 372. I remember distinctly. Matt
24 had his car parked. He had no cones out.
25 They were working on the pay phone that was

83

1 roadside. They had no hard hats on. Both of them
2 were working on the set with no safety glasses on. I
3 brought that up to Dillman.
4 I said, "How come then I pulled up to a job
5 Matt was on. He had no cones out. The pay phone was
6 roadside. He had no hard hat on, no safety glasses
7 on.
8 At that point, Matt got up and says, "If
9 that's the way you want to be, I'm going to get you.
10 I'm going to get you." Dillman had to restrain him.
11 They said that we need a recess.
12 Dave Roberts, labor relations, and Matt and
13 Ed went outside. They came back in. They said, "We
14 thought this over. We're going to reduce it to like
15 two day suspension." I already had the time off.
16 They said I could take like three vacation days to
17 make up for the three days.
18 Q. So you wouldn't lose any pay?
19 A. I said, "No. I'm not going to do that." I
20 already had vacation plans. I'm not going to use my
21 vacation days. I wound up eating five days I believe,
22 but yeah. That's what the result of that was.
23 Q. So we got to this from locking your truck?
24 A. You were asking. It was the result of what
25 happened.

84

1 Q. Right. How did the grievance come out I
2 think is what I asked you?
3 A. Right.
4 Q. But then you continued working at SNET
5 after that; right?
6 A. Yes.
7 Q. Did you lock your truck after that?
8 A. I mean, there was times I forgot to lock
9 it. Sometimes I didn't. I mean, there was times when
10 I thought I locked it and I was told that I didn't
11 lock it.
12 So I mean, there's a lot of keys to trucks in
13 the garage. The mechanics have like two sets. So I
14 mean, you know, there were other times I thought for
15 sure I locked my van and I was told it was open.
16 There was times I didn't lock it that I know I forgot
17 to lock it.
18 Q. You tried to lock it after that?
19 A. Right.
20 Q. So to put this together, I think you said
21 the basis for your impression that Mr. Cordner was
22 trying to get rid of Miss Evarts was the time sheet
23 situation, the truck being unlocked and the riding
24 exercises and the comments which we have not talked
25 about?

## 101

```
15:37:24  1   Q.   Do you understand the question?
15:37:27  2   A.   Can you repeat it.
15:37:28  3   Q.   Let me ask it a different way. Did you ever
15:37:33  4   hear anyone else or Matt Cordner making any other
15:37:38  5   remarks about women other than what you already talked
15:37:44  6   about today?
15:37:44  7   A.   Did I hear anyone other than Matt Cordner?
15:37:47  8   Q.   Or Matt Cordner make any other remarks
15:37:50  9   about women?
15:38:00 10   A.   There's a lot of men who work outside that
15:38:06 11   I've seen like that, that are of that same opinion.
15:38:10 12   They resent the fact that women work out in the field.
15:38:12 13        So I didn't only hear that kind of comment
15:38:15 14   from Matt Cordner. I mean, but that's the only
15:38:22 15   statements I ever heard him make, to that, what I told
15:38:27 16   you.
15:38:28 17   Q.   That's the only statement you heard Mr.
15:38:30 18   Cordner make?
15:38:30 19   A.   The one I told you about.
15:38:34 20   Q.   Who else did you hear make that statement?
15:38:35 21   A.   I can't pinpoint other guys. We had a guy
15:38:38 22   in our crew. It was after Matt left for a short time.
15:38:38 23   This kid, Bud Fennel.
15:38:42 24   Q.   Let me limit the time frame. During the
15:38:44 25   time that you worked with Denise Evarts, did you hear
```

## 102

```
15:38:47  1   any other gender related remark in the work place?
15:38:51  2   A.   I would say no because that's so short a
15:38:54  3   time frame, no, no. Can we take five?
          4        MS. ALEXANDER: Sure.
          5        (Whereupon there was a brief 15 minute
          6   recess in the proceedings.)
          7        (Whereupon, Defendant's Exhibit Nos. 9
          8   through 14 were marked for identification.)
          9   BY MS. ALEXANDER:
15:56:38 10   Q.   Mr. Iannielo, you testified before the
15:56:39 11   break concerning Rick Dellavolpe leaving his truck
15:56:42 12   unlocked and having tools stolen.
15:56:47 13        Do you have a clear recollection that that in
15:56:47 14   fact occurred?
15:56:48 15   A.   Yes.
15:56:48 16   Q.   Did he tell you that occurred?
15:56:50 17   A.   Yes. Because I asked him. I asked him.
15:56:53 18   Q.   Did you report it to your supervisor?
15:56:56 19   A.   No. Because I was under the impression
15:57:01 20   that Matt knew about it because Rick had to get all
15:57:01 21   his tools replaced.
15:57:03 22   Q.   Sometimes you carry more than one set of
15:57:05 23   tools; right?
15:57:06 24   A.   Right.
15:57:06 25   Q.   Did you report it to Matt Cordner?
```

