$700,000 in emotional distress damages on her sexual harassment claim, and $300,000 in emotional distress damages on her constructive discharge claim. GMC appeals from the district court's denial of its post-trial motion for judgment as a matter of law, and the district court's award of attorneys' fees attendant to the posttrial motion. We reverse.

I.

Diana Duncan worked as a technical training clerk in the high-tech area at GMC as part of the College's Center for Business, Industry, and Labor program from August 1994 until May 1997. Duncan provided in-house training support to GMC employees.

Duncan first learned about the College's position at GMC from Booth, a United Auto Workers Union technology training coordinator for GMC. Booth frequented the country club where Duncan worked as a waitress and a bartender. Booth asked Duncan if she knew anyone who had computer and typing skills and who might be interested in a position at GMC. Duncan expressed interest in the job. Booth brought the preemployment forms to Duncan at the country club, and he forwarded her completed forms to Jerry Reese, the manager of operations, manufacturing, and training for the College. Reese arranged to interview Duncan at GMC. Reese, Booth, and Ed Ish, who was Booth's management counterpart in the high-tech area of the GMC plant, participated in the interview. Duncan began work at GMC in August 1994.

Two weeks after Duncan began working at GMC, Booth requested an off-site meeting with her at a local restaurant. Booth explained to Duncan that he was in love with a married coworker and that his own marriage was troubled. Booth then propositioned Duncan by asking her if she would have a relationship with him. Duncan rebuffed his advance and left the restaurant. The next day Duncan mentioned the incident to the paint department supervisor Joe Rolen, who had no authority over Booth. Duncan did not report Booth's conduct to either Reese (her supervisor) at the College or Ish (Booth's management counterpart) at GMC. However, she did confront Booth, and he apologized for his behavior. He made no further such "propositions." Duncan stated that Booth's manner toward her after she declined his advance became hostile, and he became more critical of her work. For example, whenever she made a typographical error, he told her that she was incompetent and that he should hire a "Kelly Services" person to replace her. Duncan admitted that Booth's criticisms were often directed at other employees as well, including male coworkers.

Duncan testified to numerous incidents of Booth's inappropriate behavior. Booth directed Duncan to create a training document for him on his computer because it was the only computer with the necessary software. The screen saver that Booth had selected to use on his computer was a picture of a naked woman. Duncan testified to four or five occasions when Booth would unnecessarily touch her hand when she handed him the telephone. In addition, Booth had a planter in his office that was shaped like a slouched man wearing a sombrero. The planter had a hole in the front of the man's pants that allowed for a cactus to protrude. The planter was in plain view to anyone entering Booth's office. Booth also kept a child's pacifier that was shaped like a penis in his office that he occasionally showed to his coworkers and specifically to Duncan on two occasions.

In 1995, Duncan requested a pay increase and told Booth that she would like to be considered for an illustrator's posi-

tion. Booth said that she would have to prove her artistic ability by drawing his planter. Duncan objected, particularly because previous applicants for the position were required to draw automotive parts and not his planter. Ultimately, Duncan learned that she was not qualified for the position because she did not possess a college degree.

Additionally in 1995, Booth and a College employee created a "recruitment" poster that was posted on a bulletin board in the high-tech area. The poster portrayed Duncan as the president and CEO of the Man Hater's Club of America. It listed the club's membership qualifications as: "Must always be in control of: (1) Checking, Savings, all loose change, etc.; (2)(Ugh) Sex; (3) Raising children our way!; (4) Men must always do household chores; (5) Consider T.V. Dinners a gourmet meal." (Appellant's App. at 99.) In April 1996, Booth and a College employee arranged to have Duncan "arrested" at GMC as part of a charity event. A fellow employee explained the event to Duncan, and Duncan left willingly with the "police officer." Booth's financial donation to the charity secured Duncan's "release." Instead of escorting Duncan back to GMC, and despite her protestations, Booth took Duncan to a bar.

On May 5, 1997, Booth asked Duncan to type a draft of the beliefs of the "He–Men Women Hater's Club." The beliefs included the following:

- Constitutional Amendment, the 19th, giving women [the] right to vote should be repealed. Real He–Men indulge in a lifestyle of cursing, using tools, handling guns, driving trucks, hunting and of course, drinking beer.
- Women really do have coodies [sic] and they can spread.
- Women [are] the cause of 99.9 per cent of stress in men.
- Sperm has a right to live.
- All great chiefs of the world are men.
- Prostitution should be legalized.

(Appellant's App. at 95–96.) Duncan refused to type the beliefs and resigned two days later.

Duncan testified that she complained to anyone who would listen to her about Booth's behavior, beginning with paint department supervisor Joe Rolen after Booth propositioned her in 1994. Duncan testified that between 1994 and 1997 she complained several times to Reese at the College about Booth's behavior, which would improve at least in the short term after she spoke with Reese. During that same time period, Duncan met twice with an attorney to discuss her treatment by Booth. Duncan reported Booth's alleged harassment to union official Bob Boatwright some time before April 1, 1997, and to the United Auto Workers local chairman employed at GMC, Wayne Belue, approximately one week later. Belue advised Duncan to report her allegations directly to Tom Pilkington who was the personnel director at the GMC plant. Duncan met with Pilkington, Boatwright, and Belue on April 1, 1997. During that meeting, Duncan recounted Booth's antics and explained that she previously had never complained to GMC management about Booth. Pilkington told Duncan that she needed to meet with Al Moellenhoff, GMC's Equal Employment Opportunity (EEO) coordinator. After the meeting, Personnel Director Pilkington removed the planter from Booth's office and contacted Moellenhoff and requested that he begin an investigation. Pilkington also informed the College that Duncan reported being harassed at GMC. Duncan met with EEO Coordinator Moellenhoff and agreed to prepare a written statement recounting the alleged incidents with Booth. In the meantime, Moellenhoff prepared a list of suggested corrective actions for GMC to



initiate. Duncan resigned prior to submitting her written allegations to GMC and prior to GMC's initiation of any of the suggested corrective actions.

