Under the standard analysis, a plaintiff suing under the ADA, ADEA, and MHRA must first demonstrate a "tangible change in duties or working conditions" to prove an adverse employment action. *Manning*, 127 F.3d at 692. However, the majority incorrectly requires Baucom to prove, in addition to a tangible change in duties and working conditions, that Holiday was the driving force behind Baucom's hourly reductions and that Holiday's decision to reduce Baucom's hours was not motivated by a legitimate business purpose.

The majority concludes that Baucom has failed to meet this burden for two reasons. First, Baucom voluntarily took time off for medical reasons and, as a result, the reduction of Baucom's hours amounts to a self-inflicted decrease. Second, the majority references Holiday's new policy to reduce labor costs generally,[5] and states that this policy demonstrates a legitimate business justification to account for the reduction of Baucom's hours.

However, both of these factors are properly considered only *after* Baucom has established a prima facie case of discrimination. The source of, and reasons for, Baucom's reduced hours help explain that the reductions were the result of legitimate, nondiscriminatory actions by Holiday (the burden shifting prong of the *McDonnell Douglas* test). The adverse employment prong simply addresses whether Baucom suffered a tangible change in duties or work conditions giving rise to a material employment disadvantage; not who cut Baucom's hours, or the reasons explaining the reductions.

Therefore, because the majority conflates the adverse employment prong of Baucom's prima facie case with the burden shifting prong of the *McDonnell Douglas* test, its ultimate analysis is incorrect. *See Davenport v. Riverview Gardens Sch. Dist.*, [65 EPD ¶ 43,180] 30 F.3d 940, 944 (8th Cir. 1994) (holding that the district court erred by requiring "plaintiff, at the outset, to disprove [the] defendant's alleged business reasons for its adverse employment action—in other words, to prove pretext and the ultimate issue of [] discrimination" pursuant to plaintiff's Title VII race discrimination claim); *Johnson v. Arkansas State Police*, 10 F.3d 547, 551 (8th Cir. 1993) (stating that the district court improperly combined prima facie analysis with ultimate issue analysis). The prima facie burden should not be merged with the ultimate issue of discriminatory motivation. *See Landon v. Northwest Airlines, Inc.*, [61 EPD ¶ 42,322] 72 F.3d 620, 624 (8th Cir. 1995). If the majority had properly considered Baucom's hourly reductions standing alone, as the *McDonnell Douglas* test mandates, instead of conflating otherwise separate elements, it would be forced to recognize that Baucom has suffered a tangible change in duties or working conditions, thereby establishing the first requirement necessary to show an adverse employment action.

Regarding the second prong of adverse employment action analysis, the majority states that, even if Baucom could demonstrate a tangible change in work hours, "the slight decrease was not materially significant." First, the majority states that Baucom's average weekly hours decreased below forty for only three months in 2002. Second, the majority notes that, in 2003, although Baucom experienced a slight decrease in hours worked, his weekly average nonetheless hovered around thirty-eight or thirty-nine hours. Given these "minor fluctuations," the majority concludes that Baucom's decrease in hours was not materially significant.

This analysis is predicated upon the assumption that Baucom worked, or was entitled to work, only forty hours per week. However, the record shows that Baucom regularly worked between forty-three to forty-five hours per week before Holiday's allegedly improper reductions. Conversely, during the periods where Baucom contends his hours were reduced unlawfully—first from August 2002 to November 2002, and then from January 2003 to January 2004—Baucom averaged, at most, no more than thirty-nine hours per week. As a result Baucom incurred, at the least, a four to six hour, or 9% to 13%, decrease in average weekly hours during these periods. In many instances, Baucom's reductions were even more pronounced, dipping below thirty hours per week on at least two occasions.

Finally and critically, the reduction of Baucom's hours prevented him from regularly working over forty hours per week, thus denying him continued access to overtime pay. Before Holiday's allegedly unlawful reductions, Baucom regularly worked in excess of forty hours per week and, accordingly, earned overtime pay for these hours. For most employees who work by the hour, overtime pay at time-and one-half the regular rate is a significant part of their annual incomes. Decreased accessi-

---

[5] The majority acknowledges that Holiday's new cost-reduction strategy was focused on decreasing labor costs and assumes this policy necessarily affected Baucom's hours. This fact, while providing a possible explanation for Baucom's reduction in hours, also helps establish that Baucom suffered a tangible change in duties and working conditions.

bility to this form of pay should not be taken lightly.

The reduction in Baucom's hours, coupled with his inability to regularly access previously realized overtime pay, constitutes a tangible change in duties or working conditions giving rise to a material employment disadvantage. Contrary to the majority's conclusion, Baucom has demonstrated an adverse employment action under the ADA, ADEA, and MHRA.

## AGE DISCRIMINATION UNDER THE ADEA AND MHRA

Baucom's ADEA and MHRA age discrimination claims fail because Baucom cannot demonstrate that younger Holiday employees were treated differently than he.

To establish a prima facie case under the ADEA and MHRA,[6] Baucom must show that: (1) he was within a protected class; (2) he was qualified to perform his job; (3) he suffered an adverse employment action; and (4) younger Holiday employees received more favorable workplace treatment than Baucom. *Breeding v. Arthur J. Gallagher & Co.*, [74 EPD ¶ 45,706] 164 F.3d 1151, 1156-57 (8th Cir. 1999). In support of the fourth prong of this test, Baucom relies, exclusively, on his own anecdotal observations to show that younger Holiday employees received more favorable workplace treatment than he. However, "mere allegations which are not supported with specific facts are not enough to withstand [a] motion" for summary judgment. *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999). Therefore, because Baucom failed to offer evidence, beyond his own mere assertions, to support the contention that younger Holiday employees received preferential workplace treatment, Baucom has failed to prove a prima facie case of age discrimination and, as such, the district court's grant of summary judgment for Holiday on this claim was proper.

