Slip Copy                                                                                                                          Page 5
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Resources Department employee, drafted Sitterle's response, denying the request and explaining that Sitterle needed Palomo in the office with her in February. [FN5]

> FN5. When Palomo requested vacation dates in March, that request was granted.

Palomo and Sitterle had been scheduled to go on a business trip to Brazil in the Fall of 2002. The trip had been rescheduled to January 2003. When it was learned that Palomo could not travel, Sitterle asked Michael Lendener to take Palomo's place on the trip. After Palomo's miscarriage, she did not request that she be permitted to go on this trip to Brazil and did not object to Lendener going on the trip. On January 7 and 8, however, Palomo and Sitterle exchanged e-mails regarding the trip. It began with Palomo asking Sitterle how she should respond to an inquiry she had just received as to why she wasn't traveling to Brazil on that trip. Sitterle suggested that Palomo tell "the truth, that you had a medical condition that prevented you from traveling." Palomo responded that since she no longer had the medical condition, she would just say that there are "business issues keeping me in the office this month." Palomo then pointed out that on December 11, when a planning meeting was held to choose whom to visit in Brazil, she was no longer pregnant. Sitterle completed the exchange by explaining that Lendener had been asked to go in Palomo's stead before December 11 because the Department was accommodating Palomo's request not to travel.

On January 17, Sitterle sent Palomo a document entitled "position expectations," and asked for Palomo's "input." That same day, Palomo responded in writing asking whether the document was her new job description. She complained that the document contained "most" of her old job responsibilities "in addition to some other full time responsibilities." Besides complaining about the amount of work required, Palomo also objected that one specific task was administrative work at a grade 10 level. She also observed that it appeared as if she had been stripped of her alumni management responsibilities and would be required instead simply to assist others. She ended with a request for clarification before meeting to discuss the "new" expectations.

On January 20, Palomo amended her EEOC charge to add allegations of retaliation based on the Department sending holiday cards without her signature, denying her request for a vacation in February, denying her the opportunity to travel to Brazil on business, and giving her administrative responsibilities usually performed by employees working at lower grades.

On January 23, Hanabury met with Palomo to review her job expectations. Hanabury told Palomo that he wanted to put the EEOC charge aside and focus on moving ahead. He assured her that he wanted her to stay in the Department. Hanabury told Palomo that she would continue to work with Sitterle's team, but report directly to him. They discussed the job description document that described Palomo as responsible for developing and maintaining alumni relationships.

*6 In January, Palomo saw Sitterle's group meeting without her in a conference room. Palomo does not know the purpose or subject of the meeting, and cannot say whether it related to a project that did not involve her.

In April 2003, Hanabury gave Palomo her year-end performance review. Hanabury gave Palomo a positive review. He told Palomo that instead of working with Sitterle's team, she would work with the Marketing and Open Sales team, led by Liz Zale. Palomo approved of this change.

8. Palomo Begins Her Plan to Relocate

In July 2003, Palomo applied for jobs in Las Vegas, near her family. By September, Palomo began planning to relocate to Nevada.

In the Fall of 2003, Sitterle contacted alumni whom Sitterle was going to visit on an upcoming trip. Palomo testified at her deposition that she was the key contact for these alumni and that she believe that Sitterle should have asked Palomo to contact

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                           Page 6
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

the alumni for her. Palomo submitted her resignation on November 5. Her last day of employment was December 17.

B. Facts Underlying Harrell's and Pow's Claims

Pow began working at the Department as a casual employee in June 1997, following her graduation from Columbia's undergraduate program. She became a permanent employee in February 1998, as a Program Coordinator at Grade 10 with a salary of $32,000. In September 1998, Hanabury recommended that Pow be promoted to Marketing and Systems Coordinator at Grade 11, including a 7% salary increase. In October 1998, Phillip Vlahakis ("Vlahakis"), the Director of Marketing, resigned, and Pow assumed his responsibilities and reported directly to Hanabury until Robert Levy ("Levy") was hired. Pow received a promotion to Assistant Director, Grade 12, with a new salary of $45,368 effective February 23, 1999 in conjunction with her new role, and also received $5,000 of additional compensation for handling Vlahakis's responsibilities between his resignation and her promotion.

Harrell was hired as a permanent employee of the Department in June 1999 at Grade 10 with an annual salary of $40,000. She reported to Pow, her domestic partner.

