Slip Copy  
Slip Copy, 2005 WL 1683586 (S.D.N.Y.)  
**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Page 17

these discussions with them because of their gender. Their own evidence supports the inference that Hanabury chose to talk to them based on his judgment that fellow homosexuals would be receptive to his chatter, or his belief (albeit misguided) that Pow and Harrell were his friends. In particular, Pow and Harrell do not point to any content in the conversations that suggests that they were targeted for the conversations because of their gender. It is also undisputed that there were other women with comparable jobs in the Department with whom Hanabury did not have such personal conversations, such as Palomo and Foster, and a man in the Department with whom he did have personal conversations, to wit, Eggers. Because Pow and Harrell have not presented sufficient evidence from which a jury could conclude that Hanabury spent hours at work discussing personal matters with them because of their gender, their claim of gender discrimination due to disparate treatment fails. [FN16]

> FN15. On summary judgment, Pow abandons her claim that Hanabury and Columbia discriminated against her by not sponsoring her for the "EMBA" program.
>
> FN16. In discussing this claim, the plaintiffs refer to Hanabury's treatment of Levy and Foster in the 1990s. Some of their assertions are unsupported by admissible evidence. None of their assertions are relevant to this specific claim since they do not involve Hanabury's discussion of personal matters at the office and do not tend to show why Hanabury chose to have such conversations with the plaintiffs.

2. Hostile Work Environment and Constructive Discharge

Pow and Harrell cite seven aspects of their working relationship with Hanabury that they claim created a hostile working environment for them. First, Hanabury tolerated Levy's use of gay pornographic materials in the office and expressed indifference over Harrell's witnessing Levy engaging in sexual activity in his office. [FN17] Second, Hanabury encouraged Eggers' abuse of Pow and was dismissive of Pow's complaint that she felt physically threatened by Eggers' outburst. Third, they reiterate that Hanabury had personal conversations with them for hours every day, which wasted their time and exposed them to what they characterize as a graphic discussion of his sex life. [FN18] Fourth, Hanabury had dinner with them, where he would subject them to more personal conversations about topics including his dating life and his interest in bathing suits. Fifth, Hanabury asked them to scan personal photographs of himself, including at least one depicting him in his underwear. Sixth, they claim that Hanabury coerced them to engage in the personal conversations with him by subjecting them to unfair criticisms and increases in their workload whenever they sought to avoid him, and by dictating which exit they could use to leave the Department at the end of the day. Seventh, Hanabury told them that the environment would not change at work and that if they wanted a change, they would have to leave the Department.

> FN17. The plaintiffs also accuse Hanabury of allowing Levy to leave the office during working hours to engage in sex, but have offered no evidence to support this.
>
> FN18. In terms of graphic discussions, the plaintiffs have only identified Hanabury's single conversation regarding the fact that he had had a very good night.

a. Severity or Pervasiveness

*20 The most serious of these accusations concerns Levy's activity in early 2000, more than three years before Pow and Harrell filed their claims in this lawsuit. Columbia and Hanabury acted promptly after Harrell interrupted Levy's improper sexual activity in the office and Levy resigned. This episode is too unconnected to the other issues of which the plaintiffs complain and too remote in time to be considered part of any pattern or otherwise to assist the plaintiffs in their hostile work environment claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1683586 (S.D.N.Y.)

**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Page 18

The only other incident concerning something other than the plaintiffs' personal relationship with Hanabury is the confrontation in April 2002 between Eggers and Pow over the memorandum Pow had sent regarding Eggers' management of the color copier. While Pow is critical of Hanabury's management of this workplace incident, the incident is neither severe nor representative of pervasive conduct that could be said to create a hostile work environment.

The nub of the hostile work environment claim, and indeed their constructive discharge claim, is the assertion by Pow and Harrell that they were engaged against their will in the conversations with Hanabury about his personal life both in the office and during their frequent dinners. The difficulty with their claim that they resented these conversations is that neither Pow nor Harrell ever objected to Hanabury, or ever refused. They never explained that they were too busy, or had other plans for the evening. They never indicated an unwillingness to help him use the office scanning machine. To fill this gap, the plaintiffs contend that when they tried to avoid him, Hanabury coerced them into continuing to be available to him by increasing their workload, unfairly criticizing their work, and explaining that nothing would change. [FN19] The only examples of criticism they point to are isolated instances of informal criticism that were not memorialized in writing, and that occurred in the context of a long history of praise, positive reviews, salary increases, and promotions.

