## V. *The Apprendi Issue*

[17, 18] In *Apprendi v. New Jersey,* the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348. *Apprendi* was decided on June 26, 2000. The jury in Walker's case was instructed on June 29, 2000. Because Walker did not request an *Apprendi* instruction, our review of Walker's *Apprendi* claim is limited to plain error. *United States v. Butler,* 238 F.3d 1001, 1005 (8th Cir.2001). We find no *Apprendi* error, plain or otherwise, because Walker's sentence of 151 months did not exceed the 20–year statutory maximum for cocaine or crack cocaine offenses in their simplest form. As we concluded in *United States v. Aguayo–Delgado,* 220 F.3d 926, 933 (8th Cir.2000), "[t]he rule of *Apprendi* only applies where the non-jury factual determination increases the maximum sentence beyond the statutory range authorized by the jury's verdict." *Apprendi* does not require a jury determination of the facts giving rise to a mandatory minimum penalty, nor does it require a jury determination of the sentencing guideline factors. *Aguayo–Delgado,* 220 F.3d at 933–34. Accordingly, Walker's *Apprendi* issue is without merit.



Said **HANNOON, Plaintiff–Appellant,**

v.

**FAWN ENGINEERING CORP. and
Tony John Wayne, Defendants–
Appellees.**

No. 02–2078.

United States Court of Appeals,
Eighth Circuit.

Submitted: Dec. 9, 2002.

Filed: April 14, 2003.

Former employee brought state court action against former employer, alleging harassment and discrimination based upon race and national origin, in violation of Title VII and the Iowa Civil Rights Act (ICRA), and state law fraudulent misrepresentation. Action was removed to federal court. The United States District Court for the Southern District of Iowa, Robert Pratt, J., granted summary judgment in favor of employer. Former employee appealed. The Court of Appeals, Melloy, Circuit Judge, held that: (1) employer met burden of producing legitimate, non-discriminatory reason for employee's discharge; (2) employee failed to show that employer's proffered reason for his discharge, his poor performance, was pretextual, barring discrimination claims; (3) dismissal of employee's harassment claims was warranted; and (4) employee failed to demonstrate that employer made false representation, barring fraudulent representation claim.

Affirmed.

**1. Civil Rights** ⊂⊃378

When employee presents no direct evidence of employment discrimination, the Court of Appeals analyzes discrimination

claims under the burden shifting analysis of *McDonnell Douglas.*

## 2. Civil Rights ⟺142

Under the first step of the *McDonnell Douglas* burden-shifting analysis for race-based Title VII employment discrimination claims, an employee must establish a prima facie case by demonstrating (1) that he is a member of a racial minority, (2) that he is qualified for the relevant position, (3) that there was an adverse employment action, and (4) that some evidence of record supports the inference of improper motivation. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

## 3. Civil Rights ⟺378

Once an employee makes a prima facie showing of employment discrimination, under the *McDonnell Douglas* burden-shifting analysis, the defendant employer must meet a burden of production in to articulate a legitimate, non-discriminatory reason for the adverse employment action; and if employer meets this burden, burden returns to employee to prove that employer's proffered reason is raised merely as a pretext for the discrimination.

## 4. Civil Rights ⟺378

Within the *McDonnell Douglas* framework, the ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against the plaintiff remains at all times with the plaintiff.

## 5. Civil Rights ⟺383, 389

In cases where a prima facie case of employment discrimination is sufficiently strong, an employee may meet its ultimate burden of proving discrimination and create a triable issue for the jury by setting forth the prima facie case and offering evidence to demonstrate that the employer's proffered nondiscriminatory reason for the adverse employment action is pretextual.

