UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------X

DENISE EVARTS,                                :

    Plaintiff,                                :

      vs.                                :   No. 3:00cv1124(WIG)

SOUTHERN NEW ENGLAND              :
TELEPHONE COMPANY,
                                              :
    Defendant,
-------------------------------------------------------------X

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 113]**

    Plaintiff, Denise Evarts,  has brought this single-count employment discrimination action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, <u>et seq.</u>, ("Title VII"), and Connecticut's Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(a)(1), <u>et</u> <u>seq.</u>, ("FEPA"),  against her former employer, Southern New England Telephone Company, commonly referred to as "SNET," alleging that she was discriminated against on the basis of her gender.  She alleges that she was subjected to a "myriad of adverse employment actions based upon her gender which created a hostile working environment."  (Pl.'s Compl. ¶ 12).

    Defendant has moved for summary judgment [Doc. # 113] under Rule 56(c), Fed. R. Civ. P., on the grounds that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  After due consideration of the parties' extensive briefs and exhibits and the relevant case law, and after hearing oral argument of counsel, for the reasons set forth below, Defendant's Motion for Summary Judgment will be granted in part and denied in part.

## **Background**

SNET is a regional provider of a wide range of telecommunications services to businesses and private residences in Connecticut.  It employs approximately 7,400 persons at various locations throughout the state.  Plaintiff was hired by SNET on January 12, 1987, as a repair service clerk as part of its New Haven Payphone Services Installation and Repair Group ("Payphone Services"), which installs and repairs telephones.  She worked out of the SNET garage in New Haven.   In 1989, she was promoted to service technician in the Payphone Services Department.  As a service technician, Plaintiff installed, repaired, and maintained coin-operated telephones and associated network facilities.  She remained in that position until May 30, 1997.  Over the course of her ten years with SNET, Plaintiff received regular pay increases and was not subject to any disciplinary procedures, other than as noted below.

Plaintiff, like other technicians, was at all times a member of the Connecticut Union of Telephone Workers, such that the terms and conditions of her employment were governed by a collective bargaining agreement.

During Plaintiff's tenure as a service technician, she was the only female service technician on her eight-person crew, and one of only two female service technicians out of a total of approximately fifty service technicians in her entire department.

The incidents giving rise to this lawsuit commenced with the appointment of Plaintiff's new supervisor, Matt Cordner ("Cordner"), who took over as Supervisor of Payphone Services in July 1996.  Prior to the arrival of Cordner, Plaintiff had worked under two managers, Crystal White and Patrick Kinsella.  She had no problems with either of these supervisors.  Plaintiff claims that from July 1996 to May 1997, she was subjected to a hostile work environment on the

basis of her gender and cites to the following incidents in support of her discrimination claim:

(1) Cordner's refusal to create a satellite office for a service technician in North Madison, Connecticut, although her previous supervisors had promised Plaintiff that this satellite office would be created and that Plaintiff would probably be assigned to it, since she lived in close proximity to North Madison;[1]

(2) Following Plaintiff's leave of absence to care for her terminally ill sister, Cordner's calling her after the funeral to inquire why she had not shown up for work and threatening her with discharge if she did not return to work;[2]

(3) Cordner's giving a new work truck to a male service technician whose truck was

---

[1]  On November 8, 1996, Cordner offered Plaintiff the opportunity to move to the Guilford, Connecticut satellite office, which she declined.  Cordner then entered the following note in his records after he offered her a move to the Guilford office: "Denise told me: I don't want you to feel you did me any favors - Because you didn't - I wanted North Madison not Guilford! (She also talked to Ed [Cordner's superior] about this and tried to get him to override me -) (Ed feels as I do that the work load does not warrant a person in Madison)."  On November 11th and 12th, he noted that Denise [Plaintiff] had a bad attitude and was not speaking to him. (Pl.'s Ex. 4).  Plaintiff maintains that from that point on, Cordner targeted her for discriminatory treatment, excessive and obsessive supervision, oversight, and criticism with the aim of forcing her out of her job or orchestrating her discharge.  (Pl.'s Local Rule 56(a)2 St. ¶ 19, citing Pl.'s Ex. 11-19).  On November 15, 1996, Cordner noted in Plaintiff's personnel file an incident when Plaintiff called in sick so as to avoid being assigned overtime work. He stated that he would discuss sick time with her on Monday and noted that her attitude since the Guilford "co-offer has been very negative."  (Pl.'s Ex. 5).

[2]  Plaintiff was on leave from late November 21, 1996, until January 24, 1997.  Her sister died on January 12, 1997.  According to Defendant's version of the facts, Plaintiff told Cordner she was going to resign in order to care for her sister.  Instead, Cordner encouraged her to take a leave of absence, although she was not entitled to this leave under the Family and Medical Leave Act, which does not apply to absences to care for a sibling.  He allowed her to work whenever she wanted to and specifically allowed her to work the day before a holiday so she would get paid for the holiday.  Following her sister's funeral, Cordner gave her a week of bereavement leave rather than the usual three days.  When she did not return on the scheduled day, Cordner states that he called her and allowed her to take an unscheduled paid vacation until she was ready to return to work.  He denies that he ever threatened her with discharge.  (Cordner Aff. ¶¶ 7 - 10).

3

newer and in better condition than Plaintiff's truck, after Plaintiff had been told by Ed Dillman, Cordner's superior, that she would be getting a new truck;

(4) On February 6, 1997, shortly after she returned from her leave of absence, Cordner's requiring her to perform a "ride along," an exercise customarily reserved for new employees, although experienced male service technicians were not subjected to this exercise, during which Cordner was excessively critical and "nit-picky" concerning her work;[3]

(5) Cordner's revoking her cell phone privileges due to her exceeding the 300-minute monthly allotment, although male employees were not similarly treated and there was no written policy to this effect;[4]

(6) On March 17, 1997, Cordner's giving her a documented verbal warning[5] for leaving her work truck unlocked, whereas male employees, who left their trucks unlocked did not receive

---

[3] Plaintiff states that during the entire time that Cordner was her supervisor, no other technician was subjected to a ride along exercise. Cordner, on the other hand, claims that the purpose of the "ride-along" was to reacquaint her with her job and to observe her work. Defendant emphasizes that she did not receive any kind of warning or discipline as a result of this exercise. See Def.'s Ex. 8.

[4] Defendant points to the fact that Plaintiff violated this 300-minute limit in six out of ten months in 1996 and in January and February of 1997. Cordner had counseled her twice about this excessive usage. Her phone usage and that of a male technician, David Ianiello, who had his phone removed twice, exceeded that of all other co-workers. Plaintiff was not disciplined in any way, but her cell phone was taken from her for a month. When it was returned, she still exceeded the 300-minute limit.

[5] The documented verbal warning was for failure to secure her vehicle which left access to tools, supplies, and a coin box with cash in it. This was a six-month warning "to be kept on file." (Pl.'s Ex. 11). Under the Collective Bargaining Agreement, this was the first and lowest step of discipline in the four-step disciplinary process. Union Steward Gerry Nuzzo was present at the disciplinary meeting. When he asked Cordner if anyone else had been written up for leaving his truck unlocked, Cordner responded "no." (Pl.'s Local Rule 56(a)2 St. ¶ 44).

