# Tab C

**ORIGINAL**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * *
                           *
DENISE EVARTS             *
        Plaintiff         *
                          *Case No. 3:00CV1124(JCH)
    VS.                   *
                          *June 13, 2001
THE SOUTHERN NEW ENGLAND  *
TELEPHONE COMPANY         *
        Defendant         *
                          *
* * * * * * * * * * * * * *
```

DEPOSITION OF DENISE EVARTS

Appearances:

       FOR THE PLAINTIFF:

       LAW OFFICES OF KAREN LEE TORRE
       51 Elm Street
       Suite 307
       New Haven, CT 06510
       By:  Michelle Holmes, Attorney

       FOR THE DEFENDANT:

       SOUTHERN NEW ENGLAND TELEPHONE
       310 Orange Street
       8th Floor
       New Haven, CT 06510
       By:  Stephen M. Pincus, Esq.
           Carol Wilder, Attorney

       POST REPORTING SERVICE

    HAMDEN, CONNECTICUT (800) 262-4102

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

```
 1   of either day school or preschool or --
 2        A    Yeah, he went to Chester Child Care.
 3        Q    Okay.  Was there any time where he stayed
 4   home with you during the first couple years of his
 5   life?
 6        A    No.  The first couple years I was -- for
 7   the first year and a half I was working --
 8        Q    Okay.
 9        A    -- at SNET and then, yes, there was a
10   period where he stayed home with me when I was -- I
11   had a babysitting job --
12        Q    Um-hum.
13        A    -- after I left SNET and he stayed home
14   with me then.  And then I went back to work, I got
15   a part-time job and he went back into Chester Child
16   Care.
17        Q    And when do you recall the babysitting
18   job, what year that was?
19        A    '98.
20        Q    How long did you have that babysitting
21   job?
22        A    Approximately nine months.
23        Q    Okay.  And then after that -- those nine
24   months you -- was there a time where you weren't
```

POST REPORTING SERVICE

HAMDEN, CONNECTICUT (800) 262-4102

Case 3:00-cv-01124-WIG    Document 166-4    Filed 05/11/2007    Page 4 of 20

18

DEPOSITION OF DENISE EVARTS
JUNE 13, 2001

1  working or did you go back to another part-time
2  job?
3      A   After that nine months I started school
4  and I was in school from August of '98 until May of
5  '99, and then I started a part-time job at Kapusta
6  and Otzel and I had that from '99 to 2000.
7      Q   When you were in school from '98 to '99
8  was Kyle in any day care or was he home? Were you
9  going to school at night?
10     A   Yes, he was in day care for a couple
11 hours three days a week.
12     Q   Okay. That's fine. I'd just like to go
13 through some schooling of yours. You went to high
14 school, right?
15     A   Yes.
16     Q   Where did you graduate?
17     A   Foran High in Milford.
18     Q   Foran High?
19     A   Um-hum.
20     Q   What year was that?
21     A   '82.
22     Q   I know you have gone to college. Could
23 you just tell me about your college?
24     A   Okay. Teikyo I went.

POST REPORTING SERVICE
HAMDEN, CONNECTICUT (800) 262-4102

# Tab D

```
                THE UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT


    - - - - - - - - - - - - - - X
    DENISE EVARTS              :      COPY
          PLAINTIFF,            :
                                :
                                :
                                :
                                :
    VS                          :   NO. 3:00CV1124(JCH)
                                :
                                :
                                :
                                :
    SOUTHERN NEW ENGLAND        :
    TELEPHONE COMPANY           :
          DEFENDANT.            :
    - - - - - - - - - - - - - - X
```

         Deposition of Denise Evarts
    taken in accordance with the Connecticut
    Practice Book at the office of Tyler
    Cooper & Alcorn, LLP, 205 Church Street,
    New Haven, Connecticut, before Clifford
    Edwards, a Professional Shorthand
    Reporter and Notary Public, in and for
    the State of Connecticut, on September
    14, 2001, commencing at 1:12 p.m.


              DEL VECCHIO REPORTING SERVICES
             PROFESSIONAL SHORTHAND REPORTERS
                    FAX 203 245-2760

    117 RANDI DRIVE          100 PEARL ST., 14th FLOOR
    MADISON, CT 06443        HARTFORD, CT 06103-4506
       (203) 245-9583            (800) 839-6867

