## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DENISE EVARTS, | : | CIVIL ACTION NO. |
| | : | 3:00CV1124 (WIG) |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| THE SOUTHERN NEW ENGLAND | : | |
| TELEPHONE COMPANY, | : | |
| | : | |
| *Defendant.* | : | MAY 10, 2007 |

### DEFENDANT'S MEMORANDUM OF LAW
### IN SUPPORT OF MOTION IN LIMINE

Defendant Southern New England Telephone Company ("SNET") moves in limine to preclude the offer and introduction of evidence or comments of counsel relating to the Connecticut Commission on Human Rights and Opportunities' ("CHRO") preliminary "Finding of Reasonable Cause" in this matter. This Court should preclude this evidence because it is not relevant to the issues presented in this case. Further, even if the Court were to conclude that this "finding" offers marginal probative value, any such value is wholly outweighed by the danger that introduction of this evidence will unfairly prejudice SNET, confuse the issues, mislead the jury, and waste time during trial.

## I.    BACKGROUND

The CHRO conducted a fact-finding conference in an administrative claim of discrimination by Denise Evarts on November 6, 1998. This fact-finding was not audio or video taped, nor was is it transcribed. Over one year later, on December 29, 1999, Richard Gordon, a CHRO investigator,

issued a "Finding of Reasonable Cause." ("Gordon CHRO Finding").  <u>See</u> Reasonable Cause

Finding.  <u>See</u> Ex. 1 to Plaintiff's Exhibits in Opposition to Motion for Summary Judgment.

This "finding" contains numerous errors and irregularities.  For example, although Mr.

Gordon indicated in the finding that he had reviewed a "fact finding tape," he undertook no such

review -- the conference undisputedly was NOT taped.  Gordon's findings also contradict the

undisputed facts; for example, he found that, as to a certain truck locking incident at issue,

"complainant showed [Matt Cordner] proof from respondent's mechanic shop evidencing that the

door was faulty and could not be locked." <u>Id.</u> at 5.  Plaintiff, however, testified that the door could be

locked with her key.   <u>See</u> Denise Evarts Deposition, September 14, 2001, at 40-41.  (Attached at

Tab A).  There are many other factual inaccuracies throughout the document.

Further, and as SNET previously detailed in its Reply to Opposition to Motion to Motion for

Summary Judgment ("Reply"), after Gordon left the CHRO he sued the CHRO for, among other

alleged wrongs, discrimination on the basis that the CHRO failed to promote him on the basis of his

gender and national origin.  <u>See</u> Reply at Ex. F.  In defending against those charges, the CHRO

averred that in December 2000, it began to uncover "issues" with Gordon's "work performance."

<u>See</u> CHRO's Rule 56(a)(1) Statement of Facts, ¶ 57. (Attached at Tab B ).  The CHRO also learned

that Gordon had held himself out as an attorney admitted to practice in Connecticut, when he in fact

was not admitted to practice law in this state, and that he had improperly recorded time.  <u>Id.</u> at ¶¶ 83,

95-96, 98.  The CHRO's Regional Director reported "that a review of the files assigned to Richard

Gordon <u>showed numerous errors, disorganized material, un-filed records, incomplete work or no</u>

work product at all." Id. at ¶ 87 (emphasis added).

Finally, certain conclusions set forth in Gordon's CHRO Finding are inconsistent with this Court's Ruling on Defendant's Motion for Summary Judgment ("Summary Judgment Ruling"). For example, this Court rightfully concluded that under "Second Circuit precedent . . .the incidents of which Plaintiff complains do not rise to the level of an adverse employment action necessary to meet Plaintiff's prima facie burden for her disparate treatment claim under Title VII." Ruling at 18 (internal quotation marks omitted). In Gordon's CHRO Finding, however, Gordon concluded that SNET took "adverse job actions" against plaintiff. E.g., Gordon CHRO Finding at 5. Gordon also concluded that SNET's actions were motivated by unlawful bias. Id. at 5-6. As this Court recognized in its Summary Judgment Ruling, however, whether this is so is a critical and open question. See Ruling at 32-33 (cautioning plaintiff that "at trial [she] bears the burden of establishing that each of the incidents on which she relies to support her hostile work environment claim was motivated by gender bias.").

