# Tab C

2004 U.S. Dist. LEXIS 1072, *
Applera Corporation and Roche Molecular Systems, Inc., plaintiffs, v. MJ Research Inc. and Michael and John Finney, defendants.

3:98cv1201 (JBA)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2004 U.S. Dist. LEXIS 1072

January 28, 2004, Decided

**SUBSEQUENT HISTORY:** Motion granted by Applera Corp. v. MJ Research Inc., 220 F.R.D. 13, 2004 U.S. Dist. LEXIS 1465 (D. Conn., 2004)
Reconsideration granted by, On reconsideration by Applera Corp. v. MJ Research, Inc., 2004 U.S. Dist. LEXIS 21100 (D. Conn., Sept. 29, 2004)

**PRIOR HISTORY:** Applera Corp. v. MJ Research, Inc., 297 F. Supp. 2d 459, 2004 U.S. Dist. LEXIS 1071 (D. Conn., 2004)

**DISPOSITION:** Plaintiffs' motion to exclude defendant's evidence and arguments claiming PCR rights are tied to authorized thermal cyclers granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs filed a motion in limine to exclude evidence and argument by defendant that plaintiffs had illegally tied the rights to practice polymerase chain reaction (PCR) to the purchase of thermal cyclers sold by licensed suppliers.

**OVERVIEW:** One plaintiff had patented the PCR process in certain fields, and licensed the right to perform PCR on a thermal cycler. Plaintiff aggressively sought suppliers' participation in its supplier authorization program (SAP), and told suppliers who refused to participate that they were at risk of liability for inducing infringement of plaintiff's PCR process patent. Defendant, a manufacturer and supplier of thermal cyclers, did not participate in the SAP, and claimed that the SAP unreasonably restrained trade in violation of § 1 of the Sherman Act, 15 U.S.C.S. § 1 et seq., by unlawfully tying thermal cyclers to PCR process patent rights. The court held that, because there was no dispute that the PCR process patent covered the performance of PCR on a thermal cycler, plaintiff was entitled to license the use of thermal cyclers to perform PCR in the fields covered by its patent in order to protect its patent. The court held that, for the purpose of the tying claim, there were not two separate products because the PCR process patent right was the same as the authorization on the thermal cycler. The court also held that, even if there were two products, there was no evidence of coercion.

**OUTCOME:** The court granted plaintiffs' motion in limine.

**CORE TERMS:** thermal, cycler, patent, user, tied, tying, authorization, supplier, machine, automated, antitrust, temperature, tie, motion in limine, license, buy, patent right, heating, cooling, Local Rule, infringement, deposition, performing, licensing, unwanted, scenario, patented, customers, join, summary judgment motion

LexisNexis(R) Headnotes

*Civil Procedure > Summary Judgment > Evidence*
*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Relevance > Relevant Evidence*
[HN1] A court has an obligation to admit only "relevant evidence" that is of consequence to the determination of the action. Fed. R. Evid. 401, 402. Moreover, even relevant evidence may be excluded if it is substantially outweighed by the risk of confusion of the issues or misleading the jury. Fed. R. Evid. 403. Since evidence offered in support of non-viable legal claims is not relevant, and carries a substantial risk of misleading the jury, a motion in limine is an appropriate vehicle for obtaining an order of exclusion.

*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
[HN2] The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into a purchase of a tied product that the buyer either did not want, or might have preferred to purchase elsewhere on different terms. To prevail on a tying claim, the proponent must establish that (1) the tying and the tied products are separate and

2004 U.S. Dist. LEXIS 1072, *

distinct products; (2) the seller has forced purchasers of the tying product to also buy the tied product; and (3) the tie forecloses a substantial volume of commerce in the market for the tied product.

*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
[HN3] The test for whether two separate products are involved, with respect to a tying claim, turns not on the functional relation between them, but rather on the character of the demand for the two items.

*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
[HN4] For service and parts to be considered two distinct products in order to support a tying claim, there must be sufficient consumer demand so that it is efficient for a firm to provide one product separately from another product.

COUNSEL: [*1] For Roche Molecular Systems, Inc, PLAINTIFF: Asim Varma, David Gersch, Michael J Klyce, Jr, Arnold & Porter, Washington, DC USA. James Sicilian, Day, Berry & Howard-HTFD-CT, Hartford, CT USA. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY USA. Jennifer K Lawson, Mario R Borelli, Day, Berry & Howard, Hartford, CT USA.

For Applera Corp, PLAINTIFF: Edward R Reines, Weil, Gotshal & Manges, Redwood Shores, CA USA. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY USA. James T Shearin, Pullman & Comley, Bridgeport, CT USA.

