# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DENISE EVARTS, | : | CIVIL ACTION NO. |
| | : | 3:00CV1124 (WIG) |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| THE SOUTHERN NEW ENGLAND | : | |
| TELEPHONE COMPANY, | : | |
| | : | |
| *Defendant.* | : | MAY 10, 2007 |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE RE IANNIELO TESTIMONY OR TO BIFURCATE TRIAL

As a result of this Court's Ruling on Defendant's Motion for Summary Judgment ("Ruling"), the issue remaining in this matter is whether plaintiff Denise Evarts was subjected to a hostile work environment based upon her gender. In order to prevail, plaintiff must establish that her *work environment* was objectively *and* subjectively hostile. SNET therefore moves in limine to preclude the reference to or introduction into evidence of testimony from former SNET employee David Iannielo concerning Matt Cordner's alleged comments regarding women working at SNET. Because Ms. Evarts did not even know about Mr. Cordner's purported comments until years after leaving SNET, these comments cannot support a claim that her work environment was hostile. Further, in light of the facts that the record evidence contains no other evidence suggesting that Mr. Cordner made any gender-related comments, and plaintiff's claims are focused solely on Mr. Cordner's alleged conduct, any probative value of this testimony wholly is outweighed by the danger of unfair prejudice to SNET.[1] Because testimony regarding these alleged comments cannot support Ms. Evarts's hostile environment claim, this Court

---

[1] As this Court suggested in its Ruling, Iannielo's testimony is also suspect. Ruling at 29 & n.20. [REDACTED UNDER SEAL]

should exclude such testimony because it is irrelevant, likely to confuse the jury, and its probative value, if any, is wholly outweighed by the danger of unfair and irreparable prejudice to SNET.

Alternatively, in the event that this Court should decline to exclude this testimony, SNET respectfully moves that the Court bifurcate the trial in this matter and allow this testimony to be presented to the jury only if and when the jury is asked to decide whether any "hostility" experienced by plaintiff was "because of her gender."[2]  Specifically, in the event that the Court denies this motion in limine, SNET requests that the Court bifurcate this matter into two phases: during the first phase, the parties would present evidence relating to plaintiff's claim that her environment was objectively and subjectively hostile.  Iannielo's testimony has no connection to this issue and would not be allowed during this phase.  In the event that plaintiff satisfies her burden to establish such a legally "hostile" environment, during the second phase the parties would present evidence as to whether plaintiff's work environment was "hostile" because of gender and whether SNET is liable to plaintiff for this environment.

By bifurcating the trial in this way, the Court would reduce, to some extent, the prejudice to SNET by not having the jury consider the Iannielo testimony when deciding whether the conduct plaintiff claims she experienced rose to the level of a hostile work environment.  She simply did not experience the remarks Mr. Cordner is alleged to have made, and thus Iannielo's testimony about them should not be introduced at this phase.  Although SNET urges this Court to exclude this testimony altogether, bifurcation in this matter should at least assist in reducing the unfair prejudice to SNET that would result if the jury were to consider testimony regarding Mr.

---

[2]  This is the second part of the analysis as to whether plaintiff was subjected to a legally cognizable hostile work environment because of her gender.

Cordner's alleged comments regarding women when it decides whether plaintiff experienced a subjectively and objectively hostile work environment. As detailed more fully below, because these alleged comments undisputedly were not made in plaintiff's presence, nor did plaintiff know about these comments, Iannielo's testimony has no bearing whatsoever on the issue of whether plaintiff was subjected to a hostile work environment.

## I.    LEGAL STANDARD

The Second Circuit will review this Court's exclusion of evidence for abuse of discretion. See, e.g., Chavez v. Metropolitan Dist. Commission, 198 Fed. Appx. 74, 2006 U.S. App. LEXIS 24062, *75 (2d Cir. Sept. 18, 2006) (Attached at Tab A). This Court is obliged "to admit only relevant evidence that is of consequence to the determination of the action." Applera Corp. v. MJ Research, Inc., 3:98cv1201 (JBA), 2004 U.S. Dist. LEXIS 1072, *4 (D. Conn. Jan. 28, 2004) (citing Fed. R. Evid. 401, 402) (Attached at Tab B). Because evidence offered in support of non-viable legal claims is not relevant and also carries a substantial risk of misleading the jury, a motion in limine is the appropriate vehicle for a party seeking an order of exclusion. Applera Corp., 2004 U.S. Dist. LEXIS 1072, *5. This Court should enter an order precluding the offer or introduction into evidence of testimony from Iannielo concerning Matt Cordner's alleged comments regarding women working at SNET ("Iannielo's Testimony") because this testimony is irrelevant, and its introduction would serve only to confuse the jury and to unfairly prejudice SNET.

## II.    THIS COURT SHOULD EXCLUDE IANNIELO'S TESTIMONY BECAUSE IT IS NOT RELEVANT TO ANY ISSUE TO BE TRIED AND WOULD SERVE ONLY TO CONFUSE THE JURY AND UNFAIRLY PREJUDICE SNET.

Plaintiff purports to support her claims against SNET with the testimony of former SNET employee David Iannielo regarding comments that Matt Cordner allegedly made about women working at SNET. During his deposition, Iannielo testified that Mr. Cordner stated to Iannielo

"something to the effect . . . women do not belong working like out in the field, they should be in an office . . ." Mr. Cordner never made such statements. Iannielo, moreover, could not specifically recall anyone else being in the area when Mr. Cordner purportedly made these comments. See Iannielo Dep. Day I at 86-89, 107-109. (Attached at Tab C). Even if Mr. Cordner had made these comments -- which he did not -- plaintiff undisputedly did not hear them or even learn about them until well *after* she commenced this litigation. In addition, even if plaintiff had heard them, these purported statements are benign when viewed against the other comments and conduct that the Second Circuit and other courts have found insufficient to constitute a hostile work environment.[3] Iannielo's testimony regarding these comments therefore cannot support plaintiff's hostile work environment claim and it should not be presented to the jury.

    **A.**    **This Court should bar testimony regarding Mr. Cordner's alleged comments about women working at SNET, because these comments undisputedly were not part of Denise Evarts's work environment.**

To prevail on a disparate treatment claim, a Title VII "plaintiff is required to prove that the defendant had a discriminatory intent or motive." Nweze v. N.Y. City Transit Auth., 115 Fed. Appx. 484, 485 (2d Cir. 2004), citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986 (1988) (Attached at Tab D). Plaintiff's disparate treatment claim was dismissed on summary judgment and the only remaining claim of discrimination is a claim of hostile work environment based on gender.

