## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DENISE EVARTS, | : | CIVIL ACTION NO. |
| | : | 3:00CV1124 (WIG) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE SOUTHERN NEW ENGLAND | : | |
| TELEPHONE COMPANY, | : | |
| | : | |
| Defendant. | : | MAY 30, 2007 |

## OBJECTION TO PLAINTIFF'S MOTION IN LIMINE

### I.    INTRODUCTION

Plaintiff Denise Evarts moved in limine to exclude from evidence: opinions of other female employees of defendant Southern New England Telephone Company ("SNET") regarding Matt Cordner and Edward Dillman; the opinions or notes of her former supervisor, Wanda Lewis; plaintiff's academic records; and evidence concerning Ms. Evarts's legal career and efforts to secure employment.  See Plaintiff's Motion in Limine, May 10, 2007.  Because this evidence relates directly to the issues the jury must decide in this matter, plaintiff's motion should be denied.

The parties agree that a critical remaining issue for the jury to decide is whether SNET, through the actions of its supervisor Matt Cordner, subjected plaintiff to a hostile work environment based upon her gender.[1]  See Plaintiff's Motion in Limine at 2.  The parties also agree that a related threshold question is whether Ms. Evarts was

---

[1]    In her pre-trial submissions plaintiff recently has suggested that she claims that Edward Dillman, Mr. Cordner's supervisor, also created a hostile environment.  For the past many years, and in her Complaint, however, plaintiff principally has asserted claims against Mr. Cordner.  See Complaint at ¶ 12 (listing examples of Mr. Cordner's allegedly discriminatory acts).  The arguments stated herein apply regardless of whether plaintiff now contends that Mr. Dillman also was responsible for the alleged hostile environment.

constructively discharged as a result of this hostile environment. Id.  A third and undisputedly important issue is whether Ms. Evarts reasonably mitigated her damages. See Defendant's Answer and Affirmative Defenses, September 18, 2000, at Second Affirmative Defense. Evidence concerning the opinions of other female employees regarding Matt Cordner and Ed Dillman; plaintiff's prior relationship with supervisor Wanda Lewis and in particular, plaintiff's reactions to Ms. Lewis's criticism; Ms. Evarts's academic records; and Ms. Evarts's present career as a lawyer and her attempts to find work as a lawyer, bear directly upon these issues.  Plaintiff's motion in limine should therefore be denied.[2]

## II.    ARGUMENT

### A.    Sally Sanderson's observations of Mr. Cordner's demeanor and interactions with co-workers is relevant.

Under settled law, in order to prevail on her hostile work environment claim plaintiff must establish "both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and [she] must also subjectively perceive that environment to be abusive." Summary Judgment Ruling at 25 (internal citations and quotation marks omitted).

---

[2]    This Court may deny plaintiff's motion for the additional reason that plaintiff failed to comply with D. Conn. L. Civ. R. 7, as well as this Court's Trial Memorandum Order, both of which required plaintiff to submit a memorandum of law with any motion in limine. See D. Conn. L. Civ. R. 7(a) (failure to submit memorandum of law with motion "may be deemed sufficient cause to deny the motion"); Trial Memorandum Order at 2-3 (requiring motions in limine and memoranda of law regarding evidentiary problems); see also Viada v. Osaka Health Spa, Inc., 04 Civ. 2744, 2005 U.S. Dist. LEXIS 32854, at *3 (S.D.N.Y. Dec. 12, 2005) (denying motions in limine that were vague and not supported by memoranda of law; court noted that parties' failure to comply with Local Civil Rule 7.1, which similarly required memoranda of law with motions in limine, provided "another ground on which the motions are denied") (attached at Tab A).

Plaintiff claims that Matt Cordner discriminated against her and in fact hounded her to force her to resign because she is a woman. Her claim is that Mr. Cordner did not want any women working with him or for him and, as plaintiff alleged in her opposition to summary judgment, that he did not like anyone who didn't "stand up to pee." Plaintiff further has submitted an affidavit, attesting under oath in opposition to summary judgment, that Mr. Cordner "had a violent temper" in the workplace. The strange thing is, in a garage with no private offices and people coming and going all the time, no one saw this "violent temper" or Mr. Cordner's "physically intimidating" demeanor. In fact, a co-worker in the Payphone Services Department, Sally Sanderson, wrote a letter to Ed Dillman during the same period of time complimenting Mr. Cordner as "a pleasure to work with," and "always even tempered and exceptionally polite to customers as well as co-workers." She praised him as "an ambassador and an asset in the Company." SNET has marked this document, which was in Cordner's personnel file and is a business record, as an exhibit for trial and may call Ms. Sanderson as a witness.

Logically, to rebut plaintiff's attempt to establish a hostile work environment, defendant will offer evidence that plaintiff's environment in fact was not hostile. Because plaintiff has focused her attack on Messrs. Cordner and Dillman, SNET necessarily will seek to establish that women working in this same allegedly hostile environment did not perceive the environment as "hostile." Just as plaintiff will state she had no problem with any other supervisor, SNET will put on evidence that Mr. Cordner had no problems with any other co-workers and was in fact known for his

moderate temperament.[3]  Such evidence is relevant and admissible and plaintiff's motion to exclude it should be denied. See, e.g., Kaupas v. Village of University Park, No. 02 C 3674, 2003 U.S.Dist. LEXIS 15110, *30 & n.14  (Sept. 2, 2003) (N.D. Ill. Sept. 2, 2003) (in hostile environment case, fellow employees' testimony regarding their perceptions of the workplace is admissible)(attached at Tab B); see also Burks v. Oklahoma Publishing Co., 81 F. 3d 975, 981 (10th Cir. 1996) (testimony of other employees about their treatment by defendant generally is relevant to issue of employer's discriminatory intent).[4]  Clearly, if other women in the workplace perceived Mr. Cordner as hostile to them, plaintiff would be the first to offer such evidence.

> **B.    Evidence regarding plaintiff's academic history, her attempts to find legal employment, and her career as an attorney is relevant to her entitlement to damages and her claimed emotional distress and reputational injury.**

If the plaintiff were to successfully establish SNET's liability, the extent to which plaintiff mitigated her damages will directly inform the amount of recovery to which she is entitled. See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47 (2d Cir. 1998).  Because plaintiff is now a practicing attorney, evidence concerning her career as an attorney, the efforts she undertook to launch this career (and the timing thereof), and her academic record, is relevant to whether she reasonably mitigated her damages. See, e.g., Brownell v. Roadway Package Sys., No. 97-CV-1034, 1999 U.S. Dist. LEXIS 11799, *36

---

[3]    If plaintiff's motion in limine were to be granted, SNET would request a similar instruction that plaintiff and her counsel be barred from putting on evidence and/or making my argument about the other side of the same coin: (1) Mr. Cordner's purported temper; (2) Ms. Evarts's belief that he wanted her out of her work group because she was a woman; and/or (3) the alleged fact that she had no problems with any other supervisor.

[4]    Although plaintiff refers to "character" evidence, she does not argue that such opinion testimony is inadmissible under Rule 404(b).  SNET notes moreover that Rule 404 does not bar or even apply to this evidence because SNET will not introduce the testimony of other female SNET employees in order to "prove conduct." See Fed. R. Evid. 404(a) (barring evidence of person's character or trait to prove "action in conformity therewith").

