# TAB C

LEXSEE 1999 U.S. DIST. LEXIS 11799

**DEBORAH BROWNELL, Plaintiff, -against- ROADWAY PACKAGE SYSTEMS, INC., d/b/a RPS, A Caliber Systems Co., Defendant.**

**97-CV-1034 (LEK/RWS)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

***1999 U.S. Dist. LEXIS 11799***

**June 29, 1999, Decided**
**June 29, 1999, Filed**

**DISPOSITION:** [*1] RPS's motion for summary judgment GRANTED-in-part and DENIED-in-part and Plaintiff's motion for summary judgment DENIED.

**COUNSEL:** FOR PLAINTIFF: Debra J. Schmidt, Esq., Karen A. Butler, Esq., THUILLEZ, FORD, GOLD & JOHNSON, L.L.P., Albany, NY.

FOR DEFENDANT: Evan J. Spelfogel, Esq., Elana S. Marcus, Esq., EPSTEIN BECKER & GREEN, P.C., New York, NY.

**JUDGES:** LAWRENCE E. KAHN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** LAWRENCE E. KAHN

**OPINION:**

**MEMORANDUM - DECISION AND ORDER**

I. Introduction

Plaintiff Deborah Brownell ("Plaintiff") brings this action claiming that Defendant, Roadway Package System, Inc. ("RPS"), created a hostile work environment and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, *42 U.S.C. § 2000e,* et seq. (1994). Plaintiff also alleges violations of New York State law.

Presently before this Court is RPS's motion for summary judgment on Plaintiff's hostile work environment and retaliation claims under Title VII. RPS also moves for summary judgment on the issue of whether Plaintiff properly mitigated her damages. Plaintiff cross-moves for summary judgment on her retaliation claim.

II. Background [*2]

Because RPS moves for summary judgment, the facts are described in a light most favorable to Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Maguire v. Citicorp Retail Servs., Inc., 147 F.3d 232 (2d Cir. 1998).* From September 9, 1994 to January 7, 1997, Plaintiff was employed by RPS as a secretary in its Latham, New York location. RPS is in the business of delivering packages, typically business to business. Plaintiff's immediate supervisor during the relevant time period was David Durette ("Durette"), RPS terminal manager for the Latham office.

Sometime in April or May, 1996, Plaintiff brought her ten (10) year-old-son to work with her. During that visit, Plaintiff claims that Jim Murphy ("Murphy"), a quality assurance clerk, and Tim Hartman ("Hartman"), of janitorial services, said the following to Plaintiff's son: "Hey little boy want to play hide the sausage." Comments similar to the foregoing continued the rest of that day. In fact, Plaintiff claims that Murphy and Hartman made sexually charged comments regarding Plaintiff's son several times per week until approximately [*3] November 1996. Plaintiff contends that on certain occasions these conversations were witnessed by Durette, Mike LeFort ("LeFort"), the package and delivery ("P and D") manager, and Jim McDade ("McDade"), the P and D Coordinator.

In June 1996, while on the phone with Gary Pagano ("Pagano"), the manager of the RPS terminal in Hartford, Connecticut, Pagano proposed that Plaintiff and he double a pre-existing interoffice bet. Pagano bet Plaintiff that if the Latham terminal surpassed the Hartford terminal in accounts receivable, Pagano's secretary would do Latham's accounts receivable for the month and Plaintiff would receive double the flowers of the earlier bet. If the Hartford terminal won, however, Plaintiff avers that Pa-

gano suggested he would win Plaintiff for a night of "dinner, dancing and you know what." Complaint P 15. Plaintiff immediately objected to the tone of the conversation and reported it to Durette. In response, Plaintiff claims Durette stated that Pagano's comment was "just a joke." Id. Plaintiff avers that in subsequent telephone conversations with Pagano, he was rude, angry, and threatening. This behavior continued until November 1996. In December 1996, Plaintiff [*4] reported the conversations with Pagano to the Albany County Rape Crisis Center as a sexual harassment complaint. Pl.'s Dep. at 66-68.

In July or August 1996, Don Mitchell ("Mitchell"), a line haul driver, attempted to hug Plaintiff. When Plaintiff pulled away, she accidentally pulled Mitchell's suspenders. In response, Mitchell pulled Plaintiff's bra straps. Immediately following this incident, Mitchell attempted to pull Plaintiff's chair closer to him so that he could sit on her lap. Plaintiff immediately complained to Durette of Mitchell's conduct. In response, Durette notified Michael Foell ("Foell"), Mitchell's supervisor, of the incident. Foell then spoke to Mitchell about his actions and arranged for Mitchell never to be in Plaintiff's area again.

Throughout the time period including September 1996 to November 1996, Ron Rogers ("Rogers"), a P and D contractor, made the following comments toward Plaintiff: "don't bend over," "you have a cute butt," "get me coffee honey," "if you don't like it, I'll tell your boss," and "I think your blouse is unbuttoned." Id. After the last comment regarding Plaintiff's blouse, Plaintiff claims Rogers placed his finger close to her breasts. [*5] At times, these comments occurred in front of Durette who did nothing to stop them and in fact laughed with Rogers on occasion. Though Plaintiff reported to Durette that Rogers was behaving inappropriately towards her, she did not tell Durette the specifics of what Rogers said. Pl.'s Dep. at 63.

Plaintiff further alleges that at the end of October or beginning of November, 1996, Dan Foster ("Foster"), a terminal employee, put his hands on Plaintiff's waist and kissed and nuzzled her neck. Plaintiff contends she pushed Foster away and that these actions occurred while she was at her desk on the phone with customers. Plaintiff also reported Foster to Durette. Again, however, she did not tell Durette about all of specifics of the alleged incident she now describes in this litigation. Pl.'s Dep. at 64. According to the record, Foster never again behaved inappropriately towards Plaintiff.

A few weeks later, Plaintiff overheard Rogers talking with Durette. Though she failed to hear the entire conversation, she did hear her name mentioned followed by laughter. Afterwards, Durette, while laughing, told her that "that was a really bad joke Ron told about you, you should hit him." Complaint [*6] at P 15.

