### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DENISE EVARTS, | : | CIVIL ACTION NO. |
| | : | 3:00CV1124 (WIG) |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| THE SOUTHERN NEW ENGLAND | : | |
| TELEPHONE COMPANY, | : | |
| | : | |
| *Defendant.* | : | MAY 30, 2007 |

### DEFENDANT'S OBJECTION TO CERTAIN TRIAL EXHIBITS
### RE COUNSEL'S LETTERS TO THE CHRO AND DISCOVERY OBJECTIONS

Defendant the Southern New England Telephone Company ("SNET") respectfully objects to three exhibits which plaintiff has included on her exhibit list related to the production of time records of other technicians in SNET Payphone Services. SNET learned for the first time that plaintiff intended to introduce these exhibits after 5:00 p.m. on May 24, 2006. Plaintiff had not designated these documents as documents that support her claims or that she would introduce as evidence at trial, in response to SNET's discovery requesting any such documents.[1] See Exh. J. SNET will separately file objections to other proposed exhibits upon receipt of legible copies of plaintiff's exhibits.[2]

### I.    BACKGROUND

It is undisputed that plaintiff's supervisor, Matt Cordner, spoke to plaintiff about the quality of her handwritten timesheets. She was never disciplined, demoted, suspended, or subjected to any adverse employment action because of her timesheets. Timesheets were the

---

[1] The proposed exhibits may be precluded from evidence on this basis alone.

[2] The parties exchanged copies of their trial exhibits on May 24, 2007 at a settlement conference in this matter. The copies provided by plaintiff's counsel of her exhibits were so light that almost all of them are entirely illegible. The undersigned has twice requested legible copies of the exhibits and will file any additional objections upon receipt of such legible copies.

handwritten documents technicians completed while on the job where they recorded the jobs they worked and the hours spent on each, as well as lunch breaks and tasks performed. The handwritten timesheets were the documents from which they were paid. "DCWS" reports, by contrast, were records generated by hand-held computers known as "Huskeys" on which technicians signed on and off each job assigned to them throughout the day. DCWS records were stored automatically and reflected the times input by the technicians into the Huskeys at the start and end of each job; they were not the records on which the technicians' pay was based.

A.    **The Exhibits at Issue**

Copies of the plaintiff's three proposed exhibits at issue are attached hereto as Exhibit A. The first document, Exh. 23, is a December 28, 1998 letter written by defense counsel to the investigator for the Connecticut Commission on Human Rights and Opportunities ("CHRO") in an agency proceeding related to this matter. The letter responds to the investigator's informal, oral request for additional information following a fact-finding conference. At the fact-finding conference, which was attended by the undersigned and an associate from Attorney Karen Torre's office, Michelle Holmes (formerly Michelle Esposito), the investigator told the parties that he sought additional information that would be helpful to him in considering the case. The letter from defense counsel to the investigator has been altered and contains handwriting, apparently by plaintiff's counsel, underlining and bracketing the following statement by defense counsel:

>        DCWS records are not routinely retained by SNET, so respondent is unable to answer this question as posed. SNET can state, however, that if any such discrepancies were noted during the relevant times by the supervisors, employees would have been counseled (like Complainant was), or would have received formal discipline as in the cases of the 3 male co-workers described in response to Question No. 7 above.

2

The letter contains arguments of counsel, was prepared and submitted by counsel, and is not signed by any employee of SNET.

The second document, Exh. 24, consists of page 1 and page 14 only of defense counsel's response to Attorney Holmes's arguments to the CHRO about the documents. Like Exh. 23, it contains arguments of counsel and has been altered, the following statement being circled in handwriting in the proposed exhibit:

> As explained previously, DCWS records are not generally retained by the Payphone Services Department, so it is unable to answer this question as posed. Once again, Ms. Esposito's comment that she 'finds it unusual' that old DCWS records are not retained is not in any respect evidence and is inappropriate in this investigation.

The third exhibit, Exh. 25, is SNET's Objection to Document Request dated October 24, 2002. It is SNET's objection to plaintiff's 2002 request in the notice of deposition for Ed Dillman for "daily time reports, 'DCWS' reports/printouts for the mail [sic] technicians who worked with Denise Evarts under the supervision of Matthew Cordner from July, 1996 through May, 1997." SNET objected that this request was overly broad and burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

## II.    THIS COURT SHOULD EXCLUDE PLAINTIFF'S EXHIBITS 23, 24 AND 25 BECAUSE THEY ARE NOT RELEVANT TO ANY ISSUE TO BE TRIED.

### A.    Summary

Federal Rule of Evidence 401 defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Plaintiff Denise Evarts's remaining claim in this matter is that SNET violated Title VII of the Civil Rights Act by subjecting her to a hostile work environment based upon her gender. The exhibits at issue have nothing whatsoever to do with Ms. Evarts's purported work environment at

SNET. SNET's response to the CHRO that DCWS records were not generally retained and its objection to plaintiff's discovery request for all "daily time reports" do not make it more or less probable that plaintiff was subjected to an unlawfully hostile work environment based on gender.

Further, objections to discovery are simply not admissible as evidence at trial. Discovery disputes are the province of this Court; if a plaintiff disputes an objection to discovery, her recourse is to file a motion to compel or make another appropriate motion with the Court, which plaintiff in fact did in this case.

