# EXHIBIT C

# Tyler Cooper & Alcorn, LLP

### C O U N S E L L O R S   A T   L A W

205 Church Street
P.O. Box 1936
New Haven, CT 06509-1910
203 784.8200
Telecopier 203 789.8069

Lori B. Alexander
203 784.8270
Email alexander@tycoop.com

December 28, 1998

12-30-98

Richard C. Gordon
CHRO Representative
Commission on Human Rights
  and Opportunities
50 Linden Street
Waterbury, Connecticut  06702

***VIA HAND DELIVERY***

Re:   Denise Evarts v. Southern New England Telephone Company
      CHRO No.:  9830248; EEOC No.:   16a983056

Dear Mr. Gordon:

Enclosed are the documents that you requested that respondent Southern New England Telephone Company ("SNET") produce following the fact-finding conference in the above-referenced case.

1.    **List of all female employees in the Payphone Services department from May 1, 1995 through May 30, 1997.**

The list is included in Exhibit A appended hereto.[1]

2.    **Copies of all of Complainant's performance evaluations from 1990 through May 30, 1997.**

As discussed at the fact-finding conference, bargaining unit employees of SNET, like Complainant, do not receive annual performance evaluations.   Respondent encloses Complainant's

---

[1] Employees' genders and hire dates are included, as well as a designation of each employee by number.  Names of employees have not been included to protect these employees' privacy.

Richard Gordon
December 28, 1998
Page 2

Riding Exercise Report, from her sole riding exercise on February 6, 1997. As stated by her supervisor, Matt Cordner, at the fact-finding conference, no employee discipline or any sort of warning resulted from that exercise.

**3.    Copies of all evaluations of other Technicians in the Payphone Services Department from May 1, 1995 through May 30, 1997.**

As set forth in response to Question No. 2, bargaining unit employees such as Technicians in the Payphone Services Department do not receive annual performance evaluations. However, as in the case of Ms. Evarts, SNET encloses as Exhibit C Riding Exercise Reports[2] of other Technicians by Matt Cordner from the time he became a supervisor through May, 1998.

**4. a.    Addresses of all other employees in the Payphone Services department from May 1, 1995 through May 30, 1997, noting any changes of address during that period.**

While SNET wishes to provide information relevant to this investigation, it objects to making the home addresses of its employees, which are highly confidential, available to the Complainant and (by filing them with the CHRO) to the public. SNET has provided relevant information concerning female employees in the Payphone Services Department in response to Document Request No. 1; these women's and other employees' home addresses are not relevant to any issues in this case, and therefore SNET believes strongly that these employees' privacy interests outweigh any possible benefit of disclosing them as part of the investigation of this matter.

To the extent that the purpose of this request is to elicit information concerning employees' requests to work out of satellite locations, see SNET's response to Document Request No. 4(b) below. As stated at the fact-finding conference, no Technicians in Payphone Services were assigned to satellite offices from the New Haven reporting center where Complainant worked, during the requested period.

_____

[2] To protect the privacy of the employees involved, respondent has redacted the employees' names from these documents but has indicated on each evaluation whether the employee was male or female . In addition, customer names have been deleted because the identities of SNET's customers are proprietary and confidential business information.

Richard Gordon
December 28, 1998
Page 3

 

**b.**   <u>List of all employees in the Payphone Services Department allowed to "satellite out" from May 1, 1995 through May 30, 1997.</u>

Since Ed Dillman became the Manager of SNET Payphone Services in 1991, <u>no</u> <u>one</u> has satellited out of the New Haven reporting center where Complainant worked. Although some Technicians worked out of the SNET office in Meriden, those assignments were not satellite assignments, because the Meriden office is a reporting center rather than a satellite location. Any claim that Complainant was treated differently from her male co-workers in the New Haven reporting center with respect to "satelliting out" has no merit.

As to the Payphone Services reporting centers other than New Haven, from May 1, 1995 through May 30, 1997, one Technician (male) who worked out of the Norwalk/Stratford Payphone Services reporting center volunteered to satellite out of the New Canaan Central Office after SNET determined that the volume of service it performed in the New Canaan area warranted the assignment of a Technician there. Ms. Evarts was not part of the Norwalk/Stratford crew that covered this area and was therefore ineligible for this assignment; more importantly, this satellite location was in a different part of the state and would not have been closer to her home.

Another employee (male) who worked out of the Norwalk/Stratford Payphone Services reporting center satellited out of the Derby central office for a brief period of time, but this area was later reconfigured and he was brought back to the central Norwalk/Stratford reporting center. As in the other case, Complainant was not part of this crew and Derby was not hear her home.

The only other employee in the Payphone Services group who "satellited out" during the requested period (Matt Cordner) did so out of the New London reporting center. He satellited out to an office in East Haddam for a period of time, but this arrangement was discontinued when he took on supervisory responsibilities and the needs of the business required that he report to work in the New Haven reporting center.

As SNET's witnesses testified at the fact-finding conference, the assignment of a Payphone Services Technician to a "satellite office" is not an employee benefit which is granted for the convenience of employees. Rather, such "satelliting out" occurs only when the volume of installation and repairs in a given area warrants a full-time Payphone Services Technician being assigned to an area where the department does not already have an office from which such Technicians report. In addition, as Mr. Cordner previously explained, any satellite assignment had to be offered to employees in order of their seniority with the company and could not be granted to particular employees on a preferential basis.