## 103

```
15:57:08  1   A.   No.
15:57:09  2   Q.   Is it possible that it occurred under a
15:57:13  3   different supervisor?
15:57:14  4   A.   Not that I was aware of.
15:57:19  5   Q.   Is it possible that was under a different
15:57:19  6   supervisor?
15:57:21  7   A.   No. Not from what Rick told me, no.
15:57:25  8   Q.   What did Rick tell you?
15:57:26  9   A.   I asked him if all the tools are gone. He
15:57:29 10   said, "Yeah, because I forgot to secure them in the
15:57:32 11   back," I think is what he said. They were left in the
15:57:35 12   cab of the truck.
15:57:36 13   Q.   Did he tell you that he told Matt Cordner
15:57:39 14   in particular?
15:57:41 15   A.   I don't remember. But I do remember when
15:57:43 16   we were at the grievance hearing for me that I brought
15:57:49 17   that up.
15:57:49 18   Q.   Right. But is it possible that that
15:57:50 19   occurred while Pat Kinsella was the supervisor?
15:58:01 20   A.   I don't know the actual date it happened.
15:58:03 21   Let's put it that way. I mean, I can't say. This was
15:58:07 22   like six, seven months I think after Pat was gone.
15:58:10 23        So why it came up then is, I mean, I don't
15:58:15 24   know. It would be strange to me if it happened when
15:58:19 25   Pat was there. That would seem very odd to me. It
```

## 104

```
15:58:23  1   was brought up seven, eight months later.
15:58:27  2   Q.   When did you receive the discipline that
15:58:30  3   led to you bringing that up?
15:58:33  4   A.   That had to be like, I don't know, 2000 or
15:58:37  5   somewhere around there. That grievance hearing?
15:58:40  6   Q.   Yes.
15:58:40  7   A.   I don't know. It had to be -- I don't
15:58:44  8   know. Like around maybe -- I'm not sure. I know it's
15:58:48  9   long after Denise was gone. I don't know. Like, I'm
15:58:52 10   not exactly sure of the date.
15:58:54 11   Q.   You don't have any personal knowledge do
15:58:55 12   you that Matt Cordner knew about Rick Dellavolpe
15:59:02 13   losing his tools?
15:59:07 14   A.   Yes. Because when I brought it up at the
15:59:10 15   grievance hearing, Ed Dillman asked Matt if that was
15:59:12 16   true. Matt said, "Yes."
15:59:12 17        Ed Dillman said, "Well, you're going to
15:59:16 18   discipline him when he comes in tonight for that." So
15:59:19 19   he had to have knowledge.
15:59:24 20   Q.   Asked him if what was true?
15:59:24 21   A.   When we were at the grievance hearing, I
15:59:29 22   brought up the fact that Rick Dellavolpe had his tools
15:59:30 23   stolen out of the van and didn't receive any
15:59:32 24   discipline whatsoever.
15:59:35 25        Ed Dillman at that point turned to Matt and
```

157

```
17:11:48  1        MS. ALEXANDER: Stop calling me names. I'm
17:11:48  2   tired of it.
17:11:50  3        MS. TORRE: You have to start a dispute
17:11:50  4   over everything, Lori. Everything. Why don't you act
17:11:54  5   like a human being for once with some kind of
17:11:57  6   conscience.
          7        THE WITNESS: Where's the original
          8   subpoena?
          9        THE COURT REPORTER: Are we off the record
         10   now?
         11        MS. TORRE: We've been off the record.
         12        MS. ALEXANDER: No, we haven't. We are
         13   now.
```

158

| | EXAMINATIONS | | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | DIRECT EXAMINATION | | 4 |
| 3 | | | |
| 4 | DEFENDANT'S EXHIBITS | BATES | |
| 5 | NO. 1 - SUBPOENA | | 4 |
| 6 | NO. 2 - PROGRESSIVE DISCIPLINE | | 20 |
| 7 | NO. 3 - RIDING EXERCISES 1996 | 199 | 30 |
| 8 | NO. 4 - RIDING EXERCISES 1/29/96 | 1811 | 34 |
| 9 | NO. 5 - RIDING EXERCISES 7/29/97 | 1280 | 35 |
| 10 | NO. 6 - PURPLE HAND WRITTEN NOTES SHOWN | | 40 |
| 11 | NO. 7 - TIME SHEETS | | 52 |
| 12 | NO. 8 - CONTRACT | 1434 | 67 |
| 13 | NO. 9 - COIN SECURITY | 1624 | 102 |
| 14 | NO. 10 - VERBAL WARNING | 1623 | 102 |
| 15 | NO. 11 - NOTICE REPORTED ACTION | 1605 | 102 |
| 16 | NO. 12 - VERBAL WARNING 5/19/97 | 1611 | 102 |
| 17 | NO. 13 - NOTICE | 1612 | 102 |
| 18 | NO. 14 - QUALITY INSPECTION | 1613 | 102 |
| 19 | NO. 15 - NOTICE | 1619 | 124 |
| 20 | NO. 16 - LETTER 9/9/97 | 1620 | 129 |
| 21 | NO. 17 - NOTICE REPORTED ACTION | 1731 | 129 |

159

CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the foregoing deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, not of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand as Notary Public this 10th day of September, 2003.

_____
Holly M. Murphy
NOTARY PUBLIC in and for the
State of Connecticut.
00177

160

INSTRUCTIONS FOR READING AND SIGNING OF DEPOSITION

CASE NAME: DENISE EVARTS VS SNET COMPANY
DEPOSITION OF: DAVID IANNIELO
SENT TO: DAVID IANNIELO

1. To Witness: Please read the enclosed transcript of your deposition.

2. If there are any corrections to be made in the transcript, please DO NOT make them on the transcript. Please use the attached form to list any and all corrections.

3. After reading the deposition, appear and sign before a notary public where indicated.

4. DO NOT MAKE CHANGES JUST TO RESTATE YOUR TESTIMONY.

5. Please return to:
DEL VECCHIO REPORTING SERVICE
117 RANDI DRIVE
MADISON, CT 06443

Thank you.