Duncan filed a charge of sex discrimination with the Equal Employment Opportunity Commission (EEOC) on October 30, 1997. The EEOC issued Duncan a right to sue notice on April 17, 1998. Alleging sexual harassment and constructive discharge, Duncan filed suit against the College and GMC under both Title VII of the Civil Rights Act and the Missouri Human Rights Act. Duncan settled with the College prior to trial. After the jury found in Duncan's favor on both counts against GMC, GMC filed a posttrial motion for judgment as a matter of law or, alternatively, for a new trial. The district court denied the motion. The district court also awarded Duncan attorneys' fees in conjunction with GMC's posttrial motion. GMC appeals.

## II.

### A. Hostile Work Environment

[2, 3] GMC argues that it was entitled to judgment as a matter of law on Duncan's hostile work environment claim because she failed to prove a prima facie case. We agree. We review the district court's denial of a motion for judgment as a matter of law de novo, using the same standard as the district court. *Brown v. Lester E. Cox Med. Ctrs.*, 286 F.3d 1040, 1044 (8th Cir.2002). Judgment as a matter of law is proper "when all the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict." *Blackmon v. Pinkerton Sec. & Investigative Servs.*, 182 F.3d 629, 635 (8th Cir.1999) (internal quotations omitted).

[4] Under Title VII, an "employer" is prohibited from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Passing for the moment the thorny issue of whether GMC was actually Duncan's employer under the statute, we turn our attention to the merits of her claims. In order to succeed on a claim of hostile work environment sexual harassment, Duncan was required to prove "that she was a member of a protected group, that she was subjected to unwelcome sexual harassment, that the harassment was based on sex, and that the harassment affected a term, condition, or privilege of her employment." *Beard v. Flying J, Inc.*, 266 F.3d 792, 797–98 (8th Cir.2001).

[5–7] It is undisputed that Duncan satisfies the first two elements of her prima facie case: she is a member of a protected group and Booth's attention was unwelcome. We also conclude that the harassment was based on sex. An offensive workplace atmosphere does not amount to unlawful discrimination unless one gender is treated differently than the other. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The fundamental issue is whether members of one sex are subjected to unfavorable conditions of employment that the members of the opposite sex are not. *Id.* Although there is some evidence in the record that indicates some of Booth's behavior, and the resulting offensive and disagreeable atmosphere, was directed at both male and female employees, GMC points to ten incidents when Booth's behavior was directed at Duncan alone. GMC concedes that five of these ten incidents could arguably be based on sex: (1) Booth's proposition for a "relationship"; (2) Booth's touching of Duncan's hand; (3) Booth's request that Duncan sketch his planter; (4) the Man Hater's Club poster; and (5) Booth's request that Duncan type

the He–Men Women Haters beliefs. "A plaintiff in this kind of case need not show ... that only women were subjected to harassment, so long as she shows that women were the primary target of such harassment." *Beard,* 266 F.3d at 798. We conclude that a jury could reasonably find that Duncan and her gender were the overriding themes of these incidents. The evidence is sufficient to support the jury finding that the harassment was based on sex.

[8–13] We agree, however, with GMC's assertion that the alleged harassment was not so severe or pervasive as to alter a term, condition, or privilege of Duncan's employment. *See Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 967 (8th Cir.1999). To clear the high threshold of actionable harm, Duncan has to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive— is beyond Title VII's purview." *Oncale,* 523 U.S. at 81, 118 S.Ct. 998 (internal quotation omitted). Thus, the fourth part of a hostile environment claim includes both objective and subjective components: an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. In determining whether the conduct is sufficiently severe or pervasive, we look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. However, Title VII is "not designed to purge the workplace of vulgarity." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995). These standards are designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotations omitted).

The evidence presented at trial illustrates that Duncan was upset and embarrassed by the posting of the derogatory poster and was disturbed by Booth's advances and his boorish behavior; but, as a matter of law, she has failed to show that these occurrences in the aggregate were so severe and extreme that a reasonable person would find that the terms or conditions of Duncan's employment had been altered. *See Scusa,* 181 F.3d at 967 (experiencing unpleasant conduct and rude comments does not equate to severe or pervasive harassment that altered conditions of employment). Numerous cases have rejected hostile work environment claims premised upon facts equally or more egregious than the conduct at issue here. *See, e.g., Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 872, 874 (5th Cir.) (holding that several incidents over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, repeated touching of plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile work environment claim), *cert. denied,* 528 U.S. 963, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999); *Adusumilli v. City of Chicago,* 164 F.3d 353, 357, 361–62 (7th Cir.1998) (holding conduct insufficient to support hostile environment claim when employee teased plaintiff, made sexual jokes aimed at her, told her not to wave at police officers "because people would think she was a prostitute," commented about low-necked