## DISABILITY DISCRIMINATION UNDER THE ADA AND MHRA

Baucom's disability discrimination claims fail because Baucom does not demonstrate that he is "disabled" within the meaning of the ADA or MHRA.[7]

To prove a prima facie case for disability discrimination under the ADA and MHRA, Baucom must show: (1) that he was a disabled person within the meaning of the controlling statute; (2) that he was qualified to perform the essential functions of his job; and (3) that he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *Miners v. Cargill Communications, Inc.*, [4 ADD ¶ 4-019] 113 F.3d 820, 823 (8th Cir. 1997). A disability includes physical or mental impairments that substantially or materially limit one or more major life activities. *Compare* 42 U.S.C. § 12102(2)(A) (stating that a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual"), *with* Minn. Stat. § 363A.03, subd. 12 (stating that a disabled person is one who has a "physical, sensory, or mental impairment which materially limits one or more major life activities").

Baucom alleges that he is disabled because he suffers from a back impairment and a heart condition. However, Baucom's heart condition is not a disability because Baucom fails to cite what, if any, major life activity is substantially or materially impaired as the result of this infirmity. *See Weber v. Strippit, Inc.*, [7 ADD ¶ 7-006] 186 F.3d 907, 914-15 (8th Cir. 1999) (stating that a failure to "present sufficient evidence to establish the nature, duration, and long-term impact" of a heart condition does not constitute a disability). Nor does Baucom's back impairment, which precludes him from lifting items over twenty pounds, amount to an actionable disability. In *Snow v. Ridgeview Med. Ctr.*, [4 ADD ¶ 4-192] 128 F.3d 1201, 1207 (8th Cir. 1997), we failed to recognize a purported disability under the ADA and MHRA where the plaintiff was restricted from lifting objects over twenty-five pounds; *see also Aucutt v. Six Flags Over Mid-Am., Inc.*, [68 EPD ¶ 44,108] 85 F.3d 1311, 1318-19 (8th Cir. 1996) (finding no disability where plaintiff was restricted from lifting objects over twenty-five pounds). Therefore, because Baucom's medically-imposed lifting restriction is five pounds less than a similar restriction that we have held does not constitute a qualifying disability, Baucom has failed to demonstrate that he is disabled under either the ADA or MHRA. As

---

[6] We treat Baucom's MHRA and ADEA age discrimination claims under the same mode of analysis. *Chambers*, 351 F.3d at 855.

[7] MHRA and ADA disability claims are generally afforded the same treatment. *See Maziarka v. Mills Fleet Farm, Inc.*, [9 ADD ¶ 9-027] 245 F.3d 675, 678 n.3 (8th Cir. 2001). The chief difference between the two statutes is that the MHRA defines a "disability" as one that *materially* limits one or more major life activities. Minn. Stat. § 363A.03, subd. 12. Conversely, the ADA defines a disability as one that *substantially* limits one or more major life activities. 42 U.S.C. § 12102(2)(A). The Eighth Circuit recognizes the definition of "materially" to be different from, and less stringent than, the more heightened federal standard of "substantially." *See Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).

such, the majority's decision to affirm the district court's grant of summary judgment on this claim was also proper.

---

### [¶ 42,247] US Equal Employment Opportunity Commission, Plaintiff v Robert L. Reeves & Associates, a Professional Corporation, Defendant.

United States District Court, Central District of California. No CV 00-10515 DT (RZx). January 13, 2006. 2006 US Dist LEXIS 4395.

*Civil Rights Act of 1964—Title VII*

**Attorney Fees—Award Against EEOC—Inadequate Investigation.—** The EEOC's poor investigation, in which it interviewed only three clearly biased witnesses before issuing a "reasonable cause" finding of class-wide discrimination and filing suit on behalf of persons identified by those witnesses, and its knowledge or "studied and inexcusable ignorance" of being used as "a primary weapon" in a "campaign to destroy" the employer, supported an award of attorneys' fees.

See ¶ 2635.49

**Attorney Fees—Award Against EEOC—Improper Discovery Tactics.—** The EEOC's use of improper discovery tactics supported a finding that it "was making improper use of the legal system to prosecute what it knew, or should have known, were groundless claims."

See ¶ 2635.49

**Attorney Fees—Award Against EEOC—Baseless Claims.—** An award of attorneys' fees against the EEOC was warranted because the evidence at trial showed that: (1) the claims were "entirely baseless" as to all 12 claimants; (2) the EEOC's investigation was "woefully inadequate" to justify a "reasonable-cause" determination; and (3) the claims as to the six claimants surviving an earlier appeal were "frivolous, unreasonable and without credible foundation," including the claims of the three claimants for which the court had initially found did not warrant a fee award.

See ¶ 2635.49

**Attorney Fees—Award Against EEOC—Could Not Show Fees Unwarranted.—** Although some of its claims were reinstated after appeal from summary judgment and several claims proceeded to trial, the EEOC failed to show that a fee award was unwarranted as the evidence at trial showed there was no credible evidence to support the EEOC's claims and its witnesses' testimony consisted of "exaggerations and distortions."

See ¶ 2635.49

**Attorney Fees—Award Against EEOC—Fair and Reasonable Billing.—** An employer was awarded attorneys' fees of $1,022,653.69 against the EEOC, the full amount requested, because: (1) the billing rates of its counsel were reasonable considering prevailing rates in the community, required experience for the case, the time expended and the quality of work produced; and (2) the number of hours expended by its counsel were reasonable in light of the quality of work produced and the time billed.