1. Levy's Conduct, July 1999 to May 2000

Levy was hired in July 1999, and supervised Pow. Hanabury was displeased with Levy's performance, and put him on a performance action plan. It is undisputed that Levy used his office computer to view sexually explicit materials and to participate in sexually explicit dialogue in gay chat rooms. Pow and Harrell learned about this in December 1999 during an effort to ascertain the reason for high bandwidth use on the computer system while updating Y2K patches on the Department's computers. Pow and Harrell saw the materials Levy was viewing remotely, from their own office, and Levy did not know that they were aware of his activities; his computer faced the back wall of his office so that others could not view the screen.

Pow and Harrell state that they informed Hanabury of Levy's inappropriate computer use in February 2000 but that Hanabury did not take action in response. In late April 2000, Harrell walked in on Levy while he was engaged in sexual conduct. Harrell reported this incident to Hanabury, who conducted an investigation, including requesting and receiving documentation from Harrell regarding Levy's inappropriate computer use earlier that year. Levy was asked to resign on May 4, and did resign.

2. Promotions, May 2000 to June 2001

*7 In May 2000, Harrell's position was upgraded to Grade 11, and her salary was increased by 5% to $42,000. Pow began reporting directly to Hanabury again in 2000, and in June 2000, Hanabury awarded Pow a 5% pay increase to $49,535. In January 2001, Harrell was awarded an $8,000 increase in salary to $50,000, and Pow was awarded a 20% salary increase.

At Pow's year-end review in June 2001, Hanabury gave Pow a rating of "above average" and indicated that he continued to be pleased with the quality of her performance, awarding her a 4% salary increase. In the section for employee comments on her 2000-2001 year-end review, Pow wrote that Hanabury's "feedback is well thought out and constructive, encouraging one to push boundaries and comfort zones and to develop into a more effective manager. [Hanabury's] dedication to the Executive Education team and his support or each individual including myself is evident in the continuous success of the department."

3. Hanabury's Relationship With Pow and Harrell

Hanabury states that he came to regard Pow and Harrell as friends as well as colleagues; Pow and Harrell deny that they had any friendship with Hanabury. When Hanabury's parents were visiting New York, Hanabury invited Pow and Harrell to lunch to meet them, and Pow and Harrell accepted the invitation. Often, when they were working late, Hanabury would invite Harrell and Pow to join him for dinner and Harrell and Pow would accept. During these dinners and on other occasions,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Hanabury, Pow, and Harrell would discuss their personal lives. [FN6]

> FN6. Hanabury also had personal conversations with a man in the Department, Troy Eggers.

Some of the topics of conversation between Hanabury and Harrell and Pow included Hanabury's dating life, travel plans, and other Department employees. Harrell and Pow describe one sexually explicit conversation. [FN7] Hanabury discussed with Pow and Harrell his upcoming vacation plans with a man he was dating in Michigan, and how it was difficult to maintain a long distance relationship. On other occasions, Hanabury would ask Pow and Harrell whether they knew of any men suitable for him to date, and twice Pow suggested the name of a man with whom Hanabury might go on a date.

> FN7. Hanabury "commented that he had a very good night and when he sat down he took a very gingerly approach to sitting which was more of a-- an indicator of the activity from the night before and appeared very proud of his activities."

Hanabury would sometimes make observations about other employees, commenting on male employees he thought were "cute" or "good looking," that someone was thin or "looked good in his clothing," that someone had gained some weight, or that someone was losing his hair. Hanabury commented about a male employee being in better shape while preparing for a marathon, and putting on a little bit of weight when not training, and that he was "the only thing he had to look at in the office." Hanabury would also speculate about the sexual orientation of other employees and in that connection would comment on, for example, Eggers's interests in cooking and fine arts.

On a number of occasions, unfamiliar with computer scanning equipment, Hanabury asked Pow and Harrell to assist him in scanning photographs of himself onto a computer so that he could post them with his profile on a gay male dating internet website. Hanabury asked Pow and Harrell to help him select the photographs that they thought "would attract him the most attention" from viewers. None of the photographs were more revealing than seeing Hanabury in a bathing suit, although Pow and Harrell emphasize that some of the photographs showed him in his underwear and that one was entitled "the perfect Christmas present" and showed him in his underwear with a wrapped gift box on his lap. Both Pow and Harrell assisted him with scanning the photographs on each occasion and did not complain to Hanabury about such requests or otherwise tell him that the requests made them uncomfortable.

*8 Neither Pow nor Harrell complained about the content of his conversations with them, nor did they tell Hanabury that the conversations made them uncomfortable or that they did not want to engage in such conversations at work. Pow and Harrell, however, claim that instead they overtly avoided contact with Hanabury, and that whenever they did so, Hanabury would retaliate by increasing his scrutiny and criticism of their work performance, increasing the amount of work assigned to them, and creating conflicts with them. They also state that because Hanabury engaged them in conversations about his personal life at work, they were forced to work late into the evening to complete their work. Harrell also claims that Hanabury would regularly tell employees that the Department was his ship and they could get off if they did not like how he ran it.