> FN19. While a significant disparity in position or blatantly inappropriate discourse would likely obviate any need for a plaintiff to assert that she had objected, Pow and Harrell are sensitive to the fact that it is unusual in the circumstances presented here that they did not share their views with Hanabury. They do not contest that their failure to object contributed to Hanabury's misguided belief that he could confide in them because they were his friends.

Pow and Harrell certainly describe bad judgment by a supervisor and unprofessional conduct in the workplace. The issue here, however, is whether their description of Hanabury's conduct, if credited by a jury, could constitute the creation of a hostile work environment that sufficiently altered the conditions of their employment. On one hand, Pow and Harrell have identified few conversations with Hanabury with sexual content. On the other, they have described one objectionable reference to a previous night's date, and it is undisputed that Hanabury showed them pictures of himself in his underwear. Hanabury also commented generally on the personal appearance and attractiveness of employees, and asked for suggestions of men to date.

What is missing from the plaintiffs' accusations is conduct by Hanabury that was permeated with "discriminatory intimidation, ridicule, and insult." *Morgan,* 536 U.S. at 116. While the conversations were unwanted from the plaintiffs' point of view, the plaintiffs do not contend that Hanabury discussed his personal life with them in order to harass, intimidate, ridicule, or insult them in some way, or even that they perceived that to be his motive. While Hanabury imposed on their time, they do not allege that they perceived him to be motivated by a desire to harass them. It does not appear, therefore, that they have presented evidence from which a jury could conclude that Hanabury created a work environment that was hostile to them based on either the objective or subjective standards of a hostile work environment claim. Because their claim fails for other reasons, however, it is unnecessary to resolve this issue.

b. Motivation Based on Pow's and Harrell's Sex

\*21 Even if Pow and Harrell were able to satisfy the pervasiveness element of a **hostile work environment** claim, for the reasons already described in connection with the **disparate treatment** claim, they are unable to demonstrate that any harassment was "because of" their sex. "It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1683586 (S.D.N.Y.)

**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Page 19

VII only when it occurs because of an employee's sex, or other protected characteristic." *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001). "In determining whether an employee has been discriminated against because of *such individual's* sex, the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace." *Id.* (emphasis in original) (citation omitted).

Pow and Harrell have presented no evidence supporting the notion that Hanabury targeted them for excessive conversation because they are women, or required them to go to dinner with him because they are women, or asked them to scan photographs for him because they are women. [FN20] None of the evidence suggests that the content of his communications with them was affected by their gender.

> FN20. They also have presented no evidence that Eggers' or Levy's conduct targeted Pow and Harrell because they are women. There is no evidence that Levy was aware or intended that Pow or Harrell would view his misbehavior. Eggers' outburst was triggered by Pow's decision to add a "cc" that advised Hanabury of her complaint regarding Eggers.

To show that the conduct to which they object was "because of" their gender, as opposed to their perceived friendship, Pow and Harrell rely on a statement by a male employee, Drawbridge, that he was unaware that Hanabury subjected any male employees to the same conversations that Hanabury had with Pow and Harrell. Drawbridge can only speak for himself, *see Woodman,* 411 F.3d at 87, and it is undisputed that Hanabury did have personal conversations with the only male senior level administrative employee, Eggers, and did not have personal conversations with certain female senior level administrative employees, to wit, Foster and Palomo. Given this record, the jury would have no evidentiary basis to find that Hanabury chose to engage Pow and Harrell in these conversations because of their gender. The evidence points only to Hanabury's mistaken judgment as to the existence of a friendship, and the assumptions he made because of their sexual orientation. For this reason, the claim based on a hostile work environment and the intertwined claim of constructive discharge are dismissed.

3. Retaliation

Pow and Harrell contend that they complained of gender discrimination to Hanabury during resignation discussions in November 2001 and April and June 2002, to the Columbia Ombuds Office in early 1999 and April and May 2002, and to the EEOC on February 21 and March 3, 2003. In retaliation for their complaints to Hanabury, Harrell and Pow contend that they were constructively discharged. [FN21] Harrell asserts that, in retaliation for her EEOC complaint, Hanabury ordered the Department not to do business with her new employer.