## 6. Civil Rights ⟺382.1

Employer met burden of producing legitimate, non-discriminatory reason for former employee's discharge, as required in employee's Title VII employment discrimination claim based upon race and national origin, where employer provided a detailed and undisputed documentary account of employee's poor performance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

## 7. Civil Rights ⟺153

Employee failed to show that employer's proffered reason for his discharge, his poor performance, was pretext for employment discrimination based upon race or national origin, barring employee's Title VII race and national origin discrimination claim; although supervisor confronted employee about his hygiene and body odor, such comments did not relate to employee's race or national origin, employee admitted that he failed to complete his work assignments on time, supervisor's criticism that employee requested Friday afternoons off for prayers did not support an inference of race or national origin discrimination, as employee was permitted to take that time off and there was no indication that employer considered employee's adjusted schedule as factor in discharge, and supervisor's other criticisms of employee were not connected to employee's race or national origin. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

## 8. Civil Rights ⟺145

To prove Title VII harassment based on race or national origin, employee must show that: (1) he is a member of a protected class, (2) unwelcome harassment occurred, (3) there is a causal nexus between the harassment and his protected-group status, (4) the harassment affected a term, condition, or privilege of employment, and





(5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**9. Civil Rights ⊃145**

Employee failed to show that he was subjected to harassment in the workplace or that there was any causal nexus between the alleged harassment and his race or national origin, and thus, dismissal of employee's Title VII harassment claims on basis of race and national origin was warranted; although supervisor confronted employee about his body odor, and criticized employee's performance on numerous occasions, such comments comprised criticism rather than harassment, and there was no connection between employee's race or national origin and supervisor's criticisms. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**10. Fraud ⊃9, 13(1)**

To prove a claim of fraudulent representation under Iowa law, there must, in fact, be a false representation.

**11. Fraud ⊃9, 13(1)**

Employee failed to demonstrate that employer made false representation, as required to support fraudulent representation claim based upon his discharge, under Iowa law; even though some managers viewed hiring of employee as temporary fix for internal problems in employee's department, that perception by managers did not demonstrate intent at time of hiring to retain employee only for short period of time, and employee was at-will employee without guarantee of employment for any set period of time and without entitlement to notice prior to discharge.

1. The Honorable Robert W. Pratt, United States District Judge for the Southern District

Tammy Westhoff, argued, Des Moines, IA (Alfredo Parrish, on the brief), for appellant.

Frank Harty, argued, Des Moines, IA (Mary E. Fund, Des Moines, IA, on the brief), for appellee.

Before WOLLMAN, HEANEY, and MELLOY, Circuit Judges.

MELLOY, Circuit Judge.

Plaintiff–Appellant Said Hannoon appeals the district court's [1] adverse grant of summary judgment on his claims of harassment and discrimination based on race and national origin. He also appeals the district court's adverse grant of summary judgment on his state claim of fraudulent representation. We affirm.

I.

Defendant–Appellee Fawn Engineering Corp. (Fawn) hired Hannoon in September, 1999, to serve as the Information Systems (IS) Manager for Fawn's ailing IS Department. Before Hannoon was hired, Fawn had fired its prior IS Manager and the situation in the IS Department was described as "out of control" regarding both expenditures and a lack of communication with management. Hannoon was hired as an at-will employee. The letter containing his offer of employment stated, "Upon your employment, you will be subject to the terms and conditions as outlined in our employee handbook. This handbook is available for your review. Employees of the company are not hired for any set period of time and can be terminated with or without cause at any time or without notice."

of Iowa.

In January 2000, Fawn hired Defendant–Appellee Tony John Wayne to serve as its Vice–President of Finance and Chief Financial Officer. Wayne held supervisory power over the IS Department and, ultimately, over Hannoon. Before meeting Hannoon, Wayne compiled notes based on a review of Hannoon's personnel file. In his notes, Wayne identified various concerns as well as questions to ask Hannoon. These notes included the comments: "hygiene," "first week on job requested Fri. off," "See no formal IT education on his resume," and "3 jobs in 2 years."[2] Other comments in Wayne's notes related to questions such as "How does he communicate expectations, overall, to his people," and "IT staff meetings? Who? When?"

On February 10, 2000, Wayne met with Hannoon for the first time. Wayne gave Hannoon a series of specific assignments with specific deadlines. Most of these assignments related to the creation of a documented plan of action for the IS department including the creation of job descriptions for IS employees...and the development of a policy to restrict the department's reliance and expenditures on outside programmers and IS consultants. During this meeting, Wayne told Hannoon "the rock is bigger than you." Hannoon understood this comment to mean that Wayne thought Hannoon was not fit for the job of IS Manager and that the job of solving problems at the IS department was too big for Hannoon. Wayne memorialized the assignments in a memo dated February 11.