4

similar warnings, and on March 18, 1997, Cordner's placing a note[6] in Plaintiff's personnel file

detailing her presentation of evidence to him that the lock on her truck was broken, and his

violently screaming at her; [7]

     (7)  On April 9, 1997, Cordner's orally counseling her about the increase in her  "minutes

per trouble"[8] for March, whereas male service technicians with comparable "minutes per trouble"

---

    [6]  Cordner wrote, "She feels me telling her about the seriousness of the situation (could
lead to dismissal) was a threat from me – (it was a reminder of how serious this is)."  (Pl.'s Ex.
12).  Defendant explains that it had a policy requiring technicians to keep their vehicles locked
whenever they were unattended, which was particularly important when coins from the
payphones were in the vehicles.  Under the policy, violations resulted in progressive discipline.
After frequent reminders to all of the service technicians, in March 1997, during a routine check,
Cordner discovered three employees' vehicles were unlocked and all three, two males and
plaintiff,  were counseled about the need to lock their vehicles.  Cordner found plaintiff's truck
unlocked two more times and counseled her each time.  Only the fourth time, when she allowed
open access to company tools, supplies, and a coin box, was she given a documented verbal
warning.  Plaintiff does not deny that she left her truck unlocked and admits that on prior
occasions equipment had been stolen from her truck and she had not been disciplined.  Her
excuse was that the knob for locking the truck was broken, but she did not report this until after
she was disciplined, and that everyone left his truck unlocked inside the garage.

    [7]  Plaintiff testified in her affidavit,

>     Mr. Cordner had a violent temper.  For example, with respect to the
> disciplinary action he took against me for failing to lock my vehicle, when I
> returned to Mr. Cordner with documentary proof that the rear door locking
> mechanism on my truck was broken, Mr. Cordner rose quickly to anger and went
> out of control.  He screamed at me at the top of his lungs, stating that he did not
> care what kind of note I had from the mechanics.  He was having a near-violent
> temper tantrum which was not only unsettling but physically intimidating.  His
> eyes were wide and his complexion turned bright red.  Mr. Cordner's tantrum took
> place not in the confines of a closed office but in an open area of the
> administrative offices at SNET's New Haven garage.  In fact, Mr. Cordner was so
> loud and abusive and caused such a disturbance that two cable technicians, one
> male and one female, came over and asked if "everything was OK."

(Pl.'s Ex. 27, Pl.'s Aff. ¶ 11).

    [8]  "Minutes per trouble" measures a technician's efficiency.  (Pl.'s Aff. ¶ 9).

did not receive oral counseling, and she had previously received an award from SNET for having the best record in the entire state;[9] and

(8)  On May 2, 1997, Cordner's verbally reprimanding her when her hand-written time sheets did not match Defendant's computer print-outs, the "DCWS data," whereas male service technicians were not reprimanded for committing the same violation, which was a common error, since time sheets were customarily filled out at the end of the day rather than on the job, and the computers were frequently down.[10]

According to David Ianiello, Plaintiff's union steward and co-worker, during the time that Plaintiff worked under Cordner, Cordner referred to her as an example of a "woman who doesn't belong in the job," and that Cordner repeatedly made comments to the effect that women did not belong in the field, that this was a man's job, and that women belonged in an office behind a desk.  (Ianiello Depo. at 5, 8).  He testified that Cordner was "constantly riding" Plaintiff, scrutinizing her work more closely than anyone else's work.  (Id. at 20).  In fact, he told Plaintiff that he believed that Cordner was trying to make her life as difficult as possible.  (Id. at 22).

---

[9]  SNET maintains that Cordner's actions were justified based on the decline in Plaintiff's productivity after the death of her sister.  Cordner never disciplined Plaintiff because of her poor productivity but he did meet with her on April 9, 1997, to discuss this with her.  See Def.'s Ex. 3.

[10]  On May 2, 1997, Plaintiff was summoned to a meeting with Cordner, Dillman, and union representative Debbie Guarnieri, to review the discrepancies in her time sheets and the DCWS reports.  She was asked to account minute-by-minute for the jobs she performed on April 25, 1997.  Plaintiff and Guarnieri demanded to know if Cordner had analyzed the male technicians' time records as well, and, according to Plaintiff, he responded "no."  (Pl.'s Local Rule 56(a)2 St. ¶ 13; Pl.'s Ex. 17).  On May 5th and 6th, Cordner again reviewed the discrepancies in Plaintiff's time sheets.  When Cordner requested a meeting with her, she indicated she wanted a union representative present.  Cordner noted in her personnel file, "Denise also told me I'd better be checking everyone else's time sheets – Told her that's not the issue here."  (Pl.'s Ex. 18).  Defendant maintains that Plaintiff was counseled more frequently than others because her performance was worse.

6

Plaintiff testified that the men on her crew told her, in rather crude terms, that Cordner "has a problem with anyone who can't stand up to pee." (Pl.'s Depo. at 69). She also complained that he was constantly reprimanding her for things that the male technicians were also guilty of doing. (Id.). She also testified that Cordner was trying to make her life on the job as difficult as possible. (Id.).

In April 1997, Plaintiff told Dillman that she did not want to work for SNET any longer and asked him for a "pink slip" indicating that she had been laid off so that she could collect unemployment compensation benefits. Dillman declined to issue her a pink slip. On May 16, 1997, she submitted to Cordner her two-week written notice of resignation, which stated, "I feel that it is no longer in my best interest to remain employed at SNET in this current position. I have tried to transfer to other positions, but I have not been successful. Please accept my resignation and my last day of employment being two weeks from the date of this letter." (Def.'s Ex. 9). Before resigning, Plaintiff spoke with union representative Guarnieri and told her that she could not withstand Cordner's harassment any longer. (Pl.'s Depo. at 171, 191). She had also complained to Cordner that he treated her differently than he treated her male counterparts. (Cordner's Depo. at 236). Plaintiff's last day of work was May 30, 1997.

Cordner did subject Ianiello to a ride-along evaluation and disciplined a male employee for failing to lock his truck, but only after Plaintiff gave notice of her intent to resign and complained of discrimination by Cordner. Cordner completed a Work Reference Report, indicating that he would not recommend Plaintiff for reemployment because of her frequent "absents [sic], Referred to medical." (Pl.'s Ex. 28).

During the times relevant to this complaint, SNET had an anti-discrimination and anti-

harassment policy in place that contained complaint procedures.  (Def.'s Ex. 10).  The reporting

procedure required the employee to report any incident of sexual or other unlawful harassment to

his or her supervisor and/or to the EEO Manager.  (Id.)  Supervisors who became aware of

possible sexual or other unlawful harassment were also required to promptly advise the EEO

Manager.  (Id.)

It was not until after Plaintiff submitted her two-week notice of resignation that she

complained to SNET's human resources office (EEO office) that she believed she had been

subjected to a hostile work environment by her supervisor, Cordner.  Plaintiff told Constance

Rogers, SNET's EEO manager, that she "couldn't take it any more" and felt compelled to quit.

(Pl.'s Local Rule 56(a)2 St. ¶ 81).  Rogers never interviewed Plaintiff in person, although she did

interview in person Cordner, who told her that he had subjected Ianiello to the same treatment.

(Rogers' Depo. at 29).  Rogers did nothing further by means of investigation.  She never

interviewed Ianiello; she never interviewed any of Plaintiff's co-workers; and she never reviewed

Plaintiff's personnel file.  She closed her investigation because Plaintiff's allegations of

discrimination could not be corroborated.  (Id. at 63).

Plaintiff dual-filed a charge of discrimination with the United States Equal Employment

Opportunity Commission ("EEOC") and Connecticut's Commission on Human Rights and

Opportunities ("CHRO") on November 17, 1997.  On June 16, 2000, after receiving a right-to-

sue letter,[11] she timely filed the instant lawsuit.