```
 1    Q    EAP program.  Tell me how you came to see
 2  Sandra Rhodes?
 3    A    It was a -- SNET has a newspaper called the
 4  SNET Times and there was an article in there
 5  saying that if you needed counseling -- saying if
 6  you needed counseling, they would provide you with
 7  counseling services.
 8    Q    So you called the SNET EAP office?
 9    A    Yes.
10    Q    This wasn't through your husband's medical
11  insurance?
12    A    No.
13    Q    And they referred you to Sandra Rose?
14    A    Yeah.
15    Q    And is Sandra Rose an employee of SNET?
16    A    No.
17    Q    Where did you see her?
18    A    In New Haven.
19    Q    Did you have choices over who to go to?
20    A    No.
21    Q    She was the recommended person at the time?
22    A    Yes.
23    Q    Okay.  could you turn to page 12 please?
24  Referring you to interrogatory number one which
25  starts on the prior page.  Okay.  That was a
```

```
 1   question about efforts to find employment.  Okay.
 2   And I'm going to read the response.  See documents
 3   attached hereto bearing Bates Stamp No. 0191 --
 4   0199.  "The plaintiff was employed by May 1998
 5   through August 1998.  Plaintiff earned $135 on a
 6   weekly basis."
 7         As to that part of your answer, why did you
 8   leave the employment of Dorothy Gerardi (phonetic)
 9   as a baby-sitter?
10   A     She moved.
11   Q     Okay.  And how did you find that
12   baby-sitting job?
13   A     She was my neighbor.
14   Q     Have you done any baby-sitting or day care
15   since that time since August of 1998?
16   A     Other than my own children, no.
17   Q     Okay. Have you sought any baby-sitting or
18   day care positions since August of 1998?
19   A     No.
20   Q     Has anyone asked you to be their day care
21   provider or baby-sitter after that date?
22   A     No.
23   Q     Are you qualified to be a baby-sitter or day
24   care provider?
25               MS. HOLMES:  Objection as to form.
```

```
 1   BY MS. ALEXANDER:
 2     Q    Is that something that you have a
 3   demonstrated ability to do?
 4     A    Yes.
 5     Q    And then the final paragraph of that
 6   response states, "the plaintiff is currently
 7   employed at Capusta & Otsel as a title searcher.
 8   250 Blood Street, 06410 earning $50 per search."
 9   When did you start working for them?
10     A    May of 1999.
11     Q    And are you still currently working for
12   them?
13     A    No.
14     Q    When did you stop?
15     A    December of 2000.
16     Q    Why did you stop being a title searcher for
17   Capusta & Otsel?
18     A    He had no more work for me.  He lost one of
19   his major accounts.
20     Q    Okay.  Have you applied for any other
21   positions or work as a title searcher since that
22   time?
23     A    No because I have the twins now.
24     Q    Are you available for full-time work?
25     A    Yes.
```

```
1    Q    Are you working now anywhere?
2    A    Outside of the home, no.
3    Q    When will you be finishing law school?
4    A    May of 2002.  That's approximate.  I might
5    have to take a few summer courses in order to
6    fulfill the graduation requirements.
7    Q    Okay.  And during the summer of 2001, which
8    is this summer, did you work at all?
9    A    No.
10   Q    Did you go to school?
11   A    No.
12   Q    And why didn't you work during the summer of
13   2001?
14   A    Because the babies were only a few months
15   old at that point.
16   Q    What was their date of birth?
17   A    March 13th.
18   Q    13th, 2001?
19   A    Yes.
20   Q    And then during the summer of 2000, you
21   worked at Capusta & Otsel?
22   A    Yes.
23   Q    Did you work full-time?
24   A    I -- some weeks, yes.  Some weeks, no.  It
25   was, he would just send me work and however long
```

```
 1   it took me to accomplish that work is how many
 2   hours I would put in that week, so it varied.
 3   Some weeks I would work ten hours, some weeks I
 4   would work 50 depending on how many searches he
 5   had for me to do.
 6     Q    Were you an employee or an independent
 7   contractor?
 8     A    An independent contractor.
 9     Q    And you were a sole proprietorship?
10     A    Yes.
11     Q    That's what your tax return says doesn't it?
12              MS. HOLMES:  Objection as to form.
13     A    I thought I just said independent contractor
14   BY MS. ALEXANDER:
15     Q    Okay. So you were not ever an employee of
16   Capusta & Otsel correct?
17     A    No.
18     Q    And in the summer of 2000 you had finished
19   two years of law school?
20     A    Yes.
21     Q    Did you apply for any full-time employment
22   positions during that time for that period?
23              MS. HOLMES:  Objection as to form.
24   BY MS. ALEXANDER:
25     Q    Let me strike that.  I'll start again. For
```