## II.    **LEGAL STANDARD**

A motion in limine is the appropriate vehicle for a party seeking an order of exclusion of irrelevant or prejudicial evidence. Applera Corp. v. MJ Research, Inc., 3:98cv1201 (JBA), 2004 U.S. Dist. LEXIS 1072, *5 (D. Conn. Jan. 28, 2004) (Attached at Tab C). The Gordon CHRO Finding is completely unreliable and offers little probative value because during trial, the parties will present abundant evidence to the jury addressing plaintiff's hostile work environment claim. Because introduction into evidence of the Gordon CHRO Finding will only confuse the jury, waste time, and

seriously and irreparably prejudice SNET, this Court should not allow evidence regarding the Gordon CHRO Finding to be presented to the jury.

### III.   THIS COURT SHOULD EXCLUDE ALL EVIDENCE RELATING TO THE GORDON CHRO FINDING.

Foreshadowing its recognition that the Gordon CHRO Finding should not be presented to the jury, this "Court indicated its reluctance to admit the CHRO findings as evidence in the trial of this case because of the risk of unfair prejudice." Ruling at 8-9 n.11. Guided by the authority that SNET cites below, and the Court's previous concern regarding the admissibility of Gordon's CHRO Finding, this Court should enter an order precluding the introduction into evidence of the Gordon CHRO Finding and all comments relating to this document.

Several courts in the Second Circuit have concluded that similar findings by the CHRO should not be admitted into evidence at a trial on like claims. Following an extended analysis, in Paolitto John Brown E. & C., Inc., 151 F.3d 60 (2d Cir. 1998), the Second Circuit joined the majority of Circuits to have considered whether in employment cases, agency determinations should be admitted into evidence during subsequent litigation. Paolitto affirmed the decision of the District Court to exclude from evidence a finding of the CHRO, based on the principle that agency determinations may be admitted into evidence only at the discretion of the district court. Id. at 65. In Paolitto, the District Court (Goettel, J.) had precluded the defendant from offering into evidence the CHRO finding on the bases that the evidence that plaintiff introduced at trial undercut many of CHRO's factual findings, and the defendant had a full opportunity to present to the jury all the evidence it had submitted to CHRO. Id.; see also Giannone v. Deutsche Bank Sec., Inc., No. 03 Civ.

4

9665, 2005 U.S. Dist. LEXIS 36948, *7 (S.D.N.Y. 2005) (*citing* Paolitto, court granted plaintiff's motion in limine barring introduction of EEOC finding). (Attached at Tab D).

Several District Courts in Connecticut have also refused to admit CHRO findings into evidence. In Barlow v. Connecticut, 319 F.Supp.2d 250, 258 (D.Conn. 2004), applying the same evidentiary principles that would apply during trial, Judge Burns granted defendants' motion to strike a CHRO Reasonable Cause Investigation Report from plaintiff's opposition to summary judgment. Characterizing the report as "a preliminary investigation into whether discrimination or retaliatory conduct against plaintiff could have occurred," Judge Burns found that the CHRO report in Barlow was "unreliable" because the investigator based its conclusions largely upon hearsay and statements from the plaintiff, and also had disregarded the defendants' testimony and other evidence that favored the defendants. Id. at 258. Because the court had before it all the evidence that the investigator considered in making her reasonable cause determination, there was little probative value in the investigator's conclusions. Judge Burns therefore struck the reasonable cause finding from the record. Id.

Judge Hall similarly granted defendants' motion to strike a CHRO reasonable cause finding made "in summary disposition" after a reasonable cause determination, which Judge Hall described as a "preliminary investigation into whether discrimination could have occurred." Keene v. Hartford Hosp., 208 F.Supp.2d 238, 242-43 (D.Conn. 2002) (emphasis in original). Recognizing that "the court [had] the discretion to determine whether the [reasonable cause determination] offered in evidence has sufficient independent indicia of reliability to justify its admission," Judge Hall

exercised that discretion to strike the CHRO reasonable cause determination.  Id. at 243 (internal

quotation marks omitted; alterations added).    Under similar reasoning, in Equal Employment

Opportunity Comm'n v. Regency Architectural Metals Corp., 896 F.Supp. 260 (D.Conn. 1995),

Judge Goettel ruled that the EEOC's determinations should be given no weight because they

"consist[ed] largely of brief factual assertions which were the subject of testimony at the trial, and

legal reasoning, which is the province of the court."  Id. at 263 (alteration added).