For MJ Research, Inc, DEFENDANT: Albert L Jacobs, Jr, Greenberg Traurig, New York, NY USA. Donna Nelson Heller, Harold Bolton Finn, III, Finn Dixon & Herling, Stamford, CT USA. Joseph B Darby, III, Greenberg & Traurig, Boston, MA USA.

For MJ Research, Inc, Michael Finney, John Finney, DEFENDANTS: Gerard F Diebner, Joseph M Manak, Greenberg Traurig, New York, NY USA. C Allen Foster, Kevin E Stern, Greenberg Traurig, LLP, Washington, DC USA. Daniel A Ladow, Graham & James, New York, NY USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA. John E Beerbower, Cravath, Swaine & Moore, New York, NY USA.

For MJ Research, [*2] Inc, Counter CLAIMANT: Daniel A Ladow, Graham & James, New York, NY USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA.

For Roche Molecular Systems, Inc, Counter DEFENDANT: James T Shearin, Pullman & Comley, Bridgeport, CT USA.

JUDGES: Janet Bond Arterton, U.S.D.J.

OPINION BY: Janet Bond Arterton

OPINION:

Ruling on Motion in Limine to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 667 (2)]

Plaintiffs Applera Corp. and Roche Molecular Systems, Inc. seek to exclude defendant MJ Research Inc.'s evidence and argument that the plaintiffs have illegally tied the rights to practice PCR to the purchase of thermal cyclers sold by licensed suppliers, arguing that as a matter of law, there is no unlawful tie, and that the admission of such evidence and argument would confuse the jury. For the reasons discussed below, plaintiffs' motion [Doc. # 667 (2)] is GRANTED.

I. Background

Applera has patented the PCR process in certain fields, and licenses the right to perform PCR on a thermal cycler in its fields in two ways. First, an end user performing PCR on a thermal cycler pays a royalty when purchasing "reagents," or enzymes [*3] used in the PCR process, from Applera or from a licensee of Applera. Second, a licensing fee is paid for each thermal cycler, after which the thermal cycler is referred to as "authorized" for use in performing PCR without violating Applera's PCR process patents. Applera has both end user and supplier authorization programs for licensing "authorized" thermal cyclers. That is, an end user either may buy a thermal cycler that has already been authorized for use in PCR, because the supplier purchased a license through Applera's Supplier Authorization Program ("SAP"), or an end user may purchase an unlicensed thermal cycler and obtain the right to use the thermal cycler to perform PCR through Applera's End User Authorization Program ("EAP"). Applera aggressively seeks suppliers' participation in the SAP, and tells suppliers who refuse to participate that they are at risk of liability for inducing infringement of Applera's PCR Process Patent. As Applera states, the SAP "permits competing thermal cycler suppliers to promote performance of PCR on their machines, conduct which otherwise may induce infringement of the PCR Process Patents, and convey PCR rights to end users with their thermal [*4] cyclers." Memorandum in Support of Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 669] at 3.

2004 U.S. Dist. LEXIS 1072, *

MJ, a manufacturer and supplier of thermal cyclers, does not participate in the SAP, and claims that the SAP unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully tying thermal cyclers to PCR Process Patent rights.

II. Discussion

MJ raises both procedural and substantive objections to plaintiffs' motion. First, MJ contends that the motion in limine is procedurally inappropriate, as it is no more than a thinly veiled summary judgment motion, targeting not specific evidence but simply legal positions supporting certain claims. [HN1] The Court has an obligation, however, to admit only "relevant evidence" that is "of consequence to the determination of the action." See Fed. R. Evid. 401, 402. Moreover, even relevant evidence may be excluded if it is substantially outweighed by the risk of confusion of the issues or misleading the jury. See Fed. R. Evid. 403 [*5] . Since evidence offered in support of non-viable legal claims is not relevant, and carries a substantial risk of misleading the jury, a motion in limine is an appropriate vehicle for obtaining an order of exclusion. See, e.g. United States v. Stop & Shop Companies, Inc., 1984 U.S. Dist. LEXIS 22103, 1984 WL 3196, at *1 (D.Conn. Nov. 9, 1984) (granting motion to preclude defendants from offering evidence of economic justification at trial, because it was legally irrelevant). This Court, in fact, invited such motions as a means of narrowing the issues for trial. See May 5, 2003 Status Conference Transcript [Doc. # 679] at 29-33.