By contrast to a disparate treatment claim, on a Title VII hostile work environment claim, a plaintiff's burden focuses on the result of any discrimination on her workplace. As this Court recently recognized in its Ruling: "[t]he plaintiff must show that the workplace was so severely

---

[3] See, e.g., cases cited in Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment at 37-39.

permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Ruling at 24 (citing cases; internal quotation marks omitted). Critically here, "[p]roving such a claim involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, *and the victim must also subjectively perceive that environment to be abusive*." Id. at 25 (internal citations and quotation marks omitted; emphasis added).

In light of the focus in hostile work environment actions on an employee's workplace, "[w]here a 'hostile environment' claim rests on gender-or race-based comments . . . the plaintiff, to show that he or she perceived the 'environment' as 'hostile,' must at least have been aware of those comments, even if the person making them did not make them directly to the plaintiff." Bradshaw v. Golden Rd. Motor Inn, 885 F. Supp. 1370, 1381 (D. Nev. 1995). Applying this reasoning, in Bradshaw the court held that plaintiff's supervisor's vulgar statements regarding plaintiff could <u>not</u> support her hostile work environment claim because her supervisor referred to plaintiff in sexually vulgar terms only when he was with other supervisors, he did not make these vulgar references to plaintiff directly or when she was in earshot, and he did not make these vulgar comments more generally around the organization. Id. at 1380-81. Similarly, in Williams v. Herman Goelitz Candy Co., NO. CIV. S-94-1226 -WBS PAN, 1995 U.S. Dist. LEXIS 22198 (E.D. Cal. Nov. 17, 1995), *citing* Bradshaw, the court held that because plaintiff was not present when alleged sexual comments were made about her, and she was not aware of the comments, testimony from a co-worker regarding these alleged sexually offensive statements could not support a hostile environment claim. Id. at 22 n.11. (Attached at Tab E). The court similarly found that testimony regarding an alleged picture of a "nude lady" could not support plaintiff's

hostile work environment claim because there was no evidence that plaintiff was aware of the drawing. Id. at 23 & n.4.

Other courts also logically have ruled that even the most egregious comments or behavior can not support a hostile work environment claim when the plaintiff did not know about the comments or behavior. See, e.g., Cottrill v. MFA Inc., 443 F.3d 629, 636-39 (8th Cir. 2006) (where plaintiff's supervisor undisputedly drilled a hole in rest room in order to spy on plaintiff and also contaminated toilet seat and toilet paper holder, causing plaintiff to suffer rashes and burning, plaintiff could "not rely on the peeping to establish that her work environment was hostile" because she "did not subjectively perceive the peeping"; although the court found supervisor's conduct "reprehensible," it nonetheless affirmed summary judgment in favor of defendant on plaintiff's hostile environment claim); Turner v. Honeywell, 54 Fed. Appx. 236, 239 (7th Cir. Dec. 20, 2002) (affirming summary judgment in favor of defendant on racial harassment claim, because alleged racial slurs in the workplace that plaintiff did not hear could not support plaintiff's harassment claim) (attached at Tab F); Ngeunjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467-68 (7th Cir. 1998) (affirming summary judgment in favor of defendant on plaintiff's hostile environment claim where alleged comments regarding "the yellow race" and Buddhists "were offensive but they were also isolated and, in some circumstances, not directed at [plaintiff]"; court described comments as "unenlightened" but noted that they were made outside of plaintiff's presence) (alteration added).[4]

Plaintiff's action now centers upon whether her work environment was "hostile." Even if

_____

[4] While the Court in Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997), concluded that racially derogatory comments that plaintiff learned about second-hand could impact his work environment, unlike here, plaintiff in Schwapp learned of the comments *while he still worked for defendant*. Id. at 108-109. Plaintiff in this instance can not similarly claim that purported comments that she learned about for the first time years *after* leaving SNET actually caused her to experience a hostile work environment *while* she worked at SNET.

Mr. Cordner had made the comments Iannielo alleges, i.e., that women should not work in the field, plaintiff did not hear these comments, and she did not know about them until well after leaving SNET and commencing this litigation. That Mr. Cordner made any such comments can not support plaintiff's hostile work environment claim.

> **B.    Even if Mr. Cordner made the comments Iannielo claims regarding women working at SNET, these comments constitute nothing more than the type of offhand comments that are insufficient to support a hostile work environment claim.**

Courts, including the United States Supreme Court, have held time and again that "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment," sufficient to create a hostile environment under Title VII. See Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (internal quotation marks omitted).

For example, in Crawford v. Medina General Hosp., 96 F.3d 830 (6th Cir. 1996), plaintiff claimed that she suffered a hostile work environment based upon her age. Like here, plaintiff relied upon alleged conduct that may have suggested hostility in the workplace, but she offered no evidence to suggest that the hostility related to her age. Rather, "the evidence suggest[ed] that the atmosphere stemmed from a simple clash of personalities." Id. at 836 (alteration added). Therefore, even though the record in fact included a few age-based comments, the district court granted defendant's motion for summary judgment. Affirming the district court's ruling, the Sixth Circuit held:

> [Plaintiff's] complaints are of 'mere offensive utterance [s],' as opposed to physically threatening or humiliating conduct. Saying '[o]ld people should be seen and not heard' is certainly rude, but it is not enough to create a hostile working environment within the meaning of [Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)]. Similarly, while a supervisor's opinion that women should retire at age 55 may be unenlightened and logically indefensible, and might

> be circumstantial evidence of age discrimination if the supervisor
> were later to have fired [plaintiff], it hardly rises even to the level
> of an 'offensive utterance,' as it is simply one person's opinion,
> susceptible to retort and dispute.

Id. at 836 (alterations added).  Even if Iannielo's Testimony were true, the comments Iannielo claims Mr. Cordner made are not probative of any issue in this case because, as a matter of law, they are, at worst, the same sort of "offensive utterances" that courts have time and again found insufficient to support a hostile work environment claim.