(N.D.N.Y. June 29, 1999) (reviewing plaintiff's business degrees and prior positions, court noted that in light of "[p]laintiff's background, education, and experience, her efforts to mitigate simply were not reasonable under the circumstances.") (attached at Tab C). Further, the nature and extent to which plaintiff has been employed since leaving SNET also is relevant to plaintiff's claimed reputational injury and the extent to which plaintiff has suffered emotional distress. The facts that plaintiff took the LSAT's, applied to law school, was accepted into law school, and then began to attend law school, all within a little over one year after resigning from SNET, clearly indicate that following her resignation, she was quickly functioning at a high level. This relevance exists whether or not plaintiff stipulates that she will limit her back pay claim to the three years after leaving SNET. Plaintiff's request that this Court exclude from trial evidence regarding her academic records and her "career as a lawyer, her bar admission, job-seeking and employment as a lawyer" – a request that tellingly is unsupported by any legal argument or supporting authority – should be denied.[5]

> **C.    Evidence concerning Ms. Evarts's prior relationship with former supervisor Wanda Lewis and Ms. Lewis's opinion of Ms. Evarts is relevant to whether Ms. Evarts reasonably experienced a hostile environment.**

When plaintiff worked as a Service Administrator for SNET, before becoming a Service Technician,  plaintiff's female supervisor, Wanda Lewis, noted in plaintiff's

---

[5]    In defending her refusal to update outdated responses to discovery relating to damages, plaintiff's counsel recently announced that plaintiff had decided that she would not seek damages beyond three years post her resignation from SNET. As SNET argued in its Memorandum in Support of Motion for Order and Expedited Consideration, dated May 21, 2007, the operative complaint in this matter contains no such limitation. Moreover, plaintiff may not, on the eve of trial, select a limited period for which to seek damages in an attempt to prevent the jury from learning that plaintiff is a lawyer who will undoubtedly earn significantly more over her working life than she would have as a technician at SNET.

personnel file that after Ms. Lewis had offered Ms. Evarts some coaching regarding her customer service skills, Ms. Evarts responded that Ms. Lewis was being "picky." When Ms. Lewis tried to talk to plaintiff about her interactions with customers, plaintiff became defensive and would not accept any of the coaching advice offered to her. In this case, years later, in support for her claimed hostile environment, Ms. Evarts similarly complains that Mr. Cordner was "picky" regarding her work. Mr. Cordner perceived that plaintiff was extremely defensive and resistant to any coaching he offered her. Defendant is clearly entitled to have the jury see the pattern here: that plaintiff cannot accept criticism, and responds to such criticisms by calling the supervisor "picky" and reacting defensively. The jury should know that plaintiff reacted this way when a female supervisor tried to coach the plaintiff, just as she did when Mr. Cordner tried to coach her. This is not a gender issue. It is an issue with Denise Evarts's personality.

In order to prevail on her hostile work environment claim, in addition to proving what she personally believed, Ms. Evarts will need to establish that her environment was hostile in a manner that a reasonable person would perceive it as such. Evidence that Ms. Evarts had problems accepting reasonable criticism from a female years prior to meeting Mr. Cordner is clearly relevant to whether plaintiff experienced an objectively hostile environment. Plaintiff's unsupported claim to the contrary should be rejected and her motion in limine should be denied.[6]

---

[6] Plaintiff also claims that Ms. Lewis's handwritten note should be excluded due to a lack of authentication. Motion in Limine at 2. This argument is premature -- a challenge to evidence based on a purported lack of authentication is properly made at trial and should not be the basis of a motion in limine. See Wechsler v. Hunt Health Sys., 94 Civ. 8294, 2003 U.S. Dist. LEXIS 14592, *8-9 (S.D.N.Y. Aug. 22, 2003) (attached at Tab D).

## III.    CONCLUSION

Based upon the foregoing, SNET respectfully requests that this Court deny

plaintiff's Motion in Limine dated May 10, 2007 in its entirety.


Dated at North Haven, Connecticut this 30th day of May, 2007.


THE DEFENDANT,
THE SOUTHERN NEW ENGLAND
TELEPHONE COMPANY


By _Lori B. Alexander_____

    Lori B. Alexander
    Federal Bar No. CT 08970
    Theresa M. Waugh
    Federal Bar No. CT23559
    LITTLER MENDELSON, P.C.
    110 Washington Avenue, 3rd Floor
    North Haven, Connecticut 06473
    Telephone: (203) 234-6344
    Facsimile: (203) 234-6345
    E-Mail: lalexander@littler.com
    E-Mail: twaugh@littler.com

**TAB A**

LEXSEE 2005 U.S. DIST. LEXIS 32854

**JUANA VIADA, ET AL., Plaintiffs, -against- OSAKA HEALTH SPA, INC., ET AL., Defendants.**

**04 Civ. 2744 (VM)(KNF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 32854*

**December 9, 2005, Decided
December 12, 2005, Filed**

**SUBSEQUENT HISTORY:** Magistrate's recommendation at *Viada v. Osaka Health Spa, Inc., 2005 U.S. Dist. LEXIS 33120 (S.D.N.Y., Dec. 9, 2005)*

**PRIOR HISTORY:** *Viada v. Osaka Health Spa, Inc., 2005 U.S. Dist. LEXIS 33138 (S.D.N.Y., Dec. 8, 2005)*

**COUNSEL:** [*1] For Juana Viada, Maria Pumavilla, Cecilia Zumba, Plaintiffs: Haeyoung Yoon, The Urban Justice Center, New York, NY; Tony Y. Lu, Urban Justice Center, New York, NY; Theodore Kevin Cheng, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY.

For Ana Erraez, Plaintiff: Haeyoung Yoon, The Urban Justice Center, New York, NY; Tony Y. Lu, Urban Justice Center, New York, NY.

For Martha Chicaiza, Virgilio Lopez, Elena Zumba, Plaintiffs: Theodore Kevin Cheng, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Haeyoung Yoon, Tony Yen-Chieh Lu, The Urban Justice Center, New York, NY.

For Osaka Health Spa, Inc., doing business as Osaka 56, Osaka 46 Traditional Health, doing business as Osaka 46, Bol Sil Lee, Osaka Health Spa Center, Corp., doing business as Osaka 56, Osaka Spa Construction, Inc., Joshua Haesong Lee, Defendants: Daniel P. Smulewicz, Law Office of Daniel P. Smulewicz, New York, NY; Andrew A. Kimler, Capell & Vishnick, LLP, Lake Success, NY; James P. Philbin, III, Morgan, Lewis and Bockius LLP, New York, NY; Jonathan Yoon Sue, Jonathan Y. Sue, NY, NY.

For Green Cross Clinic, also known as Osaka Zen Spa, Myung-Hi Sonserai Lee, also known as Myung-Hi [*2] Lee also known as Sonserai Lee, Nam-Hi Lee, Green Cross Essential Therapeutics, LLC, Defendants: Daniel P. Smulewicz, Law Office of Daniel P. Smulewicz, New York, NY; James P. Philbin, III, Morgan, Lewis and Bockius LLP, New York, NY; Jonathan Yoon Sue, Jonathan Y. Sue, NY, NY.

For Lee Osaka, Defendant: James P. Philbin, III, Morgan, Lewis and Bockius LLP, New York, NY; Jonathan Yoon Sue, Jonathan Y. Sue, NY, NY.

For Nam-Hi Lee, Counter Claimant: Daniel P. Smulewicz, Law Office of Daniel P. Smulewicz, New York, NY.