On November 21, 1996, Plaintiff asked to speak to a supervisor regarding the foregoing acts. Durette told Plaintiff to put her complaints in writing so that she could give a written account to Alex Kapinos ("Kapinos"), the regional manager. Plaintiff prepared handwritten notes that described her complaints. At the end of the day, Plaintiff presented this written account to Kapinos and also made a verbal complaint as to the acts described in the written document.

Subsequent to filing her complaint with Kapinos, Plaintiff contends she began receiving anonymous phone calls at her desk where the caller would either hang up or say "bitch" and then hang up. These calls continued into December 1996. Plaintiff told Durette of the calls but Plaintiff claims that Durette did nothing to stop or to investigate the calls.

On November 26, 1996, Kapinos requested that Plaintiff meet with RPS legal counsel from Pittsburgh, Pennsylvania. On December 2, 1996, Plaintiff was contacted by Gary Dunbar ("Dunbar"), one of RPS's attorneys. Dunbar requested a meeting with Plaintiff, but Plaintiff refused to speak with him unless her own legal counsel could be present. Dunbar tried two more times [*7] to speak with Plaintiff, but she immediately hung up the telephone when Dunbar identified himself as the caller. Pl.'s Dep. at 108-09. In fact, Plaintiff filed an incident report for what she claims were harassing phone calls from Dunbar. Id.

On December 12, 1996, Plaintiff requested a copy of RPS's sexual harassment policy from Durette. Durette claimed he did not have a copy and Plaintiff did not recall ever seeing one. Ultimately, Plaintiff was able to obtain a copy of the policy from RPS's Human Resources Department.

On December 19, 1996, Plaintiff met with Heather Hart ("Hart"), a member of the RPS Human Resources Department, and verbally complained of the above-described acts. Plaintiff met again with Hart on January 7, 1997, this time in the presence of Durette. At this meeting, Hart told Plaintiff that her investigation revealed that the acts about which Plaintiff complained did not constitute sexual harassment.

Shortly after this meeting, Ron Rogers entered the terminal and commented on the fact that Plaintiff had not made coffee. Complaint at P 24. Specifically, Plaintiff contends Rogers stated that "someone needs to get that little lady in gear." Id. Plaintiff [*8] asked to speak with Rogers on the loading dock to ascertain whether anyone had spoken with him regarding her complaints. While they were out on the loading dock, Plaintiff alleges that

Rogers opened his overcoat and asked Plaintiff if she would like to "step inside" where it was warmer, allegedly referring to the inside of his overcoat. Id.

Immediately upon re-entering the building, Plaintiff reported the incident via electronic mail to Durette. Durette later notified Hart who told Plaintiff she was being "ridiculous" and that Rogers's action was "just a joke." Id. at P 25. Hart then asked Plaintiff to leave the premises and told Plaintiff that she was not fired and that she would continue to get paid. In fact, Plaintiff continued to get paid from RPS until April 3, 1997 when she was terminated.

Plaintiff contends that the above acts constitute hostile work environment sexual harassment and unlawful retaliation in violation of Title VII. RPS moves for summary judgment asserting that Plaintiff cannot make out a prima facie case for hostile work environment and that she was terminated for legitimate non-discriminatory reasons. RPS also contends that Plaintiff cannot show that [*9] she is entitled to either back or front pay.

III. Discussion

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. *Fed. R. Civ. P. 56*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Lang v. Retirement Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).* The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. *Fed. R. Civ. P. 56*; *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990).* Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Project Release v. Prevost, 722 F.2d 960, 968 (2d Cir. 1983).* A genuine issue is an issue that, if resolved [*10] in favor of the non-moving party, would permit a jury to return a verdict for that party. *R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997)*(citing *Anderson, 477 U.S. at 248).*

When the moving party has met the burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., 475 U.S. at 586.* At that point, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56*; *Liberty Lobby Inc., 477 U.S. at 250; Matsushita Elec. Indus. Co., 475 U.S. at 587.* To withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc., 477 U.S. at 248-249; Matsushita Elec. Indus. Co., 475 U.S. at 587.* Thus, summary judgment is proper where there is "little or no evidence . . . in support of the non-moving party's case." *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-1224 (2d Cir. 1994)*(citations omitted).

In the context [*11] of discrimination cases, "[a] grant of summary judgment is proper only if the evidence is so slight that no rational jury could find in Plaintiff's favor." *Id. at 1224;* see also *Viola v. Philips Med. Sys. of N. Am., 42 F.3d 712, 716 (2d Cir. 1994).* Further, a court reviewing a motion for summary judgment is called upon only to determine whether the "'proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn.'" *Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995)*(quoting *Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994)).* The instant case is reviewed with the foregoing standards in mind.

A. Hostile Work Environment

Title VII makes it unlawful for "an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2* [*12] (a)(1) (1994). As such, it has been interpreted to protect against two forms of sexual harassment: quid pro quo and hostile work environment. *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64-65, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986).* See also *Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998).* Only the latter is at issue here.

A plaintiff asserting a hostile work environment claim must prove "(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996).* See also *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).* In order to establish the first prong, a plaintiff must show that the work environment was objectionable when viewed through both a subjective and an objective lens. That is, a finder of fact must be satisfied that a reasonable person would have found it hostile, and that [*13] the plaintiff perceived it to be so as well. *Harris, 510 U.S. at 21-22.*

In Harris, the Supreme Court directed courts to look at the totality of the circumstances in order to objectively assess the conditions of the work environment. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Id. at 23.* Simple teasing or isolated incidents, unless extremely serious, do not violate Title VII. See, e.g., *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998).* Rather, the alleged incidents "must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998).* It should be noted that "whether a reasonable person would objectively perceive this conduct to create a hostile work environment is a matter frequently left to the sound discretion of reasonable jurors." *Dobrich v. General Dynamics Corp, Elec. Boat Div., 40 F. Supp. 2d 90, 99 (D. Conn. 1999).* [*14]

RPS asserts that Plaintiff cannot establish a hostile work environment claim because some of the alleged incidents were not based on Plaintiff's gender, some happened only once, and the alleged conduct was not unwelcome, or stated otherwise, was not subjectively objectionable.