Moreover, to the extent that plaintiff may seek to make a spoliation argument based on DCWS reports, in addition to the fact that such documents are irrelevant to any issue to be tried, the reports had been automatically purged before any issue about DCWS reports was raised and even before the CHRO complaint was filed. SNET had no duty to interrupt its normal purge cycle to preserve them. Any spoliation argument fails as a matter of law.

Finally, to the extent plaintiff might argue that such records show SNET somehow treated her differently than other technicians – a theory that, with respect to the DCWS reports would directly contradict her CHRO complaint[3] – the jury is not going to consider any "disparate treatment" claim. Plaintiff's disparate treatment claim was dismissed on summary judgment and her only remaining claim is for hostile work environment based on gender.

In sum, as Ms. Evarts framed her action years ago, these reports have no relevance to her claims. Because plaintiff's Exhibits 23, 24 and 25 are wholly irrelevant to any issue in this case, this Court should preclude their admission into evidence under Rule 401.

---

[3]  In her CHRO complaint, plaintiff alleges that her supervisor did not look at other technicians' DCWS reports. Exh. B at ¶ 14. If the supervisor did not know about any discrepancies between other technicians' DCWS reports and their time sheets about which plaintiff speculates, then he certainly could not counsel them about such discrepancies. He was not treating plaintiff any differently when he spoke with plaintiff about her timesheets, and in the process of figuring out why her timesheets were so inaccurate checked some of the corresponding DCWS reports.

**B.**      **The DCWS Reports Were Not Part of Plaintiff's Work Environment, So Any Evidence Relating to These Reports is Irrelevant to Her Hostile Work Environment Claim.**

As this Court recently recognized in its Summary Judgment Ruling, to prevail on a hostile work environment claim, "[t]he plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Ruling at 24 (citing cases; internal quotation marks omitted). Critically, "[p]roving such a claim involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Id. at 25 (internal citations and quotation marks omitted; emphasis added).

In light of this focus on a plaintiff's environment in a hostile environment case, numerous courts have held that a plaintiff must know about an act or statement before it can support a hostile work environment claim.  See, e.g., Bradshaw v. Golden Rd. Motor Inn, 885 F. Supp. 1370, 1381 (D. Nev. 1995)("[w]here a 'hostile environment' claim rests on gender-or race-based comments . . . the plaintiff, to show that he or she perceived the 'environment' as 'hostile,' must at least have been aware of those comments, even if the person making them did not make them directly to the plaintiff."); Cottrill v. MFA Inc., 443 F.3d 629, 636-39 (8th Cir. 2006) (where plaintiff's supervisor undisputedly drilled a hole in rest room in order to spy on plaintiff and also contaminated toilet seat and toilet paper holder, causing plaintiff to suffer rashes and burning, plaintiff could "not rely on the peeping to establish that her work environment was hostile" because she "did not subjectively perceive the peeping"; although the court found supervisor's conduct "reprehensible," it nonetheless affirmed summary judgment in favor of defendant on plaintiff's hostile environment claim); see also cases cited in SNET's Memorandum of Law in

Support of Motion in Limine Re Iannielo Testimony or to Bifurcate Trial, dated May 10, 2007, at pp. 5-6.

Accordingly, in this case, even if DCWS reports were available, they would be inadmissible because they are irrelevant to any claim left in this action. These reports were not distributed to Ms. Evarts and therefore their content can not have impacted her work environment at SNET.

## C.   The DCWS Reports Did Not Exist During the CHRO Proceedings and SNET Had No Duty to Preserve Them.

To the extent that plaintiff will argue that Exhibits 23, 24 and 25 are relevant to a "spoliation" claim, this argument fails based on the undisputed facts. SNET had no duty to preserve these records, which were automatically purged in the normal course of business before Ms. Evarts had even filed a claim with the CHRO. As plaintiff is well aware, the DCWS information from July 1996 through May 1997 was purged in October 1996 through August 1997. Exh. I, p. 2 (letter from Thomas Taft of SNET). The CHRO Complaint was filed on November 17, 1997, and the federal court action was commenced on June 20, 2000. See Exh. B and Complaint in the present action. Further, as argued above, the records are not relevant to any issue to be tried, so the "spoliation" doctrine does not even apply.

As this Court recently recognized, a party seeking to obtain an adverse inference instruction for spoliation or non-production of evidence must establish: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Cortes v. Peter Pan Bus Lines, Inc., 455 F. Supp. 2d 100, 102-103 (D.Conn. 2006) (internal quotation marks omitted). "[A] party is under an obligation to

preserve the evidence when the party *has notice that the evidence is relevant to litigation or when it should have known that the evidence may be relevant to future litigation.*" Id. at 103 (internal quotation marks omitted; emphasis added).    In this instance, and as SNET's counsel advised plaintiff's counsel in December 2003, the DCWS reports covering Spring 1997 were purged at the latest in August 1997, several months before plaintiff even filed her CHRO charge,[4] and years before she filed this action.    SNET had no duty to preserve these documents and there was nothing intentional or even reckless about their being purged in the normal course of SNET's business. See Exh. I, letter from Thomas Taft.