Richard Gordon
December 28, 1998
Page 4

SNET notes that Complainant does <u>not</u> claim that SNET failed to offer her a satellite assignment that she was entitled to because of seniority but offered it instead to a male. Her complaint is that SNET was somehow legally obligated to <u>create</u> a <u>new</u> satellite office for her in North Madison, where it had never offered a satellite to anyone, once she moved her residence from Meriden (which was closer to her New Haven reporting center) to Chester, Connecticut. There is no legal basis for her claim that SNET somehow treated her differently by not allowing her to satellite out of her New Haven reporting center to North Madison. First, it is undisputed that SNET had no satellite office in North Madison at the time and has never had one since. Second, as Matt Cordner testified at the fact-finding conference, there was simply not enough work in the North Madison area to justify putting in a satellite there. Moreover, as he testified, most of Complainant's work was in the New Haven area and therefore it made business sense for Complainant to report to the main office in New Haven.

Third, notwithstanding the above facts, Mr. Cordner testified that SNET researched Complainant's request for a satellite location and concluded that there was sufficient work and therefore a business need that could justify creating a satellite office in Guilford, which is between Madison and New Haven. Accordingly, Mr. Cordner was able to obtain approval to create a satellite in Guilford, and a male co-worker with more seniority than Complainant who also lived in that area stepped aside to permit Complainant take the satellite rather than him. However, Complainant declined the offer to "satellite out" of Guilford, even though that location was undisputedly closer to her home than New Haven.

5. <u>List the percentage of time Complainant worked outside of New Haven County in her job from May 1, 1995 - May 30, 1997, and provide a similar list of the percentage of time co-workers who satellited out of their territories within Payphone Services spent out of their areas.</u>

SNET does not keep these statistics by person and therefore cannot answer this question. SNET notes that Complainant has <u>not</u> claimed that most of her work was in the North Madison area, and therefore it made business sense for her to have an office in North Madison rather than New Haven. Indeed, Mr. Cordner testified that most of her work was in the New Haven area. In addition, she was offered a satellite opportunity in Guilford, a town located between New Haven and her home in Chester, which would have allowed her to work closer to her home, but she declined the offer.

Richard Gordon
December 28, 1998
Page 5

6.    **List of Payphone Services Technicians, with their actual cellular usage per month, from May 30, 1995 - February, 1997, noting any employees who had their phones taken away, including Complainant.**

SNET has attached as Exhibit D a chart showing Ms. Evarts' cellular telephone usage and the usage of other Payphone Services Technicians who had their phones taken away during 1996-97. See also SNET's Jan. 15, 1998 response to Complaint (previously filed) at 9-10.

Complainant claims in this case that she was discriminated against because of her gender when Mr. Cordner, her supervisor, prohibited her from using her cellular telephone for a month after she undisputedly exceeded the limitation on cellular usage during three of the first five months of 1997. See SNET's Jan. 15, 1998 response to Complaint at pp. 9-10. The documents enclosed at Exhibit D corroborate the testimony at the fact-finding conference that male employees had their cellular telephones taken away, like Complainant, for overuse. Again, Complainant was not treated any differently from her co-workers.

7.    **An indication of any adverse action taken against any Payphone Services Technician because his/her actual times worked did not correspond with the computer sign-offs, and whether the individuals involved were male or female, from May 30, 1995 - May 30, 1997.**

All experienced supervisors in Payphone Services have counseled their employees concerning timesheet errors, as Complainant was counseled. In addition, unlike Complainant who never received a formal written warning for her timesheet errors, 2 male co-workers did receive final written warnings or suspensions for problems that included inaccurate timesheets in 1997, and 1 male co-worker received a formal written warning concerning timesheet reporting in 1992. Documentation of these formal disciplinary actions against male workers concerning timesheets is attached as Exhibit E.

8.    **The hire dates of all employees in the Payphone Services department, noting their genders and which ones worked for Matt Cordner, from May 30, 1995 - May 30, 1997.**

This information is provided in Exhibit A.

Richard Gordon
December 28, 1998
Page 6


**9.** **Copies of timesheets for all Payphone Services Technicians from May 1, 1995 - May 30, 1997, where there were discrepancies between time recorded by the DCWS and actual times worked at each job.**

DCWS records are not routinely retained by SNET, so respondent is unable to answer this question as posed. SNET can state, however, that if any such discrepancies were noted during the relevant times by the supervisors, employees would have been counseled (like Complainant was), or would have received formal discipline as in the cases of the 3 male co-workers described in response to Question No. 7 above.


**10.** **Any schedules reflecting riding exercises done with other Payphone Services Technicians from May 1, 1995 - May 30, 1997, and any documents reflecting the results/evaluations of those exercises.**

Schedules of riding exercises through 1997 are attached as Exhibit F. They show that all employees undergo riding exercises, and Complainant was not treated any differently by having a riding exercise with her supervisor in 1997. Moreover, Complainant was never disciplined or reprimanded as a result of the riding exercise, and it is unclear in what way she claims she was discriminated against based on her gender with respect to that exercise.

Documents reflecting the results/evaluations of those exercises are included in Exhibits B and C, submitted in response to Questions No. 2 and 3.

Very truly yours,

*Lori B. Alexander*

Lori B. Alexander

LBA:mjd

cc:    Carole Wilder, Esquire
       Ed Dillman
       Matt Cordner
       Michelle Esposito, Esquire (counsel for Complainant)

Richard Gordon
December 28, 1998
Page 7

## CERTIFICATION

A copy of the foregoing was sent via first-class mail, postage prepaid to counsel for

Complainant, Michelle Esposito, Esquire, Law Offices of Karen Torre, 51 Elm Street, New Haven,

Connecticut 06510 on this 28th day of December, 1998.