See ¶ 2635.55

### [Statement of Case]

#### I. Background

TEVRIZIAN, District Judge: This action was brought by Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") against Defendant Robert L. Reeves and Associates, a Professional Corporation ("Defendant") under Title VII of the Civil Rights Act of 1964, as amended, the Pregnancy Discrimination Act of 1978 and Title I of the Civil Rights Act of 1991 to correct alleged unlawful employment practices on the basis of sex, and to provide appropriate relief to certain females who were adversely affected by such practices ("Claimants").[1]

Because all parties are intimately familiar with the factual and procedural history of the case, this Court need not set it forth in full here. This Court

---

[1] Claimants includes Judith Quilaton, Deanna Saez, Rowena Silva, Nikki Mehrpoo Jacobson, Lisa Wilkerson, Clarissa Liao, Jeanette Caitura, Nadia Preciado, Miwa Arai, Elizabeth Babida, Margaret Eum and Joyce Wang.

tween business-related social functions and religious meetings. (*See* Part III.C, *supra*.) As long as the distinction is reasonable, it appears that is all that the Supreme Court requires. *Cornelius*, 473 U.S. at 808 ("The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." (emphasis in original)). Furthermore, there is no suggestion that other employees (other than the Relay for Life group) have been granted use of the Red Bluff Room for a use similar to that sought by Mr. Berry.

Finally, the Department makes a reasonable argument that opening up the Red Bluff Room to religious meetings by all employees who requested such a meeting would be an undue hardship. Indeed, in *Forbes*, the Supreme Court noted that "the prospect of cacophony" that might result from allowing all who sought to participate in a nonpublic forum might well force the closure of the forum. 523 U.S. at 681. The Red Bluff Room is not a public forum, and we do not read the applicable Supreme Court decisions as requiring that the Department choose either to allow Mr. Berry to hold prayer meetings or to discontinue allowing business-related social functions in the conference room.[15]

[13] In sum, the record reflects that: (1) the Department declined to allow Mr. Berry to use the Red Bluff Room for prayer meetings for a legitimate nondiscriminatory reason, to maintain the room as a nonpublic forum; (2) Mr. Berry has not shown that this reason was a pretext for some discriminatory reason; and (3) Mr. Berry has not shown that other employees who sought to use the conference room for similar purposes were allowed to do so.[16] Accordingly, we agree with the district court that Mr. Berry's claim of disparate treatment is not supported by the record.

V

Public employers such as the Department face the difficult task of charting a course between infringing on employees' rights to the free exercise of their religions under the First Amendment and violating the Establishment Clause of the First Amendment by appearing to endorse their employees' religious expressions. The *Pickering* balancing test resolves these sometime conflicting constitutional rights by recognizing the legitimacy of the interests asserted by both sides. It provides a chart by which a public employer may navigate a safe course. We hold that the Department did so. While it allowed employees to discuss religion among themselves, it avoided the shoals of the Establishment Clause by forbidding them from discussing religion with its clients. Similarly, the Department allowed employees to display religious items, except where their viewing by the Department's clients might imply endorsement thus evading the reef of the Establishment Clause. The Department did not prohibit its employees from holding prayer meetings in the common break room or outside, but declined to open the Red Bluff Room to employee social or religious meetings as such use might convert the conference room into a public forum. We conclude that these restrictions were reasonable and the Department's reasons for imposing them outweigh any resulting curtailment of Mr. Berry's rights under the First Amendment of the United States Constitution or Title VII of the Civil Rights Act of 1964. The district court's grant of summary judgment to the Department and the denial of summary judgment to Mr. Berry are **AFFIRMED**.

---

[¶ 42,345]   **Kevin L. Nitsche, Plaintiff-Appellant v CEO of Osage Valley Electric Cooperative, Defendant-Appellee.**

United States Court of Appeals, Eighth Circuit. No 05-2208. May 8, 2006. 2006 US App LEXIS 11364.

Appeal from United States District Court, Western District of Missouri. SACHS, District Judge. Affirmed.

---

[15] In her plurality opinion in *Kokinda*, Justice O'Connor observed:

If anything, the Service's generous accommodation of some types of speech testifies to its willingness to provide as broad a forum as possible, consistent with its postal mission. The dissent would create, in the name of the First Amendment, a disincentive for the Government to dedicate its property to any speech activities at all.

497 U.S. at 733. Similarly, in this case, the Department could respond to Mr. Berry's concerns by forbidding the use of the conference room for birthday parties and baby showers rather than allowing additional uses of the room.

[16] Although not addressed by the parties, we assume that the April 1, 2001 letter from the Director to Mr. Berry informing him that he could not use the Red Bluff Room meets the "adverse employment action" prong of a disparate treatment claim. *See Peterson*, 358 F.3d at 603.

©2006 CCH. All Rights Reserved.

*Civil Rights Act Of 1964—Title VII*

*Missouri Human Rights Act*

**Sexual Harassment—Same-Sex Harassment—Terms Of Employment Unaffected.**— While a male employee presented evidence of a male coworker's approximate 20-year history of harassment by way of unwanted sexual banter about females, the evidence was insufficient to raise a triable issue as to whether the employee was subjected to a hostile work environment because, although the coworker's conduct was "crude and immature," it occurred sporadically over the course of the 20 years, was not "physically violent or threatening" and did not interfere with the terms, conditions, or privileges of the employee's employment.