4.   Harrell's   Initial   Resignation   Discussion, November 2001

In November 2001, Harrell approached Hanabury to discuss her intent to resign. She indicated that she felt that Hanabury created an unhealthy work environment, that there was not enough teamwork, and that other groups were not completing their work, which created more work for her. She did not complain of gender discrimination or harassment. Hanabury told Harrell that he did not want her to resign, and asked Harrell to continue her employment for another six months, promising her that he would work to improve the atmosphere at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Page 8

the Department. Harrell did not resign.

5. Promotions and Restructuring, December 2001 to February 2002

In December 2001, Francis Petit ("Petit"), the Department's Director for New Product Development, resigned. At the time of his resignation, Petit had a doctoral degree. Harrell, who had only a bachelor's degree, assumed many of Petit's responsibilities. In conjunction with the early 2002 restructuring of the Department described above, Harrell was promoted to a Grade 12 position with the title of Assistant Director, Brand Development. She was also awarded a 5% salary increase to $52,000, retroactive to January 1, 2002. Harrell continued to report to Pow.

As part of the same February 2002 restructuring, Pow was promoted to Director of Marketing and Open Sales, a Grade 13 position. She received a 5% salary increase retroactive to January 2002. In this new position, Pow had four people reporting to her. In February, Hanabury also gave Pow a very positive review and continued to give her informal positive feedback and encouragement in March.

6. The Copy Machine Incident, April 2002

In April 2002, Pow sent an e-mail to Eggers that was carbon-copied to Hanabury that criticized Eggers's management of a problem with the color copier. Hanabury had asked to be kept informed of such problems due to prior similar incidents with Eggers. Eggers was upset with Pow for copying Hanabury on the e-mail and told Hanabury that he was angry with Pow for having done that. Hanabury encouraged Eggers to speak with Pow directly and to try and resolve the dispute.

*9 Eggers went into Pow's office, slammed the door, and yelled at her for approximately one to two minutes, telling her that she had no right to "cc" his boss and slammed the door as he left. Eggers did not make any threats and was never closer than five feet to Pow, although Pow states that Eggers repeatedly pounded his clenched fist into the palm of his other hand. Eggers did not make any reference to Pow's gender or say anything sexual in nature. William Drawbridge ("Drawbridge"), another Department employee, stated that he overheard the interaction between Eggers and Pow, and that Pow appeared visibly shaken afterwards.

Hanabury discussed the incident with Pow and her feelings about it for approximately an hour later that same day. Pow states that she thought Hanabury treated the incident too casually and that he chuckled during her meeting with him. The next day, on his way to London for business, Hanabury asked Pow and Eggers to prepare a list of three things that each wished the other would do more or less of, and when he returned, Hanabury met with Eggers and Pow together to facilitate their discussion of their expectations of one another and to mediate between them. At no point during the meeting did Pow complain of gender discrimination.

7. Ombuds Complaints and Resignations, April 2002 to November 2002

Pow and Harrell complained to the Ombuds Office of the University that Hanabury treated men and women differently in the office. Pow had complained in early 1999. Harrell complained in April 2002, and was advised that she could either resign or complain to Human Resources. The parties do not dispute that University policy explicitly provides that complaints to the Ombuds Office are "off-the-record and do not constitute formal notice to the University." Hanabury did not learn that any such complaints had been made until June 2002.

On April 30, Harrell submitted her letter of resignation, stating that she found the Department's "current working environment personally hostile and [felt] extremely uncomfortable continuing to work within the organization." Harrell also stated in her letter that she had "developed physical stress-related conditions including light-headedness, headaches, diarrhea and difficulties breathing." Harrell and Hanabury met the next day to discuss Harrell's feelings. Harrell did not mention gender discrimination in her letter. Harrell's last day was May 17. Harrell met with the Ombuds Office a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)  
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Page 9

second time after submitting her resignation. During her exit interview, Harrell complained to Susan Glancy in Human Resources about the Department's low morale.

On June 5, Hanabury met with Pow to go over her 2001-2002 year-end review; Hanabury gave Pow both positive feedback and constructive criticism and gave her an "above average" rating, which is the same level she received the prior year. Pow claims that Hanabury orally gave her a more negative assessment of her performance than is reflected in the written documentation associated with her year-end review by stating that he no longer regarded her as an above-average employee. Hanabury also advised Pow that he would have liked her to warn him that Harrell was experiencing problems so that he could have advised Pow on how to deal with her. Pow states that she attempted to discuss the negative environment at the Department and that Hanabury informed her that it would not change and that it "look[ed] like [she'd] be the next to leave."