> FN21. Although the plaintiffs' memorandum of law in opposition to summary judgment explicitly makes a retaliation claim only for Harrell, it is appropriate to infer that a similar claim is also being made for Pow.

*22 Pow and Harrell have not shown that their complaints to Hanabury constituted protected activity; they never complained to Hanabury of discrimination. Rather, they complained about issues such as low morale within the Department and Hanabury's alleged indifferent management style.

The only evidence regarding Hanabury's knowledge of Pow's and Harrell's complaints to the Ombuds Office is that Hanabury learned about them in June 2002, after Harrell had resigned and after Pow had submitted her resignation. Thus, Pow and Harrell have not generated a material issue of fact concerning whether Hanabury knew of their participation in a protected activity, assuming the complaints to the Ombuds Office constituted protected activity, prior to their announcements of their decisions to leave Columbia. [FN22]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 1683586 (S.D.N.Y.)

**(Cite as: 2005 WL 1683586 (S.D.N.Y.))**

Page 20

> FN22. Even after Pow had submitted her resignation, instead of suffering an adverse employment action, she received both a bonus and a raise.

The final instance of retaliation is similarly flawed. The Department rejected the proposal from Harrell and her new employer weeks before it learned of her EEOC filing. Therefore, the retaliation claims for both Pow and Harrell are dismissed.

## CONCLUSION

The defendants' motion for summary judgment is granted. The Clerk of Court shall close the case.

SO ORDERED:

Slip Copy, 2005 WL 1683586 (S.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

421 F.3d 699 Page 1
421 F.3d 699, 96 Fair Empl.Prac.Cas. (BNA) 673
**(Cite as: 421 F.3d 699)**
C

Briefs and Other Related Documents

United States Court of Appeals,
Eighth Circuit.
Lesa DAVIS, Plaintiff--Appellant,
v.
KARK-TV, INC., doing business as Morris
Multimedia; Nexstar Broadcasting Inc.,
originally sued as KARK-TV, Inc., doing business
as Nexstar Communications,
Inc., doing business as KARK-TV, Inc. Defendant--
Appellees.
No. 04-3606.

Submitted: May 13, 2005.
Filed: Aug. 30, 2005.

Background: African-American former employee filed lawsuit against former employer, alleging race discrimination, retaliation, and constructive discharge, in connection with her failure to receive a promotion and raises, and her transfer to another position, in violation of § 1981, Title VII and the Arkansas Civil Rights Act. The United States District Court for the Eastern District of Arkansas, Susan Webber Wright, Chief Judge, granted summary judgment in favor of employer. Employee appealed.
 Holdings: The Court of Appeals, Melloy, Circuit Judge, held that:
 (1) employee failed to show that employer's proffered non-discriminatory reason for failure to promote her was pretext for race discrimination;
 (2) employee failed to show that employer's proffered non-discriminatory reasons for not giving her a raise were pretext for race discrimination;
 (3) transfer did not constitute an "adverse employment action"; and
 (4) employer did not create an intolerable work environment in connection with transfer.
 Affirmed.

West Headnotes

[1] Civil Rights 1138
78k1138 Most Cited Cases
A court analyzes Title VII disparate treatment claims, § 1981 claims, and Arkansas Civil Rights Act (ACRA) claims in the same manner. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; West's A.C.A. § 16-123-101.

[2] Civil Rights 1536
78k1536 Most Cited Cases
Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets her burden of establishing a prima facie case of Title VII employment discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[3] Civil Rights 1536
78k1536 Most Cited Cases
Under the *McDonnell Douglas* framework, once an employee successfully establishes a prima facie Title VII discrimination case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[4] Civil Rights 1118
78k1118 Most Cited Cases
To establish a prima facie case of Title VII discrimination, an employee must show that: (1) she is a member of a protected class, (2) she met the legitimate expectations of her employer, (3) she suffered an adverse employment action, and (4) similarly situated employees that were not members of the protected class were treated differently. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[5] Civil Rights 1544
78k1544 Most Cited Cases
The burden on an employer to articulate a nondiscriminatory justification for the adverse employment decision is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence, for purpose of employee's Title VII discrimination claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[6] Civil Rights 1137
78k1137 Most Cited Cases
African-American employee failed to show that employer's proffered non-discriminatory reason for failure to promote employee, that she was less