Wayne again met with Hannoon on February 23. During the February 23 meeting, Wayne confronted Hannoon regarding the issue of Hannoon's body odor. Wayne stated that he had noticed the problem, that other employees had complained, and

that good interpersonal communication was important to the position of IS Manager. Hannoon responded that a prior employer had reproached him about odor. Hannoon now claims that the prior reproachment related to breath odor rather than body odor. At the time, Hannoon did not voice objection to Wayne's comments. After the meeting, however, Hannoon did object to the comments. He communicated his objections and embarrassment via email to Wayne and other employees.

Later in February, Wayne again met with Hannoon. Wayne memorialized the discussion from this meeting in a memo dated February 28. Under the heading "Written Communication Skills" he noted, "your written communications are difficult to follow and include grammatical errors, tense errors, and are often incomplete. This is an essential element of your job as you have the need to communicate in writing via email, memos and project reports, policy and procedure documents, performance evaluations, etc." Under the heading "Policy and Procedure Documents" he noted that Hannoon may lack necessary experience because the draft documents submitted by Hannoon "read like a detailed standard operating procedure (S.O.P.) as opposed to a clear, specific documentation of authority, accountability, and approved spending guidelines for these decisions." Under the heading "Listening Skills" Wayne noted that Hannoon failed to submit various draft documents that were requested in the February 10 meeting and that Hannoon failed to account for specifically identified information in documents that were submitted. Wayne noted that he was concerned with the breadth and depth of Hannoon's skills, questioned Hannoon's ability to lead a con-

**2.** The terms information technology (IT) and information services (IS) are used interchangeably throughout the record. Other

than direct quotes, we employ the terms information services and IS.



version effort, and stated, "[s]pecifically, we are looking to *you* to help facilitate overall planning and direction, *not* our outside consultants." (emphasis in original). Finally, under the heading "Leadership Skills" Wayne criticized Hannoon for being too passive in meetings and advised Hannoon that he needed to work to "build relationships with IT staff members and . . . managers."

In memos to Hannoon dated March 24 and 27, Wayne noted that he had not yet received updated documents from Hannoon and reproached Hannoon for not meeting the deadlines set during their first meeting. Hannoon admits that he did not complete the specifically assigned tasks on time. However, in his own defense he states that the assignments were very large and Wayne provided only a very short time for their completion. Further, Hannoon argues that Wayne was partially responsible for the tardiness of Hannoon's work because Wayne received certain revised draft documents but failed to respond between February 24 and March 13.

Hannoon was terminated on April 4, 2000. He brought suit in state court claiming that the defendants discriminated against him, subjected him to harassment in a hostile work environment, and made fraudulent misrepresentations that induced him to accept the job of IS manager. In support of the harassment and discrimination claims, Hannoon points generally to the manner in which he was treated by Wayne and specifically to the comments about body odor as well as the fact that Wayne developed adverse opinions about him before their first meeting. Hannoon argues that Wayne's confrontation regarding body odor and failure to refer Hannoon to Fawn's employee medical assistance program regarding the issue of body odor represent deviations from standard company policy and support an inference of discrimination. Finally, Hannoon alleges that

two other facts are relevant to his claims. First, he notes that Wayne forwarded an email from Hannoon to one of Hannoon's subordinates with a request that the subordinate "translate" the email. The email contained various technical terms of art. Second, Hannoon complains that Wayne undermined Hannoon's authority by sending one of Hannoon's subordinates to Canada for training without first consulting Hannoon.

Regarding the issue of fraudulent misrepresentation, Hannoon alleges that he had other employment opportunities available when he accepted the position with Fawn and that he would not have accepted the position with Fawn had he known that it would not be a secure position. Hannoon identifies certain language from a memo between managers at Fawn as evidence that Fawn misrepresented its intentions regarding the IS Manager position. The memo between managers contained a discussion of the severance package to be offered Hannoon. One manager noted, "I know [Hannoon] has not been the best fit, but you and I knew going into it that we were putting a band-aid on the problem." Hannoon alleges fraudulent representation because he was not informed at the time of hiring that his position in the IS Department was viewed as a band-aid or temporary fix.