---

[11]  Plaintiff, citing Philbrook v. Ansonia Bd. of Edud., 757 F.2d 476, 481 (2d Cir. 1985),
aff'd, 479 U.S. 60 (1986), relies heavily on the fact that the CHRO, after conducting a hearing,
found probable cause to believe that Defendant had violated Title VII, which probable cause
finding, she argues, is admissible to help establish her prima facie case of discrimination.  In a
more recent decision, however, the Second Circuit clarified that it was not adopting an automatic

Defendant now moves for summary judgment on four grounds:

(1) Many of the events on which Plaintiff relies are time-barred by the 300-day limitations period of Title VII and the 180-day limitations period of FEPA;

(2) Plaintiff cannot establish a <u>prima facie</u> case of discrimination or, alternatively, Plaintiff cannot rebut Defendant's legitimate, non-discriminatory reasons for its actions;

(3) Plaintiff did not suffer an adverse employment action; and

(4) Plaintiff was not subjected to a hostile work environment.

## Summary Judgment Standard

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c).   No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-moving party, it appears that the evidence supporting the non-moving party's case is so scant that a rational jury could not find in that party's favor.   <u>Chertkova v. Connecticut Gen. Life Ins.Co.</u>, 92 F.3d 81, 86 (2d Cir. 1996).   A fact is "material" if it may affect the outcome of the suit under governing law.   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

---

rule of admissibility, as a minority of circuits have done.  Instead, the Second Circuit left to the discretion of the trial judge the determination of whether the probative value of the agency determination is substantially outweighed by the danger of unfair prejudice.  <u>Paolitto v. John Brown E. & C., Inc.</u>, 151 F.3d 60, 64 (2d Cir. 1998); <u>see also</u> <u>Dodson v. CBS Broadcasting, Inc.</u> 423 F. Supp. 2d 331, 334 (S.D.N.Y. 2006).  Although this Court makes no ruling on this issue at this time, at oral argument, the Court indicated its reluctance to admit the CHRO findings as evidence in the trial of this case because of the risk of unfair prejudice.

The burden of demonstrating the absence of a genuine dispute as to any material fact and entitlement to judgment as a matter of law rests with the party seeking summary judgment -- in this case, the Defendant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Chertkova , 92 F.3d at 86.  Once the moving party has made a showing that there are no genuine issues of fact to be tried, the burden then shifts to the non-moving party to raise triable issues of fact.  Anderson v. Liberty Lobby, 477 U.S. at 256.  Mere conclusory allegations will not suffice.  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  Even when the facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough probative evidence to enable a reasonable jury to return a verdict in its favor.  Anderson v. Liberty Lobby, 477 U.S. at 248.

The Second Circuit has noted that an extra measure of caution is warranted when granting summary judgment in a discrimination action because direct evidence of discriminatory intent is rare, and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. See, e.g., Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), cert. denied, 534 U.S. 993 (2001).

Thus, in ruling on Defendant's Motion for Summary Judgment, the Court has construed the facts of record in the light most favorable to Plaintiff and drawn all reasonable inferences in her favor.

## Discussion

Initially, the Court notes that Defendant's counsel and the Court have struggled with the question of what legal theory of discrimination Plaintiff is pursuing in this action – disparate treatment or hostile work environment or both.  In her complaint she alleges that she "was subjected to a myriad of adverse employment actions based upon her gender which created a hostile working environment.  The unbearable and humiliating conditions of plaintiff's employment were the result of chauvinistic and discriminatory behavior by the defendant, by and through its management."  (Pl.'s Compl. ¶ 12).  She then cites to the eight incidents discussed above, allegedly supporting her claim, all of which except one appear to be disparate treatment claims.  At oral argument, Plaintiff clarified that she is asserting both theories, relying on a series of incidents of disparate treatment that cumulatively created a hostile work environment, which ultimately led to her constructive discharge.

## I.  Statute of Limitations

Defendant argues that, as to her Title VII claim, Plaintiff may not rely on any incidents of discrimination occurring prior to January 21, 1997, which is 300 days from the date she dual-filed her charge of discrimination with the CHRO and EEOC, citing National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002).  Similarly, Defendant asserts that she may not rely on any conduct occurring prior to May 21, 1997, for purposes of her state-law claim, which date is 180 days prior to the date she filed her discrimination charge with the CHRO. Additionally, since she fails to allege any conduct by Defendant occurring after May 21, 1997, Defendant insists that her state-law FEPA claim must be dismissed in its entirety as a matter of law.

### A.  Plaintiff's Federal Title VII Claim

Under Title VII, a charge of discrimination must be filed with the EEOC within 180 days or 300 days "after the alleged unlawful employment practice occurred."   42 U.S.C. § 2000e-5(e)(1).  In this case, because Plaintiff dual-filed her charge with the CHRO and EEOC, the 300-day limitations period would apply.  See 42 U.S.C. § 2000e-5(e)(1).

As the Supreme Court held in the National Railroad case, 536 U.S. at 110, whether Plaintiff may rely on conduct occurring outside of this 300-day period depends on whether Plaintiff's claim is viewed as a disparate treatment claim or hostile work environment claim.  To the extent she is asserting a disparate treatment claim, any alleged discriminatory act prior to January 21, 1997, is untimely under Title VII, and no longer actionable.  The Supreme Court held:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred.  The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Id. at 113.  Thus, Plaintiff may not pursue a Title VII disparate treatment claim relating to Defendant's failure to transfer her to a satellite office, which is the only discrete act of disparate treatment alleged that occurred prior to January 21, 1997.  This incident, however, may be used by either side as background evidence.

Hostile environment claims, however, are different in kind from discrete acts. Their very nature generally involves repeated conduct. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348-349 (3d ed.1996) (hereinafter "Lindemann") ("The repeated nature of the harassment or its intensity constitutes evidence that management knew or should have known of its existence."). A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The "unlawful employment practice" usually cannot be said to occur on any particular day. It occurs over a series of days or perhaps years. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). "The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." National R.R., 536 U.S. at 117. "The statute does not separate individual acts that are part of the hostile environment claim from the whole for purposes of a timely filing and liability." Id. at 118. "Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." Id. Thus, in order for a charge to be timely, it only needs to be filed within 180 days or 300 days of any act that is part of the hostile work environment. Id.; see also Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir. 2004).

In the instant case, because some of the acts allegedly contributing to Plaintiff's hostile

work environment claim occurred within 300 days of the filing of her charge of discrimination

with the EEOC, her federal hostile work environment claim is not time-barred.   The Court will

consider the entire spectrum of conduct with respect to Plaintiff's hostile work environment

claim.

### B.  Plaintiff's State-Law FEPA Claim

Defendant asserts that Plaintiff's state-law discrimination claim under FEPA is barred in

its entirety by the 180-day limitations period of Conn. Gen. Stat. § 46a-82(e).  The statute and

case law are clear that a claim must be filed within 180 days "after the alleged act of

discrimination." Conn. Gen.Stat. § 46a-82(e);  see State v. Commission on Human Rights &

Opportunities, 211 Conn. 464, 471-73 (1989) (employee cannot recover for employer's acts that

occurred more than 180 days prior to filing).  Although "the 180 day time requirement for filing a

discrimination petition pursuant to § 46a-82(e) is not jurisdictional, but rather, is subject to

waiver and equitable tolling," Kahn v. Fairfield University,  357 F. Supp. 2d 496, 502 (D. Conn.