```
 1   the summer of 2000, did you apply for any
 2   full-time employment positions, employment
 3   positions as opposed to independent contracting?
 4              MS. HOLMES:  Objection as to form.
 5   A    No.  I thought we had already discussed this
 6   here.  Didn't you already ask me about 2000?
 7   BY MS. ALEXANDER:
 8   Q    I asked you whether -- Did you apply to be
 9   an employee anywhere?
10              MS. HOLMES:  Objection as to form.
11   A    No.
12   Q    And was Capusta & Otsel the only position
13   that you applied for in the summer of 2000?
14   A    Capusta & Otsel was a job I applied for in
15   the summer of 1999.
16   Q    And so you had that job for two summers?
17   A    Yes.
18   Q    Do you know how much you earned in the
19   summer of 2000 for Capusta & Otsel?
20   A    It was probably just a few thousand dollars.
21   Q    For just the summer you're referring to.
22   Yes?
23   A    Yes.
24   Q    And how about the summer of 1999?
25   A    Probably the same thing, just a few thousand
```

```
 1    dollars.
 2    Q    If you had applied for summer associate or
 3    some other legal positions, would you have been
 4    qualified for a position that paid more than a few
 5    thousand dollars?
 6              MS. HOLMES:  Objection as to form.
 7    A    I don't know if I can answer that.
 8  BY MS. ALEXANDER:
 9    Q    Did you have colleagues at law school who
10    did in fact work for law firms and other
11    businesses and make more money during 1999 summer
12    and 2000 summer?
13    A    Well, I know that most of my colleagues
14    worked full-time and go to school at night like I
15    do so they already have full-time positions.
16    Q    Did you apply for any summer associate
17    positions at any time while you were in law
18    school?
19              MS. HOLMES:  Objection as to form.
20    A    Yeah
21  BY MS. ALEXANDER:
22    Q    Do you have a plan to work for Capusta &
23    Otsel when you graduate?
24    A    No.
25    Q    And have you applied for any positions yet
```

1  for your graduation in the year 2002?

2          MS. HOLMES: Objection as to form.

3  BY MS. ALEXANDER:

4  Q    You can answer the question.

5  A    Yeah.  I haven't physically applied but I

6  have been making some contacts.

7  Q    What contacts?

8  A    I don't even have names.  I have friends of

9  friends that have firms.  And there's a local firm

10 that I was speaking with here, and she was going

11 to speak with her friend and give her my

12 qualifications and let her know I'd be interested

13 in working for the firm in Chester when I

14 graduate.

15 Q    Could you turn to page 14 please?  At the,

16 toward the top of that page.  In response to

17 interrogatory number 13 you state, "In 1997 the

18 plaintiff inherited $20,000 which she used for

19 living expenses as a result of the termination."

20      Did I read that right?

21 A    Yes.

22 Q    And that was the $20,000 from your sister's

23 estate?

24 A    Yes.

25 Q    When did you first learn that you would be

```
 1    inheriting $20,000?
 2              MS. HOLMES:  Objection as to form.
 3    A    In the beginning of 1997.  I can't recall
 4    the exact date.
 5    BY MS. ALEXANDER:
 6    Q    Was it shortly after your sister passed
 7    away?
 8    A    Yes.  A few months or so.
 9    Q    When did you actually receive that money?
10              MS. HOLMES:  Objection as to form
11    BY MS. ALEXANDER:
12    Q    In 1997?
13    A    I would just say in the beginning of 1997
14    sometime.  I'd have to look at my bank account
15    records to get the exact date.
16    Q    When did you decide to go to law school?
17              MS. HOLMES:  Objection as to form.
18    A    19 -- I would say 199 -- I guess I always
19    wanted to go to law school, and I guess I applied
20    in 1998.
21    Q    I didn't hear --
22    A    1998.
23    Q    Certainly you made the decision that you
24    were going to apply before you applied, right?
25    A    Yes.
```

1   Q   Approximately when did you make the decision
2   to apply to law school?
3   A   I guess in 1998. I don't remember the exact
4   date.
5   Q   You can't be any more specific than that?
6           MS. HOLMES:  Objection as to form.
7   A   Probably the beginning of 1998 because I
8   took the LSAT.
9   BY MS. ALEXANDER:
10  Q   At the bottom of page 14 you state that you
11  are presently insured through your spouse?
12  A   Uh-huh.
13  Q   And your spouse's name is Frederick Evarts?
14  A   Yes.
15  Q   Where does he work?
16  A   IMS in Marlborough, Connecticut.
17  Q   When did he start there?
18  A   About two years ago.
19  Q   1999?
20  A   I think so.
21  Q   And he was, he ran his own business before
22  that?
23  A   No he worked at a company called Novametrix
24  before that for a couple of years.
25  Q   Is there a painting company that your