Paolitto's sound reasoning is consistent with decisions from other jurisdictions.  See, e.g.,

Williams v. The Nashville Network, 132 F. 3d 1123, 1128-29 (6th Cir. 1997) (held district court did

not abuse its discretion in granting motion in limine to exclude EEOC letter under Fed. R. Evid. 403;

court noted "[a] strong argument can be made that a jury would attach undue weight to this type of

agency determination, viewing it as a finding of discrimination--as the plaintiff himself suggests it

should be viewed--rather than as a mere finding of probable cause."); Johnson v. Yellow Freight

System, Inc., 734 F.2d 1304, 1309-10 (8th Cir. 1984) (observing "EEOC determinations are not

homogeneous products; they vary greatly in quality and factual detail," held district court did not

abuse discretion in excluding EEOC determination where report was supported by only conclusory

statements, substantial evidence was presented to jury on all matters in report, and admission of

report would require additional evidence to apprise jury of nature and extend of EEOC

investigation); Lee v. Executive Airlines, Inc., 31 F. Supp. 2d 1355, 1356-58 (S.D. Fla. 1998)

(granting plaintiff's motion in limine to exclude EEOC determination letter because it was "highly

conclusory" and had little probative value; court noted also that admission of the document could

confuse the jury and that it was "distinctly possible that the jury [would] attach undue weight to the authoritative and personalized conclusions of the EEOC inspector, thus creating unfair prejudice.") (alteration added).

The fact-finding conference in this matter was held over one year before Gordon issued his preliminary finding and the conference was not recorded by any means. Further, the CHRO recognized and publicly averred that Gordon's work was substandard and included numerous errors shortly after he issued his determination in this matter. Indeed, and consistent with the CHRO's statements, the Gordon CHRO Finding contains clear errors. The Gordon CHRO Finding is therefore completely unreliable.

The Gordon CHRO Finding is also unnecessary -- at trial the parties will present to the jury all of the evidence that they presented to the CHRO. Indeed, the parties will present a good deal more evidence to the jury than they presented to Gordon.

Further, allowing the Gordon CHRO Finding into evidence will be confusing to the jury and waste time during trial. Using Judge Hall's words, the document reflects a "preliminary investigation into whether discrimination could have occurred." Keene v. Hartford Hosp., 208 F. Supp. 2d at 242-43. If this document is presented to the jury, the Court and jurors will necessarily waste the time necessary for this Court to attempt to explain the origins of the document and its role in the trial. It is unlikely that a jury would understand the nuance that this is a preliminary investigative document to determine whether there are sufficient facts to find "reasonable cause" and that it is not a final finding by the agency; a jury of non-lawyers is likely to assume the latter.

Instructions on this issue and on the fact that the plaintiff moved the case to court before any final agency determination could be made, would be cumbersome and confusing.

Finally, in light of the fact that Gordon's conclusions are factually and legally flawed, as well as inconsistent with conclusions that this Court reached in its Ruling, any remote probative value that may be attributed to this document wholly is outweighed by the confusion of the issues, and unfair and irreparable prejudice to SNET that will result if it is presented to the jury. A simple reading of the document, supported by the imprimatur that it is a finding of a governmental agency, show very clearly that the document would have a substantial prejudicial effect on SNET. This Court should therefore enter an order precluding the introduction of evidence or commentary relating to the Gordon CHRO finding.

## IV.    **CONCLUSION**

For the reasons set forth above, SNET respectfully moves that this Court enter an order precluding the offer and introduction of evidence or comments of counsel relating to the Gordon CHRO Finding.

·     Dated at North Haven, Connecticut this 10th day of May, 2007.