The Court recognizes that the plaintiffs previously challenged MJ's tying claim in its January 19, 2001 Motion for Summary Judgment on MJ's Antitrust and Patent Misuse Claims [Doc. # 399], which was denied by then-presiding Honorable Dominic J. Squatrito on March 28, 2002. See Memorandum of Decision and Order [Doc. # 624]. However, while Judge Squatrito found that there were disputes of material fact at issue as to some parts of the defendant's antitrust claims, his ruling did not address the particular tying claim now before the Court. n1 As a result, [*6] the Courts finds that it is appropriate to rule on the plaintiffs' motion in limine. n2

n1 At the pre-trial conference on January 22, 2004, defendant's counsel expressed a concern that the Court would not have the benefit of the parties' statements of undisputed facts under Local Rule 56(a)(1) and (2) in deciding the motion in limine, and that without these statements, the Court could not take at face value any statement in the briefing as to whether certain facts were undisputed or not. Recognizing that no further discovery on the antitrust matters has taken place since the January 19, 2001 filing for summary judgement, the Court has reviewed the Statements submitted in conjunction with the previous antitrust summary judgment motion in connection with its consideration of this motion in limine. See [Docs. # # 401 and 466].

n2 This ruling precludes MJ from arguing or presenting evidence in support of its tying claim. As MJ has correctly pointed out, the plaintiffs have not identified any particular evidence to be excluded, and this ruling, therefore, does not address the admissibility of specific evidence, recognizing that evidence may be probative of more than one claim.

[*7]

" [HN2] The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into a purchase of a tied product that the buyer either did not want, or might have preferred to purchase elsewhere on different terms." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984). To prevail on a tying claim, MJ must establish that (1) the tying and the tied products are separate and distinct products; (2) the seller has forced purchasers of the tying product to also buy the tied product; and (3) the tie forecloses a substantial volume of commerce in the market for the tied product. See id. at 11-16.

1. Separate Products

The parties agree that the tying product in this case is the PCR Process Patent right, and the tied product is an "authorized" thermal cycler. n3 Thus, MJ's claim is that the plaintiffs have tied the rights to perform PCR to the purchase of authorized thermal cyclers.

n3 See, e.g. Memorandum of MJ Research, Inc. ("MJ") in Opposition to Plaintiffs' Five Motions to Exclude Evidence and Arguments relating the MJ's Antitrust Counterclaims and Patent Misuse Defense ("MJ Opposition") [Doc. # 684] at 15 n. 17.

[*8]

[HN3] The test for whether two separate products are involved "turns not on the functional relation between them, but rather on the character of the demand for the two items." Jefferson Parish, 466 U.S. at 19. n4 The issue, then, is whether thermal cyclers that are authorized to perform PCR have a market distinct from PCR Process patent rights. See id. Phrased in these terms, the question suggests its answer. If it can be concluded that automated PCR as described in Applera's patent requires the use of a thermal cycler, then the "authorization" of the thermal cycler is the same product as the PCR patent right.

Page 3

2004 U.S. Dist. LEXIS 1072, *

n4 Applera suggests that the test for determining whether there are two separate products is one which looks "to the nature of the claimed invention as the basis for determining whether a product is a necessary comcomitant of the invention or an entirely separate product." Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 670-71 n. 14 (Fed. Cir. 1986). While this is the test for whether there are two separate products for purposes of patent misuse, the "law of antitrust violation, tailored for situations that may or may not involve a patent, looks to a consumer demand test for determining product separability." Id. at 670.

[*9]

Although MJ has never specifically agreed in its briefing to the Court that the '188 patent (U.S. Patent No. 4,965,188) covers the performance of PCR on a thermal cycler, it has stipulated that the '188 patent covers "the performance of PCR using a thermostable enzyme, in which the heating and cooling steps required by PCR . . . are automated by a machine that controls temperature levels, transitions from one temperature to another, and the timing of the temperature levels." Joint Stipulation Regarding Claim Construction of the '202, '195, and '188 Patents [Doc. # 640] at P 4. While PCR can be performed without a thermal cycler n5, "automated" PCR, as defined in the '188 patent, can only be practiced on a machine performing the heating and cooling functions. MJ has agreed that a thermal cycler is a machine that performs these functions. See Amended Report of Dr. Almarin Phillips, Oct. 17, 2000 [Doc. # 668, Ex. 2] at 9 ("Thermal cyclers are devices capable of performing the required heating and cooling")(citing Deposition of Michael Finney dated April 17, 2000, at 1069). n6 As MJ acknowledged in a September 25, 2000 submission to the U.S. Patent Office, the '188 patent "claims [*10] the PCR process automated by a thermal cycling machine." Petition to Invoke Supervisory Authority of the Commissioner [Doc. # 688, Ex. 4] at 3.

n5 See Local Rule 9(C)(2) Statement in Support of MJ's Opposition to Plaintiffs' Motion for Summary Judgment on MJ's Antitrust Claims and Patent Misuse Defense [Doc. # 466] at P 3.