In a very recent case with analogous facts, the District of Utah granted summary judgment to defendant on plaintiff's hostile environment claim, notwithstanding plaintiff's claim that she had heard from others that her supervisor commented that "women don't belong working here" or that "men do a better job than women."  Important to the court's decision in favor of defendant, as here, there was no claim that the supervisor made these comments to plaintiff. Benally v. Kennecott Utah Copper Corp., No. 2:06 CV 00509, 2007 U.S. Dist. LEXIS 26631, *2, 8-9 (D. Utah April 9, 2007). (Attached at Tab G).  Like Ms. Evarts, in Benally, plaintiff was the only female working for this supervisor; in addition to the comments, she based her claim on allegations that her supervisor "left her to work alone often," "was verbally rude to her in evaluations," excluded plaintiff from safety training meetings, and made an "insensitive comment regarding her deceased mother." Id. at *1-4.  She claimed too that she was denied a request to participate in a voluntary lay-off based upon her gender. Id. at *3.  The Benally court concluded that the alleged facts together could not establish a "legally cognizable hostile environment."  Particularly relevant here, the court further ruled that "*even if admissible*," the alleged statements regarding women "alone [were] insufficient to show that [the supervisor's] conduct was motivated by gender animus." Id. at *8-10 (alterations added; emphasis added).

Even if Iannielo's testimony concerning Mr. Cordner's comments regarding women working at SNET were to be believed, and even if plaintiff had heard one of these comments before she left SNET – which she did not – such offhand comments would be insufficiently offensive to a reasonable person. Because these alleged comments are at the most "offensive utterances" that could not support a finding that plaintiff experienced a hostile work environment, there is little probative value in placing such evidence before the jury.

### C.   Any probative value of Iannielo's Testimony is wholly outweighed by prejudice to SNET and confusion of the issues.

Other than the isolated comments alleged by Iannielo, who also made a complaint that Mr. Cordner discriminated against him, the record in this matter is devoid of any evidence suggesting that Mr. Cordner made any gender-related comments. Given that the jury will be presented with no other evidence of gender-specific conduct or statements by Mr. Cordner, introduction of the Iannielo Testimony poses an even greater risk that SNET will be irreparably and unfairly prejudiced by this testimony. This utter lack of any similar evidence not only discredits the veracity of the Iannielo Testimony in the first instance, but for the purposes of this motion, it provides this Court additional basis to exclude this testimony.

Other courts have not hesitated to find that similar evidence should be excluded. For example, in Schrand v. Federal Pacific Electric Co., 851 F.2d 152 (6th Cir. 1988), plaintiff sued defendant for age discrimination. The jury returned a verdict for plaintiff and defendant appealed. Id. at 153. On appeal, among other challenges, defendant argued that the district court erred in allowing two former employees to testify that they were advised by defendant that they were being terminated because they were too old. The Sixth Circuit agreed. Id. at 155. In addition to being irrelevant, the Schrand court held that this testimony should have been excluded under Fed. R. Evid. 403: "With no other direct evidence of age discrimination in the

case, the impact of the two former employees' testimony would be great" and therefore, "even if that evidence were relevant . . . its probative value was substantially outweighed by the danger of unfair prejudice flowing from its admission." <u>Id.</u> at 156.  The court in <u>Schrand</u> concluded also that the evidence would confuse the jury by focusing the jury on "two totally unrelated events." <u>Id.</u>  Similarly, if Iannielo's testimony is allowed before the jury, jury confusion and unfair prejudice to SNET will result because it will undoubtedly consider such testimony in determining whether a plaintiff was subjected to hostile work environment.   In this case, confusion of the issues will only assist plaintiff, while irreparably prejudicing SNET.

Guided by <u>Schrand</u> and other authority involving similar situations in which a plaintiff presented no other direct evidence of discrimination but sought to rely upon irrelevant but facially prejudicial comments, this Court should exclude Iannielo's Testimony. <u>See, e.g.</u>, <u>Mitroff v. Xomox Corp.</u>, 797 F.2d 271, 277 (6th Cir. 1986) (ordering new trial and holding district court abused its discretion in admitting testimony regarding alleged statements by personnel manager, Sixth Circuit explained basis for its ruling: "[i]n close cases the improper admission of prejudicial evidence is all the more damaging, and here it would appear that arguably the [ ] testimony [regarding personnel manager's alleged comments that age discrimination existed in defendant organization] was the strongest evidence in plaintiff's favor at trial."); <u>Benally</u>, 2007 U.S. Dist. LEXIS 26631, at *10 (suggesting that evidence regarding supervisor's alleged statements that "women don't belong working here" or that "men do a better job than women" might not be admissible, court ruled that "[e]ven if those statements were admissible, alone, they [were] insufficient to show that [supervisor's] conduct was motivated by gender animus.") (alternations added); <u>accord</u> <u>Chappell v. GTE Products Corp.</u>, 803 F.2d 261, 268 n.2 (6th Cir. 1986) (in age discrimination case, court affirmed district court's exclusion of purported age-

biased comments made out of court by defendant's agents where "comments [were] too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.").

In light of the facts that: (1) Iannielo's Testimony relates to comments that plaintiff did not know about until after she left SNET; (2) these alleged offhand comments would not support a hostile work environment claim even if plaintiff had heard or known about them; and (3) Iannielo's testimony regarding these alleged comments is the only evidence in the record suggesting any gender-related conduct or comments by Mr. Cordner, this Court should exclude the Iannielo Testimony because it lacks any probative value and it will only confuse the jury and unfairly prejudice SNET.

**III.    ALTERNATIVELY, IF THE COURT ALLOWS IANNIELO'S TESTIMONY, IT SHOULD BIFURCATE THIS MATTER INTO TWO PHASES AND ALLOW THIS EVIDENCE TO BE INTRODUCED ONLY IF PLAINTIFF ESTABLISHES AN OBJECTIVELY AND SUBJECTIVELY HOSTILE ENVIRONMENT.**

Federal R. Civ. P. 42 permits this Court to bifurcate a trial in order to avoid prejudice to a party. Ms. Evarts undisputedly did not hear any of the comments that Iannielo alleges he heard from Mr. Cordner regarding women working at SNET, and she in fact did not even know that Iannielo claims to have heard such comments until *after* discovery began in this litigation. Iannielo's Testimony regarding these statements is therefore patently irrelevant to the question of whether Ms. Evarts experienced an objectively or subjectively hostile environment. As detailed above, under the circumstances presented, SNET maintains that allowing the jury to consider Iannielo's Testimony unfairly will prejudice SNET. At a minimum, however, SNET requests that this Court bifurcate the trial so as to ensure that the jury does not consider this evidence when determining whether Ms. Evarts experienced a hostile work environment.

In the event that the Court should decline to bar Iannielo's Testimony, SNET respectfully requests that it bifurcate this matter so that Iannielo's Testimony is not  presented to the jury

until after it has determined whether plaintiff has established that she experienced an objectively and subjectively hostile work environment. In the event that plaintiff satisfies her burden of establishing an objectively and subjectively hostile work environment, SNET proposes that during the second phase of trial, the parties would present evidence as to whether this "hostility" was "because of her gender" and whether SNET is liable for this hostile environment.