**JUDGES:** KEVIN NATHANIEL FOX, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** KEVIN NATHANIEL FOX

**OPINION:**

**MEMORANDUM and ORDER**

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Before the Court are motions *in limine* made by defendants Nam-Hi Lee and Myung-Hi Lee. Through these motions, the defendants seek to have the plaintiffs precluded from offering into evidence, at the trial of this action, writings and testimony that these defendants believe are the product of material "stolen from defendant Dr. Nam Hi Lee, M.D." The plaintiffs oppose the motions. They contend that the motions should be denied, in part, because they are premature and should be made only after [*3] the parties have completed their pretrial discovery activities. The plaintiffs also contend that the motions should be denied because the defendants failed to submit a memorandum of law in support of their re-

2005 U.S. Dist. LEXIS 32854, *

spective motions, as required by Local Civil *Rule 7.1* of this court.

A federal district court "has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds . . . . Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT&T Technologies, Inc., 831 F. Supp. 1398, 1400 (N.D. Ill. 1993).*

In the case at bar, the motions *in limine* made by the two defendants identified above are vague in that they do not specify the writings or potential testimony that the movants believe should be excluded from the trial of this action. As a result, the Court is unable to determine, with any degree of certainty, whether the writings and testimony sought to be excluded from the trial would be inadmissible under any of the provisions of the Federal Rules of Evidence. [*4] Therefore, the respective motions *in limine* are denied. However, the defendants are free to renew their respective motions *in limine* at the time of trial should they believe that a valid basis exists for excluding any evidence that the plaintiffs seem likely to offer at the trial of this action. n1

n1 The Court has previously made all parties aware of the obligation of complying with Local Civil *Rule 7.1* of this court. See the Order of the Court dated February 22, 2005. The parties are reminded that the willful failure to submit a memorandum of law with a motion may be deemed sufficient cause for the denial of the motion. Inasmuch as no memorandum of law was submitted with either of the above-noted motions *in limine,* which are dated after February 22, 2005, the failure to submit memoranda with the motions is another ground on which the motions are denied.

Dated: New York, New York

December 9, 2005

SO ORDERED:

KEVIN NATHANIEL FOX

UNITED STATES MAGISTRATE [*5] JUDGE

**TAB B**

LEXSEE 2003 U.S.DIST. LEXIS 15110

**Fred Kaupas and Rosanne M. Kaupas, as individuals, Plaintiffs, v. Village of University Park, a municipal corporation; Board of Trustees of the Village of University Park, a body politic; Village Manager Elbert Shaw, individually and in his official capacity; Police Chief Craig Martin, individually and in his official capacity; Police Sergeant Gregory Box, individually and in his official capacity; and other unknown conspirators, Defendants.**

No. 02 C 3674

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 15110; 92 Fair Empl. Prac. Cas. (BNA) 1236*

**August 29, 2003, Decided
September 2, 2003, Docketed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted in part and denied in part.

**COUNSEL:** For FRED KAUPAS, ROSANNE M KAUPAS, plaintiffs: James F. Pastor, Pastor Law Office, Lemont, IL.

For VILLAGE OF UNIVERSITY PARK, BOARD OF TRUSTEES OF THE VILLAGE OF UNIVERSITY PARK, ELBERT SHAW, CRAIG MARTIN, GREGORY BOX, defendants: William W. Kurnik, Basileios John Foutris, Knight, Hoppe, Kurnik & Knight LLC, Des Plaines, IL.

**JUDGES:** JAMES F. HOLDERMAN, United States District Judge.

**OPINION BY:** JAMES F. HOLDERMAN

**OPINION:**

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On January 14, 2003, plaintiffs Fred Kaupas ("F. Kaupas") and Rosanne M. Kaupas ("R. Kaupas") filed a seven-"claim" consolidated amended complaint against defendants Village of University Park ("Village"), Board of Trustees of the Village of University Park ("Board"), Elbert Shaw ("Shaw"), Craig Martin ("Martin"), and Gregory Box ("Box") alleging numerous reverse discrimination claims described in detail below. n1 On July 18, 2003, defendants moved, pursuant to *Federal Rule of Civil Procedure 56*, for summary judgment. For the reasons explained below, defendants' motion is granted in part and [*2] denied in part.

n1 Plaintiffs failed to comply with *Federal Rule of Civil Procedure 10(b)*, which requires each claim founded on a separate transaction or occurrence to be set forth in a separate count. This is but one of many transgressions of the Rules of Civil Procedure or Local Rules. This court has done its best to determine the claims advanced and will explain them in the text below. In addition, this court has interpreted each enumerated "claim" to actually be a "count" and will refer to each as such. Thus, the consolidated amended complaint has seven counts, although it has many more claims.

STATEMENT OF FACTS n2

n2 The facts assumed to be true for purposes of this summary judgment motion are derived in part from defendants' Local Rule 56.1(a) statement of facts and plaintiffs' response thereto and plaintiffs' Local Rule 56.1(b) statement of facts and defendants' response thereto. Before proceeding, however, this court strongly urges both counsel for plaintiffs and counsel for defendants to review *Local Rule 56.1 and Malec v. Sanford, 191 F.R.D. 581 (N.D. Ill. 2000)*. Both counsel failed miserably to comply with *Rule 56.1*. Because of this, the record on summary judgment is convo-

2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

luted and confusing. By failing to comply with the Local Rules, the parties have made it very difficult for this court to decipher the claims at hand, the relevant issues, and the parties' arguments. It is not this court's obligation to scour the record, but because both parties have not performed their obligations, this courts has no choice.

In the case at hand, neither party set forth a statement of facts in its respective memorandum. Defendants state that "the page limitations set forth by Local Rule do not allow a detailed re-statement of the facts and undisputed evidence and the facts swill [sic] simply be highlighted in the argument below." (Defs' Mem. at 1.) This comment is without merit, as defendants could have sought leave to file a brief in excess of fifteen pages.

[*3]

Viewing all facts in the light most favorable to plaintiffs and construing all ambiguities in their favor, in January 2001, Board amended a Village ordinance reducing the number of deputy chief of police positions from two to one. At this time, F. Kaupas, a white male, was the deputy chief of police. The acting chief at the time (and now current chief), Martin, is a black male. Village manager Shaw and officer (now sergeant) Box also are black males. R. Kaupas is a white female and worked for Village as a civilian employee in the police department.

On March 16, 2001, Martin ordered F. Kaupas to provide Martin with a list of all pending investigations and thereafter provide him with a weekly status report. This weekly status report had not been previously requested of F. Kaupas by any prior police chief. Martin did not inquire about the data until December 2001.

On June 6, 2001, Shaw and Martin convened a mandatory meeting of all police department personnel to address morale and training issues. At the time of the meeting, approximately half of the full time officers were white and half black. Box and a couple of other black officers had been drinking prior to attending the meeting. [*4] The meeting became heated with black officers saying such things as "us vs. them," "our turn to shine," "I get so mad I'd cap people except I would go to jail," and "more of us than there are of them now." (Pls.' Mem. at 4. n3 ) Immediately after the meeting, Box said, "these white mother fuckers have to go." (Defs.' Stmt. of Facts P 42.) Neither Shaw nor Martin, who both presided over the meeting, interceded to control such comments or admonished any officers. The following day, at a meeting of the Board of Police and Fire Commissioners, chairperson Gloria Barnett-Brookins ("Barnett-

Brookings") said that "we are not going to hire any more white boys." (Pls.' Mem. at 4.)

n3 Pursuant to *Local Rule 56.1*, in their memoranda parties are supposed to cite to their statements of undisputed facts or responses, not directly to the record. Plaintiffs, however, cite directly to the record in their memorandum. Worse yet, defendants do not cite to any record whatsoever in their memorandum! For example, they quote from the Village policy manual but provide no citation. (Defs.' Mem. at 11.) Although not required to do so, this court will consider the evidence presented in plaintiffs' memorandum and has done its best to find the appropriate portions of the record to support defendants' uncited statements.