RPS's objections are unavailing. RPS contends that comments about Plaintiff's son by Hartman and Murphy and those made about or to Plaintiff by Rogers ("get me coffee" and "if you don't like it, I'll tell your boss") are gender neutral and, therefore, cannot form the basis of a Title VII claim. RPS's approach is fundamentally flawed in that it essentially seeks to remove each individual incident from its circumstantial context. The Supreme Court's directive for courts to examine the totality of the circumstances would be rendered a nullity if after listing all instances of the alleged conduct, courts animated an inquiry which examined an individual incident in isolation. Such an inquiry would risk losing sight of the fact that certain comments or conduct, though not explicitly in sexual or harassing terms may nonetheless further stereotypes that lead to discriminatory or denigratory treatment. See *Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 707, n.13, 55 L. Ed. 2d 657, 98 S. Ct. 1370 (1978)* [*15] ("'In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'")(quoting *Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1198 (7th Cir. 1971)).* The Supreme Court has recently reaffirmed this notion by stating that "the line between animus and stereotype is often indistinct, and it is not always necessary to distinguish between them." Olmstead v. Zimring, U.S. , , *119 S. Ct. 2176, 144 L. Ed. 2d 540, 1999 U.S. LEXIS 4368,* *52, *1999 WL 407380,* *16 (1999) (Kennedy, J., concurring)(construing Americans with Disabilities Act). Here, comments such as "get me coffee" though certainly not sufficient standing alone to support a finding of sexual harassment, may nevertheless taken in context reveal a workplace permeated with comments made or conduct taken in conformity with stereotypes which in turn lead to harassment. At the very least, this Court is not willing to say as a matter of law that a reasonable juror with all of the evidence before him or her could not so find.

Furthermore, the fact [*16] that some of the remaining incidents happened once is not conclusive. See *Richardson v. New York State Dept. of Correctional Serv., 180 F.3d 426, , 1999 U.S. App. LEXIS 13249,* *18 (2d Cir. 1999)(stating the quantity, severity, and frequency of the alleged incidents must be considered "'cumulatively'" so that a court can "obtain a realistic view of the work environment.'")(quoting *Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 444 (7th Cir. 1994).* Literal application of RPS's argument would mean that a putative plaintiff would have no claim against her employer if each of her coworkers engaged in objectionable, though not extreme conduct only once. So, for example, a plaintiff working in a company of ten (10) employees would have to endure more than ten denigrating comments provided that each individual comment came from a different person. Given RPS's first argument, this would hold with greater force if some of the comments were innocuous when viewed alone.

In its third objection, RPS contends that Plaintiff's own behavior reveals the fact that the comments, if any, made by other RPS employees were not unwelcome. For example, RPS points to the fact that [*17] Plaintiff referred to other RPS employees and contractors as "cutie," "honey," "babe," or "sweetie" n1 and started a rumor that Mike LeFort was having an extramarital affair knowing same was not true just to see how quickly rumors spread around RPS. See Durette Dep. at 257-58. Indeed, Plaintiff admits to starting the vicious lie about LeFort for the reason given. See Plaintiff's Dep. at 140. These are certainly issues with which the jury may wrestle in terms of determining whether there in fact was a hostile work environment here. It is no surprise that here as in other cases, the finding may turn on an assessment of witness credibility which cannot be done at the summary judgment stage.

n1 See Durette Dep. at 262, Foell Dep. at 37, LeFort Dep. at 49, 55, Melander Dep. at 27, Murphy Dep. at 67-68, Puccio Dep. at 23 (Plaintiff called him "dolly") referred to herself as "the chick," flirted with other RPS employees, see

McDade Dep. at 42-43, 45 (Plaintiff flirted with Paul Melander and RPS drivers)

[*18]

By rejecting RPS's contentions, this Court is not adhering to a view that would find liability for even the slightest workplace impropriety. Rather, viewing the record as a whole this Court simply finds that Plaintiff has put forth sufficient evidence for a rational finder of fact to find in her favor as to the first prong of the hostile work environment analysis.

The second thing a plaintiff needs to show in order to make out a hostile work environment claim is that the conduct that created the hostile environment should be imputed to the employer. See *Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995).* Plaintiff's complaint predominantly revolves around the alleged actions of her coworkers. Plaintiff does not allege that Durette, her supervisor, made any comments or initiated any physical contact himself, but rather that he overheard the allegedly inappropriate comments, laughed at the comments or conduct, and did little if anything to remedy the situation. This Court must therefore review RPS's liability as to actions or inactions of Plaintiff's supervisor [*19] as well as the actions of Plaintiff's coworkers.

The Supreme Court has recently held that an employer is presumed liable in cases where the harassment is perpetrated by the plaintiff's supervisor. *Burlington Indus. v. Ellerth, 524 U.S. 742, 763, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998); Faragher v. City of Boca-Raton, 524 U.S. 775, 805-07, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998).* An employer may avoid liability if it pleads and establishes, as an affirmative defense, that "(1) the employer exercised reasonable care to prevent and promptly correct any sexual harassment by such a supervisor, and (2) the employee unreasonably failed to avail herself of any corrective or preventative opportunities provided by the employer or to avoid harm otherwise." *Quinn v. Greentree Credit Corp., 159 F.3d 759, 767 (2d Cir. 1998).* This defense is unavailable, however, if the harassing conduct results in an adverse employment action, such as discharge. Id.

In contrast, an employer is generally not liable for the actions of coworkers "'unless the employer either provided no reasonable avenue of complaint or knew of the [*20] harassment but did nothing about it." *Quinn, 159 F.3d at 766* (quoting *Tomka v. Seiler Corp., 66 F.3d 1295 (2d Cir. 1995).* See also *Faragher, 118 S. Ct. at 2289* (noting general agreement among circuits that negligence standard governs employer liability in co-worker harassment cases).