Moreover, plaintiff's counsel herself did not even think of such documents as potentially relevant until September 24, 2002, more than two years after commencing the present litigation and more than five years after plaintiff had resigned from SNET.    The first time plaintiff requested DCWS reports in this case was with the notice of deposition of Ed Dillman on September 24, 2002, toward the end of discovery, and no such request was included in any of plaintiff's prior production requests in the course of more than two years of discovery.[5]    If plaintiff's counsel did not consider these documents relevant or important, SNET cannot reasonably have been expected to identify these materials as relevant or important and deviate from its normal purging cycle months before Ms. Evarts even filed her CHRO claim and years before she filed her federal court action.

---

[4]    The CHRO charge was filed on November 17, 1997.  Exh. B.
[5]    The federal court action was commenced on June 16, 2000.

**B.**    **Exhibits 23, 24, and 25 Will be Misleading and Confusing to the Jury, and Their Introduction Would Require Counsel for Both Plaintiff and Defendant to Become Trial Witnesses.**

**1.**    **The Exhibits Are Not Probative of Any Issue to Be Determined by the Jury.**

In addition to being inherently improper and irrelevant to any issue in this case, plaintiff's Exhibits 23, 24, and 25 should not be introduced as evidence at trial, because their introduction would confuse the issues in this case and require counsel to become witnesses to explain a complicated discovery history that the Court has already reviewed at length and which is outside the province of the jury.[6]    Similarly, to the extent that plaintiff seeks to argue that these records should have been maintained and she is therefore entitled to some relief, such request and any such relief would be considered by this Court, *not* the jury.    Issues regarding discovery and spoliation are matters for the Court, not the jury, to decide. See Cortes, 455 F.Supp. 2d at 102 (court has broad discretion in determining appropriate sanction for non-production of documents); see also Fed. R. Civ. P. 37.    Lacking real evidence to support a hostile work environment claim, counsel clearly seeks to engage the jury in an improper and confusing history of discovery, in order to try to imply some sort of sinister conduct by defense counsel to distract from the legal and factual issues in the case.    Plaintiff's attempt to grandstand before the jury should be rejected, and Exhibits 23, 24 and 25 should be excluded from evidence.

The jury's role in this case is to determine whether plaintiff was subjected to a hostile work environment based on sex, not to affirm, overrule, or form opinions about objections to discovery.    The documents plaintiff seeks to introduce were not signed by any employee of

---

[6]    If the letters and discovery objections that plaintiff seeks to admit were relevant and otherwise admissible – which they are not – plaintiff's counsel could not avoid Local Civil Rule 83.13's prohibition barring counsel from serving as a witness.  As a review of the proposed exhibits shows, the letters and objections have handwritten notes, presumably counsel's, which she would need to explain during the process of authenticating the documents for the jury.  Additionally, defense counsel would have to call plaintiff's counsel as a witness concerning the chronology of the discovery issue as set forth fully below.

SNET and relate to discovery issues, not to substantive issues in the case. To the extent plaintiff may try to offer the identified exhibits as somehow relevant to conduct by SNET's counsel, this is not the proper forum for such a claim.

Lacking substantive facts to support her claims, plaintiff would clearly like to try this case not on relevant facts but on the same types of vexatious accusations related to discovery with which she has repeatedly attacked defendant throughout this litigation. To the extent plaintiff may try to offer the exhibits as somehow evidence of improper conduct by SNET's counsel during the course of this litigation, however, that claim has already been raised with the Court at least half a dozen times in the course of this case, and the Court has found no such impropriety.[7] The jury's sole charge is to determine whether SNET acted unlawfully toward plaintiff while she was an employee of that company; it is not the jury's role to make judgments about discovery disputes that this Court already has considered.

### 2. Plaintiff's Proffer of Exhs. 23, 24, and 25 Would Result in a Mini-Trial of a History of Discovery That Would Require Testimony by Trial Counsel.

The history of this case demonstrates that, in addition to being completely irrelevant and improper, the introduction of the proffered exhibits would result in a protracted dispute about the reasonableness of SNET's discovery disclosures in this case, which is not the issue here, and which would result in both plaintiff's counsel and defense counsel becoming witnesses. The jury would need to understand the full history of the "time records" discovery as set forth below if Exhs. 23, 24, and/or 25 were introduced as evidence at trial.

---

[7] The federal court action was initially handled by in-house counsel for SNET. As soon as outside counsel became involved, plaintiff engaged in a flurry of discovery motions, all of which sought sanctions and attorneys' fees, and all of which were denied. Indeed, in ruling on one of plaintiff's motions, the Court cautioned plaintiff's counsel that she had "crossed the line between fair advocacy and a meanness unworthy of one of the best members of the federal bar." See Endorsement Ruling by The Honorable William Garfinkel dated Nov. 6, 2001 on Motion No. 33.

**a.    The CHRO Did Not Request Copies of DCWS Reports.**

Although plaintiff's counsel did not attend the CHRO fact-finding conference, she implies that the CHRO requested SNET to produce DCWS reports. It did not.

On November 17, 1997, plaintiff Denise Evarts filed a complaint alleging sex discrimination and disability discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). In the CHRO charge, plaintiff alleged, among other things, that Mr. Cordner warned her for not locking her truck, went on a riding exercise with her, would not create a new satellite office in North Madison for her to reduce her commute, took away her cell phone for a month for excessive usage, and counseled her about the way she was completing her time sheets. See Affidavit dated November 17, 1997, ¶ 14, attached at Exh. B.