_Lori B. Alexander_
Lori B. Alexander

# EXHIBIT D

# Tyler Cooper & Alcorn, LLP

### COUNSELLORS AT LAW

205 Church Street
P.O. Box 1936
New Haven, CT 06509-1910
203 784.8200
Telecopier 203 789.8069

Lori B. Alexander
203 784.8270
Email alexander@tycoop.com

January 12, 1999

Richard C. Gordon
CHRO Representative
Commission on Human Rights
  and Opportunities
50 Linden Street
Waterbury, Connecticut  06702

***VIA HAND DELIVERY***

Re:  <u>Denise Evarts v. Southern New England Telephone Company</u>     1-14-99
      CHRO No.:  9830248; EEOC No.:  16a983056

Dear Mr. Gordon:

This is in response to Michelle Esposito's letter to you dated December 31, 1998 ("Letter") and received in this office on January 4, 1999.  For the Investigator's convenience, SNET has provided revised exhibits with the names of individual employees included.  The revised exhibits are attached hereto.[1]

As an initial matter, SNET strongly objects to Ms. Esposito's numerous unsupported accusations that respondent failed to disclose relevant information, as well as her implications that SNET has fabricated false information for the Commission.  As counsel for SNET in this matter, I also personally and professionally take offense to Ms. Esposito's remarks in that regard, which are unprofessional in a way that is uncommon among practitioners in Connecticut.  Apparently, she is resorting to unsupported innuendo rather than fact because she realizes that Complainant's claim that she was treated differently from her male co-workers lacks any factual basis.

SNET also objects to Ms. Esposito's own offer of false and misleading information to the Commission concerning several particular employees of SNET, as well as her attempts to define the relevant inquiry differently as to different questions.  Specifically, the Investigator will note that in

---

[1]  The revised exhibits are lettered to correspond with the redacted exhibits previously filed with the Commission.

HARTFORD     MADISON     NEW HAVEN     STAMFORD

Richard Gordon
January 12, 1999
Page 2

the course of her response, she alternates between claiming that only those Services Technicians who worked under Matt Cordner should be considered as similarly situated to Ms. Evarts, and (at other times) criticizing SNET for focusing its information on employees who reported to Mr. Cordner.

Third, although SNET has now provided the names of employees in order to cooperate fully with the investigation of this matter, it still firmly believes and emphasizes that employees' names are not relevant to this case.[2] The issue, and the <u>only</u> issue in this case, is whether Complainant was treated differently from similarly situated male co-workers. What is important, then, is whether each employee was male or female, not what their names were. Accordingly, names of employees other than Ms. Evarts are completely irrelevant to a determination of any substantive issues in this case. Ms. Esposito does not argue that names <u>are</u> relevant but she claims she wants them anyway because "there is no way to verify the accuracy of" the information provided by SNET without names; again, such comments implying that SNET has fabricated information are inappropriate and designed to avoid the facts and evidence in the case. Moreover, SNET previously provided copies of <u>original personnel records</u>, such as riding exercise reports, with only names redacted; neither SNET nor the undersigned would fabricate the documents and send them to the Commission, whether or not they contained employees' names.

Fourth, SNET notes that Complainant could have made this whole process a great deal simpler for all involved, including the Investigator, by revealing the alleged "facts" she now sets forth for the first time in her Letter. She claims now to have additional evidence, some of which she alludes to mysteriously as unidentified "witnesses" she "can produce." If Complainant had relevant information, Ms. Esposito should have disclosed the information from the beginning, so that SNET could directly and promptly respond to it. Her allegedly new claims now require yet another response from SNET.

In addition to the above general comments, SNET responds below to the specific misleading and inaccurate statements submitted by Complainant in her Letter. It also takes this opportunity to offer its Proposed Findings of Fact based on the documentary and testimonial evidence submitted by SNET in this case.

---

[2] Attorney Karen Torre, who also represents Complainant in this matter, has already informed SNET that she is committed to moving this case to federal court, regardless of the Investigator's decision. She has indicated that she does not want to do so, however, until the investigation is completed so that she can obtain documents for use in federal court through the Commission process. SNET has been reluctant to turn over employees' names to her and to make them publicly available under these circumstances.

Richard Gordon
January 12, 1999
Page 3

1.    <u>List of all female employees in the Payphone Services department from May 1,
1995 through May 30, 1997.</u>

<u>(Response was provided in Exhibit A and in text.)</u>

As to Exhibit A (list of employees in Payphone Services under Ed Dillman's management),
Attorney Esposito first states that, "the respondent claims they provided the Commission with the
employees' date of hire but in actuality have given only what appears to be an employee number."
Letter at 1.  SNET employees do not have employee numbers.  The dates listed under "Hire Date"
in Exhibit A are, indeed, hire dates as they are labeled.  As is common with information stored on
computer, the year is listed first, followed by the month, and then followed by the day.  If Ms.
Esposito was confused about this information, a simple phone call to the undersigned would
alleviated her confusion and avoided the need for her to incorrectly represent that SNET had provided
the wrong information.

Complainant's next claim that SNET did not provide the positions of the employees listed is
meritless, because the Investigator did not request that SNET provide that information.

<u>Proposed Finding of Fact Based on This Information:</u>

1.    In addition to Denise Evarts, 16 female employees worked under Ed Dillman's
management in Payphone Services between May 1, 1995 and May 30, 1997.  Many of them had been
employees of SNET for a long time, including five female employees who were hired in 1970 or
before, and several who were hired in the 1980's.  Exhibit A.