See ¶ 241.28, ¶ 565.70 and Missouri ¶ 26-20,005.66

Before: RILEY, HEANEY and MELLOY, Circuit Judges.

**[Statement of Case]**

RILEY, Circuit Judge: Kevin L. Nitsche (Nitsche) appeals the district court's[1] grant of summary judgment in favor of Osage Valley Electric Cooperative (Osage Valley) on Nitsche's sexual harassment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. §§ 213.010 to 213.137. We affirm.

**I. BACKGROUND**

In April 1979, Nitsche began working for Osage Valley, a cooperative providing electric services in rural Missouri. Nitsche initially worked on Osage Valley's brush crew and later joined the line crew, where he ultimately became a line foreman. Nitsche complains that throughout his employment he was subjected to unwanted sexual banter by another line foreman, Steven Hanson (Hanson), who had seniority over Nitsche but did not have authority to fire Nitsche, reduce his salary, or control his hours. The sexual banter was about females, and Nitsche found Hanson's banter highly offensive.

As examples of Hanson's conduct, Nitsche cites several incidents occurring over the course of approximately twenty years. In 1982, while Nitsche, Hanson, and another Osage Valley male employee were traveling in a work truck, Hanson asked Nitsche how many wheels a menstrual cycle had. Nitsche answered "three," prompting Hanson to tease Nitsche and later repeat the incident to other male coworkers. About fifteen years ago, another incident occurred while Nitsche and several other Osage Valley employees were playing poker at Hanson's home. Hanson played a pornographic video for those in attendance, which upset Nitsche and caused him to leave Hanson's home. On multiple occasions, Hanson told Nitsche he would need to have a Pap smear. Frequently over the years, Hanson examined *Playboy* magazines in Nitsche's presence and encouraged Nitsche to look at the pictures of naked women portrayed in the magazines. Nitsche had never seen a *Playboy* or other similar magazine before. On one occasion when a couple of pages of one magazine were stuck together, Hanson told Nitsche, "look it here, you stuck the pages together. You shot your wad." Nitsche also blamed Hanson for putting snakes and mice in Nitsche's lunch box, which Nitsche's wife discovered later when cleaning the lunch box. In October 2001, Hanson posted a picture of a donkey over Osage Valley employee Bobby Fennewald's engagement picture, which was located on a company bulletin board, along with a drawing of a penis.

According to Nitsche, neither Hanson nor any other Osage Valley employee ever asked Nitsche to engage in any sexual activity. However, on two or three occasions five to ten years before, Hanson stuck a shovel between Nitsche's legs and rubbed Nitsche with it. Hanson also called Nitsche "stub" because of the size of Nitsche's fingers and remarked a man with stubby fingers has a short penis. In Nitsche's presence, Hanson referred to female genitalia using crude slang names, pretended he had a pubic hair in his mouth, and made lewd comments concerning women. Nitsche testified Hanson liked to embarrass him in front of other people and continued to make inappropriate comments because Hanson was "trying to keep [Nitsche] on edge" and knew the comments bothered Nitsche. Nitsche admitted he laughed at some jokes told by Hanson or other Osage Valley employees (but not the "dirty jokes") and "like[d] it when people pick on [him]." Although Hanson also told jokes to women, he told off-color jokes or jokes with a sexual connotation only to men and would cease telling such a joke if a woman came near.

---

[1] The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

In February 2001, Hanson and a few other employees authored a belittling poem[2] implicitly referencing Nitsche, who had spilled a container of molasses from his truck onto the road. Someone placed the poem on a company bulletin board. Nitsche reported this incident to Daryl Veatch (Veatch), Osage Valley Assistant General Manager, and also to Osage Valley's then-president Mickey Chapman, who advised Nitsche that concerns of a personal nature should be brought to the attention of Jon McClure (McClure), Osage Valley's General Manager and Chief Executive Officer. Nitsche did not immediately speak to McClure about the poem.

On December 7, 2001, Nitsche threatened Osage Valley employee Clint Bennett (Bennett) at work and questioned Bennett on why he told another coworker of Nitsche's earlier physical altercation with another employee. Nitsche's confrontation with Bennett was over whether Nitsche had hit the other employee once or multiple times. Following this incident, McClure held a meeting with Nitsche and Bennett, told Nitsche to go home and think about his job, and asked Nitsche to return to work the following Monday, December 10. Nitsche met with McClure on December 10, at which time he reported the February 2001 poem incident to McClure. McClure then removed Nitsche from active employment, advised him to complete an anger management counseling program, having arranged an appointment for Nitsche, and stated he could not return to work until Osage Valley was satisfied Nitsche successfully completed counseling. During his absence from work, Nitsche used accumulated sick leave and vacation time through June 17, 2002, and thereafter received long-term disability benefits until June 8, 2004, while working on his farm raising cattle. Osage Valley ultimately discharged Nitsche from employment.

On April 11, 2002, Nitsche filed a charge against Osage Valley with the Missouri Commission on Human Rights (MCHR) and the Equal Employment Opportunity Commission (EEOC), alleging sex discrimination and sexual harassment based on Hanson's conduct. Nitsche received right to sue letters from the MCHR on August 18, 2003, and from the EEOC on September 16, 2003.