*10 Later that day, Pow submitted her letter of resignation. In her letter, Pow stated that "[g]iven the extent of unrest within Executive Education and the effect of the current environment on my personal health" she had decided to resign and wanted to meet with Hanabury to discuss "a departure package and timeline." Hanabury met with Pow and explained that he did not want her to resign. Hanabury later reiterated this in a letter, writing that although "[i]n your annual review, I suggested that you would need to work on two areas of development with full commitment and enthusiasm[,] I regret that you may have interpreted this as me suggesting that you consider alternative options for employment," and that "[y]our dedication, creativity, passion, strategic-ability, and professional growth have been a pleasure to witness." Pow and Hanabury agreed that Pow would continue to work full time until June 28 and then she would work part-time, supplementing her time with her vacation until September 4. On June 24, Pow was awarded a $2,500 bonus, and on July 1, she received a 3.5% increase in salary. When Pow left the Department on September 4, she was earning $67,813.

In late June 2002, meetings took place between Glancy of Human Resources and other Department officials regarding complaints about Hanabury's management style and the Department's low morale and high turnover rate. In November 2002, Hanabury hired Elizabeth Zale, a woman, to replace Pow.

8. Harrell's Next Job and EEOC Charges, 2003--2004

Harrell began working at J. Walter Thompson Specialized Communications ("JWT") in January 2003. She filed an EEOC charge on February 21. Pow filed an EEOC charge on March 3.

In early 2003, Harrell spoke with Drawbridge about the possibility that the Department might use JWT's services. Harrell drafted a proposal for the Department to use JWT's and Harrell's services, but the Department rejected her proposal in a February 21 e-mail. Although Harrell speculated that Hanabury scuttled the proposal in order to retaliate against her for filing her EEOC charge, it is undisputed that the defendants first learned of Harrell's EEOC filing on March 12. Harrell also asserts that her failure to secure a deal with the Department on behalf of JWT in early 2003 led JWT to terminate her employment in November 2004.

9. Hanabury's Treatment of Other Female Employees

Pow and Harrell have offered evidence from two other women who once worked in the Department. Lorrie Foster ("Foster"), who resigned in June 1999, and had held the position of Executive Director of Open Enrollment prior to Levy, states that Hanabury treated female employees differently from male employees. Foster refers to times when Hanabury yelled at her for being late to work or for requesting to work from home to be with her child, but states that she never heard Hanabury treat male employees that way. She also stated in her deposition that Hanabury was angry with her when

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Page 10

she left the office before the dinner hour. Foster admitted, however, that she was never asked to go to dinner with Hanabury. As an example of the scrutiny to which she was exposed, Foster points to an occasion where Hanabury was on vacation in 1998 or 1999 and asked Sitterle to check the time sheets to find out what time Foster left work one evening. Foster met with the Ombuds Office twice between April and June 1999 to discuss Hanabury's treatment of her.

*11 Carol Reese, the Department's financial manager, states that Hanabury would discuss his personal life with her at work but that she would attempt to ignore it. She states that she received an outstanding evaluation from Hanabury in 1999, but that when she explained that she was interested in advancing her career, Hanabury became abusive and demeaning towards her, including criticizing her performance and telling her that she was "not Columbia material." Reese also states that Hanabury increased her workload and took away her strategic responsibilities. Reese complained to the Ombuds Office twice, and resigned in July 2000.

C. The Claims

The plaintiffs have filed nine claims. The three plaintiffs allege in three separate claims that Columbia discriminated against them on the basis of their sex, including Palomo's pregnancy, and fostered a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and that all three defendants did so in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("State HRL") and the New York City Human Rights Law, N.Y.C. Admin.Code §§ 8-107 et seq. ("City HRL"). They allege in three additional claims that Columbia retaliated against each of them in violation of Title VII, and that all three defendants retaliated against them in violation of the State and City HRL. In two additional claims they allege that Hanabury and Sitterle aided and abetted these violations in violation of the State and City HRL. The final cause of action brought by each plaintiff against each defendant is for intentional infliction of emotional distress. The plaintiffs have withdrawn this last claim.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed.R.Civ.P.; *accord Burt Rigid Box, Inc. v. Travelers Property Cas. Corp.,* 302 F.3d 83, 91 (2d Cir.2002).

A. Palomo's Claims

Palomo's claims may be reduced to four categories: pregnancy discrimination, hostile work environment, retaliation, and constructive discharge. This section addresses each of those claims in turn.