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




421 F.3d 699  
(Cite as: 421 F.3d 699)

Page 2

qualified than the other two candidates, was pretext for race discrimination, as required to establish Title VII race discrimination claim, absent any evidence that the selected candidates were not qualified for the job, or any showing that the decision was motivated by race. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[7] Civil Rights ⇐ 1137
78k1137 Most Cited Cases
African-American employee failed to show that employer's proffered non-discriminatory reasons for not giving her a raise, that employee expressed that she did not want any raise if it was under two percent and that employee did not qualify for a larger raise based on her performance and her failure to attend required meetings, were pretext for race discrimination, as required to establish Title VII race discrimination claim, absent evidence that other employees who were not members of protected group received raises larger than two percent, or that race was a motivating factor for denying her raises. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[8] Civil Rights ⇐ 1123
78k1123 Most Cited Cases
To show constructive discharge, an employee must show more than just a Title VII violation by her employer. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[9] Civil Rights ⇐ 1123
78k1123 Most Cited Cases
A "constructive discharge" in a Title VII context occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[10] Civil Rights ⇐ 1119
78k1119 Most Cited Cases

[10] Civil Rights ⇐ 1123
78k1123 Most Cited Cases
Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects constitute "adverse employment actions," for purpose of demonstrating constructive discharge in a Title VII action, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[11] Civil Rights ⇐ 1123
78k1123 Most Cited Cases

[11] Civil Rights ⇐ 1135
78k1135 Most Cited Cases
African-American employee's transfer did not constitute an "adverse employment action," for purpose of demonstrating that she was constructively discharged, in Title VII employment discrimination action, and as required to establish Title VII retaliation claim, where employee's job was eliminated and she was offered a new position that involved only minor changes in working conditions and no reduction in pay or benefits, and employee received a seven percent raise with the transfer. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[12] Civil Rights ⇐ 1123
78k1123 Most Cited Cases
Employer did not create an intolerable work environment in connection with African-American employee's transfer, as required to prove constructive discharge, in Title VII employment discrimination claim; employee did not have problems with coworkers or supervisors, and when employee informed her supervisor that the hours required of her new position would conflict with a job she held at another company, the supervisor asked her to check with the other company to see if an arrangement could be made to accommodate her new hours. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[13] Civil Rights ⇐ 1123
78k1123 Most Cited Cases
An employee who quits without giving her employer a reasonable chance to work out a problem has not been constructively discharged, for purpose of Title VII employment discrimination case. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

[14] Civil Rights ⇐ 1243
78k1243 Most Cited Cases
To establish a prima facie case of Title VII retaliation, an employee must show that she engaged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




in protected conduct, that she suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.
*701 Sheila F. Campbell, Little Rock, AR, for appellant.

William L. Davis, Dallas, TX, for appellee.

Michael S. Moore, Little Rock, AR, for appellee Morris Multimedia.

Before LOKEN, Chief Judge, HANSEN, and MELLOY, Circuit Judges.

MELLOY, Circuit Judge.

Lesa Davis appeals the district court's [FN1] grant of summary judgment in favor of KARK-TV on her claims of race discrimination and retaliation under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000e, and the Arkansas Civil Rights Act of 1993 *702 ("ACRA"), Ark.Code. Ann. §§ 16-123-101 et. seq. We affirm.

> FN1. The Honorable Susan Webber Wright, Chief Judge, United States District Court for the Eastern District of Arkansas.

I.

Lesa Davis was hired at KARK-TV in 1977 as a part-time camera operator. Shortly thereafter, she started to work for United Parcel Service ("UPS"). She remains employed by UPS. In 1979, Davis became a full-time camera operator at KARK-TV on the nightshift. Not long after, Davis began to perform audio duties and was promoted to Production Coordinator. As Production Coordinator, Davis was responsible for ordering supplies, booking time for clients to make commercials, and assisting the Production Manager. As part of this promotion she began to work the day shift.

In the mid-1980s Morris Multimedia purchased KARK-TV. Morris made a number of changes at KARK-TV including starting a morning program. Davis was assigned to do graphics and audio for that show. As part of a normal annual review, in 1994, Davis was offered a one percent raise. She informed the station that she did not want to receive a raise if it was only one or two percent. Although she accepted a two and one half percent raise later that year, she continued to refuse raises of two percent or less. In 1997, Troy Thompson became the Production Manager at the station. She repeated her request to not receive a raise of two percent or less to Thompson. She told Thompson that she did not want a raise of less than two percent because it would put her in a higher tax bracket and would reduce her take-home pay.