Hannoon brought suit in state court alleging claims of harassment as well as national origin and race discrimination under Title VII of the Federal Civil Rights Act of 1964 and the Iowa Civil Rights Act (ICRA). In addition, he alleged a claim of fraudulent misrepresentation under Iowa law. Defendants removed to the district court which granted summary judgment on all claims.

## II.

We review the district court's grant of summary judgment de novo, reading the

record in a light most favorable to the non-moving party and granting all reasonable inferences in his favor. *Yarborough v. DeVilbiss Air Power, Inc.,* 321 F.3d 728, 730 (8th Cir.2003). Because Hannoon presented no separate arguments under the ICRA, we address his state civil rights claims together with his Title VII claims. *See Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (Iowa 1982) ("The parties assume we will find federal cases persuasive in selecting the analytical framework for deciding discrimination cases under the Iowa civil rights statute. This assumption is warranted by our prior decisions.") (citations omitted); *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA.") (citation omitted).

[1–4] Because Hannoon presented no direct evidence of discrimination, we analyze his discrimination claims under the burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the first step of this analysis, a plaintiff must establish a prima facie case by demonstrating (1) that he is a member of a racial minority, (2) that he was qualified for the relevant position, (3) that there was an adverse employment action, and (4) that some evidence of record supports the inference of improper motivation. *Id.* If the plaintiff makes this prima facie showing, the defendants must meet a burden of production in the second step to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 802–03, 93 S.Ct. 1817. Finally, if the defendants satisfy the second step, the burden returns to the plaintiff in the third step to prove that the defendants' proffered reason is raised merely as a pretext for discrimination. *Id.* at 804, 93 S.Ct. 1817. Within this framework, "[t]he ulti-

mate burden of persuading the trier of fact that the defendant[s] intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

[5] In cases where the prima facie case is sufficiently strong, a plaintiff may meet its "ultimate burden" and create a triable issue for the jury by setting forth the prima facie case and offering evidence to demonstrate that the defendants' proffered reason is pretextual. *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. One of the Court's rationales for permitting a plaintiff to satisfy its "ultimate burden" merely through a strong prima facie case coupled with a demonstration of pretext is the longstanding principle of evidence that, when a party asserts a false motive for its actions, "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.* at 147, 120 S.Ct. 2097.

Notwithstanding the importance that the *Reeves* Court accorded the prima facie case, it remains permissible for lower courts to bypass analysis of the prima facie case where the facts permit easy disposition under a later stage of the *McDonnell Douglas* test. *See Crone v. United Parcel Serv.,* 301 F.3d 942, 944 (8th Cir.2002) (assuming the presence of a prima facie case in order to reach the dispositive fact that the plaintiff had not shown the defendant's proffered explanation to be pretextual). The facts of the present case lend themselves to such practice. Hannoon is a Middle–Eastern Arab who was born in Kuwait. He was terminated from the position of IS Manager, and he was replaced in that position by a white male. Accord-



ingly the first, third, and fourth elements of the prima facie case are not in dispute. The parties do, however, dispute the second element, namely, Hannoon's qualifications for the position of IS Manager. We assume for the purpose of summary judgment that Hannoon was qualified and, therefore, that he would be able to demonstrate a prima facie case.

**[6]** Under the second step of *McDonnell Douglas*, the defendants easily met their burden of production by alleging poor performance as the legitimate, nondiscriminatory basis for Hannoon's termination. Further, although not required (because the burden is merely one of production and not of proof), the defendants provided a detailed and undisputed documentary account of the poor performance.

**[7]** Turning to the third step, we conclude that Hannoon failed to present evidence that would create a genuine question of material fact on the issue of whether the defendants' proffered reason was pretextual. He complains that he was given large assignments with short deadlines, but he admits that the assignments were not completed in the time frame required and he does not argue that the assignments were unreasonable in scope. Further, the other facts Hannoon relies on as evidence of pretext do not indict the veracity of the defendants' proffered reason nor support an inference of discrimination.