2005) (citing Williams v. Commission on Human Rights & Opportunities, 257 Conn. 258, 264

(2001)),  neither waiver nor equitable tolling applies in the instant case.  Defendant has not

waived this defense,  see Majewski v. Bridgeport Bd. of Educ., No. CV030406893,  2005 WL

469135, at *5 (Conn. Super. Ct. Jan. 20, 2005), and Plaintiff has not asserted any basis for

equitable tolling.

The Connecticut state courts look to federal law for guidance in interpreting FEPA and

analyze claims under FEPA in the same manner as federal courts evaluate federal discrimination

claims.  State v. Commission on Human Rights & Opportunities, 211 Conn. at 469-70; Jackson

v. Water Pollution Control Auth., 278 Conn. 692, 705 n.11 (2006).  Accordingly, applying the

holding of <u>National Railroad</u> to Plaintiff's state-law claim, both her disparate treatment and her hostile work environment claims would be barred because Plaintiff has failed to allege any conduct on the part of Defendant occurring on or after May 21, 1997.  At that point, Plaintiff had already submitted her letter of resignation, giving two weeks notice.   Although she did not actually resign until May 30, 1997, she alleges no conduct by Defendant between May 21st and May 30th that could in any way support a claim of disparate treatment or hostile work environment.

To overcome Defendant's statute of limitations defense, Plaintiff argues that this case falls within the "continuing violation doctrine." This argument must fail for two reasons.  First, in order to invoke the continuing violation doctrine, Plaintiff must still establish at least one incident of discrimination within the limitations period.  See <u>Church v. Connecticut Commission on Human Rights & Opportunities</u>, No. CV 980492731S, 1999 WL 1315013, at *3 (Conn. Super. Ct. Dec. 22, 1999); <u>Walker v. Connecticut Commission on Human Rights & Opportunities</u>, No. CV 980490150S, 1999 WL 643369, at *3 (Conn. Super. Ct. Aug. 12, 1999). Since she has failed to allege any conduct by Defendant within 180 days of the date she filed her charge of discrimination with the CHRO, her state-law claims under FEPA are barred.  Second, discrete incidents or even similar multiple incidents of discrimination that do not result from discriminatory policies or mechanisms do not amount to a continuing violation.   See <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 765 (2d Cir. 1998).  Here, Plaintiff has not alleged nor provided any proof of a discriminatory policy or mechanism by Defendant.  Her discrimination claims are based upon a series of discrete acts, none of which occurred within 180 days of her filing her charge of discrimination with the CHRO.  Therefore, Plaintiff cannot rely on the

continuing violation doctrine to save her otherwise time-barred state-law FEPA claims.

Accordingly, the Court finds that Plaintiff's state-law disparate treatment and hostile work environment claims under FEPA are barred by the 180-day limitations period of Conn. Gen. Stat. § 46a-82(e).  Additionally, Plaintiff's disparate treatment claim under Title VII relating to incidents occurring prior to January 21, 1997, is time-barred.  The Court grants summary judgment in favor of Defendant as to these claims.  However, the Court denies Defendant's motion for summary judgment on statute of limitations grounds as to Plaintiff's Title VII disparate treatment claim involving incidents on or after January 21, 1997, and as to her Title VII hostile work environment claim.   Plaintiff may rely on all incidents involving Cordner that occurred during the July 1996 to May 1997 time period for purposes of her hostile work environment claim under Title VII.

## II.  Plaintiff's Title VII Disparate Treatment Claims

Defendant argues that it is entitled to summary judgment as a matter of law on Plaintiff's disparate treatment claims because Plaintiff has failed to establish a prima facie case of discrimination in that she was not subjected to an adverse employment action and there is no basis for inferring that the actions taken against her were because of her gender.  Further, even assuming that Plaintiff carries her prima facie burden, Defendant maintains that it is entitled to summary judgment because Plaintiff cannot rebut its proffered legitimate, non-discriminatory explanations for the actions that were taken.

Courts analyze disparate treatment claims under the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001), cert. denied, 536 U.S. 922 (2002); Ferraro v. Kellwood Co.,

440 F.3d 96, 99 (2d Cir. 2006).  The plaintiff must first establish a prima facie case of

discrimination by demonstrating that: (1) she is a member of a protected class;  (2) her job

performance was satisfactory;  (3) she suffered an adverse employment action;  and (4) the action

occurred under conditions giving rise to an inference of discrimination.  If the plaintiff

demonstrates a prima facie case of discrimination, a presumption of discrimination arises, and

the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for

the action.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981); Chertkova,

92 F.3d at 87.   This burden is one of production, not persuasion, and involves no credibility

assessments.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993).  If the defendant

makes such a showing, the McDonnell Douglas framework – with its presumptions and burdens–

disappears, and the sole remaining issue is "discrimination vel non."  Reeves v. Sanderson

Plumbing Products, Inc., 530 U.S. 133, 142 - 43 (2000).   To defeat summary judgment,  "the

plaintiff is not required to show that the employer's proffered reasons were false or played no role

in the employment decision, but only that they were not the only reasons and that the prohibited

factor was at least one of the 'motivating' factors."  Cronin v. Aetna Life Ins. Co., 46 F.3d 196,

203 (2d Cir. 1995).   The plaintiff's burden in this regard "may often be carried by reliance on the

evidence comprising the prima facie case, without more."  Id.

In this case, there is no question that Plaintiff is a member of a protected class.

Additionally, for purposes of Plaintiff's meeting her prima facie burden, the Court will assume

that her performance was satisfactory at least prior to Cordner's appointment as her supervisor.

**A.  Adverse Employment Action**

Turning to the third element of Plaintiff's prima facie case, Plaintiff bears the burden of

17

demonstrating that she suffered an adverse employment action.  An adverse employment action

is a "materially adverse change in the terms and conditions of employment [that] is more

disruptive than a mere inconvenience or an alteration of job responsibilities." Fairbrother v.

Morrison, 412 F.3d 39, 56 (2d Cir. 2005).[12]  "An adverse employment action may or may not

entail economic loss, but there must be a link between the discrimination and some 'tangible job

benefits' such as 'compensation, terms, conditions or privileges' of employment." Alfano v.

Costello, 294 F.3d 365, 373 (2d Cir. 2002) (quoting Karibian v. Columbia Univ., 14 F.3d 773,

778 (2d Cir. 1994)).  "Examples of materially adverse changes include termination of

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, significantly diminished material responsibilities, or other indices  . . .

unique to a particular situation." Fairbrother, 412 F.3d at 56.  There is no bright line rule defining

what constitutes an adverse employment action.  Wanamaker v. Columbian Rope Co., 108 F.3d

462, 466 (2d Cir. 1997).  However, based on a review of Second Circuit precedent, the Court

finds that the incidents of which Plaintiff complains do not rise to the level of an "adverse

employment action" necessary to meet Plaintiff's prima facie burden for her disparate treatment

claim under Title VII.

Plaintiff complains that she was subjected to a "ride along exercise" with Cordner where

he criticized and "nit-picked" her work, that her cell phone privileges were revoked, that she was

subjected to several oral counseling sessions concerning her productivity and time-keeping, that

---

[12] As discussed infra, this decision was abrogated by the Supreme Court's decision in Burlington Northern & Santa Fe Railway Co. v. White, — U.S. —, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), to the extent that it applied this limited definition of "adverse employment action" in the context of a retaliation claim.  See Kessler v. Westchester Couty Dep't of Soc. Servs., — F.3d —, 2006 WL 2424705 (2d Cir. Aug. 23, 2006).

she did not receive a new work vehicle, that Cordner called her after her sister's death to inquire as to when she would be returning to work, and that he gave her a documented written warning for leaving her work truck unlocked.[13]   Ultimately, she claims that she was constructively discharged.