```
 1    Q    Would you be qualified to do entry-level
 2  sales positions?
 3              MS. HOLMES:  Object as to form.
 4    A    No.  I don't think I'm good at it,
 5  obviously, I couldn't pass the test.
 6  BY MS. ALEXANDER:
 7    Q    Okay.  So during the entire time that you've
 8  been going to law school, you've been going at
 9  night?
10    A    Correct.
11    Q    Never during the day?
12    A    No.
13    Q    Okay.
14    A    I might have taken one class at 3:00, which
15  might be considered a day class, but all my
16  classes are at night.  I'm registered as a night
17  student.
18    Q    And before your twins were born in March of
19  this year, what did you do during the days after
20  you left SNET once you started law school and
21  before your twins were born?  What were you doing
22  during the day?
23    A    The baby-sitting job and Capusta & Otsel.
24    Q    Okay.  And how many hours a week was the
25  baby-sitting job?
```

```
 1    A    Forty.
 2    Q    Was there ever a time that you weren't
 3   working while you had been in law school?
 4              MS. HOLMES:  Object as to form.
 5    A    Yeah.
 6   BY MS. ALEXANDER:
 7    Q    When was that?
 8    A    From August '98 to May of '99.
 9    Q    You didn't work at all?
10    A    Right.
11    Q    Why didn't you work at all during that
12   period?
13    A    I think I had tried to because I was going
14   to law school and I was taking care of Kyle and I
15   had lost the baby-sitting job, so.
16    Q    Okay.  Between August of '98 and May of '99,
17   did you apply for any jobs?
18    A    No.
19    Q    Was your decision to go to law school
20   voluntary?
21    A    Yes.
22    Q    No one forced you to go?
23    A    No.
24    Q    And you didn't go to law school because you
25   couldn't find a job anywhere?
```

```
 1    Q    Okay.  Unemployment.
 2         Anything else?
 3    A    No.
 4    Q    So you had no earned income for 1997 at all.
 5         Is that right?
 6    A    No.  Other than the unemployment.  No.
 7    Q    And what is your college degree?
 8    A    Bachelor of arts or Bachelor of science?
 9    A    B.S.
10              MS. ALEXANDER:  Can you mark this.
11              (THEREUPON, DEFENDANT'S EXHIBIT NO.
12              27, 1998 TAX RETURN, WAS MARKED FOR
13              IDENTIFICATION.)
14    BY MS. ALEXANDER:
15    Q    Showing you Defendant's 27, is that a copy
16    of your 1998 tax return?
17    A    Yes.
18    Q    And did you and your husband together earn
19    $33,004?
20    A    Yes.
21    Q    How much income did you yourself earn in
22    your work efforts in 1998?
23    A    It was approximately $150 a week for
24    approximately nine months, so --
25    Q    Okay.
```

```
 1    A    Yes.
 2    Q    Have you sent your updated resume to anyone
 3   since the summer of 1997?
 4    A    Yes.
 5    Q    Who?
 6    A    Capusta & Otsel, C-a-p-u-s-t-a, O-t-s-e-l.
 7    Q    Anyone else?  Have you sent your resume to
 8   any other entity since the summer of 1997?
 9    A    No.
10    Q    Have you regularly checked the newspaper for
11   job ads since the summer of 1997?
12    A    Regularly, no.  Periodically.
13    Q    Is it fair to say that you've removed
14   yourself from the job market in terms of
15   comparable to that that you had at SNET?
16    A    Yes, because I'm qualified for different
17   positions now.
18    Q    And what is the position that you hope to
19   have after you graduate from law school?
20    A    I'd like to be an associate in a firm.
21              MS. ALEXANDER:  Would you mark
22          this, please.
23              (THEREUPON, DEFENDANT'S EXHIBIT NO.
24              40, TIME SHEETS OF RICK DELLAVOLPE,
25              WAS MARKED FOR IDENTIFICATION.)
```