THE DEFENDANT,
THE SOUTHERN NEW ENGLAND TELEPHONE
COMPANY

By _____

      Lori B. Alexander
      Federal Bar No. CT 08970
      Theresa M. Waugh
      Federal Bar No. CT23559
      LITTLER MENDELSON, P.C.
      110 Washington Avenue
      North Haven, Connecticut 06473
      Tel. (203) 234-6344
      Fax (203) 234-6345
      E-Mail: lalexander@littler.com
      E-Mail: twaugh@littler.com

**Tab A**

THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - X
DENISE EVARTS                  :        COPY
        PLAINTIFF,             :
                               :
                               :
                               :
VS                             :    NO. 3:00CV1124(JCH)
                               :
                               :
                               :
SOUTHERN NEW ENGLAND           :
TELEPHONE COMPANY              :
        DEFENDANT.             :
- - - - - - - - - - - - - X



                Deposition of Denise Evarts
        taken in accordance with the Connecticut
        Practice Book at the office of Tyler
        Cooper & Alcorn, LLP, 205 Church Street,
        New Haven, Connecticut, before Clifford
        Edwards, a Professional Shorthand
        Reporter and Notary Public, in and for
        the State of Connecticut, on September
        14, 2001, commencing at 1:12 p.m.



            DEL VECCHIO REPORTING SERVICES
         PROFESSIONAL SHORTHAND REPORTERS
                FAX 203245-2760

    117 RANDI DRIVE          100 PEARL ST., 14th FLOOR
    MADISON, CT 06443        HARTFORD, CT 06103-4506
      (203) 245-9583           (800) 839-6867

1    the facility if there was money in it, you

2    individually?

3    A    No.  Like I said, it was more of a time

4    factor.  If you had time before 4:30, you emptied

5    the truck of any equipment and you took out any

6    coin receptacles if you had time. If not, we did

7    it in the morning.

8    Q    So you did that based on whether you had

9    time?

10                MS. HOLMES:  Objection as to form.

11   BY MS. ALEXANDER:

12   Q    Before the ending time?

13   A    Correct.

14   Q    And you didn't make a distinction whether

15   you had money in the coin box or not?

16   A    Me and all my colleagues did not.

17   Q    When -- sometimes when you had money in your

18   truck, did you fail to lock your vehicle?

19                MS. HOLMES:  Object as to form.

20   A    If I had money in it I did make an attempt

21   to lock my vehicle.  I tried to, if there was

22   money, lock the back of it at least

23   BY MS. ALEXANDER:

24   Q    And how were you able to do that?  How do

25   you lock the back of the truck?

```
 1    A    Well, before you would open the door and hit

 2    the knob and shut the door.  But mine was broken,

 3    I had no knob on mine.  So I would have to

 4    physically put the key in to lock it.

 5    Q    Use the key?

 6    A    Yes.

 7    Q    And you did that when there was money in the

 8    truck?

 9    A    Yes.

10    Q    Even after it was broken, so to speak?

11    A    I tried to remember, yes.

12    Q    And why was it that you tried to lock it

13    when there was money in it?

14    A    I guess to secure the money.

15    Q    Okay.  Did you ever tell anyone at SNET that

16    you were bored with your job as a service

17    technician?

18    A    I don't think so.

19                    MS. ALEXANDER:  Could you mark this

20              please.

21                       (THEREUPON, DEFENDANT'S EXHIBIT NO.

22                       16, PAGES OF DAY TIMER, WAS MARKED

23                       FOR IDENTIFICATION.)

24    BY MS. ALEXANDER:

25    Q    Showing you Defendant's 16, can you take a
```

**Tab B**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD C. GORDON | : | CIVIL NO.  3:01cv1656(MRK) |
| | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| COMMISSION ON HUMAN RIGHTS | : | |
| AND OPPORTUNITIES, ET AL. | : | |
| | : | |
| *Defendants* | : | November 10, 2004 |

**DEFENDANTS' RULE 56(a)(1) STATEMENT OF FACTS**

COMES NOW the defendant  and for its Rule 5(a) (1) statement of facts states as

follows:

INTRODUCTION

1.      Richard Gordon is a black male of Jamaican origin who formerly resided

in Bloomfield, CT. (Ex. 1, Third Amended Complaint, ¶ 9; Ex. 4, CHRO Response to

EEOC Charge, p. 16, ¶ 3).

2.      Defendant Cynthia Watts Elder is a resident of the state of Connecticut

and the former Executive Director of the Commission on Human Rights and

Opportunities ("CHRO"). Ms. Watts Elder served as the permanent Executive Director

from July 1999 until August 2003. (Ex. 4, CHRO Response, p. 16, ¶ 9; Ex. 43,  Affidavit

of Donald Newton, ¶ 6).

3.      Defendant Donald Newton is a resident of the state of Connecticut and is

currently employed as the Chief of Field Operations for the CHRO. He has been

1

employed by the CHRO for over 30 years and has held his current position since the fall of 1999.  (Ex. 43, Newton Affidavit, ¶'s 2-3).