N6 See also Local Rule 9(C)(2) statement [Doc. # 466] at P 8 (denying Applera's claim that the '188 patent covers the performance of PCR on a thermal cycler, or "automated PCR" only "to the extent that the phrase 'covers the performance of PCR on a thermal cycler, or 'automated PCR" includes subject matter not described by claims 9 and 32 of the '188 patent,'" or "to the extent that it implies that MJ or its customers necessarily infringe claims 9 and 32 of the '188 patent."). Claims 9 and 32 of the '188 patent both refer, in relevant part, to a process "wherein the heating and cooling steps . . . are automated by a machine which controls temperature levels, transitions from one temperature to another, and the timing of temperature levels." See [Doc. # 688, Ex. 3]. Thus, MJ does not dispute that the performance of the processes described in claims 9 and 32 of the '188 patent is done on a thermal cycler machine.

[*11]

Because there is no dispute that the '188 PCR process patent covers the performance of PCR on a thermal cycler, Applera is entitled to license the use of thermal cyclers to perform PCR in the fields covered by its patent in order to protect its patent. For the purposes of the tying claim, then, there are not two separate products, because the PCR process patent right (the tying product) is the same as the "authorization" on the thermal cycler (the "tied" product). There can be no demand for an "authorized" thermal cycler separate and distinct for the demand for a PCR process patent right. See Jefferson Parish, 466 U.S. at 19.

It should be noted, however, that if the "tied" products were thermal cyclers generally, rather than "authorized" thermal cyclers, then there would be a factual dispute as to the demand for thermal cyclers as distinct from the demand for rights to the PCR process patents. " [HN4] For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide [one product] separately from [another product]." Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 462, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992) [*12] (citing Jefferson Parish, 466 U.S. at 21-22). Thus, a trier of fact would have to assess the nature of the demand for thermal cyclers separate and apart from their use in PCR.

Neither Applera nor MJ describes the tied product as thermal cyclers generally, however. In fact, MJ's argument about the coercive and anti-competitive effect of the alleged tying scheme relies on the "authorization" aspect of the thermal cycler market. As MJ contends, the "imposition of the requirement of thermal cycler 'authorization' as a condition to obtaining a license for the PCR process alters the competitive dynamics in the thermal cycler market, giving PE a profit on each thermal cycler so authorized and a significant control over the costs of--and therefore, the prices to end users charged by--competing thermal cycler manufacturers. Every 'authorized' thermal cycler is, for all relevant antitrust purposes, a 'PE thermal cycler.'" MJ Opposition [Doc. # 684] at 17. Nonetheless, and inconsistently, MJ also argues that there are two distinct products involved because the Court has previously found thermal cyclers to be "staple goods" with "substantial noninfringing uses." See MJ [*13] Opposition [Doc. # 684] at 16 n. 20. Such an argument implies that the tied products are thermal cyclers in general, not simply thermal cyclers authorized to perform PCR. Thus, to some extent, it appears that MJ seeks to define the tied product one way for the purpose of determining whether it is separate and distinct from the tying product, but another way for the purposes of determining the other elements of its tying claim.

2. Coercion

2004 U.S. Dist. LEXIS 1072, *

Even assuming the "tied" product is in fact a thermal cycler in general, not simply an "authorized" thermal cycler, MJ's tying claim must fail, because there is no evidence that end users have been forced to purchase thermal cyclers that they "did not want at all, or might have preferred to purchase elsewhere on different terms," Jefferson Parish, 466 U.S. at 12, in order to obtain the right to the PCR process patents.

Applera argues that because it sells the rights to perform PCR in its fields on any thermal cycler directly to end users through the End User Authorization Program ("EAP"), the end user is not required to purchase an authorized thermal cycler (or any thermal cycler). Applera has presented evidence that it has "executed [*14] a total of 155 agreements under the EAP with end users of thermal cyclers sold by firms that have not joined [Applera's] Supplier Authorization Program," and that these agreements "confer authorizations for 435 thermal cyclers." Affidavit of Hannelore Fischer in Support of Plaintiffs' Motion for Summary Judgment of MJ's Antitrust Counterclaims [Doc. # 669, Ex. 1] at P 2-3. MJ, while disputing the exact number of agreements executed under the EAP, does not deny that a substantial number of EAP agreements have been reached. See Local Rule 9(C)(2) Statement [Doc. # 466] at P 21 (stating that data "presented by plaintiffs' antitrust expert, Dr. Janusz Ordover, indicates that 124 end users have executed EAP agreements with [Applera]."). Because the EAP program operates independently from the sale of thermal cyclers, and remains a viable way for end users to obtain a license to perform PCR on thermal cyclers, Applera cannot be said to coerce such persons to buy unwanted thermal cyclers.