Other courts and academics recognize the value of bifurcating hostile work environment claims where a plaintiff seeks to introduce evidence that is highly prejudicial and which is relevant to only certain issues in a case. For example, in Evans v. Port Authority, No. 02-Civ. 3482, 2005 U.S. Dist. LEXIS 19796 (S.D.N.Y. Sept. 13, 2005), after partial summary judgment, the only claim that remained for trial was plaintiff's claims that he was retaliated against and subjected to a hostile work environment. Id. at *1. (Attached at Tab H). Defendant moved to preclude plaintiff from offering evidence regarding defendant's "custom and practice" of creating a hostile work environment by retaliating against African-Americans. The court agreed that this evidence was relevant to only certain issues and highly prejudicial to defendant; therefore, in response to defendant's motion in limine, the court bifurcated the trial to separate the trial of the retaliation and hostile work environment claims from the "circumstantial Monell issue." Id. at *4. Because "plaintiff's retaliation claims [were] weak," and the "Monell issue" might therefore "prove to be entirely academic," the Evans court ruled that bifurcation was appropriate in order to prevent "undue prejudice that should be avoided, at least unless it is necessary to decide the case."[5]  Id.; see also Jennifer D. McCollum, "Employers' Greatest Enemy: Second-Hand Evidence in Hostile Work Environment Claims," 59 SMU L. Rev. 1869,

---

[5] Plaintiff in Evans moved for reconsideration of the court's ruling; adhering to its initial ruling without prejudice to plaintiff filing a more detailed offer of proof, the court noted that "[i]ntroduction of evidence of alleged retaliation against other employees entail[ed] very substantial risks of most of the adverse effects enumerated in [Rule 403]." Id. at *7.

1884 (Fall 2006) (recommending bifurcation of hostile work environment cases as "simplest way to avoid unfair prejudice to the defendant, confusion of the issues, and waste of time that results when evidence about [ ] peripheral [second-hand] issues is introduced at trial"; during first phase, "evidence should be presented about only those issues that involved the plaintiff directly.").

SNET respectfully emphasizes that it urges this Court to bar Iannielo's Testimony altogether. If this Court declines to do so, however, SNET submits that by bifurcating the trial in this matter, the Court will at least decrease the chance that this testimony will infect the preliminary inquiry – i.e., whether Ms. Evarts did in fact work in an objectively and subjectively hostile environment.

IV.    **CONCLUSION**

For the reasons set forth above, SNET respectfully moves that this Court enter an order precluding the offer and introduction of testimony from Iannielo concerning Matt Cordner's alleged comments regarding women working at SNET. Alternatively, SNET moves that this Court bifurcate the trial so that this testimony is not presented to the jury until after it has determined that plaintiff has established she experienced an objectively and subjectively hostile work environment.

Dated at North Haven, Connecticut this 10th day of May, 2007.

                    THE DEFENDANT,
                    THE SOUTHERN NEW ENGLAND TELEPHONE
                    COMPANY


                    By _____
                          Lori B. Alexander
                          Federal Bar No. CT08970
                          Theresa M. Waugh
                          Federal Bar No. CT23559
                          LITTLER MENDELSON, P.C.
                          110 Washington Avenue
                          North Haven, Connecticut 06473
                          Tel. (203) 234-6344
                          Fax (203) 234-6345
                          E-Mail: lalexander@littler.com
                          E-Mail: twaugh@littler.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed by first-class mail, postage prepaid to all counsel and *pro se* parties of record on this 10th day of May, 2007, as follows: Karen Torre, Esquire, Law Offices of Karen Lee Torre, 51 Elm Street, Suite 307, New Haven, Connecticut 06510.

Lori B. Alexander
Federal Bar No. CT08970

# Tab A

198 Fed. Appx. 74, *; 2006 U.S. App. LEXIS 24062, **

**DAISY CHAVEZ, Plaintiff-Appellant, - v - METROPOLITAN DISTRICT COMMISSION,
Defendant-Appellee.**

No. 05-3513-cv

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**198 Fed. Appx. 74; 2006 U.S. App. LEXIS 24062**

**September 18, 2006, Decided**

**NOTICE:** [**1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED
OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Connecticut (Kravitz, J.). Chavez v. Metro. Dist.
Comm'n, 2005 U.S. Dist. LEXIS 17273 (D. Conn., Aug. 9, 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant employee sought review of a judgment from the United States District Court for the District
of Connecticut, which granted a motion in limine brought by appellee employer and entered judgment in the employer's favor
following a jury verdict on the employee's discrimination claims.

**OVERVIEW:** The district court excluded a report prepared by a law firm that the employer had hired to conduct a compliance audit
of its employment practices. The district court reasoned that the report was inadmissible hearsay, was irrelevant, and was overly
prejudicial. On appeal, the court agreed. The employee also challenged the judgment, contending that the jury verdict, which found
that the employee had been subjected to a hostile work environment but that neither her race, gender, nor national origin was a
motivating factor, was inconsistent. The court held that the employee waived this argument by not raising it before the district court.
Further, the argument was without merit. The jury found on question one that the employee had been subjected to a hostile work
environment but then found on question three that this hostility was not due to the employee's race, gender, and/or national origin.
This seeming inconsistency could be resolved through an examination of the evidentiary record, the jury charge, and the verdict sheet,
all of which suggested that the jury found that the work environment was harsh but that the hostility was due to something other than a
protected characteristic.

**OUTCOME:** The court affirmed the district court's judgment.

**CORE TERMS:** gender, inconsistency, national origin, jury verdict, hostile work environment, hostile, seeming, work environment,
jury charge, subjected, hostility, harsh

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
*Evidence > Procedural Considerations > Rulings on Evidence*
[HN1] A circuit court reviews for abuse of discretion a district court's exclusion of evidence.

*Civil Procedure > Trials > Jury Trials > Verdicts > Inconsistent Verdicts*
[HN2] When confronted with a potentially inconsistent jury verdict, a court must adopt a view of the case, if there is one, that resolves
any seeming inconsistency by exegesis if necessary. In looking for consistency, courts bear in mind that the jury was entitled to
believe some parts and disbelieve other parts of the testimony of any given witness.

**COUNSEL:** For Plaintiff-Appellant: FRANCIS A. MINITER, Miniter & Associates, Hartford, CT.

For Defendant-Appellee: DAVID A. RYAN, JR., Ryan & Ryan, LLC, New Haven, CT.