[*5]

After the June 6 department meeting, on June 20, R. Kaupas sent a letter of complaint signed by her and six other department members to Martin. She outlined what happened at the meeting and requested that Martin "take appropriate action to this problem immediately." (Pls.' Mem. at 5.) About two-and-a-half weeks later, Village Finance Direct Steven Rosenquist ("Rosenquist") inquired of Shaw as to whether F. Kaupas was entitled to overtime pay. Shaw determined that F. Kaupas was an exempt employee and directed that he repay prior overtime payments to Village. F. Kaupas maintained that former police chief Thomas Leonard ("Leonard") had approved his overtime in the past. Shaw claims that Leonard had never authorized paid overtime for F. Kaupas. (Defs.' Stmt of Facts P 65.) However, as plaintiffs point out, Leonard testified that the policy had been that deputy chiefs had the discretion to take financial compensation or compensatory time for any overtime worked. (Pls.' Mem. at 6.) Thereafter, because F. Kaupas had told Shaw that Leonard had authorized overtime (which Shaw believed was a lie), Shaw demoted F. Kaupas to sergeant and promoted Mel Easley ("Easley"), a black male, to deputy [*6] chief. n4

n4 Plaintiffs' counsel, in the memorandum filed in opposition to defendants' motion, seems to do everything in his power to try to confuse this court. First, throughout, plaintiffs refer to "Kaupas." Importantly, there are *two* Kaupas plaintiffs in this case. Often the context does not readily make clear which plaintiff is being referred to. Second, plaintiffs often use the singular possessive "plaintiff's" without any reference to which plaintiff. This court had trouble determining which plaintiff was at issue or whether plain-

Case 3:00-cv-01124-WIG    Document 180    Filed 05/30/2007    Page 14 of 22

Page 3

2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

tiffs meant to use the plural possessive "plain-tiffs'." Third, for example, plaintiffs state: "*Kaupas* testified that Martin screamed at *him ... (R.* Kaupas Dep. pp. 66)." (Pls.' Mem. at 7 (emphasis added).) The dilemma created by this phrase is that plaintiffs refer to "Kaupas" without specifying which one, then go on to state "him"--thus context would seem to indicate F. Kaupas--but then cite to Rosanne Kaupas's deposition for testimony that Fred Kaupas gave. Finally, and most troublesome, plaintiffs' exhibits, which were not originally submitted to this court, are all but useless. Plaintiffs have submitted to this court in chambers, but have not filed in the record, three stacks of papers which purportedly correspond to their memorandum, 56.1(b) response, and 56.1(b) statement of additional facts. In cover letters to this court accompanying each stack of documents, plaintiffs state that "the order of the documents track the cites in the pleadings." Overlooking the fact that the exhibits are not "pleadings," see *FED. R. CIV. P. 7(a)*, this order of presentation is of no help to this court. Say for example that this court needed to find an exhibit cited to on page ten of plaintiffs' Rule 56.1(b) statement. How is this court to go about locating this exhibit? What this court had to do was cull through each of the pages until it found the exhibit in questions. Then, oftentimes, the deponent was not identified, preventing this court from verifying the exhibit or plaintiffs' statement. Tremendous judicial resources have been wasted.

[*7]

F. Kaupas filed a complaint with the Illinois Labor Board regarding the overtime pay dispute. After receiving the complaint, Shaw distributed it along with a cover memorandum to all employees n5 emphasizing that racial and sexual discrimination and harassment would not be tolerated and requesting employees to report prior instances of racial or sexual harassment to him. Within the next week, seven police department employees sent memos to Shaw. Because he believed the memos were false and baseless, Martin did not investigate any of the incidents set forth in the memos. In addition, Shaw believed they lacked merit and took no further action.

n5 It is not clear whether this was all Village employees or just those who worked in the police department.

R. Kaupas saw two co-workers reading the memo from Shaw and F. Kaupas's complaint. She became upset and had a confrontation with Martin. Martin heard her

mumble "mother fucker" under her breath. As a result, Martin suspended R. Kaupas for two days without pay. R. Kaupas [*8] denies making this comment.

On September 6, 2001, plaintiffs attended a Monee Township meeting to vote on a referendum. Plaintiffs drove F. Kaupas's departmental take-home vehicle, which Village had allowed F. Kaupas to use since approximately 1997 or 1998. Village's employee manual stated that "although Village employees are encouraged to participate in political activities, they may not do so while they are on duty nor may they use their position or Village resources for political purposes." (Defs.' Stmt. of Facts P 106.) Shaw admitted that it was not deemed politically motivated abuse to vote. In response to trustees' complaints about F. Kaupas driving his take-home vehicle to vote, Shaw amended Village's take-home vehicle policy. Under the new policy, employees who were not residents of Village, including F. Kaupas, were not allowed to use a Village vehicle but instead were to use their personal vehicles and then be reimbursed for mileage by Village. In his deposition, Shaw stated that he believed removing F. Kaupas's vehicle violated F. Kaupas's *First Amendment* free speech rights. (Defs.' Stmt. of Facts P 111.) After a grievance was filed on F. Kaupas's [*9] behalf, Shaw reinstated F. Kaupas's take-home vehicle privileges.

In December 2001, days after Village received R. Kaupas's EEOC complaint, Martin, perhaps upon a request from Shaw for information, instructed F. Kaupas to prepare a statistical report on certain investigations covering the years 1999, 2000, and 2001. Shaw stated at his deposition that the request for this data "doesn't make any sense to me." (Pls.' Mem. at 12.) It took F. Kaupas eighty hours to complete the data collection manually, even though such information was readily available on the computer.

On January 2, 2002, F. Kaupas submitted his letter of resignation, effective July 15, 2002. In May, Martin ordered F. Kaupas, along with two other officers, to inventory the evidence locker. At some point in the spring, Box stated that "it's our time to shine. Fred's got to go. I'm going to get his job." (Defs.' Stmt. of Facts P 143.) After F. Kaupas's retirement, Box was promoted to head of the investigations division. A few months prior to his retirement, Village removed F. Kaupas's name placard from his door. By memorandum dated May 31, 2002, F. Kaupas was placed on administrative leave effective June 1 and was paid through his retirement. [*10] Shaw made the decision to place F. Kaupas on administrative leave because Shaw believed that F. Kaupas was hostile to the Village for what the Village had done to him.

Finally, on June 4, 2002, R. Kaupas received a pornographic e-mail from Box. Attached to the e-mail was a

Case 3:00-cv-01124-WIG     Document 180     Filed 05/30/2007     Page 15 of 22

Page 4

2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

video which depicted a naked man defecating in a naked woman's mouth. The video was approximately one minute in length. After viewing the video once, R. Kaupas deleted it. She finished work that day but never returned. She tendered her resignation a few days later. Her resignation letter did not mention the e-mail from Box.