Plaintiff contends that Durette participated in at least some of the allegedly harassing incidents by laughing along. This Court need not decide at this stage whether the sum of Durette's actions constitutes harassment itself because, at the very least, a showing that Durette laughed at a coworker's inappropriate comments supports Plaintiff's contention that Durette, and perhaps RPS, was negligent in curing the harassment. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59 (2d Cir. 1992)*(remanding for additional findings as to reasonableness of employer's response to harassment, and noting that claims "must be evaluated in light of all the circumstances," including evidence "tending to indicate" that supervisors "at least tolerated" their subordinate's unlawful harassing conduct). This raises the issue of whether Durette's knowledge [*21] can be imputed to RPS or, more specifically, whether Plaintiff has adduced sufficient evidence to support at least a colorable claim that RPS, through or because of Durette, knew of the alleged harassment but did not do enough to remedy the situation. This Court finds that she has.

RPS's sexual harassment policy required individuals to report incidents either to their supervisor, their supervisor's superior, or to the Human Resources Department in Pittsburgh, Pennsylvania. Butler Aff. Ex. B. Here, Plaintiff reported some of the alleged incidents to Durette in both verbal and written form. The policy requires, however, that any complaint must be made in writing and the original sent to RPS's Director of Human Resources in Pittsburgh, Pennsylvania. Id. Read in this light, RPS apparently felt that a complaint filed with a supervisor was not the equivalent of a complaint filed directly with the Human Resources Department. Butler Aff. Ex. B. Implicit therein is the notion that a complaint filed with a supervisor does not place RPS on notice of any allegations of harassment. Indeed, according to the policy, the onus is on the individual, not the supervisor, to report the allegedly wrongful [*22] conduct. Whether RPS itself did nothing depends, at least in part, on when the Human Resources Department was notified to Plaintiff's allegations. It is only at that point that an RPS-sponsored investigation would begin. Arguably, this did not occur until November 21, 1996 when Plaintiff submitted a written complaint to Alex Kapinos, the regional manager. Complaint P 16. By November 26, 1996, Kapinos had requested that Plaintiff meet with RPS attorneys. At first blush, therefore, a literal reading of the sexual harassment policy implies that the mere fact that Plaintiff reported these incidents to Durette is insufficient to impute the knowledge of the incidents to RPS.

This Court, however, refuses to give such a literal construction to RPS's sexual harassment policy. TO this court's knowledge, no Supreme Court or Second Circuit precedent mandate otherwise. In this particular case,

there is conflicting evidence as to whether RPS's sexual harassment policy was even available on the RPS premises and whether employees were made aware of the reporting procedures. See Complaint P 21. RPS claims it was clearly posted at the Latham terminal, but Plaintiff claims she was not given a copy [*23] of the policy until December 1996 and was not aware of it in any other manner during her employment with RPS.

RPS may be deemed to have had knowledge of the alleged harassment notwithstanding the exact procedures set forth in its sexual harassment policy because Durette, as Plaintiff's supervisor, may have been aware of all the alleged incidents. RPS contends that knowledge cannot be shown simply because Plaintiff reported to Durette because it is unclear whether Plaintiff told Durette the specific details of the alleged incidents. Plaintiff admits that in describing some of the incidents, she was general; for others, Plaintiff admits she did not even tell Durette. Instead, Plaintiff claims that because Durette was present for many of the instances, or because most of the harassing comments or conduct occurred near her desk which was in the direct vicinity of Durette's office, Durette was already aware of the harassment and, therefore, there was no need for Plaintiff to report the incidents to him again. The Second Circuit has held that knowledge of the harassment does not have to be explicit or specific but rather may include constructive notice (i.e. that management should have [*24] known), *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996)*, n2 and RPS does not contend that Durette was not "sufficiently high . . . in [its] hierarchy," *Kotcher, 957 F.2d at 64*, so as to preclude a finding that his knowledge can be imputed to RPS. RPS's knowledge may therefore turn on Durette's knowledge which is not entirely clear from the materials before this Court. Notwithstanding the generality with which Plaintiff described the alleged harassing conduct, if Durette was present or heard the comments, his knowledge may be more expansive than what Plaintiff specifically stated. As a result, reading the record in a light most favorable to Plaintiff, this Court cannot conclude as a matter of law that RPS did not have knowledge of Plaintiff's complaints.

n2 This is consistent with both the Equal Employment Opportunity Commission Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604 (1993), and decisions in other circuits. See *29 C.F.R. § 1604.11(d)* (employer has notice of sexual harassment committed by coworkers "where the employer (or its agents or supervisory employees)" knew "or should have known of the conduct.") See also *Nichols v. Frank, 42 F.3d 503, 508 (9th Cir. 1994)* ("The proper analysis for employer liability in hostile environment cases is what management-level employees knew or should have known. . . ."); *Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 803-04 (6th Cir. 1994)* (accepting constructive notice standard in coworker harassment cases); *Baker v. Weyerhaeuser Co., 903 F.2d 1342, 1345-46 (10th Cir. 1990)* (affirming judgment based on district court's finding that employer had actual or constructive notice).

[*25]

Finally, if Plaintiff is able to establish RPS's knowledge, whether the investigation RPS performed was adequate under the circumstances is a determination better made by a jury. If Plaintiff does show that RPS knew of the harassment, RPS "will be liable for any hostile work environment created by Plaintiff's co-workers unless it can show that it took immediate and appropriate remedial action." *Richardson v. New York State Dept. of Correctional Serv., 180 F.3d 426, 1999 U.S. App. LEXIS 13249, 1999 WL 391551,* *11 (2nd Cir. 1999)(quoting *Kracunas v. Iona College, 119 F.3d 80, 88 (2d Cir. 1997))*. However, "'if the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate.'" *Richardson, 180 F.3d at , 1999 U.S. App. LEXIS 13249,* *31, *1999 WL 391551,* *11 (quoting *Gallagher v. Delaney, 139 F.3d 338, 348 (2d Cir. 1997))*. Whether RPS's action was "immediate and appropriate" must be determined from the facts presented with consideration given to the gravity of the harm, the nature of the work environment, and the resources available to RPS. *Snell v. Suffolk County, 782 F.2d 1094, 1104 (2d Cir. 1986).* [*26] Here, RPS conducted its investigation by interviewing Plaintiff three times and speaking with Durette and Pagano. No RPS representative ever spoke with any of the alleged harassers, however. Furthermore, Plaintiff contends that the harassment continued from Rogers immediately after Hart told Plaintiff that her claims lacked merit. On these facts, a jury could find that RPS's investigation was untimely, inappropriate, or ineffective.