On November 6, 1998, a fact-finding conference was held in the case at the CHRO. At the conference the investigator made an oral, informal request for ten additional pieces of information. One of the oral requests was for "copies of timesheets for all Payphone Services Technicians from May 1, 1995 – May 30, 1997, where there were discrepancies between time recorded by the DCWS and actual times worked at each job." See Exh. C at 6 (emphasis added). It did not ask SNET to produce DCWS records for Evarts or for other technicians.

Notwithstanding that this question was impossible to answer,[8] defense counsel did inquire of its client whether there were DCWS reports that could be checked. It reasonably objected to the requests and indicated to the CHRO and to plaintiff's counsel back on December 28, 1998 that the DCWS records were not routinely retained and therefore could not be checked. Exh. C at 6. The CHRO made no further inquiry about time sheets or any sort of time records.

---

[8] It is impossible to determine whether there are discrepancies between the DCWS and actual times worked. The technicians sign on and off jobs on the DCWS, so the times on the DCWS should always be accurate and reflect "actual times worked at each job." The only exception to this would be when the technician did not sign on and off jobs when they actually started or finished the jobs.

On January 12, 1999, after plaintiff's counsel questioned SNET's truthfulness about its statement that the records were not retained, defense counsel again wrote that, "DCWS records are not routinely retained by SNET, so respondent is unable to answer this question as posed. SNET can state, however, that if any such discrepancies were noted during the relevant times by the supervisors, employees would have been counseled (like Complainant was), or would have received formal discipline as in the cases of the 3 male co-workers described in response to Question No. 7 above." Exh. D.

**b.    Plaintiff's Request for DCWS Reports Was an Afterthought Made at the End of Discovery and After the Case Had Been Pending for Two and a Half Years.**

Plaintiff commenced the present federal court action on June 16, 2000. See Complaint dated June 16, 2000. During more than two years of litigation and during several sets of interrogatories and requests for production, plaintiff did not ask for time records of any other technicians much less ask for DCWS reports. Plaintiff apparently recognized during that time that DCWS records were not probative of any of her claims in the matter.

Finally, after multiple discovery disputes and after plaintiff had filed several unsuccessful motions to compel (each one accompanied by a request for sanctions), during one of the last depositions in the case, plaintiff served a document request with the notice of deposition of Ed Dillman on September 24, 2002. The request sought "[d]aily time reports, DCWS report/printouts for the mail [sic] technicians who worked with Denise Evarts under the supervision of Matthew Cordner from July, 1996 through May, 1997." Exh. E. Defendant timely objected to the request as overly broad and burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

There is no dispute that plaintiff's supervisor spoke with her about the quality of her time sheets, not the DCWS records.  When looking at plaintiff's timesheets, which appeared to reflect jobs in the wrong order, Mr. Cordner reviewed some of plaintiff's DCWS reports to see what order she really worked the jobs.  Whether other technicians had timesheets that did not match the DCWS reports – which were never brought to Mr. Cordner's attention – is beside the point and irrelevant to plaintiff's claim of hostile work environment based on gender.  SNET argued that the fact that plaintiff's supervisor talked to her about something – with no discipline, no employment consequences whatsoever, and certainly no adverse employment action – did not give plaintiff the right to roving discovery about eight technicians' voluminous daily computer DCWS records for a ten-month period.

In an effort to resolve the discovery dispute without Court intervention, SNET copied and produced every time sheet for every technician who worked with the plaintiff during the 11-month period requested, which consisted of 3,137 pages of time sheets for eight technicians.  Plaintiff refused this offer of compromise, but SNET produced the documents anyway.

In lieu of filing a motion to compel production of all daily time reports and  DCWS report/printouts for the male technicians from July, 1996 through May, 1997, plaintiff requested a conference call with the Court with no obligation to file briefs and defendant agreed to such a conference call concerning SNET's objection set forth in Pl. Exh. 25.  Notwithstanding the agreement, as the date of the conference approached, plaintiff's counsel sent a lengthy letter brief directly to The Honorable William I. Garfinkel, presiding judge, making her arguments in writing despite having asked to avoid briefing of the issue.  SNET quickly responded in writing.  See SNET letter to The Honorable William I. Garfinkel, attached hereto as Exh. F.  In the response, SNET again pointed out that the DCWS reports were only retained for about 90 days

and could not be produced.  Exh. F at n. 1.  On  November 25, 2003, Judge Garfinkel issued a

memorandum to counsel, stating the following:

> I reviewed the correspondence on the time records matter.  Given plaintiff's
> theory and the evidence to date, the time records, including electronic records, of
> members of the plaintiff's team for the period at issue (when she was working
> under Cordner for less than a year) would be sufficiently relevant, albeit not
> critical, to warrant retrieving them and producing them.  If they aren't available,
> so be it.  If they are, I would like them made available for inspection within a
> reasonable time.  Copying would be at plaintiff's cost.  If someone needs a formal
> motion and ruling, I could do that.

Exh. G.

On  December 26, 2003, defense counsel served its response in accordance with the

Court's request:

> The defendant has already provided all technician time sheets for the work group
> and period requested.  SNET does not have any other information or documents
> responsive to this request.  The DCWS reports were merely a working tool for
> supervisors that were purged 90 days after they were created.  In addition, there
> was no electronic time reporting for the plaintiff's work group in 1996-97 and
> thus no electronic time reporting records are available.