2.    <u>Copies of all of Complainant's performance evaluations from 1990 through May
30, 1997.</u>

<u>(Response was provided in Exhibit B and in text.)</u>

As Matt Cordner testified at the fact-finding conference, riding exercises are when a
supervisor physically rides in the Services Technician's truck with him/her during the day, offering
helpful suggestions and giving feedback about various aspects of the employee's work performance.
Lacking any real facts to support her client's claims, Ms. Esposito tries to twist the concept of a
"riding exercise," which is a positive and helpful feedback opportunity, into a negative event by
claiming that "complainant would ask the Commission to note that the only time she was subjected
to a riding exercise during her eight years as a service technician was while under the supervision of

Richard Gordon
January 12, 1999
Page 4

Matt Cordner." Complainant's carefully chosen term, "subjected," gives an entirely false impression and is misleading. <u>Riding exercises are not a disciplinary tool or a punishment of any sort</u>, but a way for employees to receive informal feedback from their supervisors. As shown in Exhibits B and C, Complainant, just like all the other Services Technicians, received such valuable feedback through a riding exercise in 1997. Exhibit F shows that as early as in 1995, several male Services Technicians in Complainant's work group had riding exercises, including R. DellaVolpe (M), T. Carroll (M), J. Conway (M), D. Gannon (M), L. Nagle-Washng (M), J. Verrastro (M), and J. Young (M). In 1996, D. Ianello (M), A. Jackson (M), J. Brown (M), and D. Starling (M) all had riding exercises. Denise Evarts had a riding exercise in 1997, as did 16 male co-workers during that year. <u>See</u> Exhibit F.

Exhibits B, C, and F clearly show that Complainant was not treated less favorably than male co-workers. Male co-workers were given riding exercises, and she was given a riding exercise. There is no claim or evidence that she was unduly criticized or received any sort of warning or discipline as a result of the riding exercise. Raising this single 1997 riding exercise as the key event allegedly underlying Complainant's claim of discrimination demonstrates that there really is no substance to her claim. All her supervisor did was ride along with her once as she did her normal work routine to help her improve her performance. Moreover, she was not "subjected" to anything; she was given the benefit of a riding exercise.[3]

## <u>Proposed Findings of Fact Based on This Information:</u>

1. Complainant, like other bargaining unit employees of SNET, did not receive annual performance evaluations. SNET's Dec. 28, 1998 Supplemental Response at 1. Instead, in the absence of serious performance problems, which would result in formal discipline, such employees received periodic informal feedback concerning their performance. Cordner Testimony at Fact-Finding Conf.

2. One type of informal feedback for Payphone Services Technicians was through riding exercises, which occur when a supervisor rides in the Services Technician's truck with him/her during the day, offering helpful suggestions and giving feedback about various aspects of the employee's work performance. Cordner Testimony at Fact-Finding Conf. Complainant had one riding exercise

---

[3] SNET notes that if Complainant had <u>not</u> been given a riding exercise like her male co-workers, surely Ms. Esposito would be claiming here that Ms. Evarts was discriminated against by being <u>deprived</u> of the important performance feedback available to Services Technicians through riding exercises.

Richard Gordon
January 12, 1999
Page 5

in February, 1997. Exhibits B, F. Just like Complainant, many male Services Technicians in Payphones Services had riding exercises with their supervisors between 1995 and 1997. Exhibit F. Complainant was never warned, disciplined or received any sort of unusual criticism for her performance during the riding exercise. Exhibit F; Cordner Testimony at Fact-Finding Conf.

3.    **Copies of all evaluations of other Technicians in the Payphone Services Department from May 1, 1995 through May 30, 1997.**

(Response was provided in Exhibit C and in text.)

Complainant makes no substantive comments about Exhibit C, which further supports the fact that both male and female employees were treated the same with respect to riding exercises with their supervisors. The best Complainant can do is claim the exhibit is "misleading" because apparently some of the pages in her copy were out of order. If that was so, SNET apologizes. While again taking the opportunity to accuse SNET of being "misleading," Complainant does not specify how SNET has tried to mislead anyone by the fact that a couple of the pages in her copy were out of order.

More importantly, Complainant's statement that "[t]he only individual [Matt Cordner] ["]subjected["] to a ride-along during the relevant time period was the Complainant" is blatantly untrue. See supra. at 3-4. Since Matt Cordner became a supervisor for the first time in July, 1996, clearly he could not have given anyone a riding exercise from January 1, 1995 through June, 1996. Accordingly, the investigator did not limit the question to Matt Cordner, because such a limitation would not make sense given this fact. Complainant's effort again to shift the applicable universe, in this instance claiming that the Investigator should consider only employees under Mr. Cordner's supervision, is an attempt to distort the fact that Services Technicians, Complainant included, are routinely given the benefit of riding exercises. In addition, as shown in Exhibit F, from the time Matt Cordner started as a supervisor in July, 1996 through 1997, he gave the following Services Technicians riding exercises:

R. Bock (male)
R. DellaVolpe (male)
D. Evarts (female)
D. Ianello (male)
D. Kapral (male)
L. Marino (male)
R. Reiss (male)

Richard Gordon
January 12, 1999
Page 6

Again, he treats everyone the same; there are no distinctions based on gender.

With respect to SNET's Dec. 28, 1998 response to this question, Complainant also claims that, "[o]nly after the complainant made it known to Mr. Cordner that she believed she was being singled out for a ride-along, did he begin to conduct ride-alongs with other individuals." Letter, p. 2. This claim is utter nonsense. As Matt Cordner testified at the fact-finding conference, he to this day regularly performs riding exercises with his Services Technicians. It is preposterous to suggest -- once again with absolutely no evidence -- that he would do this for three years to somehow make it look like he was treating everyone the same when he wasn't. As he testified, he accompanied Complainant on a riding exercise in February, 1997 because she had recently come back from a leave of absence for several months and he wanted to offer his assistance reminding or updating her on procedures, some of which may have changed while she was out. This is hardly discrimination of any sort. He had to start with someone and there was no reason not to start with her.