On December 15, 2003, Nitsche filed suit against Osage Valley,[3] alleging sexual harassment by way of unwanted sexual banter about females, in violation of Title VII and the MHRA. Thereafter, the district court granted summary judgment in favor of Osage Valley, concluding (1) there was insufficient evidence to establish Hanson's harassing conduct toward Nitsche was based on sex; (2) the harassment did not affect a term, condition, or privilege of employment because Hanson's conduct did not rise to the level of actionable hostile work environment sexual harassment; and (3) there was insufficient evidence Osage Valley either knew or should have known of the alleged harassing conduct. Nitsche appeals.[4]

## II. DISCUSSION

Our standard of review is a familiar one. We review de novo the district court's grant of summary judgment, viewing the evidence in the light most favorable to Nitsche, the nonmoving party. *See LeGrand v. Res. for Cmty. & Human Servs.*, [85 EPD ¶ 41,846] 394 F.3d 1098, 1101 (8th Cir.), *cert. denied*, 126 S. Ct. 335 (2005). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. We analyze Nitsche's claims under both Title VII and the MHRA in the same manner. *See Breeding v. Arthur J. Gallagher & Co.*, [74 EPD ¶ 45,706] 164 F.3d 1151, 1156 (8th Cir. 1999) ("Our analysis is the same for both the state and federal claims because decisions under the various federal employment discrimination statutes are applicable and authoritative under the [MHRA] as well as federal law." (citation omitted)).

---

[2] The poem read:
  There once was a man who hauled molasses
  At common sense he barely passes
  For he forgot to tie down his load
  And dumped it on the road
  These people are known as dumbasses!

[3] Nitsche originally named the CEO of Osage Valley as the defendant in this matter, but on July 27, 2004, the district court, over Osage Valley's objection, granted Nitsche leave to amend the complaint to change the named defendant to Osage Valley.

[4] In its brief, Osage Valley argues the district court abused its discretion in granting Nitsche leave to file an amended complaint to change the named defendant from "CEO of Osage Valley" to "Osage Valley." We need not address this argument given Osage Valley's failure to file a cross-appeal on this issue. *See El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) ("Absent a cross appeal, an appellee . . . may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." (internal quotation omitted)); *see, e.g., Bethea v. Levi Strauss & Co.*, [54 EPD ¶ 40,309] 916 F.2d 453, 456 (8th Cir. 1990) ("It is well-settled that failure to file a cross-appeal prohibits an appellee from attempting to enlarge [its] rights or lessen [its] adversary's rights." (citing *Morley Constr. Co. v. Md. Cas. Co.*, [55 LC ¶ 11,900] 300 U.S. 185, 191 (1937); *Langnes v. Green*, 282 U.S. 531, 538 (1931); *Johnson v. U.S. Fire Ins. Co.*, 586 F.2d 1291, 1294 n.7 (8th Cir. 1978))). We therefore limit our review to the issues raised in Nitsche's appeal.

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Discrimination based on sex that creates a hostile or abusive working environment violates Title VII. *Harris v. Forklift Sys., Inc.*, [62 EPD ¶ 42,623] 510 U.S. 17, 21 (1993); *Quick v. Donaldson Co.*, [68 EPD ¶ 44,184] 90 F.3d 1372, 1377 (8th Cir. 1996). To establish a prima facie case of hostile work environment sexual harassment, Nitsche must demonstrate: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) his employer knew or should have known of the harassment and failed to take proper remedial action. *See McCown v. St. John's Health Sys., Inc.*, [84 EPD ¶ 41,524] 349 F.3d 540, 542 (8th Cir. 2003) (citation omitted). Because we conclude Nitsche failed to raise a genuine issue of fact regarding whether the harassment affected a term, condition, or privilege of employment, we affirm the district court's entry of summary judgment in favor of Osage Valley.

"Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howard v. Burns Bros., Inc.*, [73 EPD ¶ 45,460] 149 F.3d 835, 840 (8th Cir. 1998) (quoting *Harris*, 510 U.S. at 21). Nitsche must clear a high threshold to demonstrate actionable harm, for "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" obtain no remedy. *See Faragher v. City of Boca Raton*, [73 EPD ¶ 45,341] 524 U.S. 775, 788 (1998) (internal quotation omitted). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787 (citation omitted). To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant. *LeGrand*, 394 F.3d at 1101 (citation omitted). Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was "so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan*, [84 EPD ¶ 41,608] 348 F.3d 714, 720 (8th Cir. 2003) (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999)). Such standards are demanding, for "Title VII does not prohibit all verbal or physical harassment" and is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, [72 EPD ¶ 45,175] 523 U.S. 75, 80 (1998). In determining whether a work environment was sufficiently hostile or abusive, we examine the totality of the circumstances, including whether the discriminatory conduct was frequent and severe; whether it was physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interfered with the employee's work performance. *Harris*, 510 U.S. at 23.

Supreme Court and Eighth Circuit precedent persuades us Hanson's conduct did not create an actionable hostile work environment. Given this court's rejection of claims premised on equally or more egregious facts than those set forth here, *see LeGrand*, 394 F.3d at 1102 (collecting cases), and *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 935 (8th Cir. 2002), we conclude Nitsche fails to demonstrate the harassment he encountered was sufficiently severe or pervasive to alter the conditions of his employment and create a hostile work environment. Viewing the evidence, both objectively and subjectively, in the light most favorable to Nitsche, Hanson's behavior, albeit crude and immature, occurred sporadically over the course of approximately twenty years, was not physically violent or threatening, and did not unreasonably interfere with Nitsche's work performance. Although sexual content was abundant in Hanson's repertoire of ribaldry, "the Supreme Court has never held that 'workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations.'" *Scusa*, 181 F.3d at 967 (quoting *Oncale*, 523 U.S. at 80). We also note Hanson's caricature incident occurring in October 2001 did not relate to Nitsche, the snakes and mice in Nitsche's lunch box and the molasses poem did not involve any sexual conduct or connotation, and Hanson's display of a pornographic video following a poker game occurred at Hanson's home, not the Osage Valley workplace. Further, Hanson's other comments were not so frequent, intimidating, offensive, or hostile to have poisoned the work environment. Keeping in mind "Title VII is 'not designed to purge the workplace of vulgarity,'" *Duncan*, 300 F.3d at 934 (quoting *Baskerville v. Culligan Int'l Co.*, [66 EPD ¶ 43,485] 50 F.3d 428, 430 (7th Cir. 1995)), we conclude

Nitsche fails to demonstrate an actionable hostile work environment sexual harassment claim.[5]

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Osage Valley.