1. Pregnancy Discrimination

*12 Palomo contends that the defendants discriminated against her during her pregnancy because she was pregnant. Claims of employment discrimination brought pursuant to Title VII are analyzed under the burden-shifting approach set forth in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). The same standard applies to employment discrimination claims brought pursuant to the State and City HRL. *Weinstock v. Columbia University,* 224 F.3d 33, 42 n. 1 (2d Cir.2000). A plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Williams v. R.H. Donnelly Corp.,* 368 F.3d 123, 126 (2d Cir.2004). To satisfy this burden, a plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 11

Slip Copy, 2005 WL 1683586 (S.D.N.Y.)

**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

alleging discrimination must establish that
(1) [s]he is a member of a protected class; (2)[s]he is competent to perform the job or is performing his duties satisfactorily; (3)[s]he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on [her] membership in the protected class.

*Dawson v. Bumble & Bumble,* 398 F.3d 211, 216 (2d Cir.2005). A plaintiff's burden in presenting prima facie evidence is *de minimis. Abdu-Brisson v. Delta Airlines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001).

If the plaintiff establishes a prima facie case, she "creates a presumption that the employer unlawfully discriminated, and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action." *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000) (citation omitted); *Mandell v. County of Suffolk,* 316 F.3d 368, 380 (2d Cir.2003). Once the employer articulates a nondiscriminatory explanation, the burden shifts back to the employee to prove, by a preponderance of the evidence, that the adverse employment decision was discriminatory. *Mandell,* 316 F.3d at 381. A plaintiff's demonstration that the employer's proffered reason is pretextual may provide evidence of discrimination. *Id.*

The plaintiff bears the ultimate burden of persuading the trier of fact that her employer intentionally discriminated against her. *James,* 233 F.3d at 154; *see also Reeves v. Sanderson Plumbing Prod.,* 530 U.S. 133, 153 (2000). "Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James,* 233 F.3d at 154.

To defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 123 (2d Cir.2004) (citation omitted). Conclusory statements and general attacks on the defendant's credibility are insufficient to defeat a motion for summary judgment. *Opals on Ice Lingerie v. Body Lines,* 320 F.3d 362, 370 n. 3 (2d Cir.2003); *see also Crawford El v. Britton,* 523 U.S. 574, 600 (1998).

*13 Palomo has identified what she contends were two adverse employment actions that she suffered as a result of discrimination based on her pregnancy. She contends that she was demoted on September 12, 2002, when she was required to report to Sitterle instead of Hanabury. Secondly, Palomo contends that the criticism of her work and the pressure to do work while pregnant constitute an adverse employment action.

"Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir.2004) (citation omitted). *See also Fairbrother v. Morrison,* --- F.3d ---, No. 03-9242-CV, 2005 WL 1389894, at *13 (2d Cir. June 14, 2005). These examples demonstrate that "to be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Williams,* 368 F.3d at 128 (citation omitted). *See also Fairbrother,* 2005 WL 1389894, at *13.

The core of Palomo's discrimination claim is that Hanabury demoted her on September 12 by telling her that she should report in the future to Sitterle instead of to him. It is undisputed that Sitterle was senior to Palomo in title and grade, and that this change in the reporting structure did not alter Palomo's title, grade, salary or benefits. This change in the line of reporting does not by itself constitute an adverse employment action. [FN8]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
(Cite as: 2005 WL 1683586 (S.D.N.Y.))

Page 12

> FN8. For this reason, Palomo's argument that *Alban-Davies v. Credit Lyonnais Sec. (USA) Inc.,* No. 00 Civ. 6150(DLC), 2001 WL 884113 (S.D.N.Y. Aug. 8, 2001), compels a different result is misplaced. In *Alban-Davies,* the plaintiff submitted evidence that he had been removed as the head of a division of a financial services company, had been pushed down two reporting levels, and had lost a private office and trading authority, among other things. *Id.* at *1, 7.

To establish that what she characterizes as a demotion was an adverse employment action, Palomo points to the following three additional circumstances. Professor Schon Beechler, contends that she viewed Sitterle and Palomo as organizational equals despite Sitterle's senior rank. [FN9] This opinion, even if admissible evidence, is not sufficient to convert the change in the reporting structure into an adverse employment action.

> FN9. Beechler represents that "Ms. Palomo and Ms. Sitterle were considered equals at Executive Education, and it was clear that making Ms. Palomo report to Ms. Sitterle was a demotion." To the extent that Beechler seeks to convey the opinion of any other Department employee, that is not admissible evidence. *See Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 87 (2d Cir.2005).