In 1998, KARK bought computers so the employees would be better able to produce graphics. By 2000, the station's news directors requested more graphics for their programs. Davis testified that, as a result of the increased demands from the news directors, it became a problem for her to complete all the graphics work and then produce the audio. In addition, Thompson believed he should be responsible for some of the tasks being done by Davis, such as scheduling personnel and commercial production. As a result, Thompson gave Davis a choice of producing the audio or generating the graphics for the morning show. Davis chose to focus exclusively on the graphics.

In August 2001, Rick Iler became the Director of News Operations at KARK-TV. In Spring 2002, the station moved into a new building. As part of the move, the station restructured its operations. Iler wanted graphics to become part of the news department because most of the graphics produced were news graphics. After the decision was made to move graphics from the production department to the news department, Iler met with Thompson and Carl Bruce, the station's General Manager, to determine how the move would impact employees. They determined that two employees, Trey Williams and Brian Stafford, should automatically be moved to the news department from the production department because they were graphic artists who were hired to build graphics.

The station decided to transfer two of the three remaining graphics personnel, who were known as character generators, to the news department. This group consisted of Lesa Davis, Kim Pearson, and Annette Gatlin. These employees operated the system and pulled up graphics for the director during the show. Although Thompson testified that he was in the process of training them to do more

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




graphics, their primary job was to run the graphics machine during the news cast. Their jobs, as opposed to the graphic artist positions, were fairly interchangeable. In other words, on any given day a person might *703 run a camera, audio, or operate a character generator. The station moved Annette Gatlin and Kim Pearson, white females, to the news department. Davis was assigned to run the teleprompter with the promise that she would be moved to camera operator on the morning show.

In June 2003, Nexstar Broadcasting Group, Inc. ("Nexstar") purchased KARK-TV. Nexstar brought in Perry Chester to be the General Manager. Chester evaluated the jobs at the stations and concluded that three positions should be eliminated: graphic artist, teleprompter, and website developer. The graphic artist and website developer employed by the station were terminated. Instead of terminating Davis, Chester offered her a position as a camera operator. Davis told Chester that the new position, which required working in the evening, created a conflict with her position at UPS. Chester advised Davis to check with UPS to see if an arrangement could be made to avoid any scheduling conflicts. Davis accepted the camera operator position and was given a raise as part of that transfer to $10.00 per hour. Davis worked the camera operator job for approximately two weeks and then took a leave of absence for foot surgery. She did not return to work at KARK-TV.

Davis filed a claim of race discrimination against Morris Multimedia for failing to promote her to the position of graphic artist with the Equal Employment Opportunity Commission ("EEOC"). She received a right-to-sue letter from the EEOC on August 26, 2002. Davis later filed a claim of race discrimination against Nexstar for failing to promote her to the position of graphic artist. She received a right-to-sue letter from the EEOC pertaining to this claim on April 29, 2004. Davis filed a lawsuit on November 22, 2002 against Morris Multimedia. She amended her complaint to add Nexstar as a defendant on November 25, 2003. Davis filed a second amended complaint on July 14, 2004 to add a claim of retaliation against Nexstar.

Davis alleges that Morris discriminated against her on the basis of race when she was not given an opportunity to interview for the for the position of graphic artist in the news department, a promotion,

and for Morris's refusal to give her raises. Davis asserts that Nexstar discriminated against her when it failed to place her in the position of graphic artist or audio operator on the morning show when it purchased KARK-TV. She claims Nexstar's actions when it moved her from the morning news show to the evening show as a camera operator were in retaliation for her filing complaints against KARK-TV and amounted to a constructive discharge.

II.

We review de novo the district court's grant of summary judgment. *Pope v. ESA Services, Inc.,* 406 F.3d 1001, 1006 (8th Cir.2005). Summary judgment is appropriate if there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden of demonstrating that there are no genuine issues of material fact rests on the moving party." *Winthrop Resources Corp. v. Eaton Hydraulics, Inc.,* 361 F.3d 465, 468 (8th Cir.2004). We review the evidence and the inferences that reasonably may be drawn from the evidence in "the light most favorable to the nonmoving party." *Gilmore v. AT & T,* 319 F.3d 1042, 1046 (8th Cir.2003).