First, Hannoon argues that the confrontation concerning body odor demonstrates animus concerning race or national origin. We disagree. Because the comments regarding body odor did not suggest any reference to race or national origin, we are unwilling to hold such comments reasonably capable of supporting an inference of discriminatory intent.

Hannoon attempts to bolster his argument on this point by noting that Wayne did not need to confront him, but rather could have referred him to Fawn's employee medical assistance program. As an initial matter, while we understand that comments from a supervisor to a subordinate concerning the delicate issue of body odor are, no doubt, distressing to all involved, we do not believe that a reasonable jury could find such comments to be race-based, inherently discriminatory, or the type of matter that requires referral to a medical assistance program. Further, there is no evidence that Hannoon's body odor problem was a medical issue rather than merely an issue of personal hygiene.

Second, Hannoon argues that Wayne's notation of the fact that Hannoon had requested Friday afternoons off demonstrates animus regarding race or national origin. Hannoon explains that he requested Friday afternoons off to observe weekly Muslim prayers. This explanation does not refute the defendants' proffered explanation that Hannoon was fired for poor performance nor does it support an inference of race or national-origin based discrimination. The record indicates that Hannoon was allowed to take Friday afternoons off and was permitted to work at other times to make up for those afternoons. While it is true that Wayne noted Hannoon's request for Friday afternoons off after reading Hannoon's personnel file, there is no indication that defendants considered Hannoon's adjusted schedule as a factor in their decision to terminate his employment. Further, even if Hannoon's adjusted schedule for prayers had been considered, Hannoon alleged discrimination based on race and national origin, not religion, and Hannoon has identified no evidence that would permit the use of religion as a proxy for race.

Finally, viewed collectively or individually, the balance of the specific instances of allegedly discriminatory conduct cited by Hannoon do not involve race or national origin. Rather, they are merely instances

of a subordinate employee being subjected to the criticism and control of a supervisor. For example, the comment "the rock is bigger than you," the fact that Wayne sent one of Hannoon's subordinates for training without consulting Hannoon, the fact that Wayne repeatedly criticized Hannoon's leadership and written communication skills, and the fact that Wayne asked one of Hannoon's subordinates to translate a technical email from Hannoon are all race-neutral comments or actions that do not refute the defendants' proffered explanation for Hannoon's termination. Even if we were to believe that a trier of fact could interpret use of the word "translate" as a reference to race or national origin, we agree with the district court and do "not find that criticizing a foreign employee's facility with the English language constitutes discrimination against a particular race or national origin." *Hannoon v. Fawn Engr. Corp.*, No. 4–01–CV–90170 at 7 (S.D. Iowa April 2, 2002). Because these asserted bases for finding pretext fail, we conclude that Hannoon did not generate a triable issue regarding discrimination under Title VII and the ICRA and affirm the district court's grant of summary judgment on these claims.

[8, 9] Hannoon also alleged harassment based on the same facts. To prove harassment, Hannoon must establish that:

(1) he is a member of a protected class; (2) unwelcome harassment occurred; (3) there is a causal nexus between the harassment and his protected-group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) [the defendants] knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Robinson v. Valmont Indus.*, 238 F.3d 1045, 1047 (8th Cir.2001). Considering the above-alleged instances of discrimination as the alleged instances of harassment, we agree with the district court that these actions and comments comprised criticism rather than harassment. Further, not only do we conclude that no reasonable jury could classify the alleged acts as harassment, we find that Hannoon failed to establish the requisite causal nexus between these alleged instances and his race or national origin. Accordingly, Hannoon's claims of harassment also fail.

[10, 11] Finally, Hannoon's claim of fraudulent representation fails. To prove a claim of fraudulent representation under Iowa law, there must, in fact, be a false representation. *Midwest Home Distrib., Inc. v. Domco Indus. Ltd.*, 585 N.W.2d 735, 738 (Iowa 1998) (listing elements for the common law tort of fraudulent representation under Iowa law). Although some employees at Fawn may have viewed Hannoon as a "band-aid" or temporary fix for the problems in the IS Department, Hannoon cites no false representation made by defendants at the time of his hiring. It is undisputed that he was covered by an employee handbook which, together with an explicit statement in his letter of employment, clearly stated that he was an at-will employee without a guarantee of employment for any set period of time and, in fact, without an entitlement to notice prior to termination. Even if Hannoon had not been clearly informed prior to hire that he was an at-will employee, the fact that some managers may have viewed Hannoon as a "band-aid" does not demonstrate an intent at the time of hiring to retain Hannoon for only a short period of time. Because Hannoon alleged no false statement, his claim of fraudulent representation under Iowa law fails.