In Palomo v. Trustees of Columbia University, 170 Fed. Appx. 194, 195 (2d Cir. 2006) , the Court held that the plaintiff could not establish a prima facie case of discrimination because defendant's failure to reinstate her on a business trip to which she had not even asked to be reinstated,  the mailing of holiday cards without her signature during her absence, the temporary reporting line change, the criticism regarding her effort level, and the addition of several new responsibilities to her job description in connection with a larger restructuring did not, individually or collectively, rise to the level of an adverse employment action.  In Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006), the Court held that a vehicle assignment was not an adverse employment action.  In Fairbrother, 412 F.3d at 56, the Court held that a transfer to another unit, which did not involve any material difference in responsibilities from plaintiff's prior assignment, was not an adverse employment action.  In Weeks v. New York State (Division of Parole), 273 F.3d 76, 86 (2d Cir. 2001),  the Second Circuit held that a "notice of discipline[ ] for misconduct and incompetence for failing to have her handcuffs and weapons" could not constitute an adverse employment action because the plaintiff alleged no facts from which the Court could infer that this notice created a materially adverse change in her working conditions.

She does not describe its effect or ramifications, how or why the

---

[13]  Having found that Plaintiff's disparate treatment claim relating to Cordner's refusal to transfer her to a satellite office is time-barred, the Court need not consider whether this would constitute an adverse employment action.

> effect would be serious, whether it went into any file, or even
> whether it was in writing.  It hardly needs saying that a criticism of
> an employee (which is part of training and necessary to tallow
> employees to develop, improve, and avoid discipline) is not an
> adverse employment action.

Id.  The Court in Weeks held that, for similar reasons, the plaintiff's claim that she received a

counseling memo for her procedure in taking a parolee into custody was also insufficient, as was

her transfer to another office, and the seizure and review of her work files.  Id. at 86-87.  "Again,

[plaintiff] does not allege how these actions effected a 'materially adverse change in the terms

and conditions of employment.'"  Id. at 87; see also Joseph v. Leavitt, — F.3d —, 2006 WL

2615313, at *3 (2d Cir. Sept. 13, 2006) (holding that the employer's action of putting an

employee on administrative leave pending a criminal investigation was not an "adverse

employment action"); but see Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640-41 (2d

Cir. 2000) (holding that a transfer is an adverse employment action if it results in a change of

responsibilities so significant as to constitute a setback to the plaintiff's career, and finding that a

delay in reassigning a teacher and an assignment to a lab with inferior facilities did not constitute

an adverse employment action); de la Cruz v. New York City Human Resources Admin., 82 F.3d

16, 20-21 (2d Cir. 1996) (holding that a transfer from an "elite" unit to one that was "less

prestigious" could constitute an adverse employment action).[14]

---

[14]  Rodriguez v. Board of Educ. of Eastchester Union Free School Dist., 620 F.2d 362,
366 (2d Cir. 1980), cited by Plaintiff, is not to the contrary. In that case the Second Circuit found
that a junior high school art teacher's transfer to an elementary school constituted an adverse
employment action, even though there were no pecuniary implications because the new position
was so "profoundly different . . . as to render utterly useless her twenty years of experience and
study in developing art programs for middle school children."  Id.  The Court concluded that
"[t]his radical change in the nature of the work [plaintiff] was called upon to perform constitutes
interference with a condition or privilege of employment adversely affecting her status within the
meaning of the statute."  Id.

Plaintiff relies on the case of Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999), for the proposition that a reprimand can constitute an adverse employment action.  Morris, however, is inapplicable to the disparate treatment claims in this case.   In Morris, a town's police chief and his son brought a civil rights action pursuant to 42 U.S.C. § 1983, alleging that their First Amendment rights had been violated by virtue of the retaliatory actions taken by the town in response to the police chief's protected free speech.   Citing Bernheim v. Litt, 79 F.3d 318, 327 (2d Cir. 1996), another section 1983 First Amendment retaliation case, the Court held that actions lesser than dismissal, reduction in pay, or demotion in rank may also be considered adverse employment actions in the context of a First Amendment retaliation case.  196 F.3d at 110; see also Coogan v. Smyers, 134 F.3d 479, 483-84 (2d Cir. 1998); Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002).   Likewise, in cases involving claims of unlawful retaliation under Title VII, the Courts have applied a lesser standard in determining what constitutes an "adverse employment action."  See Wanamaker, 108 F.3d at 465;  Bond v. City of Middletown, 389 F. Supp. 2d 319, 332-33 (D. Conn. 2005).   This standard, however, does not apply to disparate treatment claims under Title VII, 42 U.S.C. § 2000e-2(a)(1).

In the recent case of Burlington Northern & Sante Fe Railway Co. v. White, — U.S. —, 126 S. Ct. 2405, 2411, 165 L. Ed. 2d 345 (2006) ("White"), the Supreme Court explained the rationale for this distinction based upon the differences in the language and purpose of Section 703(a),[15] the substantive anti-discrimination provision of Title VII (on which Plaintiff relies in

---

[15]  Section 703(a) provides:

It shall be an unlawful employment practice for an employer--
     (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

this case), and Section 704(a),[16] Title VII's anti-retaliation provision.   In <u>White</u>, the Supreme

Court held that the language of Section 703(a) limits the scope of its provisions to actions that

affect employment or alter the conditions of the workplace. <u>Id.</u> at 2412.  "No such limiting words

appear in the anti-retaliation provision." <u>Id.</u>   As to the different purposes of the two provisions,

the Court explained that the anti-discrimination provision "seeks a workplace where individuals

are not discriminated against because of their racial, ethnic, religious, or gender-based status."

<u>Id.</u>  "The anti-retaliation provision seeks to secure that primary objective by preventing an

employer from interfering (through retaliation) with an employee's efforts to secure or advance

enforcement of the Act's basic guarantees."  <u>Id.</u>  "To secure the first objective, Congress did not

need to prohibit anything other than employment-related discrimination." <u>Id.</u>  However, because

an employer can retaliate against an employee by taking actions not directly related to his or her

employment or by causing harm outside the workplace, the anti-discrimination provision is not

---

   <u>conditions, or privileges of employment</u>, because of such individual's race, color, religion, sex, or national origin;  or

    (2) to limit, segregate, or classify his employees or applicants for employment in any way <u>which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee</u>, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1)(emphasis added in <u>White</u>, 126 S. Ct. at 2411).

  [16]  Section 704(a) provides:

   It shall be an unlawful employment practice for an employer <u>to discriminate against</u> any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added in <u>White</u>, 126 S. Ct. at 2411).

limited to discriminatory actions that affect the terms and conditions of employment.  Id. ; see also Kessler v. Westchester County Dept. of Social Servs., — F.3d —, 2006 WL 2424705, at *9 (2d Cir. Aug. 23, 2006) (discussing White); Zelnik v. Fashion Inst. of Tech., — F.3d —, 2006 WL 2623923, at *10 (2d Cir. Sept. 14, 2006) (same).