4.      Defendant Dr. Pamela Libby is currently employed by the Connecticut Department of Administrative Services ("DAS"). She is the Personnel Assessment Manager for DAS, and has held that position dating before 1999.  Pamela Libby was never served with service of process, nor did she ever authorize anyone to accept service of process on her behalf.  (Ex. 44, Affidavit of Pamela Libby, ¶'s 2-3).

5.      On June 7, 1996, Richard C. Gordon was hired as a temporary student law clerk by the Connecticut Commission on Human Rights and Opportunities ("CHRO") working 35 hours a week.  The CHRO is a state agency established pursuant to C.G.S. 46a-51, et seq. (Ex. 4, CHRO Response, pp. 9, 16 [¶ 6]; Ex. 42, Affidavit of Susie Carlson, ¶ 4).

6.      On October 18, 1996, Richard Gordon became a "durational" employee in the same classification-- law clerk.  (Ex. 4, CHRO Response, p. 9; Ex. 42, Carlson Affidavit, ¶ 4).

7.      Under state statutes, a temporary appointment is one that is established for less than six months. Because the position is for a short time period, no formal candidate list is necessary as compared to "permanent" classified positions that require a formal hiring process and candidate list.  (Ex. 3, DAS Response to EEOC Charge, pp. 11-12).

8.      A "durational" position is established for a set period of time with a certain ending date, upon which the employee's job ends, if not renewed. (Ex. 3, DAS Response, pp. 11-12).

2

9.    Richard Gordon was assigned as law clerk to the CHRO Investigative Unit at its West Central regional office in Waterbury and was supervised by Regional Manager Femi Bogle-Assegai. (Ex. 4, CHRO Response, pp. 17-18 [¶'s 16-18]; Ex. 36, Deposition of Gordon, Vol. I, pp. 32:17-33:16).

AUGUST 1996 TO JULY 2000

10.    In August 1996, Mr. Gordon returned to law school and expressed an interest in remaining as a law clerk. Accordingly, the CHRO renewed his durational status through May 1999, when he graduated from Touro Law School in New Jersey. During the school year Mr. Gordon worked part-time for the CHRO in the West Central regional office. (Ex. 4, CHRO Response, pp. 17-18 [¶'s 18-20]; Ex. 36, Gordon Depo., Vol. I, pp. 16:22-17:6).

11.    Upon graduating from law school, Gordon's supervisor recommended that he be hired as a permanent or durational Assistant Commission Counsel 1 position ("ACC-1"). At the time, the CHRO used the ACC-1 position in the regional offices interchangeably with the Human Rights Officer Representative ("HRO") position. Both positions basically investigated complaints of discrimination for the agency. (Ex. 37, Gordon Depo., Vol. III, p. 318:15-22; Ex. 47, Memo from Femi Bogle-Assegai to Cynthia Watts Elder, dated May 5, 1999; Ex. 4, CHRO Response, p. 18 [¶ 22]; Ex. 43, Newton Affidavit, ¶ 5).

12.    In May 1999, the then Deputy Director for Enforcement , Jewel Brown authorized paying the plaintiff at the rate of a full time "durational" ACC-1 position even though he was still classified as a law clerk. No change in state classification was submitted by the CHRO to the Department of Administrative Services ("DAS"). DAS

3

never approved this change in pay for the plaintiff. It is the agency (in this case the CHRO) which is responsible for administering the payroll system. (Ex. 4, CHRO Response, p. 10; Ex. 44, ¶ 7).

13.    Between 1991 and 1999, the CHRO had developed the practice of using durational positions to meet its needs. The CHRO hoped to convert durational employees into permanent positions as budget and staffing needs permitted. DAS and OPM (Office of Policy and Management) must approve the creation of additional permanent positions (Ex. 4, CHRO Response, pp. 10-11; Ex. 43, Newton Affidavit, ¶ 7).

14.    The CHRO was fortunate to be able to renew the durational status of employees beyond the period initially contemplated. (Ex. 4, CHRO Response, p. pp. 10-11).

15.    In July 1999, Cynthia Watts Elder, a black female, was permanently appointed as the Executive Director of the CHRO. (Ex. 4, CHRO Response, p. 10; Ex. 43, Newton Affidavit, ¶'s 6).