MJ argues, however, that the EAP itself is an illegal tie, and likens this case to Int'l Salt Co. v. United States, 332 U.S. 392, 92 L. Ed. 20, 68 S. Ct. 12 (1947), in which the Supreme Court [*15] found it unlawful for International Salt to lease its patented salt dispensing machine to customers on condition that they use only International Salt's products in them. But the lease agreement in International Salt was improper because it required the purchase of a separate product (International Salt's salt) in order to obtain the right to use the patented machine. In contrast, the EAP at issue in this case is a self-contained program. It does not require end users to buy thermal cyclers. Moreover, unlike in International Salt, here it is not disputed that the use of a thermal cycler to perform PCR is patented. Thus, there is nothing improper about requiring end users to obtain authorization for this purpose.

In the alternative, MJ argues that the EAP is a sham, because Applera has pressured thermal cycler suppliers to join the Supplier Authorization Program ("SAP") by accusing them of inducing infringement of the PCR process patents. If all suppliers join the SAP, then the EAP would not be used. As Applera contends, however, even if the SAP were the only authorization program available, there would be no unlawful tie. As the parties agree, automated PCR requires the use [*16] of a thermal cycler. See Videotaped Deposition of Michael Finney, Oct. 7, 1998 [Doc. # 688, Ex. 1] at 61. Thus, any end user who wished to perform automated PCR would, by necessity, have to obtain a thermal cycler of some kind. The SAP does not restrict the choices of the end user, because it does not determine which thermal cycler machines are available on the market, nor does it require end users to purchase a particular thermal cycler machine. n7 In this scenario too, then, no end user is coerced into buying an unwanted thermal cycler.

> n7 MJ focuses on the anti-competitive effects of the "authorization" requirement. As discussed above, however, an "authorized" thermal cycler is not a separate product from the PCR patent right, and Applera is entitled to a lawful monopoly over its patent.

In the scenario in which all suppliers join the SAP, however, it may well be concluded that an end user seeking to purchase a thermal cycler would be forced to buy unwanted PCR rights. In this scenario, the thermal cycler [*17] would be the tying product and the PCR rights would be the tied product. According to the parties, between 7% and 20% of thermal cyclers are used for purposes other than PCR. See Videotaped Deposition of Michael Finney, Oct. 7, 1998 [Doc. # 559, Ex. 2] at 176 ("I would guess of the thermal cyclers that we are currently selling at this point, perhaps 20 percent are never used to perform PCR"); Letter from Joseph Smith, PE to Michael Finney, MJ, Jan. 30, 1998 [Doc. # 671, Ex. 2] at 1 (stating that "worldwide, at least 93% of thermal cyclers need authorization" and offering to discount the royalty to reflect the 7% of thermal cyclers not used for PCR). These thermal cycler purchasers, then, may be forced to pay for an authorization that they do not want or need. MJ, however, does not allege that such a result is a tie. See, e.g. MJ Opposition [Doc. # 684] at 19 n. 24 ("The imposition of the costs of licensing the PCR process rights on end users who do not need those rights may not technically be a 'tie' . . ."). The PCR Process Patents give the plaintiffs a lawful monopoly on PCR rights and thus, as a matter of law, plaintiffs cannot be found to "unlawfully restrain [*18] free competition in the market for the tied product. . . ." Coniglio v. Highwood Servs., Inc., 495 F.2d 1286, 1291 (2d Cir. 1974). n8

> n8 Moreover, the Plaintiffs state, and MJ does not dispute, that as a factual matter, they "do not require competing suppliers licensed through the SAP to convey PCR rights with each thermal cycler they sell," as suppliers may "include authorization notices only for customers who need them." See Memorandum in Support of Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 669] at 7; Letter from Joseph Smith to Michael Finney, Jan. 30, 1998 [Doc. # 669, Ex. 5] at 2.

Page 5

2004 U.S. Dist. LEXIS 1072, *

III. Conclusion

For the foregoing reasons, Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 667 (2)] is hereby GRANTED.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 28th day of January [*19] 2004.**

# Tab D

LEXSEE 2005 US DIST LEXIS 36948

GINA GIANNONE, Plaintiff, - against - DEUTSCHE BANK SECURITIES, INC., Defendant.

03 Civ. 9665 (WHP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2005 U.S. Dist. LEXIS 36948; 97 Fair Empl. Prac. Cas. (BNA) 301*

December 30, 2005, Decided

**PRIOR HISTORY:** *Giannone v. Deutsche Bank Sec., Inc., 392 F. Supp. 2d 576, 2005 U.S. Dist. LEXIS 20493 (S.D.N.Y., 2005)*

**COUNSEL:** [*1] Debra L. Raskin, Esq., Rebecca J. Osborne, Esq., Vladeck, Waldman, Elias & Engelhard, P.C., New York, NY, Attorneys for Plaintiff.