**JUDGES:** Present: HON. ROGER J. MINER, HON. JOSEPH M. McLAUGHLIN, HON. ROBERT A. KATZMANN, Circuit
Judges.

198 Fed. Appx. 74, *; 2006 U.S. App. LEXIS 24062, **

OPINION:

[*75] SUMMARY ORDER

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is AFFIRMED.

Plaintiff-appellant Daisy Chavez appeals from (i) the pre-trial ruling of the United States District Court for the District of Connecticut (Kravitz, J.) granting a motion in limine brought by defendant-appellee Metropolitan District Commission ("MDC") and (ii) the judgment of the district court entered on June 7, 2005 following a jury verdict in the MDC's favor on her employment discrimination claims. We assume the parties' familiarity with the facts and procedural background of this [**2] action.

[HN1] We review for abuse of discretion a district court's exclusion of evidence. See, e.g., Provost v. City of Newburgh, 262 F.3d 146, 163 (2d Cir. 2001). Here, the district court excluded the document in question - a report prepared by the law firm of Levy & Droney, P.C., which the MDC had hired to conduct a compliance audit of its employment practices - on grounds that the report was inadmissible hearsay, was irrelevant, and that the prejudice associated with admitting the report far outweighed its probative value. We agree with this determination, substantially for the reasons stated by the district court in its written order.

We next turn to Chavez's challenge to the judgment in the MDC's favor. That challenge rests on her contention that the jury verdict - which found that Chavez had been subjected to a hostile work environment but that neither her race, gender, nor national origin was a substantial or motivating factor in the MDC's conduct - was internally inconsistent. This argument fails for two reasons.

First, Chavez did not raise this argument before the district court. She has therefore waived it. See, e.g., Lavoie v. [*76] Pacific Press & Shear Co., 975 F.2d 48, 55-56 (2d Cir. 1992). [**3]

Second, even if we were to reach this argument on the merits, it would fail. [HN2] "When confronted with a potentially inconsistent jury verdict, the court must adopt a view of the case, if there is one, that resolves any seeming inconsistency . . . by exegesis if necessary." Turley v. Police Dep't of the City of New York, 167 F.3d 757, 760 (2d Cir. 1999) (internal quotation marks and citations omitted). In looking for consistency, "we bear in mind that the jury was entitled to believe some parts and disbelieve other parts of the testimony of any given witness." Tolbert v. Queens College, 242 F.3d 58, 74 (2d Cir. 2001).

Here, there was indeed an inconsistency in the jury verdict, insofar as the jury found on question one of the verdict form that Chavez had been subjected to a hostile work environment (which the district court had defined, at one point early in its charge, as an environment that "was permeated with *discriminatory harassment on the basis of race, gender, and/or national origin* that was sufficiently severe or persuasive to alter the conditions of [the] work environment") (emphasis added), but then found on question three that this [**4] hostility was not due to Chavez's race, gender, and/or national origin. This seeming inconsistency, however, can readily be resolved through an examination of the evidentiary record, the jury charge as a whole, and the verdict sheet, all of which suggest that the jury found that the MDC work environment was "hostile" (insofar as "hostile" means "harsh" or "abusive"), but that this hostility was not due to Chavez's race, gender, or national origin. This interpretation is particularly supported by the subsequent portion of the jury charge in which the judge specifically instructed that "a workplace environment that is equally harsh for all races, genders, and national origins does not constitute an unlawful hostile environment under Title VII." Because we are able to resolve this inconsistency, we reject Chavez's claim that a new trial on her hostile work environment claim is warranted.

We have considered all of Chavez's remaining arguments and find them to be without merit. The decision of the district court is therefore AFFIRMED.

**Tab B**

2004 U.S. Dist. LEXIS 1072, *

**Applera Corporation and Roche Molecular Systems, Inc., plaintiffs, v. MJ Research Inc. and Michael and John Finney, defendants.**

**3:98cv1201 (JBA)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

**2004 U.S. Dist. LEXIS 1072**

**January 28, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion granted by <u>Applera Corp. v. MJ Research Inc., 220 F.R.D. 13, 2004 U.S. Dist. LEXIS 1465 (D. Conn., 2004)</u>
Reconsideration granted by, On reconsideration by <u>Applera Corp. v. MJ Research, Inc., 2004 U.S. Dist. LEXIS 21100 (D. Conn., Sept. 29, 2004)</u>

**PRIOR HISTORY:** <u>Applera Corp. v. MJ Research, Inc., 297 F. Supp. 2d 459, 2004 U.S. Dist. LEXIS 1071 (D. Conn., 2004)</u>

**DISPOSITION:** Plaintiffs' motion to exclude defendant's evidence and arguments claiming PCR rights are tied to authorized thermal cyclers granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs filed a motion in limine to exclude evidence and argument by defendant that plaintiffs had illegally tied the rights to practice polymerase chain reaction (PCR) to the purchase of thermal cyclers sold by licensed suppliers.

**OVERVIEW:** One plaintiff had patented the PCR process in certain fields, and licensed the right to perform PCR on a thermal cycler. Plaintiff aggressively sought suppliers' participation in its supplier authorization program (SAP), and told suppliers who refused to participate that they were at risk of liability for inducing infringement of plaintiff's PCR process patent. Defendant, a manufacturer and supplier of thermal cyclers, did not participate in the SAP, and claimed that the SAP unreasonably restrained trade in violation of § 1 of the Sherman Act, <u>15 U.S.C.S. § 1</u> et seq., by unlawfully tying thermal cyclers to PCR process patent rights. The court held that, because there was no dispute that the PCR process patent covered the performance of PCR on a thermal cycler, plaintiff was entitled to license the use of thermal cyclers to perform PCR in the fields covered by its patent in order to protect its patent. The court held that, for the purpose of the tying claim, there were not two separate products because the PCR process patent right was the same as the authorization on the thermal cycler. The court also held that, even if there were two products, there was no evidence of coercion.

**OUTCOME:** The court granted plaintiffs' motion in limine.

**CORE TERMS:** thermal, cycler, patent, user, tied, tying, authorization, supplier, machine, automated, antitrust, temperature, tie, motion in limine, license, buy, patent right, heating, cooling, Local Rule, infringement, deposition, performing, licensing, unwanted, scenario, patented, customers, join, summary judgment motion

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Evidence*
*Evidence > Relevance > Confusion, Prejudice & Waste of Time*
*Evidence > Relevance > Relevant Evidence*
[HN1] A court has an obligation to admit only "relevant evidence" that is of consequence to the determination of the action. Fed. R. Evid. 401, 402. Moreover, even relevant evidence may be excluded if it is substantially outweighed by the risk of confusion of the issues or misleading the jury. Fed. R. Evid. 403. Since evidence offered in support of non-viable legal claims is not relevant, and carries a substantial risk of misleading the jury, a motion in limine is an appropriate vehicle for obtaining an order of exclusion.