STANDARD OF REVIEW

Under *Rule 56(c)*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In ruling on a motion for summary judgment, the evidence of the nonmovants must be believed and all justifiable inferences must be drawn in the nonmovants' favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* [*11] This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* As stated above, it is not the function of this court to scour the record in search of evidence to defeat a motion for summary judgment; the nonmoving party must identify with reasonable particularity the evidence upon which that party relies. *Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996).* The evidence relied upon must be competent evidence of a type otherwise admissible at trial. *Id.*

ANALYSIS n6

n6 It certainly would have been helpful to this court if the parties would have properly drafted their memoranda. Ideally, the memorandum applies the law to the specific facts of the case. *Malec, 191 F.R.D. at 585.* Here, defendants' memorandum is overflowing with case law but barely mentions the facts, and, as explained above, when facts are discussed, the record is not cited to. On the other extreme, plaintiffs' memorandum is basically a recitation of the facts and some argument. In fact, their memorandum reads almost like their statement of additional undisputed facts. Conspicuously absent from plaintiffs' memorandum is any case authority in support of their position. Once again, plaintiffs' and defendants' counsel's failure to comply with the local rules has caused this court to expend much more

time than should have been necessary to resolve this motion.

[*12]

In this section of the opinion, this court will analyze the claims it has construed from plaintiffs' consolidated amended complaint. Plaintiffs' unclear allegations have unnecessarily complicated this task. This court had difficulty determining which plaintiff (or both) was suing which defendant (or defendants) on what claim. Moreover, in their summary judgment materials, defendants and especially plaintiffs address a few of the claims in such a cursory way that this court wonders if they are really claims at issue at all. Nonetheless, this court will address what appears to be all of the claims. Unless otherwise noted, both F. Kaupas and R. Kaupas advance the claim under discussion.

I. Count I *Section 1983* Claims

A. *Section 1983* Claims Against Village and Board

Pursuant to *42 U.S.C. § 1983*, plaintiffs advance claims against Village; Board; and Shaw, Martin, and Box in their individual and official capacities. An official capacity claim against a governmental official is the same as a claim against the governmental entity. *Kentucky v. Graham, 473 U.S. 159, 165-66, 87 L. Ed. 2d 114, 105 S. Ct. 3099(1985).* Thus, plaintiffs' claims [*13] against Shaw, Martin, and Box in their official capacities are actually claims against Village. Moreover, plaintiffs' claims against the Board are actually claims against Village itself. There is no indication that plaintiffs seek to hold Board members liable in their individual capacities.

The Seventh Circuit has stated, citing *Monell v. Department of Social Servs., 436 U.S. 658, 690-91, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978),* that:

[a] local governmental unit is subject to suit under *42 U.S.C. § 1983* because it is deemed a "person" within the meaning of that provision. The Supreme Court has consistently interpreted this language as barring *respondeat superior* liability on the part of a local governmental unit. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under *§ 1983*." The caselaw has identified three instances in which a municipality can be said to have violated the civil

Case 3:00-cv-01124-WIG    Document 180    Filed 05/30/2007    Page 16 of 22

Page 5

2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

rights of a person because of its policy: (1) an express [*14] policy that, when enforced, causes a constitutional deprivation; (2) "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law;'" or (3) an allegation that the constitutional injury was caused by a person with "final policymaking authority."

*Baxter v. Vigo County Sch. Corp., 26 F.3d 728, 734-35 (7th Cir. 1994)* (citations omitted). Clearly, Village is not liable, simply as the employer, for the acts of Shaw, Martin, or Box. Plaintiffs attempt to proceed only under the third prong and argue that Village can be held liable because Shaw and Martin are final policymakers.

The determination as to whether a person is a final policymaker for *§ 1983* purposes is a question of local law. *Auriemma v. Rice, 957 F.2d 397, 400 (7th Cir. 1992)*. Pursuant to Illinois law, a municipal manager, such as Shaw, merely has the power to enforce municipal laws and ordinances and has no right to vote at board meetings. *65 ILCS 5/5-3-7(1), (6)*. A final policymaker, conversely, has the "authority to adopt rules for the conduct of government. [*15] Authority to make a final decision need not imply authority to establish rules." *Auriemma, 957 F.2d at 401*. According to Illinois law, Shaw, and certainly Martin, did not have the authority to adopt rules for the conduct of Village. Only the Board possessed such power. Therefore, this court finds that neither Shaw nor Martin is a final policymaker for *§ 1983* purposes.

The only action of the Board, the final policymaker of Village, at issue in this case is its passage of an ordinance reducing the number of deputy chiefs of police from two to one. Plaintiffs have not pointed to any evidence establishing that this express policy caused F. Kaupas to lose his job or that such ordinance was based on racial animus. Consequently, because plaintiffs have no basis in the law to hold Village or Board liable, Village and Board are entitled to summary judgment on all *§ 1983* claims against them.

B. *Section 1983* Equal Protection Claims Against Individual Defendants

1. Disparate Treatment

Plaintiffs assert that defendants are personally liable for discriminating against them because of their race in violation of the *Fourteenth Amendment's Equal Protection Clause* and [*16] *42 U.S.C. § 1983*. As the Seventh Circuit recently explained, "the same standards for prov-

ing intentional discrimination apply to *Title VII* and *§ 1983* equal protection." *Williams v. Seniff, 342 F.3d 774, 2003 U.S. App. LEXIS 17047, *32, No. 02-1231 n.13 (7th Cir. Aug. 20, 2003)*. Further, like Title VII, plaintiffs "can prevail on [their] equal protection claims by offering direct proof of discriminatory intent, or [they] may prove discriminatory intent by circumstantial evidence." *2003 U.S. App. LEXIS 17047 at *30*. Therefore, the Title VII disparate treatment discussion below is applicable to plaintiffs' equal protection disparate treatment claims here. However, "*section 1983* creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a *§ 1983* action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983)*.

F. Kaupas alleges that Shaw discriminated against him on the basis of race with regards to the terms and conditions of his employment by demoting him and demanding he reimburse Village for allegedly improper overtime pay. n7 R. Kaupas asserts [*17] that Martin suspended her because of her race. n8 The undisputed facts show that Box was not personally involved in making any of these decisions; thus, summary judgment is granted in his favor on the *§ 1983* disparate treatment claims. To be clear, and as is explained in detail below, with respect to Shaw (for F. Kaupas's claim) and Martin (for R. Kaupas's claim), because issues of material fact exist whereby a jury could infer intentional discrimination, summary judgment must be denied.

n7 F. Kaupas does not actually specify against which defendants this *§ 1983* claim is brought, but the undisputed facts show that only Shaw was involved in making these decisions, and thus potentially only he can be held liable.

n8 Again, R. Kaupas does not indicate who the defendant is, but because only Martin was involved in making the decision to suspend her, he is the only potentially liable defendant.

2. Hostile Work Environment

Plaintiffs argue that Shaw, Martin, and Box personally created a racially hostile [*18] work environment in violation of the *Equal Protection Clause* and *§ 1983*. R. Kaupas asserts that the individual defendants created a sexually hostile work environment. As with the *§ 1983* equal protection disparate treatment claims above, *§ 1983* equal protection hostile work environment claims follow the same standard as Title VII. *McPhaul v. Bd. of Comm'rs of Madison County, 226 F.3d 558, 566 n.6 (7th Cir. 2000)*. This court will discuss fully plaintiffs' hostile

Case 3:00-cv-01124-WIG    Document 180    Filed 05/30/2007    Page 17 of 22

Page 6
2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

work environment claims below. n9 To be clear, though, because material facts are in dispute as to whether Shaw and/or Martin created a hostile environment, summary judgment is denied as to the racially hostile work environment claims. n10 However, summary judgment is granted with regard to the sexually hostile work environment.

n9 Only the first part of the Title VII analysis, i.e., whether the individual defendants personally created a subjectively and objectively hostile environment, is relevant to *§ 1983* liability.