Consequently, RPS's motion for summary judgment as to Plaintiff's hostile work environment claim is hereby DENIED.

B. Retaliatory Discharge

It is an "unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [that employee] opposed any practice made an unlawful employment practice by this subchapter . . . ." *42 U.S.C. § 2000e-3a* (1994). An employer runs afoul of Title VII "when a retaliatory motive plays a part" in an adverse employment action, "whether or not it was the sole cause." *Cosgrove v. Sears, Roebuck & Co., 9 F.3d*

*1033, 1039 (2d Cir. 1993)*. This is so "even if valid objective reasons for the discharge exist." Id. Courts use the familiar burden-shifting [*27] model set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* to analyze a plaintiff's retaliatory discharge claim. *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998)*. According to this model, a plaintiff must first put forth a prima facie case, see id.; see also *Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995)*, which, if successful, gives rise to a presumption of retaliation. A defendant can overcome this presumption by setting forth a legitimate reason for its employment decision. See *Quinn, 159 F.3d at 768*. The burden then falls back onto the plaintiff to show that the proffered explanation is a pretext for retaliation. *Id. at 769*.

To establish a prima facie case of retaliation, a plaintiff must show the following three elements: (1) that she was engaged in a protected activity of which the employer was aware, (2) that she was discharged, and (3) that a causal connection existed between the protected activity and her discharge. *Tomka, 66 F.3d at 1308*. The only matter at issue here is whether Plaintiff can establish [*28] a causal connection between her complaints of sexual harassment and RPS's decision to terminate her. The requisite causal connection may be established (i) indirectly by showing that the adverse employment action followed closely in time after the protected activity, (ii) through other indirect evidence such as similar treatment of other employees who engaged in similar activity, or (iii) directly through evidence of retaliatory animus directed at the plaintiff. *Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991)*. See also *Cosgrove, 9 F.3d at 1039; Manoharan v. Columbia Univ. College of Physicians and Surgeons, 842 F.2d 590, 593 (2d Cir. 1988)*("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").

RPS contends that Plaintiff cannot show a causal link because she complained of the allegedly harassing behavior in November 1996 but was not officially terminated until April 3, 1997. It is undisputed that between November 1996 and January 7, 1997 RPS conducted an investigation into Plaintiff's complaints (though the sufficiency of that investigation [*29] is a matter of considerable controversy). It is also undisputed that on January 7, 1997, RPS notified Plaintiff that it believed her claims to be without merit and that on that same day RPS suspended Plaintiff with pay. Plaintiff continued to be suspended with pay until she was finally terminated on April 3, 1997. RPS contends that it used the time between January 7, 1997 and April 3, 1997 to investigate allegations into Plaintiff's disruptiveness. RPS claims that the foregoing precludes a finding of a causal connection between Plaintiff's complaints and her ultimate discharge. In essence, RPS would have this Court draw two conclusions: (1) suspension with pay followed by termination is not a sufficiently negative action to warrant Title VII liability and/or (2) as a matter of law, a six month lag between initial complaint and discharge is too great to give rise to a claim for retaliatory discharge.

As a preliminary matter, putting stock in such a mechanistic approach would allow employers to undermine Title VII by simply suspending an employee with pay for an extended period of time before terminating her. This obviously cannot be so. More germane here is the fact that though RPS [*30] suspended Plaintiff months after her first complaint, her suspension occurred only hours after her last. Clearly, Plaintiff could not seek advancement, become eligible for a raise, or be considered for any office awards during the time of her suspension. Given that "an adverse action is one that affects the terms, privileges, duration, or conditions of employment," *Yerdon v. Henry, 91 F.3d 370, 378 (2d Cir. 1996)*(quoting *Johnson v. Frank, 828 F. Supp. 1143, 1153 (S.D.N.Y. 1993))*, RPS's request that Plaintiff leave the premises, followed months later by a decision to terminate was sufficiently adverse and, therefore, of sufficiently close temporal proximity to support a claim of retaliatory animus. n3

n3 This Court is of course mindful of the fact that "'not every unpleasant matter . . . creates a cause of action' for retaliatory discharge," *Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997)* (internal citation omitted) (quoting *Welsh v. Derwinski, 14 F.3d 85, 86 (1st Cir. 1994))*, and that "courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'" Id. Indeed, the Second Circuit has held that "reasonable defensive measures do not violate the anti-retaliation provision of Title VII, even though such steps are adverse to the charging employee and result in differential treatment," so long as they "do not affect the complainant's work, working conditions, or compensation." *United States v. New York City Transit Auth., 97 F.3d 672, 677 (2d Cir. 1996)*. Given the extant facts presented here, this Court cannot make a finding as a matter of law that RPS's actions fall within the bounds of "reasonable defensive measures."

[*31]

This is borne out further by the fact that Plaintiff's employment reviews, the only two formal reviews of Plaintiff's employment in the record before this Court, showed that RPS thought that Plaintiff was a satisfactory

(and in some areas exceptional) employee. Moreover, the time period RPS claims that Plaintiff was a disruptive employee coincides with the time period Plaintiff alleges she was having difficulties with her coworkers and Durette. RPS's contention that it suspended Plaintiff for a legitimate reason, to investigate allegations that Plaintiff was disruptive, simply raises the specter of credibility relative to the question of which came first, Plaintiff's disruptiveness or the allegedly harassing conduct. A reasonable inference from this coincidence is that Plaintiff was reacting to her unfavorable environment and revealing frustration in an investigation she claims was wholly inadequate. Though this Court would not find such behavior to be appropriate even if found to be in response to RPS's conduct, it certainly will not use it to deny Plaintiff an opportunity to fully present her case as RPS suggests. In short, this Court finds that Plaintiff has provided evidence that [*32] supports a finding of a causal connection between her complaints and RPS's adverse employment action. Consequently, Plaintiff has also shown a prima facie case of retaliation.