Exh. H.  On December 30, 2003, defense counsel wrote to plaintiff's counsel: "As further

support for SNET's answer to your document request sent to you last Friday, December 26th,

please find enclosed a letter from Thomas Taft of SNET explaining why the records you

requested do not exist."  In the enclosed letter, Thomas Taft, Area Manager-Network

Engineering for SNET, wrote that the DCWS reports for the period July 1996 through May 1997

did not exist and would have been purged during the October 1996 through August 1997 time

frame. Exh. I.

### c.    The DCWS Reports Had Been Purged Long Before This Action Was Commenced.

As the above record indicates that plaintiff did not even file her complaint with the

CHRO until November 17, 1997, three months after the documents had been purged.  These are

13

not payroll records and therefore there was no need for the company to keep them for any particular time. They were simply work order records, which were purged 90 days after the work was done. By the time the CHRO charge was filed, the information had been purged as part of SNET's normal electronic processes. The CHRO never requested copies of DCWS reports, and plaintiff herself did not consider such documents worthy of a discovery request until over two years into the litigation in federal court when the documents had long since been automatically purged in accordance with SNET's normal document retention practices.

The three documents plaintiff attempts to place into evidence require the full explanation of the discovery history of this case, which is not an appropriate focus for the jury in this case. Otherwise, they are subject to inaccurate distortions and improper arguments by counsel about the course of discovery in the matter. The Court has already considered plaintiff's arguments concerning the DCWS reports and ruled on plaintiff's arguments, as it has the multitude of unsuccessful discovery motions plaintiff filed in this case. It is not up to the jury to re-visit this issue. Much as plaintiff might like to distract the jury from the real issues in this case and create a diversion into a side issue that has already been appropriately dealt with by the Court, she should not be allowed to create confusion and subject the jury to a mini-trial concerning discovery issues in the case.

## I.    <u>CONCLUSION</u>

For the reasons set forth above, SNET respectfully objects to plaintiff's Exhibits 23, 24 and 25 and requests that they be excluded from evidence to be introduced at the trial of this matter.

Dated at North Haven, Connecticut this 30th day of May, 2007.

THE DEFENDANT,
THE SOUTHERN NEW ENGLAND TELEPHONE
COMPANY

By _Lori B. Alexander_____
      Lori B. Alexander
      Federal Bar No. CT08970
      Theresa M. Waugh
      Federal Bar No. CT23559
      LITTLER MENDELSON, P.C.
      110 Washington Avenue
      North Haven, Connecticut  06473
      Tel. (203) 234-6344
      Fax  (203) 234-6345
      E-Mail: lalexander@littler.com
      E-Mail: twaugh@littler.com

# EXHIBIT A

# Tyler Cooper & Alcorn, LLP

### COUNSELLORS AT LAW

205 Church Street
P.O. Box 1936
New Haven, CT 06509-1910
203 784.8200
Telecopier 203 789.8009

Lori B. Alexander
203 784.8200
Email lalexander@ycoor.com

December 23, 1998

Richard C. Gordon
CHRO Representative
Commission on Human Rights
 and Opportunities
50 Linden Street
Waterbury, Connecticut  06702

*VIA HAND DELIVERY*

Re:   Denise Evarts v. Southern New England Telephone Company
       CHRO No.: 9830248; EEOC No.:  16a983056

Dear Mr. Gordon:

       Enclosed are the documents that you requested that respondent Southern New England
Telephone Company ("SNET") produce following the fact-finding conference in the above-referenced
case.

    1.    List of all female employees in the Payphone Services department from May 1.
          1995 through May 30. 1997.

    The list is included in Exhibit A appended hereto.[1]

    2.    Copies of all of Complainant's performance evaluations from 1990 through May
          30. 1997.

    As discussed at the fact-finding conference, bargaining unit employees of SNET, like
Complainant, do not receive annual performance evaluations.   Respondent encloses Complainant's

---

    [1] Employees' genders and hire dates are included, as well as a designation of each
employee by number.  Names of employees have not been included to protect these employees'
privacy.



Gordon
~~r 28, 1998

9.    <u>Copies of timesheets for all Payphone Services Technicians from May 1, 1995 -
May 30, 1997, where there were discrepancies between time recorded by the
DCWS and actual times worked at each job.</u>

DCWS records are not routinely retained by SNET, so respondent is unable to answer this
question as posed.  SNET can state, however, that if any such discrepancies were noted during the
relevant times by the supervisors, employees would have been counseled (like Complainant was), or
would have received formal discipline as in the cases of the 3 male co-workers described in response
to Question No. 7 above.

10.    <u>Any schedules reflecting riding exercises done with other Payphone Services
Technicians from May 1, 1995 - May 30, 1997, and any documents reflecting the
results/evaluations of those exercises.</u>

Schedules of riding exercises through 1997 are attached as Exhibit F.  They show that all
employees undergo riding exercises, and Complainant was not treated any differently by having a
riding exercise with her supervisor in 1997.  Moreover, Complainant was never disciplined or
reprimanded as a result of the riding exercise, and it is unclear in what way she claims she was
discriminated against based on her gender with respect to that exercise.

Documents reflecting the results/evaluations of those exercises are included in Exhibits B and
C, submitted in response to Questions No. 2 and 3.