**Proposed Finding of Fact Based on This Information:**

1. Matt Cordner gave riding exercises and completed reports concerning them for both male and female Services Technicians who reported to him, and continues to do so today. He gave riding exercises to Complainant and six male co-workers in 1997. Exhibits C, F; Testimony of Matt Cordner at Fact-Finding Conf.

**4. a.    Addresses of all other employees in the Payphone Services department from May 1, 1995 through May 30, 1997, noting any changes of address during that period.**

**(Objection was provided in text.)**

Complainant fails to give any reason why disclosure of the home addresses of employees of SNET are relevant to the claims in this case. In fact, at the fact-finding conference, Attorney Esposito stated that she was not really interested in this information.

To the extent that the purpose of this request is to elicit information concerning employees' requests to work out of satellite locations, relevant information was provided in response to Request No. 4(b) below, both in SNET's Dec. 28, 1998 Supplemental Response and as revised herein.

Richard Gordon
January 12, 1999
Page 7

      **b.**    **<u>List of all employees in the Payphone Services Department allowed to "satellite out" from May 1, 1995 through May 30, 1997.</u>**

     <u>(Response was provided in text, as amended below</u>.)

      As set forth previously, since Ed Dillman became the Manager of SNET Payphone Services in 1991, <u>no</u> <u>coin</u> <u>Services Technician</u> has satellited out of the New Haven reporting center where Complainant worked.   SNET hereby supplements its prior response by indicating the names of the individuals discussed in that prior response.

      As to the Payphone Services reporting centers other than New Haven, from May 1, 1995 through May 30, 1997, one Technician, Tony Spadaccini (male), who worked out of the Norwalk/Stratford Payphone Services reporting center, volunteered to satellite out of the New Canaan Central Office after SNET determined that the volume of service it performed in the New Canaan area warranted the assignment of a Technician there.   Ms. Evarts was not part of the Norwalk/Stratford crew that covered this area and was therefore ineligible for this assignment; more importantly, this satellite location was in a different part of the state and would not have been closer to her home.

      Another employee, John Tarbunas (male), who worked out of the Norwalk/Stratford Payphone Services reporting center satellited out of the Derby central office for a brief period of time, but this area was later reconfigured and he was brought back to the central Norwalk/Stratford reporting center.   As in the case of Tony Spadaccini, Complainant was not part of this crew and Derby was not near her home.

      The only other employee in the Payphone Services group who "satellited out" during the requested period, Matt Cordner, did so out of the New London reporting center.   He satellited out to an office in East Haddam for a period of time, but this arrangement was discontinued when he took on supervisory responsibilities and the needs of the business required that he report to work in the New Haven reporting center.

      Attorney Esposito claims, without any statement from Ms. Evarts or documentary evidence to support it, that "there are additional employees who have been allowed to satellite out during the relevant time period." Letter at 3.   She first lists Matt Cordner and John Tarbunas <u>who were included in SNET's original response</u>.   Therefore, these are not "additional" employees at all, and SNET already disclosed them.

Richard Gordon
January 12, 1999
Page 8

She lists several others as well, and SNET has investigated her claim. (Again, Complainant should have raised these names originally so that SNET could have addressed these individuals directly in its original response, rather than hiding them until now.) Neither Michael Tobin nor Arnold Petrus, to SNET's knowledge, ever "satellited out" during the relevant period.

None of the others worked out of satellite offices either. All of them did work for some period of time out of other established reporting centers but none of them satellited out. As indicated in job description for Services Technician, a copy of which is attached hereto as Exhibit G (a copy was also previously filed as Exhibit 8 to SNET's Jan. 15, 1998 Response), Services Technicians may work out of established reporting centers in Danbury, Waterbury, Winsted, Stratford, Hartford, Meriden, New London, Willimantic, Norwalk, and Hamden. North Madison, where Complainant wanted to work, is not a reporting center and is not listed as such in the job description. If a Services Technician wants to move from one reporting center to another, he/she may do so if there is space available by submitting a transfer request through SNET's Transfer Bureau; if it is approved, he/she may transfer. Under this system, Andew Jackson, John Young, Nicholas Pollock, Mark Richard, and George Pitts transferred to work out of an established office in Stratford. Again, Complainant never asked to work out of Stratford, and, if she had, she would have been considered to do so. Similarly, Steve Boisvert transferred to an established office in Willimantic through a transfer request. Complainant never asked to be transferred to the reporting center in Willimantic either; if she had, she would have been considered just like Mr. Boisvert. Stratford and Willimantic are not at all satellite locations. Complainant could have transferred to either of these locations as easily as these co-workers. Once again, she has the facts wrong and has submitted inaccurate information to the Commission. Complainant's claim that SNET Payphone Services allowed Services Technicians to satellite out other than those listed in its original response is incorrect.

As Mr. Cordner and Mr. Dillman testified at the fact-finding conference, satellites are very different from the established offices listed on the job description for Services Technician. The assignment of a Payphone Services Technician to a "satellite office" occurs only when the volume of installation and repairs in a given area warrants a full-time Payphone Services Technician being assigned to an area where the department does not already have an office.

**Proposed Findings of Fact Based on This Information:**

1. The re-assignment of a Payphone Services Technician to a "satellite office" is not an employee benefit that SNET grants for the convenience of employees. A satellite office may be created for a Services Technician in an area outside of his/her reporting center only when the number of installations and repairs in the area warrants a full-time Payphone Services Technician being assigned to a town where the department does not already have a reporting center. SNET's Dec. 28,

Richard Gordon
January 12, 1999
Page 9

1998 Supplemental Response; Dillman and Cordner Testimony at Fact-Finding Conf.

2. Complainant previously lived in Meriden and worked out of the New Haven office. Later, she moved to Chester, Connecticut and asked SNET to create a "satellite office" for her in North Madison so that she would no longer report to New Haven. Evarts and Cordner Testimony at Fact-Finding Conf.