---

**[¶ 42,346]  Michael J. Nelson, Plaintiff-Appellant v The Boeing Company, Defendant-Appellee.**

United States Court of Appeals, Tenth Circuit. No 05-3156. May 3, 2006. 2006 US App LEXIS 10966.

Appeal from United States District Court, District of Kansas. Affirmed.

### Civil Rights Act Of 1964—Title VII

**Attorneys—Ineffective Assistance Of Counsel—Exceptions, Title VII.—** While an employee contended that Section 2000e-5(f)(1) of Title VII — which grants "litigants a statutory right to request appointed counsel at court expense" — carved out an exception to the general rule that "ineffective assistance of counsel is not a basis for appeal or retrial" in civil cases by providing a corresponding statutory right to the "effective assistance of counsel," the Tenth Circuit concluded Congress's decision to make appointed counsel available at the court's discretion did not mean that Congress abrogated the "long-standing principle of not recognizing a right to the effective assistance of counsel in civil cases."

See ¶ 2238.10

**Attorneys—Ineffective Assistance Of Counsel—Sixth Amendment Vs Title VII.—** Although the Sixth Amendment implicitly provides for the "effective assistance of counsel" in criminal cases (due to "the grave and irremediable consequences of a criminal conviction"), the Tenth Circuit held that no analogous statutory right existed under Title VII because of the important differences between Title VII and the Sixth Amendment — a Title VII plaintiff who loses because of his attorney's incompetence can file a legal malpractice suit "to recoup the damages he would have been awarded in the Title VII case, including damages to compensate him for the loss of equitable relief such as reinstatement," but a legal malpractice award "cannot release a convicted defendant from jail."

See ¶ 2238.10

Lawrence W. Williamson, Jr. (Shores Williamson and Ohaebosim, LLC), Wichita, Kansas for Plaintiff-Appellant. Timothy B. Mustaine and Jeff P. DeGraffenreid (Foulston Siefkin LLP), Wichita, Kansas for Defendant-Appellee.

Before: McCONNELL, ANDERSON and TYMKOVICH, Circuit Judges.[*]

### [Statement of Case]

McCONNELL, Circuit Judge: The general rule in civil cases is that the ineffective assistance of counsel is not a basis for appeal or retrial. *MacCuish v. United States*, 844 F.2d 733, 735 (10th Cir. 1988). If a client's chosen counsel performs below professionally acceptable standards, with adverse effects on the client's case, the client's remedy is not reversal, but rather a legal malpractice lawsuit against the deficient attorney. *Id.* at 735-36; *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 n.10 (1962). Recognizing this rule, Plaintiff-Appellant Michael J. Nelson asks this Court to craft an exception for Title VII plaintiffs based on the language of 42 U.S.C. § 2000e-5(f)(1). He further claims that because his trial counsel was ineffective, we should reverse the district court's grant of summary judgment in favor of the Defendant-Appellee, The Boeing Company ("Boeing"). We conclude that Title VII does not create a statutory right to the effective assistance of counsel, and **AFFIRM** the district court's decision.

### I. Background

Mr. Nelson, an engineer of Iranian descent, was employed by Boeing from 1996 until he was laid off in 2002 as part of a reduction in force. He filed this lawsuit in 2003, asserting that Boeing discriminated against him on the basis of his race, national origin, sex, and disability, and in retaliation

---

[5] Because we agree with the district court that Nitsche is unable to prove any material fact question as to the fourth element of his prima facie case, we need not address the remaining elements. *See, e.g., Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 738 (8th Cir. 2005).

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument.

Westlaw

Slip Copy                                                                                           Page 1

Slip Copy, 2005 WL 1683586 (S.D.N.Y.)

**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Yolanda PALOMO, Monisha Harrell, and Danielle Pow, Plaintiffs,
v.
THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, Ethan Hanabury, and Jaki Sitterle, Defendants.
**No. 03 Civ. 7853(DLC).**

July 20, 2005.

Scott Browning Gilly, Michelle M. le Roux, Thompson Wigdor & Gilly LLP, New York, New York, for the Plaintiffs.

Edward A. Brill, Susan D. Friedfel, Proskauer Rose LLP, New York, New York, for the Defendants.

*OPINION AND ORDER*

COTE, J.

\*1 The defendants the Trustees of Columbia University ("Columbia"), Ethan Hanabury ("Hanabury") and Jaki Sitterle ("Sitterle") bring a motion for summary judgment in this employment discrimination action. For the following reasons, the motion is granted.

BACKGROUND

The following facts are undisputed or taken in the light most favorable to the plaintiffs, unless otherwise indicated. The plaintiffs Yolanda Palomo ("Palomo"), Monisha Harrell ("Harrell"), and Danielle Pow ("Pow") each worked in the Executive Education department at the Columbia Graduate School of Business ("Department"). The Department markets and administers non-degree programs to companies and executives throughout the world. Hanabury is the Associate Dean for the Department, which as of February 2002, had 32 non-faculty employees, two-thirds of which were women. As of that time, there were five non-faculty staff members who held Director level positions in the Department, including Palomo and Pow. There were two Executive Directors, each of whom was a woman, and one of whom was defendant Sitterle. Sitterle became an Executive Director at grade level 15 in June 1998, and had at least two Director level employees reporting to her since May 1999.