Relying on a memorandum she wrote on January 17, 2003, Palomo asserts that the September 12 action resulted in a wholesale elimination of material job responsibilities, including a loss of her relationship management responsibilities, requiring her to handle administrative work and event coordination. The January 17 memorandum does not establish that Palomo's job responsibilities were materially altered in a discriminatory fashion during and as a result of her pregnancy. The January 17 memorandum, which Palomo wrote to respond to a written description of "job expectations," was part of a dialogue that occurred months after the September 12 meeting and weeks after the termination of her pregnancy. To the extent Palomo relies on the January 17 memorandum as evidence of retaliatory treatment, that is addressed below.

*14 Finally, Palomo asserts that she was denied the opportunity to travel to Brazil in January 2003 despite the fact that she was no longer medically restricted from traveling. Palomo does not dispute that another employee was asked to travel to Brazil in her stead at a point in time when she informed the Department that she could no longer travel. She did not ask the Department to replace that employee on the Brazil trip once she was free to travel, and the Department's failure to make that change unilaterally does not constitute an adverse employment action.

With respect to the second adverse action she has identified, the criticism of her work while she was pregnant, Palomo has also failed to establish the existence of an adverse employment action. Palomo has shown that in meetings on November 8 and 14, Hanabury and Sitterle questioned and then criticized Palomo's work effort. She contends that in two instances unnecessarily short deadlines were imposed on her. [FN10] She asserts that the complaints that her work reflected a lack of effort and dedication were unfair. While she admits that she was unable to work the same hours during her pregnancy that she had before the pregnancy, she asserts that the criticism was unfair because the defendants have not shown that she was unable to complete all of her work responsibilities in the time she did spend at the office.

> FN10. The onerous deadlines she has identified were for tasks she was asked to perform in mid-November 2002.

"[C]riticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Fairbrother,* 2005 WL 1389894, at *14. The Second Circuit has "rejected a claim of an adverse employment action based on an 'unsatisfactory' evaluation that was either threatened or actually received" where there was no diminution in salary or benefits. *Id.* (citation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                       Page 13
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

omitted).

To the extent that Palomo argues that the criticism of her work created a hostile work environment, that argument is addressed below. Because Palomo has failed to show that the defendants took an adverse employment action against her during the period of her pregnancy, the defendants' motion for summary judgment on her pregnancy discrimination claim is granted.

2. Hostile Work Environment

Palomo contends that Hanabury and Sitterle created a hostile work environment during her pregnancy. Title VII prohibits "a discriminatorily hostile or abusive [work] environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993). The same Title VII hostile work environment standard applies to hostile work environment claims brought pursuant to the State and City HRL. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998). To prevail on a claim that harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish two elements. The plaintiff must show: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002) (citation omitted).

*15 Unlike claims of discrimination based on **disparate treatment** or retaliation, a **hostile work environment** claim is "based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002). Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 116 (citation omitted).

Hostile work environment claims must meet both an objective and a subjective standard. Not only must the victim herself "subjectively perceive [the] environment to be abusive," but the misconduct of which a plaintiff complains also must be "severe or pervasive enough to create an objectively hostile or abusive work environment." *Petrosino v. Bell Atlantic,* 385 F.3d 210, 221 (2d Cir.2004) (citation omitted). As a general matter, the conduct of which a plaintiff complains "must be sufficiently continuous and concerted in order to be deemed pervasive." *Feingold v. New York,* 366 F.3d 138, 150 (2d Cir.2004). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness ." *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002).

Palomo has not presented sufficient evidence from which a jury could infer that the defendants created a hostile work environment during the thirteen days she was at work between September 12 and November 15, 2002. She has identified no event or set of events that was severe, and has not presented sufficient evidence to raise a question of fact that there was pervasive discrimination against her during those days because of her pregnancy. It is undisputed that Palomo met with Hanabury and Sitterle on only three occasions during that period: September 13, and November 8 and 14. Palomo has also referred to Sitterle's e-mail requests of her on November 8, 11 and 12.

As far as the September 13 meeting was concerned, Palomo was unable to identify what pressure either Hanabury or Sitterle placed on her except that she was asked to find an interpreter to translate a document before leaving on vacation. It was at the November 8 meeting with Sitterle and Palomo, that Hanabury expressed concerns about Palomo's level of effort. During her deposition Palomo could not remember anything derogatory being said, other than the complaint about her level of effort. Nor could she identify any projects discussed at that meeting that placed her under stress. At the November 14 meeting with Sitterle and Palomo, Hanabury expressed disappointment in Palomo's performance and reminded Palomo that paid disability leave was available to her if she was having difficult with her work load due to her health. The three e-mails concerned requests that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Palomo perform certain tasks. Cumulatively, and taking all inferences in the plaintiff's favor, meetings that review performance and assign tasks, and the assigning of tasks, are not the type of conduct or activity that, except in the case of unusual circumstances not present here, create or constitute a hostile work environment.