[1][2][3] We analyze Title VII disparate treatment claims, § 1981 claims, and ACRA claims in the same manner. *Henderson v. Simmons Foods, Inc.,* 217 F.3d 612, 615 n. 3 (8th Cir.2000) (noting that claims premised under the ACRA are *704 analyzed in the same manner as Title VII claims); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1056 (8th Cir.1997) (noting that the *McDonnell Douglas* analysis is applicable to Title VII disparate treatment and § 1981 claims). We employ the familiar *McDonnell Douglas* burden-shifting framework to conduct our analysis. *Turner v. Honeywell Fed. Mfg. & Techs., LLC,* 336 F.3d 716, 720 (8th Cir.2003) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). "Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination. A minimal evidentiary showing will satisfy this burden of production." *Pope,* 406 F.3d at 1006-07 (citations omitted). Once a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate "a legitimate, non-discriminatory reason for its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




adverse employment action." *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir.1994). If the employer meets its burden, "the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." *Pope*, 406 F.3d at 1007. The plaintiff has the burden of persuasion at all times. *Id.*

A. Claim of Discrimination for Failure to Promote Against Morris

[4] To establish a prima facie case of discrimination, Davis must show that: (1) she is a member of a protected class; (2) she met the legitimate expectations of her employer; (3) she suffered an adverse employment action; and (4) similarly situated employees that were not members of the protected class were treated differently. *Gilmore*, 319 F.3d at 1046.

Davis, as an African-American, is a member of a protected class. We will assume for purposes of this opinion, as the district court did, that Davis can establish the rest of her prima facie case against Morris, although we are by no means certain that she has done so. Given this assumption, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for not selecting Davis for the graphic artist position. *Williams*, 14 F.3d at 1309.

Morris offered as a legitimate, non-discriminatory reason for her non-selection that she was less qualified than the other two candidates. One reason she was not selected was that the station believed that Davis was not as fast at learning how to produce and display graphics. This skill was significant in the station's decision because the station was looking to increase the amount of graphics it used during its newscasts. Rick Iler stated:
[p]robably the number one thing that popped out for me from listening to Troy's feedback and just from my observations, was speed. She was not very fast. And I knew that with the new news cast I had to have someone that would be able to pull up several different graphics, you know, at one time, would be able to learn and grasp the ability to build several different graphics because the position has always been, the position that she was in was just running a machine and you ran them from the night before .... This now would be actually creating all new graphics for a brand new show every single morning and from my observation and feed back from her direct manager, I did not feel that the speed in which she could get things done was going to work for that position.... I also took into consideration, like I said, feedback from Troy. Troy told me she was a good employee but that considering what I *705 needed, knowing what expectations I had of these news shows, that his feedback was simple, she's a good employee but with what you're wanting to do he didn't think that she could do [the job].
Morris also asserted that it did not select Davis for the position because it did not find her to be sufficiently dependable.

[5] "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. Mo. Dept. of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir.1999). Morris's stated justifications meet its burden. Accordingly, the burden shifts to Davis to produce evidence sufficient to create a genuine issue of material fact whether Morris's proffered nondiscriminatory reason was a pretext for discrimination. *Pope*, 406 F.3d at 1007.

[6] Davis fails to produce any evidence of pretext. Instead, Davis appears to argue that she was better qualified than the other candidates who were selected. In particular, Davis appears to argue that the people chosen, Pearson and Gatlin, were less qualified because they had spent less time as graphic operators. We cannot "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.1999). Here, there is no evidence that the persons selected were not qualified for the job. Further, seniority was never listed as a consideration in who would perform graphics in the news department. Thus, given the lack of evidence of pretext from Davis, we will not second guess Morris's hiring decision.

Davis also appears to argue that discrimination by KARK-TV in training led to the differences in qualifications. This argument fails because Davis does not provide any evidence of a denial of training. Accordingly, we conclude that the district

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




421 F.3d 699 Page 6
(Cite as: 421 F.3d 699, *705)

court correctly held that Davis failed to demonstrate that Morris's proffered justification for not promoting Davis was a pretext for discrimination. *Pope,* 406 F.3d at 1007.

B. Claim of Pay Raise Discrimination Against Morris

Davis claims she was denied raises given to Pearson and Gatlin, white employees. Even if we again assume that Davis can establish a prima facie case, she has no evidence of pretext in regards to Morris's legitimate, non-discriminatory justification for its decision.