For the reasons set forth above, the district court is affirmed.





340 F.3d 510                                                                                   **Page   1**
14 A.D. Cases 1296, 26 NDLR P 179
**(Cite as: 340 F.3d 510,  2003 WL 21919572 (8th Cir.(Minn.)))**
< KeyCite History >

United States Court of Appeals,
Eighth Circuit.

Lynn BURCHETT, Plaintiff-Appellant,
v.
TARGET CORPORATION, a Minnesota
Corporation, Defendant-Appellee.

No. 02-3902.

Submitted: June 13, 2003.
Filed: Aug. 13, 2003.

Employee brought action against employer,
alleging disability discrimination in violation
of the Americans with Disabilities Act (ADA)
and the Minnesota Human Rights Act
(MHRA). The United States District Court for
the District of Minnesota, Paul A. Magnuson,
J., 2002 WL 31398774, granted summary
judgment in favor of employer. Employee
appealed. The Court of Appeals, Murphy,
Circuit Judge, held that: (1) employer's failure
to transfer her to a different department as
requested by employee did not constitute
failure to provide reasonable accommodation,
as would violate the ADA and the MHRA, and
(2) employee failed to establish a causal
connection between employer's refusal to
transfer her and her alleged disability, as
required to establish a prima facie claim
under the ADA and the MHRA.

Affirmed.

West Headnotes

[1] Civil Rights ⬥ 1540
78k1540 Most Cited Cases

[1] Civil Rights ⬥ 1744
78k1744 Most Cited Cases

The burden shifting formula in *McDonnell
Douglas* is used to evaluate discrimination
claims under both the ADA and the Minnesota
Human Rights Act (MHRA).  Americans with
Disabilities Act of 1990, § 2 et seq., 42
U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-
363.15.

[2] Civil Rights ⬥ 1217
78k1217 Most Cited Cases

Under *McDonnell Douglas*, an employee
asserting a discrimination claim under the
ADA or the Minnesota Human Rights Act
(MHRA) must first establish a prima facie case
of discrimination by demonstrating (1) that
she has a disability within the meaning of the
ADA or the MHRA, or that her employer
thinks she does, (2) that she is qualified to
perform the essential functions of her job, with
or without reasonable accommodation, and (3)
that she has suffered an adverse employment
action as a result of her disability.  Americans
with Disabilities Act of 1990, § 2 et seq., 42
U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-
363.15.

[3] Civil Rights ⬥ 1540
78k1540 Most Cited Cases

[3] Civil Rights ⬥ 1744
78k1744 Most Cited Cases

If an employee establishes a prima facie case
of discrimination under the ADA or the
Minnesota Human Rights Act (MHRA), then
the burden shifts to the employer to articulate
a legitimate, nondiscriminatory reason for its
actions.  Americans with Disabilities Act of
1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.;
M.S.A. §§ 363.01-363.15.

[4] Civil Rights ⬥ 1218(4)
78k1218(4) Most Cited Cases

[4] Civil Rights ⬥ 1225(1)
78k1225(1) Most Cited Cases

In order to show that disabled employee is
otherwise qualified to perform the essential
functions of her job, as required to establish
prima facie claim of discrimination under the
ADA and the Minnesota Human Rights Act
(MHRA), the employee must show that she
meets the necessary prerequisites for the job,
and that she can perform the essential
functions, with or without reasonable
accommodation; if the employee establishes

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works





340 F.3d 510
**(Cite as: 340 F.3d 510, 2003 WL 21919572 (8th Cir.(Minn.)))**

that she cannot perform the essential functions of the job without accommodation, she must show that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01- 363.15.

[5] Civil Rights ☞ 1225(2)
78k1225(2) Most Cited Cases
Considered.