In the instant case, because Plaintiff's claim of gender-based discrimination arises under Section 703(a) of Title VII, in order to meet her prima facie burden, she must show an adverse employment action taken by her employer, one that was sufficiently disadvantageous to constitute a materially adverse change in the terms and conditions of her employment and is more disruptive than a mere inconvenience or an alteration of job responsibilities.  Fairbrother, 412 F.3d at 56; Williams v. R.H. Donnelley Corp., 368 F.3d 123, 128 (2d Cir. 2004).   Plaintiff was never demoted, her pay was never decreased, her title was never changed, no benefits were ever taken from her, and she was never transferred.  The only "disciplinary" action taken against her was a documented verbal warning in her personnel file, the lowest form of discipline and the first step in a four-step process outlined in the Collective Bargaining Agreement; but there is no evidence that this amounted to a materially adverse change in her employment.  None of the actions of which she complains meets this standard.[17]

Thus, Plaintiff has not met her prima facie burden of showing that she was subjected to an adverse employment action.  Accordingly, the Court grants summary judgment in favor of Defendant on Plaintiff's Title VII disparate treatment claim due to her failure to carry her prima

---

[17]  Having found that Plaintiff did not suffer an adverse employment action, the Court need not reach the other issues raised by Defendant, i.e., whether Plaintiff has presented facts to support an inference of gender discrimination and whether Plaintiff has sufficiently rebutted Defendant's proffered non-discriminatory justifications for its actions.

facie burden.

### III.  Plaintiff's Title VII Hostile Work Environment - Constructive Discharge Claim

As discussed above, Plaintiff also seeks relief under Title VII for a hostile work environment created by the cumulative effect of the incidents mentioned above, as well as for a constructive discharge resulting from the hostile work environment.  To prevail on a Title VII hostile work environment claim, a plaintiff must establish unwelcome conduct, based on the plaintiff's gender, sufficiently severe or pervasive to alter the conditions of employment and to create a hostile work environment, together with some basis (either vicarious liability or negligence) for imputing liability to the employer.   Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).  "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."  Id.; see also Gallagher v. Delaney, 139 F.3d 338, 347 (2d Cir. 1998); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).

The Supreme Court has instructed that a court should look to all of the circumstances collectively to determine whether a hostile work environment exists, and set forth a non-exhaustive list of factors that should be considered, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with the employee's work performance.  Harris v. Forklift Systems, 477 U.S. at 67-68.  The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 n.1 (1998).  The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not

amount to discriminatory changes in the terms and conditions of employment.  See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998).  Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was "extraordinarily severe." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).  Thus, the plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Id. (internal quotation marks omitted). "There is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 439 (2d Cir.1999) (internal quotation marks omitted).

Proving such a claim "involves showing both 'objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (quoting Harris v. Forklift Systems, 510 U.S. at 21).

In addition, the plaintiff must show that a specific basis exists for imputing the objectionable conduct to the employer.  "Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d Cir. 2004).  If  the harassment is

attributed not to non-supervisory co-workers but to a supervisor with immediate or successively

higher authority over the employee, "a court looks first to whether the supervisor's behavior

'culminate[d] in a tangible employment action' against the employee."  Id. (quoting Burlington

Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998) ("Ellerth")).  If it did, "the employer will,

ipso facto, be vicariously liable."  Mack v. Otis Elevator Co., 326 F.3d 116, 124 (2d Cir.), cert.

denied, 540 U.S. 1016 (2003).  If no such tangible employment action is present, however, an

employer will still be liable for a hostile work environment created by a supervisor unless the

employer successfully establishes what is commonly referred to as the "Faragher/Ellerth

defense."[18]  Petrosino, 385 F.3d at 225.  That defense requires the employer to show that (a) it

"exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and

(b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective

opportunities provided by the employer or to avoid harm otherwise."  Ellerth, 524 U.S. at 765.

In Pennsylvania State Police v. Suders, 542 U.S. 129, 133 (2004),  the Supreme Court

held that to establish "constructive discharge" in a hostile work environment case, the plaintiff

bears the additional burden of showing that the abusive work environment became so intolerable

that her resignation qualified as a fitting response.  Constructive discharge occurs when an

employer, rather than directly discharging an individual, deliberately and discriminatorily created

work conditions so intolerable that a reasonable person in the employee's position would have

felt compelled to resign.  Id. at 141. Working conditions are intolerable if they are so difficult or

unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73 (2d Cir. 2000) .

---

[18]  This is also referred to by the courts as the "Ellerth/Faragher" defense.

Defendant argues that Plaintiff's hostile work environment claim must fail as a matter of law because the facts alleged do not rise to the level of a hostile work environment and there is no basis for imputing liability to SNET.

### A.  Were the Incidents Sufficiently Severe and Pervasive?

After reviewing the testimony of Plaintiff, the Court finds that there is no genuine issue of material fact that Plaintiff perceived Cordner's conduct as sufficiently severe and pervasive to create an abusive work environment.  Plaintiff claims that she quit for mental health reasons. She could not stay in her position any more because of Cordner's harassment.

The more difficult question is whether a reasonable person of ordinary sensibilities would so perceive it.  On a motion for summary judgment, the question for the Court is whether a reasonable factfinder could conclude, considering all of the circumstances, that "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse."  Whidbee, 223 F.3d at 70 (internal quotation marks omitted).

In a recent decision, Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 605 (2d Cir. 2006), the Second Circuit explained that the determination of whether sexual harassment alters the conditions of employment "'is not, and by its nature cannot be, a mathematically precise test.'"  Id. (citing Harris, 510 U.S. at 22).  It can be determined only by looking at all the circumstances.  Id.  The Court noted that hostile work environment cases present "'mixed questions of law and fact' that are 'especially well-suited for jury determination.'"  Id. (quoting Richardson, 180 F.3d at 437).  Emphasizing that the factors set forth in Harris were a non-exhaustive list to be used by the factfinder in making a factual determination as to whether, based on a totality of the circumstances, a hostile work environment existed, the Court held that it was

27

error for the district court to examine each factor in isolation, comparing and contrasting its presence in that case to fact patterns from other cases.  Id.  "Prior cases in which we have concluded that a reasonable juror could find that the work environment was sufficiently objectively hostile do not 'establish a baseline' that subsequent plaintiffs much reach in order to prevail."  Id. at 606 (citing Richardson, 180 F.3d at 439).   The determination as to whether a hostile work environment existed must be made on a case-by-case basis considering "all of the individual facts at hand."  Id.  at 607.  Although recognizing that there are cases in which it is clear to both the trial court and reviewing court that after assessing the frequency of the misbehavior, measured in terms of its seriousness, the facts cannot, as a matter of law, be the basis of a successful hostile work environment claim, the Court in Schiano cited its earlier decision in Alfano v. Costello, 294 F.3d at 377,  for the proposition that in some instances it may be more appropriate to overturn a jury verdict after trial than to grant summary judgment beforehand.  Schiano, 445 F.3d at 608 & n.5.

In this case, Plaintiff relies on eight facially sex-neutral incidents involving her supervisor Cordner, occurring over a ten-month period.  She claims that Cordner was arbitrarily imposing on her standards and working conditions that were not being imposed on any of the male service technicians.  She says the "harassment" was constant, that he screamed at her so loudly on one occasion that other employees feared for her safety,[19] that Cordner was continually subjecting her to excessive criticism, "nit-picking" her about her time records, recording entries in her file about her performance, and that he and his supervisor, Dillman, spent countless hours going over her time sheets just trying to find something to make her look bad.  Other male technicians, who had

---

[19]  See Note 7, supra.

similar problems with their time records, were not subjected to this constant scrutiny. Plaintiff, a ten-year veteran of SNET, was subjected to a ride-along exercise, whereas men with far less seniority and experience were not required to do this.  She was given a documented verbal warning for leaving her truck unlocked, whereas other male service technicians did not receive a written warning, even when they had tools stolen from their vehicles.  Priority was given to a male service technician for a new work truck.  Plaintiff, who had previously received an award for her productivity, was verbally reprimanded when her production/performance times dropped off, although male technicians were not similarly treated.  Her cell phone privileges were revoked for excessive usage.  Her co-worker and union steward, Dave Ianiello,[20] testified that Cordner was "constantly riding" Plaintiff and that he was trying to make her life as difficult as possible.