16.    Donald Newton was named Chief of Field Operations in the fall of 1999 and has held that position to this date. As Chief of Field Operations, he is responsible for supervising the Regional Managers who oversee the CHRO regional offices. (Ex. 43, Newton Affidavit, ¶ 2).

17.    By the summer of 1999, the CHRO had five durational employees, including Richard Gordon, who was the only person being paid as a durational ACC-1. The plaintiff's durational status was extended from February 10, 2000 until June 15, 2000 and from June 15 to June 30, 2000. (Ex. 4, CHRO Response, p. 10; Ex. 42, Carlson Affidavit, ¶'s 4,6).

18.     After reviewing the agency's staffing needs, Cynthia Watts Elder decided to pursue the course of continuing to fill vacancies of permanent authorized staff as they occurred from outside sources and to the extent possible, work to convert the existing durational positions into permanent ones. (Ex. 4, CHRO Response, pp. 10-11; Ex. 43, Newton Affidavit, ¶ 7).

19.     Director Watts Elder was concerned that the agency might be misusing the durational positions.  Deciding not to simply allow the durational employees to loose their jobs when their terms expired,  Watts Elder wanted to convert the durational employees into permanent positions.  In July 1999, she was misquoted in a newspaper article speaking about the hiring practices of her predecessor, but made no reference to the plaintiff.  (Ex. 4, CHRO Response, p. 11; Ex. 51, Journal Inquirer Article).

20.     During the period of December 1999 through March 2000, the CHRO was engaged in a dialogue with the Office or Policy and Management (OPM)  to obtain additional "permanent" staff positions. (Ex. 4, CHRO Response, p. 11).

21.     In late 1999 and early 2000, two permanent ACC-1 vacancies occurred, one in the West Central Region (where Gordon worked) and one in the CHRO Special Enforcement Unit.  Richard Gordon did not apply for either of these positions.  Had he applied and been hired, the job requirement for an ACC-1 requires that upon appointment to a permanent position, the employee must either be admitted to the Connecticut Bar or obtain admission to the Connecticut Bar with one year of appointment. (Ex. 4, CHRO Response, pp. 20-21 [¶'s 32-33]; Ex 42, Carlson Affidavit, ¶'s 10-11, 19; Ex. 37, Gordon Depo., Vol. II, pp. 157:21-158:4; Ex. 38, Gordon Depo., Vol. III, p. 324:7-11; Ex. 44, Libby Affidavit, ¶ 30).

22.    In November 1999, the ACC-1 position in the Special Enforcement Unit was filled by a Hispanic Male.  On March 24, 2000, a black female who was already admitted to the Connecticut Bar was hired for the ACC-1 position in the West Central region. (Ex. 42, Carlson Affidavit,  ¶'s 13 & 16).

23.    In late 1999, DAS notified CHRO that it had begun a SCOPE study of the state jobs, including the HRO and ACC-1 positions. This was an analysis of state job classifications based in part on actual job duties as mandated by both statute and Collective Bargaining Agreements. (Ex. 3, DAS Response, p. 12; Ex. 44,  Libby Affidavit, ¶ 4).

24.    According to Gordon, all ACC-1 positions were involved in the SCOPE study, not just him.  Gordon filled out a detailed job duties questionnaire, as did other CHRO employees such as Stacey Owens. (Ex. 37, Gordon Depo., Vol. II, pp. 217:20-218:8; Ex. 48, Job Duties Questionaire of Stacey Owens).

25.    The plaintiff has no evidence that anyone from the CHRO attempted to influence the outcome of the SCOPE study. (Ex. 37,  Gordon Depo., Vol. II, pp. 219:5-220:4).

26.    As part of several attempts to convert durational positions into permanent ones, on March 9, 2000 the CHRO had contacted DAS requesting to reclassify the plaintiff  from a *durational law clerk to a permanent* ACC-1 position.  This was the first time that DAS learned that former Deputy Director Brown had approved that the plaintiff be paid as a full time durational ACC-1, dating back to June 1999. (Ex. 3, DAS Response, p. 12, Ex. 4, CHRO Response, p. 10-11; Ex. 44, Libby Affidavit, ¶'s 6-7).