Ronald M. Green, Esq., Barry Asen, Esq., Susan Gross Sholinsky, Esq., Epstein, Becker & Green, P.C., New York, NY, Attorneys for Defendant.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION:**

MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiff Gina Giannone ("Plaintiff" or "Giannone") brings this employment discrimination action against her former employer, Deutsche Bank Securities, Inc. ("Defendant" or "Deutsche Bank"). By Memorandum and Order dated September 21, 2005, this Court granted summary judgment to Defendant dismissing all claims except Plaintiff's claim that Deutsche Bank terminated her in November 2002 because of her gender, in violation of federal, New York State and New York City discrimination laws. See *Giannone v. Deutsche Bank Securities, Inc., 392 F. Supp. 2d 576 (S.D.N.Y. 2005)*. A jury trial is scheduled to begin on February 6, 2006.

Presently before this Court are the parties' motions in limine which focus on three categories of evidence: (1) Deutsche Bank's response [*2] to Giannone's prior complaints of gender discrimination; (2) notes of Deutsche Bank's Human Resources ("H.R.") Department advisors; and (3) e-mails that Giannone contends demonstrate her cooperation with Susan Estes ("Estes"), the supervisor who terminated her. For the reasons that follow, the in limine motions are granted in part and denied in part.

I. Plaintiff's Prior Complaints of Gender Discrimination

Soon after Giannone began working for Estes in September 2002, Plaintiff complained to Lisa Walsh ("Walsh"), an advisor in Deutsche Bank's H.R. Department, that Estes was discriminating against her because Plaintiff is a woman. Thereafter, Giannone and Estes met both separately and together with Walsh and Jeannette Gorgas ("Gorgas"), an H.R. Vice President. In November 2002, Estes decided to terminate Giannone, a decision Plaintiff attributes to Estes' discriminatory animus. Plaintiff also contends that Deutsche Bank acted discriminatorily by failing to take her complaints seriously and affording Estes free rein to authorize her termination, supposedly in violation of the Bank's anti-discrimination policy. See *Stern v. Trustees of Columbia Univ. in the City of New York, 131 F.3d 305, 313 (2d Cir. 1997)* [*3] (holding that a departure from an established employee relations policy may suggest a discriminatory motive); accord *Sklaver v. Casso-Solar Corp., 2004 U.S. Dist. LEXIS 24934, No. 02 Civ. 9928 (WCC), 2004 WL 1381264, at *9 (S.D.N.Y. May 15, 2004)*.

To bolster the latter claim, Giannone seeks to introduce evidence that Deutshce Bank had responded in similar fashion to her prior complaints of gender discrimination. Specifically, in 2000, Giannone complained to Gorgas and H.R. advisor Brad Brenner that her then-supervisor, Damian Kissane, and an outside consultant were discriminating against her because she is a woman. Plaintiff posits that "it is unclear whether [H.R.] ever investigated [her] complaints" (Pl. Mem. at 3) and maintains that, after directing a reassignment and a retroactive

Case 3:00-cv-01124-WIG   Document 168-4   Filed 05/11/2007   Page 10 of 13

Page 2
2005 U.S. Dist. LEXIS 36948, *; 97 Fair Empl. Prac. Cas. (BNA) 301

salary increase, Gorgas warned her not to complain of gender discrimination. In the summer of 2002, after Deutsche Bank engaged the consultant again, Giannone revived her complaint of gender discrimination with Gorgas. Plaintiff contends that the H.R. Department ignored this renewed complaint.

In employment discrimination cases, evidence of prior, even time-barred acts of discrimination may provide relevant [*4] background to the alleged discriminatory act at issue - particularly for the purpose of establishing the defendant's discriminatory animus. See *United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977)*; accord *Vernon v. Port Auth. of N.Y. & N.J., 200 F. Supp. 2d 401, 403 (S.D.N.Y. 2002)*; *Franklin v. Consolidated Edison Co. of N.Y., Inc., 2000 U.S. Dist. LEXIS 18277, No. 98 Civ. 2286 (NRB), 2000 WL 1863767, at *1 (S.D.N.Y. Dec. 19, 2000)*; *Gilani v. NASD, 1997 U.S. Dist. LEXIS 12287, No. 96 Civ. 8070 (SS), 1997 WL 473383, at *11 (S.D.N.Y. Aug. 19, 1997)*; *Brown v. City of New York, 869 F. Supp. 158, 169 (S.D.N.Y. 1994)*. The trial court has discretion to decide whether to admit or exclude such evidence using "the ordinary evidentiary standards of probity and prejudice." *Malarkey v. Texaco, Inc., 983 F.2d 1204, 1211 (2d Cir. 1993)*; accord *Vernon, 200 F. Supp. 2d at 403*.