*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
[HN2] The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into a purchase of a tied product that the buyer either did not want, or might have preferred to purchase elsewhere on different terms. To prevail on a tying claim, the proponent must establish that (1) the tying and the tied products are separate and

2004 U.S. Dist. LEXIS 1072, *

distinct products; (2) the seller has forced purchasers of the tying product to also buy the tied product; and (3) the tie forecloses a substantial volume of commerce in the market for the tied product.

*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
[HN3] The test for whether two separate products are involved, with respect to a tying claim, turns not on the functional relation between them, but rather on the character of the demand for the two items.

*Patent Law > Inequitable Conduct > Anticompetitive Conduct*
[HN4] For service and parts to be considered two distinct products in order to support a tying claim, there must be sufficient consumer demand so that it is efficient for a firm to provide one product separately from another product.

COUNSEL: [*1] For Roche Molecular Systems, Inc, PLAINTIFF: Asim Varma, David Gersch, Michael J Klyce, Jr, Arnold & Porter, Washington, DC USA. James Sicilian, Day, Berry & Howard-HTFD-CT, Hartford, CT USA. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY USA. Jennifer K Lawson, Mario R Borelli, Day, Berry & Howard, Hartford, CT USA.

For Applera Corp, PLAINTIFF: Edward R Reines, Weil, Gotshal & Manges, Redwood Shores, CA USA. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY USA. James T Shearin, Pullman & Comley, Bridgeport, CT USA.

For MJ Research, Inc, DEFENDANT: Albert L Jacobs, Jr, Greenberg Traurig, New York, NY USA. Donna Nelson Heller, Harold Bolton Finn, III, Finn Dixon & Herling, Stamford, CT USA. Joseph B Darby, III, Greenberg & Traurig, Boston, MA USA.

For MJ Research, Inc, Michael Finney, John Finney, DEFENDANTS: Gerard F Diebner, Joseph M Manak, Greenberg Traurig, New York, NY USA. C Allen Foster, Kevin E Stern, Greenberg Traurig, LLP, Washington, DC USA. Daniel A Ladow, Graham & James, New York, NY USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA. John E Beerbower, Cravath, Swaine & Moore, New York, NY USA.

For MJ Research, [*2] Inc, Counter CLAIMANT: Daniel A Ladow, Graham & James, New York, NY USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA.

For Roche Molecular Systems, Inc, Counter DEFENDANT: James T Shearin, Pullman & Comley, Bridgeport, CT USA.

JUDGES: Janet Bond Arterton, U.S.D.J.

OPINION BY: Janet Bond Arterton

OPINION:

**Ruling on Motion in Limine to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 667 (2)]**

Plaintiffs Applera Corp. and Roche Molecular Systems, Inc. seek to exclude defendant MJ Research Inc.'s evidence and argument that the plaintiffs have illegally tied the rights to practice PCR to the purchase of thermal cyclers sold by licensed suppliers, arguing that as a matter of law, there is no unlawful tie, and that the admission of such evidence and argument would confuse the jury. For the reasons discussed below, plaintiffs' motion [Doc. # 667 (2)] is GRANTED.

I. Background

Applera has patented the PCR process in certain fields, and licenses the right to perform PCR on a thermal cycler in its fields in two ways. First, an end user performing PCR on a thermal cycler pays a royalty when purchasing "reagents," or enzymes [*3] used in the PCR process, from Applera or from a licensee of Applera. Second, a licensing fee is paid for each thermal cycler, after which the thermal cycler is referred to as "authorized" for use in performing PCR without violating Applera's PCR process patents. Applera has both end user and supplier authorization programs for licensing "authorized" thermal cyclers. That is, an end user either may buy a thermal cycler that has already been authorized for use in PCR, because the supplier purchased a license through Applera's Supplier Authorization Program ("SAP"), or an end user may purchase an unlicensed thermal cycler and obtain the right to use the thermal cycler to perform PCR through Applera's End User Authorization Program ("EAP"). Applera aggressively seeks suppliers' participation in the SAP, and tells suppliers who refuse to participate that they are at risk of liability for inducing infringement of Applera's PCR Process Patent. As Applera states, the SAP "permits competing thermal cycler suppliers to promote performance of PCR on their machines, conduct which otherwise may induce infringement of the PCR Process Patents, and convey PCR rights to end users with their thermal [*4] cyclers." Memorandum in Support of Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 669] at 3.

Page 2

2004 U.S. Dist. LEXIS 1072, *

MJ, a manufacturer and supplier of thermal cyclers, does not participate in the SAP, and claims that the SAP unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by unlawfully tying thermal cyclers to PCR Process Patent rights.

II. Discussion

MJ raises both procedural and substantive objections to plaintiffs' motion. First, MJ contends that the motion in limine is procedurally inappropriate, as it is no more than a thinly veiled summary judgment motion, targeting not specific evidence but simply legal positions supporting certain claims. [HN1] The Court has an obligation, however, to admit only "relevant evidence" that is "of consequence to the determination of the action." See Fed. R. Evid. 401, 402. Moreover, even relevant evidence may be excluded if it is substantially outweighed by the risk of confusion of the issues or misleading the jury. See Fed. R. Evid. 403 [*5] . Since evidence offered in support of non-viable legal claims is not relevant, and carries a substantial risk of misleading the jury, a motion in limine is an appropriate vehicle for obtaining an order of exclusion. See, e.g. United States v. Stop & Shop Companies, Inc., 1984 U.S. Dist. LEXIS 22103, 1984 WL 3196, at *1 (D.Conn. Nov. 9, 1984) (granting motion to preclude defendants from offering evidence of economic justification at trial, because it was legally irrelevant). This Court, in fact, invited such motions as a means of narrowing the issues for trial. See May 5, 2003 Status Conference Transcript [Doc. # 679] at 29-33.