N10 With respect to Box, summary judgment on this *§ 1983* claim is granted. The undisputed facts show that at most he made a comment or two, such as "these white mother fuckers have to go." Although crude and highly offensive, such an isolated comment does not by itself create an objectively hostile work environment. As to supervisors Shaw and Martin, as will be discussed in the text below, they not only acquiesced in numerous racially divisive comments but also failed to take any actions to remedy the problems. Consequently, a jury could find that they personally created an objectively hostile environment.

[*19]

C. *Section 1983 First Amendment* Retaliation Claim Against Shaw n11

n11 Because the undisputed facts show that Shaw alone, and not Martin or Box, had anything to do with the Village vehicle policy, only Shaw potentially can be held liable under *§ 1983.*

To prevail on a *First Amendment* retaliation claim, F. Kaupas n12 must show that: (1) his speech was a matter of public concern; and (2) the speech played at least a substantial part in Shaw's decision to remove F. Kaupas's take-home vehicle privileges. If F. Kaupas can carry his burden on these two elements, Shaw can prevail only if he proves by a preponderance of the evidence that Village's interest, as an employer, in efficiently providing government services outweighs F. Kaupas's *First Amendment* interests, or if Shaw can prove that Village would have disciplined F. Kaupas even in the absence of the speech. *Gustafson v. Jones, 290 F.3d 895, 906 (7th Cir. 2002).* In the case at hand, the speech at issue is F. Kaupas's voting at a township [*20] meeting. With respect to the prima facie case, Shaw admitted that the voting did not violate departmental policy, i.e., was not

politically motivated, and that it played a part in Shaw's decision to amend the Village policy. Shaw argues, however, that driving the vehicle to vote violated departmental policy. Shaw's own deposition testimony contradicts this argument. Shaw admitted that it was not deemed politically motivated abuse to vote at a township meeting. (Pls.' Mem. at 8, citing to Shaw Dep. at 257.) Further, Shaw conceded that he believed his actions violated F. Kaupas's free speech rights. (Defs.' Stmt. of Facts P 111.) A material question of fact remains as to whether Shaw would have eliminated the vehicle privilege in the absence of F. Kaupas's vote. Consequently, summary judgment must be denied.

n12 Although it appears that R. Kaupas may have alleged a *First Amendment* violation, she has produced absolutely no evidence in support of her claim. Therefore, even if such claim is in fact alleged, Shaw is entitled to summary judgment in his favor.

[*21]

II. Count II *Section 1985* Claim Against Individual Defendants

In order to state a claim under *42 U.S.C. § 1985(3),* plaintiffs must demonstrate (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens. *Green v. Benden, 281 F.3d 661, 665 (7th Cir. 2002).* In order to establish the existence of a conspiracy, plaintiffs must demonstrate that the conspirators had an agreement to inflict injury or harm upon plaintiffs. *Hernandez v. Joliet Police Dep't, 197 F.3d 256, 263 (7th Cir. 1999).* In the case at hand, plaintiffs have not submitted any evidence of a conspiracy between Shaw, Martin, or Box to deprive plaintiffs of equal protection of the laws. In fact, plaintiffs spend one short paragraph on the issue and make sweeping generalizations. (Pls.' Mem. at 14-15.) Furthermore, under the intracorporate conspiracy doctrine, a conspiracy cannot exist solely between members of the same entity. *Payton v. Rush-Presbyterian-St. Luke's Med.Ctr., 184 F.3d 623, 632 (7th Cir. 1999).* [*22] The Seventh Circuit has made clear that this intracorporate conspiracy doctrine applies to municipal employees except in "egregious circumstances." *Id. at 633.* In *Hartman v. Bd. of Trustees of Cmty, College, 4 F.3d 465 (7th Cir.1993),* the Seventh Circuit explained that such egregious circumstances do not include every instance of invidiously discriminatory motivation but rather exist when employees are "motivated *solely* by personal bias." *Id. at 470* (emphasis

Case 3:00-cv-01124-WIG    Document 180    Filed 05/30/2007    Page 18 of 22

Page 7

2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

added). Here, plaintiffs have not shown that the individual defendants were motivated solely by personal bias. Consequently, summary judgment as to plaintiffs' *§ 1985* claims is granted.

### III. Count III *Section 1986* Claim Against Individual Defendants

*42 U.S.C. § 1986* establishes a cause of action against any person who fails to prevent a conspiracy to violate civil rights. Because, as stated above, as a matter of law, no conspiracy existed between Shaw, Martin, and Box, they cannot be held liable for failing to prevent a conspiracy. Therefore, defendants' motion for summary judgment on this claim is granted.

### IV. Count IV *Section 1981* [*23]  Claims Against Village

Claims pursuant to *42 U.S.C. § 1981* are analyzed under the same standards as Title VII. *Logan v. Kautex Textron N. Am., 259 F.3d 635, 637 n.1 (7th Cir. 2001).* As such, the Title VII analysis below applies to plaintiffs' *§ 1981* claims.

### V. Count V Title VII Claims Against Village

Under Title VII of the Civil Rights Act of 1964, *42 U.S.C. §§ 2000e-2000e-15,* it is unlawful for an employer, such as Village, "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... [or] sex ...." *42 U.S.C. § 2000e-2(a)(1).* Plaintiffs advance both individual disparate treatment and hostile work environment claims.

#### A. Disparate Treatment (F. Kaupas)

F. Kaupas alleges that he was demoted from deputy chief to sergeant on the basis of his race in violation of Title VII. He has two methods available to him to prove that Village discriminated against him through either (1) the direct method or (2) the indirect method. *Venturelli v. ARC Cmty. Servs., Inc., 336 F.3d 606, 612 (7th Cir. 2003).* [*24]  F. Kaupas clearly proceeds under only the first of these, the direct method. (Pls.' Mem. at 2 ("Our memorandum will focus on the direct method.").) As such, this court will not address F. Kaupas's claim under the indirect method.

Under the direct method, two types of evidence are permissible: direct and circumstantial. *Venturelli, 336 F.3d at 612.* Direct evidence includes evidence that if believed would prove the fact in question "without reliance on inference or presumption." *Id,* The Seventh Circuit has pointed out that "direct evidence 'essentially requires an admission by the decision-maker that his

actions were based upon the prohibited animus.'" *Id,* (citation omitted). Circumstantial evidence is evidence that allows a jury to infer intentional discrimination by the decisionmaker. Id. F. Kaupas claims that he has both "direct and circumstantial" evidence. (Pls.' Mem. at 2.) However, he fails to in any way classify his evidence or attempt to distinguish which evidence he believes is direct and which circumstantial. He apparently leaves this task to this court. Consequently, this court finds that F. Kaupas's evidence is best characterized as circumstantial [*25]  evidence and will be analyzed as such.

The Seventh Circuit has identified three categories of circumstantial evidence under the direct method approach, "each of which may suffice by itself to establish discrimination, or may be used in conjunction with one or both of the other categories." *Venturelli, 336 F.3d at 615.* According to Venturelli:

> The first category consists of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." The second type requires a showing that the employer systematically treated other, similarly situated, [black] employees better. The third type is evidence that the plaintiff was qualified for the position in question but passed over in favor of a person not having the forbidden characteristic and that the employer's stated reason for its decision is "unworthy of belief, a mere pretext for discrimination." The latter category "is substantially the same as the evidence required" under the indirect method.

*Id.* (citations omitted). It appears that [*26]  all of F. Kaupas's evidence falls within the first category.