RPS contends that even if Plaintiff is able to establish a prima facie case, she cannot meet her ultimate burden of showing unlawful retaliation because RPS had a legitimate reason to discharge her. RPS points to the fact that Plaintiff was highly emotional, n4 behaved inappropriately among her coworkers and while on the phone with customers, n5 caused errors in deliveries because she at times operated outside the scope of her employment, n6 disrupted the work environment, n7 and failed to take phone messages correctly. n8 Indeed, RPS claims that after Plaintiff left, "the terminal was settled down, and people were able to walk around as if they were not on egg shells so to speak . . . ." Dunbar Dep. at 36. See also LeFort Dep. at 62 (same).

n4 See Conway Dep. at 11-12; Durette Dep. at 77 (Plaintiff became very upset when another individual was promoted instead of her); id. at 255-56 (Plaintiff would get upset for days); Foell Dep. at 25-26, 28 (same), McDade Dep. at 23 (Plaintiff slammed her chair into her desk on more than one occasion); Murphy Dep. at 75.

[*33]

n5 See Conway Dep. at 36 (Plaintiff was "very nasty" towards Durette); Durette Dep. at 41, 43 (Plaintiff told people "I look like a Barbie"); Foell Dep. at 63, 68; LeFort Dep. at 38 (Plaintiff stated how some drivers wanted to "get in her pants"); McDade Dep. at 20 (heard Plaintiff raise her voice at Durette, LeFort, Murphy, and other RPS employees); Melander Dep. at 94 (Plaintiff called Melander at home to ask if they were dating); Murphy Dep. at 85 (heard Plaintiff yelling at Durette); Puccio Dep. at 20 (customer complained of Plaintiff's flirtatious behavior).

n6 See Conway Dep. at 33; Foell Dep. at 30-31; Melander Dep. at 10-11; Puccio Dep. at 57.

n7 See Durette Dep. at 257-58 (Plaintiff admitted starting a rumor that another RPS employee, Mike LeFort, was having an affair when she knew same was untrue).

n8 See Durette Dep. at 41; Foell Dep. at 23; LeFort Dep. at 43; McDade Dep. at 26; Melander Dep. at 8; Murphy Dep. at 67; Puccio Dep. at 11.

Though RPS presents some legitimate reasons as to why Plaintiff may have been fired, RPS fails to explain why the two [*34] reviews of Plaintiff's performance rated Plaintiff satisfactory or above in almost every area of consideration, some of which mirror those which RPS now claims were Plaintiff's problem areas. The latter of the reviews, dated September 11, 1996, is of particular interest here because it was conducted after RPS allegedly recognized Plaintiff's shortcomings or disruptiveness and only two months prior to Plaintiff's first official complaint.

Because of the foregoing, RPS's motion for summary judgment as to Plaintiff's retaliation claim is hereby DENIED. Given that there are unresolved issues of fact, Plaintiff's motion for summary judgment on this issue is also DENIED.

C. Damages

Finally, RPS contends it is entitled to summary judgment on the issue of back and front pay damages because Plaintiff failed to mitigate and is capable of obtaining gainful employment in the future. This Court discusses each of these issues seriatim.

"An employee discharged in violation of Title VII has an obligation to attempt to mitigate her damages by using 'reasonable diligence in finding other suitable employment.'" Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998)(quoting *Ford Motor Co. v. Equal Employment Opportunity Comm'n, 458 U.S. 219, 231, 73 L. Ed. 2d 721, 102 S. Ct. 3057 (1982)).* [*35] See also *42 U.S.C. § 2000e-5*(g)(1) (1994). The obligation to mitigate is not onerous and does not in turn require the employee to be successful in securing employment. It is the employer's burden to show that the employee did not make reasonable efforts to mitigate her damages. *Haw-*

*kins, 163 F.3d at 695.* See also *Pierce v. F.R. Tripler & Co., 955 F.2d 820, 830 (2d Cir. 1992)*(stating that plaintiff must only have acted reasonably in attempting to gain employment).

In the case sub judice, the record reveals that Plaintiff took computer classes, filled out job applications at various locations for work in retail and as a receptionist, spoke to friends about job opportunities, and started two businesses, one performing tax work and the other for housecleaning. Plaintiff was able to maintain neither business for an extended period of time. To show efforts to gain employment, during discovery Plaintiff disclosed advertisements for "work from home" businesses, several pages of classified ads with a select few circled indicating Plaintiff's interest, and an advertisement for various Internet job search sites. Spelfogel Aff. Ex. [*36] W. This would barely suffice if Plaintiff was unemployed for a year or less. It has been over two (2) years, however, since Plaintiff was terminated by RPS, and even longer if one includes her period of suspension. Plaintiff holds a degree in accounting and computer science from Albany Business School. She has been employed as a business manager for the Capital Rep Theater and as a nurse's aid. Most recently she was a secretary at RPS for two years. Given Plaintiff's background, education, and experience, her efforts to mitigate simply were not reasonable under the circumstances. Accordingly, RPS's motion for summary judgment as to back pay is hereby GRANTED.

The same can be said for Plaintiff's claim to front pay. Every indication on the record, including her aforementioned education and experience, is that Plaintiff is capable of present and future comparable alternative employment. Accordingly, RPS's motion for summary judgment as to Plaintiff's claim for front pay is hereby GRANTED.

In sum, it is hereby ORDERED that RPS's motion for summary judgment is GRANTED-in-part and DENIED-in-part and Plaintiff's motion for summary judgment is DENIED.

IT IS SO ORDERED.

DATED: June [*37] 29 1999

Albany, New York

LAWRENCE E. KAHN

UNITED STATES DISTRICT JUDGE

# TAB D

LEXSEE 2003 U.S. DIST. LEXIS 14592

**RAYMOND H. WECHSLER, ADMINISTRATIVE TRUSTEE OF THE TOWERS FINANCIAL CORPORATION ADMINISTRATIVE TRUST, Plaintiff, - against - HUNT HEALTH SYSTEMS, LTD., P&G ENTERPRISES, INC., MHTJ INVESTMENTS, INC., ESPERANZA HEALTH SYSTEMS, LTD. AND FRIENDSHIP, INC., Defendants.**

**94 Civ. 8294 (PKL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

***2003 U.S. Dist. LEXIS 14592***

**August 21, 2003, Decided**
**August 22, 2003, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Wechsler v. Hunt Health Sys., 2003 U.S. Dist. LEXIS 14594 (S.D.N.Y., Aug. 21, 2003)*

**PRIOR HISTORY:** *Wechsler v. Hunt Health Sys., 2003 U.S. Dist. LEXIS 13775 (S.D.N.Y., Aug. 7, 2003)*

**DISPOSITION:** [*1] Defendants' motion to preclude plaintiff from proffering non Bates-stamped documents denied.

**COUNSEL:** For Plaintiff: Joseph G. Colao, Esq., LEADER & BERKON LLP, GADSBY HANNAH LLP, Boston, MA.

For Plaintiff: Daniel J. Kelly, Esq.