Very truly yours,

*Lori B. Alexander*

Lori B. Alexander

LBA:mjd

cc:    Carole Wilder, Esquire
Ed Dillman
Matt Cordner
Michelle Esposito, Esquire (counsel for Complainant)

# Tyler Cooper & Alcorn, LLP

## COUNSELLORS AT LAW

Lori B. Alexander
203 784.8270
Email alexander@tycoop.com

205 Church Street
P.O. Box 1936
New Haven, CT 06500-1010
203 784.8200
Telecopier 203 789.8060

January 12, 1999

Richard C. Gordon
CHRO Representative
Commission on Human Rights
and Opportunities
50 Linden Street
Waterbury, Connecticut  06702

*VIA HAND DELIVERY*

Re:    Denise Evarts v. Southern New England Telephone Company
       CHRO No.:  9830248; EEOC No.:  16a983056

Dear Mr. Gordon:

This is in response to Michelle Esposito's letter to you dated December 31, 1998 ("Letter") and received in this office on January 4, 1999.  For the Investigator's convenience, SNET has provided revised exhibits with the names of individual employees included.  The revised exhibits are attached hereto.[1]

As an initial matter, SNET strongly objects to Ms. Esposito's numerous unsupported accusations that respondent failed to disclose relevant information, as well as her implications that SNET has fabricated false information for the Commission.  As counsel for SNET in this matter, I also personally and professionally take offense to Ms. Esposito's remarks in that regard, which are unprofessional in a way that is uncommon among practitioners in Connecticut.  Apparently, she is resorting to unsupported innuendo rather than fact because she realizes that Complainant's claim that she was treated differently from her male co-workers lacks any factual basis.

SNET also objects to Ms. Esposito's own offer of false and misleading information to the Commission concerning several particular employees of SNET, as well as her attempts to define the relevant inquiry differently as to different questions.  Specifically, the Investigator will note that in

---

[1] The revised exhibits are lettered to correspond with the redacted exhibits previously filed with the Commission.

Richard Gordon
January 12, 1999
Page 14

"Reported to Matt Cordner." See SNET's Dec. 28, 1998 Supplemental Response at Exh. A, p. 3.

**Proposed Findings of Fact Based on This Information:**

See Proposed Findings of Fact under Request No. 1 above.

9.  **Copies of timesheets for all Payphone Services Technicians from May 1, 1995 - May 30, 1997, where there were discrepancies between time recorded by the DCWS and actual times worked at each job.**

(Response was provided in text and Exhibit E.)

As explained previously, DCWS records are not generally retained by the Payphone Services Department, so it is unable to answer this question as posed. Once again, Ms. Esposito's comment that she "finds it unusual" that old DCWS records are not retained is not in any respect evidence and is inappropriate in this investigation.

10.  **Any schedules reflecting riding exercises done with other Payphone Services Technicians from May 1, 1995 - May 30, 1997, and any documents reflecting the results/evaluations of those exercises.**

(Response was provided in text and Exhibit F.)

Ms. Esposito states that she did not realize this information was requested but assumes it is relevant to show "how much notice employees are given before having riding exercises with their supervisors." That assumption is not correct. There is no claim in this case that Complainant did not get as much prior notice of riding exercises as her male co-workers.

What the chart does show is that eleven male Payphone Services Technicians were given riding exercises with their supervisors before Complainant was. Therefore, her claim that she was given riding exercises before her male co-workers has no merit. In addition, after Complainant's riding exercise, sixteen other male Payphone Services Technicians were given riding exercises just like she was. The chart in Exhibit F clearly shows that Complainant's claim that she was treated differently from males by being given a riding exercise is frivolous.



THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

DENISE EVARTS,                                \*

  Plaintiff,                                    \*

v.                                            \*   CIV. ACTION NO. 3:00CV1124(WIG)
                                              \*
                                              \*
THE SOUTHERN NEW                              \*
ENGLAND TELEPHONE                             \*
COMPANY,                                      \*
                                              \*
  Defendant.                                  \* OCTOBER 24, 2002
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

## OBJECTION TO DOCUMENT REQUEST

The defendant, Southern New England Telephone Company hereby objects to plaintiff's

document request accompanying the Notice of Deposition of Ed Dillman dated September 24, 2002.

2. Daily time reports, "DCWS" reports/printouts for the mail technicians
who worked with Denise Evarts under the supervision of Matthew
Cordner from July, 1996 through May, 1997.

**Objection:**    This request is overly broad and burdensome and not reasonably
calculated to lead to the discovery of admissible evidence.

THE DEFENDANT,
SOUTHERN NEW ENGLAND TELEPHONE, INC.

By _____
Lori B. Alexander
Federal Bar No. CT08970
Tyler Cooper & Alcorn, LLP
205 Church Street
New Haven, Connecticut 06509
Tel. (203) 784-8200
Fax No. (203) 789-2133
E-Mail: alexander@tylercooper.com



## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent via first-class mail, postage prepaid to all counsel and *pro se* parties of record on this 24th day of October, 2002, as follows: Karen Torre, Esquire, Law Offices of Karen Lee Torre, 51 Elm Street, Suite 307, New Haven, Connecticut 06510.