3. Although Complainant claims that SNET should have granted her request to create a new satellite office just for her in North Madison, the evidence was undisputed that SNET had never offered a satellite in North Madison to any other coin employee. SNET's Dec. 28, 1998 Supplemental Response, at 3; Dillman Testimony at Fact-Finding Conf.

4. When Complainant made her request for SNET to set up a new satellite office for her in North Madison, her supervisor, Matt Cordner, investigated the issue and concluded that there was simply not enough work in the North Madison area to justify putting in a satellite office there. That business-related decision is corroborated by the fact that SNET to the present has not put in a coin satellite in North Madison. SNET's Dec. 28, 1998 Supplemental Response, at 3-4. However, upon researching the issue for Ms. Evarts, Mr. Cordner did conclude that there was sufficient work that could justify creating a satellite office in nearby Guilford, which is a town between North Madison and New Haven and would be closer to Complainant's home. Mr. Cordner obtained approval to create that satellite, but Complainant declined the opportunity to "satellite out" of Guilford. SNET's Dec. 28, 1998 Supplemental Response at 3-4; Cordner and Dillman Testimony at Fact-Finding Conf.

2. Since Ed Dillman became Manager of SNET Payphone Services in 1991, no Payphone Services Technician has satellited out of the New Haven reporting center, which is the reporting center where Complainant worked. Two male Technician satellited out of the Norwalk/Stratford Payphone Services reporting center to New Canaan and Derby, because the volume of service performed on pay telephones in the New Canaan and Derby areas warranted the assignment of Technicians there. Complainant did not work out of the Norwalk/Stratford reporting center, and neither New Canaan nor Derby would have closer to her home. In addition, for a time while he was a Technician, Matt Corder satellited out of the New London reporting center to East Haddam, but that arrangement was discontinued when he became a supervisor and the needs of the business required that he report to the New Haven reporting center. Again, Complainant did not work out of the New London reporting center and never requested to satellite out of East Haddam. SNET's Dec. 28, 1998 Supplemental Response at 3-4; Cordner Testimony at Fact-Finding Conf.

Richard Gordon
January 12, 1999
Page 10

**5.    List the percentage of time Complainant worked outside of New Haven County in her job from May 1, 1995 - May 30, 1997, and provide a similar list of the percentage of time co-workers who satellited out of their territories within Payphone Services spent out of their areas.**

(Response was provided in text.)

SNET points out that, in light of the evidence submitted that no Payphone Services Technicians satellited out of the New Haven office during the relevant period, this information is really irrelevant to any claim in this case. The evidence is clear that Complainant was not treated differently from similarly situated male employees with respect to "satelliting out."

Moreover, the information is irrelevant because Complainant has not claimed that most of her work was in the North Madison area, and therefore it made business sense for her to have an office in North Madison rather than New Haven. Indeed, Mr. Cordner testified that most of her work was in the New Haven area. In addition, she was offered a satellite opportunity in Guilford, a town located between New Haven and her home in Chester, which would have allowed her to work closer to her home, but she declined the offer.

**6.    List of Payphone Services Technicians, with their actual cellular usage per month, from May 30, 1995 - February, 1997, noting any employees who had their phones taken away, including Complainant.**

(Response was provided in Exhibit D and text.)

Ms. Esposito's comments concerning Exhibit D are meritless, particularly her statement that "respondent provided the Commission with a small, selective list of technicians and their cellular phone usage." Letter at 4.

In Exhibit D, SNET has provided a list of all the Payphone Services Technicians other than Complainant who had their phones taken away during 1996-97, the only time when Matt Cordner was a supervisor. Upon information and belief, 1995 was the first year that SNET Payphone Service Technicians had cellular telephones in their SNET vehicles, and Payphone Services no longer has these records for 1995. SNET did not "select" information but provided what the department had. Only 1996 and 1997 are relevant to this case anyway, since 1995 would have been a year and a half before Matt Cordner was Complainant's supervisor and more than two years before Complainant's cell phone was taken away.

Richard Gordon
January 12, 1999
Page 11

Contrary to Complainant's claim,[4] the information in Exhibit D shows that SNET removed males' cellular telephones for excessive usage, just like Complainant's. In 1997, Matt Cordner had several group discussions with his Technicians about the department's cellular telephone policy not to exceed 300 minutes of usage per month, and there is no dispute that Complainant attended those sessions. SNET's Jan. 15, 1998 Response at 9 (attested to by Matt Cordner). Complainant exceeded this usage limitation in six of the twelve months of 1996, but Matt Cordner did not take away her telephone at that time. Dillman Aff. ¶ 8. However, three male co-workers, David Ianello, Mike Tobin, and Steve Boisvert did have their cellular telephones taken away during 1996. Exhibit D. After Complainant had cellular usage of 517 minutes in May, 323 minutes in June, 347 minutes in August and 367 minutes in November, 1996; 366 minutes in January, 1997; and 334 in February, 1997, her cellular telephone was also taken away for one month. Exhibit D; SNET's Jan. 15, 1998 Response at 9-10. During 1997, two male co-workers also had their cellular telephones taken away for period of time due to excessive usage. Exhibit D.

Complainant never received any formal written warning or other formal discipline concerning her cellular telephone usage.