While each of the plaintiffs is a woman and brings claims based on gender discrimination, the claims represent two entirely separate sets of issues. Palomo became pregnant in 2002 and contends that Hanabury required her to report to Sitterle instead of him when he learned of her pregnancy, and that she otherwise suffered discrimination due to her pregnancy. Harrell and Pow are lesbians and domestic partners and accuse Hanabury, who is a homosexual man, of sharing too much detail from his personal life with them. Their complaints range over incidents that occurred between 1998 and the dates they left Columbia in 2002 and 2003. The facts underlying Palomo's claims will be described first.

A. Facts Underlying Palomo's Claims

Palomo joined the Department in August 1990 as a program coordinator. When Hanabury was appointed Associate Dean in June 1997, Palomo was an Associate Director at grade 12. In June 2000, Palomo was promoted to Director of Sales and Administration for Open Enrollment at Hanabury's suggestion. She reported directly to Hanabury and supervised approximately a dozen employees.

1. Impact of September 11, 2001

After September 11, 2001, the demand for the Department's programs declined substantially and to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1683586 (S.D.N.Y.)

**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Page 2

the extent it survived shifted from open enrollment to custom programs, which were the responsibility of Sitterle's group. As a result, Hanabury decided in late 2001 to restructure the Department. Pursuant to this plan, in early 2002, Palomo became Director of Relationship Management and Partnerships with responsibility for alumni relationships, key accounts and relationship management. She continued to report directly to Hanabury, but lost most of her direct reports and supervised only one person. In his June 2002 year-end performance evaluation of Palomo, Hanabury stated that he found her "overall performance less consistent" after the reorganization. He marked as areas for development Palomo's "resistance" to looking at things in a new way; noted an "inconsistent" effort, and suggested that she take a business writing course. He suggested that she concentrate on "driving the overall strategy and creation of *new* partnerships, partly through your international visits." (Emphasis in original.) Palomo does not bring any claims based on this restructuring of her work or this performance review.

\*2 In the Spring of 2002, Hanabury contemplated additional restructuring. The parties dispute his motives in doing so. Hanabury contends that additional changes were needed to maximize efficiency. Palomo believes Hanabury had learned that she had experienced a miscarriage and suspected that Palomo would again be trying to become pregnant. Palomo has testified that she told Sitterle during a business trip that she had suffered a miscarriage. Harrell has testified that in early 2002, Hanabury told her and Pow that he had learned from Sitterle that Palomo had disclosed to Sitterle during a business trip that she was pregnant. Both Pow and Harrell have testified that Hanabury asked them in early 2002 if they believed that Palomo was pregnant; neither of them were able to shed any light on the issue during that conversation.

In any event, in the Spring of 2002, Hanabury decided that Palomo would report to Sitterle instead of to him. In May 2002, he met with the Dean of the Business School and presented a draft organization chart reflecting this change in the reporting structure. The Dean approved of the plan. The plan did not result in any change to Palomo's salary, title or grade.

On August 13, Hanabury told Sitterle and Palomo that he wanted them to act as one department since the custom market was stronger. Hanabury stressed that they had some overlapping responsibilities regarding company visits. The next day, Hanabury met with the Associate Dean for Administration and Finance and showed him the organizational chart reflecting the fact that Palomo would be reporting to Sitterle.

2. September 5: Palomo Told to Report to Sitterle

On September 5, Hanabury told Palomo that he wanted her to assist with the custom work and report to Sitterle. He also told her that her direct report, Anthony Madonna, would be moving to the marketing team. Palomo contends that she objected strongly to reporting to Sitterle and threatened to resign if required to do so; she did not object to Hanabury moving Madonna. Hanabury told her that he would consider her request to continue to report to him. Palomo was told that she would retain all of her alumni management responsibilities. When Hanabury discussed this change separately with Sitterle, Sitterle reluctantly agreed to it.

On September 9, Hanabury informed Palomo that she could continue to report to him while assisting Sitterle's team as needed. The parties dispute whether this was presented as a proposal for a trial basis.

During a doctor's visit on August 26, Palomo had blood drawn to learn whether she was pregnant. During a September 11 doctor's visit, Palomo learned that she should not travel due to her high risk pregnancy. Palomo left a voicemail message for Hanabury that her doctor had restricted her from traveling and that she would like to meet with him to discuss this. She did not say that she was pregnant. She was scheduled to travel in October to Japan for the Department. In making arrangements to replace Palomo for this trip, Hanabury contends that he realized it was a mistake to not require Hanabury to report to Sitterle.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 3
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

3. September 12: Palomo Informs Hanabury of her Pregnancy

**\*3** On September 12, Hanabury met with Palomo and immediately informed her that she would be directly reporting to Sitterle; he did not want to be making decisions about who was going to be traveling for the Department. Palomo then informed Hanabury for the first time that she was pregnant with a high risk pregnancy. Hanabury congratulated her on the pregnancy.

On September 13, Palomo came to work for what was to be her last day before a scheduled vacation. She met with Hanabury and Sitterle, and has testified that she felt that they were putting a lot of pressure on her. She could not identify at her deposition what caused the feeling of pressure, except that she was asked to find an interpreter to translate a document before leaving on vacation.