**\*16** Palomo contends that the defendants increased her workload and criticized her work "at a time in her life when she was vulnerable to their attacks." She has not presented evidence, however, of what she did during the thirteen days she was at work to allow a fact finder to infer that the defendants had unfairly increased her workload. Certainly the few assignments she points to do not constitute the creation of a hostile work environment. Moreover, Palomo has not presented any evidence to support a claim that the defendants increased her workload beyond what had previously been expected of her. Finally, despite Hanabury's request, she never presented the defendants with any doctor's note or even told them that her doctor had placed any restrictions upon her work beyond the travel restriction, which she admits they readily accommodated. She admits that they reminded her of the availability of paid disability leave if she needed to take leave beyond what she had already taken. While she questions their motive in pointing this out--arguing that they in fact wished her to resign--she does not dispute that the availability of such paid leave was to her advantage, was not discriminatory, and that she did take advantage of that program during her pregnancy.

Palomo's argument that the defendants should have "accommodated" her pregnancy by letting her work less hard than she had previously worked or than an employee at her grade level was expected to work at the Department may proceed from a misunderstanding of the law. Employers are not required to "take ... steps to make it easier for pregnant women to work," *Troupe v. May Department Stores Co.,* 20 F.3d 734, 738 (7th Cir.1994), nor are they required to "make alternative work available." *Armstrong v. Flowers Hospital, Inc.,* 33 F.3d 1308, 1316 (11th Cir.1994). Rather, when employees cannot work due to

pregnancy-induced disability, "they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working." *Id.* (citation omitted). Thus, an employer must only reasonably accommodate pregnant employees when the employer offers such accommodation to "similarly affected employees." *Deneen v. Northwest Airlines, Inc.,* 132 F.3d 431, 437 (8th Cir.1998). *See also Gratton v. JetBlue Airways,* No. 04 Civ. 7561(DLC), 2005 WL 1251786, at \*7 (S.D.N.Y. May 25, 2005). Palomo has not offered any evidence that other disabled employees at her grade level were given an accommodation that was denied to her when she was pregnant.

Finally, most of Palomo's hostile work environment claim rests on her feeling that she was being pressured to work harder than she was working, and her feelings of stress at a vulnerable point in her life. She made her initial complaint of discrimination at a time when she believed that that stress and pressure had caused her miscarriage. Palomo's grief at the loss of this pregnancy is entirely understandable, and she is entitled to great sympathy. But, as she now concedes, there is no basis to blame the defendants for her miscarriage. The issue on this motion is whether she has presented evidence from which a jury could find an objective level of hostility that was "sufficiently severe or pervasive to alter the conditions of" Palomo's employment and "create an abusive working environment." *Harris,* 510 U.S. at 21. She has not presented such evidence.

3. Retaliation and Constructive Discharge

**\*17** Palomo contends that the defendants retaliated against her for her complaints of discrimination, and that through that retaliation she was constructively discharged. Title VII forbids discrimination against an applicant for employment "because he has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the auspices of that statute. 42 U.S.C. § 2000e-3(a). The primary purpose of this provision

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                         Page 15
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

is "maintaining unfettered access to Title VII's remedial mechanisms." *McMenemy v. City of Rochester,* 241 F.3d 279, 284 (2d Cir.2001) (citation omitted).

Courts apply the *McDonnell Douglas* burden-shifting approach to analyze claims of retaliation pursuant to Title VII. *Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003). "In order to establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Feingold v. New York,* 366 F.3d 138, 156 (2d Cir.2004) (citation omitted). For a plaintiff's conduct to constitute participation in a protected activity, it is enough that he has made "informal protests of discrimination, including making complaints to management." *Gregory v. Daly,* 243 F.3d 687, 700-01 (2d Cir.2001) (citation omitted).

Moreover, "an employment practice need not actually violate Title VII for the protected activities element of a retaliation claim to be satisfied. The plaintiff is only required to have had a *good faith, reasonable belief* that he was opposing an employment practice made unlawful by Title VII." *McMenemy,* 241 F.3d at 285 (emphasis supplied.) Whether a plaintiff's belief is reasonable must be "assessed in light of the totality of the circumstances." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998). As to the third prong of the test, a plaintiff may indirectly establish the causal connection needed for a prima facie case by "showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001) (citation omitted).

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft,* 336 F.3d 128, 151-52 (2d Cir.2003). Courts therefore typically focus on two requirements contained within this standard: "the employer's intentional conduct and the intolerable level of the work conditions." *Petrosino,* 385 F.3d at 229.