[7] Morris's justification for not giving Davis raises was that she stated in 1994 that she did not want a raise if it was only one or two percent [FN2] and she had not earned a larger raise after 1994. Troy Thompson testified that he did not recommend Davis for a larger raise because Davis made more mistakes in her job performance than other employees, Davis had failed to attend mock news casts at the new KARK-TV facility, a requirement of her job, and he had taken over many of her duties. Further, he stated that she had a poor attitude toward her work. Davis only points out that Pearson and Gatlin received raises of more than one percent, she does not identify workers who received raises larger than the two percent. The only raise larger than two percent *706 that she identifies was a two and one-half percent raise she received, and accepted, in 1994. Davis offers no evidence that race was a motivation for denying her pay raises. Accordingly, we conclude that the district court correctly found that Davis failed to demonstrate that Morris's stated legitimate, non-discriminatory reason for not offering her a raise was pretextual.

> FN2. There is nothing in the record to indicate that Davis changed her mind and was willing to accept a one or two percent raise.

C. Constructive Discharge Claim Against Nexstar

[8][9] Davis alleges that her transfer amounted to a constructive discharge because the schedule conflicted with her UPS job. "To show 'constructive discharge, a plaintiff must show more than just a Title VII violation by her employer.' " *Breeding v. Arthur J. Gallagher and Co.,* 164 F.3d 1151, 1159 (8th Cir.1999) (quoting *Phillips v. Taco Bell Corp.,* 156 F.3d 884, 890 (8th Cir.1998)). "A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation." *Tatum v. City of Berkeley,* 408 F.3d 543, 551 (8th Cir.2005).

[10][11] In this case, Davis cannot show that her transfer constituted an adverse employment action or that Nexstar created an intolerable working environment. This court has stated:
An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not.
*Sallis v. Univ. of Minn.,* 408 F.3d 470, 476 (8th Cir.2005) (internal citations omitted). The elimination of Davis's teleprompter position and her transfer to a camera operator position involved only minor changes in working conditions and no reduction in pay or benefits. In fact, Davis admitted that the camera operator position was perceived as a higher-level position. Further, as part of the transfer Davis was given a seven percent raise. Thus, the transfer did not constitute an adverse employment action.

[12] Further, Nexstar did not create an intolerable work environment. There is no indication Nexstar acted with the intention of forcing Davis to resign or that she intended to do so as a result of Nexstar's actions. Davis admits she did not have any problems with her coworkers, Thompson, or her treatment by Chester. Her only complaint was that she had to work the evening shift, which conflicted with her job at UPS. When Davis informed Chester that the new position conflicted with her position at UPS, Chester advised her to check with UPS and get back to him to see if an arrangement could be made to accommodate Davis, UPS, and the station. Rather than force her out, Chester's actions demonstrate a desire to work with Davis to resolve the issue so that she could remain at the station.

[13] Davis quit rather than work with KARK-TV to find a solution that resolved her concerns. "An employee who quits without giving [her] employer a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.




421 F.3d 699
(Cite as: 421 F.3d 699, *706)

Page 7

reasonable chance to work out a problem has not been constructively discharged." *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996). Accordingly, Nexstar's actions in transferring Davis do not constitute a constructive discharge.

D. Retaliation Claim Against Nexstar

[14] Finally, Davis asserts that Nexstar's decision to eliminate her teleprompter *707 position was in retaliation for filing a complaint against Morris. To establish a prima facie case of retaliation, Davis must show that "[she] engaged in protected conduct, that [she] suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct." *Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir.2004). Without commenting as to the other elements that must be proven, we conclude that Davis failed to show that she suffered an adverse employment action. As discussed above, her transfer from the teleprompter position to camera operator was not an adverse employment action given that it was considered a higher-level position, it came with a raise, and the evidence suggests that the station was willing to work with Davis to avoid scheduling conflicts with her job at UPS. Accordingly, Davis fails to establish a prima facie case of retaliation by Nexstar.

III.

For the foregoing reasons, we affirm the judgment of the district court.

421 F.3d 699, 96 Fair Empl.Prac.Cas. (BNA) 673

Briefs and Other Related Documents (Back to top)

. 04-3606 (Docket)
(Oct. 28, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.