In order to show that disabled employee is otherwise qualified to perform the essential functions of her job with an accommodation, for purposes of claim under the ADA and the Minnesota Human Rights Act (MHRA), if the requested accommodation is a transfer, employee must demonstrate that she cannot be accommodated in her current position because reassignment is an option to be considered only after other efforts at accommodation have failed. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-363.15.

[6] Civil Rights ☞ 1225(4)
78k1225(4) Most Cited Cases

Under the ADA and the Minnesota Human Rights Act (MHRA), an employer must reasonably accommodate an employee's disability and engage in an interactive process to identify potential accommodations that could overcome her limitations. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-363.15.

[7] Civil Rights ☞ 1540
78k1540 Most Cited Cases

[7] Civil Rights ☞ 1744
78k1744 Most Cited Cases

If a disabled employee makes a showing that reasonable accommodation is possible, the burden of production then shifts to the employer to show that it had a legitimate nondiscriminatory reason not to provide the

accommodation, under the ADA and the Minnesota Human Rights Act (MHRA). Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-363.15.

[8] Civil Rights ☞ 1225(2)
78k1225(2) Most Cited Cases

An employer need not reassign a disabled employee in order to comply with reasonable accommodation requirement under the ADA and the Minnesota Human Rights Act (MHRA), unless accommodation within her current position would impose an undue hardship on her. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-363.15.

[9] Civil Rights ☞ 1225(3)
78k1225(3) Most Cited Cases

Assuming that employee who suffered from depression was disabled, within meaning of the ADA and the Minnesota Human Rights Act (MHRA), employer's failure to transfer her to a different department as requested by employee did not constitute failure to provide reasonable accommodation, as would violate the ADA and the MHRA, where employee admitted that she was able to perform her current job functions with the accommodations that employer was providing, including restructuring her work load and reducing her hours in accordance with her physician's orders. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-363.15; 29 C.F.R. § 1603.2(*o*).

[10] Civil Rights ☞ 1119
78k1119 Most Cited Cases

[10] Civil Rights ☞ 1219
78k1219 Most Cited Cases

To establish an adverse employment action, as required to prove discrimination claim under the ADA or the Minnesota Human Rights Act (MHRA), an employee must show a tangible change in duties or working conditions that constitutes a material employment

disadvantage. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-363.15; 29 C.F.R. § 1603.2(*o*).

[11] Civil Rights ⚷ 1119
78k1119 Most Cited Cases

[11] Civil Rights ⚷ 1219
78k1219 Most Cited Cases

A negative performance review is not in itself an adverse employment action, under the ADA and the Minnesota Human Rights Act (MHRA), and it is actionable only if the employer subsequently uses that review to alter the terms or conditions of employment to the detriment of the employee. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-363.15.

[12] Civil Rights ⚷ 1225(3)
78k1225(3) Most Cited Cases

Even if employer's refusal to transfer employee to a another department as employee requested could be viewed as an actionable adverse employment action, employee failed to establish a causal connection between that refusal and her alleged disability, as required to establish a prima facie claim for disability discrimination under the ADA and the Minnesota Human Rights Act (MHRA); employer had policy not to transfer unsatisfactory employees to another manager, and employee received negative performance review, which employee failed to show was pretext for disability discrimination. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; M.S.A. §§ 363.01-363.15.

***512** Pamela M. Miller, argued, Minneapolis, MN (William J. Mavity, on the brief), for appellant.

Joseph G. Schmitt, argued, Minneapolis, MN (Donald M. Lewis, on the brief), for appellee.

Before BOWMAN, MURPHY, and BYE, Circuit Judges.

MURPHY, Circuit Judge.

****1** Lynn Burchett brought this suit against her employer, Target Corporation (Target), alleging disability discrimination in violation of the Americans with Disabilities Act of 1990 (the ADA), 42 U.S.C. § 12101 *et seq.*, and the Minnesota Human Rights Act (MHRA), Minn.Stat. §§ 363.01- 363.15. ***513** The district court [FN1] granted summary judgment in favor of Target. Burchett appeals, arguing that there were genuine issues of material fact to preclude summary judgment. We affirm.

FN1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

I.