As the Court discussed with Counsel at oral argument, the Court has strong reservations about whether a reasonable person in Plaintiff's circumstances would consider the conduct described above to be sufficiently severe and pervasive so as not only to alter the conditions of employment but to compel her to resign.   The Court notes that in a recent case, Demoret v. Zegarelli, 451 F.3d at 150, the Second Circuit held that a plaintiff's complaints that her supervisor reviewed her budget with a fine-toothed comb and criticized her for being five minutes late to department meetings, whereas male employees could skip meetings with

---

[20]  The Court recognizes that there may be credibility issues with regard to Ianiello's testimony, given his position as the union steward and the fact that Cordner took certain actions against him, such as revoking his cell phone privileges. For those and other reasons noted by Defendant, a jury may well find Ianiello's testimony unworthy of belief.  However, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.   Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment."  Vital v. Interfaith Medical Center, 168 F.3d 615, 621 (2d Cir. 1999); see also Rodriguez, 72 F.3d at 1061.

impunity, did not constitute a hostile work environment.

However, heeding the advice of the Second Circuit in <u>Schiano</u> and <u>Alfano</u>, when the evidence of record is viewed cumulatively and in the light most favorable to Plaintiff, the Court concludes that a rational jury could view the totality of these incidents as sufficiently severe as to interfere with Plaintiff's ability to work or to otherwise affect her working conditions, thus constituting a hostile work environment. Additionally, despite strong reservations, the Court finds that a rational jury could find the working conditions so intolerable that a reasonable person would have felt compelled to resign. See <u>Pennsylvania State Police</u>, 542 U.S. at 147.

### b. Was The Hostile Work Environment Directed At Plaintiff Because of Her Gender?

Defendant next argues that there is no basis in the record for finding that the incidents of which Plaintiff complains were directed at her because of her gender.

Title VII does not prohibit all verbal and physical harassment in the workplace – only discrimination because of sex. A Title VII hostile work environment claim, however, is not limited to sexual advances or sexual behavior targeted at an employee. It also includes non-sexual behavior directed at an employee because of her gender, which is what Plaintiff is claiming in this case. In this type of hostile work environment case, the courts have generally applied the <u>McDonnell Douglas</u> burden shifting analysis, requiring the plaintiff to prove a causal connection between the conduct and her gender – i.e., that the hostile conduct was directed at her because of her gender, as opposed to, for example, the harasser's dislike of her as an individual, or the harasser's general misanthropic personality. <u>Lindermann</u> at 783. This is often referred to as the "but for" test – but for Plaintiff's gender, she would not have been the object of the

harassment.  See Palomo, 170 Fed. Appx. at 196 (granting summary judgment to defendant on

plaintiffs' sexual harassment claims, because no reasonable fact-finder could conclude that the

supervisor engaged in this behavior toward plaintiffs because they were women, rather than

because he considered them his friends).

In Alfano, the Second Circuit, in ruling on the defendant's Rule 50 motion for judgment

as a matter of law at the close of the evidence, held:

> In a hostile work environment case, it may well be a proper
> exercise of the district court's broad discretion to allow the
> plaintiff to build her case partly by adducing incidents for which
> the link to any discriminatory motive may, in the first instance,
> appear tenuous or nonexistent.  The plaintiff must, however,
> establish at trial that incidents, apparently sex-neutral were in fact
> motivated by bias.  Thus, at the close of her case, to the extent that
> the plaintiff relies on facially neutral incidents to create the
> quantum of proof necessary to survive a Rule 50 motion for
> judgment, she much have established a basis from which a
> reasonable fact-finder could infer that those incidents were infected
> by discriminatory animus.

294 F.3d at 377.  The Court stressed the importance of excluding from consideration those

incidents "that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise,

the federal courts will become a court of personnel appeals."  Id.   The Court explained that

facially neutral incidents may be included among the "totality of the circumstances" "so long as a

reasonable fact-finder could conclude that they were, in fact, based on sex.  But this requires

some circumstantial or other basis for inferring that incidents sex-neutral on their face were in

fact discriminatory."  Id. at 378 (citing Howley v. Town of Stratford, 217 F.3d 141, 155-56 (2d

Cir. 2000) (holding that the fact-finder could reasonably infer that facially sex-neutral incidents

were sex-based where the perpetrator had previously made sexually derogatory statements)).

31

Finding that the plaintiff had failed to carry this burden with respect to a number of the incidents perpetrated by one supervisor, the Court in <u>Alfano</u> was left to consider only those sex-related incidents perpetrated by another supervisor, which it found, as a matter of law, were not sufficient to support a finding of a hostile work environment.  <u>Id</u>. at 378-79.

In this case, because the actions complained of were not of a sexual nature, the burden rests with Plaintiff to show that these actions were directed at her because of her gender. Plaintiff was the only woman in her crew.  She has presented evidence that her supervisor, the perpetrator of these incidents, repeatedly made derogatory comments about women working in the field, and referred to Plaintiff as a "woman who doesn't belong on the job."  She has presented evidence that he screamed at her, that he subjected her to excessive supervision, that he "nit-picked" her work, that he engaged in obsessive oversight of her time records, that he took actions against her that were not taken against male employees, that he made repeated notes in her personnel file documenting problems that he was having with her, that male employees were treated more favorably, and that she was told by her co-workers that Cordner was trying to make her life as difficult as possible and that he had a problem with women. (Pl.'s Depo. at 69).  It was only after she complained of his harassment that he began counseling male employees and "writing them up" for problems similar to those for which he counseled Plaintiff.  (Pl.'s Depo. at 110).

The Court concludes that Plaintiff has presented sufficient evidence of a discriminatory animus on the part of her supervisor from which a reasonable jury could conclude that his actions taken against her were because of her gender.  The Court cautions, however, that at trial Plaintiff bears the burden of establishing that each of the incidents on which she relies to support her

hostile work environment claim was motivated by gender bias.  See Alfano, 294 F.3d at 378-79.

### c.  Is There a Basis For Imputing Cordner's Conduct to SNET?

Additionally, for Plaintiff's hostile work environment claim to survive summary judgment, she must establish a basis for holding the employer liable, which is determined through traditional agency principles.  Since Cordner was her supervisor, the employer, SNET, is subject to vicarious liability.