6

27.    In early April 2000, Cynthia Watts Elder wrote to the durational employees, including the plaintiff, informing them of CHRO's efforts to convert their durational status into permanent positions. Her letter was sent to all durational employees and did not state that a change was imminent. (Ex. 4, CHRO Response, pp. 11, 21 [¶ 40] & 44 [Ex. I].

28.    On April 27, 2000, DAS notified the CHRO that through the SCOPE study its preliminary analysis had concluded that the CHRO was misusing the ACC-1 position in its regional offices because the work performed by both the ACC-1 and HRO employees was identical. Regional offices were not using the ACC-1 job classification to perform legal work as required by the job specification. (Ex. 4, CHRO Response, pp. 12, 48 [¶ 22] & 51; Ex. 44, Libby Affidavit, ¶ 8).

29.    DAS informed CHRO at that time that the agency either had to reassigned all of the ACC-1's in its regional offices to legal duties or the ACC-1 position would be "red circled," with the practical effect being that any future requests to fill vacancies in the regional offices with the ACC-1 job classification would be rejected. (Ex. 4, CHRO Response, pp. 48 [¶ 4] and 51; Ex. 44, Libby Affidavit, ¶ 9; Ex ).

30.    The plaintiff was informed by DAS stating that the CHRO was misusing the ACC-1 classification in the regional offices. He recalls getting the document sometime around April 27, 2000. (Ex. 38, Gordon Depo., Vol. III, pp. 319:11-23, 322:1-6; Ex. 40, Gordon Depo. Vol. V, 674:13-17).

31.    Since the CHRO had established the practice of using ACC-1 employees in the regional offices as HRO investigators and could not reassign the duties of any of the regional ACC-1 positions, DAS "red circled" the position and rejected the CHRO's

attempt to reclassify the plaintiff from a durational position into a permanent ACC-1 position. DAS advised the CHRO to halt the process because any attempt to reclassify the plaintiff into an ACC-1 position would be rejected. (Ex. 4, CHRO Response, pp. 12-13 & 48 [¶4]; Ex. 43, Newton Affidavit, ¶ 8).

32.   Preferring to keep the plaintiff from losing his job, the agency was faced with the options of having the plaintiff take the test for a *permanent classified competitive* HRO position or hire the plaintiff as an HRO Trainee in a *classified permanent noncompetitive position*. Both positions paid less than the ACC-1 position, but were better than unemployment. (Ex. 3, DAS Response, p. 13).

33.   At the request of Personnel Officer Susie Carlson and as a courtesy to Mr. Gordon, Donald Newton informed the plaintiff that DAS had red circled the ACC-1 position and to avoid losing his durational position in June 2000, he should apply to take the HRO examination for a competitive permanent classified HRO representative position. (Ex. 38, Gordon Depo., Vol III, pp. 342:8-13; Ex. 43, Newton Affidavit, ¶ 9).

34.   A successful examination would have put Mr. Gordon on an approved list for HRO positions and give the plaintiff a chance to be hired into a permanent HRO position.  (Ex. 44, Libby Affidavit, ¶ 12).

35.   The first part of the written examination announcement outlined the "Minimum Qualifications Required." The second part, "Application/Examination Procedure," outlines in detail the documents and information that applicants are required to submits. The instructions specifically states: "Applicants who do not submit the required application and examination materials by the closing date will not be admitted

8

into the examination and will not have the right to appeal this decision." (Ex. 4,CHRO Response, p. 47; Ex. 44, Libby Affidavit, ¶ 13).

36.    The May 2000 HRO Representative examination  was an "Experience and Training" examination meaning that the examination materials constitute the examination itself.  A failure to submit all of the required materials an information is the equivalent  to not showing up for the examination.  (Ex. 3, DAS Response, pp. 13-15; Ex. 44, Libby Affidavit,  ¶ 13).

37.    An application for the HRO examination was NOT an application for a position. The exam material constituted an application for entrance into the examination, upon which the materials would be graded and those who passed the examination would be placed on the list from which the CHRO would hire they had positions to fill. (Ex. 3, DAS Response, p. 14; Ex. 44, Libby Affidavit,  ¶ 13).

38.    On April 28, 2000, CHRO Personnel Manager, Susie Carlson, as a courtesy to the plaintiff, faxed a copy of the necessary HRO examination application and instructions to him so he could apply for the HRO Representative examination. Ms. Carlson faxed 13 pages. (Ex. 3, DASpp. 84-86, 106-117; Ex. 43, Newton Affidavit ¶ 11; Ex. 42, Carlson Affidavit, ¶ 9 and pp. 9-17).