To establish her claim against Deutsche Bank, Giannone may demonstrate a discriminatory animus on the part of Estes or other Deutsche Bank employees who participated in the termination decision, including Gorgas and [*5] Walsh. Limited evidence that, as Plaintiff contends, the H.R. Department responded "cavalierly" to her prior complaints of discrimination (Pl. Mem. at 1) certainly has a tendency to make it more probable that the department acted in similar fashion when Giannone complained about Estes. Accordingly, Plaintiff's prior complaints and Deutsche Bank's responses are relevant as circumstantial evidence that others at the Bank allowed Estes to terminate Giannone for discriminatory reasons. See *Fed. R. Evid. 401*.

As revealed by Defendant's anticipated reliance on relatively few additional exhibits to contest Plaintiff's evidence in this regard (see Def. Mem. at 7), the specter of a diversionary mini-trial is minimal and does not outweigh the probative value of presenting such evidence to the jury. See *Fed. R. Evid. 403*. Moreover, given that Giannone only seeks to introduce evidence of her complaints and Deutsche Bank's responses for a very limited purpose, any risk of unfair prejudice to Deutsche Bank can be alleviated by a curative instruction from the Court. Plaintiff does not seek to admit - and this Court [*6] will not permit her to introduce - evidence of the circumstances about which she complained or the validity of her complaints. That door is Defendant's to open if it chooses. The parties are directed to propose an appropriate limiting instruction to the jury to the effect that Giannone's claims are limited to her termination in November 2002 and do not involve her earlier complaints of gender discrimination. Rather, Deutsche Bank's allegedly dismissive responses to those prior complaints are offered solely as the predicate for an inference that Defendant did not seriously consider Giannone's complaint about Estes.

In light of this ruling, and acknowledging that Deutsche Bank may not have comprehended the scope of the evidence that Giannone would seek to introduce, this Court grants Deutsche Bank leave to amend the Joint Pretrial Order to include Brenner as an additional witness and to include the eight additional exhibits identified in Defendant's moving papers. In so doing, this Court notes that there is ample time before trial for Giannone to cure any minimal prejudice that may inure to her as a result of such an amendment. See *Potthast v. Metro-North R.R. Co., 400 F.3d 143, 153 (2d Cir. 2005)*. [*7]

This Court will not permit Deutsche Bank to introduce the finding by the Equal Employment Opportunity Commission ("EEOC") that Plaintiff's charge of discrimination lacked probable cause or the fact that this Court previously dismissed some of Giannone's discrimination claims. Such evidence would suggest to the jury the imprimatur of a court and an administrative agency to find Plaintiff's claims meritless. See *Faigin v. Kelly, 184 F.3d 67, 80 (1st Cir. 1999)* ("A lay jury is quite likely to give special weight to judicial findings merely because they are judicial findings.") (citing *Nipper v. Snipes, 7 F.3d 415, 418 (4th Cir. 1993)*); see also *Paolitto v. John Brown E. & C., Inc., 151 F.3d 60, 65 (2d Cir. 1998)* ("We believe that the district court is in the best position to consider the quality of [an employment agency determination], its potential impact on the jury, and the likelihood that the trial will deteriorate into a protracted and unproductive struggle over how the evidence admitted at trial compared to the evidence considered by the agency.").

II. Notes Taken by Deutsche Bank's H.R. Advisors

Giannone seeks to exclude [*8] as hearsay notes taken by Brenner and Walsh that relate to Giannone's complaints of discrimination and the events that culminated in Plaintiff's termination. Deutsche Bank contends that the notes are admissible as business records under *Fed. R. Evid. 803(6)*.

An out-of-court statement is excepted from *Rule 802*'s general exclusion of hearsay if it is a record of "events . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to

Case 3:00-cv-01124-WIG   Document 168-4   Filed 05/11/2007   Page 11 of 13

Page 3
2005 U.S. Dist. LEXIS 36948, *; 97 Fair Empl. Prac. Cas. (BNA) 301

make the memorandum, report, record or data compilation." *Fed. R. Evid. 803(6)*. As with all hearsay exceptions, "the principal precondition to admissibility is that the record have sufficient indicia of trustworthiness to be considered reliable." *United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000)* (internal quotations omitted).