The Court recognizes that the plaintiffs previously challenged MJ's tying claim in its January 19, 2001 Motion for Summary Judgment on MJ's Antitrust and Patent Misuse Claims [Doc. # 399], which was denied by then-presiding Honorable Dominic J. Squatrito on March 28, 2002. See Memorandum of Decision and Order [Doc. # 624]. However, while Judge Squatrito found that there were disputes of material fact at issue as to some parts of the defendant's antitrust claims, his ruling did not address the particular tying claim now before the Court. n1 As a result, [*6] the Courts finds that it is appropriate to rule on the plaintiffs' motion in limine. n2

> n1 At the pre-trial conference on January 22, 2004, defendant's counsel expressed a concern that the Court would not have the benefit of the parties' statements of undisputed facts under Local Rule 56(a)(1) and (2) in deciding the motion in limine, and that without these statements, the Court could not take at face value any statement in the briefing as to whether certain facts were undisputed or not. Recognizing that no further discovery on the antitrust matters has taken place since the January 19, 2001 filing for summary judgement, the Court has reviewed the Statements submitted in conjunction with the previous antitrust summary judgment motion in connection with its consideration of this motion in limine. See [Docs. # # 401 and 466].

> n2 This ruling precludes MJ from arguing or presenting evidence in support of its tying claim. As MJ has correctly pointed out, the plaintiffs have not identified any particular evidence to be excluded, and this ruling, therefore, does not address the admissibility of specific evidence, recognizing that evidence may be probative of more than one claim.

[*7]

" [HN2] The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into a purchase of a tied product that the buyer either did not want, or might have preferred to purchase elsewhere on different terms." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984). To prevail on a tying claim, MJ must establish that (1) the tying and the tied products are separate and distinct products; (2) the seller has forced purchasers of the tying product to also buy the tied product; and (3) the tie forecloses a substantial volume of commerce in the market for the tied product. See id. at 11-16.

1. Separate Products

The parties agree that the tying product in this case is the PCR Process Patent right, and the tied product is an "authorized" thermal cycler. n3 Thus, MJ's claim is that the plaintiffs have tied the rights to perform PCR to the purchase of authorized thermal cyclers.

> n3 See, e.g. Memorandum of MJ Research, Inc. ("MJ") in Opposition to Plaintiffs' Five Motions to Exclude Evidence and Arguments relating the MJ's Antitrust Counterclaims and Patent Misuse Defense ("MJ Opposition") [Doc. # 684] at 15 n. 17.

[*8]

[HN3] The test for whether two separate products are involved "turns not on the functional relation between them, but rather on the character of the demand for the two items." Jefferson Parish, 466 U.S. at 19. n4 The issue, then, is whether thermal cyclers that are authorized to perform PCR have a market distinct from PCR Process patent rights. See id. Phrased in these terms, the question suggests its answer. If it can be concluded that automated PCR as described in Applera's patent requires the use of a thermal cycler, then the "authorization" of the thermal cycler is the same product as the PCR patent right.

2004 U.S. Dist. LEXIS 1072, *

n4 Applera suggests that the test for determining whether there are two separate products is one which looks "to the nature of the claimed invention as the basis for determining whether a product is a necessary comcomitant of the invention or an entirely separate product." Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 670-71 n. 14 (Fed. Cir. 1986). While this is the test for whether there are two separate products for purposes of patent misuse, the "law of antitrust violation, tailored for situations that may or may not involve a patent, looks to a consumer demand test for determining product separability." Id. at 670.

[*9]

Although MJ has never specifically agreed in its briefing to the Court that the '188 patent (U.S. Patent No. 4,965,188) covers the performance of PCR on a thermal cycler, it has stipulated that the '188 patent covers "the performance of PCR using a thermostable enzyme, in which the heating and cooling steps required by PCR . . . are automated by a machine that controls temperature levels, transitions from one temperature to another, and the timing of the temperature levels." Joint Stipulation Regarding Claim Construction of the '202, '195, and '188 Patents [Doc. # 640] at P 4. While PCR can be performed without a thermal cycler n5, "automated" PCR, as defined in the '188 patent, can only be practiced on a machine performing the heating and cooling functions. MJ has agreed that a thermal cycler is a machine that performs these functions. See Amended Report of Dr. Almarin Phillips, Oct. 17, 2000 [Doc. # 668, Ex. 2] at 9 ("Thermal cyclers are devices capable of performing the required heating and cooling")(citing Deposition of Michael Finney dated April 17, 2000, at 1069). n6 As MJ acknowledged in a September 25, 2000 submission to the U.S. Patent Office, the '188 patent "claims [*10] the PCR process automated by a thermal cycling machine." Petition to Invoke Supervisory Authority of the Commissioner [Doc. # 688, Ex. 4] at 3.

n5 See Local Rule 9(C)(2) Statement in Support of MJ's Opposition to Plaintiffs' Motion for Summary Judgment on MJ's Antitrust Claims and Patent Misuse Defense [Doc. # 466] at P 3.

N6 See also Local Rule 9(C)(2) statement [Doc. # 466] at P 8 (denying Applera's claim that the '188 patent covers the performance of PCR on a thermal cycler, or "automated PCR" only "to the extent that the phrase 'covers the performance of PCR on a thermal cycler, or 'automated PCR" includes subject matter not described by claims 9 and 32 of the '188 patent,'" or "to the extent that it implies that MJ or its customers necessarily infringe claims 9 and 32 of the '188 patent."). Claims 9 and 32 of the '188 patent both refer, in relevant part, to a process "wherein the heating and cooling steps . . . are automated by a machine which controls temperature levels, transitions from one temperature to another, and the timing of temperature levels." See [Doc. # 688, Ex. 3]. Thus, MJ does not dispute that the performance of the processes described in claims 9 and 32 of the '188 patent is done on a thermal cycler machine.

[*11]

Because there is no dispute that the '188 PCR process patent covers the performance of PCR on a thermal cycler, Applera is entitled to license the use of thermal cyclers to perform PCR in the fields covered by its patent in order to protect its patent. For the purposes of the tying claim, then, there are not two separate products, because the PCR process patent right (the tying product) is the same as the "authorization" on the thermal cycler (the "tied" product). There can be no demand for an "authorized" thermal cycler separate and distinct for the demand for a PCR process patent right. See Jefferson Parish, 466 U.S. at 19.

It should be noted, however, that if the "tied" products were thermal cyclers generally, rather than "authorized" thermal cyclers, then there would be a factual dispute as to the demand for thermal cyclers as distinct from the demand for rights to the PCR process patents. " [HN4] For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide [one product] separately from [another product]." Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 462, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992) [*12] (citing Jefferson Parish, 466 U.S. at 21-22). Thus, a trier of fact would have to assess the nature of the demand for thermal cyclers separate and apart from their use in PCR.