Viewing all the evidence in the light most favorable to R. Kaupas, this court finds that material issues of fact exist. A factfinder could infer that Village intentionally discriminated against him because of his race in demoting him. First, a jury could infer that Shaw, the decisionmaker with respect to the demotion, by remaining silent and not reprimanding, remedying, or correcting employees' comments at the meeting from which a person could infer racial bias, acquiesced in the employees' comments. In other words, Shaw's silence equaled concurrence. A jury could infer that by not speaking up or admonishing the allegedly harassing black employees

2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

and allowing them to go on and on that Shaw, who is black, "said" such racially divisive things as "us vs. them," "our turn to shine," "more of us than there are of them now," and "these white mother fuckers have to go." n13 Second, a month or so after the departmental meeting, and two-and-a-half weeks after R. Kaupas submitted a letter of complaint to Martin, Shaw, for the first time, questioned F. Kaupas's taking of overtime pay. Shaw then demoted F. Kaupas because F. Kaupas [*27] allegedly lied about former chief Leonard approving such overtime. The record shows that material facts are in dispute about what Leonard said to F. Kaupas about prior practices and to deputy chief Mel Easley ("Easley") during Easley's investigation of the overtime. If a jury believes Leonard that he told F. Kaupas and/or Easley that deputy chiefs during Leonard's tenure as chief were given the option of taking financial compensation for overtime, it could infer, based on the departmental meeting and the R. Kaupas letter, which both occurred in close proximity to the overtime investigation, that Shaw demoted F. Kaupas because of F. Kaupas's race. Consequently, Village's motion for summary judgment is denied.

> n13 The comment of Barnett-Brookins is not circumstantial evidence of intentional discrimination because it was not made by Shaw, the decisionmaker, nor can it be attributable to him.

### B. Disparate Treatment (R. Kaupas)

R. Kaupas maintains that she was suspended by Martin because of her race. (Pls.' 56.1(b)(3)(A) [*28] Resp. PP 8, 11.) Although not explicit, this court infers that she too, like her husband, proceeds under the direct method. Again, like F. Kaupas, a reasonable jury could infer that Martin's, the decisionmaker with respect to R. Kaupas's suspension, failure to intercede or admonish other employees at the meeting was the same as him making the comments. Further, Martin did not investigate R. Kaupas's or the other employees' complaints of race discrimination. A jury could very well find that R. Kaupas did swear at Martin and this is why he suspended her. However, this court cannot make findings regarding disputed facts on summary judgement. Because factual questions exist as to whether Martin intentionally discriminated against R. Kaupas on the basis of her race, summary judgment must be denied.

### C. Hostile Work Environment (Race)

Both plaintiffs allege that their work environment at Village was so hostile that they were constructively discharged. In this Circuit, to recover on a hostile work environment claim based on race, an employee must show that: 1) he or she was subject to unwelcome harassment;

2) the harassment was based on his or her race; 3) the harassment was severe or [*29] pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and 4) there is a basis for employer liability. *Mason v. Southern Ill. Univ. at Carbondale, 233 F.3d 1036, 1043 (7th Cir. 2000).* The primary issues in the case at hand are whether plaintiffs' work environment was actionably hostile and whether Village can be held liable.

"Plaintiff[s] must ... show that [their] work environment was both subjectively and objectively hostile." *McPhaul, 226 F.3d at 566.* An objectively hostile environment is one that a reasonable person would find hostile or abusive. *Id. at 567.* In making this assessment, courts consider the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (citations omitted). In the case at hand, clearly both plaintiffs subjectively felt that their work environment at Village was hostile. Plaintiffs argue that the following made their work environments [*30] objectively hostile: the departmental meeting and lack of investigation of race-related complaints. According to several employees, the Village police department was rife with racial hostility, i.e., racial hostility was pervasive. n14 Moreover, the comments made at the departmental meeting were more than just mildly offensive utterances, teasing, or offhand remarks. Comments such as "us vs. them," "our turn to shine," and "more of us than there are of them now" imply serious racial division and segregation. Plaintiffs could reasonably have believed that their jobs-and maybe safety-were in jeopardy when black employees said things like "these white mother fuckers have to go," and supervisors Shaw and Martin stood by and did nothing to disavow themselves or Village of the comments. A jury could find that the racially divisive remarks interfered with plaintiffs' work performance. In addition, neither Shaw nor Martin investigated the seven complaints of racial or other harassment. A jury could find that Village unreasonably refused to remedy the hostile environment. Because there are material questions of fact by which a jury could find that the work environment was objectively hostile, [*31] summary judgment cannot be granted.

> n14 Defendants argue in their reply that such opinion testimony is not admissible. However, the employees are not opining as to the motivation of Village decisionmakers; rather, they are presenting evidence based on their perceptions of the employment environment. Such evidence is admissible under *Federal Rule of Evidence 701.*

Case 3:00-cv-01124-WIG    Document 180    Filed 05/30/2007    Page 20 of 22

Page 9

2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

Because a material question of fact remains as to whether plaintiffs' work environment was hostile, although the parties did not do so, this court must assess whether a basis exists for Village's liability. The Supreme Court, in *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998),* and *Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998),* set forth the test to be used to determine whether an employer is vicariously liable for an employee's conduct. The Seventh Circuit stated:

"An employer is subject to vicarious liability to a victimized [*32] employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." Vicarious liability automatically applies when the harassing supervisor is either (1) "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy," or (2) "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Absent either of these situations, however, an employer may avoid vicarious liability by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Johnson v. West, 218 F.3d 725, 730 (7th Cir. 2000)* (citations omitted). n15

n15 Although *Ellerth, Faragher,* and *Johnson* all involve sexual harassment, the same standard applies to racial hostile work environment claims as well. See *Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345 (7th Cir. 1999).*

[*33]

The first question for this court is whether either Shaw or Martin qualifies as Village's proxy. With respect to Shaw at least, a question of material fact exists. As Village manager under the managerial form of govern-

ment, Shaw is the administrative head of Village and has extensive powers and duties. See *65 ILCS 5/5-3-7.* Shaw's duties and responsibilities are similar to a proprietor, partner, or corporate officer such that a factfinder could find that he is Village's proxy. *Faragher, 524 U.S. at 789-90.* The second question is whether one of plaintiffs' supervisors n16 took a tangible employment action against plaintiffs. *Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir. 2001).* If so, Village is automatically vicariously liable for the supervisor's acts. *Id. at 1142.* A tangible employment action "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (citation omitted). In the case at hand, like in Wolf, plaintiffs were not terminated. [*34] They resigned, and now they claim to have been constructively discharged. Although the Seventh Circuit has not determined whether constructive discharge is a tangible employment action, this court need not address this issue because the undisputed facts show that plaintiffs were not constructively discharged.

n16 Although the parties do not address the question of plaintiffs' supervisors, it appears from the record that Martin and Shaw were supervisors within the meaning of Title VII.

"An employee can assert a claim of constructive discharge when he is forced to resign because his working conditions, from the standpoint of the reasonable employee, have become unbearable." *Id.* Further, "absent extraordinary conditions, 'a complaining employee is expected to remain on the job while seeking redress.'" *Id. at 1143* (citation omitted). "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because 'in the 'ordinary' case, an [*35] employee is expected to remain employed while seeking redress.'" *Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000)* (citation omitted). In the case at hand, although questions of material fact exists as to whether the work environment was hostile, this court finds that no questions of material fact remain as to whether plaintiffs' situation was so extreme as to warrant their resignation as the only alternative to avoiding or overcoming the hostile environment. Extraordinary circumstances were not present such that plaintiffs could not remain on the job. Admittedly, the environment was probably uncomfortable for plaintiffs, but they could have sought other avenues of redress other than quitting.