For Defendants: Brooks Banker, Jr., Esq., ABBERLEY KOOIMAN LLP, New York, N.Y.

**JUDGES:** Peter K. Leisure, U.S.D.J.

**OPINION BY:** Peter K. Leisure

**OPINION:**

**MEMORANDUM ORDER**

**LEISURE, District Judge:**

Plaintiff Raymond H. Wechsler, the administrative trustee overseeing the assets of Towers Financial Corporation ("Towers"), n1 brings this action against Hunt Health Systems, Ltd. ("Hunt Health") and affiliated entities for alleged breach of contract and fraudulent conveyance in connection with the parties' factoring agreements. The parties submitted their joint pre-trial order for this case on May 14, 2003, and at that time defendants brought twelve motions in limine. In this Memorandum Order, the Court will address defendants' motion in limine to bar plaintiff from proffering non Bates-stamped documents, specifically plaintiff's proposed trial exhibits 489 and 490 ("Exhibits 489 and 490").

n1 As this Court has previously noted, by Order of United States Bankruptcy Judge Prudence Carter Beatty dated August 5, 1999, the Towers Financial Administrative Trust was terminated and the Trust's claim against Hunt Health was assigned to Raymond H. Wechsler in his personal capacity.

[*2]

In several of defendants' in limine motions, defendants properly seek rulings from the Court on evidentiary matters that can be determined prior to trial. However, this particular motion is an inappropriate one for determination before trial, as it pertains to authenticity questions regarding proposed trial exhibits, which the plaintiff has yet to seek to move into evidence. It is premature to determine whether such evidence should be admissible at trial, especially since there appears to be a dispute between the parties as to the origin of these documents. Therefore defendants' motion to preclude plaintiff from offering Exhibits 489 and 490 into evidence at trial is denied, and the Court will address whatever concerns defendants may raise regarding the admissibility of these

documents if and when plaintiff seeks to move these exhibits into evidence at trial.

**BACKGROUND**

Defendants brought this motion to have the Court preclude plaintiff from offering Exhibits 489 and 490 at trial because defendants alleged that these exhibits were not Bates-stamped, n2 and were not produced or identified by plaintiff during discovery. See Defendants' Motion In Limine to Bar Plaintiff [*3] From Proffering Non Bates-Stamped Documents ("Def. Mot.") at 1. Therefore, defendants argue that the documents which plaintiff seeks to admit as Exhibits 489 and 490 cannot be authenticated, since the absence of Bates-stamps leaves defendants with no indication of the origin of the documents or whether or not the documents are "complete." Id. at 1-2. Moreover, defendants argue that even if plaintiff could meet his burden of authenticating the documents in Exhibits 489 and 490, then plaintiff should still be prevented from admitting these documents into evidence as they are the out-of-court statements of non-parties, which defendants allege that plaintiff will "plainly offer ... for the truth of the matters asserted therein," and as such, should be deemed inadmissible hearsay. Id. at 2.

n2 Defendants acknowledged that, while plaintiff's proposed trial exhibit 489 consists of documents which are not Bates-stamped in any manner, plaintiff's proposed trial exhibit 490 actually consists of documents recently Bates-stamped as TEX00001-002223.

[*4]

Plaintiff argues that defendants' authenticity concerns regarding the non Bates-stamped documents in Exhibits 489 and 490 should be assuaged by the knowledge that the documents in these exhibits are copies of business records produced by defendants Esperanza Health Systems Ltd. ("Esperanza") and Hunt Health in response to specific document requests made by plaintiff. See Plaintiff's Opposition to Def. Mot. ("Pl. Opp.") at 2; Affidavit of Richard Macino, Esq, attached to Pl. Opp. as Ex. A ("Macino Aff."), PP 6-8. Plaintiff alleges that, in response to specific document requests served on the defendants by plaintiff's counsel at the time, Wilkie Farr & Gallagher ("WFG"), defendants chose to produce some documents responsive to the plaintiff's requests by making the business records of Hunt Health and Esperanza, which were kept in the ordinary course of business at a facility maintained, first by Hunt Health, and later by Esperanza, in Kerrville, Texas, available for inspection. See Macino Aff. P 9. According to plaintiff, an employee of WFG, Anne Beaumont, n3 traveled to the facility in Kerrville, Texas in order to conduct this inspection, and under the supervision of two of [*5] the defendants' attorneys, one of whom was Brooks Banker Jr., Esq., and members of Hunt Health's and Esperanza's staff, these documents were obtained and copied by Ms. Beaumont. See Pl. Opp. at 3; Macino Aff. P 12. Plaintiff maintains that these documents were not Bates-stamped at the time, and were kept in the custody of WFG until the case was transferred to Gadsby Hannah LLP ("Gadsby Hannah") in 1999, at which time the documents were shipped to Gadsby Hannah's offices in Boston. Def. Opp. at 3; Macino Aff. PP 12, 13.

n3 Plaintiff states that Ms. Beaumont was an associate at WFG, while defendants point out that Ms. Beaumont identified herself as a "law clerk" in correspondence with Mr. Banker. See Defendants Reply Memorandum in Further Support of Their Motion In Limine to Bar the Proferring of Certain Non Bates-Stamped Documents ("Def. Rep.") at 2, n.2. The Court notes that "law clerk" is often a title used by individuals who were hired by a law firm to serve as an attorney but whose admission to the bar is still pending. Furthermore, whether Ms. Beaumont was an associate or a law clerk is of no moment in the Court's determination of this matter.