Lori B. Alexander
Federal Bar No. CT08970

# EXHIBIT B

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

**FORM 103**

# AFFIDAVIT OF ILLEGAL DISCRIMINATORY PRACTICE

DATE: _____    CASE NO: _9830248_

My name is _Denise Evarts_

and I reside at _59-2 Cedar Lake Rd Chester CT 06412_

The respondent is _Southern New England Telephone_

whose business address is _227 Church St New Haven 06510_

I was:

( ) terminated
( ) suspended
( ) placed on probation
( ) demoted
( ) warned
( ) given a poor evaluation
( ) denied a raise
( ) less trained
( ) denied an office
(✓) denied service (s)
(✓) discriminated against in terms and conditions of employment

( ) not hired/not promoted
( ) not rented a dwelling
( ) harassed  ( )sexually harassed
( ) earning a different rate of pay
(✓) constructively discharged
( ) retaliated against
( ) not hired due to a BFOQ
( ) not hired due to a disability
( ) delegated difficult assignments
( ) other _____

on _5/30/98_ and believe that my

( ) race
( ) color
(✓) sex  { }male  {✓}female
( ) previously opposed,
   filed or assisted
( ) ancestry
( ) age  DOB:
( ) religion
( ) pregnancy
( ) alienage

( ) national origin
( ) marital status
( ) physical disability
( ) mental retardation
( ) mental disorder
( ) religious creed     ( ) creed
( ) familial status
( ) sexual orientation
( ) learning disability
( ) lawful source of income

RECEIVED
STATE OF CONNECTICUT
NOV 17 1991
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES
WEST CENTRAL REGION

was in part a factor in this action. I believe that the respondent violated the following Connecticut General Statutes and acts listed below and ( ) enforced through Section 46a-58(a) (if applicable)

(✓) 46a-60(a)(1)
( ) 46a-60(a)(4)
( ) 46a-60(a)(7)( )( )( )
( ) 46a-60(a)(8)( )( )( )
( ) 46a-64c( )( )
( ) 46a-64a( )( )( )
( ) 46a-81( )( )( )
( ) 46a-80
( ) Americans With Disabilities Act, 42 U.S.C. 12101 et seq.
( ) Equal Pay Act of 1964, U.S.C. 206
( ) Section 504 of the Rehabilitation Act of 1973, as amended

(✓) Title VII of the Civil Rights Act
of 1964, as amended, 42 U.S.C 2000e
and the Civil Rights Act of 1991
{cite for 15 individuals employed}
( ) Age Discrimination in Employment
Act, of 1967, 29 U.S.C. 621-634
{cite for over 20 individuals
employed}

other_____

Form 103                                          Revised 1/1/96

Denise Evarts
57-2 Cedar Lake Rd
Chester Ct 06412
November 13th1997

1. There are approximately 9,000 employees at Southern New England Telephone Company, throughout the state of Connecticut.

2. I left SNET on May 30, due to harassment from my supervisor Matt Cordner. The harassment had become so unrelenting, unwarranted and abusive that I became very depressed, and my home life was adversely effected. For my own health reasons I no other alternative but to quit. I had tried to transfer out of the department, and I went to the Union with regards to the harassment, but neither avenue had offered an alternative. I worked for the company for 10 years and had very good relationships with my previous supervisors. I had been promised the next promotion from the 2nd line supervisor Ed Dillman, and I always volunteered for task groups and work teams. My repair time was almost always above average. I was the only female supervised by Matt Cordner.

3. Summer of 96 Matt Cordner became my supervisor. Approximately two months after his assignment to my department I discussed my transfer to a satellite office that my previous supervisor had been in the process of arranging. ~~Matt Cordner interviewed and reversed the prior approval. He~~ believed that there was insufficient work to justify a satellite office, ~~although the previous supervisor had already~~ established that office was.

4. November of 96. I was out on a Family Medical Leave Act, because I was informed by my sister's doctor that she would not live much longer with her cancer.

5. ~~January 12, 1997~~ my sister passed away. I came back to work 2 weeks after, the last week in January.

6. ~~January Rick Deloyeh took over as interim company truck~~ I had been told by Ed Dillman the 2nd line supervisor that I would be getting a new truck. As of May, I still had not received a new one. I went to the mechanics in the motor-vehicle dept and asked them if I was on a list for a new truck. They said that a new truck had not come in for me, and that it was common practice for a supervisor to change the names on the paperwork if they didn't like a particular employee.

7. February 6, 1997 Matt Cordner came to me in the morning and informed me he would be riding with me to evaluate my work. I felt that one week after returning back to work from a devastating loss was inappropriate bad timing to choose to evaluate someone's work. In addition, I had 9 years experience on the job, and there were two new technicians with less that a year on the job. He had never ridden with any technician since he came to the department. As of May 1997, he still had not ridden with any of the other technicians.

8. February   Matt physically took my cellular phone out of my company vehicle because he claims I went over the 300-minute limit the department had set. There was never any notices sent to the employees as to what the limit was. I offered to pay for any amount over the limit, he said no.