**Proposed Findings of Fact Based on This Information:**

1. Services Technicians were not to use the cellular telephones in their SNET vehicles in excess of 300 minutes per months. They were to use the cellular telephones for personal calls only when absolutely necessary, both because of the expense involved and also because employees are not supposed to be making personal calls on company time. Dillman Aff. attached to SNET's Jan. 15, 1998 Response.

2. In 1997, Matt Cordner had several group discussions with his Services Technicians about this cellular telephone policy, and there is no dispute that Complainant attended those sessions. SNET's Jan. 15, 1998 Response at 9 (attested to by Matt Cordner); Evarts Testimony at Fact-Finding Conf.

---

[4] Ms. Esposito states that the exhibit shows "that the respondent either did not have a policy regarding cellular phone usage or assuming it had one, it failed to apply it in a consistent manner," but she does not explain in what way it allegedly shows these things. The fact is that it does not.

Richard Gordon
January 12, 1999
Page 12

3.  Complainant exceeded the permitted telephone  usage limitation in six of the twelve months of 1996, but Matt Cordner did not take away her telephone at that time.  Dillman Aff. ¶ 8.  However, 3 male co-workers did have their cellular telephones taken away during 1996 for excessive usage.  Exhibit D.

4.  After Complainant had cellular usage of 517 minutes in May, 323 minutes in June, 347 minutes in August, and 367 minutes in November, 1996; 366 minutes in January, 1997; and 334 minutes in February, 1997, her cellular telephone was taken away for a month.  During 1997, two male co-workers also had their cellular telephones taken away for period of time.  Exhibit D.

5.  Complainant did not receive any formal written warning or any other formal discipline concerning her cellular usage.  Cordner and Evarts Testimony at Fact-finding Conf.

7.      **An indication of any adverse action taken against any Payphone Services Technician because his/her actual times worked did not correspond with the computer sign-offs, and whether the individuals involved were male or female, from May 30, 1995 - May 30, 1997.**

**(Response was provided in text and Exhibit E.)**

Complainant's remarks again show a basic misunderstanding of the facts of this case.  In its Dec. 28, 1998 Supplemental Response, SNET stated that all supervisors counsel their employees.  "Counseling" is an informal process of discussing an issue with an employee; it often does not result in any sort of documentation and is not considered formal discipline that could, in and of itself, lead to termination.  Complainant, for example, was counseled about her timesheet errors but never received a formal written warning or suffered any adverse employment action concerning it.  Basically, her supervisor talked with her about the fact that her timesheets did not make sense and were inaccurate,[5] which she admitted at the fact-finding conference.

By contrast, SNET has provided documentation that Mark Richard, Joseph Regina, and Robert Dwilis, three male Services Technicians, did receive formal written warnings about issues concerning timesheets.  In other words, their conduct was treated more severely than Complainant's.

_____

[5] The lack of substance of her claims is particularly apparent in her allegation that she was discriminated against because her supervisor talked to her about her timesheets.

Richard Gordon
January 12, 1999
Page 13

Complainant's remark that SNET has not disclosed individuals who were "counseled" misses the point; all of these individuals received more serious formal discipline concerning their conduct.

As to Complainant's statement that one of the male workers apparently committed "fraud" on his timesheets, SNET notes that 1) any inaccurate reporting of time, other than inadvertent errors, is fraud, as the timesheets are what the employee's pay is based on and a statement about what the employee did that day, and 2) these individuals clearly <u>were</u> disciplined more severely than Complainant was.

**<u>Proposed Findings of Fact Based on This Information:</u>**

1. It is the normal practice of supervisors in Payphone Services to counsel their employees concerning timesheet errors when inaccuracies are discovered. Cordner Testimony at Fact-Finding Conf.

2. Complainant was counseled about many timesheet errors, including recording jobs that had unaccountable time charged against them, discrepancies between her handwritten timesheets and the DCWS computer printouts of her time, jobs that were recorded in the wrong order on her timesheets, and tasks coded with the wrong numbers. <u>See</u> SNET's Jan. 15, 1998 Response at 8 and exhibits referred to therein; Matt Cordner Testimony at Fact-Finding Conf.

3. Unlike Complainant, who never received a formal written warning for her timesheet errors, two male co-workers <u>did</u> receive final written warnings or suspensions for problems that included inaccurate timesheets in 1997, and one male co-worker received a formal written warning concerning timesheet reporting in 1992. Exhibit E. Other male employees were counseled about timesheet problems, but counseling is an informal process that often does not result in a written warning or other document. Cordner Testimony at Fact-Finding Conf.

8. **<u>The hire dates of all employees in the Payphone Services department, noting their genders and which ones worked for Matt Cordner, from May 30, 1995 - May 30, 1997.</u>**

<u>(Response was provided in Exhibit A.)</u>

As to Exhibit A, Complainant offers a comment that demonstrates that she failed to read carefully the materials provided. Ms. Esposito states, "[t]he Complainant can only assume that the asterisks noted on the respondents' Exhibit `A' reflect those employees who are supervised by Matt Cordner." Letter at 4. The exhibit clearly states on page 3 <u>that the asterisks refer to those who</u>

Richard Gordon
January 12, 1999
Page 14

"Reported to Matt Cordner."  See SNET's Dec. 28, 1998 Supplemental Response at Exh. A, p. 3.

**Proposed Findings of Fact Based on This Information:**

See Proposed Findings of Fact under Request No. 1 above.

9.    **Copies of timesheets for all Payphone Services Technicians from May 1, 1995 - May 30, 1997, where there were discrepancies between time recorded by the DCWS and actual times worked at each job.**

(Response was provided in text and Exhibit E.)