On September 18, Palomo told Hanabury that she had been placed on disability leave by her doctor until October 17. Hanabury wished her the best and informed her that should she have any additional restrictions upon her work when she returned, she should submit them in writing by October 11. Palomo did not make any such submission. After an extension of her leave, Palomo returned to work on October 28. She was again out of the office from October 30 to November 4.

During a meeting on November 8 with Sitterle and Palomo, Hanabury expressed concerns about Palomo's level of effort. While a large part of Palomo's job had involved travel, she was restricted from travel by her doctor when she returned from her disability leave. As a result, Hanabury explained that she would have to be flexible about her job responsibilities. When Palomo requested a written job description, Hanabury suggested that Palomo prepare the initial draft. Palomo did not mention any additional restrictions on her ability to work during the meeting. Palomo contends that she felt under attack at the meeting, although she does not remember anything derogatory being said, other than the complaint about her level of effort. Palomo also asserts that she felt she was being put under a lot of stress at the meeting regarding specific projects, but could not identify any of the projects during her deposition.

After the meeting, Sitterle sent Palomo several e-mails regarding projects. One requested that Palomo contact a faculty member to find out when that person would have certain material ready for a project for which they had just received the approval from a client. While Palomo admits that it is not unusual to have a short turnaround time for projects, Palomo felt that Sitterle created an unnecessary sense of urgency. [FN1]

> FN1. Sitterle's e-mail read: "Yoly, This needs pushing with Rita and Bob. Can you get in touch with Rita today to find out when she can get some material to us. Please let her know we need to get this to JBIC by the end of next week. Actually, since you are out on Friday, it well need to go out Thursday. Thanks, Jaki."

On November 11, Sitterle forwarded Palomo an e-mail from the Director of Program Management asking Palomo to respond. The e-mail requested a preliminary budget by 3:00 p.m. that day for a project assigned to Palomo. Palomo asked for and received more time to complete the budget.

On November 12, Sitterle sent Palomo an e-mail asking her whether she had sent certain information to a client. Palomo did not know whether it was the general practice in Sitterle's group to send such material to custom clients.

**\*4** During November, Sitterle's team was very busy, and Palomo tried to leave the office each day at approximately 6:00 p.m., walking to an exit that did not require her to walk past Sitterle's office. Before her pregnancy, Palomo's work often required her to work a 14 hour day.

4. November 14: Hanabury Criticizes Palomo's Performance

On November 14, Hanabury met again with Sitterle and Palomo. Hanabury and Sitterle expressed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                            Page 4

Slip Copy, 2005 WL 1683586 (S.D.N.Y.)

**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

disappointment in Palomo's performance, indicating that she was expected to work as hard or harder than other members of Sitterle's team given her grade level and title. Hanabury and Sitterle suggested that one way for Palomo to integrate herself into Sitterle's team was to ask other members of the team if there was anything she could do to help before leaving for the day. Palomo indicated that she was doing her best and could not work more hours. Hanabury pointed out that if Palomo was having difficulty with her work load due to her health, then paid disability leave was available to her.

They also discussed Palomo's draft job description. Palomo had listed as one of her proposed responsibilities the managing of key accounts, some of which are located outside the New York metropolitan area. Sitterle pointed out that managing key accounts could not be a large portion of her job responsibilities so long as she was restricted from travel. Palomo did not disagree with that assessment at the meeting.. [FN2] Sitterle also pointed out that although Palomo listed having responsibility for the alumni of the Columbia Senior Executive Program ("CSEP"), those responsibilities included travel as well and that Palomo had not met the Fall CSEP class because she was on disability leave and would be on maternity leave when it was time to meet the Spring class. Shortly after the meeting, Palomo sent Sitterle an e-mail stating, "I'm feeling very sick, so I'm going to go home early."

> FN2. Palomo asserts in her affidavit that a client is visited only once a year and that her inability to travel was only temporary. Her affidavit does not address whether she would have wanted to continue with an extensive travel schedule after her child was born.

5. November 15: Palomo Learns of her Miscarriage

On November 15, during a visit to her doctor, Palomo learned she had had a miscarriage. Between September 12 and November 15, Palomo was in the office for thirteen days.

6. November 29: Palomo Complains of Discrimination

On November 29, Palomo's attorney wrote a letter to the Dean of the Graduate School of Business, with a copy to Hanabury, alleging that Hanabury and Sitterle had discriminated against Palomo based on her pregnancy, that this misstreatment had caused her miscarriage, [FN3] and that she could not continue to work for Hanabury and Sitterle. On December 24, Palomo filed a charge of pregnancy discrimination with the Equal Employment Opportunity Commission ("EEOC"). [FN4] Palomo amended this charge on January 20, 2003 to include allegations of retaliation.

> FN3. While Palomo's complaint in this action had initially alleged that the defendants had caused her miscarriage, based on uncontroverted medical evidence she no longer makes that charge.

> FN4. The parties do not appear to have included Palomo's initial EEOC complaint with their motion papers.

7. December: Palomo Returns to Work and Takes Vacation

Palomo returned to work on December 2. On December 10, she requested and was granted vacation from December 20 to January 2, 2003. Before leaving on this vacation, Palomo sent holiday cards to about 800 alumni. The list of clients who would receive holiday cards was not ready before Palomo left on vacation, and in Palomo's absence, Sitterle signed them and sent them out without Palomo's signature. Palomo contends in her affidavit that holiday cards had been sent out late in prior years when they were not ready by the holidays, and that previously she and Sitterle had both signed cards sent to clients that they had jointly visited.

8. January 2003: Palomo Returns to Work

*5 On January 16, 2003, Palomo asked to take vacation in February. Susan Glancy, a Human

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.