With respect to the intent requirement, "if a plaintiff suing for constructive discharge cannot show specific intent, he or she must at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective." *Id.* at 229-30 (citation omitted). The inquiry whether the employer's deliberate actions created work conditions so intolerable as to compel resignation is made "objectively by reference to a reasonable person in the employee's position." *Id.* at 230. This requires that there be "the sort of circumstance that would cause a reasonable person to conclude that quitting was the only way she could extricate herself from intolerable conditions." *Id.* at 231. "[T]he law is clear that a constructive discharge claim cannot be proved by demonstrating that an employee is dissatisfied with the work assignments she receives within her job title...." *Id.*

*18 Palomo identifies the following events as the adverse employment actions taken in retaliation for her complaint of discrimination on November 29 and EEOC filing: she was denied the opportunity to travel to Brazil in January 2003; she was denied a vacation request in February 2003 for the first time in her career; she was precluded from signing holiday cards sent to Department clients; Sitterle contacted alumni in the Fall of 2003 directly without informing Palomo; Palomo was excluded from a team-wide meeting; her job description was down-graded by the substitution of supervisory and management duties with administrative and coordination tasks; her work was unfairly criticized.

Palomo has not shown that there is an issue of fact as to whether the defendants retaliated against her. First, several of the events to which she points do not constitute adverse employment actions. Palomo does not deny that a fellow employee was asked to take her place on the trip to Brazil after she told the defendants she could not travel. It is not an adverse employment action or evidence of discrimination in such circumstances to allow the substitute employee to make the trip even though Palomo actually had

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 16
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

no travel restrictions by the time of the trip. [FN11] It is not an adverse employment action to deny a single vacation request, particularly when you invite another vacation request, [FN12] or to send out holiday cards in an employee's absence during the holiday season. Palomo asserts that she was not invited by Sitterle to join one meeting of Sitterle's group, but has not presented any evidence that she should have been invited; for instance, she has not presented evidence of the topic of the meeting. Similarly, it is not an adverse employment action for the person traveling to see clients to contact those clients directly. [FN13]

> FN11. It is telling that Palomo herself never asked to take the trip after her pregnancy ended. It is also understandable why she did not make that request. If she had gone, the defendants would have had to deny that opportunity to someone who had been planning to go in her stead.
>
> FN12. Palomo's vacation requests for December and March were granted.
>
> FN13. Sitterle contacted the clients long after Palomo had left Sitterle's group. After April 2003, Palomo was no longer working on Sitterle's team.

Palomo has not identified any unfair criticism of her performance that occurred once she returned to work following her pregnancy. Indeed, as described in her memorandum of law in opposition to this motion, it appears that upon her return from her disability leave and vacation she quickly achieved her goal of separating herself from Sitterle's oversight. The memorandum describes that on January 23, Hanabury informed her that she would again be reporting to him directly, and in April he removed her from Sitterle's team and gave her what she describes as a "favorable" review.

The only remaining action that Palomo has identified is the downgrading of her responsibilities. It is not entirely clear to what Palomo is referring. [FN14] On January 17, Sitterle and Palomo exchanged e-mails regarding Palomo's position

expectations. Nothing was resolved in that exchange, and six days later Hanabury told Palomo that she would be reporting directly to him. They discussed Palomo's job as including responsibility for developing and maintaining alumni relationships. Palomo has not offered any evidence that she complained at that time or in the following months of her work assignments or job description and has not pointed to any discriminatory treatment following her meeting with Hanabury.

> FN14. It would appear that Palomo is actually referring to the work she was assigned during her pregnancy when she could not travel and was asked to help Sitterle's team in other ways.

*19 In sum, Palomo has not shown that she suffered any adverse employment action following her complaints of discrimination or that her work conditions became so intolerable that she was forced to quit against her will. To the contrary, with her complaints she achieved her goal of extracting herself from Sitterle's supervision. Hanabury agreed that she could return to reporting to him and soon removed her from Sitterle's group altogether. Palomo's claims are dismissed.

B. Harrell's and Pow's Claims

Harrell's and Pow's claims also may be reduced to four categories: gender discrimination, hostile work environment, constructive discharge, and retaliation. This section addresses each of those claims in turn.

1. Sex Discrimination

Pow and Harrell claim that they were discriminated against on the basis of their sex in that male employees were not required to spend hours of their working day engaged in personal conversations with Hanabury. [FN15] Even if engaging in extended personal conversations during the work day can constitute an adverse employment action, and it is not clear that it can, the plaintiffs have not presented sufficient evidence from which a jury could reasonably infer that Hanabury chose to have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.