Burchett is presently on long term disability leave from Target. She worked for Dayton's, the Target company department store, from 1973 until she was laid off in November 1995. In December 1996 she began working at Target in its distribution department, which is responsible for getting consumer products to its retail stores around the United States. Distribution employees communicate with the trucking and transportation carriers used by Target to ensure that merchandise is delivered. Burchett was given responsibility for maintaining electronic transfer documents, working with current carriers, and bringing new carriers into the system. She reported to Kari Melhus, who was a supervisor of Transportation Services. Melhus in turn reported to Jody Marvin, a senior manager of Transportation Finance and Systems. Burchett started out in a nonexempt or nonexecutive position, but eventually became a transportation analyst, an executive position.

At first Burchett had a very positive relationship with Melhus and Marvin. Her performance was rated as excellent on her reviews, and she received two special awards for good service. Burchett states that she began having problems at work when stress and personal issues exacerbated a recurrent depression she had experienced for some

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

340 F.3d 510
(Cite as: 340 F.3d 510, *513, 2003 WL 21919572, **1 (8th Cir.(Minn.)))

years. She says that in 1999 and early 2000 her depression caused her performance at work to suffer. She did not notify Target that she suffered from depression, however, or that it was affecting her work.

Melhus perceived that Burchett's performance was declining. According to her, Burchett was late in finishing tasks, failed to complete reports accurately, and did not follow through on her assignments. Burchett talked to Melhus in February 2000 about transferring to a less stressful position, and she began applying for other lower level, nonexecutive positions without mentioning that she was suffering from depression or that she wanted to transfer because of it. Burchett submitted several applications to Melhus for her endorsement, and Melhus recommended her for transfer and passed on her applications to the relevant departments.

On March 31, 2000, Burchett received a formal performance review from Melhus in which she received a lower score than ever before. Melhus identified a number of problems with Burchett's work and gave specific recommendations as to how she might improve. Marvin also had become concerned about Burchett's declining performance and talked with her about it. In the first week of April 2000, Marvin told Burchett that she seemed bored with her job and might need to move to a new position at Target. Burchett responded that she was having trouble doing her job because she was ill. This was the first time Burchett had mentioned an illness to either Marvin or Melhus. The week after the review was conducted, Burchett informed Target that she would need to go on a leave of absence because her depression had worsened. She also withdrew all her applications for transfers to new positions.

*514 **2 While Burchett was on leave, she communicated with Melhus by e- mail and kept her informed about her medication and therapy. At first Burchett told Target that she would be able to return to work on April 24, 2000. As that day approached Target asked if she would be able to return as scheduled, and Burchett responded that she

would need to stay out until May 1, 2000. Target again contacted Burchett before May 1, and she responded that her return would need to be postponed until June 5, 2000. This pattern recurred again around June 5, when Burchett informed Target that she could not return until June 14.

Burchett returned to work on June 14 and began a part time schedule which complied with her doctor's orders. She began working a six hour shift three days a week. Melhus reviewed Burchett's tasks before her return and adjusted her responsibilities to fit these time restrictions. Melhus reassigned those tasks which required daily communication with carriers to another employee within the department, and Burchett was given work that did not require such daily contacts but focused more on long term goals of the department. Burchett complained she did not have proper training for her new responsibilities. It appeared to Melhus that Burchett's performance problems had increased, that she was failing to follow instructions regarding her new work assignments, and that she continued to work on reassigned matters which required daily contact with carriers. Melhus told Burchett that her failure to follow instructions was creating problems, for she was not completing the tasks assigned to her and carriers were receiving conflicting information. One carrier had threatened not to ship for Target until the conflict was resolved.

Melhus also complained that Burchett had ignored other instructions she had been given. Burchett had scheduled an offsite training session even though she had been told to organize an onsite lunch presentation. While two employees assigned to work with the distribution centers were engaged in recommending ways to make the delivery paperwork process more efficient, Burchett wrote conflicting instructions to one of the distribution centers. In addition, she sent an e-mail to a distribution center instituting a deadline for carriers without discussing it with anyone else in the department. Burchett also became upset when Melhus instructed her to make up time she missed by scheduling doctor

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