However, against a claim of a hostile work environment created by a supervisor, the employer may have recourse to the so-called Faragher/Ellerth affirmative defense.  Ferraro, 440 F.3d at 101; see Faragher, 524 U.S. at 807;  Ellerth, 524 U.S. at 765.   This defense is comprised of two requirements:  (1) that the employer exercised reasonable care to prevent and correct promptly any sexually or discriminatory harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Faragher, 524 U.S. at 807-08 (1998); Ellerth, 524 U.S. at 761; see also Richardson, 180 F.3d at 442-43; Ferraro, 440 F.3d at 101; Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001).  This affirmative defense is available only when one of two additional requirements is met: (1) that the supervisor took no "tangible employment action," which involves an official company act, against the employee; or (2) any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment.  Ferraro, 440 F.3d at 101; see also Finnerty v. William H. Sadlier, Inc., No. 05-4494-CV, 2006 WL 910399, at *2 (2d Cir. Apr. 7, 2006).  "Otherwise the employer is strictly liable for the supervisor's misconduct."  Ferraro, 440 F.3d at 101.   The rationale underlying this distinction was explained by the Second Circuit in Ferraro:

33

> The Supreme Court created the <u>Faragher/Ellerth</u> affirmative defense because it saw a difference between (1) situations in which the supervisor's harassing acts plainly invoked his official power and were therefore undoubtedly aided by the supervisor's agency relationship with the employer and (2) situations in which the use of official power in the supervisor's harassment was less clear and therefore the "aided-by-the-agency" relationship was "insufficiently developed."  In the former situation, the official power granted by the employer to the supervisor was used to harass the employee, so the employer is held strictly liable for the supervisor's misconduct and the affirmative defense may not be raised.  In the latter situation, it is less certain that the supervisor misused official power to further his discriminatory harassment and that the company could know of the supervisor's misconduct. Accordingly, the Court decided that strict employer liability was inappropriate in such a situation.  "Looking elsewhere for guidance," the Court fashioned an affirmative defense that provides incentives to both employees and employers in furtherance of the conciliatory and deterrent purposes of federal antidiscrimination law.  The two elements of this affirmative defense encourage employees to report harassment and employers to institute and maintain "effective preventive and corrective measures."

<u>Id.</u> (internal citations omitted).

It is well-established that a hostile work environment, standing alone, does not constitute a tangible employment action.  <u>See</u> <u>Caridad v. Metro-North Commuter Railroad</u>, 191 F.3d 283, 294-95 (2d Cir. 1999), <u>cert. denied</u>, 529 U.S. 1107 (2000).  In this case, the only action that could constitute a "tangible employment action" is Plaintiff's alleged constructive discharge. In <u>Pennsylvania State Police v. Suders</u>, 542 U.S. at 133, which counsel for both sides oddly neglected to cite, the Supreme Court resolved what had been a split in the circuit courts on the question of whether constructive discharge brought about by a supervisor's harassment constitutes a tangible employment action.  <u>Compare</u>, <u>e.g.</u>, <u>Caridad</u>, 191 F.3d at 294-95 (holding has held that constructive discharge does not constitute a tangible employment action) <u>with</u> <u>Jaros</u>

34

v. LodgeNet Entertainment Corp., 294 F.3d 960, 966 (8th Cir. 2002) (holding that constructive

discharge qualifies as a tangible employment action).  The Supreme Court concluded that an

employer does not have recourse to the Faragher/Ellerth affirmative defense "when a

supervisor's official act[21] precipitates the constructive discharge."  Pennsylvania State Police,

542 U.S. at 140 (emphasis added).

Although this Court has concluded that there are genuine issues of material fact as to

whether a reasonable person in Plaintiff's position would have felt compelled to resign because

of Cordner's harassment, there is no evidence of an official act on the part of Cordner that led to

her resignation.  Absent such an official act, under the holding of Pennsylvania State Police,

Defendant may invoke the Faragher/Ellerth affirmative defense to establish why it should not be

held vicariously liable.  Whether this case is viewed as a hostile work environment case or a

hostile work environment/constructive discharge case, Defendant may raise this affirmative

defense.

An employer satisfies the first prong of the defense if (1) the employer had an anti-

discrimination policy as well as a procedure for filing complaints, and (2) the employer

"endeavors to investigate and remedy problems reported by its employees."  Caridad, 191 F.3d at

295.  It is undisputed that SNET had a broad anti-discrimination and anti-harassment policy, with

complaint procedures, which was contained in the employee Code of Conduct, and that Plaintiff

was aware of this policy.  The existence of that policy is an important consideration but, standing

---

[21]   The Court in Pennsylvania State Police reasoned that absent an official act, the extent
to which a supervisor's misconduct had been aided by the agency relation was less certain.  542
U.S. at 149.  "That uncertainty . . . justifies affording the employer the chance to establish,
through the Ellerth/Faragher affirmative defense, that it should not be held vicariously liable."
Id.

alone, does not automatically satisfy the first prong of Defendant's affirmative defense.   Id. at 295.  In this case, unlike Caridad, and Finnerty, there are genuine issues of material fact as to whether Defendant exercised reasonable care in investigating and remedying the hostile work environment of which Plaintiff complained.

Plaintiff testified that, in the past, Defendant had ignored or failed to investigate complaints filed by other female employees.  (Pl.'s 2d Depo. at 140).  Additionally, when she complained of Cordner's harassment, albeit after she had submitted her letter of resignation, Defendant's investigation of her complaint was cursory at best.  Defendant's EEO manager did nothing more than interview Cordner, the alleged perpetrator; and when he did not corroborate Plaintiff's accusations of his harassing conduct, she closed the investigation of Plaintiff's complaint as "uncorroborated."  Additionally, Plaintiff remained on the job for two weeks after she complained to the EEO manager about Cordner's harassment.  There is nothing in the record to indicate that Defendant took any steps whatsoever to correct the harassment.  A reasonable jury could find that Defendant's response to Plaintiff's complaint  was wholly inadequate and that Defendant did not exercise reasonable care to correct promptly the harassing behavior by Plaintiff's supervisor.   Thus, the Court concludes that Defendant has not carried its burden of establishing the first prong of this affirmative defense.

Therefore, finding genuine issues of material fact as to whether Defendant has satisfied the first prong of the Faragher/Ellerth affirmative defense, the Court denies Defendant's motion for summary judgment on Plaintiff's Title VII hostile work environment and constructive discharge claims.

The Court cautions, however, the fact that these claims have survived summary judgment

does not ensure that they will withstand a Fed. R. Civ. P. 50 motion for judgment as a matter of law after trial.  At trial, Plaintiff will bear the burden of proving a hostile work environment based upon incidents that in their totality meet the level of pervasiveness or severity required to establish a hostile work environment, both subjectively and objectively.   She will also bear the burden of proving, in support of her constructive discharge claim, "that the abusive working condition became so intolerable that her resignation qualified as a fitting response." Pennsylvania State Police, 542 U.S. at 133.  At trial, any incidents that do not support an inference of mistreatment must be removed from the equation.  See Alfano, 294 F.3d at 376. Any incidents that do not support an inference that Plaintiff's treatment was because of her gender will likewise not be considered.  Id. at 377 (holding that the plaintiff must establish at trial that the sex-neutral incidents of which she complains support an inference that the mistreatment was because of her sex).   Ultimately, if Defendant is able to carry its burden of proving that it exercised reasonable care to prevent and correct the hostile work environment and that Plaintiff unreasonably failed to avail herself of the preventive or corrective opportunities provided by Defendant, Plaintiff will have to show why she failed to take advantage of these opportunities.

## Conclusion

Accordingly, for the reasons set forth above, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's state-law FEPA claim and her Title VII disparate treatment claim. The Court denies Defendant's Motion for Summary Judgment as to Plaintiff's Title VII hostile work environment claim and constructive discharge claim.  Counsel for the parties are directed to confer and to present to the Court within thirty (30) days of the date of this ruling a

proposed scheduling order, setting forth a date for the submission of a joint trial memorandum and a date when this case will be ready for trial.

SO ORDERED, this ____30th____ day of September, 2006, at Bridgeport, Connecticut.


____/s/ *William I. Garfinkel*_____
WILLIAM I. GARFINKEL,
United States Magistrate Judge