39.    On Monday, May 1, 2000, Carlson spoke with the plaintiff to confirm that he had received the fax of April 28, 2000. The only page the plaintiff identified as missing was a page from the March 2000 PLD-1 form. Carlson then faxed that one page to Gordon.  (Ex. 3, DAS Response, pp. 84-87, 106-117).

40.    On Tuesday May 2, 2000, at the plaintiff's request, Carlson faxed him a blank employment application form (PLD-1).  Carlson reminded the plaintiff that his

9

application had to be postmarked no later than May 3, 2000. (Ex. 3,  DAS Response, pp. 86-87, 106-117; Ex. 42, Carlson Affidavit, p. 12 [¶ 13]).

41.    The plaintiff has no evidence that defendant Newton knew whether Carlson sent the correct number of  pages, as Gordon contends. (Ex. 40, Gordon Depo., Vol. V, p. 700:1-8).

42.    The plaintiff failed to submit the necessary materials for the May 2000 examination for the HRO Representative position and his application for entrance into the examination was denied by Dr. Libby.  His application was one of  16 out of  55 submitted to be rejected for the same reason, incomplete examination materials. (Ex. 3, pp. 33 [¶ 41] & p. 75; Ex. 44, Libby Affidavit, ¶ 16).

43.    The plaintiff's durational status was set to expire in June 2000 and he knew would be out of a job. (Ex. 38, Gordon Depo., Vol. III, pp. 319:2-4, 320:19-22).

44.    Instead of just letting the plaintiff's employment end in June 2000, Cynthia Watts Elder hired the plaintiff in a lower paying, but permanent, HRO Trainee position, that provided permanent status and the opportunity to advance to higher positions. (Ex. 3, DAS Response, p. 17; Ex. 44, Libby Affidavit, ¶ 26-27).

45.    On June 6, 2000, Dr. Pam Libby, the Personnel Assessment Manager for DAS, met with the plaintiff.  Dr. Libby did not know Gordon's race, ethnic origin or color prior to that time. She explained the exam announcement, the examination requirements and the appeals process.  Dr. Libby gave the plaintiff a copy of C.G. Reg. § 5-221-a-1, which provides that the rejection of an application for an examination based on an incomplete application cannot be appealed.  (Ex. 38, Gordon Depo., Vol. III, pp. 334:14-18, 339:7-25; Ex. 44, Libby Affidavit,  ¶ 17-18).

10

46.    Dr. Libby further explained to the plaintiff that other applicants had been rejected for the same reason and to make an exception for him would be unfair to other applicants. (Ex. 44, Libby Affidavit, ¶ 's 16-18).

47.    In June 2000, the plaintiff sent a letter to Dr. Pam Libby,  dated June 9, 2004, accusing the CHRO of sending him incomplete information about the examination. (Ex. 3, DAS Response, p. 69).

48.    In addition to the stated job examination announcement, information about the examination requirements and procedures were also available at DAS offices and the DAS internet site, through a 24 hour automated DAS phone system, and at the Connecticut Department of Labor offices, and the examination announcement posted at the CHRO offices. (Ex. 3, DAS Response, p. 16; Ex. 44, Libby Affidavit, ¶ 21).

49.    On June 19, 2000, Dr. Libby responded to Mr. Gordon's letter informing him that allowing him to submit late application materials would be a violation of the application procedure that is enforced for examinations. (Ex. 3, DAS Response, p. 72; Ex. 44, Libby Affidavit, ¶ 22).

50.    Dr. Libby did not make an exception to the examination requirements for a white female as the plaintiff contends. (Ex. 44, Libby Affidavit, ¶'s 23-25).

51.    In July 2000, the plaintiff was hired by the CHRO as a permanent employee classified as an HRO Trainee.  (Ex. 42, Carlson Affidavit, p. 8 [Ex. A]).

52.    The plaintiff was not demoted.  The HRO trainee position was an actual offer to hire him in a PERMAMENT position, the only permanent position that was available to the plaintiff because he did not complete the examination for the HRO Representative position. (Ex. 44, Libby Affidavit, ¶'s  27-28).

11