In support of its contention that it was the "regular practice" of Deutsche Bank's H.R. Department to make notes of meetings concerning employee relations issues, Deutsche Bank relies [*9] exclusively on the following short colloquy from Walsh's deposition:

> Q: What is your practice, if you have one, with regard to complaints or issues that are raised regarding employees as far as notes or documentation . . . ?
>
> A: Generally, my practice was to meet with the individuals involved, take notes sometimes, keep my manager informed and, obviously, involved. That was the general practice.
>
> Q: On what basis did you determine whether or not to take notes in such discussions about employee relations issues?
>
> A: I don't think any conscious decision, but for most employee relations issues I would take notes.
>
> Q: And sometimes you didn't?
>
> A: Sometimes.

(Deposition of Lisa Walsh, dated July 22, 2004, at 69-70.) Walsh's testimony that she took notes "for most employee relations issues" establishes her personal practice. However, such testimony does not establish a regular business practice of Deutsche Bank's H.R. Department.

Moreover, the business record exception is founded on the notion that such documents bear a sufficient degree of reliability "because they are created either through 'systematic checking, by regularity and continuity which produce [*10] habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.'" *In re WorldCom, Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 2215, No. 02 Civ. 3288 (DLC), 2005 WL 375313, at *7 (S.D.N.Y. Feb. 17, 2005)* (quoting *Fed. R. Evid. 803*, advisory committee's note). Deutsche Bank has not established that "the source of information or the method or circumstances of preparation" of the H.R. advisors' notes provide adequate indicia of trustworthiness. See *Fed. R. Evid. 803(6)*; *Williams, 205 F.3d at 34*. For example, there is no evidence of the use to which such notes were put, or whether they were reviewed by others in the department. Cf. Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence § 803.08[6][a]* at 803-66 (2d ed. 2005) ("Generally, records are shown to be reliable in the course of establishing the elements of the exception, by showing such factors as systematic checking, habits of precision on the part of the keeper, reliance by others on the records, or a duty to [*11] record accurately.").

Deutsche Bank concedes that it is premature to rule on the admissibility of Brenner's notes in that, because he was not deposed, the foundation for establishing his notes as business records will have to be laid at trial. Despite the Second Circuit's "'generous view' of the business records exception," *United States v. Strother, 49 F.3d 869, 874 (2d Cir. 1995)*, this Court holds that it is premature to rule on the admissibility of the notes of either H.R. advisor until Plaintiff has the opportunity to supplement Walsh's deposition with trial testimony and exhibits.

Accordingly, this Court reserves decision on whether Brenner's and Walsh's notes are admissible as business records under *Rule 803(6)*'s hearsay exception.

III. E-mails

Finally, Giannone seeks to introduce approximately fifty e-mail messages to establish that, contrary to Deutsche Bank's contention, she satisfactorily performed her duties and cooperated with Estes.

Deutsche Bank contends that it is premature to rule on the admissibility of these documents. This Court agrees. While the e-mails appear relevant to rebut one of Deutsche Bank's defenses in this action, the progression [*12] of evidence at trial may render at least some of these documents cumulative and unnecessary. See *Fed. R. Evid. 403* ("Although relevant, evidence may be excluded if its probative value is substantially outweighed . . . by considerations of . . . needless presentation of cumulative evidence.").

Accordingly, this Court reserves decision on the admissibility of Plaintiff's Exhibits 23-30, 32-41, 43, 47, 51-60, 62-67, 69, 74-75, 77, 81-83, 85, 87-90, 108 and 141-42.

CONCLUSION

For the foregoing reasons, the motions in limine are granted in part and denied in part. Specifically:

Case 3:00-cv-01124-WIG   Document 168-4   Filed 05/11/2007   Page 12 of 13

Page 4

2005 U.S. Dist. LEXIS 36948, *; 97 Fair Empl. Prac. Cas. (BNA) 301

1. Giannone may introduce evidence of her prior complaints to Deutsche Bank's H.R. Department and the Bank's responses. The parties are directed to submit a proposed limiting instruction by January 30, 2006.

2. Deutsche Bank's application to amend the Joint Pretrial Order is granted.

3. Deutsche Bank may not introduce evidence of the EEOC's determination or this Court's prior Memorandum and Order.

4. The admissibility of notes taken by Brenner and Walsh is reversed for trial.

5. The admissibility of e-mails purportedly demonstrating Giannone's [*13] cooperation with Estes is reserved for trial.

The parties shall file an amended joint pretrial order, if necessary, by January 20, 2006.

December 30, 2005

New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed by first-class mail, postage prepaid to all counsel and *pro se* parties of record on this 10th day of May, 2007, as follows: Karen Torre, Esquire, Law Offices of Karen Lee Torre, 51 Elm Street, Suite 307, New Haven, Connecticut 06510.

_____
Lori B. Alexander
Federal Bar No. CT08970