Neither Applera nor MJ describes the tied product as thermal cyclers generally, however. In fact, MJ's argument about the coercive and anti-competitive effect of the alleged tying scheme relies on the "authorization" aspect of the thermal cycler market. As MJ contends, the "imposition of the requirement of thermal cycler 'authorization' as a condition to obtaining a license for the PCR process alters the competitive dynamics in the thermal cycler market, giving PE a profit on each thermal cycler so authorized and a significant control over the costs of--and therefore, the prices to end users charged by--competing thermal cycler manufacturers. Every 'authorized' thermal cycler is, for all relevant antitrust purposes, a 'PE thermal cycler.'" MJ Opposition [Doc. # 684] at 17. Nonetheless, and inconsistently, MJ also argues that there are two distinct products involved because the Court has previously found thermal cyclers to be "staple goods" with "substantial noninfringing uses." See MJ [*13] Opposition [Doc. # 684] at 16 n. 20. Such an argument implies that the tied products are thermal cyclers in general, not simply thermal cyclers authorized to perform PCR. Thus, to some extent, it appears that MJ seeks to define the tied product one way for the purpose of determining whether it is separate and distinct from the tying product, but another way for the purposes of determining the other elements of its tying claim.

2. Coercion

2004 U.S. Dist. LEXIS 1072, *

Even assuming the "tied" product is in fact a thermal cycler in general, not simply an "authorized" thermal cycler, MJ's tying claim must fail, because there is no evidence that end users have been forced to purchase thermal cyclers that they "did not want at all, or might have preferred to purchase elsewhere on different terms," Jefferson Parish, 466 U.S. at 12, in order to obtain the right to the PCR process patents.

Applera argues that because it sells the rights to perform PCR in its fields on any thermal cycler directly to end users through the End User Authorization Program ("EAP"), the end user is not required to purchase an authorized thermal cycler (or any thermal cycler). Applera has presented evidence that it has "executed [*14] a total of 155 agreements under the EAP with end users of thermal cyclers sold by firms that have not joined [Applera's] Supplier Authorization Program," and that these agreements "confer authorizations for 435 thermal cyclers." Affidavit of Hannelore Fischer in Support of Plaintiffs' Motion for Summary Judgment of MJ's Antitrust Counterclaims [Doc. # 669, Ex. 1] at P 2-3. MJ, while disputing the exact number of agreements executed under the EAP, does not deny that a substantial number of EAP agreements have been reached. See Local Rule 9(C)(2) Statement [Doc. # 466] at P 21 (stating that data "presented by plaintiffs' antitrust expert, Dr. Janusz Ordover, indicates that 124 end users have executed EAP agreements with [Applera]."). Because the EAP program operates independently from the sale of thermal cyclers, and remains a viable way for end users to obtain a license to perform PCR on thermal cyclers, Applera cannot be said to coerce such persons to buy unwanted thermal cyclers.

MJ argues, however, that the EAP itself is an illegal tie, and likens this case to Int'l Salt Co. v. United States, 332 U.S. 392, 92 L. Ed. 20, 68 S. Ct. 12 (1947), in which the Supreme Court [*15] found it unlawful for International Salt to lease its patented salt dispensing machine to customers on condition that they use only International Salt's products in them. But the lease agreement in International Salt was improper because it required the purchase of a separate product (International Salt's salt) in order to obtain the right to use the patented machine. In contrast, the EAP at issue in this case is a self-contained program. It does not require end users to buy thermal cyclers. Moreover, unlike in International Salt, here it is not disputed that the use of a thermal cycler to perform PCR is patented. Thus, there is nothing improper about requiring end users to obtain authorization for this purpose.

In the alternative, MJ argues that the EAP is a sham, because Applera has pressured thermal cycler suppliers to join the Supplier Authorization Program ("SAP") by accusing them of inducing infringement of the PCR process patents. If all suppliers join the SAP, then the EAP would not be used. As Applera contends, however, even if the SAP were the only authorization program available, there would be no unlawful tie. As the parties agree, automated PCR requires the use [*16] of a thermal cycler. See Videotaped Deposition of Michael Finney, Oct. 7, 1998 [Doc. # 688, Ex. 1] at 61. Thus, any end user who wished to perform automated PCR would, by necessity, have to obtain a thermal cycler of some kind. The SAP does not restrict the choices of the end user, because it does not determine which thermal cycler machines are available on the market, nor does it require end users to purchase a particular thermal cycler machine. n7 In this scenario too, then, no end user is coerced into buying an unwanted thermal cycler.

n7 MJ focuses on the anti-competitive effects of the "authorization" requirement. As discussed above, however, an "authorized" thermal cycler is not a separate product from the PCR patent right, and Applera is entitled to a lawful monopoly over its patent.

In the scenario in which all suppliers join the SAP, however, it may well be concluded that an end user seeking to purchase a thermal cycler would be forced to buy unwanted PCR rights. In this scenario, the thermal cycler [*17] would be the tying product and the PCR rights would be the tied product. According to the parties, between 7% and 20% of thermal cyclers are used for purposes other than PCR. See Videotaped Deposition of Michael Finney, Oct. 7, 1998 [Doc. # 559, Ex. 2] at 176 ("I would guess of the thermal cyclers that we are currently selling at this point, perhaps 20 percent are never used to perform PCR"); Letter from Joseph Smith, PE to Michael Finney, MJ, Jan. 30, 1998 [Doc. # 671, Ex. 2] at 1 (stating that "worldwide, at least 93% of thermal cyclers need authorization" and offering to discount the royalty to reflect the 7% of thermal cyclers not used for PCR). These thermal cycler purchasers, then, may be forced to pay for an authorization that they do not want or need. MJ, however, does not allege that such a result is a tie. See, e.g. MJ Opposition [Doc. # 684] at 19 n. 24 ("The imposition of the costs of licensing the PCR process rights on end users who do not need those rights may not technically be a 'tie' . . ."). The PCR Process Patents give the plaintiffs a lawful monopoly on PCR rights and thus, as a matter of law, plaintiffs cannot be found to "unlawfully restrain [*18] free competition in the market for the tied product. . . ." Coniglio v. Highwood Servs., Inc., 495 F.2d 1286, 1291 (2d Cir. 1974). n8

n8 Moreover, the Plaintiffs state, and MJ does not dispute, that as a factual matter, they "do not require competing suppliers licensed through the SAP to convey PCR rights with each thermal cycler they sell," as suppliers may "include authorization notices only for customers who need them." See Memorandum in Support of Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 669] at 7; Letter from Joseph Smith to Michael Finney, Jan. 30, 1998 [Doc. # 669, Ex. 5] at 2.

2004 U.S. Dist. LEXIS 1072, *

III. Conclusion

For the foregoing reasons, Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 667 (2)] is hereby GRANTED.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 28th day of January** [*19] **2004.**