Because neither Martin nor Shaw took tangible employment actions against plaintiffs, the question becomes whether Village is entitled to the affirmative defense-a

Case 3:00-cv-01124-WIG    Document 180    Filed 05/30/2007    Page 21 of 22

Page 10

2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

question Village never addresses in its summary judgment papers. Did Village exercise reasonable care to prevent and correct promptly any the racially harassing behavior? Clearly, issues of material fact remain. The sparse record on this issue evinces that supervisors Shaw and Martin took little [*36] if any action to prevent future harassment. Although Shaw distributed a memorandum to employees and sought information on instances of discrimination, neither he nor Martin took any action on the seven letters Shaw received. There are material issues of fact as to whether these claims were frivolous and baseless and whether Shaw and/or Martin took appropriate actions to remedy the allegedly hostile environment. Moreover, viewing the facts in the light most favorable to plaintiffs, as this court must, there are questions of fact as to whether Shaw or Martin corrected the allegedly hostile behavior at the June 6 departmental meeting. Because Village has not clearly advanced any evidence in support of its affirmative defense and because material factual issues remain, summary judgment must be denied.

A different analysis applies to the alleged hostile environment created by Box with his racially divisive comments-again, an issue the parties do not address. Because Box was not a supervisor, but rather a co-worker, courts apply the following standard in determining whether the employer can be held liable: plaintiffs must show that the employer negligently failed to take reasonable steps [*37] to discover or remedy the co-worker harassment. *Haugerud v. Amery Sch. Dist., 259 F.3d 678, 696-97 (7th Cir. 2001).* As discussed above, Shaw and Martin attended the meeting where Box made allegedly hostile remarks. Moreover, Shaw received complaints about Box. It is thus disputed that Village did not negligently fail to discover or remedy the allege hostile environment. As such, summary judgment is denied.

D. Hostile Work Environment (Sex) (R. Kaupas)

R. Kaupas alleges that the one-minute e-mail video from Box constituted sexual harassment. The above racially hostile environment discussion applies with regard to R. Kaupas's sexual harassment claim. This claim fails for a several of reasons: (1) the harassment was not severe or pervasive; (2) it was not "because of" sex; and (3) there is no basis for Village's liability.

To prevail on her claim of sexual harassment based on hostile work environment, F. Kaupas must establish that: (1) she was subjected to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct [*38] was directed at her because of her sex; and (4) there is a basis for employer liability. *Hilt-Dyson v. City of Chicago, 282 F.3d 456,*

462-63 *(7th Cir. 2002).* Here, first, the undisputed facts show that R. Kaupas viewed the video one time only, after which she immediately deleted it. The video was one-minute in duration. This appears to have been the first time she received such an e-mail video from Box. Moreover, the e-mail did not contain any text and was from a co-worker, not a supervisor. This court finds that this video harassment was not severe or pervasive. Second, this court finds that the video was not mailed to R. Kaupas because of her sex. Box showed the same video to officer Tomany, a male, a few months before Box e-mailed it to R. Kaupas. (Pls.' 56,.1(b)(3)(A) Resp. P 145.) Finally, and most importantly, plaintiffs have not pointed to any evidence showing that Village can be held liable for Box's, a co-worker, alleged harassment. The undisputed facts show that R. Kaupas did not ever report the e-mail video incident to Village. (Pls.' 56.1(b)(3)(A) Resp. P 148.) Plaintiffs have not introduced any evidence by which a factfinder could find that Village negligently [*39] failed to take reasonable steps to discover or remedy Box's harassment. Consequently, Village's motion for summary judgment on this claim is granted.

VI. Count VI Intentional Infliction of Emotional Distress Claims

This court is not exactly sure which plaintiff (or perhaps both) is bringing the pendent intentional infliction of emotional distress ("IIED") claims. Even assuming it is both plaintiffs, defendants are entitled to summary judgment for two reasons. First, plaintiffs do not in their memorandum in response respond in any way to defendants' arguments made in their opening memorandum. Outside of the consolidated amended complaint, plaintiffs never address their IIED claims. As such, these claims are waived. See *Thompson v. G.E.S., Exposition Serv., 2001 U.S. Dist. LEXIS 5221, 2001 WL 321998, at *3 (N.D. Ill. Apr. 2, 2001).* Second, even if thy are not waived, "the Illinois Human Rights Act preempts tort claims that are 'inextricably linked' to allegations of sexual harassment and requires that such claims be brought only before the Illinois Human Rights Commission." *Quantock v. Shared Mktg. Servs., Inc., 312 F.3d 899, 905 (7th Cir. 2002).* Such reasoning presumably [*40] extends to IIED claims predicated on racial harassment as well. Because any IIED claims plaintiffs may have stem directly from their employment relationship with Village and relate to racial and/or sexual harassment, they are preempted. Therefore, defendants' motion for summary judgment is granted.

VII. Count VII Loss of Consortium Claim

R. Kaupas advances a loss of consortium claim. Again, as with the IIED claim, because plaintiffs do not respond to defendants' arguments, introduce any evi-

2003 U.S. Dist. LEXIS 15110, *; 92 Fair Empl. Prac. Cas. (BNA) 1236

dence, or address this claim at all, it is deemed waived. Plaintiffs do not advance any arguments or evidence to show that any issue of material fact exists with respect to this claim. Consequently, defendants' motion for summary judgment is granted.

CONCLUSION

For the reasons discussed above, summary judgment is granted in part and denied in part. As to the *§ 1983* claims against Village and Board (count I), *§ 1983* equal protection disparate treatment claim against Box (count I), *§ 1983* equal protection hostile work environment claim against Box (count I), R. Kaupas's *1st Amendment* retaliation claim (count I), all *§ 1985* claims (count II), all *§ 1986* claims (count III), R. Kaupas's [*41] sexual harassment claim (count V), intentional infliction of emotional distress claims (count VI), and R. Kaupas's loss of consortium claim (count VII), summary judgment

is granted. As to the remaining claims, summary judgment is denied.

The pre-trial schedule previously set is modified as follows: the final pretrial order is due on or before September 9, 2003; motions in limine are due also on September 9 and should be filed separately from the final pretrial order and separately from one another; responses to motions in limine, if any, are to be filed no later than September 16, 2003; the final pretrial conference is set for September 23, 2003, at 4:30 p.m. Trial remains set to commence at 9:00 a.m. on September 29, 2003.

To make it patently clear for trial preparation purposes, this court has summarized the remaining claims in the table below. The parties are strongly encouraged to discuss settlement.

| Count | Claim | Plaintiff(s) | Defendant(s) |
|-------|-------|--------------|--------------|
| I | Section 1983 disparate treatment | F. Kaupas | Shaw |
| I | Section 1983 disparate treatment | R. Kaupas | Martin |
| I | Section 1983 hostile work environment (race) | Both | Shaw, Martin |
| I | Section 1983 1st Amendment retaliation | F. Kaupas | Shaw |
| IV | Section 1981 disparate treatment | F. Kaupas | Village |
| IV | Section 1981 disparate treatment | R. Kaupas | Village |
| IV | Section 1981 hostile work environment | Both | Village |
| V | Title VII disparate treatment | F. Kaupas | Village |
| V | Title VII disparate treatment | R. Kaupas | Village |
| V | Title VII hostile work environment (race) | Both | Village |

[*42]

ENTER:

JAMES F. HOLDERMAN

United States District Judge

DATE: August 29, 2003