[*6]

In response to plaintiff's identification of these documents, defendants seem to argue that the documents in exhibits 489 and 490 cannot be those produced in Texas in October 1997 since, according to a letter from Ms. Beaumont to Mr. Banker dated October 23, 1997, "the beginning Bates number for those documents recently made available for inspection will be D000001." Letter from Ms. Beaumont to Mr. Banker, dated October 23, 1997 ("Oct. 23 Letter"); Def. Rep. at 2. Since the documents in Exhibits 489 and 490 were not Bates-stamped as described in the Oct. 23 Letter, defendants argue that plaintiff cannot establish that the documents contained in these exhibits were produced by defendants during discovery. See Def. Rep. at 2.

**DISCUSSION**

I. Motion In Limine

The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. See *Luce v. United States, 469 U.S. 38, 41 n.4, 83 L. Ed. 2d 443, 105 S. Ct. 460 (1984)* (noting that, although the Federal Rules of Evidence do not explicitly authorize in limine rulings,

the practice has developed pursuant to the [*7] district court's inherent authority to manage the course of trials); *Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996)*; *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group, 937 F. Supp. 276, 283 (S.D.N.Y. 1996)*. Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds. See *Baxter Diagnostics, Inc. v. Novatek Medical, Inc., 1998 U.S. Dist. LEXIS 15093, No. 94 Civ. 5220, 1998 WL 665138*, at * 3 (S.D.N.Y. Sept. 25, 1998) (denying a motion in limine to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in scope to be considered prior to trial). Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context. See *Nat'l Union Fire Ins. Co., 937 F. Supp. at 287*. Further, the court's ruling regarding a motion in limine is "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the ... proffer." *Luce, 469 U.S. at 41*.

II. Motion To Exclude Documents Is [*8] Premature

Defendants' motion to preclude plaintiff from offering non Bates-stamped documents at trial based on defendants' assertion that plaintiff will not be able to authenticate these documents at trial is clearly premature. Pursuant to *Rule 901 of the Federal Rules of Evidence*, "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Fed. R. Evid. 901*. While plaintiff has presented the Court with some evidence that the documents in Exhibits 489 and 490 are copies of the documents produced by the defendants in October 1997, and has shown the chain of custody for these documents from the time they were allegedly produced by the defendants to their identification in the joint pre-trial order, it is premature for the Court to make a determination regarding whether plaintiff has submitted sufficient evidence to support a finding that the documents at issue here are in fact the documents produced by defendants in October 1997, particularly in light of the fact that defendants contest the evidence offered by plaintiff in support of [*9] the documents' authenticity. n4 Furthermore, the Court is ill-equipped to make a determination regarding the authenticity of these documents, since the Court has not been given a copy of plaintiff's proposed trial Exhibits 489 and 490 with which to make such a determination. Therefore, the Court will reserve judgment on this matter until plaintiff seeks to offer these documents into evidence. n5

n4 The Court notes, however, that if the documents included in Exhibits 489 and 490 are indeed copies of documents produced by defendants in discovery, then the authentication of these documents will be easily established. See *John Paul Mitchell Sys. v. Quality King Distribs. Inc., 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000)* (holding that the defendants' act of production in response to request for documents implicitly authenticated the documents).

n5 While the Court notes that courts in this District have instructed parties regarding the value of Bates-stamping all documents that are produced in order to prevent this very type of dispute, i.e. disputes about the origin of certain documents and whether certain documents were produced in discovery, see *Douglas v. Victor Capital Group, 1997 U.S. Dist. LEXIS 18115, No. 96 Civ. 6557, 1997 WL 716912, *1 (S.D.N.Y. Nov. 17, 1997)*, this Court will not refuse to admit any evidence solely because the evidence lacks a Bates-stamp. Rather, the Court will evaluate whether, at the time plaintiff offers Exhibits 489 and 490 into evidence, plaintiff is able to meet his burden of authenticating those documents through alternative methods.

[*10]

Furthermore, the Court agrees with plaintiff that it is premature for the Court to preclude plaintiff from offering the documents in Exhibits 489 and 490 into evidence based on defendants' allegation that these documents are inadmissible as hearsay. Not only has plaintiff not indicated whether he will indeed seek to move these documents into evidence, but perhaps more importantly, the Court is unaware of the purpose for which plaintiff would move these documents into evidence if he elected to do so, i.e. whether plaintiff will seek to offer these documents for the truths of the matters asserted therein. The Court will address any hearsay objections raised by defendants when and if plaintiff seeks to offer the documents in Exhibits 489 and 490 for the truth of the matters asserted therein. Whether or not the documents in Exhibits 489 and 490 would qualify as records kept in the ordinary course of business, and thereby be admissible for the truth of the matters asserted therein under the exception to the hearsay rule embodied in *Rule 803(6) of the Federal Rules of Evidence*, is a matter that may be considered by the Court when an objection to the admission of these documents is raised [*11] at trial, but it is premature to consider this issue before that time. n6

n6 The Court addresses this consideration in response to defendants' allegation that plaintiff "suggests trial exhibits 489 and 490 are not hearsay because they are business records of Hunt Health and Esperanza." Def. Rep. at 3. While plaintiff refers to the documents included in Exhibits 489 and 490 as defendants' business records, at no point does plaintiff suggest that these documents would be admissible under the exception to the hearsay rule in *Rule 803(6)*.

**CONCLUSION**

For the foregoing reasons, the defendants' motion to preclude plaintiff from proffering non Bates-stamped documents is denied. Moreover, the Court reserves its determination regarding the admissibility of plaintiff's non Bates-stamped documents, in particular documents contained in Exhibits 489 and 490, until such time as plaintiff seeks to offer these documents into evidence.

**SO ORDERED.**

August 21, 2003.

Peter [*12] K. Leisure

U.S.D.J.

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was mailed by first-class mail, postage prepaid to all counsel and pro se parties of record on this 30th day of May, 2007, as follows: Karen Torre, Esquire, Law Offices of Karen Lee Torre, 51 Elm Street, Suite 307, New Haven, Connecticut 06510.

Theresa M. Waugh
Federal Bar No. CT23559