9. February 17, 1997 Matt Cordner gave me a written warning for leaving my truck unlocked. I showed him a note from the mechanics saying that the lock was broken. He began to scream at me at the top of his lungs saying that he didn't care what kind of note I had from the mechanics and that he was still writing me up. He showed me a policy saying that the vehicles needed to be locked. The company vehicles are inside a locked garage, which is inside a locked fence.   At the meeting in which I was given a warning Gerry Nuzzo the union steward was present. He asked Matt if anyone else had ever been written up for leaving their trucks unlocked, Matt said "no".
   When Matt had ridden with me on February 6th my computer was not working properly on a particular phone that I was on. He said to open another pay phone and try to dial on that line. I let him know that security personal had come to our garage and informed us that it was against the employee code of conduct

to open up pay phones other that the ones, which we were working on. He said he didn't' necessarily believe in that policy and told me to open up the pay phone. I was upset that he could arbitrarily pick and choose which policies he wants to adhere to, when and with whom. None of the other guys in the work group had ever been written up for leaving their truck unlocked

10. April 9th he questions me regarding a particular job and why it had taken so long. I asked everyone else in my crew if they had ever been questioned with regard to length of time they had ever spent on a job, they all said no.

11. April I called the EAP office and set up an appointment with a counselor. I had begun to feel sick to at the thought of going to work and I would begin shaking. The counselor said that I was depressed

12. April 29th ~~following the chain of command, I asked Matt Cordner to as his supervisor Ed Dillman~~ ~~for a them sk for for a pink slip.~~

13. May 2nd I had a meeting with Ed Dillman and Matt Cordner. The union representative was also at the meeting. Ed Dillman said he couldn't justify giving a pink slip and that there were not any job openings. The company had just given thousands of pink slips to employees in November of 1996. Ed Dillman and Matt Cordner then proceeded to pull out computerized sheet of my days work (DCWS) and match them to my written time sheets. They then asked me to account minute by minute my jobs on Friday 4/25/97. I was asked to go over the day 3 times. The union representative asked if anyone else had ever been questioned in this manner. No one ever had. I let him know I would be as accurate as I could be with my time sheets

14. May 6 Matt questioned me again about my time sheets matching up with the DCWS. I had done several jobs that day and he question why one job had 15 minutes more on one and 15 minutes more on another. The total time on the time sheets was the same. I told him it was a mistake and that I was trying to be as accurate as possible with my time reporting. I asked him if he checked any of the other guy's time sheets with the DCWS. ~~He said he but he would not tell me who. I asked if he knew~~ ~~of my notice in any my his me said that he checked any one elses time sheets with the DCWS.~~

15. Dave Ianello my (co-worker and union representative) had a meeting in the morning with me and the other guys in the crew. He asked if Matt had checked anyone's time sheets with the DCWS and everyone said no. He said that it was harassment what Matt was doing. ~~I asked Dave the union~~ ~~representative to tell Matt that he should stop harassing me. He responded to He said to wait for him to~~ ~~harass me again and to collect more evidence.~~

16. May 8th Matt spoke with me again about my time sheet, this time to give me a compliment on a "job well done". I thought this was very nice but he was still checking my time sheets and no one else's.

17. May 16th Friday I decided that Matt's harassment wouldn't stop and I saw no other alternative but to quit. I gave him my 2 weeks notice. One of my co-workers Rick Dellevolpe had said, "you know he is going to keep harassing you until you quit. I gave him my notice on Friday. On Monday he started to write my co-workers up for various things

18. May 19th, 1997 AM Matt writes Dave Ianello up for leaving his truck unlocked.
19  May 19th 1997. PM. Lou informs me that Matt has shown up at his first job.
20. May 20th, 1997 Matt questions Robert Bock about his time sheets.

21  May 20th Matt left an ace message asking for volunteers to work the holiday.  If he doesn't get a volunteer he will pick a name out of a hat.  Prior to me giving him my notice, whenever he needed someone to work overtime he would always threaten to force the lowest person on overtime when we were in our reporting room in the morning.  He would always do this when we were in our reporting room in the mornings, and he would always look over to me.  He did this often enough that it became harassing.  I was always the lowest on the overtime list, due to my obligations at home.  A very sick sister and a very young baby.  Prior to these obligations I had always been near the top of the overtime list and had volunteered whenever I could for overtime.

22.  May 30th Last Day of work.  Matt refused to give me my exit paperwork, which is SNET policy.  I received the paperwork in the mail 3 days later.  Matt Cordner had stated on the exit papers "I would not rehire Denise Evarts due to high absenteeism".  The high absenteeism occurred during the time of my sister's death.  Prior to this tragedy, my sick time had been minimal.  In addition , he started searching my truck and pulling out every piece of equipment.  To the best of my knowledge this has never been done when someone leaves.

**IMPORTANT: <u>YOU MUST OBTAIN A NOTARIZATION OF YOUR COMPLAINT</u>**

<u>BEFORE YOU RETURN</u>

I request the Connecticut Commission on Human Rights and Opportunities investigate my complaint, secure for me my rights as guaranteed to me under the above cited laws and secure for me any remedy to which I may be entitled.

_Denise Evarts_ _____ being duly sworn, on oath, states that she/he is the Complainant herein; that she/he has read the foregoing complaint and knows the content thereof; that the same is true of her/his own knowledge, except as to the matter herein stated on information and belief and that as to these matters s/he believes the same to be true.

Dated at _Waterbury_____, Connecticut this ____17th____ day of _November_____,
19 _97_.

X _Denise Evarts_____
(Complainant's Signature)

Subscribed and sworn to before me this __17th__ day of _November___, 19 _97_

_____
(Notary Public/Commissioner of
the Superior Court

My commission expires: _9/30/97_

Form 103

3

Revised 1/1/96