As explained previously, DCWS records are not generally retained by the Payphone Services Department, so it is unable to answer this question as posed.  Once again, Ms. Esposito's comment that she "finds it unusual" that old DCWS records are not retained is not in any respect evidence and is inappropriate in this investigation.

10.    **Any schedules reflecting riding exercises done with other Payphone Services Technicians from May 1, 1995 - May 30, 1997, and any documents reflecting the results/evaluations of those exercises.**

(Response was provided in text and Exhibit F.)

Ms. Esposito states that she did not realize this information was requested but assumes it is relevant to show "how much notice employees are given before having riding exercises with their supervisors." That assumption is not correct. There is no claim in this case that Complainant did not get as much prior notice of riding exercises as her male co-workers.

What the chart does show is that eleven male Payphone Services Technicians were given riding exercises with their supervisors before Complainant was. Therefore, her claim that she was given riding exercises before her male co-workers has no merit. In addition, after Complainant's riding exercise, sixteen other male Payphone Services Technicians were given riding exercises just like she was. The chart in Exhibit F clearly shows that Complainant's claim that she was treated differently from males by being given a riding exercise is frivolous.

Richard Gordon
January 12, 1999
Page 15

**Proposed Findings of Fact Based on This Information:**

1. Complainant was given a single riding exercise with her supervisor, Matt Cordner, in February, 1997. Complaint; Testimony of All Witnesses at Fact-Finding Conf.

2. Eleven male Payphone Services Technicians had riding exercises with their supervisors in 1995 and 1996, before Complainant had hers. Exhibit F.

3. After Complainant's riding exercise in 1997, sixteen male co-workers had riding exercises later in 1997. Exhibit F. Complainant was not treated differently from her male co-workers when she was given a riding exercise in 1997. Exhibit F; Cordner Testimony at Fact-Finding Conf.

**General**

SNET also takes this opportunity to emphasize that Ms. Evarts' claim cannot succeed unless she establishes that there is reasonable cause to believe that she was constructively discharged, that is, that her "working conditions were so intolerable that a reasonable person would feel <u>forced</u> to resign." <u>Seery v. Yale-New Haven Hosp.</u>, 17 Conn. App. 532, 540 (1989) (emphasis added).

Complainant never received a formal written warning, never received a final warning, and was never terminated. The sum total of her claims are that 1) her supervisor went on a riding exercise with her (like 27 of her male co-workers), 2) she had her telephone taken away for excessive telephone usage (as 4 male co-workers did), and 3) SNET did not create a special office for her in North Madison (because there was not enough business in that area to justify a full-time Services Technician there). In addition, as attested to in the Affidavits of Ed Dillman and Matt Cordner attached to SNET's Jan. 15, 1998 Response and further explained by them at the fact-finding conference, as early as April, 1997, Complainant approached Ed Dillman, told him she was not interested in working for SNET any longer, and asked him to fabricate a layoff so that she could collect unemployment benefits. He refused. About two weeks later, she offered her resignation.

Under these circumstances, there is no reasonable cause to believe that Complainant was constructively discharged.

**Proposed Findings of Fact as to Constructive Discharge:**

1. During the illness of Complainant's sister, Matt Cordner, Complainant's supervisor at the time, made arrangements for Complainant to take a special leave of absence that allowed her to work virtually whenever she liked; he also extended her leave time following the death of her sister.

Richard Gordon
January 12, 1999
Page 16

SNET's Jan. 15, 1998 Response (attested to by Matt Cordner); Cordner Testimony at Fact-Finding Conf.

2.  Before Matt Cordner became Complainant's supervisor, Complainant told Ed Dillman that she was no longer interested in the work she was doing and wanted to leave her position as Services Technician. As early as April, 1997, Complainant approached Ed Dillman, told him she did not want to work for SNET any longer, and asked him to lay her off with a pink slip so that she could collect unemployment benefits.  Mr. Dillman told her he would not lay her off, since he wanted her to continue to work there and it was fraudulent to state she was being laid off when she wasn't.  Dillman Aff. attached to SNET's Jan. 15, 1998 Response; Dillman Testimony at Fact-Finding Conf.  About two weeks later, Complainant tendered her resignation but kept working several weeks and finally left her employment voluntarily on May 30, 1997.

3.  Prior to this action, Complainant never complained to Ed Dillman that Mr. Cordner discriminated against her or mistreated her in any way, despite the fact that Mr. Dillman was her manager and had worked with Complainant for 5 ½ years.  Dillman Aff. attached to SNET's Jan. 15, 1998 Response; Dillman Testimony at Fact-Finding Conf.

4.  Complainant never received any formal written warning,  never received a final warning, and was never terminated by SNET.  Testimony of All Witnesses at Fact-Finding Conf.; Exhibit B.  Complainant voluntarily resigned her employment with SNET effective May 30, 1997.  Dillman Aff. attached to SNET's Jan. 15, 1998 Response; Dillman and Cordner Testimony at Fact-Finding Conf.

*      *      *      *

I hope the above information is helpful.  If you require any addition information to make your decision, please do not hesitate to contact me.

Very truly yours,

Lori B. Alexander

LBA:mjd
cc:    Carole Wilder, Esquire
       Ed Dillman
       Matt Cordner
       Michelle Esposito, Esquire (counsel for Complainant)

Richard Gordon
January 12, 1999
Page 17

## CERTIFICATION

A copy of the foregoing was sent via first-class mail, postage prepaid to counsel for Complainant, Michelle Esposito, Esquire, Law Offices of Karen Torre, 51 Elm Street, New Haven, Connecticut 06510 on this 13th day of January, 1999.

_Lori B. Alexander_
Lori B. Alexander